UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION; <br><br> NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE, <br><br><br><br> Plaintiffs, <br><br> v. <br><br><br> UNITED STATES DEPARTMENT OF EDUCATION, <br> 400 Maryland Avenue, SW, Washington, DC 20202; <br><br> LINDA M. MCMAHON, in her official capacity as Secretary of the Department of Education, <br> 400 Maryland Avenue, SW, Washington, DC 20202; and <br><br> CRAIG TRAINOR, in his official capacity as Acting Assistant Secretary for Civil Rights, Department of Education, <br> 400 Maryland Avenue, SW, Washington, DC 20202, <br><br><br> Defendants. | Case No.: _____ <br><br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs, by and through their attorneys, bring this Complaint against Defendants and in support state the following:

1

## INTRODUCTION

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (citation omitted). Our schools cannot fulfill their role as the nation's "nurseries of democracy," *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021), without teaching students about the world, including the historical and lived experiences of people of different races, genders, and abilities. Diversity, equity, and inclusion initiatives are critical to that effort by both expanding equal educational opportunity and providing students with an education that prepares them to succeed in a diverse democratic society.

2.      On February 14, 2025, the Department of Education ("ED") issued a Dear Colleague Letter threatening schools and colleges across the country with the loss of federal funding in a matter of days if they continued to pursue vaguely defined "DEI programs" that "teach students that certain racial groups bear unique moral burdens that others do not" and/or "stigmatize students who belong to racial groups." ("Letter") (attached as Ex. A). The Letter radically resets ED's longstanding positions on civil rights laws that guarantee equality and inclusion and impermissibly infringes on the authority of states and school districts over public education as well as the First Amendment rights of educators and students.

3.      Plaintiff National Education Association ("NEA"), Plaintiff National Education Association-New Hampshire ("NEA-NH"), and their member educators have long engaged in education in accordance with requirements of equity and inclusion as set out in civil rights laws and guidance from ED. They have incorporated issues of race, diversity, equity, and inclusion in the content and approach to their teaching, in their broader educational practices, and in training and support for educators, all in accordance with sound pedagogical practice. The Letter drastically disrupts Plaintiffs in their ability to provide education to students in accordance with professional requirements and best practices.

4.      The Letter reflects final agency action. It sets forth substantive obligations that it vows to "vigorously enforce," declares ED's intention to "take appropriate measures to assess

compliance with the applicable statutes and regulations based on the understanding embodied in th[e] letter," invites complaints, and announces that ED will begin enforcement as of February 28, 2025. Letter at 3.

5.      Yet throughout the Letter, ED wholly eschews the congressionally imposed procedures designed to ensure that agency actions are not arbitrary and capricious but reasoned and within their sound expertise. Sidestepping these requirements, the Letter announces sweeping conclusions about the existence of legal violations across states, local educational agencies, and educational institutions and issues new interpretations of law unsupported by statutory provisions, court decisions, or any articulated reasoning.

6.      The Letter fails to acknowledge—let alone explain—its marked change from ED's prior guidance and interpretations of Title VI, as well as other federal civil rights and education laws. And it fails to account for reliance interests created by decades of law, regulations, and longstanding agency guidance and interpretations. Moreover, it exceeds ED's authority and is contrary to law, including the body of law it purports to interpret.

7.      In addition to its many procedural failings, the Letter's substance is contrary to the constitutional rights of academic institutions and educators. In its parts and as a whole, the Letter mandates compliance while at the same time leaving schools and educators without clear notice of the law, opening them to arbitrary and discriminatory enforcement. And it further oversteps the federal government's role by reaching into curriculum, chilling the free speech and scholarship of academics and educators, and likewise impinging on the ability of students to hear perspectives the federal government finds objectionable.

8.      As the Supreme Court recently reaffirmed, "Congress . . . enacted the [Administrative Procedure Act ("APA")] 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). Agencies acting within their "specialized experience" can provide important guidance as to how the law will be applied, grounded in their thorough

consideration and sound reasoning. *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)). However, the courts, not agencies, provide the final interpretation of law, and agencies cannot exceed the scope and substance of the federal statutes by which they are bound. *Id.* at 392. Substantive changes to the interpretation of statutes that effectively upend decades of law, regulations, and longstanding agency guidance to impose new legal obligations on Plaintiffs and indeed the entire education sector must, at minimum, be made through the process of notice and comment rulemaking that enables reasoned decision making. 5 U.S.C. § 553. As that required process has not been followed, education institutions and educators are left scrambling with only vague direction as to what might or might not be considered discrimination under the Letter and contending with a sword of Damocles threatening their federal funding.

9.     The Letter's fundamental contradiction of Title VI in prohibiting equity and inclusion programs, its violations of due process in failing to set clear standards and in opening educators to arbitrary and discriminatory enforcement, as well as its chill to First Amendment protected speech and expression could not stand no matter the process followed.

## PARTIES

10.     Plaintiff National Education Association (NEA) is a 501(c)(5) nonprofit organization headquartered in Washington, D.C. NEA is the nation's oldest and largest professional association of educators and represents approximately three million members who work at every level of education—from pre-school to university graduate programs. NEA's members include individuals training to become educators, classroom teachers, education support professionals, higher education faculty and staff, and other current and former educators. NEA has affiliate organizations in every state and in more than 14,000 communities across the nation.

11.     NEA's mission is to advocate for education professionals and to ensure that public education prepares every student to succeed in a diverse and interdependent world.

12.     To further that mission, NEA and its members share core values, including that public education is the gateway to equal opportunity; is vital to building respect for the worth, dignity, and equality of every individual in our diverse society; and provides individuals with the skills to be involved, informed, and engaged in our representative democracy.

13.     As the nation has grown more diverse,[1] state and local curriculum, education programming, and educator preparation standards have been revised to require that educators both learn to, and do teach, in ways that are culturally competent and racially inclusive. Such curriculum and practices have been shown to be more effective methods of reaching and engaging students and preparing them to thrive in our multiracial democracy.

14.     Consistent with, and essential to, fulfilling NEA's mission, values, and objectives, NEA provides several core services to its affiliates and members. These services include:

(a) professional excellence grants that assist educators in expanding their skills and expertise, including in educating students of different races and backgrounds, including students with disabilities, students from rural communities, and students who are multi-lingual learners;

(b)  professional development training in such skills that NEA and its affiliates often offer with the support of school districts;

(c) micro-credentials (certifications in a particular topic) in such skills for which NEA members provide training and by which NEA members can advance in their careers;

(d) education reform efforts that often highlight the diverse assets of a school and its surrounding community;

(e) reading programs that celebrate a nation of diverse authors and readers; and

---

[1] New Hampshire, and Southern New Hampshire in particular, is rapidly growing more racially diverse, according to data from the 2020 Census. *See* Kenneth Johnson, *Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard* (Carsey Sch. Pub. Pol'y, Regional Issue Brief No. 66, 2021), https://perma.cc/VBQ9-5M2E.

(f)  trainings for members and staff on diversity, equity, inclusion, and racial and
social justice.

15.    NEA also provides legal representation to its members who are targeted for
teaching inclusively, provides Know Your Rights guidance and trainings to members on attacks
on inclusive education, and assists both its members and affiliates in responding to efforts to
censor curriculum and roll back progress in allowing schools and colleges to reach and engage
all of their students to learn about the world as it is.

16.    NEA members teach, provide training, and engage in a broad range of educational
programming subject to ED's enforcement authority and the requirements set forth in the Letter.
Many members' work could be construed to involve "diversity," "equity," or "inclusion,"
include topics related to race, or otherwise fall within the broad terms of the Letter.

17.    For example, NEA Member A teaches high school English in New Hampshire
and often teaches literature that touches on topics related to race and gender. He is concerned
that he could be accused of discrimination under the Letter's vague descriptions because of the
ways issues related to diversity, systemic racism, and moral burdens come up in his classroom,
subjecting him to potential risk of investigation, discipline, or adverse employment action.

18.    Member B teaches 8th Grade Social Studies in New Hampshire, including United
States history from the Civil War to modern day. Member B is concerned that classroom
discussions about matters of race and discrimination, important parts of teaching certain aspects
of American history, could be construed to violate the Letter's prohibitions related to "systemic
and structural racism" or "discriminatory policies and practices," Letter at 2, leaving her
vulnerable to allegations of discrimination under the Letter.

19.    Member C is a middle school counselor in New Hampshire. An important part of
her work is creating a school culture that fosters safe and positive identity development for
middle schoolers. Member C is concerned that she might be accused of violating the Letter's
vague prohibitions on toxic indoctrination and discrimination.

20.    Member D teaches Indigenous Studies in higher education, and their curriculum and readings reflect a range of experiences of indigenous people and explore the identities that those experiences create. Member D does not know whether they will be able to continue to teach this subject or whether it could be considered unlawful pursuant to the Letter. Despite their understanding that such instruction is vital and effective, Member D must grapple with the decision of whether to teach according to professional training and standards and risk enforcement consequences for themselves and their institution.

21.    Member E provides teacher training and incorporates into their teaching practice instructional methods that are designed to ensure that students of all abilities and all backgrounds are able to effectively access and engage with curriculum. Such methods, in fact, are part of the required training for teachers in this member's state, which mandates that individuals learn how to provide culturally responsive curriculum to diverse students. Member E understands that in response to the Letter, their institution is already undertaking efforts to comply.

22.    Similarly, Members F and G work in higher education and assist in developing training for faculty, staff, and administrators. That training has included diversity, equity, and inclusion and already has been dramatically affected by the Letter.

23.    Plaintiff National Education Association-New Hampshire (NEA-NH) is an affiliate of NEA located in Concord, New Hampshire and was founded in 1854—then as New Hampshire State Teachers Association. NEA-NH is comprised of more than 17,000 member educators in New Hampshire representing the majority of all public school employees in the state. Member A, Member B, and Member C are also members of NEA-NH.

24.    NEA-NH's members are public school educators in all stages of their careers, including classroom teachers and other certified professionals, education support personnel, instructors and staff at public higher education institutions, students preparing for a teaching career, and those retired from the profession.

25.    NEA-NH is one of the "founding ten" state education associations that formed the NEA in 1857.

26.    NEA-NH's mission is to strengthen and support public education and serve their members' professional, political, economic, and advocacy needs.

27.    Defendant U.S. Department of Education is a federal agency headquartered in Washington, DC, at 400 Maryland Avenue, SW, Washington, DC 20202.

28.    Defendant Linda M. McMahon is the Secretary for Education. She is sued in her official capacity.

29.    Defendant Craig Trainor is the Acting Assistant Secretary for Civil Rights at the Department of Education. He is sued in his official capacity.

## JURISDICTION AND VENUE

30.    This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1346 (civil actions against the United States), and 5 U.S.C. § 702 (final agency action).

31.    Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Plaintiff resides in this district and each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

32.    This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–02 and Rule 57 and 65 of the Federal Rules of Civil Procedure.

33.    This Court is authorized to vacate and set aside the Letter under 5 U.S.C. § 706(2).

34.    Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

**I.    The Letter imposes vague and viewpoint-discriminatory prohibitions on schools that upend and conflict with longstanding law, guidance, and professional practice.**

35.    The Acting Assistant Secretary of Education issued a Dear Colleague Letter on February 14, 2025. Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues (Feb. 14, 2025). The Letter purports to address "Title VI of the Civil Rights

Act of 1964, the Equal Protection Clause of the United States Constitution, and other relevant authorities." Letter at 1. It applies to "schools," encompassing "preschool, elementary, secondary, and postsecondary educational institutions that receive federal financial assistance from the Department." *Id.* at n.1.

36.     Although styled as a Dear Colleague Letter, the Letter does not operate as other Dear Colleague Letters. Guidance and interpretation issued within the scope of ED's proper authority identify and explain the law as written by Congress and interpreted in court decisions, assess relevant data and other factual information, and provide additional guidance regarding how ED will apply the law to factual circumstances in the course of its investigations and enforcement actions. *See, e.g.*, Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues (Aug. 14, 2023), https://perma.cc/69WH-NECT; U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug.14, 2023), https://perma.cc/V7Z6-XMCM; U.S. Dep't of Educ., Off. of the Undersec'y, Strategies for Increasing Diversity and Opportunity in Higher Education, https:// perma.cc/52W4-XJFR.

37.     ED's Letter instead opens with sweeping conclusions that schools are engaged in discrimination and then, abruptly and without acknowledging a change, announces new rules identifying categories of unlawful activity, invites complaints, and issues a deadline of a matter of days before ED will take "appropriate measures." Letter at 3. Contrary to civil rights and federal education laws, regulations, guidance, and other interpretations, and without even acknowledging the change, the Letter indicates ED's position that any equity or inclusion programming is unlawful.

38.     ED's Letter starts with conclusory and unsupported generalizations, asserting: that "pervasive and repugnant race-based preferences and other forms of racial discrimination have emanated throughout every facet of academia"; that "colleges, universities, and K-12 schools have routinely used race as a factor in admissions, financial aid, hiring, training, and other institutional programming"; that "many American schools and universities . . . encourage

segregation by race at graduation ceremonies and in dormitories and other facilities"; that schools have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism'" and have "advanced discriminatory policies and practices"; and that schools have used "'diversity, equity, and inclusion' ('DEI')," as a means of "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." Letter at 1–2.

39.     None of these assertions is supported by reference to ED investigations and findings, court cases, data sets, scholarly research, or the agency's own explained reasoning. The Letter provides no guidance that would help a school to understand how ED would apply existing legal precedent to reach these conclusions based on the facts of a particular case. Nor does ED provide any definitions of key terms of the practices it deems discriminatory, including "diversity," "equity," and "inclusion."

40.     ED's Letter follows these assertions by announcing entirely new rules. For the first time in ED's history, the Letter announces: that "[r]elying on non-racial information as a proxy for race . . . violates the law . . . whether the proxies are used . . . on an individual basis or a systematic one"; that it would be "unlawful for an educational institution [to undertake a change in policy] to increase racial diversity"; and that "DEI programs . . . deny students the ability to participate fully in the life of a school." Letter at 3. ED provides no specific sources for its pronouncement that these actions are, on their face, unlawful.

41.     To the extent ED supplies any reason for the positions in the Letter, it states that "[a]lthough *SFFA* [*Students for Fair Admissions v. Harvard*] addressed admissions decisions, the Supreme Court's holding applies more broadly." Letter at 2.

42.     While the Supreme Court in *SFFA* ruled that the benefits of diversity did not provide a compelling interest justifying the consideration of race in college admissions, 600 U.S. 181, 230 (2023), it did not conclude, in a particular case or as a general matter, that it violates the law to " [r]el[y] on non-racial information as a proxy for race . . . on an individual basis or a systematic one," to use race neutral efforts to increase diversity, or to implement DEI programs.

Letter at 3. ED acknowledges that the Supreme Court's holding was narrower than the proscriptions announced in its Letter, yet it treats the case as a sufficient basis for its conclusions without explanation.

43.    Further, to the extent the Supreme Court has spoken on these issues, it has distinguished them. In *SFFA*, for example, the Court writes that the interests furthered by diversity, including "promoting the robust exchange of ideas," "broadening and refining understanding," and "producing new knowledge stemming from diverse outlooks," are "commendable goals," 600 U.S. at 214 (citation omitted), and Justice Kavanaugh, in his concurrence, expressly states that "governments and universities still 'can, of course, act to undo the effects of past discrimination in many permissible ways.'" *Id.* at 317 (quoting *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 526 (1989) (Scalia, J., concurring)).

44.    The Letter states that a "[s]chool may not use students' personal essays, writing samples, participation in extracurriculars, or other cues as a means of determining or predicting a student's race and favoring or disfavoring such students." Letter at 2 (citing *SFFA*, 600 U.S. at 230 ("[U]niversities may not simply establish through application essays or other means the regime we hold unlawful today.")). Although the Letter here cites *SFFA*, it omits additional guidance that the Supreme Court itself supplied to schools in navigating this area in line with its holding.

45.    As stated by the Supreme Court: "nothing in [its] opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise . . . . A benefit to a student who overcame racial discrimination, for example, must be tied to *that student's* courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to *that student's* unique ability to contribute to the university." *SFFA*, 600 U.S. at 230–31.

46.    By omitting this additional guidance and failing to provide any reasoned explanation, it is unclear if ED intends to ignore the Supreme Court's guidance in its

enforcement actions and treat as impermissible "considering an applicant's discussion of how race has affected his or her life." *Id*. at 230. To the extent the Letter does so, ED clearly acts beyond its authority. At a minimum, ED omits available guidance that would help schools to administer their programs in a reasoned fashion, leaving them to question unnecessarily whether they can consider applicants' self-expressed experiences at all.

47.     Next, the Letter states that "[r]elying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systematic one." Letter at 3. It is unclear what exactly ED seeks to prohibit through these terms. ED accuses schools of using information "as a proxy for race" but it provides no guidance on how it would determine that information was used as a proxy for race. Further, it is unclear what ED has in mind when it references "grant[ing] preferences . . . on a systematic [basis]." *Id.*

48.     ED provides one example, stating that it would be "unlawful . . . to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity." *Id.* But this example only compounds the vagueness of the Letter's directive. It is not clear from ED's guidance how eliminating standardized testing would constitute reliance on a proxy for race, nor is it self-evident how this would amount to an impermissible racial preference. There is no reference to any law, case, or set of facts that could further illuminate ED's thinking. Nor does ED clarify how or why it would treat an intent "to increase racial diversity" as unlawful. *Id.* Schools and educators must guess, at their peril, what these provisions of the Letter actually forbid.

49.     Finally, the Letter states that "[o]ther programs discriminate in less direct, but equally insidious, ways." *Id.* The Letter discusses this form of discrimination as distinct from "programs [that] may appear neutral on their face, [but] a closer look reveals that they are, in fact, motivated by racial considerations." *Id.* at 2 & n.8 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). The Letter does not explain how it arrived at this separate standard.

50.     Further, these "ways" of discriminating are not clearly enumerated. In citing DEI programs as an example, however, ED invites the inference that the teaching of "DEI" ideas is one "less direct . . . way[ ]" of discriminating. *Id.* at 3. In particular, the Letter states without support that "DEI programs frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not." *Id.*

51.     ED does not explain what would be considered a "DEI program," how such programs "preference" certain racial groups, or how the mere discussion of certain ideas would violate the law. ED does conclude that "such programs" — whichever programs these are — "stigmatize students" and "deny [them] the ability to participate fully in the life of a school." *Id*. Again, these are broad characterizations of certain types of harm, but ED provides no actual guidance of how it would apply the law to actual or hypothetical facts to conclude that education programs violate Title VI.

52.     The Letter identifies specifically that "DEI programs . . . teach students that certain racial groups bear unique moral burdens that others do not." *Id*. It is doubtful that ED seeks to ban the verbatim use of this phrase in teaching, and such a prohibition would create separate problems. Because the Letter prohibits the teaching of an idea or concept, it inherently lacks the clear boundaries that ensure fair implementation. To enforce this prohibition in practice, ED must depend on subjective evaluations and assumptions.

53.     Here, the Letter is not only vague; it also encroaches on teaching and academic freedom. With respect to K-12 education provided by states and their subdivisions, Congress has expressly prohibited ED from involvement in curricular decisions. For example, the Elementary and Secondary Act of 1965, as amended by the Every Student Succeeds Act ("ESSA"), 20 U.S.C. §§ 6301–7981, is the primary federal statute governing K-12 education funding. The statute establishes formula and competitive grants to states, local education agencies, schools, non-profits, and institutes of higher education "to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." *Id.* § 6301. ESSA explicitly prohibits the Federal Government from interfering with states'

curriculums, instructional content, and related activities across all of its titles involving federal grants. *See id.* § 7907(b) ("Notwithstanding any other provision of Federal law, no funds provided to the Department [of Education] under this chapter may be used by the Department, whether through a grant, contract, or cooperative agreement, to endorse, approve, develop, require, or sanction any curriculum . . . designed to be used in an elementary school or secondary school."); *id.* § 7907(c)(1) ("Nothing in this section shall be construed to—(1) authorize an officer or employee of the Federal Government, whether through a grant, contract, or cooperative agreement to mandate, direct, review, or control a State, local educational agency, or school's instructional content, curriculum, and related activities.").

54.     Further, the General Education Provisions Act ("GEPA"), 20 U.S.C. §§ 1221–1234i, governs the administration of federal education programs. GEPA prohibits the federal government from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system." *Id.* § 1232a.

55.     These prohibitions on federal intrusion into curriculum, instruction, and materials are longstanding. The Department of Education Organization Act ("DEOA"), 20 U.S.C. §§ 3401–3510, which established ED and its various offices in 1979, similarly prohibits ED from exercising "direction, supervision, or control" over a range of activities, including "over the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." *Id.* § 3403(b).

56.     In higher education, the Letter's prohibitions on "indoctrination" and teaching certain disfavored ideas stand to interfere with core First Amendment rights of academics in the classroom and in broader research and writing.

57.     In declaring these practices and programs broadly unlawful, ED has not only encroached upon the courts' authority to say what the law is and exceeded the scope and substance of the statutes by which it is bound; it has also issued rules while ignoring its own prior guidance and interpretation and providing no explanation whatsoever for its dramatic reversal in position. The Letter makes no mention of ED's own prior publications on these topics, some of which remain posted on ED's website. *See, e.g.*, Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues (Aug. 14, 2023), https://perma.cc/69WH-NECT; U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug. 14, 2023) ("SFFA Q&A"), https://perma.cc/V7Z6-XMCM; U.S. Dep't of Educ., Off. of the Undersec'y, Strategies for Increasing Diversity and Opportunity in Higher Education (Sept. 28, 2023) ("Strategies for Increasing Diversity and Opportunities Report"), https://perma.cc/52W4-XJFR.

58.     Nor does the Letter even acknowledge the agency's change in position. *See FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency must "display awareness that it is changing position" (emphasis omitted)).

59.     To take but one example, in August 2023, ED issued a Q&A document regarding *SFFA* that advises that "institutions of higher education may continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity." SFFA Q&A at 3. The Letter contradicts this prior interpretation foundationally, and instead indicates that "diversity, equity, and inclusion" practices are discriminatory, Letter at 2, that such practices "deny students the ability to participate fully in the life of a school," and that "it would be unlawful … for an educational institution" to take an action "to increase racial diversity." *Id.* at 3.

60.     Similarly, ED's Strategies for Increasing Diversity and Opportunities Report is described as a "resource for educational institutions considering new policies or programs to advance or maintain student diversity after the Supreme Court's decision in *SFFA*" and presents "examples of actions that can help advance equitable opportunity in ways that do not consider an

individual student's race in and of itself in admissions." Strategies for Increasing Diversity and Opportunities Report at 6. The Report, still available on ED's website, describes programs and practices that ED has previously identified as related to promoting diversity. However, the Letter does not address the prior Report or these practices specifically, and its general conclusion that "DEI programs" are unlawful. Letter at 3, contradicts the Report. In so doing, the Letter induces confusion and broadly chills educators including Plaintiffs' members in their day-to-day work.

61.     The Letter also fails to explain the dramatic shift in the factual premises underlying those competing ED publications. Citing statistics and studies about college completion rates and sense of belonging within institutions, ED's prior guidance advises that, "[t]o support students' sense of belonging and the college completion, institutions should consider activities such as . . . ensuring campuses provide a welcoming and supportive environment for students from all backgrounds through affinity groups; diversity, equity, and inclusion (DEI) programming; and shared, accessible spaces." Strategies for Increasing Diversity and Opportunities Report at 38 & nn.158–60, 44–46 & nn.185–96. Without citation to any factual support, the Letter instead insists that DEI programs "stigmatize students who belong to particular racial groups based on crude racial stereotypes" and "deny students the ability to participate fully in the life of a school." Letter at 3.

62.     By neglecting to address its departure from settled law, regulations, and the agency's prior guidance and interpretations, the Letter fails to acknowledge the reliance interests of Plaintiffs, states, local education agencies, schools, higher education institutions, and other stakeholders in education. The Letter broadly addresses all facets of schools' programs, from pre-school to postsecondary education, including "admissions, financial aid, hiring, training, and other institutional programming," *id.* at 1 & n.1, and extending to "third-party contractors, clearinghouses, or aggregators," *id.* at 3. Schools have invested financially and otherwise in ensuring that their programming conforms with federal law while serving their own missions and the needs of their students. Now, in the middle of the academic year, the Letter advises schools and the entire education community indicated by the Letter that they must abruptly change

course to adhere to new rules that are broad and open-ended in their reach. The impact is felt immediately by schools and educators and radiates out through the entire education community.

63.     Educators, including Plaintiffs' members, have invested in practicing their profession in compliance with federal law, including in their own training and professional development, in designing their courses and curriculum, and otherwise. Indeed, laws, regulations, and other guidance and interpretation address the provision of equal educational opportunity and inclusion in many ways, including for students on the basis of race, ethnicity, national origin, sex, and for students with disabilities, English learners, and students experiencing homelessness. Compliance with these civil rights obligations is deeply woven into the practice of teaching and education. The Letter introduces new and uncertain requirements in educators' work without affording any opportunity to prepare and plan to incorporate these new requirements—a particularly thorny problem, as the Letter's requirements appear to conflict with many other professional requirements, best practices, and other federal laws. This places educators and the organizations that serve them in an immediate bind and interferes with the education that students receive.

64.     Organizations like Plaintiff NEA and NEA-NH are also impacted by the uncertainty and the change in policies that NEA has relied upon in serving its members. The Letter orders schools to "cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." *Id.* at 3. In so doing, the Letter squarely places in contention the training and support that NEA provides to members and in turn to schools.

65.     Moreover, ED elected to set forth substantive obligations and a vow to vigorously enforce them without proceeding through the notice and comment process set out by Congress in the APA. 5 U.S.C. § 553. Indeed, by inviting comments in a footnote to the Letter, *see* Letter at 1 n.3, ED appears to be aware that notice-and-comment rulemaking was required, but attempts to avoid its obligations. Section 553 demands that notice and comment be solicited before "not less than 30 days before [the rule's] effective date." 5 U.S.C. § 553(d).

II.   **The letter invites arbitrary and discriminatory enforcement and compels immediate compliance.**

66.     Although the Letter's requirements are not clear, ED's intent to enforce them is. The Letter states that ED "intended to take appropriate measures to assess compliance with the applicable statues and regulations based on the understanding embodied in this letter beginning no later than 14 days from today's date," i.e., by February 28, 2025. Letter at 3.

67.     Further, "[a]ll educational institutions are advised to: (1) ensure that their policies and actions comply with existing civil rights law; (2) cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends; and (3) cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." *Id*.

68.     These statements are phrased as directives to educational institutions. The Letter communicates to schools that enforcement action is coming swiftly, within 14 days. Yet here, as throughout the Letter, ED has already concluded that schools are in violation and schools are directed to "cease all efforts" to violate the law as ED conceives of it.

69.     The Letter also exhorts "[a]nyone" who "believes" that a covered entity has engaged in activities covered by the Letter to file a complaint with ED and provides a link to its online complaint form. *Id*. at 4.

70.     The open-ended and subjective nature of the Letter's prohibitions allow for arbitrary and discriminatory enforcement. Any teaching or other education programs that ED views as impermissible "DEI" can be targeted. The Letter's summary conclusion that schools are engaged in discrimination indicates that the administration will make determinations about a program's legality without meaningful investigation and process. Other actions by the administration substantiate this threat.

71.     For example, on February 10, 2025, the Department of Government Efficiency ("DOGE") reportedly announced termination of $881 million worth of ED grants and contracts,

including 29 training grants for diversity, equity, and inclusion, worth $101 million.[2] On

February 13, 2025, ED announced that it cancelled over $350 million in contracts and grants to

Regional Education Laboratories and Equity Assistance Centers because of purported

"ideologically driven spending not in the interests of students and taxpayers." Press Release,

U.S. Dep't of Educ., U.S. Department of Education Cancels Additional $350 Million in Woke

Spending (Feb. 13, 2025), https://perma.cc/VT57-LXEX. ED explained it targeted grants and

contracts that advised schools to "undertake 'equity audits' and equity conversations" and those

that "supported divisive training in DEI, Critical Race Theory, and gender identity for state and

local education agencies as well as school boards." *Id.* On February 17, 2025, ED slashed over

$600 million in diverse teaching grants to institutions and nonprofits for teacher preparation

programs. Press Release, U.S. Dep't of Educ., U.S. Department of Education Cuts Over $600

Million in Divisive Teacher Training Grants (Feb. 17, 2025), https://perma.cc/K2N4-UUN7.

According to the Department, such programs were targeted because they trained teachers and

education agencies on "divisive ideologies," including "inappropriate and unnecessary topics

such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism;

'anti-racism'; and instruction on white privilege and white supremacy." *Id.*

**III.    ED's actions implementing and purporting to explain the Letter continue to target
ideologies and practices with which it disagrees and sow more confusion.**

72.    ED has halted investigation of Title VI complaints on a categorical basis and

allowed only select investigations to continue or be opened.[3] Yet, following the issuance of the

Letter, ED announced a new "End DEI" complaint portal for "parents, students, teachers, and the

broader community to submit reports of discrimination based on race or sex in" schools. Press

Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb.

---

[2] Hannah Parry, *DOGE Announces it's Slashing $881M from Education Department Contracts*, Newsweek (Feb. 11, 2025), https://perma.cc/642U-T5GB.
[3] Jennifer Smith Richards & Jodi S. Cohen, *Education Department "Lifting the Pause" on Some Civil Rights Probes, but Not for Race or Gender Cases*, ProPublica (Feb. 20, 2025), https://perma.cc/BK9Z-77AV; Jennifer Smith Richards & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025), https://perma.cc/4GSZ-6NT7.

26, 2025) ("Portal Press Release"), https://perma.cc/8737-NAA9. The "End DEI" complaint form invites only specific complaints and does not provide an avenue for filing other civil rights complaints within ED's jurisdiction. U.S. Dep't of Educ., End DEI Portal, https://perma.cc/GYS3-J2GR. Instead, ED solicits complaints focused on the communication of ideas ED disfavors and tendentiously describes as "divisive ideologies and indoctrination." *Id.*

73.    The "End DEI" portal is described as focused on "divisive ideologies and indoctrination," U.S. Dep't of Educ., End DEI Portal, and asks complainants to identify specific schools or school districts and detail "concerning practices," and indicates that ED "will use submissions as a guide to identify potential areas for investigation," Portal Press Release.

74.    ED does not provide its own explanation of the portal's purpose, but cedes this space to a private individual, identified as a co-founder of Moms for Liberty, who makes unsupported claims about schools "pushing critical theory, rogue sex education and divisive ideologies" and encourages parents to use the portal "to share the receipts of the betrayal that has happened in our public schools" through "pushing critical theory, rogue sex education and divisive ideologies." Portal Press Release.

75.    ED's platforming of Moms for Liberty in its press release announcing the "End DEI" portal lays bare the Letter's potential breadth and chilling effect. On February 15, 2025, Moms for Liberty characterized the Letter informing the departments of education of all 50 states that "they have 14 days to eliminate all Diversity, Equity, and Inclusion (DEI) programs in their public schools," and that "NO MORE Tax Payer Dollars will be spent on DEI!"[4]

76.    Moms for Liberty also attended school board meetings and proclaimed that the Letter "means the Office of Equity Affairs needs to be dismantled along with any DEI programs," and threatened that "February 28 is the deadline to say goodbye to DEI. It will be in the best interest of this school district to comply. If compliance is not met, Moms for Liberty is prepared to escalate this issue, potentially leading to the loss of federal funding for the school

---

[4] Moms for Liberty, DEAR COLLEAGUE, Facebook (Feb. 15, 2025), https://www.facebook.com/story.php?story_fbid=935218675478809&id=100069720560290.

district."[5] Given the apparent close relationship of Moms for Liberty to ED, these threats weigh heavily. In the past, Moms for Liberty in New Hampshire has even offered money for people to "catch" a public school teacher violating similar bans on teaching.[6]

77.     On March 1, 2025, ED announced the release of a Frequently Asked Questions Document, "Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act," which is "intended to anticipate and answer questions that may be raised in response to [the Letter]." U.S. Dep't of Educ. Office for Civil Rights, Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Feb. 28, 2025) ("FAQ"), https://perma.cc/D63A-7MD9 (attached as Ex. B). ED states that this document is intended to "provide helpful information" about how the Supreme Court's *SFFA* decision "applies to racial classifications, racial preferences, and racial stereotypes," as well as "how OCR will interpret the ruling in its enforcement of Title VI of the Civil Rights Act of 1964 and its implementing regulations." FAQ at 1.

78.     Nothing in the FAQ changes the force and effect of the Letter. In fact, the FAQ confirms ED's position as final. ED states that this document is intended to "provide helpful information" about how the Supreme Court's *SFFA* decision "applies to racial classifications, racial preferences, and racial stereotypes," as well as "how OCR will interpret the ruling in its enforcement of Title VI of the Civil Rights Act of 1964 and its implementing regulations." FAQ at 1. Further, ED did not even announce its FAQ until after the Letter's deadline for compliance,[7] and the FAQs themselves state that they do not "bind the Department of Education in the exercise of its discretionary enforcement authority." FAQ at 1 n.3.

---

[5] Brianna Kraemer, *DEI tug-of-war in Wake County Schools stirs tensions among board, parents*, The Carolina Journal (Feb. 20, 2025), https://perma.cc/KQY2-D743.
[6] Sarah Gibson, *Offer of Cash Prize Against N.H. Teachers Draws Rebuke*, New Hampshire Public Radio (Nov. 18, 2021), https://perma.cc/BB4Y-6C6P; Moms for Liberty Hillsborough Co, NH, X (Nov. 12, 2021), https://x.com/Moms4LibertyNH/status/1459166253084467205?s=20.
[7] The FAQ is dated February 28, 2025. However, the press release announcing the document to the public was not made until March 1, 2025. Press Release, U.S. Dep't of Educ., U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing (Mar. 1, 2025), https://perma.cc/6JK6-TWRN.

79.     The FAQ only adds to educators' sense of uncertainty and chill. The FAQ purports to clarify ambiguity in the Letter. However, the FAQ is itself contradictory in how it attempts to do this, and provides further indication of the lack of objective, definite guidelines for the conduct and expression that the Letter forbids.

80.     For example, in FAQ 3, ED attempts to explain the *SFFA* decision. Yet the FAQ introduces additional misstatements of the law. In the FAQ, ED states that "[s]trict scrutiny has famously been described as 'strict in theory, fatal in fact.'" FAQ at 3. The Supreme Court has written to refute this contention.

81.     In *Adarand Constructors, Inc. v. Peña*, the Supreme Court wrote to "dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'" 515 U.S. 200, 237 (1995) (citation omitted). The Court explained further that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Id.*

82.     Further, the FAQ states that "the *SFFA* Court recognized only one interest as sufficiently compelling in the educational context." FAQ at 3. This ignores *SFFA*'s clear statement that it was not speaking beyond the case before it to reach other articulated compelling interests. 600 U.S. at 213 n.4 (declining to reach the question of whether U.S. military academies had distinct compelling interests that would justify the consideration of race in admissions).

83.     In FAQ 9, ED suggests that it is not directing schools to violate the First Amendment and acknowledges federal laws that prohibit ED from exercising control over school curricula. But this does nothing to upset the text of the Letter itself, which indicates that ED is concerned with "indoctrination" and "teaching." Letter at 2, 3. In fact ED reaffirms in the FAQ that it intends to evaluate classroom discussion for violations of Title VI, noting only that it would treat "themes in a class discussion" differently if they occur in a university or at an elementary school. FAQ at 6.

84.     Moreover, the characterization of programming that ED would review turns on subjective judgments and incorporates the same types of vague terms and viewpoint

discriminatory prohibitions that have been found constitutionally suspect in other laws. For example, what does it mean to conduct "trainings that are designed to emphasize and focus on racial stereotypes?" FAQ at 7. Courts analyzing similar prohibitions have found this vague language would prohibit a teacher from describing or identifying discriminatory beliefs in an orientation or course, or assigning a reading or work in which an author describes or identifies discriminatory beliefs, like how current stereotypes about race may affect the opportunities of historically marginalized groups. *See, e.g.*, *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024) (appeal filed); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1149 (W.D. Okla. 2024).

85.     These are just some examples of the ways in which the FAQ only serves to compound the problems with the Letter.

**IV.     The Letter causes substantial, irreparable harm to Plaintiffs.**

86.     The Letter causes substantial harm to educators, including Plaintiffs' members. The vague prohibitions in the Letter related to diversity, equity, inclusion, and race will chill teacher practices that are core to effective teacher pedagogy, state standards, and other teaching and learning requirements. Educators will be forced to guess what practices may run afoul of the Letter and will self-censor and dramatically change course, or continue core tenants of their profession at the risk of reports through the so-called "End-DEI" portal, and under the threat of investigation and discipline.

87.     Under the rules set out by ED's Letter, educators, including Plaintiffs' members, face significant uncertainty about what they can teach, how they can teach, how they can interact with their students, and about what educational programs they can operate and how. This uncertainty has an immediate impact on their ability to do their jobs in accordance with professional standards and to provide students with quality education.

88.     Consistent with sound pedagogical practices, most states across the country have requirements or standards for teaching and learning that provide that teachers should instruct on concepts and practices the Letter prohibits. Discussions regarding race are necessary to comply

with state and local standards and requirements across a variety of subjects, and particularly those governing history and social studies. For example, in New Hampshire, educators must teach about the evolution of "intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination," as well as "how to prevent the evolution of these practices." RSA 189:11, I-c(j). Moreover, many states and local school districts have requirements or standards that mandate teaching concepts and engaging in practices related to valuing and analyzing diverse perspectives, fostering critical thinking, and ensuring that education is inclusive and equitable. Principles related to diversity, equity, and inclusion and topics related to race are also included in many educator training and professional standards.

89.    Because of the Letter and against this backdrop, educators, including Plaintiffs' members, are uncertain whether they can, for example:

(a) assign or provide access to a variety of readings, including where authors express a particular view, theory, or experience concerning discrimination, racism, or other prejudices, where the reading could be considered to address topics of "diversity," "equity," or "inclusion";

(b) discuss in their instruction topics that address historical and contemporary events such as the existence and legacy of slavery, the existence of Jim Crow laws, or Supreme Court arguments regarding affirmative action;

(c) assign materials or instruct on subjects reflecting a diversity of views and beliefs such as differing political systems and theories, or addressing different cultures and languages;

(d) answer questions from students about current events that may relate to race, "diversity," "equity," or "inclusion" or respond when students share their own experiences that may relate to these subjects; or

(e) continue to teach according to professional training and standards.

90.    For example, Member A is a high school English teacher who teaches books like *Heart of Darkness* by Joseph Conrad, *To Kill a Mockingbird* by Harper Lee, and *Beloved* by

24

Toni Morrison. To make these books relevant and interesting to students and to promote critical thinking, Member A encourages students to connect these works' themes of race, colonialism, discrimination, and slavery to contemporary society. Under the Letter's vague terms, Member A is concerned that these teaching practices could result in him being accused of "indoctrinating" students in a way that the Letter suggests constitutes illegal discrimination, which could result in investigation, discipline, or adverse employment outcomes.

91.    Member B is an 8th Grade Social Studies teacher who covers United States history from the Civil War to the modern era, including state-required instruction on genocide and antisemitism and lessons on Juneteenth, the Reconstruction era, the Civil Rights Act of 1866, the Fourteenth and Fifteenth Amendments, the Black Codes, the KKK, the Jim Crow Era, the Compromise of 1877, the Tulsa race massacres, and other topics that necessarily touch on concepts of race, racism, and slavery. She does not know how she can teach or facilitate student research and discussion of these topics without creating a risk of being accused of violating the Letter's vague conception of illegal discrimination. She feels that she is being held hostage to students and parents' vague conceptions of discrimination and DEI under the Letter, which creates a risk to her career through its reporting mechanisms.

92.    In addition to the content of instruction and programming, the Letter's vague prohibitions on "diversity," "equity," and "inclusion," implicate the ways in which educators teach across subject matters. These principles are central to sound pedagogy because they encourage students to question, analyze, and think critically about the world around them. The vagueness in the Letter's prohibitions thus means that educators must not only consider whether a particular book or discussion is permissible, but every aspect of their professional practice.

93.    For example, many educators, including Plaintiffs' members:

(a) employ culturally responsive practices as part of strong pedagogy, and as encouraged or required by state and local educational policies. Culturally responsive pedagogy is teaching "to and through [students'] personal and cultural

strengths, their intellectual capabilities, and their prior accomplishments."[8] As part of culturally responsive teaching, educators should "help[ ] students learn more about their own and others' cultures, as part of their personal development and preparation for community membership, civic engagement, and social transformation."[9]

(b) provide instruction for multilingual learners through high-quality instructional materials that are culturally relevant to students, consistent with best practices. High-quality instructional materials for multilingual learners provide students with the opportunities to study their own culture—and other cultures—to learn while developing understanding of sociopolitical contexts, inequities, and global challenges; to make personal connections to the material based on their own cultural experience, for example, by free-writing on a given topic of discussion; and incorporate student voice and partnership, including students' cultural, linguistic and other intersectional identities into classroom learning.[10]

94. Educators, including Plaintiffs' members, frequently employ practices that recognize and value the diverse experiences and learning styles that their students bring to their classrooms and school community. For example, effective pedagogy includes differentiated instruction where teachers can present different material or ways of accessing the material based on, among other things, student interest and background knowledge. In the context of teaching students with disabilities, educators must consider both the strengths of a learner, and what individual support, if any, they need to participate in the most inclusive learning environment possible. Because of the broad scope and vagueness of the Letter, Plaintiffs' members cannot know which of their education practices may be construed as unlawful by ED. Instead, Plaintiffs'

---

[8] Geneva Gay, Culturally Responsive Teaching 26, 213 (Teachers College Press, 2nd ed. 2000).
[9] Geneva Gay, *The what, why, and how of culturally responsive teaching: international mandates, challenges, and opportunities*, 7 Multicultural Education Review, 123–39 (2015), https://doi.org/10.1080/2005615X.2015.1072079.
[10] Education First, *Toward Inclusivity: Advancing Social and Emotional Learning for Multilingual Learners* (2024), https://perma.cc/M5CQ-W5U4.

members must go about their professional duties under the pervasive threat of ED enforcement actions.

95.     As an example, Member B allows her 8th Grade students to choose "passion projects" to research a topic of interest, create a project outcome, and present their findings to the classmates. These assignments are highly engaging to students. Students often choose projects related to topics that could be implicated by the Letter's prohibitions, including race, gender, and LGBTQ history. Member B fears that allowing such passion projects to go forward could subject her to complaints of toxic indoctrination.

96.     These practices and concepts extend beyond the classroom. Schools are places where students learn about themselves and others. Accordingly, educators and other school personnel, like school counselors, engage in critical discussions with students regarding racial and other forms of identity. These practices necessarily happen both inside and outside of the classroom, and both formally and informally in interactions among students and educators or other school personnel.

97.     Because of the Letter, educators, including Plaintiffs' members, do not know, for example, whether they can:

(a)  support student groups that focus on interests that could be considered to relate to "diversity," "equity," or "inclusion";

(b)  offer special events and programs that celebrate different cultures, languages, or religions or that seek to bring students from differing backgrounds together;

(c)  provide education on social and emotional learning to foster a culture of kindness and respect within schools as students develop their identities; or

(d)  take steps to review and address barriers to educational access due to language access, economic need, or housing insecurity.

98.     For example, Member C is a middle school counselor. An important part of her work is creating a school culture that fosters safe and positive identity development for middle schoolers. To accomplish this, she teaches an advisory curriculum on social and emotional

learning that helps students develop healthy social skills, interpersonal skills, and emotional skills, which sometimes requires discussion of topics like hurtful language or stereotypes, including around race and racial slurs. She also teaches lessons on identity, gender, inclusivity, developing empathy, understanding bullying, and diversity, with the goal of teaching self-awareness, challenging stereotypes, imagining the feelings of others, the impact of bullying, and an appreciation for individual differences. Member C is concerned that because these lessons touch on topics implicated by the Letter, she might be accused of violating the Letter's vague prohibitions on toxic indoctrination and discrimination.

99.     Institutions are already adjusting their behavior in ways that have and will continue to immediately and irreparably harm the teaching of Plaintiffs' members. For example, Member E understands that in response to the Letter their institution is reviewing all courses that refer in any way to diversity, equity, or inclusion and may modify or eliminate such courses. Member E is aware that a colleague was instructed to eliminate the words "diversity, equity, and inclusion" from their course to avoid unwanted scrutiny. Member F has reported that training on diversity, equity, and inclusion has been "gutted" at her higher education institution in response to the Letter. Member F has been advised not to use "economically disadvantaged" or anything to do with "diversity, equity, and inclusion" in training for faculty and staff.

100.     Educators, including Plaintiffs' members, also face immediate and irreparable harm because they have no choice but to self-censor practices critical to teaching, learning, and supporting their students, or to risk the arbitrary and discriminatory enforcement the Letter invites. ED has made plain its intent to enforce the prohibitions in the Letter and is actively inviting parents and even third parties with no connection to a school community to file complaints on the so-called "End-DEI" portal. An ED investigation or enforcement action premised on so-called "receipts of betrayal," or the vague prohibitions in the Letter aimed at eradicating speech and practices with which Defendants disagree, would impose onerous costs and harms on Plaintiffs' members and other educators.

101.    Indeed, educators, including Plaintiffs' members, subject to similar discriminatory censorship laws that ban topics related to race, gender, and other ideas at the state level have experienced fear, chill, and other harm because of the parent and student complaints and inquiries by relevant authorities that these vague prohibitions invite.[11]

102.    For example, in New Hampshire, a high school World History teacher worried that discussions around topics like affirmative action, the Voting Rights Act, and the Equal Rights Amendment would spur a complaint about his teaching under the state censorship law, and that he would be subject to investigation and charges. Because he felt like he could not teach honestly under the state censorship law, he made a decision to leave his school at the end of the year.[12] A former United States History teacher in New Hampshire who encouraged students to debate and learn about topics like affirmative action, reparations, and the criminal justice system was targeted by a political group in New Hampshire who published his name for signing an online petition pledging to teach "honest history." Because of this, he was subject to online harassment, threats, and obscenities, and ultimately left the teaching profession.[13]

103.    In addition, the loss of federal funding would be a blow to almost any state, local education agency, or educational institution, including the institutions that employ Plaintiffs. According to the Office of Management and Budget, the Federal Government spent roughly $1.1 trillion (approximately 4 percent of the GDP) on aid to State, local, tribal, and territorial governments in 2023.[14] Of the total proposed federal grant spending for fiscal year 2025, over $84 billion is allocated to education, training, and social services.[15] Of the five largest discretionary programs in 2025, Education for the Disadvantaged (Title I) is estimated to be the third largest with $20 billion in spending, and Special Education is estimated to be the fifth largest with $14 billion.[16] Of the five largest mandatory spending programs in 2025, Child

---

[11] Mica Pollock et al., *The Limitation Effect: Experiences of State Policy-Driven Education Restriction in Florida's Public Schools* (2024), https://perma.cc/F9B6-T3WM.
[12] ECF No. 85-111, at 156, *Loc. 8027 v. Edelblut*, No. 21 Civ. 1077 (PB) (D.N.H. Aug. 14, 2023).
[13] *Id.*
[14] Off. of Mgmt. and Budget, *Analytical Perspectives Budget of the U.S. Government: Fiscal Year 2025* 75 (2024).
[15] *Id.* at 75–76.
[16] *Id.*

Nutrition programs (including the School Breakfast Program and the National School Lunch Program) are the second largest with $32 billion in spending.[17] States, local education agencies, and schools rely on this federal education funding for the health and welfare of their students, including for educating students with disabilities, serving students from low-income families, and providing for school counselors, nurses, and mental health professionals.

104.    To avoid cuts to this funding, many educational institutions will take steps to suppress any expression or curtail any practices that could be construed to violate the Letter and will move preemptively to enforce the Letter against educators, including Plaintiffs' members. Because the Letter's terms are wholly vague, enforcement of its prohibitions can only occur in an arbitrary and discriminatory manner and without notice and ability to steer clear of a violation.

105.    Educators, including Plaintiffs' members, face consequences of enforcement. Most states provide for processes in which teachers are subject to discipline, including suspension and termination of employment or of their teaching license or certification. As just a few examples:

> (a)  In New Hampshire, a licensed educator may face discipline, reprimand, suspension, nonrenewal, or revocation of their teaching credentials for violating the Code of Conduct. N.H. Code Admin. R. ED. 511.02(a)(2). The Code of Conduct prohibits a wide range of behaviors including discrimination. *Id.* at 510.01–03. Complaints against educators can be initiated by *anyone* including parents, students, superintendents and principals, and law enforcement. Investigations, either formal or informal, must be initiated any time possible misconduct comes to the attention to the New Hampshire Department of Education, including through means such as news articles or social media postings. *Id.* at 511.01(a). Furthermore, the Code of Conduct requires educators to

---

[17] *Id.* at 75.

report suspected violations of the Code, and failure to do so is itself a violation of the Code. *Id.* at 510.05(a) & (f).

(b) Educators in New Hampshire may also face consequences through the New Hampshire Human Rights Commission that takes complaints under the Law Against Discrimination, which prohibits discrimination including on the basis of sex, gender identity, race, creed, color, marital status, familial status, physical or mental disability, or national origin. RSA ch. 354-A. The HRC has general jurisdiction to "eliminate and prevent" discrimination in employment, places of public accommodation, and K-12 public schools.[18] *Id.*

(c) In Tennessee, the State Board of Education can "revoke, suspend, formally reprimand, or refuse to issue or renew an educators license" for, among other things, "negligence in the commission of duties as an educator" and "other good cause" defined as "conduct that calls into question the fitness of an educator to hold a license . . .". Tenn. State Bd. of Educ. R. 0520-02-03.09. Such conduct includes violations of the Tennessee Teacher Code of Ethics, which requires educators to "[a]bide by all applicable federal and state laws." T.C.A. § 49-5-1003(b).

(d) In Oklahoma, a teaching certificate can be revoked for "[a] willful violation of a rule or regulation of . . . the United States Department of Education" or "[a] willful violation of any federal [ ] law." Okla. Admin. Code § 2101:1-5-6(b).

(e) Texas teaching standards require that "educator[s] shall comply with . . . federal laws." 19 Tex. Admin. Code § 247.2, and the State Board for Educator Certification may discipline an educator if they have "conducted school or education activities in violation of law." 19 Tex. Admin. Code § 249.15.

---

[18] *See also* New Hampshire Commission for Human Rights,
https://www.humanrights.nh.gov/#:~:text=Welcome%20to%20the%20New%20Hampshire,status%2C%20disability
%20or%20national%20origin.

(f) In Idaho, a teaching license can be revoked for violations of the professional standard of ethics, Idaho Code § 33-1208, which states that "an educator abides by all federal . . . laws." Idaho Admin. Code R. 08.02.02.076.

106. Educators, including Plaintiffs' members, have a clear reason to fear that the Letter will be enforced to reach their own professional practices through state mechanisms. For example, the New Hampshire Department of Education issued a technical advisory on February 4, 2025, alerting schools that the "U.S. Department of Education takes action to eliminate D.E.I." and requiring school districts to carefully review various executive orders, including executive orders related to ending government and private sector practices related to diversity, equity, and inclusion, and to gender ideology (the "NH February Advisory") and referencing a similar "Dear Colleague" letter."[19]

107. The Letter also harms NEA as an organization. NEA must divert resources and expand and modify its core activities of representation, training, and grantmaking to address the harm its members experience under the Letter. In addition, the Letter diminishes the value of NEA's trainings and other supports to educators, including many centered on strengthening educator practices related to diversity, equity, and inclusion, as sound pedagogy requires. Because the Letter broadly prohibits programs that could be construed to involve issues of race, diversity, equity, or inclusion, NEA's offerings focused on, or including such issues, will be less sought after than they previously were, resulting in those offerings having less impact on educational practice and less value to NEA members, both of which harm NEA's organizational interests. NEA will also need to review its training and professional development offerings to attempt to ascertain what, if any, offerings should be modified in light of the Letter.

108. NEA will need to expand the support it provides to members targeted for inclusive education practices that arguably run afoul of the vague contours of the Letter, particularly as enforced through a public tipline fueled by appeals to avowed opponents of

---

[19] N.H. Dep't of Educ., Technical Advisory (Feb. 4, 2025), https://perma.cc/6K8T-QAY2.

inclusive education approaches. The primary vehicle by which NEA supports the legal needs of its members is through its Unified Legal Services Program, under which NEA funds the legal representation of NEA members and affiliates in covered matters, including approved employment related matters and matters that NEA and the relevant state affiliate agree are significant for NEA members. Such matters include advice and counsel to educators facing restrictions on how and what they teach, members facing discipline or termination, work to protect the rights of educators to engage in protected advocacy to advance educational opportunities and equity, and work representing members and affiliates in other education and employment-related matters. That work has increased as a result of state censorship initiatives and will necessarily expand further due to the national application and mass appeals to enforce the Letter to ideological opponents of inclusive education.

109.     NEA also devotes substantial resources and staff to improving educator professional excellence, including work to support educators teaching professional skills to other educators such as those related to racial and cultural competence, and other topics implicated in the Letter. This work comprises many different types of professional training, including improving the skills of educators in engaging, teaching, and supporting students of different races, national origins, sexual orientations and/or gender identities. Examples of these trainings include 15-hour blended learning courses on "Culture, Ability, Resilience & Effort (CARE)," "Bullying Prevention," "Diversity, Equity, and Cultural Competence," "Disability, Rights, and Inclusion," "LGBTQ+ Blended Learning Series," "Trauma-Informed Pedagogy," "Mental Health Awareness" and "Social Emotional Learning." NEA also offers courses that enable educators to earn micro-credentials in subjects including "Teacher Leadership: Diversity and Equity and Cultural Competence Pathway," "Bully Free Schools," "Diversity, Equity, and Culture Competence," "Native Education," "Restorative Practices," "Supporting LGBTQ+ Students," and "Trauma-Informed Pedagogy."

110.     Thousands of NEA members take these trainings and earn micro-credentials, which, in many instances, are accepted by employers as required professional development work and, in some instances, qualify members for additional compensation.

111.     Since the issuance of the Letter, NEA's members have voiced concerns that school districts or state certification agencies will no longer accept these courses because they focus on cultural competence and inclusive education approaches. NEA will be harmed as a result, as vague concerns about what the Letter permits prevent members and school districts from seeking out and utilizing NEA's offerings.

112.     NEA's professional excellence work includes annual grants to fund a variety of educational improvement efforts. This past year, NEA awarded almost $4 million in grants for professional excellence work, including work to expand and elevate the skills of educators in engaging, teaching, and supporting students of all races, national origins, sexual orientations, and gender identities. Examples of topics funded include: grants that improved the professional practice of educators by supporting induction and mentoring resources for new educators as they enter the profession, teacher certification test preparation supports for new educators, and after-school mentoring and meal programs for rural students. The work to implement NEA's professional excellence grants is often done in coordination with, and with the support of, school districts, colleges, and universities, who view the professional development work as valuable.

113.     NEA also provides a "Read Across America Grant" for state affiliates to enhance state affiliate coordinated Read Across America events and activities grounded in celebrating key ingredients in building a nation of diverse readers—books, reading, and the freedom to learn. This small grant program encourages proposals that use funds as a way to get books from diverse perspectives into the hands of students, and proposals that further that objective are strongly encouraged. Due to the Letter, NEA will need to respond to concerns that Read Across America selected books are inappropriate or at odds with the dictates of the Letter and its vague condemnation of celebrations of diversity.

114.    The Letter will substantially frustrate the purpose, execution of, and member and school interest in these grants. For example, it is unclear how the grant programs will continue to work in light of the Letter's prohibition of state and school district practices related to diversity, equity, and inclusion, which are at the core of NEA's grant work.

115.    NEA-NH is also harmed as an organization. The Letter has forced NEA-NH to divert its organizational resources to identify and counteract the Letter's impermissibly vague restrictions, and it has frustrated NEA-NH's mission of advocating for public school employees and for the kind of robust public education that will prepare the children of New Hampshire as citizens and members of society.

116.    NEA-NH advises members regarding job security, adverse employment actions, and what would rise to the level of termination of employment or discipline, including with respect to classroom instruction and conduct. NEA-NH also advises members regarding issues related to its members' ability to teach, including under collective bargaining agreements with local school districts, and the parameters of the New Hampshire's Educator Code of Conduct. NEA-NH is unable to properly advise their members on these issues because of the Letter's impermissibly vague terms and prohibitions.

117.    NEA-NH also provides its members with the benefit of extensive professional development programming, which will be affected by the Letter's vague terms and prohibitions. For example, the Letter's vague terms and prohibitions and federal and state efforts to implement it will make it impossible for NEA-NH to provide meaningful professional development about what conduct may or may not result in threats of investigation or adverse enforcement under the Letter.

118.    NEA-NH also represents members in matters before the New Hampshire State Board of Education—both in licensure actions contesting alleged violations of the New Hampshire Educator Code of Conduct, and in actions representing educators appealing the non-renewal of their teaching contracts. Based on NEA-NH's experience with the enforcement of state censorship efforts by the New Hampshire Department of Education, NEA-NH will likely

face questions from educators about how the enforcement of the Letter may impact their credentials.

## CLAIMS FOR RELIEF

### First Cause of Action
### Fifth Amendment – Due Process, Void for Vagueness

119.     Plaintiffs incorporate the above paragraphs as if fully set forth herein.

120.     The Fifth Amendment prohibits vagueness as "an essential of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotations and citation omitted). The prohibition on vagueness guarantees that ordinary people have fair notice of the conduct proscribed, and guards against arbitrary and discriminatory enforcement. *Id.*

121.     A regulation is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule). And where First Amendment rights are at stake, "[t]he general test of vagueness applies with particular force." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976). A regulation is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

122.     The Letter is impermissibly vague and violates the Fifth Amendment due process rights of Plaintiffs. All of its prohibitions are unclear and undefined, broad in scope, and turn on subjective judgement. To take an example, although the Letter asserts that "DEI programs" unlawfully "discriminate," it fails to define what constitutes a "DEI program," explain how such programs "preference" certain racial groups, or provide criteria for determining the

circumstances under which educational programs that in any way address race might violate federal antidiscrimination law. As illustrated by the difficulties facing NEA, NEA-NH, and their Members A, B, C, D, E, and F described above, the letter fails to provide adequate notice about what speech and programming regarding race, diversity, equity, or inclusion is prohibited under federal law. The ambiguity permeating the Letter's discussion of DEI programs also invites arbitrary and selective enforcement against educational programs that advocate views on race inconsistent with those espoused by ED.

123.    Plaintiffs are subject to compliance with federal law in their teaching and professional practices. They fear that their educational practices could be construed as impermissibly addressing issues of race, diversity, equity, or inclusion under the Letter. Because the letter is vague, they cannot effectively alter their practices to conform with the law and are left open to arbitrary and discriminatory enforcement.

124.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Second Cause of Action**
**First Amendment – Free Speech and Free Association**

125.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

126.    Plaintiffs' members engage in constitutionally protected expression on issues pertaining to race, diversity, equity, and inclusion, including in their curricular and extracurricular interactions with students. Plaintiffs' members reasonably fear that their speech is subject to the Letter's prohibition on "DEI programs" in federally funded educational institutions.

127.    While elementary and secondary school teachers' First Amendment rights are limited, after school hours and outside their official duties, their speech to students, even on school grounds, can be protected. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528–30 (2022). Government efforts to penalize or suppress private speech because of its content or

viewpoint, including by threatening to withhold federal funding from institutions that host disfavored speech or associate with disfavored speakers, are presumptively unconstitutional. *See Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963) (holding that a government entity's "threat of invoking legal sanctions and other means of coercion" against a third party "to achieve the suppression" of disfavored speech violates the First Amendment); *accord NRA v. Vullo*, 602 U.S. 175, 190–91 (2024).

128.    In the university context, government-sponsored censorship of disfavored ideas also interferes with fundamental principles of academic freedom. *See, e.g.*, *Keyishian*, 385 U.S. at 603; *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *cf. Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 237 (2000) (Stevens, J., concurring) ("Our understanding of academic freedom has included not merely liberty from restraints on thought, expression, and association in the academy, but also the idea that universities and schools should have the freedom to make decisions about how and what to teach.").

129.    The Letter unconstitutionally penalizes the protected speech of Plaintiffs' members by threatening to withhold federal funding from any educational institution that provides a "DEI program." The threats contained in the Letter are reinforced by ED's "End DEI" portal, which solicits members of the public to provide "receipts of betrayal" identifying educational institutions that promote "divisive ideologies and indoctrination." Portal Press Release.

130.    Because Plaintiffs' members are subject to compliance with federal law in their teaching and professional practices, the Letter also exposes them to professional and legal penalties by declaring that their protected expression violates federal law.

131.    The loss of federal funding would be devastating to almost any educational institution, including the institutions that employ Plaintiffs' members. An ED investigation premised on the vague prohibitions in the Letter, in conjunction with the so-called "receipts of betrayal," would impose onerous legal, administrative, and reputational costs on the targeted institution.

132.    To avoid these costs, it is foreseeable that educational institutions will take steps to suppress any expression that could be construed as a "DEI program." Because the Letter does not offer any guidance as to what constitutes a DEI program, any curricular or even extracurricular speech at an educational institution that conceivably runs afoul of ED's positions on race, diversity, equity, or inclusion is at risk of being censored or penalized.

133.    Plaintiffs' members reasonably fear that their educational institutions will investigate, discipline, or take other adverse action against them if they continue to discuss with students issues pertaining to race, diversity, equity, or inclusion. Plaintiffs' members also fear adverse action if they continue to assign readings, invite guest speakers, or engage in discussion and debate with students on anything that might be construed to fall within these prohibited categories.

134.    The Letter unconstitutionally penalizes protected speech on the basis of its content and viewpoint.

135.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

### Third Cause of Action
### Administrative Procedure Act, 5 U.S.C. § 706(2)(B) – Contrary to Constitutional Right

136.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

137.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

138.    The Letter constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The "End DEI" portal and FAQ likewise reflect and incorporate this final agency action.

139.    The Letter violates the Fifth Amendment right to due process and the First Amendment right to freedom of speech and association, as set forth above. Because the Letter is contrary to constitutional rights, it violates the APA. 5 U.S.C. § 706(2)(B).

140.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Fourth Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(C) – In Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right**

141.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

142.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(C).

143.    The Letter constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Spear*, 520 U.S. at 178. The "End DEI" portal and FAQ likewise reflect and incorporate this final agency action.

144.    The Letter is in excess of ED's statutory authority and limitations, and short of statutory right. Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013).

145.    The Letter exceeds ED's authority under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq. including because the Letter attempts to avoid the statutory requirements necessary to "effectuate the provisions" of Title VI by failing to acknowledge the Letter's requirements constitute a legislative rule. The rule announced through the Letter is not "consistent with achievement of the objectives of the statute," including objectives related to equity and inclusion in education. 42 U.S.C. § 2000d-1. Moreover, the Letter announces that

schools must immediately comply with its prohibitions, even though any such rule is not "effective unless and until approved by the President." *Id.*

146.    The Letter further exceeds ED's authority under the DEOA, which prohibits ED from exercising "direction, supervision, or control" over a range of activities, including "over the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b). Through the Letter, ED exceeds its authority by intruding on curricular, instructional, and other matters related to this prohibition.

147.    The Letter is therefore "in excess of statutory authority, jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

148.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

## Fifth Cause of Action
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Not in Accordance with Law

149.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

150.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

151.    The Letter constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Spear*, 520 U.S. at 178. The "End DEI" portal and FAQ likewise reflect and incorporate this final agency action.

152.    The Letter conflicts with Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq., its implementing regulations, and longstanding guidance, which are meant to further equitable and inclusive education for all students. Title VI, its implementing regulations

and related guidance, along with other civil rights statutes ED enforces, have equity and
inclusion objectives. By prohibiting any DEI or "equity" and "inclusion" programming, the
Letter fundamentally conflicts with this body of law and guidance and prohibits programming
that furthers the purpose of Title VI and other civil rights statutes. Moreover, the Letter broadly
concludes that equity and inclusion related programming is "unlawful" and "den[ies] students the
ability to participate" in education. Letter at 3. However, when a school has engaged in
discrimination, Title VI may require a school to engage in programing and activities that could
be characterized as "diversity," "equity," or "inclusion" programming in order to remedy the
violation.

153.    The Letter violates the DEOA, which prohibits ED from exercising "direction,
supervision, or control" over a range of activities, including "over the curriculum, program of
instruction, administration, or personnel of any education institution, school, or school system,
over any accrediting agency or association, or over the selection or content of library resources,
textbooks, or other instructional materials by any educational institution or school system." 20
U.S.C. § 3403(b). Through the Letter's terms and prohibitions, ED is exercising direction,
supervision, and control over curriculum, programs of instruction, instructional materials, and
other activities reserved to state and local government.

154.    The Letter is not in accordance with the GEPA, which prohibits the federal
government from "exercis[ing] any direction, supervision, or control over the curriculum,
program of instruction, administration, or personnel of any educational institution, school, or
school system, or over the selection of library resources, textbooks, or other printed or published
instructional materials by any educational institution or school system." 20 U.S.C. § 1232a.
Through the Letter's terms and prohibitions, ED is exercising direction, supervision, and control
over curriculum, programs of instruction, instructional materials, and other activities reserved to
state and local government.

155.    The Letter is therefore "not in accordance with law," within the meaning of 5
U.S.C. § 706(2)(A).

156.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

## Sixth Cause of Action
### Administrative Procedure Act, 5 U.S.C. § 706(2)(D) – Failure to Observe Procedure Required by Law

157.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

158.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "without observance of procedure required by law. . . ." 5 U.S.C. § 706(2)(D).

159.    The Letter constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Spear*, 520 U.S. at 178. The "End DEI" portal and FAQ likewise reflect and incorporate this final agency action.

160.    The Letter is a legislative rule that "effects 'a substantive regulatory change' to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (quoting *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34–40 (D.C. Cir. 2005)). The Letter imposes new legal obligations on Plaintiffs and appears on its face to be binding. "It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

161.    Because the Letter is a legislative rule, ED was required to "publish notice of [the] proposed rule in the Federal Register and to solicit and consider public comments upon its proposal." *Elec. Priv. Info. Car.*, 653 F.3d at 5; *see* 5 U.S.C § 553 (requiring agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments. . . .").

162.    The opportunity for public comment under 5 U.S.C. § 553(c) must be meaningful, which means the agency must allow comment on the relevant issues. An agency may only issue

a rule after "consideration of the relevant matter presented" in public comments. 5
U.S.C. § 553(c).

163.    ED did not provide Plaintiffs, states, local education agencies, schools, or other
stakeholders with notice of or an opportunity to comment on the Letter. As a result, the Letter
adopts legislative rules without observance of procedure required by law.

164.    The Letter is therefore agency action that is "without observance of procedure
required by law . . . ." 5 U.S.C. § 706(2)(D).

165.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will
continue to suffer irreparable harm.


**Seventh Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Arbitrary, Capricious, and Abuse of**
**Discretion**

166.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

167.    The APA provides that courts "shall . . . hold unlawful and set aside" agency
action that is "arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).

168.    The Letter constitutes a final agency action subject to judicial review. It marks the
"consummation" of the agency's decisionmaking process, sets forth the agency's conclusions
that schools are acting unlawfully, and proscribes new substantive obligations "from which legal
consequences will flow." *Spear*, 520 U.S. at 178. The "End DEI" portal and FAQ likewise
reflect and incorporate this final agency action.

169.    The APA's bar on arbitrary and capricious agency actions "requires agencies to
engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of
California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

170.    The Letter is arbitrary and capricious because ED issued the Letter without a
reasoned explanation, relied on factors that Congress did not intend it to consider, fails to

consider important aspects of the problem, and disregards material facts and longstanding reliance interests.

171.    The Letter is arbitrary and capricious because ED has failed to reasonably justify its departure from decades of settled law with respect to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq., its implementing regulations, and longstanding guidance, all of which are intended to further equity and inclusion in education. Plaintiffs have longstanding reliance interests based on these laws, regulations, and their interpretation by courts.

172.    The Letter is arbitrary and capricious because ED promulgated it without "display[ing] awareness that it is changing position." *Fox*, 556 U.S. at 515 (emphasis omitted). Indeed, the Letter wholly ignores the existence of prior agency guidance, including guidance discussing the implementation of *SFFA*, the very case it invokes. As a result, ED has not provided an explanation of its change in policy or what, if any, alternatives were considered to address ED's concerns. "An agency may not . . . depart from a prior policy *sub silentio*." *Id.*; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice'"). The Letter's failure to acknowledge or explain its change in position from prior ED guidance also violates Defendants' obligation to provide a "more detailed justification than what would suffice for a new policy created on a blank slate" where, as here, the Letter rests on factual premises that contradict those underlying its prior position, and the agency's prior position engendered serious reliance interests. *Fox*, 556 U.S. at 515.

173.    The Letter is arbitrary and capricious because its broad and vague terms and new prohibitions standing alone and taken together arbitrarily require Plaintiffs to guess at whether common education practices essential to nearly every aspect of teaching, learning, and operating schools would run afoul of the Letter, and fail to acknowledge that the terms and prohibitions create unworkable situations for Plaintiffs.

174.    The Letter is arbitrary and capricious because it fails to consider important aspects of the problem, including the Letter's interference with Title VI, of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq., its implementing regulations, and longstanding guidance on the provision of equitable and inclusive education and closely related values of diversity, including the requirement that schools with a history of racial discrimination make proactive efforts to overcome the effects of prior discrimination, 34 C.F.R. § 100.3(b)(6)(i), and longstanding Title VI and other ED guidance regarding language access and disability access.

175.    The Letter is arbitrary and capricious because it fails to consider important aspects of the problem, including its interference with the administration of ESSA, *see* 20 U.S.C. § 7906a, *id.* § 7909; GEPA, *see* 20 U.S.C. § 1232a, and the DEOA, 20 U.S.C. § 3403, insofar as the Letter intrudes on and otherwise directs, supervises, or controls curriculum, programs of instruction, and instructional materials.

176.    The Letter is arbitrary and capricious because it overstates and misstates case law interpreting Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq. and the Equal Protection Clause, including *SFFA v. Harvard*, 600 U.S. 181 (2023).

177.    The letter is arbitrary and capricious because it is pretextual. While the Letter purports to address discrimination, its adoption of terms and prohibitions bear no reasonable relationship to that purpose and demonstrates instead that ED is seeking to eliminate ideologies, practices, and programming with which it disagrees.

178.    The Letter is arbitrary and capricious because it fails to consider the enormous costs the Letter will impose, including significant costs to Plaintiffs, states, local education institutions, schools, and institutes of higher education. The Letter also fails to consider the federalism implications that intrusions into state and local education curriculum, programming, training, instructional materials, and other activities will have on these governmental entities, which will cause substantial harm and confusion to them, Plaintiffs, and students.

179.    The Letter is therefore "arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).

180.     As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Prayer for Relief**

Plaintiffs respectfully request that this Court:

A.  Declare that the Letter violates the First and Fifth Amendments to the United States Constitution;

B.  Declare that the Letter is s arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to constitutional right, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2);

C.  Hold unlawful, vacate, and set aside the Letter, the "End DEI" portal, and the FAQ;

D.  Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing and/or implementing the Letter;

E.  Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.  Grant all such other and further relief as the Court may deem just and proper.

Dated: March 5, 2025                    Respectfully submitted,

Sarah Hinger*                           /s/ Gilles R. Bissonnette
Amanda Meyer*                           Gilles R. Bissonnette (N.H. Bar No. 265393)
Alexis Alvarez*                         Henry R. Klementowicz (N.H. Bar No.
Ethan Herenstein*                       21177)
Victoria Ochoa*                         SangYeob Kim (N.H. Bar No. 266657)
Sophia Lin Lakin*                       American Civil Liberties Union of New
American Civil Liberties Union Foundation   Hampshire

125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org


Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org


Alice O'Brien*
Jason Walta*
Phil Hostak*
Stacy Hickox*
NEA Office of General Counsel
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org


Rachel E. Davidson*
American Civil Liberties Union Foundation
of Massachusetts, Inc.
One Center Plaza, Suite 801
Boston, MA 02018
(617) 482-3170
rdavidson@aclum.org




*pro hac vice forthcoming