# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

NATIONAL EDUCATION
ASSOCIATION; *et al.*,

                       *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
EDUCATION; *et al.*,

                     *Defendants*.

Case No. 1:25-cv-00091-LM

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

STATEMENT OF THE CASE ...............................................................................................2

   I.   The Dear Colleague Letter............................................................................................ 2

   II.  ED Actions Pursuant to the Letter ............................................................................... 4

   III. Impact on Plaintiffs and the Students They Serve ....................................................... 6

ARGUMENT.........................................................................................................................13

   I.   Plaintiffs are Likely to Succeed on the Merits............................................................ 14

      A.  The Letter Violates the Fifth Amendment Prohibition on Vagueness. ....................... 14

         1.  The Letter is Devoid of Objective Guidelines. ......................................... 15

         2.  Educators are Left Without Notice and Chilled in Their Ability to Teach Consistent with the Standards of Their Profession. .................................................. 22

         3.  The Letter Invites Arbitrary Enforcement. ............................................... 24

      B.  The Letter Violates the First Amendment. ................................................... 25

         1.  The First Amendment Protects the Academic Speech of Plaintiffs' Members from Viewpoint-based Censorship. .................................................... 26

         2.  The Letter Unconstitutionally Coerces Colleges and Universities to Censor Disfavored Academic Speech. .................................................... 28

      C.  The Letter Violates the Administrative Procedure Act. ................................ 31

         1.  The Letter Is Reviewable Final Agency Action. ...................................... 31

         2.  The Letter Is Contrary to Constitutional Rights. ..................................... 32

         3.  The Letter Exceeds ED's Statutory Authority. ........................................ 33

         4.  The Letter is Contrary to Law. ................................................................. 33

         5.  The Letter is Arbitrary and Capricious. ................................................... 34

           a.  ED failed to acknowledge let alone explain its dramatic departure from settled law and its own guidance. .................................................... 35

           b.  The Letter's application of *SFFA v. Harvard* is overreaching and arbitrary. ........ 38

           c.  ED failed to consider important aspects of the problem. ........................ 40

           d.  ED failed to acknowledge or consider the costs of the Letter. ............ 44

           e.  The Letter is pretextual. ......................................................................... 44

         6.  The Letter Violates the APA's Notice-and-Comment Requirement. ....... 45

   II.  Plaintiffs Suffer Irreparable Harm Because of the Letter. ............................... 46

   III. The Balance of Hardships Tilts Decidedly in Plaintiffs' Favor, and Relief Would Benefit the Public. .................................................... 49

   IV. The Relief Requested is Necessary. .................................................... 50

CONCLUSION..................................................................................................................53

**INTRODUCTION**

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (citation omitted). To expand equal educational opportunity and prepare students to succeed in a diverse democratic society, educators pursue a wide range of programs that espouse or incorporate values of diversity, equity, and inclusion. These include a wide array of approaches spanning from the focus, books, and assignments used in curriculum to various educational programs and events addressing the history and experiences that people of a particular race share, for example. The administration has unequivocally rejected that viewpoint and turned Diversity, Equity, and Inclusion (or "DEI") into a slur, requiring that any program so designated must be removed. On February 14, 2025, the Department of Education ("ED") issued a Dear Colleague Letter threatening schools and colleges across the country with the loss of federal funding in a matter of days if they continued to pursue undefined "DEI programs." Letter from U.S. Dep't of Educ. to Colleagues (Feb. 14, 2025) ("Letter"), https://perma.cc/7YT7-65SV (attached as Ex. A).[1] The Letter radically resets ED's longstanding positions on civil rights laws that guarantee equality and inclusion and impermissibly infringes on the authority of states, school districts, colleges, and universities, as well as the First Amendment rights of educators and students. It eschews congressionally imposed procedures designed to ensure that agency actions are not arbitrary and capricious, and announces sweeping and vague prohibitions that fail to provide fair notice to educators and open them to arbitrary enforcement.

The Letter creates immediate and irreparable injuries for Plaintiff educators. They are chilled in their college classrooms, afraid to engage students in discussion of diverse perspectives,

---

[1] All references in this memorandum to "Ex. _" are to the exhibits accompanying the Declaration of Sarah Hinger in Support of Plaintiffs' Motion for a Preliminary Injunction (attached hereto as Ex. 1).

and fear advancing their own scholarship. Their work contributing to improving faculty teaching has been gutted, and their academic communities reflect a pallor of fear and constraint. In K-12 schools, educators are also left scrambling mid-year with the impossible task of applying state requirements for teaching history or critical thinking skills, for example, and the contradictory prohibitions of the Letter. They risk baseless investigations, the revocation of teaching licenses, and loss of their profession. The Letter also injures Plaintiffs National Education Association ("NEA"), National Education Association-New Hampshire ("NEA-NH"), and the Center for Black Educator Development ("CBED") organizationally. These organizations have invested in providing training and support programs to teachers—including those designed to advance best practices incorporating values of diversity, equity, and inclusion— consistent with federal civil rights laws. Their ability to continue these efforts stands in jeopardy.

The Letter's threats are made that much more concrete by ED's robust enforcement, which has included an announcement on March 14, 2025, of the investigation of 45 universities following the Letter's terms.[2] ED's actions grossly infringe on Plaintiffs' constitutional and statutory rights, causing immediate and irreparable injury which cannot be outweighed by any legitimate governmental interest. Preliminary injunctive relief is warranted.

## STATEMENT OF THE CASE

### I.    The Dear Colleague Letter

As alleged in the First Amended Complaint, on February 14, 2025, ED issued a Dear Colleague Letter regarding "legal requirements under Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the United States Constitution, and other relevant authorities." Letter

---

[2] Press Release, U.S. Dep't of Educ., Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education (Mar. 14, 2025) ("Mar. 14 Investigations Press Release"), https://perma.cc/9GJ9-LBYK (attached as Ex. B).

at 1. The Letter is addressed to schools, "including preschool, elementary, secondary, and postsecondary educational institutions that receive federal financial assistance from the Department," as well as "other entities that receive federal financial assistance from [ED]." Letter at 1 & n.1. The Letter's terms encompass "every facet" of education, including "admissions, financial aid, hiring, training," *id.* at 1, and the content of classroom instruction, *id.* at 2, and extends to "third-party contractors, clearinghouses, or aggregators," *id.* at 3.

The Letter begins with ED's conclusions that "pervasive and repugnant race-based preferences and other forms of racial discrimination have emanated throughout every facet of academia"; that "colleges, universities, and K-12 schools have routinely used race as a factor in admissions, financial aid, hiring, training, and other institutional programming"; that "many American schools and universities . . . encourage segregation by race at graduation ceremonies and in dormitories and other facilities"; that schools have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism'" and have "advanced discriminatory policies and practices"; and that schools have used "'diversity, equity, and inclusion' ('DEI')," as a means of "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." Letter at 1–2. None of these conclusions is supported by facts or law.

The Letter announces, inter alia: that "[r]elying on non-racial information as a proxy for race . . . violates the law . . . whether the proxies are used . . . on an individual basis or a systematic one"; that it would be "unlawful for an educational institution [to undertake a change in policy] to increase racial diversity"; and that "DEI programs . . . deny students the ability to participate fully in the life of a school." Letter at 3. ED provides no sources for its pronouncement that these actions are, on their face, unlawful.

To the extent ED supplies any reason for the positions in the Letter, it states that "[a]lthough *SFFA* [*Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)] addressed admissions decisions, the Supreme Court's holding applies more broadly." Letter at 2. However, the Letter omits Supreme Court guidance relevant to understanding its full meaning. *See, e.g.*, *SFFA*, 600 U.S. at 230–31. The Letter also does not address and makes no mention of ED's prior guidance, including guidance on *SFFA*.[3]

The Letter threatens that ED will "vigorously enforce" the obligations set forth therein and declares ED's intention to "take appropriate measures to assess compliance with the applicable statutes and regulations based on the understanding embodied in th[e] [L]etter . . . no later than 14 days" from its issuance (i.e. February 28, 2025). Letter at 3. Schools are advised to, inter alia, "cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends" and "cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." *Id.* Schools that "fail to comply . . . face potential loss of federal funding." *Id.* at 4. The Letter further supplies a link where "[a]nyone who believes that a covered entity has unlawfully discriminated" may file a complaint. *Id.*

## II.    ED Actions Pursuant to the Letter

Following the issuance of the Letter, ED announced a new "End DEI" complaint portal for "parents, students, teachers, and the broader community to submit reports of discrimination based

---

[3] *See* Letter from U.S. Dep't of Educ. & U.S. Dep't of Just. to Colleagues (Aug. 14, 2023), https://perma.cc/69WH-NECT (attached as Ex. C); U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug. 14, 2023) ("SFFA Q&A"), https://perma.cc/V7Z6-XMCM (attached as Ex. D); U.S. Dep't of Educ., Off. of the Undersec'y, Strategies for Increasing Diversity and Opportunity in Higher Education (Sept. 28, 2023) ("Strategies Report"), https://perma.cc/52W4-XJFR (attached as Ex. E).

on race or sex in" schools.[4] The "End DEI" complaint form specifically solicits complaints regarding "divisive ideologies and indoctrination."[5] ED asks complainants to identify specific schools or school districts and detail "concerning practices," and declares that this information will be used "as a guide to identify potential areas for investigation."[6]

The explanation of the portal's purpose is not supplied by an ED official, but by a private individual, identified as a co-founder of Moms for Liberty, who encourages parents "to share the receipts of the betrayal that has happened in [ ] public schools" through "pushing critical theory, rogue sex education and divisive ideologies."[7]

In further implementation of the policies announced in the Letter, on March 1, 2025, ED announced the release of a document titled "Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act," which states that it is "intended to anticipate and answer questions that may be raised in response to [the Letter]." U.S. Dep't of Educ., Off. for C.R., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Feb. 28, 2025) ("FAQ"), https://perma.cc/D63A-7MD9 (attached as Ex. H). The FAQ purports to "provide helpful information" about how the Supreme Court's *SFFA* decision "applies to racial classifications, racial preferences, and racial stereotypes." FAQ at 1. But the FAQ adds further confusion, announcing that "many schools have advanced discriminatory policies and practices under the banner of 'DEI' initiatives," and that others "have sought to veil discriminatory policies with terms like 'social-emotional learning' or 'culturally responsive' teaching." FAQ at 5. The FAQ states that it does not "bind [ED] in the exercise of its discretionary

---

[4] Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025) ("Portal Press Release"), https://perma.cc/8737-NAA9 (attached as Ex. F).
[5] U.S. Dep't of Educ., End DEI Portal, https://perma.cc/GYS3-J2GR (attached as Ex. G).
[6] Portal Press Release.
[7] *Id.*

enforcement authority," *id.* at 1 n.3, and that "OCR's assessment of school policies and programs depends on the facts and circumstances of each case, *id.* at 5.

On March 14, 2025, ED announced that pursuant to the Letter, it had opened investigations into 45 universities, including institutions with NEA members, as part of an effort to "reorient civil rights enforcement."[8]

## III.    Impact on Plaintiffs and the Students They Serve

In the past month, the Letter has caused substantial chaos, confusion, and harm to Plaintiffs and the students they serve. Educators at every level, including Plaintiffs, are concerned that teaching core texts and topics is now impermissible or invites adverse consequences for their reputations and livelihoods. Educators fear their teaching will be considered discrimination because their courses explore themes and permit discussion of "systemic and structural racism," "discriminatory policies and practices," or gender roles, implicated by the Letter's prohibitions on "diversity," "equity," and "inclusion" and on teaching "that certain racial groups bear unique moral burdens that others do not."[9] These fears have been made worse by the additional vague language in the FAQ.[10] For example, educators fear that:

- Texts that are staples of high school English courses throughout the country like *Heart of Darkness* by Joseph Conrad, "The White Man's Burden" by Rudyard Kipling, *Beloved* by Toni Morrison, and *To Kill a Mockingbird* by Harper Lee, will subject them to accusations of discrimination because they address themes of racism, colonialism, and/or imperialism.[11]

- Because the FAQ specifically highlights the concept of "being oppressors in a racial hierarchy" as something that might create a "racially hostile environment," FAQ at 6, lessons related to *Heart of Darkness* or "The White Man's Burden" that necessarily require discussion of the fact that European imperialism was in part based on the idea of racial

---

[8] Mar. 14 Investigations Press Release.
[9] *See, e.g.*, Mem. A Decl. ¶ 6 (attached as Ex. I); Mem. B Decl. ¶ 6 (attached as Ex. J); Mem. C Decl. ¶ 6 (attached as Ex. K); Mem. D Decl. ¶¶ 10–12 (attached as Ex. L); Mem. G Decl. ¶ 9 (attached as Ex. M).
[10] *See, e.g.*, Mem. A Decl. ¶¶ 15, 18, 25; Mem. B Decl. ¶¶ 7, 23; Mem. C Decl. ¶ 10; Mem. E Decl. ¶¶ 9, 14 (attached as Ex. N).
[11] Mem. A Decl. ¶¶ 11–18.

hierarchy will now be deemed discriminatory by ED, supervisors, students, parents or community members.[12]

- Lessons integral to teaching social studies "directly tied to concepts of race, racism, and slavery," including "Juneteenth, the Civil Rights Act of 1866, and the Fourteenth and Fifteenth Amendments, leading up to the Black Codes, the founding of the KKK, the Jim Crow Era, and the Compromise of 1877" are impossible to discuss "without creating a risk of being accused of presenting a narrative of the United States as racist."[13]

- Texts and topics that are related to gender roles because of the Letter's reference to "toxic[] indoctrinat[ion]" and DEI programs may now be considered discrimination.[14]

Other examples at all levels of education abound.[15] Professors in higher education are worried that topics core to their scholarship are no longer permissible or too risky to pursue.[16]

Educators fear employing basic, sound pedagogical practices.[17] For example, educators are worried that they cannot, without risk of sanction:

- Ask students to draw on current events, popular culture, or their own experiences and use these frameworks to inform their analysis of core texts and topics without risking impermissible discussions related to race and gender;[18]

---

[12] *Id.* ¶ 14; *see also id.* ¶¶ 25–27.

[13] Mem. B Decl. ¶ 15.

[14] Mem. A Decl. ¶¶ 19–20 (worried about texts that explore the concept of gender such as works by Austen, Atwood, Shakespeare, Shelley, Salinger, and Vonnegut and discussions the texts prompt); *see also* Mem. B Decl. ¶¶ 18–19.

[15] *See, e.g.*, Mem. B Decl. ¶ 14 (eighth grade social studies teacher in New Hampshire fearing "that it is not possible to teach about the Holocaust or other examples of antisemitism without reference to concepts like white privilege or racial oppression" without risking accusations of discrimination under the Letter); Mem. G Decl. ¶ 9 (Professor at Georgia State University focusing on social justice teacher education fears teaching about equity and inclusion relating to English Language Arts curricula could be perceived as teaching that "people of some races or gender/ sexuality carry a moral burden that others do not" in violation of the Letter); *id.* ¶ 12 (worried that assigning readings that center on the experiences of marginalized people in the U.S. and that take a social justice approach, such as Linda Christensen's *Reading, Writing and Rising Up* (2017) could be perceived as discriminatory); Mem. D Decl. ¶ 10 (worried that lessons focused on Indigenous narratives and identity, which include topics of colonialism and settlerism central to her teaching and scholarship could be perceived as teaching that "certain racial groups bear unique moral burdens"); Mem. E Decl. ¶ 13 (explaining concern that assigning students to reflect on the documentary *Crip Camp*, which allows students "to see the fight for social justice for people with disabilities," will be alleged to violate the Letter); NEA-NH Decl. ¶¶ 9–12 (attached as Ex. O); Mem. I Decl. ¶ 7 (attached as Ex. P) (sixth-year higher-education student explaining that her education is being impacted because her children's literature classes have "removed focus on cultural responsiveness" in response to Letter).

[16] *See, e.g.*, Mem. G Decl. ¶¶ 11–13, 18; Mem. D Decl. ¶¶ 10–11, 13–15; Mem. H Decl. ¶¶ 8, 13–15,18 (attached as Ex. Q) (describing fears that she will be unable to continue her research that focuses on transgenerational trauma and lynchings); Mem. F Decl. ¶¶ 17–18 (attached as Ex. R) (explaining she is worried her scholarship on anti-DEI legislation and its negative impact on student success for her Leadership in Community College Ed. D. program will be viewed as impermissible and explaining that looking at equity gaps and where those gaps may be bridged is central to her discipline and academic inquiries); NEA Decl. ¶ 27 (attached as Ex. S).

[17] *See generally* NEA Decl. ¶¶ 29–30; NEA-NH Decl. ¶¶ 13–14.

[18] *See* Mem. A Decl. ¶¶ 12, 16–18; Mem D. Decl. ¶ 12.

- Allow students to explore topics related to race, diversity, or discrimination by choosing their own essay topics or projects;[19]

- Continue methods of student assessment that implicate the topics in the Letter, for example, asking aspiring teachers to develop a critical literacy unit plan because "critical literacy involves analyzing power and representation in texts and society";[20]

- Have conversations with students regarding race, diversity, equity, and inclusion, including by helping students understand and navigate hurtful language;[21]

- Engage in practices and lessons reflecting social and emotional learning and culturally responsive teaching, which the FAQ deems efforts that "veil discriminatory policies."[22]

This uncertainty strikes at the heart of educators' professional responsibilities.[23] The instruction and practices implicated by the Letter and FAQ are not only necessary to comply with state and local teaching and learning requirements,[24] and prepare students for success in the next

---

[19] *See* Mem. A Decl. ¶ 21; Mem. D Decl. ¶ 12; Mem. F Decl. ¶¶ 6–8.

[20] Mem. G Decl. ¶ 11; *see also* Mem. D Decl. ¶ 12 (questioning whether she can give credit to student assignments that address their own experiences and viewpoints related to race, diversity, and inclusion).

[21] *See* Mem. B Decl. ¶¶ 20–21; Mem. C Decl. ¶¶ 9–10.

[22] *See* Mem. C Decl. ¶ 9 (explaining instruction on social and emotional learning that includes lessons on "hurtful language, identity, gender, inclusivity, developing empathy, understanding bullying, and diversity" with the goal of providing "students with the social and emotional competencies they need to feel successful as learners and citizens of their communities"); *see also* Mem. A Decl. ¶ 23; Mem. B Decl. ¶ 23; Mem. E Decl. ¶ 9; Mem. I. Decl. ¶ 7.

[23] This also includes NEA member responsibilities outside the classroom, including participation in developing curriculum and professional development standards and a range of extracurricular activities that support student learning. NEA Decl. ¶¶ 32–34; NEA-NH Decl. ¶ 15.

[24] In New Hampshire, for example, educators must teach about "intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination," as well as "how to prevent the evolution of these practices." N.H. Rev. Stat. Ann. § 189:11, I-c(j) (2023); *see also* Mem. B Decl. ¶ 14; Mem. A Decl. ¶ 12 (explaining "state certification standards require [him] to teach students how to talk about experiences (both their own and others), understand different cultures, and experiences other than their own, and critically examine the information they receive in the media every day").

In Tennessee, the State Board of Education provides social studies content standards for K-12 educators, defined as "the essential knowledge to be learned … within each course." Tenn. State Bd. of Educ., *Tennessee Social Studies Standards* 6 (2017), https://www.tn.gov/content/dam/tn/education/standards/ss/Social_Studies_Standards.pdf (attached as Ex. T). Examples of content standards include "how slavery became a national issue during the mid-19th century, including the significance of: [the] *Dred Scott v. Sandford* decision," *id.* at 59, the "economic and social impact of Jim Crow laws on African Americans," *id.* at 122, and "the state-sponsored mass murder of the Jews in Nazi-controlled lands," *id.* at 240.

Oklahoma's educational standards guide educators to prepare students "to become informed, contributing, and participating citizens in this democratic republic," Okla. State Dep't of Educ., *Oklahoma Academic Standards for Social Studies, Pre-K–12* at 3 (2019), https://perma.cc/H95Y-FAZN (attached as Ex. U), and to engage them with curricula that is "inclusive of the identities that reflect the richness and diversity of the human experience" to cultivate

steps in their education,[25] but also critical to ensure students engage with learning,[26] build trust with their teachers and community,[27] and establish the foundation and critical thinking skills to formulate their own arguments and reach their own conclusions.[28] Because of the vague and sweeping terms of the Letter and FAQ, and ED's explicit threats of enforcement, including by soliciting "receipts of betrayal" from parents and others, Plaintiffs grapple with an impossible choice: Continue practices core to teaching and risk adverse consequences to their reputations and livelihoods,[29] or substantially change practices, requiring significant disruption and time and sacrificing the quality of their teaching and professional obligations.[30] At bottom, either choice will have a profound impact on students,[31] including censoring their expression.[32]

---

a more complete understanding of the past and present, Okla. State Dep't of Educ., *2021 Oklahoma Academic Standards for English Language Arts* 5 (2021), https://perma.cc/D7GD-DFT6 (attached as Ex. V).

Pennsylvania recommends a "multicultural education program" for students to "promote cultural understanding and appreciation and to further good will among all persons, without regard to race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability." 43 P.S. § 958; *see also generally* NEA Decl. ¶¶ 12, 28–34.

[25] *See, e.g.*, Mem. A Decl. ¶¶ 9–10, 27 (explaining certain practices and texts that are central to preparing students for success on the English Advanced Placement exam); Mem. E Decl. ¶ 11 (explaining the conflict between the Letter and accreditation standards for special education teachers); Mem. I Decl. ¶¶ 7–10 (student discussing impact Letter has had on her education and her preparedness to serve as a future K-12 educator).

[26] *See, e.g.*, Mem. A Decl. ¶ 12; Mem. F Decl. ¶ 6; Mem. I Decl. ¶¶ 7–9.

[27] *See, e.g.*, Mem. B Decl. ¶ 10; Mem. C Decl. ¶¶ 7, 9; Mem. D Decl. ¶ 14; Mem. I Decl. ¶¶ 7–9.

[28] *See, e.g.*, Mem. A Decl. ¶¶ 19, 24; Mem. B Decl. ¶¶ 9, 21; Mem. C Decl. ¶ 7; Mem. F Decl. ¶ 9; NEA Decl. ¶ 30.

[29] *See, e.g.*, NEA Decl. ¶¶ 35–37; NEA-NH Decl. ¶¶ 16–17; Mem. A Decl. ¶¶ 8, 25–26; Mem. B Decl. ¶ 25; Mem. C Decl. ¶ 6.

[30] *See, e.g.*, Mem. A Decl. ¶ 27; Mem. B. Decl. ¶ 26; Mem. D Decl. ¶¶ 9–11, 13–15; Mem. F Decl. ¶¶ 13–14; *cf.* Mem. G Decl. ¶¶ 16–18.

[31] *See, e.g.*, Mem. A Decl. ¶ 19 (explaining how critical thinking is essential to "promote[ ] the democratic principles enshrined in our Constitution"); *id.* at ¶ 27 (explaining that his "[s]tudents preparing for the AP English Exam would be most affected" if he revised his curriculum in response to the Letter because "it would be difficult to modify the curriculum quickly enough to cover all the necessary components that the AP Exam tests"); Mem B. Decl. ¶¶ 26–27 (explaining English language learner students and students with disabilities would "suffer the most"); NEA Decl. ¶ 31 ("The Letter leaves in doubt whether and how teachers will be able to continue key practices and programs that serve students with disabilities and multi-lingual learners"); Mem. D Decl. ¶ 14 (explaining that her students can no longer learn about aspects of "diversity, equity, and inclusion or hear their classmates' viewpoints, to understand the sheer breadth of possible arguments" and to "debate this subject with their peers"); *id.* ¶ 9; Mem. H Decl. ¶ 19 (explaining those interested in her research will "no longer have the chance to learn about topics related to diversity, equity and inclusion, hear their classmates' viewpoints, or understand the breadth of possible arguments related to these topics); Mem. E Decl. ¶¶ 9, 11–12; Mem. F Decl. ¶ 9; Mem. I Decl. ¶¶ 7–10.

[32] *See, e.g.*, Mem. G Decl. ¶ 10 (Professor whose teaching focuses on social justice in teacher education is worried that students will feel prohibited from discussing their own or others' experiences with ableism, racism, sexism, and other forms of discrimination); Mem. F Decl. ¶ 16 (explaining harm to students at two-year colleges, many of whom

Educators in numerous states face consequences including revocation of a teaching license and civil enforcement. For example, in New Hampshire, educators face discipline up to revocation of their teaching credentials for violating the Code of Conduct, N.H. Code Admin. R. ED. 511.02(a)(2), which prohibits behaviors including discrimination. *Id.* at 510.01–03. Complaints can be initiated by anyone, including parents, students, superintendents and principals, and law enforcement. Investigations, either formal or informal, must be initiated any time possible misconduct comes to the attention of the state Department of Education, including through means such as news articles or social media postings. *Id.* at 511.01(a). Furthermore, the Code of Conduct requires educators to report suspected violations of the Code, and failure to do so is itself a violation of the Code. [33] *Id.* at 510.05(a) & (f).

Plaintiffs in higher education have already experienced censorship of speech and expression related to race, diversity, equity, and inclusion. For example:

- On the day that ED's threats of funding termination became effective, a professor at Georgia State University who serves as the co-director for Center for Equity and Justice in Teacher Education was told to rework the name and website for the Center, which has been

---

are economically disadvantaged); Mem. I Decl. ¶ 10 (student explaining that, under ED's letter and accompanying guidance, she fears she will be unable to speak freely about diversity, equity, and inclusion).

[33] Educators may also face consequences through the New Hampshire Human Rights Commission that takes complaints under the Law Against Discrimination, which prohibits discrimination including on the basis of race. N.H. Rev. Stat. Ann. §354-A. The HRC has general jurisdiction to "eliminate and prevent" discrimination in employment, places of public accommodation, and K-12 public schools. *See also* New Hampshire Commission for Human Rights, https://www.humanrights.nh.gov/ (attached as Ex. W); *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *19 (D.N.H. May 28, 2024) ("The Law Against Discrimination, in turn, authorizes aggrieved parties to sue not only employers but also individual employees who aid and abet in an employer's 'unlawful discriminatory practice.'") (appeal filed July 26, 2024). Educators in other states face similar consequences. In Tennessee, the State Board can "revoke. . . an educator's license" for, among other things, "negligence in the commission of duties as an educator" and "other good cause" defined as "conduct that calls into question the fitness of an educator to hold a license . . .". Tenn. State Bd. of Educ. R. 0520-02-03.09. Such conduct includes violations of the Teacher Code of Ethics, which requires educators to "[a]bide by all applicable federal and state laws." T.C.A. § 49-5-1003(b). In Oklahoma, a teaching certificate can be revoked for "[a wi]llful violation of a rule or regulation of . . . the United States Department of Education" or "[a] willful violation of any federal [ ] law." Okla. Admin. Code § 2101:1-5-6(b). Texas requires that "educator[s] shall comply with . . . federal laws." 19 Tex. Admin. Code § 247.2, and educators face discipline if they have "conducted school or education activities in violation of law." 19 Tex. Admin. Code § 249.15. In Idaho, a teaching license can be revoked for violations of the professional standard of ethics, Idaho Code § 33-1208, which states that "an educator abides by all federal . . . laws." Idaho Admin. Code R. 08.02.02.076.

unavailable to students since ED issued the Letter.[34] She was also instructed to change the programming for an upcoming event related to the Black freedom struggle.[35]

- That same day, the administration at Pensacola State College canceled a professor's presentation to the college community of work referencing the need to overcome the history of white supremacy and addressing lynching.[36]

- At a college in the Midwest, a teaching fellow was instructed to review training on pedagogical best practices for words such as "diversity," "equity," "inclusion," "culturally responsive," or "economically disadvantaged," and has had to gut much of this training.[37]

- The provost of a university in the Southeast instructed faculty to remove terms such as "'disability, 'inclusion,' and 'culturally responsive'" from course descriptions.[38]

These actions taken pursuant to the Letter have grave consequences for Plaintiffs, including in the evaluation and advancement of their employment and in their success in their disciplines.[39]

In addition, Plaintiffs NEA, NEA-NH, and CBED experience and will continue to experience organizational harms because of the Letter. For example, since the Letter was issued, NEA has fielded concerns from its members about pursuing and completing NEA's extensive teacher training and professional development programs related to strengthening its members' skills in engaging, teaching, and supporting students of different races, national origins, sexual orientations, and gender identities.[40] NEA does not know whether school districts will cease supporting such training, thereby limiting the scope and reach of NEA's professional development work, which is core to its mission.[41] Similarly, the Letter directly affects the purpose, execution

---

[34] Mem. G Decl. ¶¶ 16–18.
[35] *Id.* ¶ 18.
[36] Mem. H Decl. ¶¶ 12–14.
[37] Mem. F Decl. ¶¶ 3, 10–14.
[38] Mem. E Decl. ¶ 10; *see also* Mem. I Decl. ¶ 7 (student explaining that her courses "removed the focus on cultural responsiveness" following issuance of the Letter).
[39] *See, e.g.*, Mem. G Decl. ¶ 18 (explaining that in addition to the time and resources she will need to spend making these changes, she has lost the opportunity to fully participate in the Center and its services for her college, which is part of her academic responsibilities for which she is evaluated); Mem. H Decl. ¶ 15 (explaining inability to share her research); Mem. D Decl. ¶¶ 9–11, 15; Mem. E Decl. ¶ 14.
[40] NEA Decl. ¶¶ 12–13.
[41] NEA Decl. ¶¶ 13, 25, 28.

of, and member interest in grant programs focused on diversity, equity, and inclusion, including grants to "expand and elevate the skills of educators in engaging, teaching, and supporting students of all races, national origins, sexual orientations, and gender identities," in which NEA has already invested heavily, and its "Read Across America Grant" focused on "building a nation of diverse readers."[42] NEA will have to divert resources to assess, modify, and address concerns related to these substantial investments.[43] Similarly, NEA-NH must grapple with the impact of the Letter on its annual professional training and how it could be revised to capture the Letter's vague prohibitions.[44]

NEA and NEA-NH continue to address the effect the Letter has on its members. NEA has had to expend substantial resources to address the legal needs of its members through its Unified Legal Services (ULS) Program, a core component of its services, as a result of censorship initiatives since 2020.[45] Because the Letter expands prohibitions on teaching certain concepts to a nationwide scope, abruptly changes federal interpretation of civil rights laws, and adds the risk of a loss of federal funding, NEA expects that it will need to expend substantial resources to advise and defend its members in an uncertain national legal landscape.[46]

CBED provides training and programs to students, educators, and schools on topics including implicit bias, cultural identity, cultural proficiency, and equity.[47] Due to the vague language in the Letter and FAQ, CBED faces the need to invest significant time and resources into modifying, expanding, or eliminating its offerings to educational institutions. If CBED continues its work in accordance with its mission, it would be difficult if not impossible to continue

---

[42] NEA Decl. ¶¶ 14–16. *See also id.* ¶ 17 (discussing NEA partnerships with community schools).
[43] NEA Decl. ¶ 16.
[44] NEA-NH Decl. ¶ 20.
[45] NEA Decl. ¶¶ 18–22. NEA-NH is similarly injured in its ability to advise and support its members. NEA-NH Decl. ¶¶ 10, 18–19, 21.
[46] NEA Decl. ¶ 23.
[47] CBED Decl. ¶¶ 41–45 (attached as Ex. X).

partnerships and contractual relationships with educational institutions due to schools' fears of complaints, enforcement, and federal funding rescission, significantly hampering CBED's core activities in frustration of its mission. One school district planning to start a Teaching Academy has already indicated that it is not sure whether it can proceed following the issuance of the Letter.[48]

Fundamentally, the concepts prohibited by the Letter and FAQ are essential to CBED's programming and the issues that it works to address, including rebuilding the Black teacher pipeline, training all educators in how to teach Black students in an engaging, effective, and culturally responsive way, supporting school districts to meet Black and non-Black teachers' needs in these areas, and generally addressing the national shortage of qualified teachers.[49] The Letter will inhibit these efforts, including by dissuading future educators, and particularly Black students and students of color, from pursuing a career in education.[50] As a small organization that cannot adapt its programming and funding sources quickly, CBED's core programming, mission, and indeed existence are thus existentially threatened by ED's actions.[51]

## ARGUMENT

Plaintiffs meet the requirements for a preliminary injunction. They are "likely to succeed on the merits" and are "likely to suffer irreparable harm in the absence of preliminary relief, . . . the balance of equities tips in [their] favor, and [ ] an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (quotation marks omitted)). In addition, the APA authorizes courts to "preserve status or rights pending conclusion of review proceedings." 5 U.S.C.

---

[48] *Id.* ¶ 43
[49] *Id.* ¶¶ 4, 9–11.
[50] *Id.* ¶ 45.
[51] *Id.* ¶¶ 44–45.

§ 705. The standard for a stay under § 705 is the same as the standard for a preliminary injunction. *See Bauer v. DeVos*, 325 F. Supp. 3d 74, 104–05 (D.D.C. 2018).

## I.      Plaintiffs are Likely to Succeed on the Merits.

 "[L]ikelihood of success on the merits is the 'main bearing wall' of [a court's] analysis." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024) (citation omitted). Here, Plaintiffs are likely to succeed on the merits of their constitutional and APA claims.

### A.  The Letter Violates the Fifth Amendment Prohibition on Vagueness.

The Fifth Amendment prohibits vagueness as "an essential of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotations and citation omitted). A rule is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).

Where, as here, a vague rule "abuts upon sensitive areas of basic First Amendment freedoms . . . [u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal quotations omitted). For this reason, "[t]he general test of vagueness applies with particular force." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976). Likewise, a rule is "subject to the most exacting vagueness review" when, as here,[52] it imposes severe consequences such as penalties "that strip persons of their

---

[52] The penalties are severe. Schools stand to lose federal funding critical to their provision of education. According to the Office of Management and Budget, over $84 billion in proposed federal grant spending for fiscal year 2025 is allocated to education, training, and social services. Off. of Mgmt. and Budget, Analytical Perspectives Budget of the

professional licenses and livelihoods." *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *7, *8 (D.N.H. May 28, 2024) (quoting *Sessions*, 584 U.S. at 184 (Gorsuch, J., concurring in part)) (appeal filed July 26, 2024); *see also Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 95–96 (1st Cir. 2004) ("[V]agueness concerns are more pressing when there are sanctions (such as expulsion) attached to violations of a challenged regulation."). Even where a more stringent test for vagueness does not apply, "[v]ague laws in any area suffer a constitutional infirmity." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966) (collecting cases).

### 1. The Letter is Devoid of Objective Guidelines.

The Letter is replete with vagueness. ED announces its determination that schools and educators "have discriminated against students on the basis of race" and face enforcement action. Letter at 1, 3. Without distinction, it covers pre-K through college, *id.* at 1 n.1, encompasses "every facet" of education, *id.* at 1, including classroom instruction, *id.* at 3, and extends to "third-party contractors, clearinghouses, or aggregators," *id.* But the Letter provides no clarity to educators of what they stand accused of (by reference to either specific facts or standards of law) nor any clear guidelines to follow. Instead, the Letter makes broad and overlapping assertions regarding programming ED considers discriminatory. As such, it operates as a whole to induce uncertainty and chill. The related FAQ and End DEI Portal only compound these problems.

The Letter concludes that schools have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism,'" *id.* at 2, and prohibits "DEI programs" that "teach students that certain racial groups bear unique moral burdens that

---

U.S. Government: Fiscal Year 2025, 75 (2024), https://www.govinfo.gov/content/pkg/BUDGET-2025-PER/pdf/BUDGET-2025-PER.pdf (attached as Ex. Y). Education for the Disadvantaged (Title I) is estimated to be the third largest discretionary program, with $20 billion in spending, and Special Education is estimated to be the fifth largest with $14 billion. *Id.* at 75–76. Educators stand to lose their teaching credentials and livelihoods. *See supra* at 10 & n.33. NEA, NEA-NH, and CBED's core activities are thrown into uncertainty. *See supra* at 11–13.

others do not," *id.* at 3. Similarly, the FAQ discusses "themes in a class discussion," that "shame," "accuse," "ascribe . . . less value" or "assign . . . intrinsic guilt," and "school programming [that] discourages … students of a particular race or races." FAQ at 6. These pronouncements of illegality suffer from the same constitutional failings found in other laws restricting teaching of "concepts" rather than objectively measurable conduct. The Letter "is built around unrestrained appeals to abstract principles with contestable moral and political content." *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024).

Because the Letter targets concepts or values of diversity, equity, and inclusion, it inherently lacks clear boundaries that ensure fair implementation and adequate notice. *See, e.g.*, *Smith v. Goguen*, 415 U.S. 566, 578 (1974) (statute with operating term "treats contemptuously," turns on subjective preference, and "simply has no core"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (statute with operating term "annoying" found vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all").

The Letter does not define "DEI program," Letter at 3, or discrimination "under the banner of 'diversity, equity, and inclusion' ('DEI')," *id.* at 2. There are a wide range of viewpoints on what DEI encompasses, or what the values of diversity, equity, and inclusion mean when describing a program or practice. Individuals may disagree not only about whether values of diversity, equity, and inclusion are a good thing, but also about what constitutes a DEI program at all. Applying the ordinary meaning from dictionary definitions confirms the Letter's lack of an objective core. *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011). "Diversity, Equity, and Inclusion," is defined as "a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and

retaining a diverse group of participants, including people who have historically been excluded or discriminated against."[53] Deciding what constitutes an impermissible "DEI program" necessarily requires a subjective assessment of a set of values.

As such, a wide range of speech and activity are swept in, and enforcement necessarily and impermissibly turns on subjective evaluation of, for example, toxicity, falsehood, and the assignment of moral burdens. *Grayned*, 408 U.S. at 108–09 ("A vague law impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis."); *see also, e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 353–54 (1983) (requirement to provide "credible and reliable" identification); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921) (prohibition on "unjust and unreasonable" rates). Courts considering state laws prohibiting teaching similar concepts have also found these to be vague in whole. *Loc. 8027*, 2024 WL 2722254, at *12 ("All told, the banned concepts speak only obliquely about the speech that they target . . . . This lack of clarity sows confusion and leaves significant gaps that can only be filled in by those charged with enforcing the Amendments . . . ."); *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807 ("[T]he practical meaning of the Act must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it."); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543–44 (N.D. Cal. 2020) (prohibition on trainings that "inculcate," "promote," "teach[] or imply[]" certain concepts unconstitutionally vague) (internal quotations and citation omitted).

Looking to the individual terms further demonstrates the Letter's broad reach. Diversity is defined as "being composed of differing elements," "especially," but not exclusively, related to

---

[53] *Diversity, Equity, and Inclusion*, Merriam-Webster, https://perma.cc/Y879-7HB2 (last visited Mar. 20, 2025) (attached as Ex. Z).

"inclusion of people of different races, cultures, etc."[54] Any number of educational programs include aspects of diversity, including a course on world history or world religions, or any course that incorporates perspectives from different races or cultures, such as anthropology, sociology, literature, or art history. Equity is defined as "fairness or justice in the way people are treated," and "specifically freedom from disparities in the way people of different races, genders, etc. are treated."[55] Similarly, inclusion is most relevantly defined as "the act or practice of including students with disabilities with the general student population," or "the act or practice of including and accommodating people who have historically been excluded (as because of their race, gender, sexuality, or ability)."[56] It would seem implausible that ED means to prohibit any course for students, any approach to student conduct, or any educator trainings that teach values of justice and fairness, or to prohibit any effort to include, rather than exclude, students. Yet the Letter does not provide objective guidelines to differentiate among numerous programs addressing or operating through principles of diversity, equity, or inclusion.

The FAQ only highlights and compounds confusion. For example, the FAQ states that "schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI . . . . However, schools must consider whether any school programming discourages members of all races from attending, either by excluding or discouraging students of a particular race or races, or by creating hostile environments." FAQ at 6. How will ED evaluate whether a program "discourages" attendance, and what does it mean by "discourages members of all races"? *Id.* ED continues that "discourage[ment]" may occur through "excluding," "discouraging," or "creating a hostile environment." *Id.* It is not clear whether

---

[54] *Diversity*, Merriam-Webster, https://perma.cc/XZ8W-KAVJ (last visited Mar. 20, 2025) (attached as Ex. AA).
[55] *Equity*, Merriam-Webster, https://perma.cc/9PJW-JHE9 (last visited Mar. 20, 2025) (attached as Ex. AB).
[56] *Inclusion*, Merriam-Webster, https://perma.cc/CHW8-FGP5 (last visited Mar. 20, 2025) (attached as Ex. AC).

"exclusion" here refers to a policy prohibiting attendance, for example, or has a broader meaning, and to "discourage[ ] . . . by . . . discouraging" has no definite meaning at all. *Id.* ED is referring to something other than circumstances that would "creat[e] a hostile environment," *id.*, but schools and educators can only guess at what this might mean. As a consequence, administrators may decide to pull down such programming altogether or otherwise seek to limit and restrict programming to avoid risking the loss of federal funding. Many already have.[57]

Eschewing definiteness, the Letter's prohibition allows enforcement against particular articulations of diversity, equity, and inclusion with which ED disagrees, or indeed against any articulation of these values. By referring to unlawful programs "under the banner of 'diversity, equity, and inclusion,' ('DEI')," Letter at 2, the Letter allows ED to make up the rules as it goes.

The Letter's remaining terms characterizing DEI programs as unlawful similarly fail to provide objective standards. First, distinct from facially discriminatory policies and discrimination

---

[57] In addition to Member experiences discussed above, colleges and universities have expressed the need to overcorrect to avoid the threatened loss of federal funding. The University of Cincinnati, for example, noting the Letter and other EOs are "sweeping in their scope, categorical in their conclusions and pressing in their timing," reasoned that the federally funded institution had "little choice but to follow" the Letter. John Back, *President Pinto shares message regarding future of DEI at UC*, UC News (Feb. 21, 2025), https://perma.cc/D8HM-ZSDB (attached as Ex. AD). As a result, the university began evaluating jobs, programs, initiatives and projects, and removing references to DEI principles, recognizing this as a "departure from decades of established practice within academic communities." *Id.*

At Colorado State University, the President wrote that although the school was confident that it was in compliance with the law, "the new administration's interpretation of law marks a change" and "[g]iven the university's reliance on federal funding, it is necessary to take additional steps to follow the federal administration's new interpretations." Amy Parsons, *Feb. 18: New Federal Directives, Colorado State University Federal Updates* (Feb. 18, 2025), https://perma.cc/3GGQ-68K5 (attached as Ex. AE).

The University of Nebraska president wrote that the Letter "outlines federal requirements to restrict [DEI] initiatives at institutions receiving federal financial support" and "outlines consequences for direct and *non-direct* noncompliance – most notably the entire university system becoming ineligible for all federal funding." Univ. of Neb. System, *A message from President Gold on OCR's 'Dear Colleague' letter'*, (Feb. 21, 2025), https://perma.cc/ET78-B7ZV (emphasis added) (attached as Ex. AF). In response, the University initiated an "immediate" and "comprehensive review of potentially relevant activities," recognizing the "significant questions and uncertainties" remaining for the university community. *Id.*

In Michigan, Muskegon Community College "suspended Diversity, Equity, and Inclusion (DEI) programming" to comply with the Letter. Danielle James, *Muskegon Community College suspends DEI programs amid Trump mandates*, M Live (Mar. 7, 2025), https://perma.cc/6CV3-NTRU (attached as Ex. AG). Reviewing the Letter, "'the uncertain legal landscape regarding enforcement, and implementation by the Education Department of that interpretation,' led the college to conclude that continuing to offer DEI programming 'could place absolutely necessary federal financial assistance at risk.'" *Id.*

established through circumstantial evidence, *id.* at 2 & n.8 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)), the Letter states that "[o]ther programs discriminate in less direct, but equally insidious, ways," *id.* at 3. The Letter provides no further articulation of this separate standard, and the "less direct . . . ways" of discriminating are not enumerated except to cite DEI programs as an example. *Id.*

The Letter states that "DEI programs frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not," and that they "stigmatize students . . . based on crude racial stereotypes." *Id.* Similarly, the FAQ states that "pressuring" students to "take certain positions" and "mandating courses . . . that are designed to emphasize and focus on racial stereotypes" are forms of "school-on-student harassment." FAQ at 7. Neither explains how ED has or would reach the conclusion that programs create a "preference," "stigmatize," "stereotype," or "teach," "emphasize," or "focus on" impermissible ideas. Letter at 3; FAQ at 6–7. Moreover, these prohibitions do not turn on the intent of the educator. Courts analyzing similar prohibitions have found this vague language would prohibit a teacher from describing or identifying discriminatory beliefs in an orientation or course, or assigning a reading or work in which an author describes or identifies discriminatory beliefs, like how current stereotypes about race may affect the opportunities of historically marginalized groups. *See, e.g.*, *Loc. 8027*, 2024 WL 2722254 at *13 (prohibition on "teach[ing]" a doctrine could "ostensibly extend to a professor who merely 'informs his class' about the banned doctrine without in any way advocating for that doctrine") (quoting *Keyishian*, 385 U.S. at 600)); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1148–49 (W.D. Okla. 2024) (prohibition of any requirement that "presents on any issue of race or sex stereotyping" could apply to "discussing or assigning the reading of a work in which the author describes or identifies discriminatory beliefs—

for example, an analysis of how historic beliefs about race led to the enslavement and subjugation of Black men and women as depicted in Mark Twain's *Huckleberry Finn*"); *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022) (observing that under vague prohibition it was unclear "what is prohibited beyond literally espousing that, for example, 'White people are superior to Black people.'").

Other requirements announced in the Letter are likewise vague. The Letter states that "[r]elying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systematic one." Letter at 3. It is entirely unclear what ED seeks to prohibit through these terms. ED accuses schools of using information "as a proxy for race" but provides no explanation of how it believes this occurs. *Id.* Further, it is wholly unclear what ED has in mind when it references "grant[ing] preferences . . . on a systematic [basis]." *Id.* ED's one given example only compounds the vagueness of the directive. The Letter states that it would be "unlawful . . . to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity." *Id.* It is not clear how eliminating standardized testing would constitute reliance on a proxy for race, or how this would amount to an impermissible racial preference. Nor does ED clarify how or why it would treat an intent "to increase racial diversity" as unlawful. *Id.* The Letter points to no further source of definition or guidance.

Even where referencing the Supreme Court's guidance, ED introduces confusion. The Letter instructs against using students' self-expression, including through essays and writing samples, "as a means of determining or predicting a student's race and favoring or disfavoring such students." Letter at 2 (citing *SFFA*, 600 U.S. at 230). While citing *SFFA* for this rule, the Letter omits the Supreme Court's particular guidance regarding what schools *can* do consistent

with its holding. In fact, the Supreme Court in *SFFA* pointedly advised that "nothing in [its] opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." 600 U.S. at 230. But ED ignores this guidance, suggesting these considerations are encompassed by the Letter's prohibitions. At a minimum, ED leaves schools and educators to question unnecessarily whether they can consider students' self-expression at all.

The FAQ likewise introduces uncertainty regarding the Supreme Court's holdings. First, they state the *SFFA* Court recognized "only one interest as sufficiently compelling in the educational context," FAQ at 3, omitting the Court's statement that it was not speaking beyond the case before it to reach other articulated compelling interests, *SFFA*, 600 U.S. at 213 n.4 (declining to reach the question of whether U.S. military academies had distinct compelling interests that would justify the consideration of race in admissions). And the FAQ states that "[s]trict scrutiny has famously been described as 'strict in theory, fatal in fact,'" FAQ at 3, inviting the reader to adopt this understanding as accurate, despite the Supreme Court writing directly to "dispel [this] notion." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 237 (1995) (citation omitted) (addressing the use of racial classifications). As the Court in *Adarand* explained, "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Id.*

### 2. Educators are Left Without Notice and Chilled in Their Ability to Teach Consistent with the Standards of Their Profession.

The Letter's broad prohibitions on diversity, equity, and inclusion programs create significant confusion for educators who must comply with both federal law and state requirements and who seek to teach according to their training and the best practices of their profession. For

example, discussions regarding race are necessary to comply with state and local standards and requirements across a variety of subjects, and particularly those governing history and social studies.[58] Moreover, many states and local school districts have requirements or standards that mandate teaching concepts and engaging in practices related to valuing and analyzing diverse perspectives, fostering critical thinking, and ensuring that education is inclusive and equitable.[59]

As described above, the Letter leaves educators uncertain of what and how they can teach under the broad and vague prohibitions of its terms. They do not know, for example, whether they can engage students in critical thinking about classic works of literature like *To Kill a Mockingbird* that address themes or race and discrimination, or teach the history of the Jim Crow era and the civil rights movement without being accused of "indoctrination" or impermissibly teaching that "certain racial groups bear unique moral burdens."[60] The Letter's chill extends to educator's work beyond the classroom, including their ability to help students to develop social and emotional skills such as developing empathy, challenging stereotypes, understanding bullying, and appreciating individual difference.[61]

In higher education as well, educators face a chill and uncertainty in their academic activities due to the broad and vague terms of the Letter. For example, they question whether they can continue to allow students to choose their own paper topics, they have been denied the ability to present their own research to faculty and the broader community, and their training programs that reference diversity, equity, or inclusion have been gutted.[62]

---

[58] *See supra* at 8 & n.24.
[59] *Id.*
[60] *See supra* at 6–7.
[61] *Supra* at 7–8.
[62] *Supra* at 8, 11–13.

The chill and uncertainty caused by the Letter extends to the programs and services of NEA, NEA-NH, and CBED as well.[63] As illustrated by the difficulties facing Plaintiffs, the Letter fails to provide adequate notice about what speech and programming regarding race, diversity, equity, or inclusion is prohibited under federal law, leaving them to guess at their peril and undermining their ability to support effective teaching.

### 3. The Letter Invites Arbitrary Enforcement.

The open-ended and subjective nature of the Letter's prohibitions allow for arbitrary and discriminatory enforcement. The Letter's summary conclusion that schools are engaged in discrimination indicates that the administration will make determinations about a program's legality without meaningful investigation and process.[64] And although ED reportedly has halted other investigations under Title VI,[65] in conjunction with the issuance of the Letter, ED announced a specialized "End DEI" complaint portal for "parents, students, teachers, and the broader community to submit reports,"[66] focused on the communication of ideas ED disfavors and tendentiously describes as "divisive ideologies and indoctrination."[67] Further description of the portal's purpose is offered by a private individual, identified as a co-founder of Moms for Liberty,

---

[63] *Supra* at 11–13.

[64] The likelihood of this threat is supported by other actions of the administration. For example, ED cancelled over $350 million in contracts and grants to Regional Education Laboratories and Equity Assistance Centers because of purported "ideologically driven spending," including "divisive training in DEI, Critical Race Theory, and gender identity." Press Release, U.S. Dep't of Educ., U.S. Department of Education Cancels Additional $350 Million in Woke Spending (Feb. 13, 2025), https://perma.cc/VT57-LXEX (attached as Ex. AH). ED also slashed over $600 million in diverse teaching grants for teacher preparation programs, because they provided training on "divisive ideologies," including "inappropriate and unnecessary topics such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; 'anti-racism'; and instruction on white privilege and white supremacy." Press Release, U.S. Dep't of Educ., U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants (Feb. 17, 2025), https://perma.cc/K2N4-UUN7 (attached as Ex. AI).

[65] Jennifer Smith Richards & Jodi S. Cohen, *Education Department "Lifting the Pause" on Some Civil Rights Probes, but Not for Race or Gender Cases*, ProPublica (Feb. 20, 2025), https://perma.cc/F3TW-K8XP (attached as Ex. AJ); *see also* Jodi S. Cohen & Jennifer Smith Richards*, Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Feb. 20, 2025), https://perma.cc/6632-A9X4 (attached as Ex. AK).

[66] Portal Press Release.

[67] End DEI Portal.

who encourages parents "to share the receipts of the betrayal that has happened in our public schools" through "pushing critical theory, rogue sex education and divisive ideologies."[68]

ED plans to use portal submissions "as a guide to identify potential areas for investigation."[69] Moms for Liberty posted the Letter stating "NO MORE Tax Payer Dollars will be spent on DEI!" and referencing "woke ideologies,"[70] and has threatened local school boards that "[i]t will be in the best interest of this school district to comply. If compliance is not met, Moms for Liberty is prepared to escalate this issue, potentially leading to the loss of federal funding for the school district."[71] In the past, Moms for Liberty has offered money for people to "catch" a public school teacher violating similar New Hampshire bans on teaching.[72] Given the apparent close relationship of Moms for Liberty to ED, these threats weigh heavily.

### B.  The Letter Violates the First Amendment.

As discussed above, the Letter does not provide meaningful guidance; instead, it baldly asserts that "DEI programs" violate the law. Because the Letter does not define what constitutes a DEI program, colleges and universities must guess—on pain of the imminent loss of all federal funding—what speech concerning race, equity, diversity, or inclusion is now prohibited. With the Sword of Damocles hanging over their heads, administrators will broadly suppress any speech that is even potentially inconsistent with ED's views on these topics, including the constitutionally protected academic speech of Plaintiffs.

---

[68] Portal Press Release. Moms for Liberty's founder has also stated that she "helped on the project" of the End DEI portal and describes it as the "culmination" of her "efforts to advance conservative parental values in the classroom." Moms for Liberty, 'End DEI' portal is 'culmination' of her efforts, says M4L co-founder Justice (Mar. 5, 2025), https://perma.cc/95M3-MKYU (attached as Ex. AL).
[69] Portal Press Release.
[70] Moms for Liberty, DEAR COLLEAGUE, Facebook (Feb. 15, 2025), https://www.facebook.com/story.php?story_fbid=935218675478809&id=100069720560290 (attached as Ex. AM).
[71] Moms for Liberty, DEI Tug of War in Wake County Schools Stirs Tensions Among Board, Parents (reposted from the Carolina Journal) (Feb. 20, 2025), https://perma.cc/3B8D-W5WN (attached as Ex. AN).
[72] Moms for Liberty Hillsboro Co, NH, X (Nov. 12, 2021), https://perma.cc/L9YE-7HZJ (attached as Ex. AO).

This violates the First Amendment. ED undoubtedly lacks the power to directly ban the academic expression of disfavored ideas in higher education—including "DEI programs" that, in ED's view, "toxically indoctrinate[] students with the false premise that the United States is built upon 'systemic and structural racism,'" Letter at 2, and "teach students that certain racial groups bear unique moral burdens that others do not," *id.* at 3; *see also* End DEI Portal (soliciting complaints regarding "divisive ideologies and indoctrination"). Likewise, ED cannot threaten the withdrawal of federal funding to coerce colleges and universities to engage in viewpoint discrimination against disfavored ideas. In doing so, ED violates the First Amendment.

### 1. The First Amendment Protects the Academic Speech of Plaintiffs' Members from Viewpoint-based Censorship.

"The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any authoritative selection." *Keyishian*, 385 U.S. at 603 (cleaned up). For this reason, academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.*; *see also, e.g.*, *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("The essentiality of freedom in the community of American universities is almost self-evident. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.").

Courts throughout the country hold that the First Amendment forbids censoring academic speech in the nation's colleges and universities. This includes protecting professors who are public employees, where a government employer would otherwise have broad authority. *See, e.g.*, *Kilborn v. Amiridis*, No. 23-3196, 2025 WL 783357, at *4 (7th Cir. Mar. 12, 2025) (declining "to extend [*Garcetti v. Ceballos*, 547 U.S. 410 (2006)] to speech involving university teaching and

scholarship when the Supreme Court was unwilling to do so" and noting that "[e]very other circuit to decide the issue has recognized that *Garcetti* does not apply . . . .") (collecting cases).

The Supreme Court has repeatedly reaffirmed the "bedrock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 582 U.S. 218, 223 (2017). Viewpoint discrimination, including in the provision of public funds for private expression, is always impermissible. *See, e.g.*, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) ("[E]ven in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas," especially if doing so "result[s] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" (cleaned up)); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (holding that a public university may not discriminate against religious viewpoints in the provision of funds for student groups). "The dangers of viewpoint discrimination are heightened in the university setting," *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022), where a legislature's suppression of specific views undermines the universities' "chief mission … to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic," *id.* at 1128.

"The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another." *McGuire v. Reilly*, 386 F.3d 45, 62 (1st Cir. 2004). Here, the Letter announces that "DEI programs" are unlawful because, in ED's view, such speech "toxically indoctrinate[s] students with the false premise that the United States is built upon 'systemic and structural racism,'" Letter at 2, and "teach[es] students that certain racial groups bear unique moral burdens that others do not," *id.* at 3. Likewise, the FAQ explains that ED targets "themes in a class discussion" because, in ED's view, they "act[] to shame students of a particular

27

race or ethnicity, accuse them of being oppressors in a racial hierarchy, ascribe them less value as contributors to class discussions because of their race, or deliberately assign them intrinsic guilt because of the actions of their presumed ancestors,"[73] FAQ at 6, as well as a school's "further[ance] of DEI objectives, 'equity,' a racially-oriented vision of social justice, or similar goals," *id.* at 8. ED's placement of scare quotes around the term equity further indicates its hostility toward associated viewpoints. ED's End DEI portal reflects this, soliciting complaints regarding DEI "indoctrination."[74] In sum, ED seeks to suppress certain ideas about racial justice in favor of other narratives. This is straightforward viewpoint discrimination.

Courts have found similar laws prohibiting teaching or discussing concepts related to race, diversity or equity to be viewpoint discriminatory. *See Pernell v. Fla. Bd. of Governors*, 641 F. Supp. 3d 1218, 1277 (N.D. Fla. 2022) ("[T]he State of Florida says that to avoid indoctrination, the State of Florida can impose its own orthodoxy and can indoctrinate university students to its preferred viewpoint. This extravagant doublespeak flies in the face of 'the invaluable role academic freedom plays in our public schools, particularly at the post-secondary level.'" (quoting *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991))).

### 2. The Letter Unconstitutionally Coerces Colleges and Universities to Censor Disfavored Academic Speech.

The Constitution bars indirect, as well as direct, attempts at censorship. As the Supreme Court reaffirmed last year, "a government entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 180 (2024) (quoting *Bantam*

---

[73] ED notes these would be "less likely" to be viewed as creating a hostile environment in the university setting. FAQ at 6. However, this statement acknowledges ED's intent to regulate classroom discussions in higher education, and the possibility that it will deem them unlawful.
[74] End DEI Portal.

*Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). That is precisely what the Letter does by threatening schools with the loss of federal funding if they do not prohibit academic speech that "toxically indoctrinate[s] students with the false premise that the United States is built upon 'systemic and structural racism,'" Letter at 2, that "teach[es] students that certain racial groups bear unique moral burdens that others do not," *id.* at 3, that "shame," "accuse," "ascribe . . . less value," "assign . . . intrinsic guilt," or "discourage," FAQ at 6, or "that are designed to emphasize and focus on racial stereotypes," FAQ at 7.

The government violates the First Amendment through coercion of a third party when it engages in conduct "that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. To conduct this analysis, courts consider factors, including: (1) whether the entity seeking to limit speech had actual enforcement authority, (2) whether the communications were presented as mere suggestions or instead as "orders" with "thinly veiled threats," and (3) how the third parties reacted to the communications. *See id.* at 190–94. This list is not exhaustive, and no one factor is dispositive; rather, "[c]onsiderations like who said what and how, and what reaction followed, are . . . helpful guideposts in answering the question whether an official seeks to persuade or, instead, to coerce." *Id.* at 191. Here, the factors conclusively support an inference that the Letter is coercive.

Start with the first factor, "who." ED's conduct carries particular coercive weight because of the expansive power it wields over federally-funded educational institutions. ED's express threat to withhold federal funding would devastate the educational institutions that employ Plaintiffs.[75] Even the threat of an ED investigation imposes onerous legal, administrative, and

---

[75] For example, on March 7, ED announced the "immediate cancellation of approximately $400 million in federal grants and contracts" to Columbia University related to its "ongoing investigation under Title VI of the Civil Rights Act." Press Release, U.S. Dep't of Educ., Cancelation of Grants and Contracts to Columbia University (Mar. 7, 2025),

reputational costs. Given the tremendous power ED wields, its instructions are carefully scrutinized and enforced by educational institutions under its purview, and Plaintiffs have already experienced their schools silencing speech associated with race, diversity, equity, and inclusion.[76]

Next, consider the second factor, "how." The Letter opens with sweeping conclusions, including that schools have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism'" and used "'diversity, equity, and inclusion' ('DEI')," as a means of "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." Letter at 1–2; *see also id.* at 3 ("DEI programs . . . deny students the ability to participate fully in the life of a school."). These conclusions are generalized across educational institutions and asserted without support in any facts or analysis. Instead, ED declares that anything it deems DEI programming is unlawful on its face.

The Letter announces ED's plans to "vigorously enforce" its interpretation of the law to begin within 14 days. Letter at 3. ED has already concluded that schools are in violation and orders them to "cease efforts" to violate the law as ED conceives it. *Id.* Enforcement here does not suggest subsequent procedurally adequate investigation, but the swift threat of funding termination. Early efforts by federal government actors in the Letter's wake reinforce the broad threat the Letter imposes. On March 14, 2025, ED announced in a single statement that it has "opened investigations into 45 universities" following the issuance of the Letter.[77]

---

https://perma.cc/96Y4-CNC2 (attached as Ex. AP). In announcing the cuts, the government asserted that this "serves as a notice to every school and university that receives federal dollars." *Id.* On March 13, ED, along with other agencies, sent a letter indicating sweeping "precondition[s]" to negotiation and receipt of federal funds, including placing an academic department under receivership and conducting comprehensive admissions reform. Letter from Josh Gruenbaum, Comm'r of the Fed. Acquisition Serv., Gen. Servs. Admin., et al., to Dr. Katrina Armstrong, Interim President, Columbia University (Mar. 13, 2025), https://perma.cc/RNC4-E3GY (attached as Ex. AQ).

[76] *See supra* at 10–11; *id.* at 19 & n.57.

[77] Mar. 14 Investigations Press Release.

Which takes us to the third factor, the "reaction": Given the enormous pressure ED is exerting on schools to suppress any speech that might run afoul of the Letter's ideological diktats, schools where Plaintiffs work have already moved to alter, restrict, or eliminate educators' teaching and scholarship.[78]

### C.  The Letter Violates the Administrative Procedure Act.

The Letter constitutes final agency action reviewable under the APA, which "provides for judicial review of both procedure and substance." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020). The Letter is both procedurally deficient and substantively unlawful.

### 1.  The Letter Is Reviewable Final Agency Action.

The Letter constitutes "final agency action." 5 U.S.C. § 704. It satisfies both conditions under the Supreme Court's "pragmatic" test for finality. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016) (citation omitted). It "mark[s] the consummation of the agency's decision-making process," and through it, "rights or obligations have been determined," and "legal consequences . . . flow." *Id.* at 597; *see also Berkshire Env't Action Team, Inc. v. Tenn. Gas Pipeline Co.*, 851 F.3d 105, 111 (1st Cir. 2017) (an agency action is final when it "'conclusively determine[s] the rights and obligations of the parties with respect to the matters at issue'") (quoting *Rhode Island v. EPA*, 378 F.3d 19, 23 (1st Cir. 2004)).

The Letter marks the consummation of decision-making because it "is properly attributable to the agency itself." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020) (internal quotation marks omitted). The Letter sets forth ED's definitive conclusion that schools are acting unlawfully. It "consistently speaks in [ED's] voice, setting forth the 'interpretation' and 'guidance'

---

[78] *See supra* at 10–11; *id.* at 19 & n.57.

of the agency." *Id.* It was signed by Craig Trainor, the Acting Assistant Secretary for Civil Rights who, far from a "mere subordinate," *id.*, is the official with authority to determine ED's position.

The Letter is not "tentative." It announces that ED will begin enforcement "based on the understanding embodied in this [L]etter"—*i.e.*, that schools are acting unlawfully—within two weeks of its issuance. Letter at 3. Further, schools and educators are ordered to "cease all efforts" that violate ED's prohibitions. *Id.* The Letter is thus "unequivocal," *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000), and "gives rise to 'direct and appreciable legal consequences.'" *Hawkes*, 578 U.S. at 598 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)); *see also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000). To conform, schools and educators must take immediate, costly action. The Letter is therefore final agency action.

Confirming the Letter is "controlling in the field" and that ED "bases enforcement actions on the policies or interpretations formulated" therein, *Appalachian Power Co.*, 208 F.3d at 1021, ED set up a portal to solicit complaints in line with the dictates of the Letter,[79] and has moved pursuant to the Letter to investigate 45 universities.[80] The Letter "is for all practical purposes 'binding.'" *Appalachian Power Co.*, 208 F.3d at 1021. "It commands, it requires, it orders, it dictates." *Id.* at 1023.

### 2. The Letter Is Contrary to Constitutional Rights.

When final agency action is contrary to constitutional rights, the APA requires it to be "set aside." *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224, 243 (D. Mass. 2021) (citing 5 U.S.C. § 706(2)(B)). For the reasons explained *supra*, the Letter violates the First and Fifth Amendments and, in turn, the APA.

---

[79] End DEI Portal.
[80] Mar. 14 Investigations Press Release.

### 3.  The Letter Exceeds ED's Statutory Authority.

The Letter violates the APA because it is in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The "question . . . is always whether the agency has gone beyond what Congress has permitted it to do," *City of Arlington v. FCC*, 596 U.S. 290, 298 (2013), a consideration requiring courts to "exercise their independent judgment," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Here, the Letter exceeds ED's authority as clearly limited by ED's enabling statute.

In the Department of Education Organization Act ("DEOA"), 20 U.S.C. §§ 3401–3510, establishing ED, Congress made clear that ED has no authority to exercise "direction, supervision, or control" over, inter alia, "the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b). Yet the Letter makes plain ED's intent to control many of these activities, including the curricular and instructional choices of schools and educators. *See supra*; *e.g.*, Letter at 3 (prohibiting "teach[ing] students that certain racial groups bear unique moral burdens that others do not"). As such, ED has impermissibly "exercise[d] its authority 'in a manner inconsistent with the administrative structure Congress enacted into law.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)).

### 4.  The Letter is Contrary to Law.

The Court must "hold unlawful and set aside" agency action "not in accordance with law." 5 U.S.C. § 706(2)(A). The Letter impermissibly intrudes on educational matters that Congress explicitly prohibits ED from directing, controlling, or supervising and thus is contrary to law.

Under the General Education Provisions Act ("GEPA"), governing the administration of federal education programs, 20 U.S.C. §§ 1221–1234i, ED is prohibited from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system," *id.* § 1232a. Similar prohibitions are incorporated in the DEOA, *see supra* section C.3, the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act ("ESSA"), 20 U.S.C. §§ 6301–7981; *see, e.g.*, 20 U.S.C. § 7906a(a) ("No officer or employee of the Federal Government shall, through grants, contracts, or other cooperative agreements, mandate, direct, or control a State, local educational agency, or school's specific instructional content, academic standards and assessments, curricula, or program of instruction developed and implemented to meet the requirements of this chapter."), and the Higher Education Opportunity Act, 20 U.S.C. § 1132-2 ("HEOA"). The Letter violates these provisions, including because it seeks to direct, supervise, or control the curricular and instructional choices of schools and educators. *See supra*; *e.g.*, Letter at 3 (prohibiting "teach[ing] students that certain racial groups bear unique moral burdens that others do not").

### 5.  The Letter is Arbitrary and Capricious.

The APA's bar on arbitrary and capricious agency actions "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). "An agency decision fails to pass this test if . . . the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so

implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Wheeler*, 954 F.3d at 21 (internal quotation marks omitted). The Letter fails this test.

### a. ED failed to acknowledge let alone explain its dramatic departure from settled law and its own guidance.

The Letter marks an unexplained departure from decades of settled law with respect to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq., its implementing regulations, and longstanding guidance, all of which are intended to further equity and inclusion in education. Indeed, ED has indicated its intent to "reorient civil rights enforcement."[81]

When an agency changes an existing policy, it must "display awareness that it is changing its position," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account,'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 226 (2016) (citation omitted). This is especially true, where, as here, ED's regulations and guidance on furthering equity and inclusion have been consistent throughout the decades.[82] *See Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1439 (D.C. Cir. 1983) (agency's "elimination" of a policy that governed "for almost 50 years" required the court "to scrutinize more closely the [agency's] proffered explanations for its actions"). Yet the Letter wholly ignores prior agency guidance—including, most recently, guidance discussing the implementation of *SFFA*, 600 U.S. 181, the very case it

---

[81] Mar. 14 Investigations Press Release.

[82] *See, e.g.*, Letter from Richard W. Riley, Sec'y of the Dep't of Educ., to Colleagues (Jan. 19, 2001), https://perma.cc/K9ZM-Z7L9 (attached as Ex. AR) (explaining how long-standing racial and ethnic disparities in the distribution of educational resources, including "gaps and access to experienced and qualified teachers, adequate facilities, and instructional programs and support" raise legal concerns under Title VI and instructing states to examine their practices to identify and remedy inequities); Letter from Catherine E. Lhamon, Assistant Sec'y for C.R., Off. of C.R., to Colleagues (Oct. 1, 2014), https://perma.cc/5343-RZCQ (attached as Ex. AS) (encouraging school districts to "conduct a comprehensive resource equity assessment" of educational resources to ensure compliance with Title VI and other laws).

invokes.[83] In 2023, ED issued a Q&A document regarding *SFFA* advising that "institutions of higher education may continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity." SFFA Q&A at 3. The Letter contradicts this premise, indicating that "diversity, equity, and inclusion" practices are discriminatory, Letter at 2, that "DEI programs . . . deny students the ability to participate fully in the life of a school," and that "it would be unlawful . . . for an educational institution" to take action "to increase racial diversity," *id.* at 3.

Similarly, ED's previously published Strategies for Increasing Diversity and Opportunities Report is described as a "resource for educational institutions considering new policies or programs to advance or maintain student diversity after . . . *SFFA*" and presents "examples of actions that can help advance equitable opportunity in ways that do not consider an individual student's race in and of itself in admissions." Strategies Report at 6. The Report, still available on ED's website, describes programs and practices ED identified as promoting diversity. The Letter does not address the prior Report or these practices specifically, yet its generalized conclusion that "DEI programs" are unlawful, Letter at 3, sweeps away ED's prior guidance in whole.

It is not surprising then that inconsistencies exist in each of the Letter's pronouncements. For one glaring example, take ED's statements regarding the use of standardized tests: ED's Strategies for Increasing Diversity and Opportunities Report (at 26) states that "[i]nstitutions can consider test-optional or test-free policies as a practice to diversify their applicant pool," while the Letter (at 3) declares it would be "unlawful for an educational institution to eliminate standardized

---

[83] *See, e.g.*, Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues (Aug. 14, 2023); SFFA Q&A; Strategies Report.

testing . . . to increase diversity."[84] Such an "'[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars*, 579 U.S. at 222 (quoting *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

The Letter is also silent as to why, in reversing position, ED blatantly disregards the factual premises underlying prior publications. Chief among them is ED's premise, supported by academic scholarship, that affinity groups, accessible spaces, and DEI programming can "influence enrollment and retention rates by shaping [underrepresented students'] sense of belonging on campus." Strategies Report at 44. Another is that efforts of fostering and increasing diversity via financial support and academic advising can improve disparate college completion rates among Hispanic/Latino, Native Hawaiian/Pacific Islander, Black, and American Indian/Alaska Native students. *Id.* at 38. ED also supported this premise with compelling statistics and academic scholarship. *Id.* Yet, the Letter disregards the benefits DEI programming can have on underserved students' enrollment, retention, and completion rates and instead proffers another, factually unsupported premise: that these programs "discriminate" and "deny students the ability to participate fully in the life of a school." Letter at 3.

Plaintiffs and their members have built up legitimate reliance on longstanding federal laws and regulations, their interpretation by courts, and ED's own prior guidance.[85] Now, in the middle of the academic year, the Letter advises the entire education community that they must abruptly

---

[84] ED's Strategies for Increasing Diversity and Opportunities Report (at 8, 20) also encouraged institutions to promote diversity by conducting targeted recruitment programs in "communities with high proportions of low-income students and students of color" and consider[ing] "experiences of hardship or discrimination, including but not limited to racial discrimination" in admissions, and its prior SFFA Q&A guidance (at 3) advises that "institutions of higher education may continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity." In contrast, the Letter (at 2–3) deems these practices "unlawful" if used to "increase racial diversity."
[85] *See supra* at 8–9, 11–13; CBED Decl. ¶ 12.

change course to adhere to new vaguely worded rules. In failing to grapple with or even recognize the Letter's inconsistencies with these sources, ED abdicated its responsibility to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33; *see also California v. United States Dep't of Educ.*, No. 25-1244, 2025 U.S. App. LEXIS 6597, at *11-12 (1st Cir. Mar. 21, 2025) (explaining that "it does not appear that [ED] properly considered the reliance interests of" the affected stakeholders or that it "accounted for all relevant impacts of" the challenged agency action (citing *Regents of the Univ. of Cal.*, 591 U.S. at 30-31)).

### b. The Letter's application of *SFFA v. Harvard* is overreaching and arbitrary.

To the extent that ED offers any rationale for its marked departures, it relies on *SFFA v. Harvard*. But the Letter misconstrues and misapplies the Supreme Court's decision in violation of the APA. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) (agency action must be logical and rational). While the Court in *SFFA* held that the benefits of diversity did not provide a compelling interest justifying the consideration of race in college admissions, its holding was limited to such admission decisions. 600 U.S. at 213 n.4 (declining to reach the question of whether U.S. military academies had distinct compelling interests that would justify the consideration of race in admissions). Yet the Letter announces that the "Supreme Court's holding applies more broadly," to conclude that it violates the law as a general matter to "[r]el[y] on non-racial information as a proxy for race . . . on an individual basis or a systematic one," to use race neutral efforts to increase diversity, or to implement "DEI programs." Letter at 2–3; *cf. Friends of Back Bay v. U.S. Army Corps. Of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("A material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision.").

38

When the Supreme Court has spoken on these issues, it has distinguished them. In *SFFA*, for example, the Court writes that the interests furthered by diversity, including "promoting the robust exchange of ideas," "broadening and refining understanding," and "producing new knowledge stemming from diverse outlooks," are "commendable goals." 600 U.S. at 214 (citation omitted). Moreover, Justice Kavanaugh, concurring, expressly states that "governments and universities still 'can, of course, act to undo the effects of past discrimination in many permissible ways.'" [86] *Id.* at 317 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 526 (1989)); *see also id.* (citing *Croson*, 488 U.S. at 509 (plurality opinion of O'Connor, J.) ("[T]he city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races[.]")). Justice Kavanaugh cites back to SFFA's own briefing, *SFFA*, 600 U.S. at 317 (citing Pet'r's Br. at 80–86), which highlights examples of permissible means of achieving diversity, including: eliminating preferences, such as legacy preferences, that benefit the white and wealthy, increasing preferences for the socioeconomically disadvantaged, *id.*, Pet'r's Br. at 80–81, eliminating requirements for SAT scores, *id.*, Pet'r's Br. at 82–83, increasing financial aid, increasing recruitment efforts, increasing admissions of community college transfers, and developing partnerships with disadvantaged high schools, *id.* at 85–86. The Letter fails to acknowledge, let alone explain that the very opinion on which its reasoning rests contradicts its pronouncement that these practices are broadly discriminatory.

---

[86] The same is true of the Supreme Court's address of elementary and secondary education, also unmentioned in the Letter. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 788 (2007) (Kennedy, J., concurring in judgment) ("In the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. . . . School boards may pursue the goal of bringing together students of diverse backgrounds and races through [ ] means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race.").

The Letter prohibits schools from "us[ing] students' personal essays, writing samples, participation in extracurriculars, or other cues as a means of determining or predicting a student's race and favoring or disfavoring such students." Letter at 2 (citing *SFFA*, 600 U.S. at 230 ("[U]niversities may not simply establish through application essays or other means the regime we hold unlawful today.")). Although citing *SFFA*, the Letter omits additional guidance the Supreme Court itself supplied to schools in navigating this area in line with its holding. As stated by the Court: "nothing in [its] opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise . . . . A benefit to a student who overcame racial discrimination, for example, must be tied to *that student's* courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to *that student's* unique ability to contribute to the university." *SFFA*, 600 U.S. at 230–31.

ED seems to ignore the Supreme Court's guidance it omits and treats as impermissible "considering an applicant's discussion of how race has affected his or her life." *Id*. at 230. To the extent the Letter does so, ED clearly acts beyond its authority. At a minimum, ED omits available guidance that would help schools to administer their programs in a reasoned fashion. In either case, its action is arbitrary. *Cf. Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 69 (D.D.C. 2016) (reversing agency decision that "cherry-pick[ed] evidence").

### c.  ED failed to consider important aspects of the problem.

The Court must "set aside" the Letter because ED "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. ED failed to consider numerous important aspects of the problems the Letter creates. First, the Letter arbitrarily failed to consider how its broad, vague prohibitions on DEI programs and concepts related to race would dramatically

undermine the effective provision of education, and various state, local, and professional obligations. *See ACA Int'l v. FCC*, 885 F.3d 687, 699 (2018) ("Administrative action is 'arbitrary and capricious [if] it fails to articulate a comprehensible standard' for assessing the applicability of a statutory category.") (quoting *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 754 (D.C. Cir. 2015)). For example, consistent with sound pedagogical practices, most states have requirements or standards for teaching and learning providing that educators should instruct on concepts and practices the Letter prohibits.[87] Similarly, principles related to diversity, equity, and inclusion and topics related to race are included in many educator training and professional standards.[88] For example, many educators, including Plaintiffs, employ culturally responsive practices as part of strong pedagogy, and as encouraged or required by state and local educational policies.[89] The Letter's vague terms not only sweep in these practices, but the FAQ also explicitly labels them discriminatory. FAQ at 5. ED also fails entirely to consider how practices related to diversity, equity, and inclusion extend beyond the classroom, and are necessary for students to fully participate in school. Such instruction helps students develop healthy social, interpersonal, and emotional skills.[90] Yet, the Letter's prohibitions make these discussions suspect. *See, e.g.*, FAQ at 3 (indicating without explanation that "social-emotional learning" is discriminatory). "[W]hen an agency ignores factual matters," as ED clearly has, courts "ha[ve] not hesitated" to vacate agency decisions. *Water Quality Ins. Syndicate* 225 F. Supp. 3d at 68.

Second, ED fails to consider the Letter's interference with the administration of Title VI and its implementing regulations. The Letter makes it impossible for Plaintiffs to implement

---

[87] *See supra* at 8.
[88] Relatedly, ED fails to consider how DEI principles are deeply embedded in the training and other programs that are offered to educators throughout the country, including by Plaintiffs NEA and CBED, which are, in turn, central to their mission. *See supra* at 11–13.
[89] *See supra* at 8–9, 13.
[90] *See supra* at 8–9.

programs that foster diversity, equity, and inclusion, which Title VI and its implementing regulations permit and often require. *See, e.g.*, 34 C.F.R. § 100.3(b)(2) (prohibiting program participants from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin"); *id.* § 100.3(b)(6)(i) (where a recipient has previously discriminated against persons on the ground of race, the recipient "must take affirmative action to overcome the effects of prior discrimination"). For example, the Letter determines it is "unlawful for an educational institution to eliminate standardized testing . . . to increase racial diversity." Letter at 3. Yet educational institutions may decrease their reliance on standardized testing where they find it unfairly disadvantages Black and Latine students, English learners, women, and students from economically marginalized backgrounds, including due to cultural biases in the makeup of test questions and methods of test validation.[91] Put another way, schools may eliminate a test that unfairly denies students educational opportunities.

The Letter also interferes with Plaintiffs', schools', and stakeholders' ability to ensure that students fully participate in school in accordance with Title VI and its implementing regulations. For example, ED has included remedies like social and emotional learning to address racially hostile learning environments and exclusionary discipline practices that violate Title VI.[92]

---

[91] *What is Test Optional?*, FairTest, https://perma.cc/E5CN-V55W (attached as Ex. AT); Christopher T. Bennett, *Untested Admissions: Examining Changes in Application Behaviors and Student Demographics Under Test-Optional Policies*, 59 American Education Research Journal 180 (2022), https://perma.cc/SH33-JWL7(attached as Ex. AU); Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 Harvard Educational Review 1, 28–29 (2003) (attached as Ex. AV); William C. Kidder, *How the SAT Creates "Built-In-Headwinds": An Educational and Legal Analysis of Disparate Impact*, 43 Santa Clara Law Review 131, 156–57 (2002), https://perma.cc/XK78-CMXH (attached as Ex. AW); *see also SFFA*, 600 U.S. at (Kavanaugh, J., concurring) (citing Pet'r's Br. at 80–86).

[92] *See, e.g.*, Letter from U.S. Dep't of Educ., Off. of C.R. to Dr. Jason Reynolds, Superintendent, Peoria Unified Sch. Dist. at 13, 22–23 (Sept. 30, 2022), https://perma.cc/NWB7-AZBR (attached as Ex. AX); Resolution Agreement, East

Third, ED fails to consider the Letter's interference with federal statutes expressly prohibiting ED from involvement in curricular and instructional decisions. Specifically, ESSA, 20 U.S.C. §§ 6301–7981, establishes formula and competitive grants to states, local education agencies, schools, non-profits, and institutes of higher education "to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps." *Id.* § 6301. ESSA explicitly prohibits the federal government from interfering with states' curriculums, instructional content, and related activities across all of its titles involving federal funds. *See, e.g. id.* § 7906a; *id.* § 7907(b); *id.* § 7907(c)(1). Similarly, DEOA, GEPA, and HEOA prohibit the federal government's direction, supervision, or control over curriculum and instruction. *See supra* section C.3–4. Yet the Letter conditions all federal funding on compliance, including with prohibitions on teaching related to DEI. Letter at 3. In so doing, ED fails to consider explicit prohibitions in four separate statutes, including its enabling statute. "[W]hen an agency ignores a mandatory factor it defies a statutory limitation on its authority," and "[s]uch an act is necessarily arbitrary and capricious." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 587 (7th Cir. 2011) (cleaned up); *see also Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

Fourth, ED failed to consider the federalism implications of its intrusions into activities to state and local governments. In exceeding its statutory authority, ED overreaches into areas of state and local control, and moreover, does so in an effort to conscript schools and educators to carry the federal government's anti-DEI priorities and viewpoint.

---

Side Union High School District, Case No. 09-14-1242 at 2, 7–8 (Dec. 13, 2017), https://perma.cc/ZB6P-4P9U (attached as Ex. AY). Yet, ED now considers social and emotional learning a "veil[ed] discriminatory polic[y]." FAQ at 5.

### d.  ED failed to acknowledge or consider the costs of the Letter.

"As a general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732–33 (D.C. Cir. 2016) (Kavanaugh, B., dissenting); *see also Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017). The Letter entirely failed to acknowledge, much less quantify, the Letter's cost, including harms to practices core to the basic provision of education.

The Letter will impose financial and other costs on Plaintiffs, educational institutions, and others in the education community, all of whom have invested substantial financial and other resources in ensuring that they best serve all students through instruction and other programming.[93] Now, in the middle of a school year, they are forced to reevaluate the content and practice of their teaching and activities under the Letter's vague prohibitions. ED's refusal to acknowledge much less quantify or explain these costs is arbitrary and capricious. *See Perdue*, 873 F.3d at 932 (agencies must "adequately analyze . . . the consequences" of their actions).

### e.  The Letter is pretextual.

The Letter is pretextual, and thus arbitrary and capricious. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (explaining a court "cannot ignore the disconnect between the decision made and the explanation given")*.* While the Letter purports to address discrimination, ED points to no evidence of the discriminatory practices it seeks to curtail, and its adoption of terms and prohibitions bear no reasonable relationship to that purpose. Instead, the administration has been clear that it intends to eliminate ideologies, practices, and programming with which it disagrees at whatever cost.[94] The Letter demonstrates ED's attempt to implement this policy of censorship. *See*

---

[93] *See supra* at 7–13.
[94] *See, e.g.*, Exec. Order No. 14190, "Ending Radical Indoctrination in K-12 Schooling," 90 Fed. Reg. 8,853 (Jan. 29, 2025) (attached as Ex. AZ); Exec. Order No. 14151, "Ending Radical and Wasteful Government DEI Programs and

*supra* Section B; *Cook County v. Wolf*, 461 F. Supp. 3d 779, 796 (N.D. Ill. 2020) (evidence that agency's stated reason "obscure[d]" the real reason for agency action).

### 6.  The Letter Violates the APA's Notice-and-Comment Requirement.

The Court must "set aside" the Letter as agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The Letter is a "rule" within the meaning of the APA because it is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). In general, before an agency adopts a rule, it must first "publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553).

The Letter is plainly a substantive rule subject to notice-and-comment requirements. As the Supreme Court has explained, an agency must employ notice-and-comment procedures before issuing a rule that has the "force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979); *see also N.H. Hosp. Ass'n*, 887 F.3d at 70. As set out above, the Letter carries the force and the effect of law: It obligates schools, on pain of funding termination, to upend their longstanding curricular, instructional, and administrative practices in conformance with ED's unprecedented new policies.[95]

The substantive nature of the rule is also made evident by ED's acknowledgment that the core source it cites—the Supreme Court's decision in *SFFA*—is narrower than the proscriptions announced in its Letter, as discussed *supra*. When a rule attempts "'to supplement [existing law],

---

Preferencing," 90 Fed. Reg. 8,339 (Jan. 20, 2025) (attached as Ex. BA); Exec. Order No. 14173 entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8,633 (Jan. 21, 2025) (attached as Ex. BB); *supra* n.64.

[95] ED's characterization of the Letter as less than a substantive rule, Letter at 1 n.3, does not change this analysis. *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1056 (D.C. Cir. 1987) ("[W]e are not compelled to defer to agency characterizations of rules [as being exempt from notice and comment].").

not simply to construe it,'" that rule is substantive, not interpretive. *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992) (citation omitted); *see also Citizens to Save Spencer Cnty. v. EPA*, 600 F.2d 844, 878–79 (D.C. Cir. 1979) (rules were "clearly legislative" because they served to "create law . . . implementary to an existing law," rather than serving as mere "statements as to what [existing law] means").

## II.    Plaintiffs Suffer Irreparable Harm Because of the Letter.

Plaintiffs have and will continue to suffer irreparable harm, justifying preliminary injunctive relief. Where, as here, "the likelihood of success on the merits is great," Plaintiffs may "show somewhat less in the way of irreparable harm." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). Even without this reduced burden, Plaintiffs would establish a clear imminent and irreparable harm. In addition to present chill, the imminence of their injuries is evident from the Letter and ED's subsequent actions. ED solicits "receipts of betrayal" against Plaintiffs and their employing institutions,[96] and has demanded compliance at the risk of substantial federal funding within 14 days. Plaintiffs' injuries are, in turn, substantial: The Letter infringes on Plaintiffs' constitutional rights, chills basic educator practices, jeopardizes the livelihoods of Plaintiffs' members, and interferes with Plaintiff organizations' core activities and resources. These injuries are "not accurately measurable or adequately compensable by money damages," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000), and there "are inadequate remedies at law" to address them absent preliminary relief, *Together Emps.*, 32 F.4th at 85–86; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984).

First, Plaintiffs have shown a strong likelihood of success on their constitutional claims, *see supra*, and "the prospect of an unconstitutional enforcement" alone "'supplies the necessary

---

[96] Portal Press Release.

irreparable injury.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992). Moreover, "in the context of the First Amendment, finding a likelihood of success on the merits is coextensive with finding irreparable harm." *Silva v. Univ. of N.H.*, 888 F. Supp. 293, 326 (D.N.H. 1994); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012). Here, Plaintiffs have already been censored by their educational institutions,[97] and have self-censored in fear of adverse consequences to their livelihoods.[98] Plaintiffs have therefore established irreparable harm.

Second, Plaintiffs' members face imminent and irreparable harm because of the impossible and burdensome choices the Letter forces them to make. Plaintiffs have submitted declarations extensively documenting how the Letter interferes and will continue to interfere with core responsibilities and practices of educators inside and outside of the classroom.[99] Every day, educators must continue these practices consistent with the requirements of their profession and essential for the students they serve at the risk adverse of consequences, including the threat of investigation or discipline, or they must substantially change their practices to avoid arbitrary enforcement at the peril of their professional responsibilities.[100] These fears are far from speculative. *Cf. Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go*, 370 F.3d 151, 162 (1st Cir. 2004). Rather, Plaintiffs' members have directly experienced the adverse consequences from similar state efforts to censor them,[101] and, indeed, Plaintiffs have already experienced adverse consequences under the Letter.[102] The impossible dilemma will persist absent injunctive relief, and

---

[97] *See supra* at 8–9.
[98] *See supra* at 7–9.
[99] *Id.*
[100] *Id.*
[101] *See, e.g.*, *supra* at 10.
[102] *See supra* at 7–11.

the resulting harms are irreparable. *See, e.g.*, *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015) (finding irreparable harm where plaintiff had shown faculty members discussing "their reluctance and fear over taking sick leave in the future," including because "[t]he potential harms that can result from choosing not to take sick leave . . . are exactly the types of harm for which money damages would be inadequate").

Third, Plaintiffs NEA, NEA-NH, and CBED are irreparably injured through ED's interference with their ability to perform their core services and activities. The Letter has and will continue to undermine, decrease the value of, and jeopardize the efficacy of Plaintiffs' professional excellence and development work, including of the provision of teacher training and grants, and partnerships with school districts and states.[103] Additionally, Plaintiffs NEA and NEA-NH will need to divert resources to address the effects of the Letter, including by expanding and modifying their core legal and advisory services to their members, which is far from speculative given their past experiences in addressing previous censorship efforts.[104] CBED similarly may need to modify, expand, or eliminate its offerings to educational institutions and already faces difficulties maintaining partnerships and contractual relationships with educational institutions due to these institutions' fears of enforcement.[105] Indeed, the Letter's vague prohibitions affect the substance and continued viability of CBED's core training and programs in furtherance of its mission, posing an existential threat to its very existence.[106] *See Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986) (harm that "threatens the very existence of [a plaintiff's] business" is irreparable). These injuries to Plaintiffs' organizational interests constitute irreparable harm. *See, e.g.*, *Cook County v. McAleenan*, 417 F. Supp. 3d 1008, 1018–19, 1029 (N.D. Ill. 2019) (finding irreparable harm

---

[103] *See supra* at 11–13.
[104] *See supra* at *id*.
[105] *Id.*
[106] *See supra* at 13.

where organization would need to divert resources away from its existing programs to respond to the effects of the challenged action); *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases holding that voter engagement organizations' lost opportunities to register voters constitute irreparable harm); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, at *9 (N.D. Cal. Mar. 1, 2019) (finding irreparable harm on the basis of immigrant-rights groups' "impairment of . . . organizational mission, loss of reputation and goodwill, and financial impairment").

Plaintiffs' injury flows from the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019). "Here, such decisions are more than predictable, they are already occurring." *New York v. Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 227 (S.D.N.Y. 2020) (granting preliminary injunction). All these harms will continue irreparably absent injunctive relief.

### III.    The Balance of Hardships Tilts Decidedly in Plaintiffs' Favor, and Relief Would Benefit the Public.

Defendants lack a legitimate interest sufficient to overcome Plaintiffs' substantial and irreparable injury, and the public interest favors a preliminary injunction. Courts "must balance the competing claims of injury and must consider the effect on each party," *Amoco Production Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987), as well as whether the relief is in the public interest, *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021). These factors "merge when the [g]overnment is the opposing party." *Does*, 16 F.4th at 37 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"Enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Tirrell v. Edelblut*, 747 F. Supp. 3d 310, 319 (D.N.H. 2024). By contrast, Defendants "have no interest in enforcing an unconstitutional law." *Tirrell*, 747 F. Supp. 3d at 319. Moreover, where "a continuation of the status quo during

49

the pendency of [] litigation will only shortly prolong the longstanding practice and policy of the United States government," and the "imposition of the [government policy] would impact [] plaintiffs in . . . unnecessarily destabilizing and disruptive" ways, the balancing of equities and the public interest tilt in favor of plaintiffs. *N.H. Indonesian Cmty. Support v. Trump*, No. 25-CV-38-JL-TSM, 2025 WL 457609, at *5 (D.N.H. Feb. 11, 2025).

The Letter undeniably destabilizes and disrupts Plaintiffs' ability to educate students. In contrast, ED will not incur costs or expend additional effort to allow Plaintiffs to continue their work consistent with guidance in place for decades. *See Doe v. Trump*, No. 25-10135-LTS, 2025 WL 485070, at *14 (D. Mass. Feb. 13, 2025) (balance of equities is in plaintiffs' favor because "an injunction will do no more than maintain a status quo that has been in place for [decades] . . . including under this President during his first term in office."). Because "preserv[ing] the relative position of the parties" will not injure Defendants and dissolving the status quo will impose unnecessary hardships on Plaintiffs' constitutional rights in the classroom and beyond, preliminary relief is both urgent and necessary. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## IV.    The Relief Requested is Necessary.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Intern. Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) (allowing nationwide injunction applicable to-non-parties to remain in place) ("*IRAP*"). Nationwide relief is appropriate here: it follows necessarily from the nature of the claims; it is necessary to grant complete relief to Plaintiffs, who are located across the country; and it is consistent with what is fair and workable.

The remedy to a violation under the APA is necessarily nationwide in effect. Plaintiffs are likely to succeed in their APA claims. "[W]hen a reviewing court determines that agency

regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also NAACP v. Trump*, 315 F. Supp. 3d 457, 462 n.3 (D.D.C. 2018)*; Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) ("The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others."). And "the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 234–39 (5th Cir. 2024); *Massachusetts v. Nat'l Insts. of Health*, No. 25-CV-10338, 2025 WL 702163, at *34 (D. Mass. Mar. 5, 2025).

"Courts have also held that a nationwide injunction can be necessary when the challenged law suffers from constitutional infirmities implicating individual liberties." *Florida v. HHS*, 19 F.4th 1271, 1283 (11th Cir. 2021). Here, Plaintiffs challenge the Letter on its face under the Fifth Amendment prohibition on vagueness and the First Amendment prohibition on viewpoint discrimination. The Letter is vague in its entirety. It discriminates against speech categorically. Plaintiffs do not seek to enjoin distinguishable provisions with which "they have failed to 'engage'" and "that don't presently affect them." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring) (stay granted of injunction reaching "portions of a statute that no party has shown, and no court has held, likely offensive to federal law.").

Moreover, ED has acted in excess of its congressionally prescribed authority under DEOA, GEPA, ESSA, and HEOA, and has done so to conscript state and local education institutions (as well as private colleges) to carry out the federal government's anti-DEI viewpoint in the education

of their citizenry, implicating federalism concerns. *Chicago v. Barr*, 961 F.3d 882, 920 (7th Cir. 2020) (nationwide relief justified including because the government acted "to conscript the police powers of the state to serve the . . . goals of the federal government."); *id.* (nationwide relief justified including because "[w]hether deemed a statutory or a constitutional violation, the executive's usurpation of the legislature's power of the purse implicates an interest that is fundamental to our government") (citing *Dalton v. Specter*, 511 U.S. 462, 472 (1994)).

Complete relief likewise requires reaching Plaintiffs across the country. NEA's members number in the millions and are "dispersed throughout the United States." *Florida v. HHS*, 19 F.4th at 1282; *see also Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (recognizing nationwide relief may be necessary where plaintiffs are "scattered nationwide.") (citation omitted); *Mass. v. NIH*, 2025 WL 702163 at *33. NEA members work at every level of education and in 14,000 communities in every state,[107] and NEA's training and support programs are likewise provided across the country.[108] Similarly, CBED partners with schools and school districts throughout the country on their programming.[109]

Fairness and workability also counsels in favor of nationwide relief. *Mass. v. NIH*, 2025 WL 702163 at *33 (quoting *North Carolina v. Covington*, 581 U.S. 486, 488 (2017)). Plaintiffs, including NEA and CBED, engage in their education work in close coordination with and dependent upon education institutions, state education departments and standards bodies, other educators, and third parties providing educational supports and services. In these circumstances, the "chaos and confusion of a patchwork of injunctions," *id.* (citation omitted), or any awkwardly gerrymandered injunction, would be both unwieldy and fail to provide the necessary relief. *See*

---

[107] NEA Decl. ¶¶ 4–5.
[108] *Id.* ¶¶ 12–13.
[109] CBED Decl. ¶¶ 13–15, 18–19, 24–28, 41–44.

*Mock*, 75 F.4th at 587 (citing *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 370 (5th Cir. 2023);

*cf. Alaska v. Dep't of Educ.*, 739 F. Supp. 3d 873, 899 (D. Kan. 2024) (observing the "compelling

need for nationwide uniformity" in ED rules).

## CONCLUSION

For the reasons stated above, the Court should grant a preliminary injunction.

Dated: March 21, 2025

Respectfully submitted,

Sarah Hinger*
Amanda Meyer*
Alexis Alvarez*
Ethan Herenstein*
Victoria Ochoa*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org

Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org

Alice O'Brien†
Jason Walta*
Phil Hostak*
Stacy Hickox†
NEA Office of General Counsel
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
SangYeob Kim (N.H. Bar No. 266657)
American Civil Liberties Union of New Hampshire
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org

Rachel E. Davidson*
American Civil Liberties Union Foundation of Massachusetts, Inc.
One Center Plaza, Suite 801
Boston, MA 02018
(617) 482-3170
rdavidson@aclum.org

*admitted pro hac vice
† *pro hac vice* forthcoming