# EXHIBIT J

# DECLARATION OF VALERIE WOLFSON

I, Valerie Wolfson, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. I am NEA Member B as identified in the Complaint.

2. I am an 8th Grade Social Studies teacher at Oyster River Middle School in Durham, New Hampshire. I have been teaching for 26 years.

3. I am a member of NEA-NH and the Oyster River Teacher's Guild.

4. I am offering this Declaration in my individual capacity and not on behalf of the District that employs me.

5. I have been directly impacted and harmed by the Dear Colleague Letter (the "Letter") as I have experienced significant chill and confusion regarding my teaching practices for fear that it might violate the Letter's prohibitions.

6. In particular, I fear that my teaching will be considered discrimination because of the ways my courses explore themes and permit discussion of "systemic and structural racism," "discriminatory policies and practices," or gender roles, concepts which are explicitly or potentially implicated by the Letter's prohibitions, including in the Letter's prohibitions on "diversity," "equity," and "inclusion," and on teaching "that certain racial groups bear unique moral burdens that others do not." I fear that I may be subjected to complaints, investigation, discipline, or adverse employment action as a result of my teaching.

7. The February 28, 2025 FAQ only adds to the uncertainty, as it makes vague references to "creating hostile environments" and suggests that educational institutions are seeking out "loopholes," "laundering" racial preferences, and engaging in "covert discrimination." The FAQ thus invites distrust in the ethics and professionalism of schools and educators, compounding the risk of complaints invited by the Letter.

8. I expressed similar fears as a public advocate[1] against New Hampshire's Banned Concepts Act, which purported to ban education around similar concepts. A court declared that the Banned Concepts Act was unconstitutional, but I am now facing similar fears in response to the Dear Colleague Letter.

---

[1] *See, e.g.*, *Opinion: The culture wars have come to the classroom. Now what?*, CNN, Nov. 3, 2022, https://perma.cc/S79G-2LE2; Haley Yamada, *Teachers in New Hampshire face new legal threats for teaching so-called 'divisive concepts' on race: "It's psychological warfare,"* ABC NEWS, Nov. 16, 2021, https://perma.cc/73CR-RVAT.

1

9. My role as a social studies teacher is to provide as complete and well-rounded of a history education as possible. I am passionate about education for everyone and have committed myself to continued learning and growth, regularly updating my pedagogical practices and curriculum to ensure that students are engaged in learning history. This often involves having complex conversations with students of varying backgrounds and opinions. My students disagree with each other during discussions and may at times feel challenged and uncomfortable when confronting aspects of U.S. history, but this is all necessary to developing students' sense of critical thinking and logic—*not* indoctrination or political intention.

10. To be successful in this endeavor, I must create a foundation of trust, joy, understanding, respectful discourse, care, and acceptance in my classroom. Being inclusive in my approach to education brings in multiple voices that create a robust learning environment. My fellow teachers and I are being accused of indoctrination when in fact we approach the profession with only love, kindness, and compassion. In no sense are we discriminating against students or teaching that any group is inferior or superior, but the Letter opens the door to accusing us of doing so, putting our certifications and jobs at risk.

**Implications on my ability to teach history involving references to race, ethnicity, racism, or racial stereotypes**

11. Until recently, I taught early American history beginning with the founding of the United States of America. I structured my curriculum to teach this history from three perspectives: the Indigenous perspective, the European perspective, and the African perspective. Objectively, there is history students should learn about each of these groups. That history requires acknowledgement and discussion of the concepts of race, genocide, slavery, and colonialism—it is impossible to accurately teach this portion of history without reference to those concepts.

12. In teaching this history, I do not tell students what to believe or how to feel about history. I also do not tell them that any group is inherently inferior or superior to another group or that anyone should feel any guilt or shame because of their race, ethnicity, or national origin. Rather, I present resources and create space for discussions, questions, and further research around topics that students are passionate about and align with best teaching practices, including focusing on skill development and broad themes as a vehicle for critical thinking rather than specific topics

2

and require me to present multiple sides of an issue, promote discussion, and develop students' critical thinking.

13. However, I fear that these lessons would leave me vulnerable to accusations of discrimination under the Letter's interpretation of what constitutes discrimination since these lessons could lead to discussions around "systemic and structural racism" or "discriminatory policies and practices," which the Letter takes issue with. Such accusations could threaten my certification and my job.

14. In the past two years, I have shifted my curriculum forward in time to focus on the time period from the Civil War to the modern era to ensure that I include sufficient instruction on genocide and antisemitism as required by RSA § 189:11(I-c(j)), a New Hampshire law that went into effect before the 2023–24 school year. I fear that it is not possible to teach about the Holocaust or other examples of antisemitism without reference to concepts like white privilege or racial oppression which might open me up to accusations of discrimination under the Letter.

15. This curriculum also includes the history of the Reconstruction era. In this unit, I include lessons on Juneteenth, the Civil Rights Act of 1866, and the Fourteenth and Fifteenth Amendments, leading up to the Black Codes, the founding of the KKK, the Jim Crow Era, and the Compromise of 1877, among other historical events. All of this history is directly tied to concepts of race, racism, and slavery, and I do not know how I could discuss them without creating a risk of being accused of presenting a narrative of the United States as racist.

16. I also now worry about having to change how I teach incidents like the Tulsa race massacre of 1921, in which white residents of Oklahoma attacked Black businesses and homes, destroying a wealthy Black community known as "Black Wall Street." I discuss the Tulsa massacre to, among other reasons, help students understand the idea of generational wealth, its connections to slavery and race, and its impact on today's economy, not at all to inculcate feelings of shame, superiority, or inferiority. However, I fear this lesson leaves me vulnerable to accusation of discrimination under the Letter because of the Letter's vague and expansive theory of what constitutes illegal discrimination.

17. Given the Letter's restrictions and reporting mechanism, I feel as if I am being held hostage to students and parents' feelings and vague conceptions of discrimination and DEI. I would be risking my career to continue to teach these topics in the manner that I have. I have met

3

and advocated alongside teachers that have lost their jobs for far less in other states that have attempted to impose curriculum censorship.

**Implications on my ability to teach history involving reference to gender roles or LGBTQ history**

18. Class time is limited, and it is impossible to cover all aspects of history over the course of a year. For this reason, I encourage and permit students to pursue "passion projects" wherein they research, create a project outcome of their choosing, and present to their classmates an aspect of history that I haven't covered in my syllabus. These projects are often where students are most engaged in their learning, since it often links history to their personal lives and modern times. I have had many students work on projects related to feminism and the question of how one's identity is impacted by one's sex. I have also had many students research LGBTQ history. Gender roles and sex discrimination are very common themes in these projects.

19. Because the Letter refers to "toxic[] indoctrinat[ion]" and DEI programs generally, which could be read to incorporate this administration's idea of "gender ideology," I fear that any discussion of gender discrimination and gender roles could result in me being accused of "indoctrinating" students in a way that the Letter suggests constitutes illegal discrimination.

**Implications on my ability to respond to student questions and provide culturally responsive teaching**

20. In my courses, particularly when learning about the Civil War and slavery, past students have asked out loud "why were we so racist back then?" In response, I always note that no one in the room is personally responsible for any aspect of history, but that the lessons of the past help us understand where we came from so that we can better understand today. However, I understand that even responding to this question, which is inflammatory, creates a risk for me.

21. I have always been committed to respectfully answering students' questions to encourage their continued curiosity and engagement. I sometimes provide neutral academic resources to unpack difficult concepts further without imposing any particular viewpoint. But the truth is that slavery is difficult for a 13- or 14-year-old to understand, and they have emotions and questions

4

around the issue. It is my responsibility to help them think through difficult questions and critically examine their thoughts and the arguments of others, which I can't do without fear of being accused of indoctrination.

22. This is a particular issue because it is common for students to misrepresent what happens in the classroom. For example, a student might go home at the end of the day and say that I presented a particular conclusion that they did not agree with when really it may have been a peer that said something they disagreed with and all I did was facilitate a discussion to help students think critically, without affirmatively stating any position for or against whatever is being discussed. This reality puts me at great risk under the Letter's interpretation of discrimination.

23. Further, I am concerned about the Letter and subsequent FAQ's labeling of effective and important practices like social-emotional learning and culturally responsive teaching as "veil[ed] discriminatory policies." In my school, if I have a student who is fasting for Ramadan when a test is scheduled, that student can reschedule their exam as a matter of "culturally responsive teaching" with the goal of building relationships, appreciation for other cultures, sensitivity, and inclusion—quite the opposite of discrimination. Similarly, we teach social-emotional learning to help students solve problems, identify conflicts, manage stress, and build resilience. Now we are vulnerable to accusations that these important lessons might be disguising discriminatory motives.

### Fear of potential consequences, such as complaints, discipline, or adverse employment action

24. When the government threatens to censor teachers and their curriculum, it hurts students the most by removing tools from a teacher's toolbelt that help us develop students into informed, compassionate scholars. And of course, the threat I face of investigation, discipline, or adverse employment action is existential to my career.

25. Whereas in the past, if a parent or student had a concern about a particular topic I was teaching, they would come directly to me and my school to discuss their concerns and potential solutions, the Letter now gives an opportunity for anyone to allege that I am illegally

5

discriminating under the Letter's vague conception of discrimination in a way that threatens to destroy my livelihood.

26. I put my heart into my lesson plans. It takes a lot of time to create a cohesive narrative, find sources, and organize a syllabus, which is done in collaboration with colleagues and with the approval of my assistant superintendent. I even meet with students before they take my class to let them know what they will be learning about. Students often get excited to learn particular topics from me. I fear that any changes I would have to make would be extremely disruptive to not only my time but also to students, who look forward to learning and expect cohesive, organized lessons. The quality of my teaching would suffer if I had to suddenly change plans, for example by having to skip essential topics to accommodate a sudden change, ultimately impacting the students' educational experience.

27. English language learner students and students with disabilities would suffer the most, as it is difficult to quickly pivot to inform the English Language Learner ("ELL") teacher of alternate lesson plans, or to find accessible resources for students with disabilities and work with the special education teacher to support students with disabilities.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 3rd day of March, 2025.

Valerie Wolfson