# EXHIBIT O

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

NATIONAL EDUCATION ASSOCIATION et al., )
)
*Plaintiffs*, )
)
v. )
) Case No. 1:25-cv-00091
UNITED STATES DEPARTMENT OF )
EDUCATION et al., )
)
*Defendants*. )
)

## DECLARATION OF NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Rick Trombly, pursuant to 28 U.S.C. § 1746, declare the following:

1. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am the Executive Director of National Education Association-New Hampshire ("NEA-NH"). I am authorized to provide this declaration on behalf of the NEA-NH, which is a plaintiff in the above captioned matter. I have held the position of Executive Director since May of 2012.

3. I make this declaration to describe the effects that the Dear Colleague Letter issued on February 14, 2025 (the "Letter") by the Defendant U.S. Department of Education (the "Department"), is having, and will continue to have, on NEA-NH and its members.

### Background on NEA-NH

4. Plaintiff National Education Association-New Hampshire (NEA-NH) is one of the "founding ten" state education associations that formed the National Education Association in 1857. At that time, NEA-NH was called the New Hampshire Teachers Association.

1

5.  As currently comprised, NEA-NH represents the majority of all public-school employees in NEA Hampshire and has more than 17,000 members. NEA-NH members are public school educators including classroom teachers and other certified professionals, education support personnel, instructors and staff at public higher education institutions, as well as students preparing for a teaching career, and those retired from the profession.

6.  NEA-NH's mission is to strengthen and support public education and serve their members' professional, political, economic, and advocacy needs.

7.  NEA-NH is the state affiliate of the National Education Association (NEA) for the State of New Hampshire. NEA-NH is a legally separate entity that is incorporated as a domestic non-profit under New Hampshire law, and it is headquartered in Concord, New Hampshire.

### Impact of the Letter on NEA-NH and Its Members

8.  The Letter harms NEA-NH and its members in multiple ongoing ways.

9.  The Letter has a direct and immediate impact on NEA-NH members, who fear arbitrary and discriminatory enforcement under the Letter because it threatens enforcement actions against educational institutions within days, which effectively coerces the state and local school districts to attempt to abide by its terms or risk a substantial amount of federal funding critical to the provision of education for their students.  Even with clear guidelines, this timeline would not allow educational institutions to carefully evaluate programs. The Letter provides no standards for states or educational institutions to determine what conduct is prohibited or permissible under the Letter, and, accordingly, NEA-NH members fear it will result in discipline across a variety of common practices that NEA-NH members engage in every day as part of their professional practice and interactions with their colleagues and their students.

2

10. NEA-NH members are particularly attuned to how threats to enforce vague standards of censorship can cause confusion and chill classroom instruction, given their experience with the state law invalidated by the U.S. District Court for the District of New Hampshire in *Local 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024). While that law was in effect, many NEA-NH members self-censored and changed a wide range of their day-to-day professional activities both inside and outside of the classroom. For example:

   A. A middle school teacher stopped using Tiffany Jewell's 2020 book entitled *This Book is Anti-Racist* and Beverly Daniel Tatum's 2017 book *Why are All the Black Kids Sitting Together in the Cafeteria (Revised and Updated edition)*, which were being used by a teacher group for professional development.[1]

   B. A former World History high school teacher identified the state's censorship law as one of the reasons why she left the profession. The teacher had to change her teaching methods significantly out of fear that she would be accused of violating the law. For example, she significantly reduced open discussion and debate of ideas in her classroom because her World History units covered topics like Marxism, Stalinism, Naziism, and other dictatorship regimes, and she feared that allowing students to analyze and critique these dictatorships may raise discussions that would run afoul of the laws' prohibitions. For similar reasons, she shifted from assessing students' comprehension of material by using essays and open-ended short answer responses to multiple-choice questions out of fear that students would analyze her course's topics in ways that would implicate the banned concepts.[2]

   C. An AP high school English teacher changed the way he teaches several core texts in his classroom. He also changed a variety of practices he employed to develop his students' ability to meet state standards requiring students to be able to write about both their own and others' experiences, understand different cultures and experiences, and critically examine information they receive in the media each day.[3]

   D. An eighth-grade social studies teacher abandoned his efforts to plan for grade-wide engagement with *Stamped: Racism, Antiracism, and You: A REMIX of the National Book Award-winning 'Stamped from the Beginning"* as part of teaching about American history and addressing the history of racism in America. He understood

---

[1] *See* ECF No. 85-111, at 68, *Local 8027 v. Edelblut*, No. 21-CV-1077-PB (D.N.H. Aug. 14, 2023)

[2] *Id.* at 68–69.

[3] *Id.* at 69–70.

that school administrators had asked educators to put the project aside.[4] In New
Hampshire, one teacher restricted access to his Twitter feed following a New
Hampshire Department of Education presentation regarding the law.[5]

11. The release of the Letter has had similar effects. The individuals identified as

Member A, Member B, and Member C are members of NEA-NH. They are examples of NEA-

NH members directly affected by the Letter:

      A. Member A teaches high school English in New Hampshire and often teaches
         literature that touches on topics related to race and gender. He is concerned that he
         could be accused of discrimination under the Letter's vague descriptions because
         of the ways issues related to diversity, systemic racism, and moral burdens come
         up in his classroom, subjecting him to potential risk of investigation, discipline, or
         adverse employment action.

      B. Member B teaches 8th Grade Social Studies in New Hampshire, including United
         States history from the Civil War to modern day. Member B is concerned that
         classroom discussions about matters of race and discrimination, important parts of
         teaching certain aspects of American history, could be construed to violate the
         Letter's prohibitions related to "systemic and structural racism" or
         "discriminatory policies and practices," Letter at 2, leaving her vulnerable to
         allegations of discrimination under the Letter.

      C. Member C is a middle school counselor in New Hampshire. An important part of
         her work is creating a school culture that fosters safe and positive identity
         development for middle schoolers. Member C is concerned that she might be
         accused of violating the Letter's vague prohibitions on toxic indoctrination and
         discrimination.

12. It is unavoidable that educators will experience substantial confusion regarding

whether and how to continue exercising effective pedagogical approaches because of the Letter

and, as a result, fear about whether their teaching may subject them to enforcement actions. For

example, educators routinely invite discussion or assign work that requires students to analyze

and critically engage with a variety of topics that are likely to implicate ideas related to race,

---

[4] *Id.* at 70–71.

[5] *Id.* at 33.

gender, and other prohibited topics. These practices are not only required by sound educational pedagogy but are necessary for NEA-NH members to meet state and local standards, including those related to critical thinking, analyzing different perspectives, and making connections between subject matter areas and materials and their own lives and current events. The Letter will cause NEA-NH members to fear using or to stop using effective practices and methods of teaching that may result in discussions around the prohibited concepts.

13. Additionally, educators are professionally and legally obligated to design and implement instructional materials and approaches that ensure inclusivity and accessibility, particularly for students who are disabled and multi-lingual learners. Many of our members are special education teachers and paraprofessionals whose core job duties involve ensuring that students with disabilities are integrated with their non-disabled peers, and are included and able to equally access education. By targeting training programs related to diversity, equity, inclusion, and accessibility, the Letter leaves in doubt whether and how teachers will be able to continue key practices and programs to serve students with disabilities and multi-lingual learners, including in Integrated Co-Teaching classrooms or dual language classrooms.

14. Given the backdrop of the prior censorship law in New Hampshire, the Letter also causes substantial confusion and fear of adverse consequences with respect to core educational principles, practices, and responsibilities that NEA members have outside of the classroom and in their professional and personal interactions with one another and the students they serve. For example, many of NEA's members lead the development of curriculum or professional development for other teachers at the district or school level. The contradictions between the Letter's prohibitions, effective teaching practices, and learning and teaching standards will leave these educators guessing at a minimum, and at worse will cause them to abandon certain

5

practices and materials relevant to student and educator learning out of fear of adverse consequences.

15. NEA-NH members also regularly engage in activities that support student learning outside of the classroom, including through the development and instruction of extra-curricular activities, or in planning field trips to broaden and deepen student knowledge. The Letter raises questions regarding whether these activities must now meet some vague neutrality standard and not focus student attention on the experiences of particular groups of people. For example, are field trips to civil rights sites now in question? What about to museums that focus on the historical and cultural experience of a particular group of people such as the National Museum of African American History or the National Museum of the American Indian?

16. Members' concerns have been exacerbated by the fact that, within a week of the Department's Letter, the Department launched a public Anti-DEI tipline, explaining that the Department "is committed to ensuring all students have access to meaningful learning free of divisive ideologies and indoctrination," and asking "students, parents, teachers, and the broader community to report illegal discriminatory practices at institutions of learning." See Department of Education website, https://enddei.ed.gov. The national solicitation of reports from anyone about alleged "divisive ideologies and indoctrination" in schools places NEA-NH members at risk of investigations based on complaints about their teaching and instruction that cross into the vague category of impermissible action under the Dear Colleague Letter.

17. The existence of the national tipline in itself has raised concerns among NEA-NH leaders and members, who worry that it will be used to target educators whose teaching and instruction is viewed as too inclusive. And there is no doubt that the complaints fueled by the Department's solicitation of anti-DEI submissions will result in educators' being targeted for

6

their teaching even though that instruction is aligned with state standards and reflects best pedagogical practice. NEA-NH has had members targeted by anti-DEI activities. NEA-NH's experience has been that such complaints against members can fuel calls for discipline or even the dismissal of educators for unprofessional conduct.

18. The Letter has also forced NEA-NH to divert its organizational resources to identify and counteract the Letter's impermissibly vague restrictions, and it has frustrated NEA-NH's mission of advocating for public school employees and for the kind of robust public education that will prepare the children of New Hampshire as citizens and members of society.

19. NEA-NH advises members regarding job security, adverse employment actions, and what would rise to the level of termination of employment or discipline, including with respect to classroom instruction and conduct. NEA-NH also advises members regarding issues related to its members' ability to teach, including under collective bargaining agreements with local school districts, and the parameters of the New Hampshire's Educator Code of Conduct. NEA-NH is unable to properly advise their members on these issues because of the Letter's impermissibly vague terms and prohibitions.

20. NEA-NH also provides its members with the benefit of extensive professional development programming, which will be affected by the Letter's vague terms and prohibitions. For example, the Letter's vague terms and prohibitions and federal and state efforts to implement it will make it impossible for NEA-NH to provide meaningful professional development about what conduct may or may not result in threats of investigation or adverse enforcement under the Letter. NEA-NH engages members in an annual professional development and leadership program which typically spans a week during the summer. During this programming members are trained on a variety of topics, including, the Code of Conduct, what conduct in the classroom

7

and with respect to students may give rise to employment discipline or adverse action from the Department of Education against a credential holder. Members have already expressed confusion and concern regarding how to approach classroom instruction in order to protect themselves. Given the vague nature of the Letter, it is likely that this training, and others, would need to be revised to address the additional potential bases of potential discipline that could arise related to the Letter, and its impacts.

21. NEA-NH also represents members in matters before the New Hampshire State Board of Education—both in licensure actions contesting alleged violations of the New Hampshire Educator Code of Conduct, and in actions representing educators appealing the nonrenewal of their teaching contracts. Based on NEA-NH's experience with the enforcement of state censorship efforts by the New Hampshire Department of Education, NEA-NH will likely face questions from educators about how the enforcement of the Letter may impact their credentials.

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 1 9th of March, 2025

Rick Trombly

8