# EXHIBIT Q

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION; | Case No.: 1:25-cv-00091-LM |
| *et al.*, | |
| Plaintiffs, | **DECLARATION OF OLGA DARLENE MOSLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION; | |
| *et al.*, | |
| Defendants. | |

**DECLARATION OF OLGA DARLENE MOSLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Olga Darlene Mosley, hereby declare that

1.  My name is Olga Darlene Mosley. I am over the age of 18 years. I have personal knowledge of the following facts and if called to testify could and would competently do so.

2.  I currently serve as a Professor at Pensacola State College, which receives federal funds.

3.  I am an NEA member.

4.  I am offering this Declaration in my individual capacity and not on behalf of the institution that employs me.

5.  I received a Master's degree in Counseling & Psychology from Troy University in 2004, and a Ph.D. in Psychology from Capella University in 2012.

6.  I have 20 years of professional experience in higher education. From 2005 to 2010, I was an adjunct professor at Pensacola State College. In 2011, I joined the faculty at Pensacola State College as an Assistant Professor in the Humanities and Social Sciences Department.  In 2022, I was promoted to Professor.

7.  I teach courses on General Psychology, Human Growth & Development, and Drugs & Behavior for the purpose of fulfilling qualifications for an associate's degree.

8.  My research focuses on transgenerational trauma and lynchings committed in Escambia and Santa Rosa Counties, Florida.

9.  I have made several presentations at regional conferences, including *Dixieland and the Fatherland:  Chosen by Nature* (2016); *The Pensacola Streetcar Strike of 1908* (2019); *Fathers are the Head of the Household, but Mothers are the Heart* (2016); *Dixieland and the Fatherland* (2017); *Strikers and Lynchers* (2018) ; *The Ghost White Stars* (2019); *Secrets or Redemption:  Why it is important to talk about lynching;* (2020); *Two Lynchings in Ferdinand Plaza* (2024).

10. My department offers the opportunity for faculty to present material they are researching to the college family and the general public. These are Faculty Research Presentations given in a colloquium format. The Presentations began a year ago as an opportunity for faculty in the Humanities & Social Sciences Department to share and discuss their research projects. In the fall of 2024, they were expanded to include all college personnel, and in January 2025, they were opened to students and the general public. They have been attended by 15-20 people on average, occurring once a month. The purpose includes highlighting research and

offering an opportunity to discuss that research with colleagues and interested others. Presenting at the colloquium is outside of my regular teaching duties.

11. I am aware that the U.S. Department of Education issued a Dear Colleague letter on February 14, 2025, which threatens colleges with investigations and the loss of federal funding based on teaching and scholarship related to diversity, equity and inclusion.

12. In February 2025, I approached the coordinator of the Faculty Research Presentations with a request to present a paper I was writing for APA Division 32 Society for Humanistic Psychology national conference at the colloquium scheduled for March 4, 2025, as a "dry run" before the conference. The APA has a number of divisions which emphasize a particular area of research or expertise. The Conference theme is *Toward a Human*(us)*tic Psychology: Actualizing Hope and Healing through Liberation and Justice for All.* The paper is titled, *Beyond Atticus Finch: Accepting our ancestors' sins to achieve liberation.* It is a discussion of genealogy (my family's history in the South), perpetrator-induced trauma, and transgenerational transmission of trauma. There are references to racism and the need to overcome a history of white supremacy. Since my paper addressed familial secrets in regard to a lynching, I cannot control how anyone will feel when confronted with the ghosts in their family heritage.

13. After the Presentation was advertised, my department chair contacted me on February 27, 2025, and asked if I would share with him the abstract for the paper. I had the rough draft complete and sent it to him. His intent was to be able to say the paper was vetted before it was presented, just in case any questions came up. The next afternoon, my department chair contacted me and said there might be some issues. On February 28, 2025, my chair and I had a meeting with the Assistant Vice President of Academic Affairs, who said, "You aren't

crossing the legal line with this paper, but you are so close to it…" And I interjected, "Let's

be honest. I'm kickin' some dust across it!" I believe that they were referring to the Florida

Anti-WOKE legislation, but because the Dear Colleague Letter prohibits similar things, I

later understood them to be referring as well to the Dear Colleague Letter and its

prohibitions on programs and scholarship related to race, diversity, equity, and inclusion.

14. At the February 28 meeting, the Assistant Vice President and my chair decided to cancel my

presentation at the colloquium. While I am disappointed I will not have the opportunity to

share my research with colleagues, I understand the position to which my administration

has been relegated. Both of the individuals I met with were supportive, but they had a legal

mandate which requires adherence.

15. I cannot share my research in an open forum at the college where I teach and share

knowledge because of a poorly written, poorly thought out law. I am gratified that

individuals have asked to read the paper, and I look forward to presenting it at the

conference, but I am disheartened that a much needed discussion will go unheard in MY

voice.

16. Often, it is the sense of "guilt, anguish, or other forms of psychological distress because of

actions" that spur individuals to make needed change. To limit research only to those spaces

where everyone can emerge with their egos intact is to engage in confirmation bias of the

worst kind.

17. Education is about debate, healthy debate, to cull through all the noise and find the truth.

Restrictions on faculty research reduce us to an echo chamber, a voice of propaganda,

which will only parrot the meme of the day. It does nothing to help us move beyond the

myths which make us feel good, navigate the stormy waters of reality, and arrive on a new

shore with expanded opportunity for healing and growth. It means we tell students to avoid anything that might challenge their current worldview. We abandon them to a society in which the loudest voice wins, the snappiest comeback dominates, and truth does not matter.

18. I continue to fear that my research related to race, diversity, equity and inclusion will be restricted by my institution and the federal and state governments.

19. Those who are interested in my research no longer have the chance to learn about diversity, equity and inclusion or hear their classmates' viewpoints, to understand the sheer breadth of possible arguments related to diversity, equity and inclusion.

20. The Dear Colleague letter and the Department of Education's related guidance should not be permitted to stifle my academic speech related to diversity, equity and inclusion. As long as the letter is effective, I will be unable to fully perform my role as an educator and speak freely on this important topic. I have definite "concern" about the ramifications of the Dear Colleague Letter along the same lines as past issues caused by similar state legislation. My discipline, psychology, has had two General Learning Outcome assignments (writing assignments given and assessed by ALL faculty members in fulfillment of requirements for accreditation) challenged on the basis of current Florida anti-WOKE legislation. Personally, my office door was vandalized in October 2024 because a custodian took issue with my anti-racist posters. I participated on a panel discussion discussing Academic Freedom in Florida last fall, and it is increasingly common for faculty to be instructed to self-censor topics that might become problematic. The Dear Colleague Letter will only exacerbate these issues and give a new avenue to attack education.

I declare under penalty of perjury that the above is true and correct.

Executed this 14th day of March, 2025.

Olga Darlene Mosley