# EXHIBIT S

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION; <br><br> *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION; <br><br> *et al.*, <br><br>  , <br> Defendants. | Case No.: 1:25-cv-00091 |

**DECLARATION OF NATIONAL EDUCATION ASSOCIATION PRESIDENT REBECCA PRINGLE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Rebecca Pringle, pursuant to 28 U.S.C. § 1746, declare the following:

1. My name is Rebecca Pringle. The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify to the following matters under oath.

2. I am the President of the National Education Association (NEA). I am authorized to provide this declaration on behalf of the NEA, which is a plaintiff in the above captioned matter. I have served as President of NEA since 2020 and have held other national offices in NEA (initially as Secretary-Treasurer and then as Vice President) since 2008.

1

3. I make this declaration to describe the effects that the Dear Colleague Letter that the Department of Education (the "Department") issued on February 14, 2025 (the "Letter"), is having, and will continue to have, on NEA and its members.

**Background on the NEA**

4. NEA is the nation's oldest and largest education union, which represents nearly 3 million members who work at every level of education—from pre-school to university graduate programs. Our members include aspiring educators, K-12 classroom teachers, education support professionals, counselors, psychologists, and other professional support personnel as well as higher education faculty and staff who engage in a variety of educational activities both inside and outside of the classroom.

5. NEA has statewide and local affiliate organizations in almost 14,000 communities in every state across the United States.

6. NEA is a democratically governed union. Our mission, as adopted by the duly elected delegates to the 2006 NEA Representative Assembly, "is to advocate for education professionals and to unite our members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world."

7. NEA's work in furtherance of that mission is guided by our core values, as adopted by the NEA Representative Assembly, including that "public education is the gateway to opportunity"; is "vital to building respect for the worth, dignity, and equality of every individual in our diverse society"; and "provides individuals with the skills to be involved, informed, and engaged in our representative democracy."

8. NEA and its members also believe, as reflected in our agreed upon core values, "that the expertise and judgment of education professionals are critical to student success," and advocate for educators to receive the status, compensation, and respect due all professionals. NEA and its members also "believe that partnerships with parents, families, communities, and other stakeholders are essential to quality public education and student success."

9. As our nation has grown ever more diverse with over half of the students in K-12 schools identifying as Black, Hispanic, Asian, Multiracial, Native American or Alaskan Native there has been a growing need to diversify the content and curriculum of K-12 teacher preparation, instruction, and curriculum standards and educational programs. As a result, many states have taken steps to diversify the required and provided K-12 curriculum and/or the required teacher education and certification standards including education preparation standards that guide curriculum and instruction at colleges of education.

10. NEA has worked as well to expand its support for efforts to diversify the breadth and strength of educational offerings and educator preparation in the country. That work is reflected in NEA's six overall strategic objectives for the 2024-2026 time period, which include: (i) "supporting educators' growth in the professional knowledge, skills, and competencies necessary to maximize students' academic and social-emotional learning and shape the future of learning," (ii) safeguarding "the freedom to teach in the most effective manner for their students," (iii) supporting "the development of modern, safe, and supportive public schools that are affirming to all students and employees," (iv) supporting members "in advancing racial and social justice in education," and (v) safeguarding "the rights of students" and ensuring "that students are prepared to participate fully in our democratic society."

11. NEA advances these strategic objectives through its core activities, including providing professional and leadership development to its members, funding key education improvement efforts and defending its members freedom to teach in the most effective manner possible.

**NEA's Professional Development Work**

12. The core of NEA's professional excellence work consists of supporting educators teaching professional skills to other educators, including skills in racial and cultural competence. This work includes many different types of professional training, including several that are primarily focused on improving the skills of educators in engaging, teaching and supporting students of different races, national origins, sexual orientations and/or gender identities.

    a. Examples of NEA's currently offered trainings and resources include 15-hour blended learning courses on "Culture, Ability, Resilience & Effort (CARE)," "Bully Prevention," "Diversity, Equity, and Cultural Competence," "Disability, Rights, and Inclusion," "LGBTQ+ Blended Learning Series," "Trauma-Informed Pedagogy," "Mental Health Awareness" and "Social Emotional Learning."

    b. NEA also offers stacked courses that enable educators to earn micro-credentials in certain subjects, including "Teacher Leadership: Diversity Equity and Cultural Competence Pathway," "Bully Free Schools,": Diversity, Equity, and Culture Competence," "Native Education," "Restorative Practices," "Supporting LGBTQ+ Students," and "Trauma-Informed Pedagogy."

    c. Thousands of NEA members take these trainings and earn these micro-credentials, which in many instances are accepted by employers to fulfill continuing professional development requirements and, in some instances, qualify members for additional compensation.

    d. Since the issuance of the Dear Colleague Letter, NEA members have raised concerns about the value of NEA's offerings given the uncertainties created by

3

the Letter as to what types of diversity, equity and inclusion approaches are permitted and which are not. Those concerns undermine the perceived value of NEA's professional development offerings and harm NEA's professional excellence work by deterring individuals from pursuing and completing those trainings and credentials.

13. NEA devotes substantial resources to improving the racial and cultural competence of its members and staff. In the 2023-24 school year, for example, NEA conducted more than 50 trainings on diversity, equity, inclusion, racial and social justice for more than 1,800 members and staff. Many of the trainings for members were offered in conjunction with, or with the approval of school districts, as valuable professional development opportunities. But as a result of the Dear Colleague Letter and the threat to federal funding, NEA fears that school districts will cease their support of such training, thereby limiting the scope and reach of such trainings and further harming NEA's professional development work.

### NEA's Funding of Educational Improvement Efforts

14. NEA also engages in significant work to advance professional expertise through grant programs that fund professional practice initiatives and the delivery of professional practice instruction.

    a. Since September 2024, NEA's professional excellence work has included awarding $3,900,000 in grants for professional excellence work including work to expand and elevate the skills of educators in engaging, teaching, and supporting students of all races, national origins, sexual orientations, and gender identities. Examples of topics funded include: grants that improved the professional practice of educators by supporting induction and mentoring resources for new educators as they enter the profession, PRAXIS test preparation supports for new educators, and after-school mentoring and meal programs for rural students.

    b. The work to implement NEA's professional excellence grants is often done in coordination with, and with the support, of school districts, colleges and universities, who rely on the NEA grants to advance their mission of educational excellence.

15. NEA also provides a "Read Across America Grant" for state affiliates to enhance state affiliate coordinated Read Across America events and/or activities grounded in celebrating key ingredients in building a nation of diverse readers—books, reading, and the freedom to learn. This small grant program encourages proposals that use funds as a way to get books from diverse perspectives into the hands of students. Proposals that further that objective are strongly encouraged.

16. The Dear Colleague Letter will impact the purpose, execution of, and member and school interest in these grant programs. For example, it is unclear how the grant programs will

continue to work in light of the Letter's prohibition of state and school district practices related to diversity, equity, and inclusion, which are at the core of much of NEA's grant work. Similarly, as a result of the Dear Colleague Letter, NEA will need to respond to concerns that Read Across America selected books are inappropriate or at odds with the dictates of the Letter and its vague condemnation of celebrations of diversity.

17. NEA also supports increasing educational opportunities by partnering with school districts and communities to develop and support community schools, with the approval of and in coordination with school districts. In those community schools, the needs of the community surrounding a school inform the educational offerings and approach of the school. NEA is currently supporting over 750 community school practitioners in 90 school districts across 27 states in utilizing the community school strategy. Many of the schools recognize, support, and celebrate the diversity of the school community by shifting their curricula so as to be grounded in the cultural and linguistic assets of the local community. The Dear Colleague Letter undermines these arrangements as well, by pressuring school districts to shift away from efforts that could be perceived to cross into the category of activities targeted by the Letter.

### Defending Educators' Freedom to Teach Effectively

18. NEA also provides advice and assistance regarding labor and employment matters, individual rights, education reform, and other matters with legal implications for its members. The primary vehicle by which NEA supports the legal needs of its members is through its Unified Legal Services Program, under which NEA funds the legal representation of NEA members and affiliates in covered matters including approved employment-related matters and matters that NEA and the relevant state affiliate agrees are significant for NEA members. Such matters include advice and counsel to educators facing restrictions on how and what they teach, representation for members facing discipline or termination for their instructional choices, work to protect the rights of educators to engage in protected advocacy to advance educational opportunities and equity, and work representing members and affiliates in other education and employment related matters.

19. Since 2020, NEA's legal work has increased as a result of various censorship initiatives. At the end of his first term in office, President Trump issued Executive Order 13950 (2020), which prohibited federal agencies and federal contractors from promoting a list of so-called "divisive concepts" in workplace training and directed agency heads to identify grant programs for which grants could be conditioned on the recipient's certification that it would not use federal funds to promote the "divisive concepts," many of which related to race, gender, sexual orientation, and identity. That Order was rescinded in January of 2021 but some 20 states including Indiana, Iowa, New Hampshire, Tennessee, Florida and Oklahoma subsequently adopted similar restrictions on instruction and curriculum that barred certain instruction on race and gender in elementary, secondary, and higher education (the "State Censorship Laws").

20. NEA members in these states experienced and reported substantial confusion and concern to NEA and its affiliates regarding the meaning and implementation of the State Censorship Laws. NEA fielded questions from members about, for example:

    a. Whether the prohibitions on instruction that an individual was inherently racist prohibited instruction about institutional or systemic bias;

    b. Whether specific categories of literature or written subject matters were prohibited from assignment or dissemination to students, including whether educators could assign students the writings of certain authors that express the author's particular view or theory about discrimination, racism, or other prejudices;

    c. Whether particular books or authors were prohibited under the law;

    d. Whether topics related to racial and/or social justice were prohibited from teaching and discussion;

    e. Whether or not they could still teach or have discussions with students regarding historical racism, including, in relation to slavery, segregation, the civil rights movement, and structural racism;

    f. What parameters they must follow when answering questions from students about current events that touch upon current manifestations of racism, including the events precipitating the Black Lives Matter movement;

    g. Whether or not they could still teach about historical systems and practices which have led to discriminatory outcomes like "redlining" by the Federal Housing Administration that led to racially segregated neighborhoods and inequitably funded schools;

    h. How to adhere to the law and state and local curriculum requirements or standards that require in many instances that educators instruct students on the subjects and issues identified above.[1]

21. Because of this confusion and fear, many NEA members subject to these State Censorship Laws have self-censored and changed a wide range of their day-to-day professional activities both inside and outside of the classroom. In Florida, a detailed survey and interview of educators in 2024 found that over 82% of those surveyed had restricted in some way how they taught about issues of race and racism, 71% restricted

---

[1] *See* ECF No. 85-111, at 29 & Ex. 42, *Loc. 8027 v. Edelblut*, No. 21 Civ. 1077 (PB) (D.N.H. Aug. 14, 2023).

how they taught Black history and 62% restricted how they taught ethnic studies.[2] Similarly, national surveys conducted by RAND in 2022, 2023 and 2024 all found that substantial percentages of educators reacted to state level censorship laws by restricting what and how they taught.[3]

22. To respond to these concerns consistent with its overall mission and strategic objectives, NEA has had to expend substantial resources to ensure its members understood their rights to continue to teach in alignment with state standards and to defend members for teaching inclusively aligned with state standards.  For example, since 2020, NEA has devoted substantial staff time and funded substantial legal work to (1) win back the job of a high school contemporary issues teacher who was terminated for playing a spoken word poem addressing white privilege to his high school juniors and seniors; (2) defeat an effort to strip a teacher of her teaching credentials for declining to remove a Black Lives Matter flag from a school hallway; (3) defend the right of a teacher to assign a powerful essay by an award winning African American author to her AP English class as an example of how to write a persuasive essay; (4) challenge the termination of a middle school teacher for reading an age appropriate book *My Shadow is Purple* that her students picked for a class read aloud; and(5) challenge the termination of a music teacher for raising concerns about her school's decision to prevent the school choir from singing, "Rainbow Land." NEA also has supported litigation challenging these State Censorship laws on the ground that they are impermissibly vague.

23. The Dear Colleague Letter includes similar prohibitions to the State Censorship law prohibitions.  For example the Letter prohibits "toxic[ ] indoctrination[ ] [of] students with the false premise that the United States is built upon "systemic and structural racism." Letter at 2. As a result, NEA expects that it will need to respond through its ULSP program to defend members ability to teach inclusively aligned with state standards

**NEA & Its Members Have Been and Will Continue to Be Harmed by the February 14th Dear Colleague Letter**

24. The Dear Colleague Letter harms NEA's members and NEA itself in multiple ongoing ways.

---

[2] M. Pollack & H. Yoshikawa, *The Limitation Effect:  A White Paper* at pg. 24 (New York University & University of California at San Diego 2024).

[3] A. Woo, M. Dilberti, E. Steiner, *Policies Restricting Teaching about Race and Gender Spill Over into Other States and Localities* (RAND Feb. 15, 2024) (reporting based on national survey data that "65 percent of teachers nationally reported deciding to limit discussions about political and social issues in class"); A. Woo, M. Dilberti, E. Steiner, *Seven Takeaways on How Teachers Are Reacting to Restrictions on Discussing Race and Gender* (RAND May 17, 2024) (reporting based on synthesize of nationally representative surveys of K-12 public school educators that "one-third of teachers" had changed instruction or curriculum in response to state limitations and that social studies and English language arts teachers were especially likely to have made such changes).

25. By placing in doubt what educators may and may not teach and what educational programming schools and colleges may or may not offer without losing federal funding, the Letter has already resulted in and will continue to cause:
    a. Harm to NEA's core work of providing professional development training and resources by undermining the value of, and interest in, NEA's offerings;
    b. Harm to NEA's core work of funding educational improvement work through grants by deterring schools and colleges from supporting the programs funded through such grants and thereby limiting the scale and scope of that work;
    c. Harm to NEA's core work of advancing effective public education by addressing concerns by members about whether they can teach aligned to state standards and whether inclusive education instruction, curriculum and practices are permitted;
    **d.** Harm to NEA's core work of defending educators targeted for providing effective instruction by placing in doubt whether instruction and curriculum aligned to state standards may nevertheless be prohibited for crossing into the vaguely defined category of impermissible "DEI" work described in the Dear Colleague Letter.

26. Just as the State Censorship Laws have caused confusion, fear, and self-censorship among educators, the Letter has already caused and will continue to cause substantial confusion, fear, and self-censorship for NEA's members both inside and outside of the classroom.

27. NEA has heard from higher education members, who have, for example,

    a. Have raised concerns regarding whether or not they will be able to continue to teach Indigenous studies, ethnic studies, or courses that mention diversity, equity, and inclusion in their title or course descriptions;
    b. Have been required to remove references to diversity, equity and inclusion in their course and training materials and grant applications;
    c. Have been directed to cease supportive programs for students from diverse backgrounds;
    d. Have been demoted and stripped of positions advancing equity concerns in teacher preparation and had resources, websites, and programs advancing such concerns shut down and shuttered;
    e. Fear teaching content and providing students with support related to diversity, equity and inclusion work;
    f. Fear accurately describing their research and prior work on their C.V.'s as doing so may prevent them from obtaining employment;
    g. Fear that funding for their research will be impacted and therefore that they will need to discontinue research that would advance topics related to race, diversity, equity and inclusion.

28. At the K-12 level, educators have raised concerns with NEA about whether they can continue to take, or provide, professional development courses aimed at increasing the

8

racial and cultural competence of educators, diversifying the curriculum, and educating students or staff about the impacts of conscious and unconscious racial bias. Educators have also raised concerns about whether their efforts to ensure a school's curriculum and educational programming reflects the rich diversity of the surrounding community and the country may be prohibited under the Department's newly announced views.

29. Based on NEA member educators' experiences under the State Censorship Laws, it is unavoidable that educators will experience substantial confusion regarding whether and how to continue exercising effective pedagogical approaches because of the Letter and, as a result, fear about whether their teaching may subject them to enforcement actions. For example, educators routinely invite discussion or assign work that requires students to analyze and critically engage with a variety of topics that are likely to implicate ideas related to race, gender, and other prohibited topics. These practices are not only required by sound educational pedagogy but are necessary for NEA members to meet state and local standards, including those related to critical thinking, analyzing different perspectives, and making connections between subject matter areas and materials and their own lives and current events. Like teachers censored by similar state laws, the Letter will cause teachers across the country to fear using or to stop using effective practices and methods of teaching that may result in discussions around the prohibited concepts.

30. Moreover, principles and practices of diversity, equity, inclusion, and accessibility are deeply embedded in effective practices of teaching. For example, studies have shown that teaching ethnic studies and a culturally responsive and racially inclusive curriculum is the most effective educational approach for all students, and particularly for students of color.[4] Such practices build critical thinking skills, prepare students for active democratic participation, instill cultural values, expose students to diverse epistemologies, and cultivate a culturally literate workforce that can compete in the global marketplace.[5] Similar to the confusion and fear of adverse actions experienced by educators in response to the State Censorship Laws, NEA member educators across the country have already and will continue to experience confusion regarding whether certain materials, books, and sound educational practices like culturally responsive practices are permitted under the Letter, and may abandon them altogether.

31. Additionally, educators are professionally and legally obligated to design and implement instructional materials and approaches that ensure inclusivity and accessibility, particularly for students who are disabled and multi-lingual learners. Many of our members are special education teachers and paraprofessionals whose core job duties involve ensuring that students with disabilities are integrated with their non-disabled peers, and are included and able to equally access education. By targeting training

---

[4] *The Very Foundation of Good Citizenship: The Legal and Pedagogical Case for Culturally Inclusive and Racially Inclusive Public Education for All Students* (NEA & LFAA 2022).
[5] *Id.* at 6.

9

programs related to diversity, equity, inclusion, and accessibility, the Letter leaves in doubt whether and how teachers will be able to continue key practices and programs to serve students with disabilities and multi-lingual learners, including in Integrated Co-Teaching classrooms or dual language classrooms.

32. The Letter also causes substantial confusion and fear of adverse consequences with respect to core educational principles, practices, and responsibilities that NEA members have outside of the classroom and in their professional and personal interactions with one another and the students they serve.

33. For example, many of NEA's members lead the development of curriculum or professional development for other teachers at the district or school level. The contradictions between the Letter's prohibitions, effective teaching practices, and learning and teaching standards will leave these educators guessing at a minimum, and at worse will cause them to abandon certain practices and materials relevant to student and educator learning out of fear of adverse consequences.

34. NEA members also regularly engage in activities that support student learning outside of the classroom, including through the development and instruction of extra-curricular activities, or in planning field trips to broaden and deepen student knowledge. The Letter raises questions regarding whether these activities must now meet a new vague standard of neutrality and not focus student attention on the experiences of particular groups of people. For example, are field trips to civil rights sites now in question? What about to museums that focus on the historical and cultural experience of a particular group of people such as the National Museum of African American History or the National Museum of the American Indian?

**The Letter, Particularly Combined with the Department of Education's Anti-DEI Tipline Invites Arbitrary Enforcement Against NEA Members**

35. Within a week of the Department's Letter, the Department launched a public Anti-DEI tipline, explaining that the Department "is committed to ensuring all students have access to meaningful learning free of divisive ideologies and indoctrination," and asking "students, parents, teachers, and the broader community to report illegal discriminatory practices at institutions of learning." *See* Department of Education website https://enddei.ed.gov. The national solicitation of reports from anyone about alleged "divisive ideologies and indoctrination" in schools places educators at risk of investigations based on complaints that their teaching and instruction has crossed into the vague category of impermissible action under the Dear Colleague Letter.

36. The existence of the national tipline in itself has raised concerns among NEA leaders and members, who worry that it will be used to target educators whose teaching and instruction is viewed as too inclusive. And there is no doubt that the complaints fueled by the Department's solicitation of anti-DEI submissions will result in educators' being

targeted for their teaching even though that instruction is aligned with state standards and reflects best pedagogical practice. NEA has had members targeted by anti-DEI activities in several states and in some educators have been terminated by school boards for their inclusive education approaches. NEA's experience has been that even anonymous complaints against members can touch off lengthy investigations during which members are placed on administrative leave with the consequent reputational injury. As teacher dismissals are usually initiated by, and often resolved as well by, local school boards – the process can be both lengthy and painful for educators who, despite stellar evaluations and lengthy records of public service, find themselves publicly targeted in culture war disputes. Even though NEA has fought such dismissals, and won several cases (see *supra* at para 22), the mere fact of the dismissal and the lengthy effort to reverse the dismissal sends a clear message to other educators not to engage in the challenged instruction or curriculum choices.

37. NEA members fear arbitrary and discriminatory enforcement under the Letter including because it threatens enforcement actions against educational institutions within days, which effectively coerces states and local school districts, colleges and universities to attempt to abide by its terms or risk a substantial amount of federal funding critical to the provision of education for their students. Even with clear guidelines, this timeline would not allow educational institutions to carefully evaluate programs. The Letter provides no standards for states or educational institutions to determine what conduct is prohibited or permissible under the Letter, and, accordingly, NEA members fear it will result in discipline across a variety of common practices that NEA members engage in every day as part of their professional practice and interactions with their colleagues and their students.

I declare under penalty of perjury that the above is true and correct.

Executed this 18th day of March, 2025.

*[signature: Rebecca Pringle]*

National Education Association President Pringle