THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, <br><br> Defendants. | Case No. 25-cv-00091-LM <br><br> [***TO BE PUBLICLY FILED***] |

**PLAINTIFFS' MOTION TO SEAL DECLARATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Pursuant to Local Rule 83.12 and Administrative Procedure for Electronic Case Filing 3.3, Plaintiffs request to seal at Level II unredacted versions of five declarations filed by educators and members—Members A, D, E, F, and I—in support of Plaintiffs' March 21, 2025 Motion for Preliminary Injunction that contain personally identifiable information. *See* ECF Nos. 34-11 (Member A Decl. at Ex. I), 34-14 (Member D Decl. at Ex. L), 34-16 (Member E Decl. at Ex. N), 34-18 (Member I Decl. at Ex. P), and 34-20 (Member F. Decl. at Ex. R) (public, redacted versions).

Plaintiffs National Education Association ("NEA") and NEA-New Hampshire ("NEA-NH") bring this action not only on their own behalf as organizations injured by the Department of Education's February 14, 2025, Dear Colleague Letter ("Letter"), but also as membership associations whose members are injured by the Letter, including insofar as it vaguely refers to and prohibits as discriminatory "diversity, equity, and inclusion" ("DEI") programs. To show their members' injuries, NEA and NEA-NH have submitted declarations from members in support of their Motion for a Preliminary Injunction. Five of these declarations are from members who wish

1

to remain anonymous in public filings with the Court due to their fear of reprisals by their employers, as well as of doxing, harassment, and threats, for challenging the Letter.

These declarants are not parties. However, even if the standard governing the question of whether a party can litigate a case pseudonymously applies to these declarants, this standard has been met to justify the submission of anonymous declarations. Accordingly, NEA and NEA-NH ask for this Court's leave to file under seal at Level II unredacted versions of these five declarations that contain the name and personally identifiable information of these declarants. Plaintiffs have publicly filed redacted versions of these declarations that do not identify these declarants by name and, instead, use pseudonyms in place of those members' legal names and redact any identifiable information. *See* ECF Nos. 34-11, 34-14, 34-16, 34-18, and 34-20.

At this preliminary phase in the litigation, Plaintiffs request sealing at Level II, meaning that these unredacted declarations containing personally identifiable information "may be reviewed only by the filer or, in the case of an order, the person to whom the order is directed without prior leave of court." *See* L.R. 83.12(b)(2). Upon the entry of an agreed-upon protective order governing Defendants' handling of these unredacted declarations, Plaintiffs anticipate that the sealing could be shifted to Level I under Local Rule 83.12(b)(1), giving Defendants' counsel access to these unredacted declarations pursuant to any protective order's terms.

The unredacted declarations will be conventionally filed, provisionally under seal under Local Rule 83.12(d). Pursuant to Local Rule 83.12(c)(4) requiring Plaintiffs to inform the Court whether they "seek[] to seal the motion to seal and/or all related docket text entries," Plaintiffs do ***not*** ask that this Motion be sealed. Plaintiffs have no objection, upon sealing, to separate docket entries being entered that state "The Unredacted Declaration of Member [A/D/E/F/I]. Filed Under Seal."

## I. GOVERNING LAW[1]

As other courts of appeals have done,[2] the First Circuit has recently articulated a framework for assessing whether a party may litigate a case using a pseudonym. *See Doe v. Mass. Inst. of Tech.*, 46 F.4th 61, 72 (1st Cir. 2022) ("*MIT*"); *Doe v. Town of Lisbon*, 78 F.4th 38 (1st Cir. 2023) (applying *MIT* standard to affirm denial of motion to unseal and reveal name of pseudonymous litigant). The *MIT* court recognized that a district court "enjoys broad discretion to quantify the need for anonymity in the case before it" and to make the "ultimate determination as to whether that need outweighs the public's transparency interest." 46 F.4th at 67, 72. The court stressed that, when exercising this broad discretion, a "district court . . . should balance the interests asserted by the movant in favor of privacy against the public interest in transparency, taking all relevant circumstances into account." *Id.* at 72.

As to the circumstances that are relevant to this balancing, the *MIT* court offered four general scenarios "in which party anonymity ordinarily will be warranted," namely cases in which (1) the party "reasonably fears" that disclosure of their name will result in "unusually severe physical or mental harm"; (2) disclosure of the party's name will likely lead to disclosure of a

[1] As shown in Part II below, it is clear that Members A, D, E, F, and I satisfy the balancing test described below, which by its terms applies where a *party* seeks to litigate a case anonymously. Should the Court agree, there will be no need to determine whether a less demanding approach should obtain where a *non-party* seeks to submit evidence relevant to a party's claim, as is the case here. That said, the three courts of appeal that have squarely addressed the issue held that a membership organization can rely on pseudonymous declarations to support its standing to sue in a representative capacity, with no mention of a need to satisfy any balancing test first. *See Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,* 103 F.4th 765 (11th Cir. 2024) (holding that "identification of [organization's] affected members by the pseudonyms Owner A, Owner B, and Owner C poses no bar to its standing to sue"); *Speech First, Inc. v. Shrum*, 92 F.4th 947, 951 (10th Cir. 2024) ("[O]rganizational standing is proper even when the qualifying member of the plaintiff organization is anonymous."); *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022) (holding, in case in which union relied on survey of unnamed members to establish injury, that "anonymity is no barrier to [organizational] standing"). That no-balancing rule should apply all the more here, where Plaintiffs do not seek to rely exclusively on pseudonymous declarations, but have identified other members by name.

[2] *See, e.g., In re: Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1247 (11th Cir. 2020); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008); *Doe v. Megless*, 654 F.3d 404 (3d Cir. 2011); *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993).

nonparty's identity, with consequent harm to such an "innocent" non-party; (3) "anonymity is necessary to forestall a chilling effect on future litigants who may be similarly situated"; and (4) the lawsuit is bound up with a prior proceeding subject by law to confidentiality protections. *Id.* at 71.

The court hastened to add that these four "paradigm[atic]" categories do not "capture the entire universe of cases in which pseudonymity may be appropriate" but instead "are rough cuts" and that "a party whose case for pseudonymity appears weak when each paradigm is analyzed separately may nonetheless make a persuasive showing when multiple paradigms are implicated." *Id.* at 72. Indeed, the court's reasoning makes clear that it advertently chose against attempting to establish a comprehensive list of relevant factors precisely "[b]ecause the problem is complex and the cases are not all cut from the same cloth," making it "inevitable" that courts will have to weigh, from a multitude of potentially relevant factors, those that are relevant to the cases before them. *Id.* at 70 (quoting *In re Sealed Case*, 931 F.3d at 97, for the proposition that a "precise list of factors matters less than whether court took proper account of 'the factors relevant to the case before it' that 'inform the ultimate balancing of the public and private interests at stake'"). Because "the appropriate test must center on the totality of the circumstances," the court stressed that "[i]n the last analysis, district courts enjoy broad discretion to identify the relevant circumstances in each case and to strike the appropriate balance between the public and private interests." *Id.* at 70.

## II.    ARGUMENT

Pursuant to Local Rule 83.12(c)(2) requiring Plaintiffs to provide "the factual and legal basis to justify sealing the filing," sealing is justified here. These five declarants seeking pseudonymity are not parties, and Plaintiffs NEA and NEA-NH identify several other members/educators by name. However, even if the standard governing the question of whether a

party can litigate a case pseudonymously applies to these declarants, this standard has been met to justify the submission of anonymous declarations.

The totality of the relevant circumstances here militates decisively in favor of allowing the five NEA and NEA-NH members (Members A, D, E, F, and I) identified in the First Amended Complaint and in their declarations in support of Plaintiffs' Motion for a Preliminary Injunction to proceed pseudonymously. These members have well founded fears of suffering serious harms—the loss of their livelihoods as well as doxing, harassment, and threats—if they are identified by name in support of litigation opposing this administration's campaign against the broad array of academic programs and teaching practices that it vaguely refers to under the rubric of DEI. *See Doe v. United States Sec'y of State*, 707 F. Supp. 3d 142, 144 (D.N.H. 2023) (applying the *MIT* factors, holding that "Doe reasonably fears that disclosure of his identity in this action will cause him severe physical and psychological harm"). At the same time, there is no appreciable public interest to be served by naming these declarants and no prejudice to Defendants that could arise from preventing disclosure of the declarants' names in public filings with the court.

### A.   Members A, D, E, F, and I Reasonably Fear Serious Harms if Their Identities are Revealed in Public Filings

Member A is a New Hampshire public high school teacher. Member A Decl. ¶ 2 (ECF No. 34-11). Members D, E, and F teach in institutions of higher education, and Member D lacks tenure protections. Member D Decl. ¶ 2 (ECF No. 34-14); Member E Decl. ¶ 4 (ECF No. 34-16); Member F Decl. ¶ 3 (ECF No. 34-20). Member I is an education student who will be student-teaching this year. Member I Decl. ¶ 9 (ECF No. 34-18). All five declarants teach subjects, and employ teaching methodologies, that can be understood to fall within the loose conception of DEI set out in the Letter. Member A Decl. ¶ 6 (ECF No. 34-11); Member D Decl. ¶¶ 10-13 (ECF No. 34-14); Member E Decl. ¶¶ 6, 8-9 (ECF No. 34-16); Member F Decl. ¶¶ 8-9 (ECF No. 34-20);

Member I Decl. ¶ 9 (ECF No. 34-18). Member F also assists in developing training for faculty, staff, and administrators that includes materials that have "diversity, equity and inclusion" in their titles or have practices associated with these values embodied in the best teaching practices they describe. Member F Decl. ¶¶ 10-14 (ECF No. 34-20). All five declarants fear that being publicly named as supporting Plaintiffs' challenge to the Letter will expose them to potential reprisals by their employers and to doxing (*i.e.*, wide dissemination of personally identifying information such as their addresses and employers), harassment, and threats. Member A Decl. ¶ 28 (ECF No. 34-11); Member D Decl. ¶ 17 (ECF No. 34-14); Member E Decl. ¶ 15 (ECF No. 34-16); Member F Decl. ¶ 20 (ECF No. 34-20); Member I Decl. ¶ 11 (ECF No. 34-18). Those fears are well founded.

It is, first of all, entirely reasonable for Members A, D, E, F, and I—whose work could be considered to fall within the Letter's loose conception of DEI programs that are subject to enforcement actions—to fear for their livelihoods if they are identified by name in support of a challenge to this administration's enforcement threats. And this holds true regardless of whether their employers agree or disagree with the administration's campaign against what it considers to be impermissible DEI programs. That is because education institutions can reasonably be expected to believe that continuing to employ such educators will make their institutions ripe targets for enforcement action by this administration, with the attendant risk of losing federal grant funds. The public record is rife with examples of educators who lost their jobs for teaching about race as states began passing laws threatening public education funding to schools for maintaining instruction or other programs involving "divisive concepts."[3] Indeed, public school employers

[3] *See, e.g.*, Hannah Natanson and Moriah Balingit, "Caught in the culture wars, teachers are being forced from their jobs," *Washington Post* (June 16, 2022) (documenting 160 public-school educators who lost their jobs because of political debates of teaching concerning race and other issues), https://www.washingtonpost.com/education/2022/06/16/teacher-resignations-firings-culture-wars/; Claudette Riley, "Southwest Missouri high school teacher accused of using critical race theory loses job," *Springfield News-Leader* (April 7, 2022), https://www.news-leader.com/story/news/education/2022/04/07/greenfield-missouri-teacher-kim-

have even fired educators for their constitutionally protected off-duty speech concerning issues of gender identity based on claims that such speech was disruptive.[4]

For example, NEA has had to defend its own members: (1) winning back the job of a high school contemporary issues teacher who was terminated for playing a spoken word poem addressing white privilege to his high school juniors and seniors; (2) defeating an effort to strip a teacher of her teaching credentials for declining to remove a Black Lives Matter flag from the school; (3) defending the right of a teacher to assign a powerful essay by an award winning African American author to her AP English class as an example of how to write a persuasive essay; (4) challenging the termination of a middle school teacher for reading an age appropriate book "*My Shadow is Purple*" that her students picked for a class read aloud; and (5) challenging the termination of a music teacher for raising concerns about her school's decision to prevent the school choir from singing, "Rainbow Land." First Am. Compl. ¶ 127 (ECF No. 32).

Second, Members A, D, E, F, and I also have well-founded fears that being identified by name in public court filings opposing the Department of Education's Dear Colleague Letter will expose them to doxing, harassment, and threats. Here, too, a raft of public reporting amply

---

morrison-accused-teaching-critical-race-theory-crt-loses-job/7264924001/; Hannah Natanson, "A White teacher taught White students about White privilege. It cost him his job," *Washington Post* (Dec. 6, 2021), https://www.washingtonpost.com/education/2021/12/06/tennessee-teacher-fired-critical-race-theory/; Tyler Kingkade "Critical race theory battles are driving frustrated, exhausted educators out of their jobs," *NBC News* (July 12, 2021) (reporting that "[b]attles over diversity and equity initiatives in public schools have resulted in administrators and teachers being fired or resigning over discussions about race").

[4] For example, two public school teachers in Oregon were fired based on their creation of a social media campaign that criticized school district policies on the district's policies toward transgender students. Despite the constitutionally protected nature of this off-duty speech, a district court dismissed the educators' First Amendment challenge to their dismissal on the ground that their off-duty activities "caused a disruption to the District" simply because some people complained about their speech. *Damiano v. Grants Pass Sch. Dist. No. 7*, No. 1:21-CV-00859-CL, 2023 WL 2687259, at *7 (D. Or. Mar. 29, 2023). The educators' appeal to the Ninth Circuit remains pending. *See* Justin Higginbottom, Grants Pass educators take free speech suit to federal appeals court," *Oregon Public Broadcasting* (June 4, 2024), https://www.opb.org/article/2024/06/04/grants-pass-educators-take-free-speech-suit-to-appeals-court/.

supports the reasonableness of these fears.[5] One article has reported such conduct as: death threats delivered to school administrators' homes, the allegation that an educator is a "sexual predator" because of their work with LGBTQ+ students, and physical confrontations and assaults at board meetings, including one at which "angry parents attempted to make a 'citizen's arrest' of a school principal, using zip ties as handcuffs."[6] We also have seen such harassment in New Hampshire. After a political group in New Hampshire published an educator's name for signing an online petition pledging to teach "honest history," he was subjected to "online harassment, threats and obscenities." He left the profession after the police department sent patrols to his home in light of these threats. *See* Plaintiffs' Statement of Undisputed Facts in Support of Their Joint Memo. of Law in Support of Their Mot. for Summary Judgment in *Local 8027 et al. v. Edelblut, et al*, No. 1:21-cv-01077-PB (ECF No. 85-111, ¶ 157, at pp. 71-72).

Two comprehensive reports show that school board meetings have resulted in parents targeting teaching and instructional materials that deal with issues of race, as well as educators' and school officials' efforts to create safe and welcoming learning and working environments for students.[7]

---

[5] *See, e.g.*, Lois Beckett, "Outrage as Anti-LGBTQ+ Protest at California School Board Turns Violent," *The Guardian* (June 7, 2023), https://www.theguardian.com/us-news/2023/jun/07/lgbtq-violence-protest-glendale-unified-school-district; Kiara Alfonseca, "Teachers, Librarians Targeted by Angry Parents Over LGBTQ Books Speak Out," ABC News (May 19, 2023), https://abcnews.go.com/US/teachers-librarians-targeted-angry-parents-lgbtq-books-speak/story?id=99390577; Evie Blad, "School Boards Are Limiting Public Comment," *Education Week* (Jan. 18, 2023), https://www.edweek.org/leadership/school-districts-are-limiting-public-comment-will-that-erode-trust/2023/01; Eesha Pendharkar, "Backlash, Hostility, and Safety Fears: What It's Like to Be a Chief Equity Officer in the Anti-CRT Era," *Education Week* (July 19, 2022), https://www.edweek.org/leadership/backlash-hostility-and-safety-fears-what-its-like-to-be-a-chief-equity-officer-in-the-anti-crt-era/2022/07.

[6] Blad, "School Boards Are Limiting Public Comment," *supra* note 5.

[7] *See* Nicole Carr & Lucas Waldron, "How School Board Meetings Became Flashpoints for Anger and Chaos Across the Country," *ProPublica* (July 19, 2023), https://projects.propublica.org/school-board-meetings-flashpoints-for-anger-chaos/; Gabriella Borter, *et al.*, "School Boards Get Death Threats Amid Rage Over Race, Gender, Mask Policies," *Reuters* (Feb. 15, 2022), https://www.reuters.com/investigates/special-report/usa-education-threats/.

A 2023 report by the non-profit investigative journalism organization ProPublica examined public records and hundreds of hours of footage—from school board meeting feeds, social media, and police bodycam videos—showing how "protesters have derailed school board meetings across the country," turning the meetings into "polarized battlegrounds over COVID-19 safety measures, LGBTQ+ student rights, 'obscene' library books and attempts to teach children about systemic racism in America."[8] ProPublica's analysis "identified nearly 90 incidents in 30 states" involving "[a]ssaults, threats, and disruption, including an instance in which attendees took over the meeting," many of which "escalated into not just shouting matches and threats but also arrests and criminal charges."[9] The report found that "at least 59 people were arrested or charged" over the course of the 18-month period from May 2021 to November 2022.[10]

Similarly, a 2022 report from Reuters, based on public records and interviews with dozens of school board members from 15 states, uncovered 220 examples of threats and intimidation directed at school officials.[11] The report also found the same trajectory of protest activity as that documented by ProPublica, as illustrated by the experience of school board members in Loudon County, Virginia: "The board in Loudoun County, a Washington suburb, first came under fire in 2020 over pandemic school closures. Anger built as the district implemented anti-racism efforts in August of that year, including teacher training. By June 2021, many parents were also incensed

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] Borter, *et. al.*, "School Boards Get Death Threats Amid Rage Over Race, Gender, Mask Policies," *supra* note 7. *See also* Joe Heim, *et al.*, "Residents left fuming, fearful after contentious Loudoun County school board meeting," *Washington Post* (June 24, 2021), https://www.washingtonpost.com/local/education/loudoun-schools-transgender-critical-race-theory/2021/06/23/1691dfc2-d453-11eb-ae54-515e2f63d37d_story.html ("Anger and frustration boiled over at the Tuesday meeting where a full house of parents, students and other residents grew increasingly rancorous during a public comment session on the district's transgender rights policy and racial equity plans.").

by a proposed policy to allow transgender students to use bathrooms matching their preferred gender identity."[12]

Nor are such problems confined to the public-school setting. Public reporting shows that educators working in institutions of higher education also face doxing, harassment, and threats by reason of teaching and other programs involving issues of race and gender.[13]

There is a particular concern that Plaintiffs face similar threats in relation to the Letter and this litigation. Following the issuance of the Letter, ED instituted an "End DEI" complaint portal, and in its announcement includes statements of the co-founder of Moms for Liberty, who encourages parents to use the Portal "to share the receipts of the betrayal that has happened in [ ] public schools" through "pushing critical theory, rogue sex education and divisive ideologies."[14] Moms for Liberty has threatened local school boards that "[i]t will be in the best interest of this school district to comply. If compliance is not met, Moms for Liberty is prepared to escalate."[15] In the past, Moms for Liberty has offered money for people to "catch" a public school teacher violating similar New Hampshire bans on teaching.[16]

---

[12] Borter, *et. al.*, "School Boards Get Death Threats Amid Rage Over Race, Gender, Mask Policies," *supra* note 7.

[13] *See, e.g.*, Russell Contreras, "Educators face fines, harassment over critical race theory," *Axios* (Jun 20, 2021) (reporting that "[e]lementary school teachers, administrators and college professors are facing fines, physical threats, and fear of firing because of an organized push from the right to remove classroom discussions of systemic racism"), https://www.axios.com/2021/06/20/teachers-harassment-fines-critical-race-theory; Paul Basken, "US states' attacks on critical race theory continue post-Trump: Lawmakers and activists work to forbid talk of enduring inequities," *Times Higher Education* (May 6, 2021), https://www.timeshighereducation.com/news/us-states-attacks-critical-race-theory-continue-post-trump (documenting that Campus Reform, a group that "uses campus informants to publicly challenge [higher education] faculty whose speeches or writings they consider unacceptable" had "published more than 1,500 critiques of US college faculty," nearly half of whom "reported receiving threats of harm, including physical violence or death" and in some cases "their dismissal for discussing race and other controversial topics.")

[14] Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025) ("Portal Press Release"), https://perma.cc/8737-NAA9.

[15] Moms for Liberty, DEI Tug of War in Wake County Schools Stirs Tensions Among Board, Parents (reposted from the Carolina Journal) (Feb. 20, 2025), https://perma.cc/3B8D-W5WN.

[16] Moms for Liberty Hillsboro Co, NH, X (Nov. 12, 2021), https://perma.cc/L9YE-7HZJ

In sum, the foregoing shows that the fears of doxing, harassment, and threats articulated by Members A, D, E, F, and I—along with their fears of losing their livelihoods—if they are identified by name in public court filings in this case are eminently reasonable and well founded. This conclusion places their request to proceed pseudonymously squarely within the *MIT* court's first paradigmatic scenario in which party anonymity ordinarily will be warranted."

**B. No Appreciable Public Interest Would Be Served by Naming Members A, D, E, F, and I and no Prejudice to the Defendants Could Arise from Preventing Disclosure of their Names in Public Filings with the Court.**

On the other side of the balance, there is neither any appreciable public interest in compelling disclosure of the names of Members A, D, E, F, and I nor any prejudice to the Defendants from their proceeding under pseudonyms.

As to the former, there is a "weak public interest in knowing the litigant's identities" where, as here, the case raises issues of a "purely legal nature." *Doe v. Megless*, 654 F.3d 404, 409 (3d Cir. 2011). This already weak public interest is all the more insubstantial here, given that Members A, D, E, F, and I are not parties but *declarants* who—along with four other declarants who *have* identified themselves by name—are providing evidence of the Dear Colleague Letter's injurious effects in support of the named party membership organizations' standing and entitlement to injunctive relief.

Moreover, given the declarants' well-founded fears of doxing, harassment, and abuse if their names were to be publicly disclosed, there is a public interest *favoring* anonymity here: inasmuch as the *MIT* court recognized that anonymity is apt to be warranted when "necessary to forestall a chilling effect on" other potential litigants, 46 F.4th at 71, it is very much to the point that, for all the reasons adduced in Part II.A. above, not only Members A, D, E, F, and I but other similarly situated educators would almost certainly be deterred from providing evidence (much

less participating as parties) in challenges to this administration's anti-DEI campaign if doing so meant that their identities must be made part of the public record.

Nor will the filing of anonymous declarations from Members A, D, E, F, and I interfere with this court's administrative need to check for potential conflicts of interest, as Plaintiffs filed the names of the declarants provisionally under seal under Local Rule 83.12(d)—just as the *MIT* decision requires. *See* 46 F.4th at 77 (noting that "courts tasked with resolving pseudonymity motions must be afforded the anonymous party's true name under seal" and that district courts may make provision for this requirement "either formally (by adoption of a local rule or a publicly available operating procedure) or informally (by apprising counsel, on an ad hoc basis, of the need to submit the anonymous party's name, under seal, to the court)").

Finally, the Defendants face no prejudice by reason of the NEA member declarants' proceeding anonymously. The presumption against anonymity is weaker in cases against the government, as they "involve no injury to the Government's 'reputation,'" as opposed to claims against private parties, "the mere filing [of which] may cause damage to their good names and reputation and may also result in economic harm." *S. Methodist Univ. Ass'n of Women L. Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979). In any event, upon the entry of an agreed-upon protective order governing Defendants' handling of these unredacted declarations, Plaintiffs anticipate that this sealing can be shifted to Level I under L.R. 83.12(b)(1), which would give Defendants' counsel access to these unredacted declarations pursuant to the protective order's terms.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the that the Court seal at Level II the unredacted versions of five declarations filed by educators—Members A, D, E, F, and I—in

support of Plaintiffs' Motion for Preliminary Injunction that contain personally identifiable information.

## CERTIFICATE OF CONCURRENCE

Pursuant to Local Rule 7.1(c), undersigned counsel for Plaintiffs certify that Plaintiffs have made a good faith attempt to obtain concurrence in the relief sought. Plaintiffs sought concurrence on March 21, 2025, and Defendants had not formed a position at the time of filing and that position may be dependent on whether a protective order can be agreed upon.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Seal at Level II the unredacted versions of five declarations filed by educators—Members A, D, E, F, and I—in support of Plaintiffs' Motion for Preliminary Injunction that contain personally identifiable information. *See* ECF Nos. 34-11 (Member A Decl. at Ex. I), 34-14 (Member D Decl. at Ex. L), 34-16 (Member E Decl. at Ex. N), 34-18 (Member I Decl. at Ex. P), and 34-20 (Member F. Decl. at Ex. R) (public, redacted versions); and

(b) Grant all other relief that it deems just and equitable.

Dated: March 24, 2025

Respectfully submitted,

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
SangYeob Kim (N.H. Bar No. 266657)
American Civil Liberties Union of New Hampshire
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org

Sarah Hinger*
Amanda Meyer*
Alexis Alvarez*
Ethan Herenstein*
Victoria Ochoa*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org

Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org

Rachel E. Davidson*
American Civil Liberties Union Foundation of Massachusetts, Inc.
One Center Plaza, Suite 801
Boston, MA 02018
(617) 482-3170
rdavidson@aclum.org

Alice O'Brien[T]
Jason Walta*
Phil Hostak*
Stacy Hickox[T]
NEA Office of General Counsel
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

**admitted pro hac vice*
[T] *pro hac vice* forthcoming