## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

NATIONAL EDUCATION
ASSOCIATION; *et al.*,

     *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; *et al.*,

     *Defendants.*

Case No. 1:25-cv-00091-LM

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' EMERGENCY MOTION
FOR TEMPORARY RESTRAINING
ORDER**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................ 2

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

    I.       Plaintiffs Face Irreparable Harm ............................................................................. 7

    II.     Plaintiffs' Injuries Establish Standing. ................................................................... 9

       A.    Plaintiffs NEA and NEA-NH Have Standing as Membership Associations. .............. 10

       B.    NEA, NEA-NH, and CBED Have Standing as Organizations ..................................... 14

       C.    Plaintiffs' Injuries are Caused by ED's Actions and are Redressable Through the Requested Relief .......................................................................................................... 18

    III.    Plaintiffs are Likely to Succeed on the Merits. ................................................... 19

       A.    The DCL, Including as Implemented Through the Certification Requirement, Violates the Fifth Amendment Prohibition on Vagueness. ........................................ 20

       B.    The DCL, Including as Implemented Through the Certification Requirement, Unconstitutionally Censors Disfavored Speech. ......................................................... 22

       C.    The DCL, Including as Implemented Through the Certification Requirement, Violates the Administrative Procedure Act. .............................................................................. 22

    IV.    The Balance of Hardships Tilts Decidedly in Plaintiffs' Favor, and Relief Would Benefit the Public. ................................................................................................. 23

CONCLUSION .................................................................................................................. 25

**INTRODUCTION**

Plaintiffs request a Temporary Restraining Order to address the Department of Education's ("ED") new enforcement actions, which impose consequential deadlines for action well before the briefing schedule contemplated for the pending Preliminary Injunction Motion. ECF 34.

On April 3, 2025, ED issued a Certification Requirement to state and local education agencies, requiring them to certify that they are currently in compliance with "Title VI and *SFFA v. Harvard*" as unilaterally interpreted by ED through its February 14, 2025, Dear Colleague Letter ("DCL")[1], including its prohibition on "Diversity, Equity, & Inclusion ('DEI') programs." U.S. Dep't of Educ., Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/A8VQ-JRZB ("Certification Requirement") (attached as Ex. A).[2] ED attaches to this Certification Requirement the threat of sweeping penalties for both institutions and individuals, including the loss of all future federal funding, clawing back of previously distributed funds, and liability under contract law and the False Claims Act ("FCA"). *Id.* ED gives state education agencies ("SEAs") ten days—until Sunday, April 13—to respond, including by collecting certifications from local education agencies ("LEAs"). *Id.* To meet this requirement, at least some SEAs (including the New Hampshire Department of Education) have required LEAs to comply with the Certification Requirement even sooner, by Thursday, April 10.[3]

Under this threat, education institutions must determine *now* whether and how they will attempt to comply with the vague and viewpoint discriminatory (and improperly adopted)

---

[1] Plaintiffs have previously referred to this document as "Letter;" they amend the reference here to avoid confusion with subsequently enforcement actions which ED has also referred to as a letter.

[2] All references in this memorandum to "Ex. __" are to the exhibits accompanying the Declaration of Sarah Hinger in Support of Plaintiffs' Emergency Motion for Temporary Restraining Order (attached hereto as Ex. 1).

[3] N.H. Dep't of Educ., Certification Requirement Directions (Apr. 3, 2025) ("NHED Certification Requirement Directions") (attached as Ex. B).

provisions of the DCL. Any attempted compliance, or the risk of non-compliance, is ultimately carried by and through educator employees, as well as through organizations such as Plaintiffs, which provide programming in coordination with education institutions. Plaintiffs' members' teaching and academic pursuits are censored and scrutinized, and Plaintiffs' programs face cancellation. As such, relief is needed now.

For this reason, Plaintiffs request that the Court grant a temporary restraining order ("TRO") to enjoin Defendants from implementing the Certification Requirement and from taking any adverse action on the basis of state and local education agencies' responses or lack thereof. Plaintiffs request that the TRO sought here with respect to the Certification Requirement remain in place until the Court renders a decision on Plaintiffs' Motion for Preliminary Injunction. ECF 34. Given the potential for additional and escalating enforcement efforts evidenced by ED's issuance of the Certification Requirement, Plaintiffs also respectfully request that the Court expedite its review of their Motion for Preliminary Injunction or, in the alternative, issue a TRO enjoining all enforcement and implementation of the DCL until the Court renders a decision on the Motion for Preliminary Injunction. Plaintiffs also herein incorporate by reference the facts and legal arguments presented in their Motion for Preliminary Injunction. ECF 34.

### FACTUAL BACKGROUND

Plaintiffs' First Amended Complaint, filed on March 21, 2025, alleges that the DCL violates the First and Fifth Amendments to the U.S. Constitution and the Administrative Procedure Act ("APA"). ECF 32. On March 21, 2025, Plaintiffs filed a motion seeking "to preliminarily enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing and/or implementing the Dear Colleague Letter issued on February 14, 2025, including through the February 28, 2025

'Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act,' and the End DEI Portal, pending the resolution of this action on its merits."[4] ECF 34. Defendants' response is due April 11, 2025, and Plaintiffs' reply is due April 18, 2025. During the pendency of Plaintiffs' Motion for Preliminary Injunction, Defendants have taken further enforcement action under the DCL, necessitating a TRO.

On April 3, 2025, ED issued a press release regarding letters ED has sent to State Commissioners overseeing SEAs.[5] According to the press release, the letters require SEAs to certify that they are not engaging in undefined "DEI" and that they are complying with ED's newly announced understanding of Title VI and *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*").[6] The press release notes that the certifications "are being sent out pursuant to the Department of Education's authority and responsibility to ensure that recipients of federal funding are complying with United States civil rights law," further citing the DCL and FAQ, both of which are the subject of this lawsuit.[7] The press release indicates that SEAs have 10 days—until Sunday, April 13, 2025—to certify their compliance and collect certifications from all LEAs.[8]

The Certification Requirement provides the following "[r]equested [c]ertification" that SEAs and LEAs must sign:

> On behalf of _____[SEA/LEA], I acknowledge that I have received and reviewed this Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard*. I further acknowledge that compliance with the below and the assurances referred to, as well

---

[4] The filing of this motion also followed ED's March 14, 2025, announcement that its Office of Civil Rights had opened investigations into 45 colleges and universities under the DCL. *See* ECF 34-4.
[5] Press Release, U.S. Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://perma.cc/6UKX-7E66 ("Apr. 3 Certification Press Release") (attached as Ex. C).
[6] *Id.*
[7] *Id.*
[8] *Id.*

as this certification, constitute a material condition for the continued receipt of federal financial assistance, and therefore certify our compliance with the below legal obligations.

Certification Requirement at 1.

SEAs and LEAs are required to certify compliance with ED's new requirements for the receipt of federal funding, as first announced in the DCL, and for which ED provides no justification. While the Certification Requirement notes several sources of obligations for federal funding recipients i.e., Title VI, *id.* (citing 42 U.S.C. § 2000d), federal contract and grant regulations, *id.* at 2 (citing 2 CFR § 200.300(a)), and the Every Student Succeeds Act (ESSA), *id.* (citing 20 U.S.C. § 6301 et seq.), as well as the requirement that federal funding recipients file assurances of compliance with federal nondiscrimination law, *id.* (citing 20 U.S.C. § 7844),[9] SEAs and LEAs already have provided such assurances. The Certification Requirement thus seeks to bind SEAs and LEAs to ED's new requirements introduced in the DCL. The Certification Requirement concludes that, "[g]iven the text of Title VI and the assurances you have already given, any violation of Title VI—including the use of Diversity, Equity, & Inclusion ('DEI') programs to advantage one's race over another—is impermissible. The use of certain DEI practices can violate federal law." *Id.* at 3. Critically, as with the DCL, the Certification Requirement does not define "Diversity, Equity, & Inclusion ('DEI') programs."

---

[9]As in the DCL and FAQ, ED here suggests that ESSA prohibits education institutions from undertaking "DEI programs" but ignores the totality of assurances required under ESSA. ESSA and state plans adopted under ESSA require SEAs to implement practices relating to "diversity," "equity," or "inclusion." *See, e.g.*, 20 U.S.C. § 6311(b) (requiring inclusion of English language learners); *id.*§ 6311(c) (requiring meaningful differentiation for students, including subgroups); *New York State Revised State Template for the Consolidated State Plan: The Elementary and Secondary Education Act of 1965, as Amended by the Every Students Succeed Act* at 195–96 (2024) (explaining that the SEA will use student support and academic enrichment grants under ESSA to ensure that all students have "equitable and sustained access to highly effective schools that provide a well-rounded, culturally responsive education" and to foster a "supportive school culture and community that values and promotes diversity . . . .") (attached as Ex. D); *Massachusetts Consolidated State Plan Under the Every Students Succeeds Act (ESSA) October 2024* at 19–20 (2024) (promoting social and emotional learning through culturally responsive social-emotional competency development guidance) (attached as Ex. E).

The Certification Requirement threatens that "[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences" including (1) "eliminating federal funding for any SEA, LEA, or educational institution that engages in such conduct," (2) "the potential initiation of litigation for breach of contract by the Department of Justice in connection with civil rights guarantees contained in federal contracts and grant awards seeking to recover previously received funds paid to them under these contracts and grants," and (3) liability under the FCA, 31 U.S.C. § 3729(a), for which "violators face penalties including treble damages and civil penalties of thousands of dollars per violation." *Id.* at 3–4. The reach of the Certification Requirement is broad. It indicates that "individuals using [DEI] practices" may face "serious consequences," and that the enumerated consequences are not exhaustive. *Id.* at 3. Further, it obligates SEAs to sign on behalf of their agency as a whole, which by its terms includes the entirety of their programs, including those in higher education.[10] The email accompanying the Request for Certification also requires SEAs to report the signature status of each of their LEAs, any compliance issues within LEAs, and the SEA's proposed enforcement plans.[11]

SEAs have moved swiftly to obtain compliance. For example, on the evening of April 3, the New Hampshire Department of Education (NHED)'s Bureau of Federal Compliance emailed all New Hampshire LEAs requiring them to submit the Certification Requirement and additional information to NHED by Thursday, April 10, 2025 at 5:00 pm ET.[12] The email notes that if no form is received by the deadline, NHED "is required to report to the United States Department of

---

[10] Further, an SEA's assurance requirements under ESSA apply to each of its relevant programs under ESSA, *see* 20 U.S.C. § 7844, which include programs that involve institutes of higher education, or otherwise relate to higher education, *see, e.g., id.* § 6861 (providing grants to entities, including higher education institutions, to provide professional development to improve instruction for English language learners, including in consortia with SEAs or LEAs); *id.* § 7294 (providing grants to entities, including higher education institutions, to assist SEAs, LEAs, and other entities in training personnel in the identification and education of gifted and talented students).
[11] Letter from Daniel Morton-Bentley, Counsel & Deputy Comm'r, N.Y. State Educ. Dep't, to U.S. Dep't of Educ., Off. of C.R. at 2 (Apr. 4, 2025) (attached as Ex. F).
[12] NHED Certification Requirement Directions.

Education that no certification was received,"[13] and that "[a]ll issues of noncompliance and a proposed enforcement plan will be submitted to [ED]."[14]

NHED includes ED's Certification Requirement as well as a "Mandatory Supplement Questionnaire" (the "Supplement Questionnaire").[15] This additional questionnaire asks as follows:

> Upon investigation, have there been instances of noncompliance identified within your LEA? . . . If the answer to the question above is yes, please describe each issue of noncompliance found within your LEA. For each area of noncompliance identified above, detail your remediation plans including intended date of remediation completion.[16]

No additional reason or purpose is provided for requiring LEAs to submit this information. The Supplement Questionnaire provides no additional definitions of "investigations," "instances of noncompliance," or "remediation," or guidance on how to assess compliance.

## LEGAL STANDARD

"A temporary restraining order 'is a provisional remedy imposed to maintain the status quo until a full review of the facts and legal arguments is available.'" *Ginzburg v. Martínez-Dávila*, 368 F. Supp. 3d 343, 347 (D.P.R. 2019) (quoting *Pro-Choice Network v. Schenck*, 67 F.3d 377, 388–89 (2d Cir. 1995)). The same factors considered for a motion for a preliminary injunction apply to a motion for a TRO: the likelihood of success on the merits; the likelihood of irreparable harm in the absence of relief; the balance of equities; and whether injunctive relief is in the public interest. *Tirrell v. Edelblut*, 747 F. Supp. 3d 310, 313 (D.N.H. 2024) (citing *Karlsen v. Town of Hebron*, Civ. No. 18-cv-794-LM, 2018 WL 11273651, at *1 (D.N.H. Sept. 28, 2018)).

---

[13] *Id.*

[14] *Id.* NHED has also incorporated the DCL requirements into its annual general assurances. *See* Memorandum from Lindsey Labonville, Adm'r, Bureau of Fed. Compliance, N.H. Dep't of Educ., on General Assurances FY 2026 to Senior Education Officials at 1 (Apr. 4, 2025) (attached as Ex. G).

[15] Supplement Questionnaire (attached as Ex. H).

[16] *Id.*

## ARGUMENT

**I.    Plaintiffs Face Irreparable Harm.**

As set forth in the Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, the injuries Plaintiffs suffer are irreparable. ECF 34-1 at 49–52.[17] As indicated there and below, "the likelihood of success on the merits is great," and as such, Plaintiffs may "show somewhat less in the way of irreparable harm." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). Even without this reduced burden, Plaintiffs would establish clear imminent and irreparable harm. ED's Certification Requirement further amplifies the DCL's existing chill and increases the imminence of its harms. ED requires all SEAs and LEAs to certify compliance within 10 days and ratchets up the threatened penalties, including not only the revocation of all federal funding, but also litigation to claw back previously distributed funding, liability under the FCA,[18] and consequences for individuals. Certification Requirement at 3–4. The pressure on education institutions is immediate and heavy. SEAs and LEAs face an impossible choice: certify adherence to vague requirements and risk severe sanctions or fail to certify and risk loss of critical federal funding. Some Plaintiffs had already seen their education institutions take measures to restrict practices core to their professional responsibilities pursuant to the DCL, ECF 34-1 at 13–14, and the pressure to do so is now accelerated.

Plaintiffs' injuries are, in turn, substantial, ECF 34-1 at 49–52. The DCL infringes on Plaintiffs' constitutional rights, chills basic educator practices, jeopardizes the livelihoods of Plaintiffs' members, and interferes with Plaintiff organizations' core activities and resources. These injuries are "not accurately measurable or adequately compensable by money damages," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000), and

---

[17] All page numbers for ECF documents refer to the ECF page numbers at the top of the page.
[18] In some circumstances, FCA violations can lead to criminal liability.  *See* 18 U.S.C. § 287.

there "are inadequate remedies at law" to address them absent preliminary relief, *Together Emps. v. Mass General Brigham*, 32 F.4th 82, 85–86; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984).

First, Plaintiffs have shown a strong likelihood of success on their constitutional claims, *see infra,* and "the prospect of an unconstitutional enforcement" alone "'supplies the necessary irreparable injury.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992)). "[I]n the context of the First Amendment, finding a likelihood of success on the merits is coextensive with finding irreparable harm." *Silva v. Univ. of N.H.*, 888 F. Supp. 293, 326 (D.N.H. 1994); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012). Plaintiffs have already been censored by their educational institutions, ECF 34-1 at 13–14, and have self-censored in fear of adverse consequences to their livelihoods. *Id.* at 10–11.

Second, Plaintiffs' members face imminent and irreparable harm because of the impossible and burdensome choices the DCL forces, including as enforced through the Certification Requirement. These choices interfere with Plaintiffs' members' core responsibilities and practices as educators. ECF 34-1 at 9–12. In particular, ED's new requirements contradict educators' professional requirements, placing educators at risk of adverse consequences, including the loss of their livelihood, simply for doing their jobs. *Id.* at 11–12. These fears are far from speculative. Rather, Plaintiffs' members have directly experienced the adverse consequences from similar state efforts to censor them, *id.* at 15; ECF 34-21 at 8, and have already experienced adverse consequences under the DCL. ECF 34-1 at 13–14. This injury will persist absent relief, and the resulting harms are irreparable. *See, e.g.*, *Stagliano v. Herkimer Cent. Sch. Dist.*, 151 F. Supp. 3d 264, 273 (N.D.N.Y. 2015) (finding irreparable harm where plaintiff had shown faculty members

discussing "their reluctance and fear over taking sick leave in the future," including because "[t]he potential harms that can result from choosing not to take sick leave . . . are exactly the types of harm for which money damages would be inadequate").

Third, NEA, NEA-NH, and CBED are irreparably injured through ED's interference with their ability to perform their core services and activities. The DCL, including as enforced through the Certification Requirement, has and will continue to undermine, decrease the value of, and jeopardize the efficacy of Plaintiffs' core activities, including their professional development work, the provision of teacher training and grants, and partnerships with school districts and states. ECF 34-1 at 13–16. These harms, which underlie Plaintiffs' organizational standing as described *infra*, constitute irreparable harm. *See, e.g.*, *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986) (harm that "threatens the very existence of [a plaintiff's] business" is irreparable); *Cook County v. McAleenan*, 417 F. Supp. 3d 1008, 1018–19, 1029 (N.D. Ill. 2019) (finding irreparable harm where organization would need to divert resources away from its existing programs to respond to the effects of the challenged action); *Voto Latino v. Hirsch*, 712 F. Supp. 3d 637, 658 (M.D.N.C. 2024) (collecting cases involving the standing of organizations focused on voting rights); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, at *9 (N.D. Cal. Mar. 1, 2019) (finding irreparable harm on the basis of immigrant-rights groups' "impairment of . . . organizational mission, loss of reputation and goodwill, and financial impairment").

## II.   Plaintiffs' Injuries Establish Standing.

Standing is established where plaintiffs demonstrate (1) an "injury-in-fact," (2) that is fairly traceable to the defendant's challenged action, and (3) that is "likely" to be "redressed by a

favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation omitted).[19]

Here, Plaintiffs establish standing on behalf of their members and in their organizational

capacity.

### A. Plaintiffs NEA and NEA-NH Have Standing as Membership Associations.

Plaintiffs NEA and NEA-NH satisfy the requirements for associational standing: "(a)

[their] members would otherwise have standing to sue in their own right; (b) the interests [they]

seek[] to protect are germane to the organization's purpose; and (c) neither the claim asserted nor

the relief requested requires the participation of individual members in the lawsuit." *Hunt v.*

*Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

NEA and NEA-NH members would have standing to sue on their own behalf. Several

members provide testimony demonstrating injury in fact that is "'concrete and particularized' and

'actual or imminent, not conjectural or hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S.

149, 153 (2014) (quoting *Defs. of Wildlife*, 504 U.S. at 560). Where, as here, Plaintiffs raise pre-

enforcement challenges, standing exists when "the threatened injury is certainly impending or

there is a substantial risk that the harm will occur." *Id.* at 158 (internal quotation marks omitted)

(citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). A substantial risk of harm is

found where plaintiffs express "an intention to engage in a course of conduct arguably affected

---

[19] In addition to Article III standing requirements, in an APA challenge, plaintiffs must assert interests "arguably within the zone of interests to be protected or regulated by the statute . . . ." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012); *see also Earthworks v. U.S. Dep't of the Interior*, 496 F. Supp. 3d 472, 487 (D.D.C. 2020) (noting this is sometimes called "statutory standing"), *aff'd sub nom. Earthworks v. Dep't of the Interior*, 105 F.4th 449 (D.C. Cir. 2024).The requirement "is not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*, 567 U.S. at 225 (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S. at 399). Here, Plaintiffs' interests in ensuring they are able to teach, research, and conduct their core activities associated with diversity, equity, and inclusion consistent with long standing law and guidance and free of arbitrary and capricious regulation are more than "marginally related to" the basis for the violations here, *id.*, including Title VI. *See, e.g.*, *Sherley v. Sebelius*, 610 F.3d 69, 75 (D.C. Cir. 2010) (concluding doctors' interests in preventing agency from funding research is not inconsistent with the relevant statute).

with a constitutional interest, but proscribed." *Id.* at 159 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Pre-enforcement challenges under the APA are also proper where Plaintiffs face "significant hardship in that "the challenged action creates a 'direct and immediate' dilemma for the parties, requiring them to choose between costly compliance and non-compliance, at the risk of punishment." *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992) (citing *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152–53 (1967); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)); *see also Minn. Citizens Concerned for Life v. FEC*, 113 F.3d 129, 132 (8th Cir. 1997); *Rubins Contractors, Inc. v. Lumbermens Mut. Ins. Co.*, 821 F.2d 671, 673 (D.C. Cir. 1987).

Plaintiffs' members have an interest in pursuing their professional practice free from vague prohibitions that violate their due process rights and from viewpoint discriminatory restrictions on their speech and expression. Because of the DCL's vagueness, members can only guess at which of their practices might conflict with the law, and as such the entirety of their work is at risk. This is particularly true because members' work explores themes and permits discussion of "systemic and structural racism," "discriminatory policies and practices," or gender roles, implicated by the DCL's prohibitions on "diversity," "equity," and "inclusion" and on teaching "that certain racial groups bear unique moral burdens that others do not." *See, e.g.*, ECF 34-11 at 2; ECF 34-12 at 2; ECF 34-13 at 2; ECF 34-14 at 3–4; ECF 34-15 at 3–4. Among many examples, members are uncertain in their ability to continue teaching works like *Heart of Darkness* or *Beloved* because addressing themes of racism may be cast as discrimination under the DCL, ECF 34-11 at 3–5, works by Austen or Atwood that address gender roles and might be considered "toxic indoctrination," *id.* at 5; *see also* ECF 34-12 at 5, or about history, including slavery or the Jim Crow era, which could be construed as "presenting a narrative of the United States as racist," ECF

34-12 at 4; *see also generally* ECF 34-1 at 9–10. They fear employing basic sound pedagogical practices, such as asking students to draw comparisons with contemporary events or their own experiences lest students introduce topics related to race or gender that may be deemed impermissible, ECF 34-11 at 4, 5; ECF 34-14 at 4, or discussing topics related to social and emotional learning, like understanding and navigating hurtful language, ECF 34-12 at 5–6; ECF 34-13 at 3, or employing culturally responsive teaching practices, which might be deemed efforts to "veil discriminatory policies," ECF 34-12 at 6; ECF 34-13 at 2–3; ECF 34-16 at 4–5; ECF 34-18 at 3; *see also generally* ECF 34-1 at 10–11.

The injury is actual or at a minimum "certainly impending." A vague law is immediately coercive, requiring educators to contort their behavior in an effort to meet an unascertainable standard. *See, e.g.*, *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (a law is unconstitutionally vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."). Similarly, where a rule violates the First Amendment, the injury is in "large measure, one of self-censorship." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). Further, the DCL operates as "a directive to existing public servants" at education institutions, including NEA and NEA-NH members. *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 802 (M.D. Tenn. 2024). Schools carry out their programming through their educator employees, who are, in turn, obligated to comply with the directives of their institutions and with federal law. ECF 34-1 at 13. In certifying that it does not violate vague prohibitions on "DEI programs," an education institution is necessarily stating that it will enforce those prohibitions against educators in its employ. Indeed, the Certification Requirement makes this clear, threatening that an "individual . . . using [prohibited DEI] practices" faces "serious consequences."

Certification Requirement at 3. Educator members are thus required "to make decisions regarding compliance with [the DCL] *right now*." *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 803; *see also Susan B. Anthony List*, 573 U.S. at 165 ("administrative action . . . may give rise to harm sufficient to justify pre-enforcement review.") (citing *Ohio C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 625–26 n.1 (1986) (addressing administrative threat of sanctions). Their fears are objective and reasonable, "not imaginary or wholly speculative," *Babbitt*, 442 U.S. at 302, including because Plaintiffs' members have directly experienced the adverse consequences from similar state efforts to censor them, and have already experienced adverse consequences under the DCL, ECF No. 34-1 at 50.

The manner in which these vague and viewpoint discriminatory rules were introduced further heightens members' injuries. The DCL's prohibitions were announced mid-school year, without notice or the opportunity for comment, creating an abrupt rupture from decades of prior ED guidance, ECF 34-1 at 38–47, as well as with professional standards and state teaching requirements, ECF 34-1 at 11–12, and requiring swift compliance. The Certification Requirement amplifies the abrupt and coercive nature of the rules' introduction. Required compliance with any rule in this manner would create substantial burden and uncertainty and undermine educators in their ability to complete their fundamental responsibility to provide education to their students. ECF 34-1 at 11. These injuries are the type of "costly, self-executing compliance burden" that the Supreme Court has recognized establish sufficient hardship. *Minn. Citizens Concerned for Life*, 113 F.3d at 132 (citing *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 69–71 (1993) (O'Connor, J., concurring); *Chamber of Commerce v. FEC*, 69 F.3d 600, 603–04 (D.C. Cir. 1995)); *see also Rubins Contractors*, 821 F.2d at 674–75 (lack of review would "prolong [the plaintiffs] uncertainty

over coverage [under the regulation] and distort the [Plaintiffs'] conduct," creating "a palpable and considerable hardship."); *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 803.

The member interests NEA and NEA-NH seek to protect are germane to their organizational interests. NEA members' interest in their ability to teach and engage in academic pursuits free of vague and viewpoint discriminatory restrictions and consistent with their professional obligations is directly related to NEA and NEA-NH's missions, *see infra*, and NEA's core values "that the expertise and judgment of educational professionals are critical to student success," ECF 34-21 at 3; *see also* ECF 34-17 at 3; *Hunt*, 432 U.S. at 344.

Here, Plaintiffs facially challenge the DCL and its implementation through the Certification Requirement, raising "pure question[s] of law" and "[n]either the[] claims nor the relief sought require[] . . . consider[ation of] the individual circumstances." *Int'l Union, UAW v. Brock*, 477 U.S. 274, 287 (1986). Likewise, because Plaintiffs seek declaratory and injunctive relief and the vacatur of action under the APA, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). The participation of individual members is thus unnecessary.

**B.  NEA, NEA-NH, and CBED Have Standing as Organizations.**

Plaintiffs NEA, NEA-NH, and CBED also have standing "to sue on their own behalf for injuries they have sustained" from the DCL. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79, n.19 (1982). An organization can establish standing by showing that "the challenged conduct frustrated their organizational missions and that they diverted resources to combat that conduct." *Town of Milton v. FAA*, 87 F.4th 91, 99 (1st Cir. 2023) (quoting *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021) (citing *Havens*, 455 U.S. at 379; *Equal Means Equal v. Ferriero*, 3 F.4th 24, 29–30 (1st Cir. 2021)). Organizational plaintiffs may establish a concrete

14

injury by demonstrating that the challenged action directly affected and interfered with their core activities. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (citing *Havens*, 455 U.S. at 379). Plaintiffs easily satisfy this burden.

The DCL, including as enforced through the Certification Requirement, frustrates Plaintiffs' missions. NEA's mission, "to advocate for education professionals and to unite [their] members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world," and core values that "public education is the gateway to opportunity" and is "vital to building respect for the worth, dignity, and equality of every individual in our diverse society," are central to NEA's work, yet could be characterized as impermissibly related to DEI. ECF 34-21 at 3. By prohibiting "DEI programs" in and out of the classroom, the DCL, including as enforced through the Certification Requirement, frustrates NEA's strategic objectives for 2024–26, including supporting educators' "freedom to teach in the most effective manner" to maximize students' academic and social-emotional learning, creating "schools that are affirming to all students and employees," "advancing racial and social justice in education," and preparing students to "participate fully in our democratic society." ECF 34-21 at 4. Similarly, the Certification Requirement inhibits NEA-NH's ability to pursue its mission "to strengthen and support public education and serve their members' professional, political, economic, and advocacy needs" because ED could interpret the best practices for teaching as impermissible DEI programming. ECF 34-17 at 3, 5–6. Principles of diversity, equity, and inclusion are inextricably woven into the mission of CBED to achieve "educational equity and racial justice by rebuilding a national pipeline of Black teachers." ECF 34-26 at 3. CBED maintains that all teachers "need to be prepared to teach Black students in an engaging, effective, and

culturally responsive way, but often do not receive training or instruction on best practices to do so." *Id.* at 4.

These are not just "abstract social interests." *All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379). The DCL, including as enforced through the Certification Requirement, perceptibly impairs Plaintiffs' core activities taken pursuant to their missions. Compliance would force them to divert substantial resources—not to engage in new efforts to "gather information and advocate against" ED's actions, *id.*—because the DCL substantially frustrates existing programs. To avoid content that could be perceived as DEI, Plaintiffs would need to abandon or overhaul the focus and core content of their professional development trainings, such as NEA's trainings on racial and cultural competence, ECF 34-21 at 4–5, and diversity, equity, inclusion, and racial and social justice trainings, offered in conjunction with or with the approval of school districts, *id.* at 5. If trainings are instead continued in line with best practices and the needs of educators and students, the prohibition on DEI incorporated in ED's new rules will prevent school districts from supporting these trainings, undermining the value of, and interest in NEA's professional development. *Id.* at 5, 9. NEA-NH also would need to divert resources to modify its programs which advise members on conduct that could violate ED's conception of illegal DEI. ECF 34-17 at 8–9.

The DCL, including as enforced through the Certification Requirement, also interferes with CBED's programming. That programming, core to CBED's work, is "designed to rectify past inequities by enhancing diversity within the teaching workforce, with the ultimate goal of providing all students with a more inclusive and representative educational experience." ECF 34-26 at 4. CBED's Teaching Pathways program, for which they partner with school districts and higher education institutions, emphasizes Black history and is "grounded in Black pedagogy—

instructional practices that center the historic frameworks, philosophy and strategies that cultivate positive racial identities and social consciousness while deepening academic knowledge and skills." *Id.* at 5, 9. CBED's Teaching Academies also depend on partnership with schools, school districts, and higher education institutions, collaboration that is imperiled by the DCL. *Id.* at 5–6. Further, CBED's professional development programs for educators on culturally responsive, affirming, and sustaining teaching practices could violate the DCL. *Id.* at 6–7. Current and future partners may conclude that CBED's trainings and programs, all of which reflect its mission of equity and racial justice, would violate the DCL, making it "difficult if not impossible to continue partnerships and contractual relationships with educational institutions due to schools' fears of complaints, enforcement, and federal funding rescission, significantly hampering CBED's core activities in frustration of its mission." *Id.* at 10.

The DCL, including as enforced through the Certification Requirement, also interferes with NEA's grant programs, which have awarded $3.9 million in professional excellence grants to build educator's skills in "engaging, teaching, and supporting students of all races, national origins, sexual orientations, and gender identities" and have supported events and activities to ensure students have access to books from diverse perspectives. ECF 34-21 at 5. These programs could not operate consistent with their purpose and NEA's mission without risking conflict with the DCL. The DCL, the coercive impacts of which are now amplified and accelerated by the Certification Requirement, deters "schools and colleges from supporting programs funded through [NEA] grants and thereby limiting the scale and scope of that work." *Id.* at 9.

The NEA and NEA-NH will also need to divert resources to defend members facing discipline for alleged violations of the DCL. *Id.* at 6. This injury is closely similar to the organizational injury suffered in *Havens*, where the defendant "'perceptibly impaired HOME's

ability to provide counseling and referral services[,]' . . . core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379). The predictable need to divert resources toward defending members is heightened by the Certification Requirement, which threatens "serious consequences" for "the individual . . . using [prohibited DEI] practices." Certification Requirement at 3. Based on the level of confusion and concerns the NEA received from its members following implementation of state censorship laws, the NEA credibly expects an onslaught of questions about the impact of the DCL as well as the Certification Requirement, and the scope of the undefined prohibition on DEI, and ultimately a need to defend an increasing number of members. ECF 34-21 at 7. NEA-NH represents members in proceedings before the State Board of Education and credibly anticipates, based on experience with state censorship efforts, increasing demands for services based on enforcement of the DCL. ECF 34-17 at 9.

### C. Plaintiffs' Injuries are Caused by ED's Actions and are Redressable Through the Requested Relief.

For injuries related to both organizational and associational standing, Plaintiffs have demonstrated the remaining standing requirements: "a sufficient 'causal connection between the injury and the conduct complained of,' and [ ] a 'likel[ihood]' that the injury 'will be redressed by a favorable decision." *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Defs. of Wildlife*, 504 U.S. at 560-61).

The Certification Requirement indicates that ED intends to reach individual educators directly. Certification Requirement at 3 ("The continued use of illegal DEI practices may subject the individual . . . using such practices to serious consequences . . ."). But even where enforcement actions apply most directly to education institutions, Plaintiffs' injury flows from the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). This is not a case involving "unfettered choices made by independent actors"

who have "broad and legitimate discretion." *Defs. of Wildlife*, 504 U.S. at 562 (citation omitted). Here, education institutions are required, not merely encouraged, to comply with federal law as vaguely defined by the DCL, and subject to stiff penalties, including the imposition of liability under the FCA. The sweeping liability that ED now invokes demonstrates an intent to limit the independence and "legitimate discretion" of education institutions beyond historic precedent.

Plaintiffs' organizational programs and practices are predictably implicated, as are the fates of Plaintiffs' member educators. These circumstances are consistent with the numerous cases in which courts have found standing, for example, where government regulation "may cause downstream or upstream economic injuries to others in the chain"; where regulation of parks and lands may cause harm to users, where regulation of one property impacts the adjacent property, and "the list goes on." *All. for Hippocratic Med.*, 602 U.S. at 384–85 (collecting cases); *see also Dep't of Com. v. New York*, 588 U.S. at 767 (upholding finding of injury in fact where there was a "sufficient likelihood that the reinstatement of a citizenship question would result in noncitizen households responding to the census at lower rates than other groups, which in turn would cause them to be undercounted and lead to many of respondents' asserted injuries."). "Here, such decisions are more than predictable, they are already occurring." *New York v. Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 227 (S.D.N.Y. 2020) (granting preliminary injunction). The requested relief would redress Plaintiffs' injuries, relieving the requirement for schools and Plaintiffs to comply with vague and viewpoint discriminatory, and highly burdensome, new federal rules.

## III.    Plaintiffs are Likely to Succeed on the Merits.

"[L]ikelihood of success on the merits is the 'main bearing wall' of [a court's] analysis[ ]" in issuing preliminary relief. *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 42 (1st Cir. 2024) (citation omitted). Here, Plaintiffs are likely to succeed on the merits of their constitutional and APA claims.

### A. The DCL, Including as Implemented Through the Certification Requirement, Violates the Fifth Amendment Prohibition on Vagueness.

The Fifth Amendment prohibits vagueness as "an essential of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotations and citation omitted). A rule is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule).

Where, as here, a vague rule "abuts upon sensitive areas of basic First Amendment freedoms . . . [u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal quotations omitted). For this reason, "[t]he general test of vagueness applies with particular force." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976). Likewise, a rule is "subject to the most exacting vagueness review" when, as here, it imposes severe consequences such as penalties "that strip persons of their professional licenses and livelihoods." *See* ECF 34-1 at 13, n.33 (describing consequences); *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *7, *8 (D.N.H. May 28, 2024) (quoting *Sessions*, 584 U.S. at 184 (Gorsuch, J., concurring in part)) (appeal filed July 26, 2024); *see also Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 95–96 (1st Cir. 2004) ("[V]agueness concerns are more pressing when there are sanctions (such as expulsion) attached to violations of a challenged regulation."). Even where a more stringent test for vagueness does not apply, "[v]ague laws in any area suffer a constitutional infirmity." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966) (collecting cases).

As set forth in Plaintiffs' Motion for Preliminary Injunction, ED's DCL left undefined the critical core concept of "DEI." ECF 34-1 at 18–25. ED has also presented a confused and incorrect interpretation of *SFFA*, *id.* at 24–25, which is at odds with, among other decisions, the First Circuit's understanding of that decision. *See Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for the City of Bos.*, 89 F.4th 46, 60 (1st Cir. 2023) (noting that "three of the six justices in the majority—with no disagreement voiced by the three dissenters—separately stressed that universities can lawfully employ valid facially neutral selection criteria that tend towards the same result [of achieving a racially diverse student body]."). The Certification Requirement incorporates and implements these vague DEI references, Certification Requirement at 3–4; ECF 34-1 at 3–4, and confusing interpretations of Supreme Court precedent, Certification Requirement at 2–3. It conditions federal funding on certifying that practices encompassed by these vague terms are not taking place and threatening severe legal and monetary liability if education institutions do not make a correct assessment. *Id.* at 3–4. SEAs and LEAs who must sign the new certification are left to guess what conduct or programs might be considered impermissible DEI by ED.

In turn, educators, as represented by Plaintiffs NEA and NEA-NH, are left in a quandary regarding what and how they can teach under the broad and vague prohibitions. ECF 34-1 at 25–27. The chill and uncertainty under the DCL, including as enforced through the Certification Requirement, also falls on NEA, NEA-NH, and CBED, who are left to guess, at their peril and at the expense of effective teaching, which aspects of their programming might cross the invisible line Defendants have drawn. *Id.* at 27. These risks are further escalated by the Certification Requirement's threatened consequences, which gives 10 days for compliance, raises the specter of both government and private party suits under the FCA, 31 U.S.C. § 3730(b), threatens the

withholding or clawing back of all federal funding, and extends the threat of serious consequences to individuals.

### B.  The DCL, Including as Implemented Through the Certification Requirement, Unconstitutionally Censors Disfavored Speech.

As set forth in the Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, the First Amendment protects the academic speech of Plaintiffs' higher education members from viewpoint-based censorship. ECF 34-1 at 29–31. The DCL unconstitutionally coerces censorship of disfavored academic speech. *Id.* at 31–34. Now, the Certification Requirement's conditioning of federal funding and threats under contract law and the FCA only strengthen Plaintiffs' injuries under the framework established in *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 180 (2024). ED's enforcement authority, explicit threats regarding federal funding and civil liability, and the Certification Requirement's short timeline for compliance are highly coercive. The threat of direct consequences for individuals makes the injury even more immediate. Certification Requirement at 3.

### C.  The DCL, Including as Implemented Through the Certification Requirement, Violates the Administrative Procedure Act.

The DCL constitutes final agency action reviewable under the APA, which "provides for judicial review of both procedure and substance." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020). The DCL is both procedurally deficient and substantively unlawful.

The DCL constitutes "final agency action." 5 U.S.C. § 704; *see* ECF 34-1 at 34–35. The Certification Requirement's 10-day timeline for compliance and explicit threats of liability make the finality of ED's actions abundantly clear.

Substantively, the DCL violates the APA because it is contrary to constitutional rights, exceeds statutory authority, and is contrary to law. Because the DCL violates the First and Fifth

Amendments, as explained *supra*, the APA requires it be set aside. *See Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224, 243 (D. Mass. 2021) (citing 5 U.S.C. § 706(2)(B)). The DCL also exceeds ED's statutory authority and thus violates the APA, 5 U.S.C. § 706(2)(C), as the Department of Education Organization Act ("DEOA") makes clear that ED has no authority to exercise "direction, supervision, or control" over "the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system . . . or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b); *see* ECF 34-1 at 36–37. The DCL is contrary to law under DEOA, as well as ESSA, the Higher Education Opportunity Act, 20 U.S.C. § 1132-2, and the General Education Provisions Act, 20 U.S.C. §§ 1221–1234i, which all similarly prohibit ED from exercising direction, supervision, or control over curriculum, instructional programs, or materials. *See* ECF 34-1 at 36–37.

The DCL, which Defendants now seek to enforce through the Certification Requirement, is arbitrary and capricious in violation of the APA, as it fails to acknowledge or explain its dramatic departure from settled law and ED's own guidance, misconstrues and misapplies *SFFA*, fails to consider important aspects of the problem, fails to acknowledge or consider costs, and is pretextual. ECF 34-1 at 37–48. The DCL also violates the APA's notice-and-comment requirements, because it is a "rule" within the meaning of the APA, as evidenced by its threats of legal consequences and the Certification Requirement, and yet ED did not follow the required notice-and-comment procedures. 5 U.S.C. § 553; *see* ECF 34-1 at 48–49.

## IV.   The Balance of Hardships Tilts Decidedly in Plaintiffs' Favor, and Relief Would Benefit the Public.

Defendants lack a legitimate interest sufficient to overcome Plaintiffs' substantial and irreparable injury, and the public interest favors a preliminary injunction. Courts "must balance the

competing claims of injury and must consider the effect on each party," *Amoco Production Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987), as well as whether the relief is in the public interest, *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021). These factors "merge when the [g]overnment is the opposing party." *Does*, 16 F.4th at 37 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

As argued *supra*, the DCL, including as enforced through the Certification Requirement, violates the First and Fifth Amendment. "Enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Tirrell*, 747 F. Supp. 3d at 319. By contrast, Defendants "have no interest in enforcing an unconstitutional law." *Tirrell*, 747 F. Supp. 3d at 319. Moreover, where "a continuation of the status quo during the pendency of [] litigation will only shortly prolong the longstanding practice and policy of the United States government," and the "imposition of the [government policy] would impact [] plaintiffs in . . . unnecessarily destabilizing and disruptive" ways, the balancing of equities and the public interest tilt in favor of plaintiffs. *N.H. Indonesian Cmty. Support v. Trump*, No. 25-CV-38-JL-TSM, 2025 WL 457609, at *5 (D.N.H. Feb. 11, 2025).

The DCL, including and particularly as exemplified by its enforcement through the Certification Requirement, destabilizes and disrupts Plaintiffs' ability to educate and support students and teachers, as it sets an impending deadline for compliance with vague requirements at the risk of substantial penalties. In contrast, ED will not incur costs or expend additional effort to allow Plaintiffs to continue their work consistent with the law and guidance in place for decades. *See Doe v. Trump*, No. 25-10135-LTS, 2025 WL 485070, at *14 (D. Mass. Feb. 13, 2025) (balance of equities is in plaintiffs' favor because "an injunction will do no more than maintain a status quo that has been in place for [decades] . . . including under this President during his first term in office."). Because "preserv[ing] the relative position of the parties" will not injure Defendants and

dissolving the status quo will impose unnecessary hardships on Plaintiffs' constitutional rights in the classroom and beyond, preliminary relief is both urgent and necessary. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## CONCLUSION

For the reasons stated above, the Court should grant a TRO enjoining Defendants from implementing the Certification Requirement and from taking any adverse action on the basis of state and local education agencies' responses or lack thereof.

Dated: April 7, 2025

Respectfully submitted,

Sarah Hinger*
Amanda Meyer*
Alexis Alvarez*
Ethan Herenstein*
Victoria Ochoa*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org


Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org


Alice O'Brien*
Jason Walta*
Phil Hostak*

*/s/ Henry R. Klementowicz*
Henry R. Klementowicz (N.H. Bar No. 21177)
Gilles R. Bissonnette (N.H. Bar No. 265393)
SangYeob Kim (N.H. Bar No. 266657)
American Civil Liberties Union of New Hampshire
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org


Rachel E. Davidson*
American Civil Liberties Union Foundation of Massachusetts, Inc.
One Center Plaza, Suite 801
Boston, MA 02018
(617) 482-3170
rdavidson@aclum.org

Stacy Hickox[T]
NEA Office of General Counsel
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

*admitted pro hac vice
[T] pro hac vice forthcoming