# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION, *et al.*,<br><br>       *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>       *Defendants*. | Case No. 1:25-cv-00091-LM |

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.      ED's Initial Guidance Following the *SFFA* Decision in 2023. .............. 3

II.     ED's Further Guidance in the DCL Issued in February 2025. .............. 5

III.    This Litigation. .......................................................................................... 7

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ...................................................................................................... 9

I.      Plaintiffs are unlikely to succeed on the merits because they lack
        standing. .................................................................................................... 9

   A.   Plaintiffs fail to establish organizational standing. .......................... 10

   B.   Plaintiffs have failed to establish associational standing. ................ 14

II.     Plaintiffs lack a cause of action under the APA because they do not
        challenge any final agency action. ........................................................ 19

III.    Plaintiffs are unlikely to succeed on the merits of their APA claims. . 22

   A.   The DCL does not violate the APA's notice and comment requirement.
        ............................................................................................................... 22

   B.   The DCL is within ED's statutory authority and consistent with
        applicable law. ..................................................................................... 22

   C.   The DCL is not arbitrary and capricious. ........................................... 24

IV.     Plaintiffs are unlikely to succeed on the merits of their Constitutional
        claims. ..................................................................................................... 27

   A.   Fifth Amendment .................................................................................. 28

      i.   The DCL affords more notice than ED is required to provide before
           exercising its enforcement discretion. ............................................... 31

      ii.  The DCL is not vague because it clearly reiterates well-established
           prohibitions on discriminatory conduct. ........................................... 32

   B.   First Amendment .................................................................................. 34

      i. The DCL does not censor protected speech or intrude on academic
         freedom. ............................................................................................... 35

      ii.  ED's longstanding conditioning of federal funding on non-
           discrimination is not coercive. ........................................................... 37

V.      Plaintiffs do not face irreparable harm. ............................................... 40

VI.     The balance of the equities weighs against an injunction. ................... 42

VII.    Scope of relief. ........................................................................................ 43

CONCLUSION ................................................................................................. 45

## INTRODUCTION

This case concerns a Dear Colleague Letter ("DCL") issued by the Department of Education ("ED") on February 14, 2025 to explain ED's understanding of the preexisting requirements of the Equal Protection Clause of the Constitution and Title VI of the Civil Rights Act following the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"). As it states explicitly, the DCL does not have the force or effect of law and does not bind the public or create new legal standards.

Nonetheless, Plaintiffs, three nonprofit associations purporting to represent educators of all levels of instruction in New Hampshire and across the United States, have filed suit challenging the DCL, a related "Frequently Asked Questions" ("FAQ") document, and a new online portal for the public to file civil rights complaints, arguing that they violate the First and Fifth Amendments to the U.S. Constitution and the Administrative Procedure Act ("APA"). Plaintiffs now move for a preliminary injunction and temporary restraining order, asking the Court to enjoin ED from implementing or enforcing the DCL, FAQ, or public complaint portal.

The Court should deny Plaintiffs' motion because they are unlikely to succeed on the merits of their claims, they do not face irreparable harm, and the public interest weighs against an injunction halting ED's enforcement of the nation's civil rights laws.

Plaintiffs cannot succeed on their claims because they are unable to establish standing based on either an organizational or an associational theory. They fail to establish organizational standing because they fail to demonstrate ED's issuance of

1

the documents at issue is directly interfering with their core business activities. And Plaintiffs fail to establish associational standing because they have not shown that any one of their members would have standing to sue in his or her own right. Plaintiffs' members alleged injuries are all based on self-censorship, but the self-censoring responses of Plaintiffs' members and their schools, which Plaintiffs themselves describe as "overcorrect[ing]," are not reasonable, and any other harms alleged by Plaintiffs are highly speculative.

Further, Plaintiffs' APA claims fail as a threshold matter because the DCL does not have the force of law and thus does not constitute final agency action under the APA. Plaintiffs therefore fail to state an APA cause of action.

 On the merits, Plaintiffs' constitutional claims are unlikely to succeed, because the DCL is not unconstitutionally vague and does not implicate speech protected by the First Amendment—it addresses Title VI's prohibition on the unprotected conduct of racial discrimination, which is, in any event, unlawful when advanced by speaking.

Plaintiffs' APA claims also are unlikely to succeed on the merits. For much the same reasons as it does not constitute final agency action, the DCL was not required to go through notice-and-comment rulemaking.  Furthermore, ED has statutory authority under Title VI to withhold funding from schools that unlawfully discriminate, and ED's explanation of how it intends to exercise this enforcement discretion does not conflict with any other governing statutes or attempt to prescribe school curricula.  Lastly, the DCL is not arbitrary and capricious as it reflects a

reasonable interpretation of *SFFA* and is rationally grounded in the longstanding principle that policies that classify on the basis of race are not lawful unless justified by a compelling interest.

Because Plaintiffs have not even demonstrated they have Article III standing, they cannot establish that they face any imminent, irreparable harm in the absence of injunctive relief.  Finally, given that the public interest in diligent enforcement of the nation's civil rights laws is extraordinarily high, the balance of equities weighs against a preliminary injunction.

Accordingly, the Court should deny Plaintiffs' requests for preliminary relief.

## BACKGROUND

### I.    ED's Initial Guidance Following the *SFFA* Decision in 2023.

To effectuate the promises of the Equal Protection Clause and Title VI, Federal agencies have published guidance and regulations to ensure that schools provide equal education to students regardless of a student's race.   *See generally Nondiscrimination in Federally-Assisted Programs of the department of Health, Education, and Welfare—Effectuation of Title VI of the Civil Rights Act of 1964*, 29 Fed. Reg. 16298, 16298–305 (Dec. 4, 1964).   The Department of Education Organization Act ("DEOA") recognized, among other things, that "there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality, and such educational opportunities should not be denied because of race."  Pub. L. 96-88, Title I, § 101, 93 Stat. 669 (1979) *codified at* 20 U.S.C. § 3401(2). In 2023, the Supreme Court decided *SFFA*, a challenge to two schools' consideration of applicants' race as a plus factor in their higher-education admissions processes for

the purposes of obtaining a diverse student body.  600 U.S. 181.  The Court held that the schools' use of race violated the Equal Protection Clause of the Fourteenth Amendment. *Id.*  The decision noted that the Court has to date recognized only two compelling interests the government may have in considering a person's race for purposes of satisfying strict scrutiny; the first is an interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the second is in "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id.* at 207.  In handing down its ruling, the Court announced that "[t]he time for making distinctions based on race had passed" and that "[e]liminating racial discrimination means eliminating all of it."  *Id.* at 204, 206. The Court noted that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Id.* at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003)).

Following the decision in *SFFA*, the Departments of Education and Justice co-authored a Dear Colleague Letter ("2023 DCL")[1] and Frequently Asked Questions document ("2023 FAQ")[2] that were sent to schools receiving federal funding in an effort to provide compliance guidance on how to "pursue *lawful* steps to promote diversity and full inclusion," 2023 DCL at 1 (emphasis added), but also "noting [ED's] continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights

---

[1] Attached as Exhibit C to Plaintiffs' motion ECF, No. 34-5.
[2] Attached as Exhibit D to Plaintiffs' motion ECF, No. 34-6.

Act of 1964 from early childhood through postsecondary education." *Id*. at 3.  Shortly afterwards, ED released a more detailed guidance document entitled "Strategies for Increasing Diversity and Opportunity in Higher Education" that provided additional strategies that do not discriminate in violation of civil rights laws.  *See* Plaintiffs' Exhibit E, ECF No. 34-7.

## II.    ED's Further Guidance in the DCL Issued in February 2025.

On February 14, 2025, ED issued the Dear Colleague Letter challenged in this case. U.S. Dep't of Educ., Off. C.R, Dear Colleague Letter ("2025 DCL") (Feb. 14, 2025), https://perma.cc/J5PJ-DTKG.  It explains that Title VI, as interpreted by the agency in light of *SFFA*, forbids discriminatory practices in which "an educational institution treats a person of one race differently than it treats another person because of that person's race." 2025 DCL at 2.  The letter explains that the strict scrutiny analysis of Equal Protection, as well as the analysis of whether a school is in compliance with Title VI, will turn on a central question: does the school "treat[] a person of one race differently than it treats another person because of that person's race?"  *Id*. at 2.  The 2025 DCL also provides further detail regarding how ED understands Title VI to apply following *SFFA*; however, the DCL is explicit that its "guidance does not have the force and effect of law and does not bind the public or create new legal standards."  *Id*. at 1 n.3.

On February 27, 2025, ED launched a public portal, https://enddei.ed.gov/, for parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in publicly-funded K-12 schools, which ED could subsequently investigate to determine whether those schools were engaging in

discriminatory behavior. *See* U.S. Dep't of Educ., Press Release, U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://perma.cc/QT6V-68L7.

On March 1, 2025, ED released a Frequently Asked Questions document "to anticipate and answer questions that may be raised in response to the [DCL]." Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act at 1 (Mar. 1, 2025), https://perma.cc/WK7Z-JBC2. On April 9, 2025, ED issued a revised version of the FAQs. Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Apr. 9, 2025) ("FAQ"), https://perma.cc/43EZ-ME6A. This document reiterates that ED's interpretations "do not have the force and effect of law and do not bind the public or impose new legal requirements." *Id*. at 1 n.3. It also reaffirms ED's commitment to "enforce[] federal civil rights law consistent with the First Amendment" and confirms that "[n]othing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the [DCL] indicate as much." *Id*. at 6.

To be sure, the DCL and FAQ articulate ED's concerns with diversity, equity, and inclusion ("DEI") *programs*—not concepts—and their susceptibility to treating individuals differently on the basis of race. But as the FAQs emphasize, "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" *Id*. Rather, all school programs—DEI or otherwise—must not "intentionally treat

6

students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races." *Id*.

On April 3, 2025, ED's Office for Civil Rights ("OCR") emailed a certification letter to every State Department of Education. *See* U.S. Dep't. Ed., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard*, https://perma.cc/AL43-BUMH (April 3, 2025) ("Certification Letter"). The email directed:

> Within ten (10) days, please sign and return the attached certification along with the certifications of your Local Education Agencies (LEAs). Furthermore, within these ten (10) days, please report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs. April 3 Email, ECF No. 45-2.

The recipients were asked to certify their compliance with legal obligations undertaken in exchange for receiving federal financial assistance under Title VI and *SFFA*, as explained in the certification letter. Certification Letter at 2-4. On April 7, 2025, OCR sent a follow-up email to the same State Departments of Education. April 7 Email, ECF No. 45-3. This email notified the recipients that ED had granted all States and LEAs a 10-day extension to provide the certifications requested in the April 3, 2025, email. *Id*.

### III. This Litigation.

On March 5, 2025, Plaintiffs National Education Association ("NEA") and National Education Association-New Hampshire ("NEA-NH") filed a complaint for declaratory and injunctive relief against the United States Department of Education as well as Education Secretary Linda McMahon and Acting Assistant Secretary for Civil Rights Craig Trainor in their official capacities. *See* Compl., ECF No. 1. NEA

and NEA-NH are nonprofit organizations purporting to represent educators at all levels of instructions in New Hampshire and the United States. *Id*. at 4-7.

On March 21, 2025, Plaintiffs amended their complaint adding a new Plaintiff, the Center for Black Educator Development ("CBED"). *See* Am. Compl., ECF No. 32. CBED is also a nonprofit organization that operates "programs [that] are designed to rectify past inequities by enhancing diversity within the teaching workforce, with the ultimate goal of providing all students with a more inclusive and representative educational experience." Pls.' Ex. X, ECF No. 34-26. The amended complaint alleges violations of the First Amendment, Fifth Amendment, and various provisions of the APA. Am. Compl. at 50-59. The same day, Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin ED from implementing or enforcing the DCL, FAQ, or public complaint portal. *See* Prelim. Inj. Mot., ECF No. 34-1; Pls.' Proposed Order, ECF No. 34-58.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The "balancing of the equities and analysis of the public interest . . . 'merge when the [g]overnment is the opposing party.'" *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Ultimately, "[t]he party seeking

the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

ARGUMENT

## I.    Plaintiffs are unlikely to succeed on the merits because they lack standing.

The standing inquiry "comprises a mix of constitutional and prudential criteria." *Osediacz v. City of Cranston*, 414 F.3d 136, 139 (1st Cir. 2005). The constitutional criteria required to establish an Article III  "case[]" or "controvers[y]" include

> [f]irst, . . . an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent," not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

"The Supreme Court has overlaid these constitutional dictates with several prudential limitations," including limitations on third-party standing, pleading of generalized grievances, and parties who fall outside a law's zone of interest. *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 46 (1st Cir. 2011) (abrogated on other grounds by *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)).

Moreover, as the Supreme Court has explained, if the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *See Lujan*, 504 U.S. at 561-62 (1992) (emphasis in original). Here, Plaintiffs are not the "object of the action . . . at issue" and experience

9

solely attenuated effects of the government's regulation of someone else, and therefore "much more is needed" to demonstrate Article III standing. *Id.* They fall woefully short. Plaintiffs rely on two theories of injury, one alleging harms to their own organizational interests and another alleging harms to their associational interests, that is to their members. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) ("An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'"); *Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium*, 836 F. Supp. 45, 50 (D. Mass. 1993) (distinguishing an organization's "standing to sue representatively, on behalf of its members," with "injuries the organization has itself suffered"). Neither theory has merit.

### A. Plaintiffs fail to establish organizational standing.

First, Plaintiffs fail to demonstrate organizational standing because they have not demonstrated they are suffering or will imminently suffer any concrete, imminent, and direct harm due to the challenged documents. "In determining whether [an organization] has standing [in its own right, courts] conduct the same inquiry as in the case of an individual: Has the plaintiff "'alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction'?" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)).

In *Havens*, the plaintiff was a housing counseling service that sued the defendant under the Fair Housing Act on the ground that the defendant provided its employees false information about apartment availability. 455 U.S. at 368. As the

Supreme Court has emphasized, the counseling service in *Havens* established Article III standing because "when [defendant] gave [its] employees false information about apartment availability," it "perceptibly impaired [the service's] ability to provide counseling and referral services for low- and moderate-income homeseekers." *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 395 (2024) (quoting *Havens*, 455 U.S. at 379). The Court has explained that "*Havens* was an unusual case," *id.* at 396, likening it to "a retailer who sues a manufacturer for selling defective goods to the retailer," *id.* at 395.

The Supreme Court "has been careful not to extend the *Havens* holding beyond its context," including most recently in *Alliance for Hippocratic Medicine.* 602 U.S. at 396. There, the Court held that medical advocacy organizations lacked standing to challenge a decision of the FDA to relax regulatory requirements for the prescription of a certain drug. *Id.* The Court rejected the organizations' theory that the FDA's regulatory decision "impaired their ability to provide services and achieve their organizational missions," including by "mak[ing] it more difficult for them to inform the public about safety risks." *Id.* at 394, 395 (quotation marks omitted). The Court held that the "argument does not work to demonstrate standing" because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's actions." *Id.* at 394. *See also Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013) ("In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears

11

of hypothetical future harm that is not certainly impending") The Court also dismissed the organization's reliance on *Havens*, explaining that the FDA's "actions relaxing regulation of [the drug] have not imposed any similar impediment to the medical associations' advocacy businesses." *Alliance for Hippocratic Medicine.* 602 U.S. at 395.

Thus, it is not enough for standing purposes for "an organization [to] divert[] its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. Moreover, "[a]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Article III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Instead, Plaintiffs must show that Defendants' "actions directly affected and interfered with [their] core business activities." *All. For Hippocratic Med.*, 602 U.S. at 395.

Here, Plaintiffs fail to demonstrate any injury in fact sufficient for organizational standing because they do not show that the documents at issue "directly affect[] and interfere[] with [their] core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395. NEA's president describes the organization's core business activities as "providing professional and leadership development to its members, funding key education improvement efforts, and defending its members' freedom to teach in the most effective manner possible." Pls.' Ex. S, ECF No. 34-21. The DCL, however, does not prevent NEA from engaging in any of these activities. NEA claims that the letter has required it to "field[] concerns from its members about pursuing and completing NEA's extensive teacher training and professional

12

development programs." Prelim. Inj. Mot. at 11. Additionally, NEA-NH will have to "grapple with . . . how [its annual professional training] could be revised. . .." *Id*. at 12. These types of alleged harms are not comparable to the harms in *Havens*, where providing inaccurate information to an organization whose sole purpose was to provide accurate housing information did not leave any room for the organization to "grapple" with "concerns" in order to "revise[]" its programming; rather, the denial of accurate information directly frustrated the organization from performing its core purpose.

To the extent NEA argues that it has standing based on its anticipation that will "have to divert resources to assess, modify, and address concerns" regarding "member[s'] interest in [DEI] grant programs," *id*. at 11-12, this argument fails both because such diversion of resources does not demonstrate direct interference with NEA's core business activities, *All. for Hippocratic Med.*, 602 U.S. at 395, and because it is entirely speculative, *Clapper* 568 U.S. at 410 (2013). NEA's anticipation that it will have to "expend substantial resources to advise and defend its members in an uncertain national landscape," based on resources it has already been expending "as a result of censorship initiatives since 2020," Prelim. Inj. Mot. at 12, likewise fails to demonstrate a cognizable organizational injury, *All. for Hippocratic Med.*, 602 U.S. at 395, or that any such injury is fairly traceable to the DCL, *Perez-Kudzma v. United States*, 940 F.3d 142, 146 (1st Cir. 2019).

CBED similarly fails to show that it is suffering any organizational injury. CBED expresses concern that it "faces the need to invest significant time and

resources into modifying, expanding, or eliminating its offerings to educational institutions," Prelim. Inj. Mot. at 12, and it alleges that its "contractual relationships" with schools will be "difficult if not impossible to continue." *Id.* at 13. As evidence of this purported harm, CBED states that "[o]ne school district . . . has already indicated that it is not sure whether it can proceed [with their contractual relationship] following the [DCL]." *Id.* Here, again, CBED's theory relies entirely on anticipated downstream effects of the DCL—it does not show that the DCL's effects are the equivalent of selling "defective goods to the retailer" that Plaintiffs contract with, *All. for Hippocratic Med.*, 602 U.S. at 395, thereby directly interfering with CBED's core business activities.

Further, Plaintiffs' theories of organizational injury fail for the independent reason that they are entirely speculative. NEA admits that it "does not know whether school districts will cease supporting such training." Prelim. Inj. Mot. at 11. CBED claims that one school is "*not sure* whether it can proceed" with their contract. *Id.* at 13 (emphasis added). These claims are hardly sufficient to demonstrate an "ongoing" injury or one that "is certainly impending." *Clapper*, 568 U.S. at 414.

### B. Plaintiffs have failed to establish associational standing.

Plaintiffs also fail to establish associational standing. In order to establish associational standing, Plaintiffs "must show that at least one of its members has standing in her own right." *Equal Means Equal v. Ferriero*, 3 F.4th 24, 29 (1st Cir. 2021). Here, each Plaintiff fails to show that at least one of its members is suffering or will imminently suffer an injury in fact fairly traceable to ED's actions that is likely to be redressed by a favorable decision.

14

Plaintiffs' members' alleged harms are based on a claimed chilling of their speech or other expressive activities. "In certain facial First Amendment challenges to a statute, [a court] may relax [] prudential limitations [on standing], *Osediacz,* 414 F.3d at 141, but the constitutional requirements apply with equal force in every case, *Sutliffe v. Epping Sch. Dist.,* 584 F.3d 314, 326 n.6 (1st Cir. 2009)." <u>*Nat'l Org. for Marriage v. McKee*</u>, 649 F.3d 34, 46 (1st Cir. 2011). Therefore, the standing inquiry for First Amendment claims is no less rigorous with respect to injury, causation, and redressability than it would be in a case that did not invoke the First Amendment. *Cf. Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021) (there is no "unqualified right to pre-enforcement review" even for "constitutional claims.").

The fears that Plaintiffs' members describe fall into three categories; (1) those that depend upon an expectation that ED will take actions not actually described in the DCL; (2) those that result from actions schools have taken based on their own misunderstandings of the DCL and other documents; and (3) those about actions that third parties might take.

Beginning with the first category, these fears fail to establish Plaintiffs' members' standing in their own right because they rely on members' decisions to self-censor their own speech or expressive activities based on a misunderstanding of the DCL, and specifically an incorrect expectation that ED will take actions against *them*. But in the First Amendment context, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (quoting *United Pub.*

*Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)).  These members' fears are purely subjective, and therefore unreasonable, primarily because ED has no authority to take disciplinary action against individual teachers—ED's investigations would be into the federal funding recipient, *i.e.*, the schools.  42 U.S.C. 2000d-1.  Plaintiffs' suggestion that the April 3, 2025, certification letter indicated some different policy, Mot. for TRO at 18, ECF No. 41-1, misunderstands that document.  Unless an individual (in the manner of a school district) is a direct recipient of federal educational funding, there would be no basis for ED to take enforcement action against the individual.  *See generally* 42 U.S.C. 2000d-1.

Plaintiffs' members' fears are also unreasonable because the DCL does not prohibit teachers from teaching certain books, the history of race, racism, and slavery, gender, or any other topic.  *See* 2025 DCL at 3 (advising schools to ensure their policies comply with civil rights laws, their programs do not use racial proxies, and that their contractors also comply—*not* addressing teachers or directing curricula change).  ED has long made clear that, pursuant to its statutory authority, it does not "exercis[e] control over the content of school curricula,"  2023 FAQ at 6, but that the agency retains authority to ensure that school curricula are not discriminatory, *see, e.g.*, U.S. Dep't Educ., Dear Colleague Letter: Title VI Access to AP Courses, https://perma.cc/TL57-2AHP, at 2 (May 2008) ("To promote educational excellence for all students and to ensure nondiscrimination in secondary school curricula, the Department will vigorously enforce the nondiscrimination requirements of Title VI.").

As for the second category, some NEA members have observed that their own institutions have taken actions to change the contents and views that faculty express in trainings, presentations, or other school activities. *See* Prelim. Inj. Mot. at 11. But Plaintiffs themselves describe these actions as "overcorrect[ion]" by various schools. *Id.* at 19 n.57. To the extent Plaintiffs fear that their member institutions will take actions *not* required by Title VI or ED, based on an incorrect understanding of the DCL, Plaintiffs' complaints about potential infringements on academic freedom are traceable to their members' own unreasonable actions, not ED. *See Lujan*, 504 U.S. at 560 ("the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" (quoting *Simon*, 426 U.S. at 41-42)).

Finally, as for the third category, to the extent Plaintiffs' members assert that they face harm because of potential future actions by outside third parties like community members who submit complaints through ED's portal, or State entities that impose disciplinary consequences, these fears "rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. Moreover, the Supreme Court has emphasized that a "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id.* at 409 (cleaned up). Many of Plaintiffs' claimed injuries rest on mere speculation about future harm.

Plaintiffs' members' fears about potential harms to their "reputations and livelihoods," Prelim. Inj. Mot. at 6, rely upon a theory that if ED later found in the

course of an investigation that one of their members discriminated on the basis of race, the New Hampshire Human Rights Commission or some other State's education board may take disciplinary action against the member. *See id*. at 10 n.33. That chain of events speculates that: ED will investigate a member's school, the member's conduct will be a part of that investigation, ED will report on that conduct as discrimination (despite the fact that ED's focus is on the funding recipients themselves, not teachers), someone will learn of these findings, someone will report those findings to a State Board, and a State Board will discipline the member. This causal chain runs counter the rule that a theory of Article III injury "cannot be overly attenuated." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quoting *Katz v. Pershing*, LLC, 672 F.3d 64, 71 (1st Cir. 2012)). And this attenuation, combined with the reliance upon third parties, makes it far from clear that these harms are "certainly impending." *Clapper*, 568 U.S. at 414.

One more example of how Plaintiffs' theory depends upon third parties absent from this litigation further demonstrates that their members lack standing. One member worries that private parties will pursue a "witch hunt" against educators and file meritless complaints. *See* Ex. I, at 8. But ED has no control over whether a private third party chooses to file complaints against Plaintiffs' members. ED has always solicited complaints through online forms, *see* U.S. Dep't of Educ., File a Complaint, https://perma.cc/JMA6-UJVS; U.S. Dep't of Educ., *Racial Incidents and Harassment Against Students*, https://perma.cc/A8N5-RUFM (Mar. 1994) ("OCR will

investigate whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with title VI and the Department's implementing regulations."), and ED can only do what it has always done: investigate every complaint it receives and, if the allegations lack merit, inform the complainant and the school of that conclusion.

Because all of Plaintiffs' members' alleged harms rely upon unsubstantiated, subjective fears and attenuated chains of causation dependent upon actions that third parties may or may not take, no Plaintiff has shown the requisite harm for associational standing.[3]

## II.   Plaintiffs lack a cause of action under the APA because they do not challenge any final agency action.

The APA directs courts to review "[a]gency action made reviewable by statute and final agency action." 5 U.S.C. § 704.   Unless agency action is made reviewable by statute, a plaintiff who fails to challenge "final agency action" thus lacks a cause of action under the APA. *See R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002).

Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-178

---

[3] Defendants note that the doctrine of associational standing has been questioned in recent years, and there are doubts as to its continued viability. *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at (Thomas, J., concurring) ("Our third-party standing doctrine is mistaken. . . . . [A] plaintiff cannot establish an Article III case or controversy by asserting another person's rights. . . . Associational standing . . . is simply another form of third-party standing.").

(1997) (cleaned up). The DCL is explicit that it "does not have the force and effect of law and does not bind the public or create new legal standards." 2025 DCL at 1, n. 3. Because the DCL does not have the force and effect of law, bind the public, or create new legal standards, it cannot plausibly have finally determined anyone's rights or obligations or had direct legal consequences.

Indeed, the DCL fits comfortably within the APA's definition of an "interpretative rule." 5 U.S.C. §§ 553(b)(4)(A), (d)(2). An interpretive rule is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). Such rules do not have the force and effect of law, which distinguishes them from "legislative rules" that are subject to more rigorous procedures. *Id*. The purpose of interpretive rules is to provide notice to regulated entities of how an agency intends to exercise its enforcement discretion. "[I]nterpretative rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which [they are] addressed.'" *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (quoting Judge Harry T. Edwards et al., *Federal Standards of Review* 157 (2d ed. 2013)). To the contrary, any legal consequences from an interpretive statement ultimately flow from the statute the statement interprets. *See Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (finding that a letter from Department of Labor interpreting the Fair Labor Standards Act "created no new legal obligations beyond those the [statute] already imposed"). Here,

any hypothetical legal consequences flow from Title VI and the Equal Protection Clause, not the DCL.

The DCL does no more than reiterate the agency's interpretation of Title VI. *See* 2025 DCL at 1 ('This letter explains and reiterates *existing legal requirements* under Title VI of the Civil Rights Act of 1964," (emphasis added)).  Moreover, the DCL expressly states that it does not have the force and effect of law, it was not published in the CFR, and it did not rely on ED's rulemaking authority.  *See Guedes v. BATFE*, 920 F.3d 1, 19 (D.C. Cir. 2019) (describing each of these as factors in evaluating whether a document is an interpretive rule).

The FAQ, which anticipates questions recipients may have regarding the DCL, is also not "final agency action" within the meaning of the APA for the same reasons the DCL is not.  Like the DCL, the FAQ states "[t]he contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements."  2025 FAQ at 1 n.3.  And it too seeks only to "provide clarity about *existing law* for the benefit of the public."  *Id.* (emphasis added).  Finally, it was neither published in the CFR nor did it rely upon ED's rulemaking authority.  *See Guedes*, 920 F.3d at 19.

Because the DCL is at most an interpretive rule that does not have the force and effect of law, and because neither the DCL nor the FAQs determine rights or obligations or have legal consequences, Plaintiffs do not challenge a "final agency action" within the meaning of the APA and lacks a valid cause of action under the APA.  *R.I. Dep't of Env't Mgmt.*, 304 F.3d at 40.

## III.    Plaintiffs are unlikely to succeed on the merits of their APA claims.

Plaintiffs' APA arguments also are unlikely to succeed on the merits, as ED is vested with statutory authority to enforce the civil rights laws, and the DCL and other challenged documents are consistent with longstanding understandings of Title VI and the Equal Protection Clause.

### A. The DCL does not violate the APA's notice and comment requirement.

Plaintiffs' argument that the DCL is procedurally invalid because it did not go through notice-and-comment rulemaking applies the wrong procedural requirement. While legislative rules must go through notice and comment, the APA explicitly exempts interpretive rules like the DCL from such procedures.  5 U.S.C. § 553(b)(4)(A) ("Except when notice or hearing is required by statute, this subsection does not apply . . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."); *see also Perez*, 575 U.S. at 105 ("the text of the APA makes plain: 'Interpretive rules do not require notice and comment.'" (quoting *Shalala*, 514 U.S. at 99).  "The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'"  *Perez*, 575 U.S. at 97 (quoting *Shalala*, 514 U.S. at 99.  As was just discussed, the DCL is an interpretive rule; therefore, it is exempt from notice and comment.  *Id*.

### B. The DCL is within ED's statutory authority and consistent with applicable law.

Plaintiffs' argument that the DCL and FAQ are outside ED's statutory authority and contrary to law are without merit. Plaintiffs contend that the documents violate the Department of Education Organization Act's  (DEOA's) provision that ED shall not exercise "direction, supervision, or control" over, *inter alia*, "the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b). But Plaintiffs do not identify any portion of the documents that actually conflicts with the DEOA.

The only language Plaintiffs cite as an example of purported inconsistency with the DEOA is the DCL's comment that DEI programs may unlawfully stigmatize and stereotype when they "teach[] students that certain racial groups bear unique moral burdens that others do not." Prelim. Inj. Mot. at 33 (quoting 2025 DCL at 3). The DCL merely informs schools that they must not discriminate among students when implementing their curricula and must avoid stereotyping and stigmatizing based on race. There is a critical distinction between ED prescribing curricula or exercising control over school administration versus telling schools they must act in a nondiscriminatory manner in implementing their curricula and executing administrative decisions so that they avoid stereotyping and stigmatizing based on race. Plaintiffs' conflation of the two would leave little room for ED to enforce the civil rights laws. *See id.* Moreover, the DEOA should not be read in a manner that

would frustrate Title VI's nondiscrimination requirements.  *See 289 Kilvert, LLC v. SBC Tower Holdings LLC*, 133 F,4th 1, 3 (1st Cir. 2025) ("Simply put, we do not interpret a statute's text 'in a vacuum'; we read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016))); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 500 (2018) (applying the interpretive "canon against reading conflicts into statutes").

For the same reasons, Plaintiffs fail to show that the DCL and FAQs violate the prohibitions on ED's interference in curricular, administrative, and personnel decisions set forth in the General Education Provisions Act ("GEPA"), Elementary and Secondary Education Act ("ESEA"), or Higher Education Opportunity Act ("HEOA").  *Contra* Prelim. Inj. Mot. at 33-34; *see also* 20 U.S.C. § 3403(b); *id*. at §§ 1221-1234i; *id*. at §§ 6301-7981; *id*. at § 1132-2.

### C. The DCL is not arbitrary and capricious.

Plaintiffs contend that the DCL is arbitrary and capricious on the basis that it (1) fails to explain its departure from ED's prior guidance; (2) unreasonably interprets *SFFA*; and (3) fails to consider important aspects of the problem it addresses.  Prelim. Inj. Mot. at 34-43.  Review under the arbitrary and capricious standard is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019),and merely examines whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Because the DCL's guidance is both reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), it satisfies the deferential "arbitrary and capricious" standard.

As observed by ED in the DCL, under the standard articulated in *SFFA*, many Diversity, Equity, and Inclusion programs may violate the Equal Protection Clause— and thus also Title VI—by introducing "explicit race-consciousness into everyday training, programming, and discipline." 2025 DCL at 2. As a result, DEI programs "frequently preference certain racial groups" in ways that make them more susceptible to discriminating based on race. *Id*. In making this observation, ED simply applied the longstanding principle that policies that distinguish on the basis of race are not lawful unless justified by a fact-supported compelling interest.

On the issue of ED's prior guidance, the 2023 guidance—like the 2025 guidance at issue in this case—was at best an interpretative rule that does not have the force and effect of law. ED therefore is not required to provide any explanation for its "departure" from that guidance. But to the extent there might be any such requirement, the DCL simply explains that it would be unlawful for schools to use practices that appear race neutral as a covert means of selecting or rejecting students because of their race, 2025 DCL at 2-3—exactly what the Supreme Court held would not satisfy strict scrutiny in *SFFA*, 600 U.S. at 230-31 ("[A] student must be treated based on his or her experiences as an individual—not on the basis of race.").

***Consistent with SFFA***. Plaintiffs' argument that the DCL's discussion of personal essays conflicts with *SFFA*, *see* Prelim. Inj. Mot. at 40, is wrong because the DCL is consistent with both the Supreme Court decision and ED's earlier discussions of the topic. When making admissions decisions, schools may consider an applicant's individual circumstances. ED's 2023 DCL informed schools that they may take into

account a student's personal essay about how that student has overcome hardship, including racial discrimination. *See* 2023 DCL at 2. But, as the 2023 guidance also makes clear, a student must be "'treated based on his or her experiences as an individual' and 'not on the basis of race.'" 2023 FAQ at 3 (quoting *SFFA*, 600 U.S. 231). This is precisely what the 2025 DCL says. *See* 2025 DCL at 2 ("race-based decision-making . . . remains impermissible."). And as ED further emphasized in the FAQs, 2025 FAQ at 8, the 2025 DCL does not prohibit taking personal experiences (including race-related experiences) into account; it simply informs schools that, as *SFFA* held, schools may not use personal essays as a means to identify applicant's race and then make an admissions decision on account of that race-based information. *Compare* 2025 DCL at 2–3 ("[A] school may not use students' personal essays, writing samples, participation in extracurriculars, or other cues as a means of determining or predicting a student's race and favoring or disfavoring such students."), *with SFFA* 600 U.S. at 230–31 ("A benefit to a student who overcame racial discrimination, for example, must be tied to *that student's* courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to *that student's* unique ability to contribute to the university. In other words, the student must be treated based on his or her experiences as an individual—not on the basis of race." (emphasis in original)).

**Important aspects of the problem.** Plaintiffs' argument on Defendants' alleged failure to consider important aspects of the problem fails because no such requirement applies to interpretative rules. Regardless, the issues Plaintiffs identify

do not add up to an APA violation.  As Plaintiffs correctly state, ED is not responsible for school curricula, Prelim. Inj. Mot. at 43, and the 2025 DCL does not prescribe requirements for school curricula, *see supra* Part III.D.  So, ED need not have considered whether any given teacher would need to change his or her lesson plan or any costs plaintiffs would incur in doing so.  Prelim. Inj. Mot. at 41–44.  That is a matter for individual schools, who, notably, are not plaintiffs here.  Nor did ED need to consider state standards, *id.*. at 43, because, to the extent there is any actual conflict between state requirements and *SFFA*, those standards would be violative of the Fourteenth Amendment's guarantee of Equal Protection.  Similarly, Plaintiffs' argument on the lawfulness of removing standardized testing misses the mark, *see id.*. at 42 (asserting that the DCL "determines it is 'unlawful for an educational institution to eliminate standardized testing . . . to increase racial diversity'" (quoting 2025 DCL at 3)).  The DCL prefaces the discussion on standardized testing by stating "[r]elying on non-racial information as a proxy for race, and making decisions based on that [testing] information, violates the law," 2025 DCL at 3 which is a correct statement of the law.

Because the DCL addresses all important parts of the problem and is consistent with *SFFA* and ED's earlier guidance, it is not arbitrary and capricious.

## IV.  Plaintiffs are unlikely to succeed on the merits of their Constitutional claims.

Plaintiffs similarly are unlikely to succeed on the merits of their Constitutional claims. Plaintiffs' Fifth Amendment vagueness claim is misplaced, as the framework for such claims is meant to apply to binding actions with the force of law.  In any

event, the DCL is clear about the conduct that is prohibited: discrimination that treats a person differently on the basis of race.  Plaintiffs' First Amendment claims are also unlikely to succeed because to the extent the documents at issue address speech or expressive activity, they simply reiterate the well-established principle that speech that amounts to racial harassment and creates a hostile environment is unlawful under Title VI; harassment—including race-based harassment—is conduct that the First Amendment does not protect.

## A. Fifth Amendment

The Fifth Amendment's "void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act [arbitrarily]."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  As a threshold matter, the DCL cannot be deemed invalid under the void for vagueness doctrine because, as explained above, it does not have the force of law.

A vaguely written statute or regulation raises due process concerns because people are required to comply with its dictates.  *See id.*  The same cannot be said for an agency interpretation that binds no one, having only "power to persuade, [and] lacking power to control."  *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 402 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  Indeed, the Supreme Court has previously declined to apply the void for vagueness doctrine to non-binding documents, such as the federal sentencing guidelines.  *Beckles v. United States*, 580 U.S. 256, 263 (2017) (holding "the Guidelines are not subject to a vagueness challenge

28

under the Due Process Clause" because "they merely guide the exercise of a court's discretion."); *see also Meader v. United States*, No. 1:22-CV-00224-JAW, 2023 WL 1966115, at *3 (D. Me. Feb. 13, 2023) ("The holding in *Beckles* relied on the fact that the Supreme Court, in *United States v. Booker*, 543 U.S. 220 (2005), had previously rendered the sentencing guidelines 'advisory' or nonbinding."), *report and recommendation adopted*, No. 1:22-CV-00224-JAW, 2023 WL 2933002 (D. Me. Apr. 13, 2023), *certificate of appealability denied*, No. 23-1401, 2023 WL 7321852 (1st Cir. July 12, 2023).   Because the DCL, like the federal sentencing guidelines, has no binding effects, any analysis of it under the void for vagueness doctrine is misplaced.

However, if the Court nonetheless engages in a vagueness analysis of the DCL, it must determine the correct standard to apply.  Defendants agree that where First Amendment concerns are raised, " [t]he general test of vagueness applies with particular force."  Prelim. Inj. Mot. at 14, ECF No. 34-1 (quoting *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976)).  However, Plaintiffs invite the Court to apply heightened scrutiny even beyond what the Supreme Court suggested is appropriate, primarily relying upon isolated language from *Local 8027 v. Edelblut*, a district court case currently pending appeal.  *Id*. at 14-15. (quoting *Loc. 8027*, No. 21-CV-1077-PB, 2024 WL 2722254, at *7, *8 (D.N.H. May 28, 2024) (appeal filed July 26, 2024)).  The Court should decline this invitation.

*Local 8027* explains that "[c]ivil statutes will often be subject to lesser scrutiny than criminal statutes because 'the consequences of imprecision are less severe.'" 2024 WL 2722254, at *7 (quoting *Sessions v. Dimaya*, 584 U.S. 148, 184

(2018).Plaintiffs, however, attempt to deploy *Local 8027's* recognition of an exception to this rule—that some civil penalties may be just as "grave" as criminal misdemeanors, particularly civil "'remedies that strip persons of their professional licenses and livelihoods.'" *Id.* (quoting *Sessions*, 584 U.S. at 184 (2018) (Gorsuch, J., concurring in part)). Plaintiffs allege that ED's enforcement activities impose "severe consequences" upon individuals, thus the Court should apply the "most exacting vagueness review." Prelim. Inj. Mot. at 14-15 (quoting *Loc. 8027*, 2024 WL 2722254, at *7). But ED's only power is to withhold funding from institutions receiving federal funding, after a robust process required by statute and aimed at ensuring compliance. *See* 42 U.S. Code § 2000d-1; 34 C.F.R. §§ 100.6-100.11. ED does not have the authority to "strip persons of their professional licenses and livelihoods" as Plaintiffs suggest. Prelim. Inj. Mot. at 14-15 (quoting *Loc. 8027*, 2024 WL 2722254, at *7).

Plaintiffs do not dispute this. Instead, as already discussed *supra* Section I.B., Plaintiffs' theory is that if ED, in the course of its investigation of a member's educational institution, found one of their members to have engaged in racial discrimination, the New Hampshire Human Rights Commission or some other State's education board may take disciplinary action against that member, *see id.* at 10 n.33. This far-too-attenuated chain of causation cannot give rise to heightened scrutiny. *Cf. Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 496 (1982) (declining to find a statute overbroad when its only consequences were on "attenuated interest[s]"). Nowhere does *Local 8027* suggest that a civil law or regulation—much less an agency's non-binding guidance document—should be deemed equivalent to a

criminal statute for purposes of vagueness review based the mere possibility of such downstream consequences from the law or regulation's enforcement.

In any event, regardless of which standard would apply, because the DCL provides more notice than required and clearly reiterates established legal standards, it is not impermissibly vague.

### i. The DCL affords more notice than ED is required to provide before exercising its enforcement discretion.

First, the DCL affords more notice than ED is required to provide before exercising enforcement discretion. Title VI authorizes ED to take enforcement actions when it believes a recipient of federal funding may be violating individuals' civil rights. Under 42 U.S.C. § 2000d-1, "[e]ach Federal department and agency which is empowered to extend Federal financial assistance," including ED, is "authorized and directed" to effectuate Title VI by securing compliance through "the termination of or refusal to grant or to continue assistance."

There is no requirement that ED issue any notice of how it intends to use its enforcement discretion before it does so. Throughout Title VI, Congress instructs when agencies are required to give recipients notice or opportunity for a hearing. *See, e.g.*, *id.* (allowing termination of funding only "after opportunity for [a] hearing"); *id.* § 2000d-5 (requiring ED to provide recipients notice of deferred action on any application for funds). ED's own regulations also specify when notice is to be provided to recipients, and none of these notice requirements precedes the opening of an investigation. 34 C.F.R. §§ 100.7, 100.8, 100.10.

31

Thus, ED could lawfully exercise its enforcement discretion under Title VI consistent with the DCL, without ever having issued the DCL.  As a result, Plaintiffs' vagueness argument is effectively that the DCL provides less notice than no notice at all.  They point to no precedent supporting such a counterintuitive conclusion.  Nor would it be desirable, as a policy matter, for courts to find Fifth Amendment violations based on agencies providing more notice than regulated entities are entitled to receive, which could discourage agencies from efforts to increase transparency around planned exercise of enforcement discretion.

### ii. The DCL is not vague because it clearly reiterates well-established prohibitions on discriminatory conduct.

The DCL also is not unconstitutionally vague because it clearly describes ED's understanding of Title VI's prohibition on race discrimination.  As explained in the DCL, ED understands Title VI to forbid discriminatory practices in which "an educational institution treats a person of one race differently than it treats another person because of that person's race."  2025 DCL at 2.  Plaintiffs rely heavily on a capacious reading of terms like "diversity," "equity," and "inclusion," arguing that the DCL's reference to those terms makes it unclear what activities will be the focus of ED's enforcement discretion.  *See* Prelim. Inj. Mot. at 16-19.  But the DCL does not define ED's understanding of the scope of prohibited conduct under Title VI by reference to "DEI."  *Contra id.* at 25.  And, indeed, ED's corresponding FAQ document explains that "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'"  2025 FAQ at 6.

Plaintiffs state that the DCL's vagueness issues stem from an alleged "lack of an objective core," Prelim. Inj. Mot. at 16, however, each purported vagueness issue they identify is easily resolved by asking the "core" question that the DCL foregrounds: does an action "treat[] a person of one race differently than it treats another person because of that person's race?" 2025 DCL at 2. This simple test in no way "turns on subjective evaluation of, for example, toxicity, falsehood, and the assignment of moral burdens." Prelim. Inj. Mot. at 17. Nor does it risk *over*simplifying the test; ED is also clear that there may be certain, albeit rare, exceptions when a school has a compelling interest in "'remediating specific, identified instances of past discrimination that violated the Constitution or a statute,'" and its use of race is "narrowly tailored" to achieving that interest. 2025 DCL at 2 (quoting *SFFA*, 600 U.S. at 207). Moreover, ED has explained that

> schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI, assuming they are open to all students regardless of race. Nor would educational, cultural, or historical observances . . . so long as they do not engage in racial exclusion or discrimination." 2025 FAQ at 6.

Thus, the DCL cannot be fairly impugned as "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (describing an invitation to arbitrary enforcement as a failure to establish "minimal guidelines to govern law enforcement." (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

Plaintiffs attempt to supplement their vagueness allegations by arguing that the newly launched complaint portal will result in arbitrary enforcement because it

invites "students, parents, teachers, and the broader community to report illegal discriminatory practices at institutions of learning" and those "community submissions [will be used] to identify potential areas for investigation." *See* U.S. Dep't of Educ., Complaint Portal, https://perma.cc/M9QD-7DUX.   But ED has long solicited online reporting as a mechanism to enforce civil rights.  34 C.F.R. § 100.7(c) ("The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part."); *see also* U.S. Dep't of Educ., File a Complaint, https://perma.cc/JMA6-UJVS.  A report of discrimination is not the same as ED *finding* discrimination, and "assessment of school policies and programs depends on the facts and circumstances of each case."  2025 FAQ at 6. Online complaint forms are the method ED has always used, and the new portal does not increase any likelihood of arbitrary enforcement.

Because the DCL clearly describes a type of conduct that Title VI prohibits— differential treatment based on race—it is not vague and does not increase the risk of arbitrary enforcement, and the complaint portal does not change ED's longstanding commitment to independently investigating and assessing the facts reported in each case.

## B. First Amendment

Plaintiffs argue that the DCL "ban[s] the academic expression of disfavored ideas" because of its emphasis upon the Title VI compliance issues DEI programs often face.  Prelim. Inj. Mot. at 26.  But this mischaracterizes what the DCL actually does.  The DCL is not focused on what schools may *say* about DEI—they remain

34

entitled to take a positive view, negative view, or any other view on DEI—instead, the DCL focuses on what DEI programs often *do*—treat people differently on the basis of race in a manner that constitutes discriminatory harassment or the creation of a hostile environment.  *See* 2025 FAQ at 6 (the First Amendment does not "relieve [schools] of their duty to respond to racial harassment that creates a hostile environment").

Alternatively, Plaintiffs argue that rather than directly suppress particular viewpoints, the letter unlawfully coerces third parties—the schools that receive federal funding—into doing so.  *See* Prelim. Inj. Mot. at 28-30.  This argument also fails, as it depends upon a doctrine that is limited to situations in which a government official makes a specific threat of enforcement to a third party completely unrelated to the conduct at issue.  *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024)

### i. The DCL does not censor protected speech or intrude on academic freedom.

The DCL does not "ban" any speech expressing any particular viewpoint. *Contra* Prelim. Inj. Mot. at 32.  The DCL describes a scope of conduct has been long prohibited by Title VI.  It is well settled that denying a student an educational opportunity on the basis of race violates the law.  *See SFFA*, 600 U.S. 181.  It is no defense that creating a racially hostile environment or engaging in racial harassment may involve speaking.  *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI obligations."); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995)

(rejecting First Amendment argument that firing teacher for his harassing use of racial epithet violated his free speech).

When speech is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit, such "speech acts" may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 248 (4th Cir. 1997) ("[T]he First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts . . . ."); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, --- F. Supp. 3d ---, 2025 WL 401109, at *12 (S.D.N.Y. Feb. 5, 2025), *reconsideration denied*, No. 24 CIV. 2669 (JPC), 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025) ("when a hostile environment claim is based on both protected speech and unprotected conduct, a court must still consider the entire record in determining whether the harassment was discriminatory in nature.").

While Plaintiffs focus heavily on academic freedom, they overlook that racial discrimination is not part of academic freedom, and "free speech does not grant teachers a license to say or write in class whatever they may feel like." *Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir. 1971) (per curiam). Indeed, as recipients of federal funds overseen by ED,

> colleges and universities are legally required to maintain a hostile-free learning environment and must strive to create policies which serve that purpose. While a professor's rights to academic freedom and freedom of expression are paramount in the academic setting, they are not absolute to the point of compromising a student's right to learn in a hostile-free environment. To hold otherwise under these circumstances would send a message that the First Amendment may be used as a shield by teachers who choose to use their

unique and superior position to [] harass students secure in the knowledge that *whatever* they say or do will be protected.

*Bonnell v. Lorenzo*, 241 F.3d 800, 823–24 (6th Cir. 2001).

At the same time, however, as ED's FAQ document makes clear, schools' implementation of policies to protect against race-based hostile environment harassment must respect First Amendment rights. 2025 FAQ at 6 ("[ED] OCR enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution. Nothing in Title VI or its implementing regulations authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the [DCL] indicate as much."). To the extent Plaintiffs or their members fear that educational institutions will take actions *not* required by Title VI or ED, based on an incorrect understanding of the DCL, Plaintiffs' complaints about potential infringements on academic freedom should be directed at those institutions, not ED. *See* Prelim. Inj. Mot. at 19 n.57 ("colleges and universities have . . . overcorrect[ed] to avoid the threatened loss of federal funding.").

Because discriminatory conduct effectuated by words is neither protected speech nor an aspect of academic freedom, Plaintiffs' viewpoint censorship arguments lack merit.

### ii. ED's longstanding conditioning of federal funding on non-discrimination is not coercive.

Plaintiffs' argument that the DCL "violates the First Amendment through coercion of a third party" is also wrong. *Id*. at 29. The government is allowed to condition school funding on nondiscrimination; indeed, this is the method by which Congress intended to stop discrimination under Title VI. *Schultz v. Young Men's*

*Christian Ass'n of U.S.*, 139 F.3d 286, 290 (1st Cir. 1998) ("Title VI's only express remedy is a cutoff of federal funding to the affected program."). And the government is also allowed to express its own viewpoint; "it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Plaintiffs contend, however, that when government does both at the same time—uses its powers under Title VI and expresses its viewpoint—it somehow coercively impedes upon *their* expression of their viewpoints. This argument is unavailing.

"A government official can share her views freely and criticize particular beliefs, and she can do so forcefully." *Vullo*, 602 U.S. at 188. Thus, the expression of ED's views that concepts like structural racism are "toxic[]," 2025 DCL at 1, does not violate the free-speech rights of citizens who hold an opposite view.[4] *Contra* Prelim. Inj. Mot. at 30. And the DCL does not threaten enforcement action against educational institutions that take such a view; it separately commits to "vigorously enforce the law on equal terms" under the principles of *SFFA*. 2025 DCL at 3. This is the same longstanding commitment to Title VI and Equal Protection that ED has always held. *See* 2023 DCL at 3 ("We close by noting our continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964 . . .. We will continue to use all enforcement tools at our disposal.").

---

[4] The same is true of the online complaint portal when it expresses ED's viewpoint that DEI is "divisive" and leads to "indoctrination" *See* Prelim. Inj. Mot. at 28. Regardless of ED's views on DEI programs generally, the portal only solicits reports of "illegal discriminatory practices at institutions of learning." *See* U.S. Dep't of Educ., https://perma.cc/M9QD-7DUX.

*Vullo*, which sets forth a third-party coercion framework that Plaintiffs argue should apply here, *see* Prelim. Inj. Mot. at 28-30, is inapposite. *See Vullo*, 602 U.S. 175. Unlike the DCL, *Vullo* concerned a government official's attempt to cudgel an insurance provider into no longer insuring the National Rifle Association ("NRA") because the official disagreed with the NRA's viewpoints. *Id.* If the insurer did not comply and discontinue its coverage of the NRA, the government threatened to crack down on the insurer for "technical infractions . . . unrelated to any NRA business." *Id.* at 192. With respect to enforcement, the DCL, in contrast, merely explains ED's understanding of what Title VI requires of federal funding recipients. And as the FAQs emphasize, ED's evaluation of whether a recipient is discriminating on the basis of race in its programs or activities "depends on the facts and circumstances of each case," 2025 FAQ at 6. Whatever ED's views of DEI programs generally, ED has made clear that its enforcement of Title VI will be based on whether schools are discriminating based on race, and not on any other factor. *Id.* This is easily distinguishable from *Vullo*, where the government official was not merely executing the official's enforcement responsibilities, but threatening use of enforcement powers to coerce a specific regulated entity to disassociate from a particular organization with which the official disagreed.

Moreover, concurring in *Vullo*, Justice Ketanji Brown Jackson worried that "the effect of [the government's] alleged coercion of regulated entities on the NRA's speech [was] significantly more attenuated" than in earlier applications of the third-party coercion doctrine, signaling that *Vullo* represents the outer boundary of what

it means for an enforcement agency to "establish[] 'a system of prior administrative restraints.'" *Vullo*, 602 U.S. at 202 (Jackson, J., concurring) (quoting *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963)). Unlike in *Vullo*, ED's challenged actions here do not establish any similar system of restraint or coercion.

No court has held that Title VI's enforcement mechanism coercively violates free speech. Because the DCL only implicates enforcement insofar as it explains ED's understanding of Title VI's requirements, it does not violate the First Amendment.[5]

## V.    Plaintiffs do not face irreparable harm.

The irreparable harm standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* [not merely possible] in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." *Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Mass.*, 649 F.2d 71, 74 (1st Cir. 1981). And "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). As explained above, Plaintiffs have not even

---

[5] Plaintiffs also purport to bring claims under the APA for alleged constitutional violations under the First and Fifth Amendments. For the reasons explained in Section II.A, plaintiffs fail to state a cognizable APA claim, as they do not challenge a final agency action. Moreover, when a plaintiff "appears to distinguish its first claim, seeking review under the APA, from its second claim, stating a constitutional violation. . . . [the plaintiff] is not seeking a second basis for review under the APA . . .." *Hy-On-A-Hill Trout Farm, Inc. v. Glickman*, No. CIV. 00-443-JD, 2001 WL 873049, at *2 n.1 (D.N.H. July 31, 2001). And as explained in this Section, the DCL and other challenged documents are consistent with the First and Fifth Amendments.

demonstrated an injury in fact sufficient for Article III standing. Accordingly, they also have not demonstrated irreparable harm justifying preliminary relief. *See Brown v. Colegio de Abogados de P.R.*, 613 F.3d 44, 49-50 (1st Cir. 2010) (acknowledging that a finding of irreparable harm would be erroneous if there was no injury). But "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Virtually all of Plaintiffs' claimed harms are based on reactions to efforts—or anticipated efforts—by Plaintiffs' members' schools to avoid enforcement actions by ED. But, as explained above, both Plaintiffs' members and Plaintiffs' members schools appear to misunderstand portions of the DCL. And as with standing, Plaintiffs "cannot manufacture" a showing of irreparable harm "merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. As Plaintiffs concede, their alleged harms are a result of "self-censor[ship]." Prelim. Inj. Mot. at 47. And to the extent any "censorship" is happening at the direction of Plaintiffs' respective schools, *id.*, Plaintiffs themselves acknowledge that these schools have "overcorrect[ed]." *Id.* at 19 n.57.

Any other harms Plaintiffs allege depend on a series of speculative future events taken by third parties that may or may not come to pass. *Supra* Section I. If there is not "imminent danger of significant damage . . . the requirements for

41

irreparable harm have not been satisfied.  *Riverdale Mills Corp. v. Cavatorta N. Am., Inc.*, 146 F. Supp. 3d 356, 363 (D. Mass. 2015).  Such is the case here.

The certification letter sent by ED to States on April 3, 2025, does not render Plaintiffs' harms any less speculative. *Contra* Mot. for TRO at 18-19.  As noted above, by statute and regulation, numerous steps aimed at ensuring compliance must occur before ED may withdraw funding. *See* 42 U.S. Code § 2000d-1; 34 C.F.R. §§ 100.6-100.11.

## VI.  The balance of the equities weighs against an injunction.

Plaintiffs' likelihood of success on the merits and irreparable harm must be balanced against the government's own equities and the public interest, two factors which merge when the government is defendant.  See *Mills*, 16 F.4th at 37.  The public interest in robust civil rights enforcement cannot be overstated.  In *Crosspoint Church v. Makin*, the District of Maine faced the issue of whether a government regulation of discrimination that implicated a plaintiff's free speech rights should be preliminarily enjoined.  719 F. Supp. 3d 99, 126 (D. Me. 2024).  Finding the plaintiff's speech to be incidental to the conduct of discrimination, the court held that the plaintiff's First Amendment interests did not "outweigh the potential hardship the state would face from being unable to fully enforce its educational antidiscrimination laws." *Id*.  Furthermore, the Court found "[t]he public also has a strong interest in the state being able to effectively combat discrimination." *Id*.  This case is in a nearly identical posture—whether to enjoin ED's enforcement of a civil rights statute based on Plaintiffs' speculative assertions of chilled speech—and the equities weigh against issuing a preliminary injunction for the same reasons.

## VII.    Scope of relief.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Thus, should the Court decide to grant preliminary relief, it should be narrowly tailored to apply only to Plaintiffs and their identified members.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Accordingly, any preliminary injunction should explicitly confirm that all obligations in the injunctive order apply only with respect to the Plaintiffs and their members.

Additionally, in light of the extraordinary breadth of Plaintiffs' requested relief, to the extent the Court issues any injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Lastly, Federal Rule of Civil Procedure 65(c) mandates "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Pro. 65(C).  As "it is the policy of the United States to demand that parties seeking injunctions against the Federal Government must cover the costs and damages incurred if the Government is ultimately found to have been wrongfully enjoined or restrained,"  Presidential Mem., *Ensuring the Enforcement of Federal Rule of Civil*

43

*Procedure 65(c)*, (March 11, 2025), available at https://perma.cc/8HJZ-HCQU, Defendants respectfully request that the Court require Plaintiffs to post as security a bond commensurate with the potential costs to ED of continuing to litigate the preliminary injunction.

"The purpose of such a bond is to ensure that the enjoined party may readily be compensated for the costs incurred as a result of the injunction should it later be determined that it was wrongfully enjoined." *Axia NetMedia Corp. v. Massachusetts Tech. Park Corp.*, 889 F.3d 1, 11 (1st Cir. 2018). "[U]nder Rule 65(c), a party is wrongfully enjoined when it had a right all along to do what it was enjoined from doing." *Glob. Naps, Inc. v. Verizon New England*, Inc., 489 F.3d 13, 22 (1st Cir. 2007). In the First Circuit, Rule 65(c) bonds can be used to pay the costs of litigating to reverse a preliminary injunction. *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines*, Inc., 925 F.2d 6 (1st Cir. 1991).

"In setting the amount of bond, courts typically take into account 'the potential incidental and consequential costs as well as [ ] the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities.'" *WEX Inc. v. HP Inc.*, No. 2:24-CV-00121-JAW, 2024 WL 3358651, at *35 (D. Me. July 9, 2024), *appeal dismissed*, No. 24-1729, 2024 WL 5379024 (1st Cir. Oct. 28, 2024) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2954 (3d ed. 2013)). Despite the mandatory language of Rule 65(c), "district courts are vested with "wide discretion" to set the amount of bond." *Axia NetMedia*, 889 F.3d at 11. While substantial bonds

44

are disfavored in litigation seeking to enforce constitutional rights, *see Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984), "[w]here the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it," it is common practice in other circuits for courts to "fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421, n. 3 (4th Cir. 1999); *see also Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (approving of setting a nominal bond where "the [district] court found that any cost to the government, in the event it [might later be] found to have been wrongfully enjoined, would be minimal.").

Accordingly, Defendants respectfully request a "nominal bond" that corresponds to "the litigation cost of an appeal of this motion (should the appeal succeed)." *Novi Footwear Int'l Co. Ltd. v. Earth Opco LLC*, No. CV 22-10952-RGS, 2022 WL 2873016, at *4 (D. Mass. July 21, 2022) (granting nominal bond.).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied, or, if it is granted, should be limited to the Plaintiffs and their members.

Respectfully submitted,

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

45

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ELIZABETH TULIS
Assistant Director
Civil Division, Federal Programs Branch

/s/ Eitan R. Sirkovich
EITAN R. SIRKOVICH
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 353-5525
E-mail: eitan.r.sirkovich@usdoj.gov

John J. McCormack
Acting United States Attorney

/s/ Robert J. Rabuck
Robert J. Rabuck
Assistant U.S. Attorney
NH Bar No. 2067
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
(603) 225-1552
rob.rabuck@usdoj.gov

Dated:  April 11, 2025