# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATIONAL ASSOCIATION, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, et al., <br><br> *Defendants*. | Case No.  1:25-cv-00091-LM |

**DECLARATION OF JAY BADAMS**

I, Jay Badams, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1.      I am the Superintendent of Schools for the Hanover, Dresden, and Norwich School District (SAU 70), the nation's first interstate school district educating students in Hanover, New Hampshire and Norwich, Vermont.  While Hanover, Dresden, and Norwich each have their own school districts, SAU 70 serves as an administrative overhead for all three of these districts.  I became superintendent in 2017.  I submit this declaration in my capacity as superintendent for SAU 70 as the administrative overhead for the Hanover and Dresden School Districts.

2.      I have over 25 years of experience as an educator, including as an administrator, teacher, specialist and curriculum coordinator in Pennsylvania, New Hampshire, and Vermont public schools.  Throughout my career, I have been driven by a passion to educate students and improve outcomes through meaningful community relations and transparent, data-driven solutions.

3.      Previously, I was the Superintendent of Erie City School District and of the Wattsburg Area School District, which both serve the Erie, Pennsylvania area.  Prior to becoming

1

a superintendent, I served as an educator in Erie's public schools for 10 years as a special education teacher, assessment specialist, and a curriculum coordinator at both the elementary and secondary levels.

4.      My work developing district-wide assessment systems and revising curriculum in Erie public schools gained the recognition of the Pennsylvania Governor's Commission for College and Career Success.  In 2014, I was nominated and unanimously confirmed to a seat on the Pennsylvania State Board of Education, which I served on until 2018.

5.      I am certified in New Hampshire and Vermont as a Superintendent and have been since 2017.

6.      I have a Masters of Education and superintendent's letter of eligibility from Edinboro University of Pennsylvania and a doctoral degree in Education from the University of Pennsylvania.

7.      The Hanover and Dresden School Districts received over $350,000 in direct federal funding for the current fiscal year, which includes Title I (focused on higher poverty communities and lower-income students), Title II, Title III, and Title IV financial support, which are recurring based on qualifications.  This funding is critical to our ability to positively impact our students: Without it, our ability to hire an adequate number of special education staff, offer math and literacy tutoring, and implement Kindergarten readiness programs would cease to exist.

8.      I am aware of the February 14, 2025 Dear Colleague Letter and the February 28, 2025 "Frequently Asked Questions" ("FAQ") document published by the United States Department of Education, as well as the President's Executive Orders on diversity, equity, and inclusion in K-12 schools and higher educational institutions.  I am also aware of the United States

Department of Education's March 14, 2025 announcement that it has opened investigations into 45 universities following the February 14, 2025 Dear Colleague Letter.

9.      Furthermore, I am aware that, on April 3, 2025, the United States Department of Education sent a letter to all state departments of education stating that these state departments need to—within 10 days (by Sunday, April 13, 2025)—certify compliance with the February 14, 2025 Dear Colleague Letter as a condition for receiving federal funds.  As a result, on the evening of April 3, 2025, I received from the New Hampshire Department of Education a certification document stating that my district must complete the certification by no later than Thursday, April 10, 2025 at 5:00 p.m.  After the United States Department of Education extended the deadline for state departs to Thursday, April 24, 2024, the New Hampshire Department of Education set a new **Thursday, April 17, 2025 (5:00 p.m.)** deadline my District to send a certification.  Because SAU 70 also oversees schools in Norwich, Vermont, I must also comply with directives related to the certification requirement set forth by the Vermont Department of Education.  On April 7, 2025, the Vermont Department of Education instructed superintendents *not* to provide individual certifications on behalf of their school districts as the Vermont Department of Education will instead submit a single, statewide letter to certify Vermont's compliance with current applicable law.  I am also aware of the parties' April 9, 2025 agreement with respect to the certification ramifications.

10.      None of these letters or documents meaningfully define what the Department of Education means by "DEI" nor does it offer specific guidance as to precisely what is or is not legal in the eyes of the current federal administration.

11.    In Hanover and Dresden School Districts, diversity, equity, and inclusion are fundamental values that are embedded into the fabric of our curriculum, educational practices, and extra-curricular offerings by virtue of our mission and SAU 70 policy.

12.    The mission of the Hanover and Dresden School Districts is "to engage students' hearts, minds, and voices so that they become educated, caring and responsible adults."   In fulfilling this mission, the Districts are committed to respecting the rich diversity of our students, the uniqueness of individuals, and the contributions all can make to the greater human community. The Districts have many goals for their schools and students—one of which is to provide students with rigorous, engaging, and equitable instruction and curriculum.  Another goal is ensuring that all school programs are accessible to all students through purposeful and intentional Social Emotional Learning ("SEL").

13.    Hanover and Dresden School Districts are also governed by SAU 70's Equity Policy, which was adopted in December 2022 after members of the Hanover community initiated robust grassroots efforts in 2019 to incorporate diversity, equity, and inclusion principles into its public schools. The SAU 70 school board ultimately adopted this policy with the support of the larger Hanover community.

14.    SAU 70's Equity Policy explicitly recognizes that "[i]t is in our common interest that all of our children, of every race, ethnicity, economic status or other dimension of identity or difference, have access to learning experiences and support that enable them to exemplify the aspirations of our SAU 70 Portrait of a Learner."  Accordingly, the Equity Policy directs Hanover and Dresden School Districts to "strive to incorporate principles of equity within all policies, programs, operations, practices, and resource allocations" by incorporating diverse perspectives in academic curriculum and extracurricular activities, counteracting biased practices that perpetuate

achievement gaps, implementing culturally responsive instructional practices, and adopting a number of other equitable policies.

15.     Our unique curricular and extracurricular programming embodies our mission and goals by exposing our students to diverse perspectives in meaningful ways.  For example, to encourage SEL and teach students how to navigate and coexist among differences, our high school has conducted an advisory program that convenes students who would not otherwise socialize together to grapple with questions related to current social and interpersonal issues, including those related to identities and inequalities.  Throughout our Districts, students also participate in March Intensive, a spring enrichment week in which students elect to partake in full day courses or immersive travel experiences such as a service trip to the southern United States to explore the region's culture and history, with a particular focus on civil rights.  Across our schools, our history and social studies courses recognize the importance of incorporating the voices of populations that have traditionally been overlooked in the study of our nation's development and highlight divergent perspectives on historical events such as American colonization, the Civil War, and the Civil Rights movement.  Our inclusion of these voices extends beyond our textbooks and curriculum: Through a student-led initiative, our middle school proudly displays a land acknowledgment that it was built on Abenaki and Penacook native land.

16.     Our students have also valued diversity, equity and inclusion by forming student groups centered around diverse identities.  By their own accord, our high school students have formed and actively participate in clubs like the Slavic Club, Jewish Culture Club, Italian Club, BIPOC affinity space, Women in STEM, and the Neurodiversity club.  As part of our ongoing commitment to supporting our students and fostering a diverse, equitable, and inclusive learning

environment, our school provides a staff advisor for each of these groups and ensures they are open to all students.

17.    Hanover and Dresden School Districts also ensure that access to our robust educational opportunities is equitable.  For example, the Districts operate a free and reduced lunch program (where recipients could correlate to race) and equitably distributes funding to ensure all students can participate in curricular activities like March Intensive, both of which could perhaps be interpreted as impermissibly adopting a "proxy for race" since many of the students who benefit from this assistance are White.  To overcome achievement gaps, our Districts provide professional development programming to ensure our predominantly White teaching staff is able to serve students of all backgrounds.

18.    Under SAU 70's Equity Policy, I am required to provide a semi-annual status report to the SAU 70 School Board that measures outcomes under these equitable practices.  To develop these reports, I have measured educational outcomes as well as the experiences of students, parents, and teachers across social identity categories such as race, gender, sexual orientation, and free lunch status.  This data indicates that, on average, Hanover and Dresden School Districts' already high educational outcomes have not been adversely impacted by our equitable practices and that our school communities support their continued implementation.  Notably, in a survey conducted after the advent of our Equity Policy, we found no significant difference in students' experiences of discrimination from their peers across racial and ethnic social identities.  By contrast, our survey data indicated that students of color and their parents were more likely to respond that their teachers did not understand their cultural background, which has informed our aforementioned professional development training.  This data will continue to inform how we can

offer rigorous, equitable, and engaging instruction and curriculum to students across various social identities, and address any opportunity gaps.

19.    In implementing SAU 70's Equity Policy and embodying our mission, Hanover and Dresden School Districts do not promote racial or any kind of discrimination.  However, given the Letter's position that all diversity, equity, and inclusion programs engage in "smuggling racial stereotypes" into everyday programming, I am fearful that the United States Department of Education could view goals central to the Districts' work as themselves violative of the Letter given the Letter's ambiguities.  Simply put, it is unclear whether we can continue to operate our schools under the SAU 70 Equity Policy altogether or without significant and costly changes to our curriculum, professional development and extracurricular offerings.  It is unclear, for example, whether our explicit efforts to educate students on diverse perspectives through immersive trips and the resulting structured dialogue about the social and historical inequities our students encounter could subject us to enforcement action.  Moreover, our librarians actively ensure that 20%-30% of the new books in our libraries are authored by people of color.  And our survey data and classroom experiences indicate that certain groups like low-income White students or cisgender males stand to benefit from targeted programs to support their educational outcomes and emotional wellbeing.  Unfortunately, I now fear any current or future work to support the unique needs of different student groups and to advance diverse perspectives could be construed as advocating in a way that "preference[s] certain racial groups" against the terms of the Dear Colleague Letter.  It is also unclear whether we can continue our SEL practices, which the FAQ has labeled as a "veil[ed] racially discriminatory polic[y]."  FAQ at 6.

20.    It is also difficult for me to apply the Dear Colleague Letter to the explicit curriculum decisions our Districts have made to comply with the SAU 70 Equity Policy and

applicable state law.  For example, as required under New Hampshire law, the Districts currently offer instruction and curriculum under RSA 189:11, I(j) addressing "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices."  While we believe that our implementation of this law is nondiscriminatory under federal law, the Dear Colleague Letter can be read to constrain or restrain this instruction already offered by the Districts, and hampers the Districts' efforts to fully implement this curriculum as required by state law.  Under RSA 189:11, I(j), educators in New Hampshire and our Districts are supposed to discuss not only the evolution of how racism and bigotry have evolved in the past, but also "how to prevent the evolution of such practices."  As part of any such discussion, it is not hard to imagine that a discussion of remedies for past discrimination (like reparations) may take place, but I fear that this instruction could be viewed as being barred as instruction of "preference[s] for certain racial groups" or "teach[ing] students that certain racial groups bear unique moral burdens that others do not."  This is just one of many examples, as I cannot possibly evaluate whether all programs may be covered by the Letter given the infinite number of interpretations that the Letter is subject to.

21.     These fears are compounded by the fact that (i) the New Hampshire Department of Education, on February 4, 2025, sent a Technical Advisory highlighting the U.S. Department of Education's actions to eliminate DEI, and (ii) both the United States and New Hampshire. Department of Education are requiring me to certify that the Districts are in compliance with the Letter or risk losing vital federal funds that the Districts depend on, and (iii) the Vermont Department of Education is certifying SAU 70's compliance with applicable federal law on our behalf.

22.     The conditions to federal funds imposed by the Dear Colleague Letter and the Certification Requirement also amount to coercion.  This is because the financial conditions imposed in the Letter and Requirement seem to be new and retroactive and are imposed midstream in the middle of a funding cycle.  Given this retroactivity of new requirements, my District, as a recipient, had no opportunity to knowingly accept or reject the funds based on these new conditions when funds were accepted.  At present, our federal funding directly supports our efforts to offer rigorous, equitable, and engaging instruction to students with special needs.  Any revocation of these funds would not only compromise our ability to serve these students but also override the Hanover community's decision to incorporate diversity, equity and inclusion into its public schools.  I do not believe the needs of our students nor the will of our local community should be sacrificed in service of this ambiguous policy.

23.     The Dear Colleague Letter, through its ambiguities and lack of clarity, prevents me from knowing what our Districts can and cannot do, and I feel that it is important for our community to challenge this action to ensure that the students of Hanover, New Hampshire and students throughout the country—obtain the inclusive education that they deserve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of April, 2025.

/s/ Jay D. Badams

9