# EXHIBIT M

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

NATIONAL EDUCATION
ASSOCIATION; *et al.*,

      *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; *et al.*,

      *Defendants*.

Case No. 1:25-cv-00091-LM

### DECLARATION OF DR. ROBERT SHAPS

I, Dr. Robert Shaps, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. I am the Superintendent of Schools for the Oyster River Cooperative School District (SAU5), which educates students in Lee, Madbury, and Durham, New Hampshire. Our district currently enrolls approximately 2,068 students. I became superintendent on July 1, 2024. I submit this declaration in my capacity as superintendent of SAU5.

2. I have over 30 years of experience as an educator – serving as high school teacher and assistant principal for the Londonderry, NH Public School District, Middle/High School Principal and Superintendent of Schools for the Manchester – Essex Regional School District, in Manchester-by-the-Sea, Massachusetts, Superintendent of Schools for the Hastings-on-Hudson Union Free School District in Hastings-on-Hudson, NY. Previously, I was Superintendent of Schools of the Mamaroneck Union Free School District in Mamaroneck, New York from 2010 to 2023.

1

3. I am certified in New Hampshire as a superintendent of schools.

4. I have an Ed.D. in Educational Administrative Leadership from the University of Pennsylvania.

5. The Oyster River Cooperative School District receives at least $721,798 for this current fiscal year (2024-25) in direct federal funding grant support, which includes IDEA (Individuals with Disabilities Education Act) funding as well as Titles I (focused on students in high-poverty communities and low-income families), II, III, and IV financial support, and School Nutrition funds which are recurring based on qualifications. We cannot afford to lose this federal support as federal entitlement funds are a critical funding source for required staffing, programs, and resources to meet student educational needs, and, like all the other districts in New Hampshire, we must contend with the fact that our state government provides for only a small portion of the funding that we need.

6. I am aware of the February 14, 2025, Dear Colleague Letter and the February 28, 2025, "Frequently Asked Questions" document published by the United States Department of Education, as well as the President's Executive Orders on diversity, equity, and inclusion in K-12 schools and higher educational institutions. I am also aware of the United States Department of Education's March 14, 2025, announcement that it has opened investigations into 45 universities following the February 14, 2025, Dear Colleague Letter.

7. Furthermore, I am aware that, on April 3, 2025, the United States Department of Education sent a letter to all state departments of education stating that these state departments need to—within 10 days (by Sunday, April 13, 2025)—certify compliance with the February 14, 2025, Dear Colleague Letter as a condition for receiving federal funds. As a result, on the evening of April 3, 2025, I received from the New Hampshire Department of Education a certification

2

document stating that my district must complete the certification by no later than Thursday, April 10, 2025, at 5:00 p.m. After the United States Department of Education extended the deadline for state departments of education to Thursday, April 24, 2025, the New Hampshire Department of Education set a new **Thursday, April 17, 2025 (5:00 p.m.)** deadline for my District to send a certification. I am aware of the parties' April 9, 2025, agreement with respect to the certification ramifications.

8. Oyster River Cooperative School District promotes a safe and nurturing community where the uniqueness of each member is valued and appreciated. To this end, we seek to honor the diversity of our students, families, and staff through a range of educational opportunities and experiences including the exchange of ideas, freedom of expression and thought, and the exploration of topics and subject matter that reflect our commitment to a broad and comprehensive education. As such, during the 2022 – 2023 school year, the district created the Coordinator of Diversity, Equity, Inclusion, & Justice (DEIJ) leadership position to guide district-wide DEIJ efforts and create opportunities to define, assess, and promote diversity, equity, inclusion and justice. The role of Coordinator of DEIJ is to facilitate professional development and promote curricular initiatives and experiences that:

- Provide faculty/staff professional learning experiences to promote culturally responsive sustaining curricular frameworks.
- Promote the effort to center concepts of inclusivity, equity, and justice across the district to help shape compassionate, equitable practices, policies, and procedures in all areas of teaching and learning.
- Support school-community partnerships to advance opportunities for student access to programs, stakeholder engagement, and student community groups.

9. One important role of the Coordinator of DEIJ is to lead the District Community & Belonging Group to promote a space where students, staff, faculty, parents, administrators, and community members can come together to foster a culture of belonging, dignity, and inclusion in our schools and community. Inherent in this work is the effort to promote meaningful educational conversations about identity, multiculturalism, shared histories that strengthen our commitment to create a welcoming and inclusive environment for all.

10. DEIJB (Diversity, Equity, Inclusion, Justice, and Belonging) initiatives and the Coordinator of DEIJ position are paramount to our district missions and values, and we are unsure if we can continue with any of the initiatives underway given the Dear Colleague Letter and mandated certification. In particular, our DEIJ and DEIJB programming is called into question by the Dear Colleague Letter and FAQ, which accuses DEI programs of "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline" or "advance[ing] discriminatory policies and practices."

11. More broadly, Oyster River Cooperative School District's Mission is "Working Together To Engage Every Learner." Our District's vision is to provide a place where students, parents, staff and community members work together to foster a lifelong passion for learning and engage all students in developing the skills and knowledge they need to further their education; participate as citizens, succeed in the work-place; live healthy lives; and, thrive in the 21st century.

12. In the ORCSD students, teachers, and community members take pride in our schools and understand that each of us has a role to play in ensuring their success. We create safe, stimulating learning environments where all students are challenged and excited by the opportunities to learn; where students and teachers alike feel it is safe to take creative risks; and where every member of our community is known and valued.

13. During their time at ORCSD, students become strong, independent, critical thinkers with a commitment to living ethically and a belief that each of them can and should make a difference in our world.

14. Given the directive in the February 14, 2025, U.S. Department of Education letter we are unsure if a range of programs offered to students can continue as they could be deemed DEI. This includes our social and emotional curriculum and programs (Caring School Community and Open Circle) in K – 12, instruction for English for Speakers of Other Languages (ESOL), instruction and academic support for students with disabilities, students of low socio-economic status, and the use/implementation of culturally response sustaining curriculum frameworks, Advanced Placement courses, a range of textbooks, and high school English and social studies courses that focus on diverse literature and historical topics that may be deemed DEI-related subject matter. Similarly, we promote the NH Seal of Biliteracy - a state recognized award for students who meet competencies in two or more languages and cultural competencies - involving bilingual and multicultural learning. The FAQ calls these programs in to question because it vaguely alleges that "schools have sought to veil discriminatory policies with terms like 'social-emotional learning' or 'culturally responsive' teaching."

15. Equally at stake is the District's practice to engage in a variety of student and family activities that promote our community's diverse background and experiences. This includes honoring the tradition of Black History Month, Hispanic History Month, Pride Month, highlighting the achievements, cultural underpinnings, and unique experiences of stakeholders. We are unsure if our hosting of student community groups—PRIDE Student Spaces, Multicultural Student Spaces, the High School DEI Student Club, and the Community and Belonging Group—would be allowed to continue to create spaces where all students can discuss their common experiences and

5

differences or show films that promote the exchange of cultural forms and open dialogue regarding our diverse world. I am not sure if these programs are prohibited or if the Department of Education might conclude they impermissibly "discourag[e] members of all races from attending" or create a hostile environment.

16. Similarly, we are unsure if it continues to be proper for our DEIJ Coordinator to share existing student leadership opportunities with students, such as the University of New Hampshire True Leaders in Equity, NH EoC Student Leadership Conference and Retreat, Racial Unity Team Annual Art & Poetry Challenge, or other social justice initiatives because, while these are open to all students, they recruit students from specific backgrounds to participate in leadership activities.

17. To comply with the DCL, we might not be able to continue a practice of utilizing restorative justice conferences in response to student disciplinary incidents that are specific to the use of racial epithets, as a core of the restorative practice is to highlight the historical oppression and use of dehumanizing language to humiliate or degrade a group of individuals defined by color or race. Here too, the FAQ opens us up to accusations that this practice "deliberately assign[s students] intrinsic guilt based on the actions of their presumed ancestors." We do not assign guilt to students, but others may perceive this important work in that way.

18. Finally, we are similarly unsure if the district can continue to invite guest speakers and community organizations to engage students in conversations about race, diversity, public policy, and social history that highlight the struggles and challenges of specific demographic groups and individuals. The Dear Colleague Letter does not meaningfully define what the Department of Education means by "DEI" nor does the Letter offer specific guidance as to precisely what is (or is not) legal in the eyes of the current federal administration. Given the

Letter's vague position that all diversity, equity, and inclusion programs engage in "smuggling racial stereotypes" into everyday programming, I am fearful that the United States Department of Education and others could view goals central to the District's work as themselves violative of the Letter.

19. For example, we are worried that any effort to provide additional academic support for certain demographic student groups (e.g., low socio-economic status, English Speakers of Other Languages) will be deemed as "smuggling racial stereotypes into everyday programming." Continuing efforts to build inclusive community among students that are accessible to all may violate U.S. Education Department mandates.

20. It is also difficult for me to apply the Dear Colleague Letter to curriculum choices that my District has to regularly make. As set forth in New Hampshire law, the criteria for an "Adequate Public Education" includes: "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens." *See* RSA 193-E:2, IV. It also includes "Grounding in … literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas." *See* RSA § 193-E:2, V. Chapter Ed 300 of New Hampshire's Education Rules also addresses the "Minimum Standards for Public School Approval." Under these rules, which were adopted on December 12, 2024, graduation requirements in social studies——which includes United States and New Hampshire history, government and civics, economics, personal finance, and world history—shall require students to demonstrate and apply competencies in:

> 1. Understanding the history of the United States through multiple perspectives, including founding principles and the on-going struggle to realize those principles."; …

7

> 3. Understanding processes of civic engagement in a democratic society, including tolerance and well-mannered engagement across differences of perspective, philosophy, culture, race, and heritage;
>
> 4. Understanding important events marking world history and how those events have shaped cultural, political, and other aspects of civilization through multiple perspectives; …
>
> 8. Researching, inquiring, analyzing, and explaining historical, civic, government, geographic, and economic developments including interaction and interdependence through multiple perspectives."

N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f) (emphasis added).

21.     New Hampshire's promulgated "K-12 Social Studies New Hampshire Curriculum Framework" (last approved by the N.H. DOE in July 2006), also sets forth specific topics ("Strands") in Civics, Economics, Geography, New Hampshire and United States History, and World History and Contemporary Issues, that must be taught for each grade level. *See* K-12 Social Studies New Hampshire Curriculum Framework, https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-socialstudies-framework.pdf (June 2006) (last accessed Apr. 10, 2025). The framework sets forth a set of standards for teaching social studies to different grade levels so that students have "knowledge and skills needed to participate intelligently and responsibly in our ongoing democratic experiment and in an interdependent world." *Id.* at 5. To that end, the New Hampshire guide states that "[a]n effective study of social studies must focus on conceptual frameworks and themes rather than solely an examination of facts." *Id*. For example, themes for U.S. History topics include: "slavery; racism; 'Jim Crow'; Darwinism; eugenics." *Id.* at 11. For grades 9-12 and grades 7-8, respectively, students should be analyzing the impact of various labor systems, including "slavery, the medieval guilds, or wage labor" or how "suffrage expanded to various groups of citizens" (like African Americans and women). *Id.* at 100, 62.

22. Further, as required under state law, the District currently offers instruction and curriculum under RSA 189:11, I(j) addressing "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices." (emphasis added).

23. While we believe that our implementation of these laws and rules are nondiscriminatory under federal law, the Dear Colleague Letter can be read to constrain or restrain this instruction already offered by the District, and hampers the District's efforts to fully implement this curriculum as required by state law, because, for example, the instruction could be interpreted as "teach[ing] students that certain racial groups bear unique moral burdens that others do not" or creating a "racially hostile environment."

24. These fears are compounded by the fact that (i) the N.H. Department of Education, on February 4, 2025, sent a Technical Advisory highlighting the U.S. Department of Education's actions to eliminate DEI, and (ii) both the United States and N.H. Department of Education are requiring me to imminently certify that the District is in compliance with the Letter or risk losing vital federal funds that the District depends on.

25. The conditions to federal funds imposed by the Dear Colleague Letter and Certification Requirement also amount to coercion. This is because the financial conditions imposed in the Letter and the Requirement seem to be new and retroactive and imposed midstream in the middle of a funding cycle. Given this potential retroactivity of new requirements, my District, as a recipient, had no opportunity to knowingly accept or reject the funds based on these new conditions when funds were accepted.

26. Unless the Letter is voided, the District will be irreparably harmed. The vague and generalized limitations set forth by the U.S. Department of Education February 14th Letter and threats included in the assurances form will limit the District's ability to meet our obligation to fully deliver curriculum and instruction, uphold our mission and value statement to engage every learner, prepare students to live and work in a multicultural and global society, gain the necessary social and emotional skills that recognize the diverse and unique perspectives of others. It will limit teachers' ability to explore concepts and historical facts about World History, American History, and literature as educators and administrators fear penalties and loss of certification and limit our ability to continue programs that support all students both academically, socially, and culturally, as dictated in the U.S. Education Departments communiques.

27. The communities of Durham, Lee, and Madbury that make up the Oyster River Cooperative School District, strongly support the School Board and administration's efforts to create the conditions whereby all students feel valued, appreciated, and respected. At the heart of our commitment to students and families is the effort to implement culturally responsive sustaining curriculum and classroom experiences where student background and experiences are tied to the learning, to allow students to appreciate their cultural heritage and explore diverse ideas, complicated historical themes and facts, and develop the capacity to see differences and differences of opinions as a means to internalize a broader perspective of people, societies, nations, and our global community. We see our diverse community as an asset and seek to promote inclusion and equitable experiences as a means to ensure all students thrive and succeed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of April, 2025.

      *Dr. Robert Shaps*
      Dr. Robert Shaps