# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATIONAL ASSOCIATION, et al., *Plaintiffs*, v. UNITED STATES DEPARTMENT OF EDUCATION, et al., *Defendants*. | Case No.  1:25-cv-00091-LM |

### DECLARATION OF JOHN SHEA

I, John Shea, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. I am the Superintendent of Schools for the Somersworth School District (SAU56), which educates students in Somersworth, New Hampshire.  Our district currently enrolls approximately 1,300 students.  I became superintendent in July 2024.  I also had previously served as principal of Somersworth High School.  I submit this declaration solely in my capacity as superintendent of SAU56.

2. I have over 25 years of experience as an educator—including as an administrator, teacher, coach, and advisor.  This work has spanned the public, private, charter, college preparatory, alternative, and vocational sectors.  This work has been both throughout the United States and abroad.

3. I have served as principal at Spaulding High School in Rochester, New Hampshire and as upper school director of Berwick Academy in Maine.  I recently served as the interim head of school of Cambridge Academy Ethiopia in Addis Ababa.  I have also previously served as a

1

high school principal in New Delhi, India and in Panama City, Panama. Further, I am the co-founder of the High Tech High Charter School in San Diego.

4. I am certified in New Hampshire as a principal and superintendent, and have been for over 15 years.

5. I have earned an M.Ed. in leadership and policy studies from the University of Washington. I have earned an MBA from Harvard Business School. I also hold a Certificate of Advanced Graduate Study (CAGS) in school administration from the University of New Hampshire.

6. The Somersworth School District has directly received federal grants totaling $2.1 million for this current fiscal year (2024-25), which includes IDEA (Individuals with Disabilities Education Act) grants, Title I grants (focused on students in high-poverty communities and low-income families), and Title II, III, and IV financial support—all of which are generally recurring based on year-to-year qualifications. This $2.1 million figure for the current year also includes school safety grants and other such nonrecurring (or periodically recurring) grants. We also receive federal funding indirectly through the New Hampshire Department of Education. I am not certain precisely how much of our state funding comes through federal sources. We cannot afford to lose our federal grant support. We are not an affluent community. We do not have a large property tax base. And, like all the other districts in New Hampshire, we must contend with the fact that our state government provides proportionately less funding than any other state in the nation.

7. I am aware of the February 14, 2025 Dear Colleague Letter and the February 28, 2025 "Frequently Asked Questions" document published by the United States Department of Education, as well as the President's Executive Orders on diversity, equity, and inclusion in K-12

2

schools and higher educational institutions. I am also aware of the United States Department of Education's March 14, 2025 announcement that it has opened investigations into 45 universities following the February 14, 2025 Dear Colleague Letter.

8. Furthermore, I am aware that, on April 3, 2025, the United States Department of Education sent a letter to all state departments of education stating that these state departments need to—within 10 days (by Sunday, April 13, 2025)—certify compliance with the February 14, 2025 Dear Colleague Letter as a condition for receiving federal funds. As a result, on the evening of April 3, 2025, I received from the New Hampshire Department of Education a certification document stating that my district must complete the certification by no later than Thursday, April 10, 2025 at 5:00 p.m. After the United States Department of Education extended the deadline for state departments of education to Thursday, April 24, 2025, the New Hampshire Department of Education set a new Thursday, April 17, 2025 (5:00 p.m.) deadline for my District to send a certification. I am aware of the parties' April 9, 2025 agreement with respect to the certification ramifications.

9. Diversity, equity, and inclusion are independent, but connected, ideas that are core values in the Somersworth School District. These values are not a standalone program or limited to a practice or policy; rather, they are who we are as a community in Somersworth. We do not have any particular programs, policies, or practices specifically labeled "DEI." Diversity, equity, and inclusion were fundamental values in our school district—and in our community—long before the murders of Eric Garner, Michael Brown, Tamir Rice, George Floyd, and the racially justice reckoning that emerged in their wake. And these three values still are fundamental values in the Somersworth School District today. Even when we are not using the specific term "DEI," these values are—and have been—baked into the fabric of so much of what our District does.

10. The mission of the Somersworth School District is "to inspire all students to excel, to develop a thirst for knowledge, and to teach the essential skills necessary to be caring, contributing, and responsible individuals in an ever-changing world." In fulfilling this mission, the District is committed to providing an inclusive and complete education, as well as eliminating gaps in opportunities and barriers to access—gaps which may sometimes correlate with a student's race, ethnicity, gender, gender identity, disability, socioeconomic status, or geographic location. The District has many goals for its schools and students—one of which is to increase equitable opportunities and to ensure that a student's demographic characteristics do not limit a student's success in school and life. This work has included providing inclusive educational opportunities for the District's immigrant communities, providing robust "English for Speakers of Other Languages" (ESOL) services, and ensuring that high school students enrolled in various courses are appropriately provided meaningful opportunities for full and complete discussions on relevant historical and contemporary matters—including topics involving race, ethnicity, gender, and socioeconomic status. Providing equitable opportunity for all students includes providing free and reduced meals for students who qualify—based, needless to say, on household income. And this, as just one example, is by no means a "proxy for race." Equitable opportunity for all students also includes the provision of appropriate services, accommodations, and modifications (per state law) for students with disabilities and learning differences. In other words, equity and inclusion are the core of special education.

11. The Dear Colleague Letter does not meaningfully define what the Department of Education means by "DEI" nor does the Letter offer specific guidance as to precisely what is (or is not) legal in the eyes of the current federal administration.

12. It should go without saying that our District does not promote racial discrimination—or any kind of discrimination. Nondiscrimination is fundamental to how we operate—and it would be even without federal law. However, given the Letter's vague position that diversity, equity, and inclusion programs engage in "smuggling racial stereotypes" into everyday programming, I am concerned that the United States Department of Education and others could view goals central to the District's work as themselves violative of the Letter (given the Letter's ambiguities). For example, in seeking to ensure that our District's students from immigrant communities have equal access to educational opportunities, we engage in specific outreach to these communities to ensure that their needs are met and they are aware of the opportunities that this District has to offer. These include our ESOL programs, as well as the evening events offered several times a year for ESOL students and their families. The goal of these events for ESOL students and their families is inclusiveness—to make sure that these students (who often come from immigrant communities) feel welcome and at home. We want these students to bring their families into the school so that they know that we can be a resource for them. These interactions increase engagement and connection with the school when language can sometimes be an obstacle for this engagement. We also allow our space to host an autumn annual festival for a local immigrant community. Everyone is welcome; no one is excluded. We view welcoming these communities (and all communities) as integral to our work. But I am concerned that this work could be construed as advocating in a way that "preference[s] certain racial groups" against the terms of the Dear Colleague Letter.

13. It is also difficult for me to apply the Dear Colleague Letter to curriculum choices that my District has to regularly make. As set forth in New Hampshire law, the criteria for an "Adequate Public Education" includes: "Knowledge of civics and government, economics,

geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens." *See* RSA 193-E:2, IV. It also includes "Grounding in … literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas." *See* RSA § 193-E:2, V.  Chapter Ed 300 of New Hampshire's Education Rules also addresses the "Minimum Standards for Public School Approval."  Under these rules, which were adopted on December 12, 2024, graduation requirements in social studies—which includes United States and New Hampshire history, government and civics, economics, personal finance, and world history—shall require students to demonstrate and apply competencies in:

> 1. Understanding the history of the United States <u>through multiple perspectives</u>, including founding principles and <u>the on-going struggle to realize those principles</u>."; …
>
> 3. Understanding processes of civic engagement in a democratic society, <u>including tolerance and well-mannered engagement across differences of perspective, philosophy, culture, race, and heritage</u>;
>
> 4. Understanding important events marking world history and <u>how those events have shaped cultural, political, and other aspects of civilization through multiple perspectives</u>; …
>
> 8. Researching, inquiring, analyzing, and explaining historical, civic, government, geographic, and economic developments including <u>interaction and interdependence through multiple perspectives</u>."

N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f) (emphasis added).

14.  New Hampshire's promulgated "k-12 Social Studies New Hampshire Curriculum Framework" (last approved by the N.H. DOE in July 2006) also sets forth specific topics ("Strands") in Civics, Economics, Geography, New Hampshire and United States History, and World History and Contemporary Issues, that must be taught for each grade level.  *See* K-12 Social Studies New Hampshire Curriculum Framework, https://www.education.nh.gov/sites/g/files/ehbemt326/files/inline-documents/standards-

socialstudies-framework.pdf (June 2006) (last accessed Apr. 10, 2025). The framework sets forth a set of standards for teaching social studies to different grade levels so that students have "knowledge and skills needed to participate intelligently and responsibly in our ongoing democratic experiment and in an interdependent world." *Id.* at 5. To that end, the New Hampshire guide states that "[a]n effective study of social studies must focus on conceptual frameworks and themes rather than solely an examination of facts." *Id.* For example, themes for U.S. History topics include: "slavery; racism; 'Jim Crow'; Darwinism; eugenics." *Id.* at 11. For grades 9-12 and grades 7-8, respectively, students should be analyzing the impact of various labor systems, including "slavery, the medieval guilds, or wage labor" or how "suffrage expanded to various groups of citizens" (like African Americans and women). *Id.* at 100, 62.

15. Further, as required under state law, the District currently offers instruction and curriculum under RSA 189:11, I(j) addressing "[h]ow intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, *and how to prevent the evolution of such practices*." (emphasis added).

16. While we believe that our implementation of these laws and rules are nondiscriminatory under federal law, the Dear Colleague Letter can be read to constrain or restrain this instruction and hampers the District's efforts to fully implement this curriculum as required by state law. Again, graduation requirements in social studies require a demonstration of an understanding of history "through multiple perspectives, including founding principles and the on-going struggle to realize those principles," as well as "tolerance and well-mannered engagement across differences of perspective, philosophy, culture, race, and heritage." N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f). And, under RSA 189:11, I(j), educators in New Hampshire and our

7

District are supposed to discuss not only the evolution of how racism and bigotry have evolved in the past, but also "how to prevent the evolution of such practices." As part of any such discussions designed to comply with these curriculum requirements, it is not hard to imagine that a discussion of remedies for past discrimination (like reparations) may take place, but I fear that this instruction could be viewed as being barred as instruction that "preference[s] certain racial groups" or "teach[ing] students that certain racial groups bear unique moral burdens that others do not" under the Letter. This is just one of many examples, as I cannot possibly evaluate whether all programs may be covered by the Letter given any number of interpretations that the Letter is subject to.

17. These concerns are compounded by the fact that (i) the N.H. Department of Education, on February 4, 2025, sent a Technical Advisory highlighting the U.S. Department of Education's actions to eliminate DEI, and (ii) both the United States and N.H. Department of Education are requiring me to imminently certify that the District is in compliance with the Letter or risk losing vital federal funds that the District depends on.

18. The conditions to federal funds imposed by the Dear Colleague Letter and Certification Requirement also amount to coercion. This is because the financial conditions imposed in the Letter and the Certification Requirement seem to be new and retroactive and imposed midstream in the middle of a funding cycle. Given this potential retroactivity of new requirements, my District, as a recipient, had no opportunity to knowingly accept or reject the funds based on these new conditions when funds were accepted.

19. Unless the Letter is voided, the District will be irreparably harmed. The Letter compels the District to make impossible choices. Right now, the Letter makes decisions and planning about policy and curriculum unclear, impractical, and confusing.

20. Somersworth is a special community. It is gritty and resilient. It is diverse in so many ways. And it is proud and inclusive. The Dear Colleague Letter, through its ambiguities and lack of clarity, prevents me from knowing what our District can and cannot do, and I feel that it is important for our community to challenge this action to ensure that the students of Somersworth—and students throughout the country—receive the inclusive education and equitable opportunities that they deserve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of April, 2025.

>*/s/ John Shea*
>John Shea