# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

NATIONAL EDUCATION
ASSOCIATION; *et al.*,

       *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
EDUCATION; *et al.*,

       *Defendants.*

Case No. 1:25-cv-00091-LM

**REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

## INTRODUCTION

The Department of Education's ("ED") February 14, 2025 Dear Colleague Letter ("DCL") (ECF 34-3) and ED's subsequent implementation, including through its April 3, 2025 Certification Requirement ("Certification Requirement") (ECF 56-2), threatens stiff penalties and demands swift compliance. *See* ECF 34-1; ECF 41-1. Moreover, these serious consequences are attached to vague prohibitions—turning on ED's subjective interpretation of what constitutes discriminatory "DEI program[ming]"—that reach First Amendment protected speech and expression and constitute an abrupt departure from decades of settled law and prior guidance upon which those in the education community have relied. Plaintiffs are facing the harms from the DCL and ED's actions to implement its requirements now and will imminently suffer continued consequences absent a preliminary injunction. *See generally* ECF 34-1.

The Government's argument boils down to an assertion that the DCL has no effect: that it is not binding, ECF 52-1 at 3, 7, 8, 22–24, 28–31, that ED's enforcement authority is narrow, *id.* at 18, 20–21, 32, 36, 44, and that the DCL merely restates existing requirements, *id.* at 23, 26–28, 34, 37, 39, 40. These arguments are contradicted by the record, the text of the DCL, the Certification Requirement, and ED's other implementation actions. These legal arguments are also in stark contrast to ED's categorical statements to the public committing to broadly "End DEI."[1] They are unpersuasive in response to Plaintiffs' arguments and evidence. The Court should grant Plaintiffs' Motion for Preliminary Injunction.

---

[1] U.S. Dep't of Educ., End DEI Portal, https://perma.cc/GYS3-J2GR (ECF 34-9).

## ARGUMENT

### I.    Plaintiffs' Injuries Establish Standing.

Plaintiffs have established standing. First, the school district Plaintiffs, ECF 56-12, 56-13, 56-14, 56-15, indisputably have standing, as they are clearly the "object of the action . . . at issue" as the "colleagues" to whom the DCL is addressed and as demonstrated by ED's Certification Requirement to Local Education Agencies ("LEAs").[2] ECF 52-1 at 11 (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561–62 (1992)). For these Plaintiffs that are the subject of ED's actions, "there is . . . little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." *Defs. of Wildlife*, 504 U.S. at 561–62. Because the school district Plaintiffs have standing, evaluation of additional Plaintiffs' standing is not necessary. *See Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 n.9 (1977).

Further, the Government misapplies *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394–96 (2024). ECF 52-1 at 13. NEA, NEA-NH, and CBED do not assert injuries as advocacy organizations with "abstract social interests" expending resources to "gather information and advocate against" ED's actions. *All. for Hippocratic Med.*, 602 U.S. at 394. Rather, they face immediate, perceptible impairment of existing core business activities.[3] That the DCL "does not prevent [Plaintiffs] from engaging" in these services generally, ECF 52-1 at 14, misses the point. The cloud of uncertainty the DCL creates regarding whether Plaintiffs' core activities touching on diversity, equity and inclusion are permissible predictably will turn school districts and educators

---

[2] The Government also overlooks that the National Education Association (NEA), the National Education Association of New Hampshire (NEA-NH), their members, and the Center for Black Educator Development (CBED) are similarly "the object of the action." The DCL and FAQ impose liability on schools working with "third-party contractors," DCL at 4, and threatens any "individual or entity" with liability under contract law and the False Claims Act, Certification Requirement at 3, and it is the individual public servants and educators who must implement ED's directives, *see id.* at 4–5.

[3] *See, e.g.*, ECF 34-21 at 4–6 (impairment of NEA's trainings, grant programs, and legal representation); ECF 34-17 at 8–9 (impairment of NEA-NH's training and advising); ECF 34-26 at 5–7, 10 (impairment of CBED's Teaching Academies and professional development programs); *see also generally* ECF 41-1 at 17–20.

away from Plaintiffs' offerings, directly frustrating Plaintiffs' missions.[4] Even if Plaintiffs were able to change or navigate their activities to address the new requirements under the DCL, it would be heavily costly and burdensome.[5] *See, e.g.*, *League of Women Voters of N.H. v. Kramer*, No. 24-CV-73-SM-TSM, 2025 WL 919897, at *9 (D.N.H. Mar. 26, 2025) (standing satisfied based on interference with organization's core function of counseling and combatting voter suppression); *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 49 (D. Mass. 2024) (standing established where nonprofit providing programming and resources to immigrant communities diverted resources to respond to needs of immigrants relocated by defendants). ED interferes with the interests of organizational Plaintiffs in their programs, including with school districts, and in the case of CBED, jeopardizes its ability to remain in business at all.[6] These injuries not only establish standing but are irreparable. *See, e.g.*, *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) ("[T]he loss of customers" may result in "damages that could not be remedied by money damages."); *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986) (injury that "threaten[ed] the very existence of [plaintiff's] business" is irreparable); *see also infra.* Finally, the DCL's interference with NEA and NEA-NH's ability to provide legal defense and counsel their members on their rights and obligations in the face of the DCL's vague prohibitions[7] is closely analogous to the injury establishing standing in *Havens Realty Corp. v. Coleman*, 455 U.S. 362 (1982), where the defendant "perceptibly impaired [plaintiff's] ability to provide counseling and referral services." *All. For Hippocratic Med.*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379).

Moreover, NEA and NEA-NH have associational standing. *See* ECF 41-1 at 12–16. The Government represents that Plaintiffs' members have an "incorrect expectation that ED will take actions against *them*," ECF 52-1 at 17, but the face of ED's actions and pronouncements tell a

---

[4] *See* ECF 34-21 at 3–4; ECF 34-17 at 3, 5–6; ECF 34-26 at 3–4; ECF 41-1 at 17–18.
[5] *See* ECF 34-21 at 4–5, 9; ECF 34-17 at 8–9; ECF 34-26 at 4–7; ECF 41-1 at 18–19.
[6] *See* ECF 34-1 at 16; ECF 34-26 at 10; ECF 34-21 at 5, 9; ECF 41-1 at 18–19.
[7] See ECF 34-21 at 6–7; ECF 34-17 at 9; ECF 41-1 at 19–20.

different story. The DCL announces vague prohibitions on "teach[ing]" DEI content, DCL at 4; *see also infra*; it does not merely require equal access to curricula. *Contrast* ECF 52-1 at 18. Similarly, ED has threatened "serious consequences" for "individual[s] or entit[ies]," Certification Requirement at 4, and the DCL can be enforced directly against educators where teaching certification and licensure requirements include compliance with federal law. ECF 34-1 at 13 & n.33. *Contrast* ECF 52-1 at 18, 20. The DCL forms the basis of these consequences whether or not ED itself initiates or executes the particular adverse action. Further, the Government's argument is no answer to the coercive operation of the DCL that is harming Plaintiffs' members now.[8] *See Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 180 (2024), *infra*. ED's actions also have already and will continue to harm Plaintiffs' reputational and career interests.[9] *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021); *Meese v. Keene*, 481 U.S. 465, 473 (1987).

The Government erroneously argues that Plaintiffs' injuries are speculative and not traceable to ED. ECF 52-1 at 19–21. It is undeniable that the Certification Requirement is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Further, there is no question the DCL and implementation measures apply directly to educational institutions, and there is no third-party step required before these are effective. *Cf. Clapper*, 568 U.S. at 412–13 (respondents "assum[ed]" their third-party contacts would be targeted for surveillance, and further, could "only speculate as to whether [the FISA] court will authorize [use of the challenged surveillance mechanism]"). Plaintiffs' fear that education institutions will respond as they have

---

[8] *See generally* ECF 34-1 at 13–14 & n.35–38.

[9] *See, e.g.*, ECF 34-11 ¶ 8 ("If [an End DEI Portal] complaint were lodged, even if meritless, my reputation would be harmed"); ECF 34-12 ¶ 7 ("the FAQ [ ] invites distrust in the ethics and professionalism of schools and educators"); ECF 34-14 ¶¶ 15, 18 (explaining "if I [continue my scholarship], I will lose opportunities for advancement and that she has lost the opportunity to fully participate in the Center and its services for her college, which is part of her academic responsibilities for which she is evaluated); ECF 34-15 ¶ 18 ("my expertise as a social justice scholar is being undermined"); ECF 34-18 ¶ 10 ("the [DCL] language feels accusatory and vicious"); ECF 34-19 ¶ 14 (academic presentation on her research canceled because of the DCL); ECF 34-21 ¶ 11 ("anonymous complaints against members can touch off lengthy investigations during which members are placed on administrative leave with the consequent reputational injury"); ECF 34-26 ¶¶ 41–45.

both here, ECF 34-1 at 13–14, 22 & n.57, and in response to similar laws, ECF 34-1 at 15; ECF 34-21 at 8, is far from speculative, ECF 34-1, at 50 & n.101–02. Indeed, these harms are "already occurring." *New York v. Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 227 (S.D.N.Y. 2020); *see* ECF 34-1 at 10–14, 50 & n.102.

Education institutions' and entities' responses to the DCL are "the predictable effect of Government action," *Dep't of Com. v. New York*, 588 U.S. at 768, not "unfettered choices" within the scope of "broad and legitimate discretion," *Defs. of Wildlife*, 504 U.S. at 562 (citation omitted); *see also* ECF 41-1 at 20–21; ECF 52-1 at 43 (conceding schools' restrictions are driven by an effort "to avoid enforcement actions by ED"). Responses, including any arguable overcorrections, ECF 52-1 at 19, are caused by the vague terms of the DCL itself, and now, the steep additional penalties the Certification Requirement threatens. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up); ECF 34-1 at 21–22; *cf. Dep't of Com. v. New York*, 588 U.S. at 768 (traceability satisfied where "third parties will likely react in predictable ways . . . even if they do so unlawfully and despite the requirement that the Government [act in a contrary manner]"). Likewise, Plaintiffs' fear that ED will act consistent with its solicitation through the End DEI Portal is reasonable and not "imaginary or wholly speculative." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979). The Government's response that "ED has no control over whether a private third party chooses to file complaints," and "can only do what it has always done: investigate every complaint it receives," ECF 52-1 at 20–21, fails to account for the record evidence. [10] *See* ECF 34-1 at 7–8, 27–28.

## II.    Plaintiffs are Likely to Succeed on the Merits.

---

[10] That evidence shows, among other things, that ED is only soliciting select civil rights complaints via its End DEI portal—namely, those concerning DEI efforts. *See* ECF 34-1 at 27–28. The skewed portal solicitation and the heated rhetoric that has accompanied it, only heightens the coercive effect of ED's DCL and Certification Form.

### A. The DCL, Including as Implemented Through the Certification Requirement, Violates the Fifth Amendment Prohibition on Vagueness.

Under any standard of vagueness review, the DCL fails. ECF 34-1 at 17–18. Yet the concern with vagueness is also heightened here because the DCL abuts the First Amendment, and separately, because it imposes severe consequences. *Id.*

The Government argues that the consequences here do not warrant heightened scrutiny. ECF 52-1 at 32. The DCL and the Certification Requirement, and ED's record of enforcement, refute this. ECF 34-1 at 7–9, 27 & n.64, 32 & n.75; Certification Requirement at 4–8. Further, the Government does not dispute the severity of the consequences for education institutions of the loss of federal funds and the additional penalties threatened by the Certification Requirement. These consequences are sufficient reason for heightened scrutiny. ECF 34-1 at 17 & n.52. Moreover, as addressed above, individual educators face serious consequences, including the loss of livelihood and profession, flowing from the DCL. ECF 34-1 at 13 & n.33. These are the exact penalties found to warrant heightened scrutiny in *Local 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *7–8 (D.N.H. May 28, 2024) (appeal filed July 26, 2024); *see also Sessions v. Dimaya*, 584 U.S. 148, 184 (2018) (Gorsuch, J., concurring in part) ("civil penalties . . . that strip persons of their professional licenses and livelihoods" can warrant heightened vagueness review).

The Government's further argument that ED was not required to issue the DCL, ECF 52-1 at 33, misses the point of the due process notice requirement. ED has announced new requirements for compliance but fails to give clear notice of how a person could actually meet those obligations. *See* ECF 34-1 at 19–34. The education community is on notice, for example, that ED will treat "DEI programs" as discrimination, DCL at 4, but they have no guidelines for how to avoid steep

penalties other than to shut down anything that could potentially fall within these undefined terms; they guess at their peril.[11] ECF 34-1 at 22–23 & n.57, 26–27.

The Government does not engage directly with the DCL's vague terminology, arguing instead that "the DCL does not define ED's understanding of the scope of prohibited conduct under Title VI by reference to 'DEI.'" ECF 52-1 at 34. But this fails to account for the actual text of the DCL, which concludes that "DEI programs" "discriminate in less direct, but equally insidious ways," DCL at 4, and is no response to the numerous additional vague prohibitions Plaintiffs identify. ECF 34-1 at 24–25. Nor does the Government's reference to the statement in the Frequently Asked Questions document ("FAQ") (ECF 34-10) that "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI'" ECF 52-1 at 34 (quoting FAQ at 7), answer Plaintiffs' arguments. The statement concedes "labels" will be part of the consideration—if not the sole factor—and it does not alter the terms of the DCL. *Id.*

Similarly, citing an isolated statement in the four-page DCL, the Government argues it is limited to addressing disparate treatment discrimination. ECF 52-1 at 35 (citing DCL at 3). But the DCL and FAQ articulate liabilities untethered to any standard in case law. *See* ECF 34-1 at 22–24. Further, the DCL and FAQ fail to explain *how* any existing legal standard leads to the conclusions it asserts: that it would be "unlawful" to act "to increase racial diversity," DCL at 4; that "DEI programs deny students the ability to participate fully in the life of a school," *id.*; and that social

---

[11] The Government's reliance on *Beckles v. United States*, 580 U.S. 256, 263 (2017), and the assertion that the DCL is "non-binding," ECF 52-1 at 30–31, is similarly unavailing. Federal sentencing guidelines, as pointed out in *Beckles*, present a unique context in that they are directed toward the court, which would otherwise have entirely unfettered discretion. 580 U.S. at 894–95. Even assuming *arguendo* that the DCL was not final agency action for purpose of the APA, it is directed toward members of the education community (not at ED, the regulating body, or an entity with unfettered discretion), and those entities are entitled to clear notice of the rules with which they must comply, and have the right to be free from arbitrary and discriminatory enforcement under the Fifth Amendment. Here, as well, ED's discretion is cabined by its congressional authorization, which it exceeds. *See* ECF 34-1 at 36.

and emotional learning and culturally responsive teaching are "veil[ed] discriminatory polic[ies],"[12] FAQ at 6; *see* ECF 34-1 at 6, 8, 24.

And where the FAQ states that programs would not violate Title VI "so long as they do not engage in racial exclusion or discrimination," ECF 52-1 at 35 (quoting FAQ at 7), the same answer cautions, "[h]owever, schools must consider whether any school programming discourages members of all races from attending, either by excluding or discouraging students of a particular race or races, or by creating hostile environments," FAQ at 7. This undermines any argument that the FAQ narrows or clarifies the DCL. ECF 34-1 at 21–22.

Finally, the End DEI Portal stands separate and apart from ED's general civil rights complaint portal and further invites arbitrary and discriminatory enforcement. ECF 34-1 at 27. The End DEI Portal specifically solicits complaints regarding "divisive ideologies and indoctrination," End DEI Portal, to be used "as a guide to identify potential areas for investigation," Portal Press Release (ECF 34-8), and it is reasonable to assume that ED will engage in enforcement consistent with its announced intent. *See also* Mar. 14 Investigations Press Release (ECF 34-3) (stating ED's intent to "reorient civil rights enforcement"). *Contrast* ECF 52-1 at 36.

### B.  ED Fails to Refute Plaintiffs' First Amendment Claims.

#### i.  The DCL is Coercive.

The Government makes no serious effort to distinguish the threatened penalties and impacts here from those in *Vullo*, 602 U.S. 175. Instead, the Government rests on the argument that the "DCL merely explains ED's understanding of what Title VI requires," ECF 52-1 at 41, and

---

[12] The Certification Requirement is similarly vague and further exacerbates what Plaintiffs are required to do to avoid funding terminations and liability. As in the DCL and FAQ, ED suggests that ESSA prohibits education institutions from undertaking "DEI programs" but ignores, for example, the totality of assurances required under ESSA, which include practices associated with diversity, equity, and inclusion. ECF 41-1 at 6 & n.9; *see also Chicago Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 933871, at *8 (N.D. Ill. Mar. 27, 2025) (finding that a similar certification requirement "does not define the term 'DEI' itself . . . let alone what might make any given 'DEI' program violate Federal anti-discrimination laws").

conveys ED's views about DEI programs, ECF 52-1 at 40, ignoring altogether ED's position of authority and the commanding language of the DCL and subsequent implementation. *See Vullo*, 602 U.S. at 190–94; ECF 34-1 at 31–34.

ED's enforcement authority is substantial, and the commanding nature of the DCL is clear. ED issued the DCL to "explain . . . legal requirements," DCL at 2; it tells schools what they "may not" do, *id.* at 3, and what is "unlawful," *id.* at 4. It includes ED's stated intent "to take appropriate measures to assess compliance" with ED's positions within days, and advises schools to "cease" various practices, on penalty of the loss of federal funding. *Id.* ED has only ratcheted upward its efforts to compel adherence to its views in implementing the DCL to date. *See, e.g.*, Certification Requirement at 5–8. The record shows that education institutions have not "fe[lt] free to disregard" the directives in the DCL. *Vullo*, 602 U.S. at 192; ECF 34-1 at 13–14, 22.

ED does not merely express a general view "that concepts like structural racism are 'toxic[].'" ECF 52-1 at 40 (citing DCL at 2). It concludes that schools are violating the law by "toxically indoctrinating students with the false premise that the United States is built upon 'systematic and structural racism.'" DCL at 2. The Government's further contention that the assertions of prohibited practices in the body of the DCL are distinct from ED's "separate[ ] commit[ment]" to enforcement, ECF 52-1 at 40, strains credulity. The DCL does not merely note "a continued commitment to vigorous enforcement." *Id.* (quoting Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues at 3 (Aug. 14, 2023) (ECF 34-5)). ED has repeatedly stressed and added to the "serious consequences," schools and individuals face for noncompliance, including wholly new forms of liability through third parties, under contract law, and the False Claims Act, 31 U.S.C. § 3729(a) (FCA). Certification Requirement at 4.

The Government's attempt to distinguish *Vullo* hangs on a single fact, that the coercive penalties at issue were unrelated to the entities' business with the NRA. ECF 52-1 at 41. This

ignores the broader holding of *Vullo* and fails to distinguish *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61 (1963), in which the penalties invoked were squarely related to the speakers the government ultimately sought to silence. The Government further argues that *Vullo* is somehow distinguishable because the FAQ, not the DCL, states that enforcement "depends on the facts and circumstances of each case," ECF 52-1 at 41 (quoting FAQ at 7). However, this statement does not erase the directives of the DCL and, in any event, may merely serve to reinforce ED's intent to apply its vague prohibitions on "DEI programs" without adherence to an objective standard. *See* ECF 34-1 at 8–9. As the record demonstrates, the coercive nature of the DCL is well within the parameters of evaluation set out in *Vullo*. ECF 34-1 at 31–34.

### ii. The DCL Targets Speech.

Plaintiff's higher education members, as professors and as students, have a First Amendment right to their classroom discussions, in their scholarly research, and in the ability to share their scholarship and views on matters of public concern with the broader academic community.[13] *See, e.g.*, *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding") (quoting *Sweezy v. State of New Hampshire*, 354 U.S. 234, 250 (1957)); *Heim v. Daniel*, 81 F.4th 212, 227–28 (2023) ("[G]iven the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, [*Garcetti v. Ceballos*, 547 U.S. 410 (2006)] does not—indeed, consistent with the First Amendment, cannot—apply to a public university professor's teaching and academic writing.") (cleaned up). These rights have been and will continue to be chilled by the DCL and ED's following enforcement actions. ECF 34-1 at 10–14.

---

[13] ED is also prohibited from interfering in K-12 schools' decisions about what should be taught in schools and how it should be taught, ECF 34-1 at 36–37, and "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528–30 (2022).

Contrary to the Government's assertion, the DCL regulates what schools and educators "*say* about DEI," ECF 52-1 at 36; *see also id.* at 37. The DCL prohibits programming including classroom "teaching" and "training" based on viewpoint—values associated with diversity, equity, and inclusion—and concludes that "DEI programs" "discriminate" on their face. ECF 34-1 at 19–20. It asserts that schools have "indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism,'" DCL at 3, and "under the banner of 'diversity, equity, and inclusion' ('DEI'), smuggl[e] racial stereotypes . . . into everyday training [and] programming," *id.*, and takes issue with DEI programming because it allegedly "teaches students that certain racial groups bear unique moral burdens that others do not," *id.* at 4; *see also* ECF 34-1 at 30–31. The "End DEI" Portal, ECF 34-9, likewise solicits complaints regarding "divisive ideologies and indoctrination," and the FAQ confirms ED's focus through these prohibitions is on "themes in a class discussion."[14]  FAQ at 7.

The Government does not refute this. Instead, it argues this speech and expression constitutes racial harassment. ECF 52-1 at 37. Tellingly, however, the DCL does not refer to any legal standards applicable to a school's need to address harassment. The Government's legal argument rests on an unsupported conclusion that this speech constitutes harassment and likewise does not attempt to explain how it would, as categorically prohibited, meet the legal standard. Even if ED had sought only to regulate harassment, it could not do so through a rule that prohibits "teach[ing]" a concept, DCL at 3, or "themes in a class discussion," FAQ at 7. "[T]he First Amendment protects 'even hurtful speech on public issues to ensure that we do not stifle public

---

[14] The FAQ also asserts that forms of "school-on-student harassment" include higher education practices such as "mandating courses, orientation programs, or trainings that are designed to emphasize and focus on racial stereotypes" or "assigning [students] coursework that requires them to identify by race." FAQ at 8. It is entirely unclear what courses or coursework would be construed to violate these prohibitions. Would discussing racial diversity "emphasize and focus on racial stereotypes?" If a student is "require[ed]" to write an essay connecting lessons about civil rights leaders with their own experiences today, would this violate ED's prohibitions? What is clear is ED's focus on the content of classroom discussions and academic work.

debate.'" *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 191 (2021) (quoting *Snyder v. Phelps*, 562 U.S. 443, 461 (2011)). Indeed, "a function of free speech under our system of government is to invite dispute" and it may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Moreover, even in areas where regulation of speech is permissible, the government must use "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014); *see also R.A.V. v. St. Paul*, 505 U.S. 377, 395, 404 n.5 (1992) ("We do not doubt that these [anti-discrimination] interests are compelling, and that the ordinance can be said to promote them. But the danger of censorship" requires that the law be "necessary to serve the asserted [compelling] interest." (cleaned up)). ED's prophylactic order to "cease" programming associated with values of diversity, equity, and inclusion, DCL at 4, targets viewpoints, not conduct, and is far from narrowly tailored.

### C. The DCL, Including as Implemented Through the Certification Requirement, Violates the Administrative Procedure Act.

The Government's assertion that the DCL and actions implementing it, including the Certification Requirement, are not final agency action and instead fall under the "interpretive rule" exception to the APA falls flat. *See* ECF 52-1 at 22 (citing 5 U.S.C. §§ 553(b)(4)(A), (d)(2)). "An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations— is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). In distinguishing legislative rules from interpretive rules, the "most important factor" courts assess "concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Id.* at 252 (collecting cases). An "agency pronouncement will be considered binding as a practical matter if it . . . appears on its face to be binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). Here, there is no doubt that the DCL and the Certification Requirement

imposes legally binding obligations and prohibitions on schools, and that it will be the basis for enforcement actions. *See* ECF 34-1 at 31–32.

Courts "also have looked to post-guidance events to determine whether the agency has applied the guidance as if it were binding on regulated parties." *Nat'l Mining Ass'n*, 785 F.3d at 253. The Government's argument that the DCL does no more than reiterate the agency's interpretation of Title VI, ECF 52-1 at 23, is belied by the Certification Requirement's imminent timeline for compliance and explicit threats not only of funding loss under Title VI but also of wholly new forms of liability for violating the DCL through breach of contract claims and the FCA. Certification Requirement at 2, 4–5. This makes abundantly clear that ED intends to imminently initiate a variety of enforcement actions against schools that violate the DCL's prohibitions, and invites third parties to enforce its terms as well. *Cf. Nat'l Mining Ass'n*, 785 F.3d at 253 (explaining that the regulated entities may "ignore" the relevant guidance "without suffering any legal penalties or disabilities" and that the entities "may be able to obtain permits even if they do not meet the recommendations in the "relevant guidance"). Finally, the Government's characterization of the DCL and its subsequent actions as mere guidance, ECF 52-1 at 23, should be rejected out of hand. Courts have been quick to dismiss such caveats as "boilerplate" where, as here, the document as a whole "commands, [ ] requires, [ ] orders, [ ] dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). The DCL and the actions implementing it constitute final agency action under the APA.[15]

With respect to the merits of Plaintiffs' APA claims, the DCL and its implementing actions are clearly outside of the scope of ED's statutory authority under the Department of Education Organization Act, 20 U.S.C. § 3403(b) (DEOA), and contrary to law under the DEOA, the Every

---

[15] The Government also argues in circular fashion that the DCL was "neither published in the CFR nor did it rely upon ED's rulemaking authority." ECF 52-1 at 23. But because the DCL is final agency action, that is exactly, at minimum, what should have occurred pursuant to the APA before ED altered the legal obligations of schools throughout the country. ECF 34-1 at 45–46.

Students Succeeds Act, 20 U.S.C. § 6301 et seq., the Higher Education Opportunity Act, 20 U.S.C. § 1132-2, and the General Education Provisions Act, 20 U.S.C. §§ 1221–1242i, all of which prohibit ED from exercising direction, supervision, or control, over curriculum, instructional programs, or materials. *See* ECF 34-1 at 36–37. The Government attempts to skirt this conflict by claiming ED is merely "telling schools they must act in a nondiscriminatory manner in implementing their curricula . . . so that they avoid stereotyping and stigmatizing based on race." ECF 52-1 at 25. That is not, however, what the DCL and its implementing documents instruct. Instead, the DCL targets schools that "have toxically indoctrinated students" DCL at 4, and makes plain its legal conclusions that "programs discriminate in less direct, but equally insidious ways[,]" including by "teach[ing] students that certain racial groups bear unique moral burdens," *id.* The FAQ, in turn, baldly asserts that "social-emotional learning" and "culturally responsive" teaching are "veil[ed] racially discriminatory policies." FAQ at 7. Accordingly, ED deems concepts and practices, including curriculum, instructional programs, and materials, legally suspect, and forces schools, educators, and organizations to make drastic changes or risk grave sanctions, *see* ECF 34-1 at 6–13, in excess of ED's authority and in direct conflict with federal law.

The DCL is also arbitrary and capricious for several independent reasons, ECF 34-1 at 37–48, and the Government's arguments to the contrary ring hollow. First, ED failed to acknowledge let alone explain its dramatic departure from settled law and its own guidance. *Id.* at 38–41. The Government offers no substantive response here nor can it. Instead, it claims, without citing any authority, that ED is not required to provide any explanation for its departure from previous guidance. An agency is obligated, however, to explain its change in position whatever the form such position has taken, especially where, as here, Plaintiffs have relied on the agency's prior policies for decades.[16] *See, e.g.*, *Encino Motor Cars, LLC v. Navarro*, 579 U.S. 211 (2016)

---

[16] *See* ECF 34-1 at 11–14, 14–16, 40–41 & n.85.

(pointing to an opinion letter issued by the agency followed by an amendment to the agency's "Field Operations Handbook" as the basis for longstanding guidance); *Kentucky v. EPA*, 123 F.4th 447, 468 (6th Cir. 2024) (explaining the "mandate to address reliance interests applies just as much to an agency's departure from informal guidance as it does to its departure from formal regulations" (citing *Perez Mortg. Bankers Ass'n*, 575 U.S. 92, 105–06 (2015)). The Government next offers its own *post hoc* explanation for how the DCL is consistent with prior guidance interpreting *SFFA*. *See* ECF 52-1 at 27–28. It is well-settled, however, that courts "may not accept . . . counsel's *post hoc* rationalizations for agency action." *Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 436, 452 (D.D.C. 2015) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983)). In any event, the Government fails to address that ED additionally failed to explain its departure from Title VI and its regulations. *See* ECF 34-1 at 38, 40–41.

The Government's similar effort to reconcile the DCL with *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (*SFFA*), ECF 52-1 at 27–28, is wrong and does not change the fact that the DCL's application of *SFFA* is overreaching and arbitrary, ECF 34-1 at 41–43. The DCL goes much further than addressing the purported use of race neutral policies used "as a covert means of selecting or rejecting students because of their race," as the Government contends, ECF 52-1 at 27, and instead targets a broad range of vaguely defined practices, "[r]el[ying] on non-racial information as a proxy for race . . . on an individual basis or a systematic one," to use race neutral efforts to increase diversity, or to implement "DEI programs." DCL at 3–4. More fundamentally, the Government ignores entirely that *SFFA* did not

address race-neutral policies, or any policies within the K-12 context at all.[17] *See* ECF 34-1 at 41 (citing *SFFA*, 600 U.S. at 213 n.4).

With respect to personal essays, the Government points to the FAQ to address the glaring omission in the DCL of guidance supplied by the Supreme Court itself. ECF 52-1 at 28. The FAQ does not, however, change the content of the DCL and indeed sows more confusion. For example, the FAQ states that ED is "aware that certain schools are attempting to circumvent *SFFA*'s holding by engaging in what some commentators call the 'essay loophole,'" FAQ at 8, without explaining what such "loophole" means. Instead, ED merely lodges the unsupported accusation that schools are "craft[ing] essay prompts in a way that require applicants to disclose their race[,]" *id.*, leaving schools guessing at what such prompts could possibly entail.

With respect to ED's failure to consider important aspects of the problem, the Government does not refute that ED failed to consider the DCL's interference with the administration of Title VI and its implementing regulations, ECF 34-1 at 44–45, and the federalism implications of its intrusions into activities of state and local governments, *id.* at 46. The Government's argument that ED need not consider the costs to Plaintiffs generally, and more specifically the implications of the DCL on Plaintiffs' teaching practices and obligations to comply with professional and state requirements is wrong. ECF 52-1 at 29. Agencies must consider the costs of their action before deciding whether to act. ECF 34-1 at 47 (citing cases). Moreover, that ED issued the DCL in excess of its statutory authority and contrary to several federal laws, *see supra*, does not, contrary to the Government's argument otherwise, insulate ED from considering the effects of its unlawful actions on curriculum, instructional programs, and materials. *Contrast* ECF 52-1 at 29.

Finally, ED does not refute that the Letter is pretextual. ECF 34-1 at 47–48.

---

[17] The Government also ignores that when the Supreme Court has spoken on the issues the DCL prohibits, it has distinguished them. *See* ECF 34-1 at 42.

III.    **The Government Does Not Refute the Irreparable Harm to Plaintiffs or that the Balance of Hardships Favors Injunctive Relief.**

The Government's arguments that Plaintiffs' injuries are not irreparable relies primarily on their incorrect position that Plaintiffs lack standing and would fail on the merits of their claim. ECF 52-1 at 42–44. This is wrong. *See supra.* The Government's only additional argument is that Plaintiffs do not face imminent injury because the rescission of federal funding would purportedly not occur without further procedure. ECF 52-1 at 44. However, this ignores that funding termination is not the only harm Plaintiffs face, including harm that has already happened and is currently ongoing, *see supra*, as well as indications that ED will act without meaningful process. ECF 34-1 at 27.

Likewise, the Government argues that the balance of equities and public interest weigh against an injunction relying on *Crosspoint Church v. Makin*, 719 F. Supp. 3d 99, 126 (D. Me. 2024). However, the court's balancing in that case must be considered in the context of plaintiffs' failure to establish a likelihood of success on the merits. Here, Plaintiffs have established a likelihood of success. The Government makes no argument that either its interests or the public interest would be harmed other than citing to *Crosspoint Church* for its general interest in "enforcement of a civil rights statute." ECF 52-1 at 44. Because "preserv[ing] the relative position of the parties" will not injure Defendants and dissolving the status quo will impose unnecessary hardships on Plaintiffs' constitutional rights, preliminary relief is both urgent and necessary. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

IV.    **Scope of Relief, Stay of Injunction, and Bond.**

The Government's request that any injunction "apply only with respect to the Plaintiffs and their members," ECF 52-1 at 45, does not refute the necessity of complete relief as explained in Plaintiffs' opening memorandum, including as it relates to the nature of the claims; the ability to reach Plaintiffs located across the country; and fairness and workability. ECF 34-1 at 53. Plaintiffs'

17

requested relief is necessary to apply to all Plaintiffs, including school district Plaintiffs, and cover all of ED's subsequent enforcement action, including the Certification Requirement.[18] Nor does it address Plaintiffs' request to "preserve status or rights pending conclusion of review proceedings." 5 U.S.C. § 705. *See* ECF 34-1 at 16–17, 54.

The Government also requests that any injunction the Court issues be stayed while the Government pursues an appeal or emergency stay. ECF 52-1 at 45. Staying the injunction would render meaningless the Court's decision and the parties' April 9, 2025 agreement, ECF 48, as the Certification Requirement and other enforcement efforts under the DCL would take effect, resulting in immediate further injury to Plaintiffs. Moreover, a stay would be inappropriate where the Government has not identified any injury to ED from an injunction and has argued throughout its incorrect position that the DCL has no immediate force and effect. The request should be denied.

Plaintiffs respectfully request that the Court decline the Government's request for an injunction bond. ECF 52-1 at 45–46. A district court has "substantial discretion to dictate the terms of an injunction bond." *HCC Specialty Underwriters, Inc. v. Woodbury*, 289 F. Supp. 3d 303, 330 (D.N.H. 2018) (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991)).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

Dated: April 15, 2025

Respectfully submitted,

Sarah Hinger*                         */s/ Gilles Bissonnette*

---

[18] This relief with respect to the Certification Requirement is encompassed in the scope of initially requested relief and the proposed order; however, Plaintiffs can provide an amended proposed order to explicitly encompass these subsequent developments at the Court's request.

Amanda Meyer*
Alexis Alvarez*
Leah Watson*
Ethan Herenstein*
Victoria Ochoa*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org

Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org

Alice O'Brien*ᵀ
Jason Walta*ᵀ
Phil Hostak*ᵀ
NEA Office of General Counsel
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

Gilles R. Bissonnette (N.H. Bar No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
SangYeob Kim (N.H. Bar No. 266657)
American Civil Liberties Union of New Hampshire
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org

Rachel E. Davidson*
American Civil Liberties Union Foundation of Massachusetts, Inc.
One Center Plaza, Suite 801
Boston, MA 02018
(617) 482-3170
rdavidson@aclum.org

Callan E. Sullivanᵀ (N.H. Bar No. 20799)
Lauren Snow Chadwickᵀ (N.H. Bar No. 20288)
National Education Association-New Hampshire
9 South Spring Street
Concord, NH 03301
(603) 224-7751
csullivan@nhnea.org

*admitted pro hac vice
ᵀ appearing only on behalf of NEA, NEA-NH, and Center for Black Educator Development