UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


National Education Association, et al.

     v.                                          Civil No. 25-cv-091-LM
                                                         Opinion No. 2025 DNH 055 P
United States Department of
Education, et al.


# **O R D E R**

Ours is a nation "deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." Keyishian v. Bd. of Regents of Univ. of State of N.Y., 385 U.S. 589, 603 (1967). Indeed, "[t]he Nation's future depends upon leaders trained through wide exposure to [a] robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritative selection." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 512 (1969) (quotation omitted). And "[t]he right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes." Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949). In this case, the court reviews action by the executive branch that threatens to erode these foundational principles.

Three organizations—the National Education Association, its New Hampshire affiliate, and the Center for Black Educator Development—bring this action against the United States Department of Education ("the Department"), Secretary for Education Linda M. McMahon, and Acting Assistant Secretary for

Civil Rights at the Department of Education Craig Trainor. Plaintiffs allege that a "Dear Colleague Letter" issued by the Department in February 2025 violates their rights under the Fifth and First Amendments, as well as the Administrative Procedure Act ("APA"). Presently before the court is plaintiffs' motion for a preliminary injunction. Defendants object. The court held a hearing on plaintiffs' motion on April 17, 2025. For the following reasons, plaintiffs' motion (doc. no. 34) is granted.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the movant must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in the movant's favor; and (4) an injunction is in the public interest. Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). Of these, likelihood of success on the merits and irreparable injury are the most important factors. González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009). When, as here, the defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021).

# FINDINGS OF FACT[1]

I.     <u>The 2025 Letter</u>

On February 14, 2025, the Department issued a "Dear Colleague Letter" directed to all preschools, elementary schools, secondary schools, and postsecondary schools that receive federal funding, in addition to "other entities" that receive federal funding. Doc. no. 32-1 at 2 & n.1 [hereinafter "2025 Letter"]. The 2025 Letter states that it "explains and reiterates existing legal requirements under Title VI of the Civil Rights Act of 1964,[2] the Equal Protection Clause of the United States Constitution, and other relevant authorities" that are imposed on such schools and entities. <u>Id.</u> at 2.

The 2025 Letter begins by asserting that schools within this country have "embrace[d] . . . pervasive and repugnant race-based preferences," as well as "other forms of racial discrimination," which have "emanated throughout every facet of academia." <u>Id.</u> It goes on to state that schools have engaged in such discrimination

---

[1] The following facts are drawn from: the first amended complaint and its attachments (doc. no. 32); the motion for a preliminary injunction and its attachments (doc. no. 34); the motion for a temporary restraining order and its attachments (doc. no. 41); the defendants' objection to the motion for a temporary restraining order and its attachments (doc. no. 45); the addendum to the defendants' objection (doc. no. 46); the addendum to plaintiffs' motion for a temporary restraining order (doc. no. 47); the defendants' objection to plaintiffs' preliminary injunction motion (doc. no. 52); and those portions of the addendum to plaintiffs' motion for a preliminary injunction (doc. no. 56) that were not stricken by the court in granting in part and denying in part defendants' motion to strike (doc. no. 65).

[2] Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

by "toxically indoctrinat[ing] students with the false premise that the United States is built upon 'systemic and structural racism' and advanced discriminatory policies and practices . . . under the banner of 'diversity, equity, and inclusion' ('DEI'), smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." Id. at 3. According to the 2025 Letter, DEI programs "discriminate in less direct, but equally insidious" ways by "frequently preferenc[ing] certain racial groups and teach[ing] students that certain racial groups bear unique moral burdens that others do not." Id. at 4. It asserts that "[s]uch programs stigmatize students who belong to particular racial groups based on crude racial stereotypes" and "deny students the ability to participate fully in the life of a school." Id.

The 2025 Letter also announces that it is discriminatory for schools to rely on "non-racial information as a proxy for race" and to "mak[e] decisions based on that information." Id. It claims that such non-racial proxies may not be used "to grant preferences on an individual basis or a systemic one," and gives as an example that it would be "unlawful for an educational institution to eliminate standardized testing . . . to increase racial diversity." Id.

Prior to the 2025 Letter, the Department had not indicated a belief that programs designed to promote diversity, equity, or inclusion constituted unlawful discrimination. Nor had it taken the position that schools necessarily behave unlawfully when they act with the goal of increasing racial diversity. In fact, the Department had taken the opposite position.

In 2023, for example, the Department issued a questions-and-answers document in which it stated that, following the Supreme Court's recent decision in Students for Fair Admissions, Inc. v. President and Fellows of Harvard College, 600 U.S. 181 (2023),[3] schools could "continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity." Doc. no. 34-6 at 4 [hereinafter "2023 Q&A"]. The 2023 Q&A identifies several lawful means schools could pursue to promote racial diversity among their student bodies. For example, the Department stated that it would be lawful for educational institutions to focus their outreach and recruitment efforts toward "schools and school districts that serve predominantly students of color" to achieve a racially diverse student body, and that schools "may . . . consider race" when deciding which school districts or geographic areas to focus on. Id. at 5. In contrast to the 2025 Letter, the 2023 Q&A expressly states that schools may modify their standardized testing requirements to enhance racial diversity. Id. at 7. The 2025 Letter does not acknowledge the scores of lawful methods the Department had previously informed schools they could use to promote racial diversity following Students for Fair Admissions.

Similarly, in a report issued in September of 2023, the Department explained various "legally permissible ways to advance the critical mission of socioeconomic

---

[3] In Students for Fair Admissions, the Supreme Court held that the use of racial preferencing in college admissions programs at Harvard and the University of North Carolina violated Title VI and the Equal Protection Clause of the Fourteenth Amendment. 600 U.S. at 198 n.2, 213.

and racial diversity in American colleges and universities" following the <u>Students for Fair Admissions</u> decision. Doc. no. 34-7 at 7 [hereinafter "2023 Report"]. The 2023 Report states that, in order to attract and retain students from diverse racial backgrounds, schools could "invest in programming and activities to support students' sense of belonging, including campus cultural centers, affinity groups, DEI offices, clubs, and other programming that addresses issues relevant to student identity groups." <u>Id.</u> at 51. The 2023 Report is explicit: "Activities intended to further objectives such as diversity, equity, accessibility, and inclusion are not generally prohibited under federal civil rights laws." <u>Id.</u> To the contrary, "these activities and spaces may demonstrate to current and prospective students that the campus has a supportive, welcoming environment." <u>Id.</u> Again, the 2025 Letter does not acknowledge the Department's change in position from believing that DEI initiatives lawfully foster a "supportive, welcoming environment," <u>id.</u>, to believing that DEI programs illegally "deny students the ability to participate fully in the life of a school" by "stigmatiz[ing] students . . . based on crude racial stereotypes," doc. no. 32-1 at 4.

However, the 2025 Letter does make explicit that the Department "will vigorously enforce" its "existing interpretation of federal law" as announced therein.[4] <u>Id.</u> It further states the Department's "inten[t] to take appropriate measures to assess compliance with . . . the understanding [of federal law] embodied

---

[4]The 2025 Letter states in a footnote that it "does not have the force and effect of law and does not bind the public or create new legal standards." Doc. no. 32-1 at 2 n.1.

in this letter beginning no later than 14 days from" the date of the 2025 Letter's issuance, including by assessing compliance with "antidiscrimination requirements that are a condition of receiving federal funding." Id. The 2025 Letter instructs schools to "ensure that their policies and actions comply with existing civil rights law" and "cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means," including through "reliance on third-party contractors." Id. The 2025 Letter invites anyone who believes that a school is violating the 2025 Letter's requirements to submit an online complaint form.

## II.    Implementation of the 2025 Letter

On February 27, 2025, the Department issued a press release announcing that it had launched an "End DEI" online portal with a web address of "EndDEI.Ed.Gov." Doc. no. 34-8 at 2. The press release states that "parents, students, teachers, and the broader community" could use the portal to "submit reports of discrimination based on race or sex in publicly-funded K-12 schools," which the Department would use "as a guide to identify potential areas for investigation." Id. The press release quotes a private person named Tiffany Justice, who is described as the Co-Founder of a group known as "Moms for Liberty." Justice states that, "[f]or years, parents have been begging schools to focus on teaching their kids practical skills like reading, writing, and math, instead of pushing critical theory, rogue sex education and divisive ideologies—but their concerns have been brushed off, mocked, or shut down entirely." Id. In the press release, Justice invites parents to use the "End DEI" portal to "share the receipts of the betrayal that has

happened in our public schools." Id. Separate and apart from the press release, the End DEI portal states that it is an outlet to report the teaching of "divisive ideologies and indoctrination," which the portal classifies as an "illegal discriminatory practice[ ]." Doc. no. 34-9 at 2.

On February 28, 2025, the Department issued a "Frequently Asked Questions" document regarding the 2025 Letter. Doc. no. 32-2 at 2 [hereinafter "2025 FAQ"]. The 2025 FAQ reiterates that "[m]any schools have advanced discriminatory policies and practices under the banner of 'DEI' initiatives" while others "have sought to veil discriminatory policies with terms like 'social-emotional learning' or 'culturally responsive' teaching." Id. at 6. It continues by stating that "[s]chools may not operate policies or programs under any name that treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races." Id. at 7. Moreover, while stating that "programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI," the 2025 FAQ asserts that such programs could be unlawful if they "discourage[ ]" members of certain racial groups from attending or if they otherwise "creat[e] hostile environments based on race for students who do participate." Id. While acknowledging that federal law "prohibit[s] the Department from exercising control over the content of school curricula," the 2025 FAQ insists that the Department has the authority to curb "themes in . . . class[es]" when they involve "more extreme practices" such as colleges requiring their students to "take certain positions on racially charged

8

issues" in class, or "mandating courses . . . that are designed to emphasize and focus on racial stereotypes." Id. at 7-8. In investigating allegations of "covert discrimination," the 2025 FAQ states that the department will consider a school's history of "further[ing] DEI objectives, 'equity,' a racially-oriented vision of social justice, or similar goals." Id. at 9.

On March 14, 2025, the Department issued a press release announcing that it had opened Title VI investigations into forty-five universities "following [the Department's] February 14 Dear Colleague Letter." Doc. no. 34-4 at 2. The press release highlighted a statement from Defendant Secretary McMahon in which she stated that "[t]he Department is working to reorient civil rights enforcement to ensure all students are protected from illegal discrimination." Id.

The Department issued another enforcement-related press release on April 3, 2025. Doc. no. 41-6 at 2. Citing the 2025 Letter and the 2025 FAQ, the press release states that the Department directed each state's Department of Education to "certify their compliance with their antidiscrimination obligations in order to continue receiving federal financial assistance." Id. at 2-3. The press release contains a statement from Defendant Acting Assistant Secretary Trainor, in which he asserts that "too many schools flout or outright violate" federal antidiscrimination law, "including by using DEI programs to discriminate against one group of Americans to favor another based on identity characteristics." Id. at 2. The press release further states that each state must collect certifications of

compliance from the "Local Education Agencies"—i.e., school districts—within their jurisdiction.

The certification requires states and school districts to certify that they understand that "the use of Diversity, Equity, & Inclusion ('DEI') programs to advantage one[ ] [person's] race over another" is contrary to Title VI. Doc. no. 41-4 at 4. The certification further states that "[t]he use of certain DEI practices can violate federal law" and "[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences," including the termination of federal funding, enforcement actions seeking to recoup previously disbursed funds, or even treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a). Id. at 4-5. As with the 2025 Letter, the certification does not define "diversity, equity, and inclusion" or "DEI," and the certification contains no explanation beyond what was originally explained in the 2025 Letter of the Department's understanding of how such programs are being used or could be used to discriminate on the basis of race.

Also on April 3, 2025, the New Hampshire Department of Education ("NHED") notified all school districts and chartered public schools that they must submit the required certification to NHED along with a "Mandatory Supplement Questionnaire." Doc. no. 41-5 at 2. If a school district fails to submit the required certification, NHED stated that it would "report to the United States Department of Education that no certification was received," and "[a]ll issues of noncompliance and a proposed enforcement plan will be submitted to the United States Department of

10

Education." Id. The Mandatory Supplement Questionnaire requires the school district to answer whether, "[u]pon investigation, [there have] been instances of noncompliance identified within your [school district]." Id. at 7. If the school district states that it has identified any instances of noncompliance, the Mandatory Supplement Questionnaire requires the school district to "describe each issue of noncompliance" and "detail [the school district's] remediation plans including [the] intended date of remediation completion." Id.

III.    The Plaintiffs

    A.    NEA and NEA-NH

The National Education Association ("NEA") is America's largest education union, representing approximately three million members who work at every level of education, as well as aspiring and former educators. It has statewide affiliate organizations in every state. The National Education Association-New Hampshire ("NEA-NH") is NEA's affiliate in New Hampshire. NEA's mission is "to advocate for education professionals and to unite [its] members and the nation to fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world." Doc. no. 34-21 at 3. To advance this mission (and to assist in fulfilling state and local curricular requirements to teach in ways that are culturally competent and racially inclusive), NEA provides several services to its affiliates and members.

One such category of services is the provision of professional and continuing education courses to educators, including courses in racial and cultural competence.

For example, NEA offers 15-hour courses on topics such as "Culture, Ability, Resilience & Effort," "Diversity, Equity, and Cultural Competence," "Trauma-Informed Pedagogy," "Mental Health Awareness," and "Social Emotional Learning." Id. at 4. NEA also offers shorter courses that allow teachers to earn "micro-credentials" in such topics as "Teacher Leadership: Diversity Equity and Cultural Competence Pathway," "Native Education," and "Restorative Practices." Thousands of NEA members take these trainings and earn these micro-credentials, which in many instances are accepted by employers to fulfill continuing education requirements and can even qualify the educator for additional compensation. In the 2023-24 school year, NEA conducted over fifty trainings for NEA members and staff on topics falling under the banners of "diversity, equity, and inclusion" and "racial and social justice."

In addition to these professional development opportunities, NEA operates grant programs that fund professional practice initiatives and professional practice instruction. Since September 2024, NEA has awarded $3.9 million in grants to further educators' skills in engaging, teaching, and supporting racially diverse student bodies. These grant programs are often operated in coordination with, and with the support of, school districts and postsecondary educational institutions. One such grant is the "Read Across America Grant," which permits NEA's state affiliates to host events and activities that aim to put books from diverse perspectives into students' hands.

NEA also offers legal advice and representation to its members and affiliates, including representation for members facing discipline or termination for their instructional choices or in other employment-related matters. Since 2020, NEA has provided an increasing amount of legal representation to its members. This was in response to approximately twenty states—including New Hampshire—adopting laws that forbid the teaching of certain "divisive concepts" relating to race. See generally Local 8027, AFT-N.H., AFL-CIO v. Edelblut, Civ. No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024) ("Local 8027 II"), appeal filed, No. 24-1690 (1st Cir. July 26, 2024). These laws generated substantial confusion among NEA members, including whether members could continue to teach topics relating to race or historical practices that led to discriminatory outcomes. Many NEA members self-censored as a result, or even left the profession altogether.

Many members who did not self-censor or resign in response to these state laws faced disciplinary proceedings. Since 2020, NEA has expended substantial resources to defend members for practicing inclusive teaching practices. For example, NEA represented a middle school teacher challenging her termination for reading the book My Shadow is Purple that her students picked for a class read-aloud. By way of further example, NEA represented a music teacher challenging her termination after she raised concerns over her school's decision to prevent the school choir from singing the song "Rainbow Land."

B.     <u>CBED</u>

The Center for Black Educator Development ("CBED") is a nonprofit organization whose mission is to correct for historical discrimination and help achieve educational equity by increasing the number of Black teachers in America. Through its "Teaching Pathways" program, CBED partners with local school districts to conduct year-round courses for high school students interested in becoming teachers, with a particular focus on recruiting Black students as future teachers. The program, which is open to members of all races, aims to provide aspiring teachers with an understanding of historic frameworks that have led to a disproportionately low number of Black teachers in America, as well as the tools to deploy pedagogies and instructional practices that cultivate positive racial identities among their future students. CBED contracts with local school districts to provide the Teaching Pathways program to the district's students, and school districts often pay for the program with federal funding.

CBED also hosts a variety of professional workshops for current teachers, including workshops on cultural identity and implicit bias. In addition, CBED hosts conventions addressing the experiences and needs of Black educators, and schools often purchase tickets for their educators to attend CBED's conferences. Finally, CBED offers consultation services to other non-profits and school districts centered around implementation of DEI programs, addressing racial tensions among students and staff, and effective strategies to recruit and retain Black educators, among other things.

IV.    <u>This Lawsuit</u>

NEA and NEA-NH commenced this action on March 5, 2025, with the filing of their original complaint (doc. no. 1). Plaintiffs filed an amended complaint as of right on March 21, 2025 (doc. no. 32). The amended complaint names CBED as an additional plaintiff and contains some additional factual allegations regarding plaintiffs and their members, but no new claims.[5]

The amended complaint asserts the following claims:

- Count I: The 2025 Letter is void for vagueness in violation of plaintiffs' due process rights under the Fifth Amendment;

- Count II: The 2025 Letter penalizes speech on the basis of content and viewpoint in violation of the First Amendment;

- Count III: The 2025 Letter violates the APA because it is "contrary to constitutional right," 5 U.S.C. § 706(2)(B), insofar as it violates plaintiffs' First and Fifth Amendment rights;

- Count IV: The 2025 Letter violates the APA because it is "in excess of [the Department's] statutory jurisdiction, authority, or limitations, or short of statutory right," <u>id.</u> § 706(2)(C), insofar as federal law prohibits the Department from exercising "direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system," 20 U.S.C. § 3403(b);

- Count V: The 2025 Letter violates the APA because it is "not in accordance with law," 5 U.S.C. § 706(2)(A), insofar as various provisions of federal law prohibit the

---

[5] Plaintiffs have since filed a motion for leave to file a second amended complaint, which would add several New Hampshire school districts as plaintiffs as well as a Spending Clause claim. <u>See</u> doc. no. 57. That motion for leave remains pending at the time of this order's issuance; as such, the school districts are not currently plaintiffs in this action.

Department from directing or controlling schools'
curricula;

- Count VI: The 2025 Letter violates the APA because it
  was issued "without observance of procedure required by
  law," id. § 706(2)(D), insofar as it constitutes a
  legislative rule that was issued without notice and
  comment; and

- Count VII: The Letter violates the APA because it is
  arbitrary and capricious, id. § 706(2)(A).

Plaintiffs seek declaratory and injunctive relief. Defendants McMahon and
Trainor are sued solely in their official capacities.

On the same day they filed their complaint, plaintiffs filed a motion for a
preliminary injunction. See doc. no. 34. Plaintiffs seek to preliminarily enjoin
defendants from enforcing or implementing the 2025 Letter, including through the
2025 FAQ, the End DEI Portal, and the April 3 certification requirement pending
the resolution of this action on the merits.

## RULINGS OF LAW

As noted, to obtain a preliminary injunction, plaintiffs must demonstrate (1)
that they are likely to succeed on the merits, (2) that they are likely to suffer
irreparable harm in the absence of relief, (3) that the balance of equities tips in
their favor, and (4) that an injunction is in the public interest. Arborjet, 794 F.3d at
171. The court will address each factor in turn.

## I.    Plaintiffs are Likely to Succeed on the Merits

As an initial matter, defendants assert that plaintiffs are not likely to
succeed on the merits of any of their claims because they lack standing. The court

first addresses defendants' jurisdictional challenge. After concluding that plaintiffs have standing, the court proceeds to consider whether plaintiffs are likely to succeed on the merits of their claims.

    A.    <u>Plaintiffs Have Standing</u>

        1.    <u>Applicable Legal Principles</u>

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" FDA v. All. for Hippocratic Med., 602 U.S. 367, 378 (2024) (quoting U.S. Const. art. III, § 2). The case-or-controversy requirement "is crucial in maintaining the 'tripartite allocation of power' set forth in the Constitution." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982)). As Chief Justice Marshall recognized long ago, "[i]f the judicial power extended to every question under the constitution it would involve almost every subject proper for legislative discussion and decision . . . . The division of power among the branches of government could exist no longer, and the other departments would be swallowed up by the judiciary." Id. (brackets and emphasis omitted) (quoting 4 Papers of John Marshall 95 (C. Cullen ed. 1984)).

The doctrine of standing emanates from Article III's case-or-controversy requirement—indeed, "a case or controversy can exist only if a plaintiff has standing to sue." United States v. Texas, 599 U.S. 670, 675 (2023). To have standing, the plaintiff must have a "personal stake" in the case. TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (quoting Raines v. Byrd, 521 U.S. 811, 819

(1997)). "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" All. for Hippocratic Med., 602 U.S. at 379 (quoting Valley Forge, 454 U.S. at 487). In other words, "under Article III, a federal court may resolve only 'a real controversy with real impact on real persons.'" TransUnion, 594 U.S. at 424 (quoting Am. Legion v. Am. Humanist Ass'n, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring in the judgment)).

To establish standing, a plaintiff must show that it has suffered an "injury in fact" that is both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical. Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), 528 U.S. 167, 180 (2000). "An injury is concrete when it is 'real, and not abstract,' though it need not be 'tangible' or large." Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 86 (1st Cir. 2025) (citation omitted) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016)). "It is particularized if it 'affects the plaintiff in a personal and individual way.'" Id. at 87 (brackets omitted) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 n.1 (1992)). And the threatened enforcement of a law suffices as an "imminent" injury in fact where there is "a realistic danger of sustaining a direct injury as a result of the [law's] operation or enforcement." Blum v. Holder, 744 F.3d 790, 796 (1st Cir. 2014) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)); see also, e.g., All. for Hippocratic Med., 602 U.S. at 381 (imminence satisfied where injury is "likely to

18

occur soon"); Susan B. Anthony List v. Driehaus (SBA List), 573 U.S. 149, 158 (2014) (explaining that "[a]n allegation of future injury" may satisfy the imminence prong "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur'" (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 414 n.5 (2013))).

In addition to showing an injury in fact, the plaintiff must show that the injury was likely caused by or will likely be caused by the defendant's actions, and that the injury is likely to be redressed by a favorable judicial decision. All. for Hippocratic Med., 602 U.S. at 380. The causation and redressability requirements "are often 'flip sides of the same coin.'" Id. at 380 (quoting Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." Id. at 381. Thus, if the plaintiff can show causation, redressability is usually satisfied. To demonstrate causation, "the plaintiff must show a predictable chain of events leading from the government action to the asserted injury." Id. at 385.

Where, as here, the plaintiffs are organizations, they may seek to establish standing through either of two avenues: (1) organizational standing or (2) associational standing. Equal Means Equal v. Ferriero, 478 F. Supp. 3d 105, 119 (D. Mass. 2020), aff'd, 3 F.4th 24 (1st Cir. 2021). Here, all three plaintiffs contend that they have organizational standing, and NEA and NEA-NH contend that they have associational standing. The court will consider each category in turn.

2.    Plaintiffs Have Organizational Standing

To show organizational standing, the organization must show that the organization has itself suffered, or will suffer, an injury in fact which has been caused by the defendant and is redressable by the relief requested. All. for Hippocratic Med., 602 U.S. at 393-94; see also Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 44 n.7 (1st Cir. 2012) ("It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members."). The court first considers whether plaintiffs have shown concrete and particularized injury to their respective organizations, then turns to imminence and causation.

a.    Concrete and Particularized Injury

"Especially germane to the organizational injury inquiry is whether the injury is sufficiently concrete or merely an abstract social interest." Equal Means Equal, 478 F. Supp. 3d at 120. "Like an individual, an organization may not establish standing based on 'the intensity of the litigant's interest' or because of strong opposition to the government's conduct, 'no matter how longstanding the interest and no matter how qualified the organization.'" All. for Hippocratic Med., 602 U.S. at 394 (citation omitted) (first quoting Valley Forge, 454 U.S. at 486, and then quoting Sierra Club v. Morton, 405 U.S. 727, 739 (1972)). By contrast, an organization suffers an injury in fact "when the organization suffers an injury to its organizational activities" in a manner that "drain[s] . . . the organization's resources." Equal Means Equal, 478 F. Supp. 3d at 121-22 (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)); accord, e.g., All. for Hippocratic Med.,

602 U.S. at 395 (explaining that organizational standing may exist where the defendants' actions "directly affect[ ] and interfere[ ] with [the plaintiff's] core business activities"); Town of Milton v. FAA, 87 F.4th 91, 99 & n.6 (1st Cir. 2023).

In Havens Realty, a nonprofit organization known as "HOME" sued the owner and operator of two apartment complexes for allegedly engaging in racial steering[6] in violation of the Fair Housing Act. 455 U.S. at 366-68. HOME's organizational mission was to ensure equal housing opportunities in their city, and they operated a counseling and referral service that assisted potential renters in locating housing. Id. at 368-69. It claimed that it had been "frustrated . . . in its efforts to assist equal access to housing through counseling and other referral services" by the defendants' racial steering practices, and that it had to "devote significant resources" to counteract the defendants' discriminatory practices. Id. at 379.

The Supreme Court held that HOME's allegations left "no question that the organization has suffered injury in fact." Id. The defendants' conduct "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." Id. Because the provision of such services was at the core of HOME's organizational activities, a "concrete and demonstrable injury"

---

[6] Racial steering is a practice by which real estate agents or other similar persons "steer" prospective home buyers or renters of certain races towards apartment buildings or neighborhoods primarily occupied by members of the same race, and away from buildings or neighborhoods where members of other races live, thereby perpetuating racial segregation. Havens Realty, 455 U.S. at 366 n.1.

to its ability to provide these services "constitute[d] far more than simply a setback to the organization's abstract social interests." Id.

However, the Supreme Court recently noted a limitation on the Havens Realty holding in Alliance for Hippocratic Medicine. In that case, several pro-life doctors and medical associations sued the FDA, arguing that the FDA's relaxation of certain regulatory requirements for prescribing mifepristone violated the APA. 602 U.S. at 372-73. In support of organizational standing, the medical associations contended that they expended resources (1) conducting research on mifepristone so that they could inform their members and the public about mifepristone's risks and (2) engaging in public advocacy and petitioning the FDA in opposition to the relaxation of mifepristone regulations. Id. at 394. The associations asserted that the resources expended on these areas had to be diverted from their other spending priorities, which, they argued, gave them standing under Havens Realty. Id.

The Supreme Court rejected the associations' theory of organizational standing. "[A]n organization . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." Id. The Court disagreed that Havens Realty stands for the proposition that an organization has standing to challenge a defendant's actions whenever it diverts its resources in response to the challenged action. Id. at 395. "[T]hat theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." Id.

As for <u>Havens Realty</u>, the Court explained it was "critical[ ]" to the <u>Havens Realty</u> holding that "HOME not only was an issue-advocacy organization, but also operated a housing counseling service." <u>Id.</u> The provision of false information about housing availability to HOME's employees "directly affected and interfered with HOME's core business activities"—ensuring equal opportunities to apply for housing in the city in which HOME operated. <u>Id.</u> The FDA's relaxation on requirements to prescribe mifepristone did not "impose[ ] any similar impediment to the medical associations' advocacy businesses." <u>Id.</u> And, while the associations and their members had "sincere legal, moral, ideological, and policy objections" to the FDA's actions, "those kinds of objections alone do not establish a justiciable case or controversy in federal court." <u>Id.</u> at 396.

Here, plaintiffs have demonstrated organizational injuries akin to those suffered by HOME in <u>Havens Realty</u>, and which are far more than the ideological or moral objections put forth by the medical associations in <u>Alliance for Hippocratic Medicine</u>. NEA and NEA-NH's core activities include the provision of trainings, professional education courses, and grants designed to enable teachers to engage with a racially diverse student body and to prepare their students to succeed in and navigate a racially diverse country. These include trainings on "racial and cultural competence," "diversity, equity, and inclusion," and "racial and social justice." These trainings are often made available in conjunction with or with the approval of school districts. For its part, CBED's entire organizational purpose is to run educational programs, for students and educators alike, that prepare Black teachers

for the workforce and enable all teachers to foster a love of learning in Black students. The rhetoric of the 2025 Letter—asserting that schools have engaged in "shameful" and "repugnant" practices in "every facet" of their operations—and the defendants' subsequent steps to implement that rhetoric, impair the plaintiffs' ability to offer these programs, including programs offered in conjunction with school districts or paid for by school districts using federal funding. In the case of CBED, the 2025 Letter threatens to put it out of business entirely.

Another of NEA's core activities is providing legal representation and counseling to its members regarding employment- and education-related matters, including measures that teachers must take (or avoid) to comply with federal, state, and local law. The 2025 Letter, with its ambiguous description of DEI and what makes DEI programs violative of Title VI, impairs NEA's ability to offer these counseling services—which are closely analogous to the counseling services at issue in Havens Realty. Due to the vague and confusing prohibitions set forth in the 2025 Letter, NEA is impaired in its ability to counsel members on steps they must take to comply with federal educational requirements.

In short, because the 2025 Letter directly affects plaintiffs' core activities, the plaintiffs have shown organizational injury. See, e.g., League of Women Voters of N.H. v. Kramer, Civ. No. 24-cv-73-SM-TSM, 2025 WL 919897, at *9-10 (D.N.H. Mar. 26, 2025) (concluding that deepfaked robo-calls discouraging voters from voting interfered with voting rights groups' core functions of combating voter suppression and counseling voters on navigating the polls and registering to vote).

Defendants contend that plaintiffs lack organizational standing because the 2025 Letter does not prevent NEA from engaging in its core business activities. The court is not persuaded that impairment of an organization's core activities gives rise to organizational standing only when the impairment is such that it is literally impossible to engage in the organization's core activities. Such was not the case in Havens Realty. Indeed, in Havens Realty, HOME contended that it had standing because it had to "devote significant resources to identify and counteract" the defendants' racial steering practices. Havens Realty, 455 U.S. at 379 (emphasis added). Far from requiring the complete frustration of an organization's core activity, the Havens Realty Court found standing because the defendants' conduct "perceptibly impaired" HOME's counseling and referral activities. Id. Just last year, the Alliance for Hippocratic Medicine Court re-affirmed that an organization need only show that the defendants' "actions [have] directly affected and interfered with [the organization's] core business activities." 602 U.S. at 395.

For these reasons, plaintiffs have demonstrated a sufficiently concrete injury for purposes of organizational standing.

> b.    Imminence of the Injury and Causation

The court next considers whether plaintiffs' concrete injuries will be imminently caused by defendants. They will be.

The standing inquiry is somewhat more complicated where the challenged governmental action only directly regulates the conduct of third parties, rather than the plaintiffs. Here, the 2025 Letter and the defendants' implementation measures directly regulate the conduct of school districts and other entities receiving federal

funding, not the plaintiffs. When that is so, "the causation requirement and the imminence element of the injury in fact requirement can overlap." All. for Hippocratic Med., 602 U.S. at 385 n.2. A plaintiff makes both showings when he establishes that the government's regulation of the third party will "likely . . . cause a concrete and particularized injury in fact to the unregulated plaintiff." Id.

To show that the defendants' regulation of third parties is likely to cause plaintiffs injuries, plaintiffs must show that the regulated third parties "'will likely react in predictable ways' that in turn will likely injure the plaintiffs." Id. at 383 (quoting California v. Texas, 593 U.S. 659, 675 (2021)). This "requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." Id. It also "rules out attenuated links—that is, where the government action is . . . far removed from its distant (even if predictable) ripple effects." Id. The inquiry is "not a 'mechanical exercise,'" but is instead often "heavily fact-dependent and a question of degree." Id. at 384 (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). When, for example, the government regulates a company, the regulation may cause predictable economic injuries to entities with which the company works or transacts business. Id.

In Department of Commerce v. New York, 588 U.S. 752 (2019), a group of states sued the Secretary of Commerce after he announced that the 2020 census would contain a question about citizenship. 588 U.S. at 761, 764. The states, many of whom had large populations of noncitizens, argued that noncitizens would not

respond to the census out of fear revealing their immigration status to federal authorities. Id. at 766-67. This, in turn, would lead to undercounting those states' populations, which would jeopardize federal funding or even cost states congressional seats. Id. The government argued that any such harms to the states were not fairly traceable to the Secretary, insofar as those harms relied upon (1) the independent actions of the regulated third parties (the noncitizens) to intentionally and unlawfully fail to respond to the census, and (2) "the fact that such intervening, unlawful third-party action would be motivated by unfounded fears that the Federal Government will itself break the law by using noncitizens' answers against them for law enforcement purposes." Id. at 767-68.

The Supreme Court held that the states demonstrated standing. Id. at 768. The Court reasoned that the record "established that noncitizen households have historically responded to the census at lower rates than other groups," and affirmed the District Court "in crediting the Census Bureau's theory that the discrepancy is likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." Id. The states' theory of standing therefore did not rely upon "mere speculation about the decisions of third parties; it rel[ied] instead on the predictable effect of Government action on the decisions of third parties." Id.

In this case, plaintiffs' organizational injuries are the predictable result of the obligations imposed by the defendants upon school districts receiving federal funding. The 2025 Letter concludes that schools are currently discriminating on the basis of race, including by "toxically indoctrinat[ing] students with the false premise

that the United States is built upon 'systemic and structural racism' and advanc[ing] discriminatory policies and practices . . . under the banner of 'diversity, equity, and inclusion.'" Doc. no. 32-1 at 3. It asserts that such practices violate Title VI, announces the Department's intent to "vigorously enforce" its "existing interpretation of federal law," and that such enforcement efforts would begin within two weeks. Id. at 4. The Letter instructed schools to immediately "(1) ensure that their policies and actions comply with existing civil rights law; (2) cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends, and," as especially relevant to the plaintiffs' organizational standing, "(3) cease all reliance on third-party contractors . . . that are being used by institutions in an effort to circumvent prohibited uses of race." Id.

Given the 2025 Letter's threatening demand that schools immediately comply with the Department's interpretation of federal law, as well as the extent to which school districts rely upon federal funding, it is predictable that schools would cease all DEI programming, including by partnering with plaintiffs, in order to avoid running afoul of the stiff and swift penalties promised in the 2025 Letter. For many schools, loss of federal funding would be crippling. It is predictable—if not obvious— that such schools will eliminate all vestiges of DEI to avoid even the possibility of funding termination. Although the 2025 Letter does not make clear what exactly it prohibits, it makes at least one thing clear: schools should not come close to anything that could be considered "DEI," lest they be deemed to have guessed

28

wrong in violation of the 2025 Letter's vague and expansive prohibitions. Numerous examples in the record demonstrate this reality.

For example, on February 21, 2025 (i.e., one week after the 2025 Letter's issuance) the President of the University of Cincinnati wrote a letter to students to "share some challenging truths about the future of diversity, equity, and inclusion (DEI) at the University of Cincinnati." Doc. no. 34-32 at 2. Citing the 2025 Letter, the President wrote that "the federal government has effectively outlawed DEI Programs and practices within . . . public universities nationwide" by prohibitions that "are sweeping in their scope, categorical in their conclusions, and pressing in their timing." Id. Pointing to the 2025 Letter's promise to "begin holding noncompliant universities accountable" beginning February 28, as well as "the extent to which our university, like most educational institutions, relies on federal funding to deliver and sustain our core mission, it is untenable to operate as if noncompliance with these directives is an effective option." Id. The President therefore stated that the University had begun the process of "unwind[ing] many years of DEI efforts under an extremely compressed timeline," including by "evaluating jobs and duties related to DEI and examining our DEI programming, initiatives, and projects to bring all areas into compliance" in addition to "removing references to DEI principles across university websites, social media, and collateral materials." Id. at 3.

Just a few days prior, on February 18, 2025, Colorado State University's President wrote a similar letter to students explaining that the 2025 Letter "makes

clear that organizations which fail to comply" with the interpretations of federal law announced in the Letter "will put their federal funding at risk." Doc. no. 34-33 at 2. Although the President stated she believed the university was in compliance with federal law, she noted that federal funding accounted for a third of the university's budget, and the Department's "interpretation of law marks a change." Id. "Given the university's reliance on federal funding," the President stated it was "necessary to take additional steps to follow [the Department's] new interpretations." Id. These additional steps included changes in job duties for various positions, changes in human resources policies, and changes to the university's website "to reflect the institution's compliance with federal guidelines." Id.

Similarly, a community college in Michigan suspended all DEI programming after receiving the 2025 Letter. Doc. no. 34-35. The college concluded that the 2025 Letter created an "uncertain legal landscape" regarding the legality of DEI programming, and that, since loss of federal funding could cut the school's budget in half, the college needed to suspend DEI programming "as a direct result of" the 2025 Letter. Id. at 3-4. Following the 2025 Letter, this college ended a partnership with a local organization to conduct a two-month skills training series relating to diversity, equity, and inclusion. The college also shifted employees previously assigned to DEI-related positions to other positions, and removed references to inclusivity on its website.

The April 3 certification requirement underscores the threat posed to schools by failure to comply with the 2025 Letter's uncertain requirements. Asserting that

"certain" DEI programs violate Title VI, the certification requires school districts receiving federal funding to certify that they do not engage in "illegal DEI practices." Doc. no. 41-4 at 2, 4. If the school so certifies but is later deemed by the Department to have engaged in "illegal" DEI programming, the certification instructs schools that "the individual or entity using such practices" will be subject to "serious consequences," including the termination of federal funding, a breach of contract action seeking to recover previously paid funds, or even civil liability under the False Claims Act, "including treble damages and civil penalties of thousands of dollars per violation." Id. at 4-5. The elimination of these schools' ties to DEI is the predictable result of these serious threats, which will have a proximate and immediate impact on plaintiffs' core activities.

For these reasons, plaintiffs have satisfied the imminence and causation requirements necessary to demonstrate organizational standing. As the court has already determined that their organizational injuries are concrete, and given that enjoining defendants from engaging in actions that will imminently cause those injuries will redress them, All. for Hippocratic Med., 602 U.S. at 380-81, plaintiffs have shown organizational standing.

### 3.    NEA and NEA-NH Have Associational Standing

But even if the plaintiffs lacked organizational standing, NEA and NEA-NH have shown associational standing.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c)

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." United Food & Com. Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 553 (1996) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)). It is undisputed that NEA and NEA-NH satisfy the latter two criteria for associational standing. Therefore, the court's analysis focuses on whether NEA and NEA-NH have shown that "at least one of [their] members would have standing to sue as an individual." Housatonic River Initiative v. EPA, New England Region, 75 F.4th 248, 265 (1st Cir. 2023) (quoting Animal Welfare Inst. v. Martin, 623 F.3d 19, 25 (1st Cir. 2010)). This inquiry entails a traditional standing analysis: whether one of NEA and NEA-NH's members (1) has suffered or will imminently suffer a concrete and particularized injury which (2) has been or will imminently be caused by the defendants that (3) is likely to be redressed by a favorable judicial decision. Id.

The 2025 Letter declares that schools and teachers are illegally "indoctrinat[ing]" students that America is "built upon 'systemic and structural racism'" and "teach[ing] students that certain racial groups bear unique moral burdens that others do not." Doc. no. 32-1 at 3-4. It promises swift and vigorous enforcement of Title VI against schools and universities that permit such teaching to occur, which, for all the reasons already discussed, could have drastic consequences for such institutions. It is virtually inevitable that schools will act to limit the possibility that the Department will target them for enforcement by, for

example, eliminating teaching positions that involve race or censoring teachers who teach about race.

The record confirms this. In addition to the examples highlighted above regarding universities eliminating or reassigning positions that have to do with diversity, equity, or inclusion, several NEA members offer declarations describing how their schools have already limited their work in light of the 2025 Letter. For example, one of NEA's members is a professor at Georgia State University in their College of Education and Human Development. Her coursework focuses on social justice teacher education. She has been the co-director for the college's Center for Equity and Justice in Teacher Education, which provides resources such as teaching tools and research on best practices. The Center also sponsors regular events for students, faculty, and the community that highlight essential theory and best practices for teaching and teacher education. In addition, the Center's website included resources for teachers in teacher education as well as all students at the university. Following the issuance of the 2025 Letter, the university suspended the Center's activities and instructed this professor to develop a new name and mission statement for the Center "that does not include diversity, equity, and inclusion." Doc. no. 34-15 at 6. The university also took the Center's website down, rendering its resources unavailable. Further, the university told this teacher that she "needed to include a conservative or opposing viewpoint" at an upcoming event regarding the Black freedom struggle. Id.

This is just one example. Another of NEA's members, who is a professor teaching courses in special education, was told following the 2025 Letter's issuance to remove all terms like "disability," "inclusion," and "culturally responsive" from course descriptions. But national standards require that professors who are preparing students for special education roles teach with this kind of focus. Doc. no. 34-16. Another member teaches at Pensacola State College, where her research focuses on transgenerational trauma and lynchings committed in Escambia and Santa Rosa Counties in Florida. She had planned a presentation to discuss her paper entitled "Beyond Atticus Finch: Accepting our ancestors' sins to achieve liberation," which is a discussion of the professor's family history around lynching, perpetrator-induced trauma, and the transgenerational transmission of trauma. Doc. no. 34-19 at 4. Following the 2025 Letter, her school cancelled her presentation, citing that her research was "close" to violating the 2025 Letter's requirements. Yet another of NEA's members has been told not to utter the phrases "economically disadvantaged," "culturally responsive," or "diversity, equity, and inclusion." Doc. no. 34-20 at 4. This same professor's school eliminated a position that oversaw multicultural programs on campus within a week of the 2025 Letter's issuance.

Defendants contend that these instances do not give NEA associational standing because they are based on the schools' "incorrect understanding" of the 2025 Letter, such that the censorship these teachers have experienced is not traceable to the Department or the Letter. Doc. no. 52-1 at 19. This argument

ignores that, to the extent the censorship of these teachers was the result of school districts "overcorrecting" in response to the 2025 Letter, such overcorrections are themselves caused by the 2025 Letter's vagueness, the steep penalties the Department has announced for noncompliance with the Letter's requirements, and the measures that the Department has already taken to implement the Letter—including the announcement of a complaint portal entitled "End DEI" and promising to use the portal to target schools and teachers that "push[ ] critical theory, rogue sex education and divisive ideologies." Doc. no. 34-8 at 2. The Supreme Court "has long recognized that ambiguous meanings cause citizens to 'steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'" Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., 455 U.S. 489, 494 n.6 (1982) (ellipsis omitted) (quoting Baggett v. Bullitt, 377 U.S. 360, 372 (1982)).

        In addition to the censorship NEA's members have already faced, the realistic possibility of the letter's enforcement against their schools—or of being subject to an "End DEI" complaint—has led many more teachers to self-censor. See SBA List, 573 U.S. at 159 ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" (quoting Babbitt, 442 U.S. at 298)). NEA-NH members feel compelled to forego sound pedagogical practices, such as asking students to draw connections between instances of racism in works of fiction

35

and those in current events, for fear that they will be perceived as "indoctrinat[ing]" children that America is "built upon" racism or as "stigmatiz[ing] students who belong to particular racial groups based on crude racial stereotypes." Doc. no. 32-1 at 3-4; <u>see</u> doc. no. 34-11 at 4 (declaration of NEA member A).[7] Teachers who specialize in areas touching on race or inclusivity have self-censored out of concern that they will be reported for violating the 2025 Letter's prohibitions on DEI. <u>See</u> doc. no. 34-14 at 3-4; doc. no. 34-16 at 6; doc. no. 34-18 at 4; doc. no. 34-20 at 5-6.

Defendants contend that NEA and NEA-NH's members have unreasonably self-censored because the Department "has no authority to take disciplinary action against individual teachers" and may only take action against the funding recipient, i.e., the teachers' schools. Doc. no. 52-1 at 18. In so arguing, defendants would have this court overlook a threat in the April 3 certification that "[t]he continued use of illegal DEI practices may subject <u>the individual</u> or entity using such practices to serious consequences." Doc. no. 41-4 at 4 (emphasis added). Whether defendants would be legally empowered to subject individual teachers to "serious consequences" for using "illegal DEI practices" is beside the point for purposes of assessing whether NEA's and NEA-NH's members have acted reasonably in self-censoring

---

[7] Defendants have not argued that elementary or secondary school teachers lack First Amendment protections in the content of what they teach. But even if they had, plaintiffs need not establish that such speech is protected by the First Amendment in order to establish associational standing; they need only show that the 2025 Letter reaches conduct that is "arguably" protected. SBA List, 573 U.S. at 159 (quotation omitted); see, e.g., Local 8027, A.F.T.-NH, AFL-CIO v. Edelblut, 651 F. Supp. 3d 444, 453 (D.N.H. 2023) (finding that teachers' extracurricular speech was entitled to First Amendment protection); Kennedy v. Bremerton, 597 U.S. 507, 528-30 (2022).

given the Department's own statements about holding "individual[s]" responsible. But even without this confusing threat, censorship of NEA's and NEA-NH's individual members is the predictable and direct result of the 2025 Letter's regulation of the school districts employing them. See, e.g., Dep't of Commerce, 588 U.S. at 767-68; All. for Hippocratic Med., 602 U.S. at 383-85.

Defendants further argue that plaintiffs' members' fears are unreasonable because the 2025 Letter "does not prohibit teachers from teaching certain books, the history of race, racism, and slavery, gender, or any other topic." Doc. no. 52-1 at 18. This argument rings hollow in light of the "End DEI" portal, which asserts the Department's "commit[ment] to ensuring all students have access to meaningful learning free of divisive ideologies and indoctrination," doc. no. 34-9 at 2, and the accompanying press release inviting parents to "share the receipts of the betrayal that has happened in our public schools" by teachers "pushing critical theory, rogue sex education and divisive ideologies," doc. no. 34-8 at 2. But again, and at a more fundamental level, whether the letter does or does not in fact ban the teaching of any topic, any self-censoring has been caused by defendants' actions: promulgating a vague and threatening letter with the promise of swift enforcement and harsh penalties based on ill-defined criteria.

For these reasons, NEA and NEA-NH have demonstrated associational standing. The court proceeds to consider whether plaintiffs have shown they are likely to succeed on the merits of one or more of their claims.

B.    Plaintiffs Are Likely to Succeed on the Merits of their Vagueness
       Claim

"A fundamental principle in our legal system is that laws which regulate

persons or entities must give fair notice of conduct that is forbidden or required."

FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012). To that end, vague

laws, regulations, or executive policies may offend the Due Process Clause of the

Fifth Amendment. United States v. Williams, 553 U.S. 285, 304 (2008); Fox, 567

U.S. at 246-47, 254; Pullman Arms Inc. v. Healey, 301 F. Supp. 3d 227, 230-31 (D.

Mass. 2018).

The court's vagueness analysis proceeds as follows. First, the court explains

why the 2025 Letter is subject to a due process void-for-vagueness challenge.

Second, the court briefly touches upon the standard of review applicable to a pre-

enforcement facial vagueness challenge, which is the type of challenge plaintiffs

bring in this case. Third, the court elaborates on and applies that standard to the

2025 Letter.

1.    The 2025 Letter is Subject to a Due Process Void-for-Vagueness
       Challenge

Due process prohibits "[v]ague laws." Grayned v. City of Rockford, 408 U.S.

104, 108 (1972). As a threshold matter, the court must determine whether the 2025

Letter is a "law" that may be the subject of a vagueness challenge, i.e., whether it

purports to "give . . . notice of conduct that is forbidden or required." Fox, 567 U.S.

at 253.

Defendants contend that the 2025 Letter is not subject to the prohibition on

vague laws because it does not constitute "final agency action" under the APA. 5

U.S.C. § 704. Defendants cite no authority for the proposition that agency action is not subject to a constitutional vagueness challenge unless it constitutes final agency action for APA purposes, and there is authority to the contrary. See Fox, 567 U.S. at 246-47, 254 (considering a vagueness challenge to an FCC policy statement that was "intended to provide guidance to the broadcast industry regarding [the FCC's] caselaw . . . and [its] enforcement policies" (quotation omitted)); Pullman Arms, 301 F. Supp. 3d at 230-31 (recognizing cognizability of vagueness challenge to a notice informing the public of an agency's interpretation of a statute). However, even assuming the letter must constitute final agency action in order for it to be subject to due process vagueness requirements, the letter constitutes final agency action.

Agency action is only reviewable under the APA if it is "final." 5 U.S.C. § 704. Courts apply a two-step test to determine finality. Bennett v. Spear, 520 U.S. 154, 177-78 (1997). First, the action must "mark the 'consummation' of the agency's decisionmaking process." Id. at 178 (quoting Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948)). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Id. (quoting Port of Bos. Marine Ass'n v. Rederiaktibolaget Transatlantic, 400 U.S. 62, 71 (1970)). In other words, the decision must be "the definitive statement of the agency's position" and it must have a "direct and immediate" effect on the complaining parties. Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (brackets omitted) (quoting FTC v. Standard Oil Co., 449 U.S. 232, 241

(1980)); accord, e.g., U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 597 (2016).

This two-step inquiry is a "pragmatic" one. Hawkes, 578 U.S. at 599 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)). As such, an agency's characterization of its own action is not dispositive. See Appalachian Power Co. v. EPA, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000). Instead, an agency's action will be considered final if, looking to the practical effects, it "appears on its face to be binding" or if it "is applied by the agency in a way that indicates it is binding." Gen. Elec. Co. v. EPA, 290 F.3d 377, 383 (D.C. Cir. 2002). The "most important factor" is "the actual legal effect (or lack thereof) of the agency action . . . on regulated entities." Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 252 (D.C. Cir. 2014).

In this case, the parties do not dispute the first prong of the finality inquiry (consummation of the agency's decision making process).[8] Instead, defendants focus

_____

[8] To the extent the Department intended to contest consummation, the argument is unpersuasive. "The consummation prong of the finality inquiry requires [the court] to determine 'whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,' or is instead 'only the ruling of a subordinate official, or tentative.'" POET Biorefining, LLC v. EPA, 970 F.3d 392, 404 (D.C. Cir. 2020) (quoting NRDC v. Wheeler, 955 F.3d 68, 78 (D.C. Cir. 2020)). The 2025 Letter is attributable to the Department. It "speaks in [the Department's] voice" and sets forth "the interpretation and guidance of the agency." Id. (internal quotations omitted); see doc. no. 32-1 at 4 ("This letter provides notice of the Department's existing interpretation of federal law."). It is not signed by a "mere subordinate," POET Biorefining, 970 F.3d at 404, but by Acting Assistant Secretary for Civil Rights Craig Trainor. The Assistant Secretary for Civil Rights is a principal officer of the Department, 20 U.S.C. § 3412(b)(1)(E), and he is responsible for overseeing the Department's Office for Civil Rights and its functions, id. § 3413.

on the second prong: whether the 2025 Letter creates direct and appreciable legal consequences.

Whether the 2025 Letter creates legal consequences turns on "the actual legal effect" for regulated parties. Id. The 2025 Letter satisfies this test. The 2025 Letter asserts that colleges, universities, and K-12 schools have "toxically indoctrinated students" and "advanced 'discriminatory policies and practices'" through DEI. Doc. no. 32-1 at 3. The 2025 Letter instructs educational institutions to "cease all efforts" that violate the Letter's prohibitions or else "face potential loss of federal funding," and makes clear that the Department's enforcement efforts will begin within weeks. Id. at 4; see New York v. Trump, --- F. Supp. 3d ----, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025) (finding final agency action where "the OMB directive amounted to a command, not a suggestion, that Agency Defendants shall execute a categorical, indefinite funding freeze"), appeal filed sub nom. Heghman v. Trump, No. 25-8010 (1st Cir. Mar. 6, 2025). Within a month, the Department announced in a press release that it had opened investigations into forty-five universities "following" the 2025 Letter as part of the Department's effort "to reorient civil rights enforcement." Doc. no. 34-4 at 2. And the Department has sought to enforce the 2025 Letter by requiring states and schools to certify their compliance with the substance of the 2025 Letter's prohibitions as a condition of continuing federal funding. As the plaintiffs note, the 2025 Letter directly

contradicts the Department's <u>own</u> guidance from as recently as 2023.[9] The certification requirement forces schools to choose between following the Department's 2023 guidance and facing substantial penalties, or trying to adapt their conduct to the 2025 Letter's requirements. Because the plaintiffs face substantial threat of consequences for failing to comply with the 2025 Letter, the actual legal effect component of the finality inquiry is satisfied.

Defendants' arguments to the contrary are unpersuasive. Defendants argue that the 2025 Letter has no actual legal effect on any entity because the Letter asserts, in a footnote, that it "does not have the force and effect of law and does not bind the public or create new legal standards." Doc. no. 32-1 at 2 n.3. Therefore, defendants assert, the 2025 Letter merely restates the Department's interpretation of Title VI as well as their interpretation of <u>Students for Fair Admissions</u>. But the court is not bound by the "boilerplate" label the Department attaches to the 2025 Letter. <u>Appalachian Power Co.,</u> 208 F.3d at 1023. Instead, the court must pragmatically assess the practical effects of the 2025 Letter. <u>Hawkes,</u> 578 U.S. at 599. And such an inquiry makes clear that the 2025 Letter creates direct effects for the plaintiffs.

The 2025 Letter and the certification requirements demonstrate that the Department intends to initiate a variety of enforcement actions against schools that allegedly violate the letter's prohibitions. Schools are not free to ignore the 2025

---

[9] Indeed at least one of the contradicting documents plaintiffs point to—the 2023 Report—was available on the Department's website at the time this action was brought.

Letter's requirements. Cf. Nat'l Mining Ass'n, 758 F.3d at 253 (no final agency action where regulated entities could ignore the agency action at issue "without suffering any legal penalties"). The Department's puzzling suggestion at oral argument that decades of Supreme Court precedent demonstrates the 2025 Letter's non-binding nature is wrong. Indeed, the Department's previous guidance encouraging educators and educational institutions to adopt DEI practices defeats any such notion that the 2025 Letter solely represents a recitation of longstanding principles of Title VI and civil rights law.

The 2025 Letter is the culmination of the Department's view on DEI programs under Title VI, and it has a direct legal effect. See Sig Sauer, 826 F.3d at 600 n.1; see also Standard Oil, 449 U.S. at 242 (explaining that regulations have sufficient legal effect when they force regulated parties to choose between risking penalties for noncompliance and drastically altering their practices). Thus, the 2025 Letter constitutes final agency action. Because the 2025 Letter is "action . . . by which rights or obligations have been determined, or from which legal consequences will flow," Bennett, 520 U.S. at 178 (quotation omitted), due process requires that it "give fair notice of conduct that is forbidden or required," Fox, 567 U.S. at 253.

### 2.    Standard of Review for Facial Vagueness Challenge

Generally speaking, a plaintiff bringing a constitutional challenge may do so on a facial or as-applied basis. The standard of review applicable to a plaintiff's challenge differs based on the type of challenge brought. Here, "[p]laintiffs challenge the Letter on its face under the Fifth Amendment prohibition on vagueness," asserting that it "is vague in its entirety." Doc. no. 34-1 at 54. The court

thus construes their challenge to be a facial vagueness challenge. See Local 8027, AFT-N.H., AFL-CIO v. Edelblut, 651 F. Supp. 3d 444, 454 (D.N.H. 2023) ("Local 8027 I") ("Generally, a facial challenge raises constitutional defects as to the terms of the statute itself, independent of its application to a plaintiff's particular set of circumstances."), appeal filed, No. 24-1690 (1st Cir. July 26, 2024).

Neither party has addressed the standard of review applicable to plaintiffs' facial vagueness challenge. The court finds guidance, however, in a recent decision squarely on point. Local 8027 I, 651 F. Supp. 3d at 457-58. In this thoughtful order, Judge Barbadoro explains why—despite language in some Supreme Court cases suggesting that victory on a facial vagueness challenge requires an effectively impossible demonstration that the law is "impermissibly vague in all of its applications," Hoffman Ests., 455 U.S. at 495—more recent Supreme Court cases reject the notion "that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp," Local 8027 I, 651 F. Supp. 3d at 456 (quoting Johnson v. United States, 576 U.S. 591, 602 (2015)).

Here, defendants have waived any argument that, to succeed on their vagueness claim, plaintiffs must establish that there is no instance in which the 2025 Letter could be constitutionally applied. But even if they had not waived that argument, the undersigned would agree with Judge Barbadoro that "the void-for-vagueness doctrine does not require a showing that a [law] is vague in all of its applications, especially where, as here, the law subjects a violator to serious consequences, lacks a scienter requirement, and implicates First Amendment

rights." Id. at 459. If anything, that conclusion holds even truer in this case given that the 2025 Letter implicates more First Amendment considerations than did the statute in Local 8027 I (insofar as the Letter impinges on First Amendment rights in the higher education context, see id. at 451-52), and the fact that additional Courts of Appeals have echoed Judge Barbadoro's reasoning since he decided Local 8027 I. See Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth., 89 F.4th 1337, 1349-51 (11th Cir. 2024); Carolina Youth Action Project v. Wilson, 60 F.4th 770, 781-82 (4th Cir. 2023).

3.    The 2025 Letter is Unconstitutionally Vague

A law is impermissibly vague if it does not provide fair notice of the conduct it prohibits. Hill v. Colorado, 530 U.S. 703, 732 (2000). "Vague laws may trap the innocent by not providing fair warning." Grayned, 408 U.S. at 108. And where a vague law regulates speech, the Constitution requires heightened clarity. Hoffman Ests., 455 U.S. at 499; accord, e.g., Smith v. Goguen, 415 U.S. 566, 573 (1974). That is so given the "supremely precious" yet "delicate and vulnerable" nature of the right to free speech in our country. NAACP v. Button, 371 U.S. 415, 433 (1963). Vague laws engender self-censorship, causing "citizens to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." Grayned, 408 U.S. at 109 (ellipsis omitted) (quoting Baggett, 377 U.S. at 372); see also Arnett v. Kennedy, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting) (vague laws "hang over [citizens'] heads like a sword of Damocles . . . for the value of a sword of Damocles is that it hangs—not that it drops"). "Such self-censorship is inimical to our democracy, as 'the right to speak freely and to promote diversity of

45

ideas and programs is one of the chief distinctions that sets us apart from totalitarian regimes.'" Local 8027 II, 2024 WL 2722254, at *6 (brackets and ellipsis omitted) (quoting Terminiello, 337 U.S. at 4).

A law may also be void for vagueness if it authorizes or encourages arbitrary enforcement. Hill, 530 U.S. at 732. "A vague law impermissibly delegates basic policy matters to [those charged with enforcing the law] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned, 408 U.S. at 108-09. When a law fails to provide "minimal guidelines" governing its enforcement, it may sweep in so much conduct that enforcement decisions become based on the "personal predilections" of the person or entity bringing the enforcement action. Kolender v. Lawson, 461 U.S. 352, 358 (1983) (quoting Goguen, 415 U.S. at 575).

Guided by these principles, plaintiffs are likely to succeed in arguing that the 2025 Letter is impermissibly vague. The Letter makes clear the Department's understanding that DEI programs—at least in some circumstances—violate Title VI, as well as the Department's intent to "vigorously enforce" its understanding. The Letter does not make clear, however, what the Department believes constitutes a DEI program, or the circumstances in which the Department believes DEI programs run afoul of Title VI. The Letter does not even define what a "DEI program" is.

This is not to say that every law or regulation that proscribes a class of activity without separately defining that class runs afoul of due process. To the

contrary, courts recognize that "words are rough-hewn tools" and that it is unrealistic to expect laws to be "surgically precise" at all times. Draper v. Healey, 827 F.3d 1, 4 (1st Cir. 2016) (Souter, Circuit Justice) (quoting URI State Senate v. Town of Narragansett, 631 F.3d 1, 14 (1st Cir. 2011)). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." Williams, 553 U.S. at 306. Where a law regulates conduct based on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings," it is likely to be void for vagueness. Id.

The phrase "diversity, equity, and inclusion" commonly denotes "a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against." Diversity, equity, and inclusion, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/diversity,%20equity%20 and%20inclusion (last visited April 23, 2025). As is clear from this dictionary definition, to label a program as a "diversity, equity, and inclusion" program necessarily involves "appeals to abstract principles . . . such that the practical meaning of the [Letter] must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it." Tenn. Educ. Ass'n v. Reynolds, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024). An elementary school

teacher could seek to establish a class culture of equitable and inclusive treatment by asking her students sign a collective pledge to follow the "Golden Rule" for the entire school year. It is more than arguable that such a practice would come within the ocean-wide definition of DEI set forth above.

The Supreme Court has repeatedly struck down legal prohibitions that sweep in a wide swath of conduct while leaving individual enforcement decisions to the subjective determinations of enforcement authorities. In Kolender v. Lawson, for example, the Supreme Court found unconstitutionally vague a criminal statute that required persons to provide "credible and reliable" identification when stopped by police on reasonable suspicion that they have committed an offense. 461 U.S. at 353-54. The statute gave officers "virtually complete discretion" to determine whether an individual's identification was "credible and reliable," and provided "a convenient tool for harsh and discriminatory enforcement . . . against particular groups deemed to merit [the officer's] displeasure." Id. at 358, 360 (quoting Papachristou v. City of Jacksonville, 405 U.S. 156, 170 (1972)).

In Smith v. Goguen, the Court struck down a statute that prohibited the "contemptuous[ ]" treatment of the American flag. 415 U.S. at 567-69. Because the statute was so "unbounded [as] to prohibit . . . any public deviation from normal flag etiquette," it allowed police and prosecutors to "pursue their personal predilections" in enforcing the law. Id. at 575 (quotation omitted). Phrased differently, the statute was "so indefinite that police, court, and jury were free to react to nothing more than their own preferences for treatment of the flag." Id. at 578.

Similar considerations apply here. "The government cannot simply tell people to 'be good' and leave it up to the enforcers to decide what 'good' is." Tenn. Educ. Ass'n, 732 F. Supp. 3d at 808. DEI as a concept is broad: one can imagine a wide range of viewpoints on what the values of diversity, equity, and inclusion mean when describing a program or practice. It is no surprise that several courts— including this one—have struck down similar laws as void for vagueness. Local 8027 II, 2024 WL 2722254, at *8-9 (holding unconstitutional a state statute that banned the teaching of certain "divisive concepts"); Tenn. Educ. Ass'n, 732 F. Supp. 3d at 807 (same); Honeyfund.com, Inc. v. DeSantis, 622 F. Supp. 3d 1159, 1180-84 (N.D. Fla. 2022) (same); Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump, 508 F. Supp. 3d 521, 529, 543-45 (N.D. Cal. 2020) (holding unconstitutional an executive order that prohibited the promotion of "divisive concepts" within federal trainings, including the idea that "the United States is fundamentally racist or sexist"); Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump, --- F. Supp. 3d ----, 2025 WL 573764, at *23, *26 (D. Md. Feb. 21, 2025) (holding unconstitutional an executive order directing the Attorney General "to encourage the private sector to end illegal discrimination and preferences, including DEI").

The vagueness generated by the 2025 Letter is compounded by what few characterizations of "unlawful" DEI the Letter contains. According to the 2025 Letter, DEI programs are discriminatory when they "teach students that certain racial groups bear unique moral burdens that others do not" and "stigmatize students who belong to particular racial groups based on crude racial stereotypes."

Doc. no. 32-1 at 4. This is in stark contrast to the dictionary definition of DEI set forth above, which highlights that DEI is generally understood to be geared toward "establishing a group culture of equitable and inclusive treatment." That the 2025 Letter's isolated characterizations of unlawful DEI are inconsistent with the ordinary meaning of that phrase leads to further confusion and ambiguity.

The 2025 Letter states that it is a "discriminatory practice" to "indoctrinate[ ]" students "that the United States is built upon 'systemic and structural racism'" and that such indoctrinations have been "smuggl[ed]" into schools "under the banner of" DEI. Id. at 3. Arguably, this prohibition extends to simply speaking with students about the role that race and attitudes toward race have played in American history and culture. See Local 8027 II, 2024 WL 2722254 at *12-13 (reasoning that a prohibition on "teaching" a banned concept "means that teachers could be prohibited from merely discussing ideas that fit within the banned concepts"); Black Emergency Response Team v. Drummond, 737 F. Supp. 3d 1136, 1148-49 (W.D. Okla. 2024) (reasoning that a statute which prohibited any educational requirement "that presents any form of race or sex stereotyping or a bias on the basis of race or sex" was impermissibly vague because it "could reasonably be construed to mean that a [teacher] is prohibited from describing or identifying discriminatory beliefs"). "[M]any would suggest that it is impossible to discuss a concept—or anything for that matter—as perceived without distortion by personal feelings, prejudice, or interpretation. This is especially true when discussing concepts rooted in historical phenomena . . . ." Honeyfund.com, 622 F.

Supp. 3d at 1183-84. On the basis of the 2025 Letter's prohibition on "indoctrinat[ing]" students that the United States is "built upon" racism, would the Department conclude that a history teacher leading a class discussion on the economic development of the antebellum south has violated Title VI? What about an English teacher assigning students to write a paper comparing the persecution of Tom Robinson—whom Atticus Finch championed in To Kill a Mockingbird—to that of Emmett Till? And how would such lessons even relate to a "diversity, equity, and inclusion" program?

These are not hypotheticals. School teachers throughout the country are asking themselves these and similar questions in the wake of the 2025 Letter. For example, one of NEA's members is a high school English teacher in New Hampshire. See doc. no. 34-11. His courses often explore themes and permit discussion of race and gender. In his AP English class, for example, he has frequently assigned Joseph Conrad's Heart of Darkness, which "often shows up on the AP exam" and which "remains a staple of AP and college English courses." Id. at 3. Exploring two of the central themes of this work—racism and European imperialism—necessarily entails discussion of the historical fact that European imperialism was based on notions of racial superiority. Moreover, because Heart of Darkness was written in 1899, this teacher has found that students in the 21st century often have trouble engaging with the book because they do not see its contemporary relevance. To foster engagement, the teacher often asks his students to relate things they have seen in the news, pop culture, or even their own lives to

frame their understanding of the text. Following the 2025 Letter, the 2025 FAQ, and the End DEI portal, this teacher is unsure whether these teaching practices will be perceived as discriminatory. He is "no longer comfortable asking students to freely identify instances of racism or colonialism . . . in contemporary society for fear that it will be perceived that [he is] engaging in discrimination by permitting discussion about racism or racial stereotypes in the United States." Id. at 4.

Another of NEA's members teaches middle school social studies in New Hampshire. See doc. no. 34-12. Among other things, her classes include lessons on the American Civil War, the Reconstruction Era, and their aftermath. Discussing the events of these periods—including the enactment of the Civil Rights Act of 1866 and the Fourteenth and Fifteenth Amendments, the Jim Crow south, the founding of the KKK, and the Tulsa Race Massacre—necessarily entails discussions of race and how race and perceptions toward different racial groups has shaped American history. But given the 2025 Letter's prohibition on teaching students that America is "built upon" racism, this teacher now fears being accused of engaging in discrimination for doing no more than teaching historical facts. Given the 2025 Letter and the End DEI portal, this teacher "feel[s] as if [she is] being held hostage to students and parents' feelings and vague conceptions of discrimination and DEI." Id. at 4. These teachers' experiences are only two of many that plaintiffs identify. See doc. nos. 34-13 through 34-20.

Defendants assert that plaintiffs misread the 2025 Letter as banning anything that could be labelled "DEI," when in reality the Letter merely states that

schools may not use DEI programs as cover to engage in racial discrimination or harassment. This argument ignores, however, that the 2025 Letter fails to give reasonable notice of the Department's understanding of <u>how</u> DEI programs unlawfully discriminate and the ways in which such programs could be operated to avoid running afoul of Title VI. How is it that DEI programs "smuggl[e] . . . explicit race-consciousness into everyday training, programming, and discipline?" Doc. no. 32-1 at 3. And is it even possible to operate a DEI program—whatever such a program even is—without "race-consciousness?" <u>Id.</u> Again, the 2025 Letter does not define this term, but on its face it concerns a consciousness or awareness of one's race or others' races. How is it possible to engage in DEI programming that ignores race? The 2025 Letter is silent.

Defendants' argument—that the 2025 Letter does no more than clearly announce the uncontroversial proposition that discrimination is unlawful—ignores the "End DEI" portal and the press release accompanying it. The Department is not soliciting complaints about only those DEI programs or teaching practices that discriminate based on race. <u>By its own admission, it seeks to "End DEI."</u> Doc. no. 34-8 at 2. This announcement of the Department's understanding of the scope of the 2025 Letter shows that Department officials will be free to "pursue their personal predilections" in enforcing the 2025 Letter's sweeping prohibitions. Kolender, 461 U.S. at 358 (quoting Goguen, 415 U.S. at 575).

The 2025 FAQ does not ameliorate the opacity of the 2025 Letter, but rather, exacerbates it. The FAQ states that the Department's determination as to whether

educational programming is unlawful "does not depend on the use of specific terminology such as 'diversity,' 'equity,' or 'inclusion'" and states that the Department's "assessment of school policies and programs depends on the facts and circumstances of each case." Doc. no. 32-2 at 6-7. The FAQ nevertheless expands the categories of programs that may impermissibly "veil discriminatory policies" to programs such as "social-emotional learning" and "culturally responsive teaching." Id. at 6. Nowhere in the FAQ are these phrases defined. In addition, while the Department states that its assessment of whether a particular educational practice is unlawful does not "depend" on the practice's label, the 2025 FAQ does not state that the Department will ignore a program's label. Indeed, the 2025 FAQ expressly states that a school's prior use of DEI programming will be "probative" in conducting Title VI investigations. Id. at 9.

Moreover, while the FAQ states that "programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI," they could be unlawful if they "discourag[e] students of a particular race" from participating in the program. Id. at 7. The FAQ does not make clear what would constitute such discouragement. Finally, while the FAQ does give some examples of whether an educational program violates Title VI because it creates "a racially hostile environment," the conduct swept within this category is quite broad, extending to courses that require students to "take certain positions on racially charged issues" or courses that "emphasize and focus on racial stereotypes." Id. at 7-8. As with the 2025 Letter, the FAQ seems to sweep within its

scope lessons that require students to analyze or discuss themes of race or those that discuss how race and attitudes toward race have shaped American history.

Finally, the penalties for running afoul of the 2025 Letter's vague requirements are substantial. The greater the consequences for noncompliance with a law, the more courts will insist on precision in delineating the conduct the law prohibits. Local 8027 II, 2024 WL 2722254, at *7. While the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," Hoffman Ests., 455 U.S. at 498-99, "due process protections against vague laws are 'not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute," Sessions v. Dimaya, 584 U.S. 148, 184 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (quoting Giaccio v. Pennsylvania, 382 U.S. 399, 402 (1966)). Indeed, "civil laws regularly impose penalties far more severe than those found in many criminal statutes," including, in some instances, "remedies that strip persons of their professional licenses and livelihoods." Id.

The Department has invited any student, parent, or member of the public to "share the receipts of the betrayal that has happened in our public schools" by a school or teacher "pushing critical theory, rogue sex education and divisive ideologies." Doc. no. 34-8 at 2. The Department will use these "receipts" to determine which schools or individuals to investigate for potential violations of Title VI. The 2025 Letter promises that enforcement actions will be swift, commencing within fourteen days of the Letter's issuance. At least forty-five schools are

55

currently under investigation for alleged violations of Title VI based upon the 2025
Letter. Penalties for noncompliance are severe. The Department has threatened to
cut off federal funding to schools it finds have permitted unlawful DEI practices, in
addition to instituting enforcement actions seeking to claw back previously
disbursed funds, or even bringing proceedings under the False Claims Act for civil
penalties and treble damages. These sanctions, while non-criminal in nature, are
nevertheless punitive. See Tenn. Educ. Ass'n, 732 F. Supp. 3d at 815 ("[I]t matters
that the law, though not criminal, is potentially punitive, both toward LEAs and
. . . teachers.").

Nor can the court ignore the "stigmatizing effect" of the 2025 Letter. Hoffman
Ests., 455 U.S. at 499. The Department's press release announcing the "End DEI"
portal specifically exhorts parents to go public—"to share the receipts"—of their
accusations of discrimination. This exhortation quotes the co-founder of "Moms for
Liberty," a private advocacy group that is self-described as "dedicated to
empowering parents to advocate effectively for their children at school board
meetings and across all levels of government." Moms for Liberty,
https://www.momsforliberty.org/about/ (last visited April 23, 2025). Previously,
Moms for Liberty has taken to social media to offer monetary payments to persons
who "catch" a New Hampshire teacher violating a state law that prohibited the
teaching of certain "divisive concepts"—a law which Judge Barbadoro later found
unconstitutionally vague. Sarah Gibson, Offer of cash prize for allegations against
N.H. teachers draws rebuke, New Hampshire Public Radio (Nov. 18, 2021, 6:54

p.m.), https://perma.cc/BB4Y-6C6P; Moms for Liberty Hillsborough Co, NH (@Moms4LibertyNH), X (Nov. 12, 2021, 9:28 a.m.), https://x.com/Moms4Liberty NH/status/1459166253084467205?s=20; see Local 8027, 2024 WL 2722254, at *8-9. The 2025 Letter, the End DEI portal, and the Department's public statements regarding the purpose of the portal raise the specter of a public "witch hunt" that will sow fear and doubt among teachers lest they be publicly branded as peddlers of "divisive ideologies" based on the Department's—or even private parties'—subjective assessments. "Village of Hoffman Estates involved only the stigma of being labeled a lawful seller of drug paraphernalia. It is, suffice it to say, not obviously preferable to be considered a subversive . . . teacher in the age of social media." Tenn. Educ. Ass'n, 732 F. Supp. 3d at 815 (citation omitted).

Finally, the 2025 Letter jeopardizes teachers' employment. Numerous states have licensure requirements for teachers that prohibit discriminatory conduct. In New Hampshire, for example, a licensed teacher may face discipline—including revocation of their teaching credentials—for engaging in discrimination. N.H. Code. Admin. Rs. Ed 510.02, 511.02(a)(2). Such discipline "threaten[s] teachers with the loss of their livelihood as well as the inability to practice their chosen profession anywhere in the state." Local 8027 II, 2024 WL 2722254, at *7. And while the New Hampshire Department of Education is not bound by the 2025 Letter, any teacher who is the subject of a complaint from a student or parent must take such complaints seriously given the grave consequences that could follow.

Teachers may face professional consequences not only for their perceived noncompliance with the 2025 Letter, but also for complying with it. New Hampshire's certification requirements for English teachers require such teachers to:

- "Provide an environment in which students develop and support critical insights in response to literature;

- "Guide students to read, discuss, and write about literature through various critical lenses such as but not limited to gender, religion, ethnicity, or socio-economic conditions as appropriate;

- "Explain how bias, propaganda, persuasion, and point of view are expressed" and to "[h]elp students . . . recognize bias, propaganda, persuasion, [and] point of view;

- "Distinguish and appreciate regional, ethnic, and standard dialects;

- "Trace how English has changed and developed over time;

- Explain "[t]he strategies speakers use to present information, ideas, and feelings in a range of social contexts"; and

- Explain "[t]he processes speakers use to adjust a spoken message for different audiences and purposes."

N.H. Code Admin. R. Ed 507.24.

In a similar vein, New Hampshire's certification requirements for history and social studies teachers require teachers to:

- "Provide exposure to and opportunities to express multiple interpretations of issues;

- "Encourage in students a capacity for deliberation and thoughtful exchange of competing viewpoints between citizens within and outside the classroom;

- "Develop students' critical thinking, using a variety of instructional methods including how to assess the quality of information and ethical, legal or policy analyses;

- "Assess how factual information, opinion, entertainment, and advertising are presented differently in various media"; and

- "Apply a range of deliberative and democratic strategies and procedures to carry out analyses, make decisions and communicate ideas via oral and written expression."

N.H. Code Admin. R. Ed 507.28.

The ban on DEI embodied in the 2025 Letter leaves teachers with a Hobson's choice. If they fail to abide by the ill-defined standards set forth in the letter, they leave themselves open to (1) their school's decision to terminate their employment or curb their work in order to preserve essential federal funding, (2) public ostracization based on one person's view of what "DEI" is, or (3) potential disciplinary proceedings that put their license at risk. But even if they endeavor to abide by the 2025 Letter's requirements, they risk failing to comply with certification requirements necessary for retention of their professional credentials. All while not being afforded a reasonable opportunity to know what the 2025 Letter even requires of them. The Constitution requires more.

For all of these reasons, plaintiffs are likely to succeed on the merits of their vagueness challenge.

C.    Plaintiffs Are Likely to Succeed on the Merits of their First Amendment Claim

In Count II of their amended complaint, plaintiffs contend that the 2025 Letter and its enforcement violates the First Amendment rights of NEA and NEA-

NH's members. In addition, while the complaint alleges that the 2025 Letter violates the First Amendment rights of teachers at all levels of education, plaintiffs' motion for a preliminary injunction asserts only that they are likely to succeed on their claim that the 2025 Letter violates the First Amendment rights of NEA's members that work in colleges and universities. The court therefore focuses on whether plaintiffs are likely to succeed on the merits of their claim that the 2025 Letter violates the First Amendment rights of educators working in higher education. They are.

Under the First Amendment, it is presumptively unconstitutional for "[t]he government [to] regulate speech based on its substantive content or the message it conveys." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828 (1995). Furthermore, viewpoint discrimination is a particularly "egregious form of content discrimination," and it occurs "[w]hen the government targets not [just] subject matter, but particular views taken by speakers on a subject." Id. at 829.

"[T]he First Amendment protects the free-speech rights of professors when they are teaching." Meriwether v. Hartop, 992 F.3d 492, 505 (6th Cir. 2021). Indeed, in the context of America's universities, the Supreme Court has long recognized that

> [T]he First Amendment . . . does not tolerate laws that cast a pall of orthodoxy over the classroom. . . . The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection.

Keyishian, 385 U.S. at 603 (quotation and brackets omitted); see also Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957) (plurality opinion) ("Scholarship cannot

flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die."). Thus, "the dangers of viewpoint discrimination are heightened in the university setting." Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022) (emphasis omitted) (quoting Gay Lesbian Bisexual All. v. Pryor, 110 F.3d 1543, 1550 (11th Cir. 1997)).

The 2025 Letter targets speech based on viewpoint. It concludes that schools may not use DEI programs to "toxically indoctrinate[ ] students with the false premise that the United States is built upon 'systemic and structural racism'" or to "teach students that certain racial groups bear unique moral burdens that others do not" in any "aspect[ ] of student, academic, [or] campus life." Doc. no. 32-1 at 3-4. According to the 2025 FAQ, colleges and universities may not require students to take classes that "focus on racial stereotypes" or permit professors to instruct on "certain positions on racially charged issues." Doc. no. 32-2 at 8. And the End DEI portal and its accompanying press release further underscore that the 2025 Letter targets the "pushing [of] critical theory, rogue sex education and divisive ideologies" and "indoctrination." Doc. no. 34-8 at 2; doc. no. 34-9 at 2. A professor runs afoul of the 2025 Letter if she expresses the view in her teaching that structural racism exists in America, but does not do so if she denies structural racism's existence. That is textbook viewpoint discrimination. See, e.g., Pernell v. Fla. Bd. of Governors of State Univ. Sys., 641 F. Supp. 3d 1218, 1277 (N.D. Fla. 2022) (explaining that a

law banning the teaching of so-called "divisive concepts" discriminated based on viewpoint; "to step out of line during class and utter a single expression of approval of one of the State of Florida's disfavored ideas is to risk discipline").

In addition, the "threat of invoking legal sanctions and other means of coercion" in order to "achieve the suppression" of speech that the government disfavors violates the First Amendment. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963). The Supreme Court reaffirmed this principle just last year in National Rifle Ass'n of America v. Vullo, 602 U.S. 175 (2024). In Vullo, the defendant was the head of a state agency that oversaw insurance companies doing business in the state. 602 U.S. at 180-81. After discovering that certain insurance companies providing services to the National Rifle Association ("NRA") had committed various violations of state insurance law, she began to meet with executives at those insurance companies. Id. at 181-83. In meeting with the insurance companies, she presented the state government's "views on gun control and their desire to leverage their powers to combat the availability of firearms" as well as the "technical regulatory infractions plaguing" the companies. Id. at 183. She said she would be "less interested in pursuing these infractions" if the companies stopped working with the NRA. Id. (brackets omitted).

Shortly thereafter, the agency head issued a guidance document on agency letterhead to insurance companies within the state, pointing out the "social backlash" against the NRA for its promotion of firearms in the wake of mass shootings, and citing "recent instances of businesses severing their ties with the

NRA as examples of companies fulfilling their corporate social responsibility." Id. at 183-84. The document "encouraged" insurers to "continue evaluating and managing their risks . . . that may arise from their dealings with the NRA," "review any relationships they have with the NRA," and "take prompt actions to manage these risks." Id. at 184 (brackets omitted). The same day, the defendant issued a joint press release with the governor. The press release contained a quote from the defendant "'urging all insurance companies' . . . to join those 'that have already discontinued their arrangements with the NRA.'" Id. (brackets omitted).

In holding that these circumstances amounted to viewpoint discrimination, the Supreme Court made clear that, while a "government official can share her views freely and criticize particular beliefs," she cannot "use the power of the State to punish or suppress disfavored expression." Id. at 188. Moreover, "a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." Id. at 190. Ultimately, a government official violates the First Amendment through coercion of a third party when the official engages in "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." Id. at 191.

The Supreme Court highlighted several circumstances to aid courts in determining "whether an official seeks to persuade or, instead, to coerce." Id. at 191. For example, "[t]he power that a government official wields . . . is relevant to the objective inquiry of whether a reasonable person would perceive the official's

communication as coercive." Id. at 191. "[T]he greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." Id. at 191-92. Also relevant are the communications themselves between the official and the third party and whether the words used "can be reasonably understood as a threat," whether explicit or implicit. Id. at 192-93. Other relevant considerations include the reaction from the third party receiving the allegedly coercive communication, the formality of the communication (e.g., whether it was issued on agency stationery or at a press conference, or delivered informally in an email or in a casual setting), whether the official "singled out" his or her target, and whether the communications encouraged or required the third parties to take any particular action with respect to the official's target. See id. at 193-94. These factors, while relevant considerations, are not exhaustive. Id. at 191.

In this case, plaintiffs are likely to be successful in arguing that defendants are attempting to coerce third parties "to punish or suppress disfavored speech on [their] behalf." Id. at 190. Defendants have "direct . . . enforcement authority" over schools receiving federal funding and can "initiate investigations and refer cases for prosecution." Id. at 192. The loss of federal funding would cripple the operations of many educational institutions. Even the possibility of funding termination has been enough to lead many schools to censor their professors or eliminate all reference to "diversity, equity, and inclusion" within the school. And, while defendants point out that, as a legal matter, Title VI does not permit the immediate termination of

federal funding, there is evidence in this record that the Department is not adhering to these requirements.

On March 7, for example, the Department announced the "[i]nitial" and "immediate cancelation of approximately $400 million in federal grants and contracts to Columbia University" based on that University's alleged inaction to combat antisemitic harassment. Doc. no. 34-44 at 2. According to the Department, these were merely "the first round of action and additional cancelations are expected to follow" as the Department "continu[es] to review and coordinate . . . to identify additional cancelations that could be made swiftly." Id. The Department said that its "decisive action . . . to cancel Columbia's grants and contracts serves as a notice to every school and university that receives federal dollars." Id. The Department thereafter issued Columbia "immediate next steps" as a "precondition" for negotiations "regarding Columbia University's continued financial relationship with the United States," including that Columbia reform its admissions practices "to conform with federal law and policy." Doc. no. 34-45 at 2-3.

As for the content of defendants' communications, the 2025 Letter concludes that schools have engaged in widespread discrimination under the banner of DEI. See Vullo, 602 U.S. at 192 (content of communications suggested coercion where "Vullo brought a variety of insurance-law violations to the [insurance companies'] executives' attention"). As discussed, the Letter does not make specific how DEI programs are being deployed in a discriminatory or harassing fashion, and does not even define what a DEI program is. Nevertheless, the 2025 Letter demands that

schools immediately cease engaging in undefined DEI-based discrimination within fourteen days or else face the specter of an enforcement action. Despite failing to clearly articulate conduct that would run afoul of Title VI, "the message was . . . loud and clear": schools should not come close to anything that could be considered DEI. Id.

Schools' reactions "further confirm[ ] the communications' coercive nature." Id. at 193. As discussed, many schools have eliminated DEI-related positions altogether and have scrubbed all reference to phrases like "diversity," "equity," or "inclusion" from their websites, their research centers, and their course programming. Schools have cancelled academic presentations they deem "close" to violating the 2025 Letter. Schools have even told professors that they should not utter phrases like "culturally responsive" when teaching.

In addition, the 2025 Letter was issued on the Department's official stationery and articulates not merely a Department official's statement, but rather "the Department's existing interpretation of federal law." Doc. no. 32-1 at 4. And, while the 2025 Letter discusses various forms of allegedly discriminatory practices, DEI is a main focus. See Vullo, 602 U.S. at 194 ("Vullo singled out the NRA and other gun-promotion organizations as the targets of her call to action.").

As the Supreme Court explained in Vullo, cases like this "highlight the constitutional concerns with the kind of intermediary strategy" that defendants have adopted. Id. at 197. "Such a strategy allows government officials to expand their regulatory jurisdiction to suppress the speech of [individuals] that they have

no direct control over." Id. at 197-98. In this case, defendants agree that they lack the power to directly regulate the content of professors' curricular speech. Doc. no. 52-1 at 18. But "a government official cannot do indirectly what she is barred from doing directly." Vullo, 602 U.S. at 190.

For these reasons, plaintiffs are likely to succeed on the merits of their First Amendment claim with respect to NEA's members in higher education.

### D.    Plaintiffs Are Likely to Succeed On Their APA Claims

Plaintiffs bring several claims under the APA, including that the 2025 Letter is final agency action: "contrary to constitutional right," 5 U.S.C. § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," id. § 706(2)(C); "not in accordance with law," id. § 706(2)(A); and "without observance of procedure required by law," id. § 706(2)(D).[10] The court has already concluded that the 2025 Letter is final agency action. Having so concluded, the court addresses plaintiffs' likelihood of success on the merits of each of these APA claims.

#### 1.    Plaintiffs Are Likely to Succeed On Their Claim that the 2025 Letter is Contrary to Constitutional Right

Final agency action is unlawful under the APA if it is "contrary to constitutional right." Id. § 706(2)(B). An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of

---

[10] Plaintiffs also bring a claim that the 2025 Letter is arbitrary and capricious. In light of the court's conclusions regarding plaintiffs' constitutional claims and plaintiffs' other APA claims, it does not reach the plaintiffs' arbitrary-and-capricious claim.

whether the agency action violates the relevant constitutional provision. See New England Fishermen's Stewardship Ass'n v. Raimondo, No. 2:23-cv-00339-JAW, 2024 WL 5247893, at *39 n.7 (D. Me. Dec. 30, 2024), appeal filed sub nom., New England Fishermen's Stewardship Ass'n v. Lutnick, No. 25-1212 (1st Cir. Mar. 7, 2025). As the court has already determined that plaintiffs are likely to succeed on their claims that the 2025 Letter violates the Fifth and First Amendments, it follows that they are likely to succeed on their contrary-to-constitutional-right APA claim. See id.

> 2.    Plaintiffs Are Likely to Succeed On Their Claim that the 2025 Letter is In Excess of the Department's Statutory Jurisdiction

Final agency action violates the APA if it is "in excess of [the agency's] statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C). To determine whether agency action is in excess of statutory jurisdiction under § 706(2)(C), the court looks to "the scope of the agency's [statutory] authority and discretion" and determines whether the agency's statutory authority encompasses the action taken. N.H. Hosp. Ass'n v. Burwell, Civ. No. 15-cv-460-LM, 2017 WL 822094, at *12 (D.N.H. Mar. 2, 2017) ("N.H. Hosp. Ass'n I") (brackets omitted) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). Phrased simply, the question is "whether the agency has gone beyond what Congress has permitted it to do." City of Arlington v. FCC, 569 U.S. 290, 298 (2013). The court must exercise its "independent judgment" in ascertaining the scope of the agency's statutory jurisdiction. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024).

"The enabling legislation which established the [Department] expresses Congressional acknowledgment of state sovereignty in the area of education." Jindal v. U.S. Dep't of Educ., Civ. No. 14-534-SDD-RLB, 2015 WL 5474290, at *5 (M.D. La. Sept. 16, 2015). Indeed, the Department of Education Organization Act, 20 U.S.C. § 3401 et seq. ("DEOA"),  makes plain Congress's intent in establishing the Department "to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies" and that "[t]he establishment of the Department . . . shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems." 20 U.S.C. § 3403(a). To that end, DEOA expressly states that the Department lacks authority "to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system." Id. § 3403(b); accord Mauricio v. Daugaard, 895 N.W.2d 358, 364 (S.D. 2017) ("Congress has made it clear that the [Department] has no authority to nationalize curricula."); Jindal, 2015 WL 5474290, at *7 (DEOA "clearly and unambiguously prohibit[s] federal control over curriculum and programs of instruction"); Instituto de Educacion Universal, Inc. v. U.S. Dep't of Educ., 341 F. Supp. 2d 74, 81 (D.P.R. 2004) (DEOA "precludes the [Department] from exercising '[direction], supervision, or control over the curriculum' of an institution" (quoting 20 U.S.C. § 3403(b))).

Plaintiffs are likely to succeed in arguing that the 2025 Letter exceeds the Department's statutory authority. The 2025 Letter purports to prohibit "teach[ing]" about various concepts, including "systemic and structural racism," "race-consciousness," and whether "certain racial groups bear unique moral burdens." Doc. no. 32-1 at 3-4. The 2025 FAQ purports to control universities' curricula by prohibiting them from "mandating courses . . . that are designed to emphasize and focus on racial stereotypes" or from requiring students to "take certain positions on racially charged issues." Doc. no. 32-2 at 8. And the End DEI portal expressly targets the "pushing" of "critical theory, rogue sex education, and divisive ideologies." Doc. no. 34-8 at 2. While the Department acknowledges that it is prohibited from exercising control over curricula, and endeavors to respond to this issue in the 2025 FAQ, that response is insufficient. See doc. no. 32-2 at 7. While it may be true that a line must be drawn somewhere between the Department's lawful prerogative to enforce anti-discrimination law and its prohibition from controlling curriculum, the Letter and its associated documents do not toe that line. Though it purports to be grounded in existing law, the Letter fails to explain how or why existing law requires banning the concepts discussed previously in this paragraph from school curricula. Because DEOA "clearly and unambiguously" precludes the Department from exercising this manner of control over the content of what schools teach their students, and the Department's prerogative to enforce anti-discrimination law offers no safe harbor, plaintiffs are likely to succeed in arguing

that the 2025 Letter is contrary to the Department's statutory authority. Jindal,
2015 WL 5474290, at *7.

        3.   <u>Plaintiffs Are Likely to Succeed On Their Claim that the 2025
             Letter is Contrary to Law</u>

      The APA provides that final agency action is unlawful if it is "not in
accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs contend that the 2025 Letter is
not in accordance with law for materially identical reasons to why the Letter is in
excess of the Department's jurisdiction: various federal laws preclude the
Department from exercising control over schools' curricula. Under 20 U.S.C.
§ 1232a, the federal government may not "exercise any direction, supervision, or
control over the curriculum [or] program of instruction . . . of any educational
institution, school, or school system." Similarly, 20 U.S.C. § 7906a(a) provides that
"[n]o officer or employee of the Federal Government shall, through grants,
contracts, or other cooperative agreements, mandate, direct, or control a State, local
educational agency, or school's specific instructional content, . . . curricula, or
program of instruction developed and implemented to meet the requirements of" the
Elementary and Secondary Education Act of 1965, as amended by the Every
Student Succeeds Act, 20 U.S.C. §§ 6301-7981. For the same reasons plaintiffs are
likely to succeed on the merits of their claim that the 2025 Letter is in excess of the
Department's statutory authority, they are likely to succeed on the merits of their
claim that the 2025 Letter is not in accordance with law.

4.    Plaintiffs Are Likely to Succeed On Their Claim that the 2025
Letter Violates the APA's Notice-and-Comment Requirement

Final agency action violates the APA when it is done "without observance of
procedure required by law." 5 U.S.C. § 706(2)(D). Plaintiffs argue that the 2025
Letter violates the APA's requirement that agencies submit proposed rules to the
public for notice and comment prior to their promulgation. See 5 U.S.C. § 553.

It is a familiar refrain of administrative law that "legislative rules" undergo
notice-and-comment, while "interpretive rules" do not. N.H. Hosp. Ass'n v. Azar,
887 F.3d 62, 70 (1st Cir. 2018) ("N.H. Hosp. Ass'n II"). A legislative rule "creates
rights, assigns duties, or imposes obligations, the basic tenor of which is not already
outlined in the law itself." Id. (quoting La Casa Del Convaleciente v. Sullivan, 965
F.2d 1175, 1178 (1st Cir. 1992)). By contrast, an interpretive rule "merely
. . . 'advise[s] the public of the agency's construction of the statutes and rules which
it administers.'" Id. (quoting Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 97 (2015)).

The 2025 Letter is a legislative rule. It imposes substantial obligations,
directing schools to "cease all efforts to circumvent prohibitions on the use of race"
or else face "potential loss of federal funding." Doc. no. 32-1 at 4-5. After promising
to "vigorously enforce" the requirements announced in the 2025 Letter within two
weeks, id. at 4, defendants made good on that promise. They opened investigations
into forty-five universities based upon the 2025 Letter, launched the End DEI
portal, and instructed all school districts in the country that receive federal funding
to certify their understanding that "illegal DEI practices" violate Title VI and that
"[t]he continued use of illegal DEI practices may subject the individual or entity

using such practices to serious consequences," including funding termination, the clawing back of previously disbursed funds, or even substantial civil penalties and treble damages. Doc. no. 41-4 at 4.

The obligations imposed by the 2025 Letter are new. Indeed, as recently as 2023, the Department advised schools and regulated entities that DEI programs were not only lawful, but to be encouraged. Nat'l Family Plan. & Reprod. Health Ass'n, Inc. v. Sullivan, 979 F.2d 227, 237 (D.C. Cir. 1992) ("[A] rule which 'effect[s] a change in existing law or policy' is legislative." (quoting Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir. 1983))). Defendants' argument that the 2025 Letter merely interprets Title VI obligations announced in the Students for Fair Admissions case is not persuasive. While the Supreme Court held in Students for Fair Admissions that the use of racial preferencing in admissions failed to satisfy strict scrutiny, the Court did not hold that the Constitution commands color-blindness. To the contrary: "nothing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." Students for Fair Admissions, 600 U.S. at 230. And in his concurring opinion, Justice Kavanaugh makes explicit that "governments and universities still 'can, of course, act to undo the effects of past discrimination in many permissible ways that do not involve classification by race.'" Id. at 317 (Kavanaugh, J., concurring) (quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 526 (1989) (Scalia, J., concurring in the judgment)). Because the 2025 Letter "attempts to supplement [the

law], not simply to construe it," it is a legislative rule. Sullivan, 979 F.2d at 237 (quotation omitted).

As it is undisputed that defendants issued the 2025 Letter without complying with the APA's notice-and-comment requirements, plaintiffs are likely to succeed on their claim that the 2025 Letter was issued without observance of procedure required by law.

II.    Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Relief

Having determined that plaintiffs are likely to succeed on the merits, the court turns to irreparable harm. Irreparable harm exists when, in the absence of relief, the plaintiff would suffer "a substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, 102 F.3d 12, 19 (1st Cir. 1996). When, as here, "the likelihood of success on the merits is great," the movant need not make as strong of an irreparable harm showing. EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996). Moreover, "certain constitutional violations are more likely to bring about irreparable harm," including First Amendment violations. Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 484 (1st Cir. 2009).

Plaintiffs have shown irreparable harm. Plaintiffs' members are presently suffering First Amendment violations as a result of defendants' coercion of educational institutions into censoring their members' speech. Many more of plaintiffs' members have self-censored to protect their livelihoods. NEA, NEA-NH, and CBED face injuries to their organizational missions and core activities because

the 2025 Letter diminishes or eliminates the value of much of their programming and grants designed to advance educators' abilities to prepare students to succeed in a diverse and interdependent society. See S.A. v. Trump, No. 18-cv-03539-LB, 2019 WL 990680, at *9 (N.D. Cal. Mar. 1, 2019) ("[A]n organizational plaintiff's suffering 'ongoing harms to [its] organizational missions' can constitute irreparable harm." (quoting Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1029 (9th Cir. 2013))). Indeed, the 2025 Letter threatens CBED's very existence. Irizarry, 587 F.3d at 485 (irreparable harm exists when the harm "threaten[s] the existence of the movant's business" (quoting Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1382 (6th Cir. 1995))).

Defendants assert that plaintiffs have not shown irreparable harm because they have not shown an imminent, non-speculative injury traceable to the defendants—in other words, that they have not shown Article III standing. In addition, defendants contend that plaintiffs' injuries are "self-inflicted" based on their misreading of the 2025 Letter—in other words, that the plaintiffs are unlikely to succeed on the merits of their vagueness claim. The court has already rejected defendants' arguments in both areas. Thus, defendants have failed to refute plaintiffs' showing of irreparable harm.

For these reasons, the irreparable harm prong is satisfied.

III.    The Balance of Equities and the Public Interest Weigh in Favor of a Preliminary Injunction

As noted, when the defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge.

Does 1-6, 16 F.4th at 37. Here, as just discussed, plaintiffs would face substantial and irreparable harm in the absence of preliminary relief. By contrast, defendants stand to suffer little harm if a preliminary injunction is granted. Indeed, a preliminary injunction would merely maintain the status quo prior to the 2025 Letter's enactment—a status quo which, as recently as 2023, the Department believed was both lawful and worthy of encouragement. Moreover, the court has already determined that plaintiffs are likely to be successful in arguing that the 2025 Letter is unconstitutional. The "government has no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R., 437 F. Supp. 3d 119, 137 (D.P.R. 2020). Thus, the balance of equities and the public interest favor a preliminary injunction

IV.    Scope of Injunction

As a general matter, "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs." Califano v. Yamasaki, 442 U.S. 682, 702 (1979). In most cases, when a court grants a preliminary injunction enjoining a governmental defendant from enforcing a particular law, the terms of the preliminary injunction will enjoin the defendant from enforcing the law against the plaintiff or other parties to the case but will not expressly enjoin enforcement as to nonparties. See, e.g., Tirrell v. Edelblut, 748 F. Supp. 3d 19, 47-48 (D.N.H. 2024). In this case, plaintiffs request a so-called

"nationwide" injunction, which would enjoin the defendants from enforcing the 2025
Letter altogether.

The court is mindful, however, that the scope of a district court's authority to
issue nationwide injunctions is unsettled. Members of the Supreme Court have
expressed recent skepticism regarding the lawfulness of nationwide injunctions. See
Trump v. Hawaii, 585 U.S. 667, 721 (2018) (Thomas, J., concurring) (opining that
nationwide injunctions "are legally and historically dubious"); Dep't of Homeland
Sec. v. New York, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in grant of
stay) (questioning whether district courts have equitable authority under Article III
to grant relief outside of the case or controversy between the parties to the case);
Dep't of State v. AIDS Vaccine Advoc. Coal., 145 S. Ct. 753, 756 (2025) (Alito, J.,
dissenting from denial of application to vacate) (suggesting that nationwide
injunctions "'def[y] . . . foundational' limits on equitable jurisdiction" (quoting
Labrador v. Poe, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in grant of
stay))); cf. Labrador, 144 S. Ct. at 931 (Kavanaugh, J., with whom Barrett, J.,
joined, concurring in grant of stay) ("[P]rohibiting nationwide or statewide
injunctions may turn out to be the right rule as a matter of law regardless of its
impact on this Court's emergency docket."). On the other hand, courts have also
held that nationwide injunctions are not only permissible, but sometimes necessary
"to provide complete relief to the plaintiffs, to protect similarly situated nonparties,
. . . to avoid the chaos and confusion of a patchwork of injunctions, [o]r . . . where
the plaintiffs are dispersed throughout the United States." Florida v. Dep't of

Health & Hum. Servs., 19 F.4th 1271, 1281-82 (11th Cir. 2018) (quotation omitted);

see also City of Chicago v. Barr, 961 F.3d 882, 915-16 (7th Cir. 2020) (arguing that

the Supreme Court implicitly approved nationwide injunctions in Trump v.

International Refugee Assistance Project, 582 U.S. 571 (2017), when it denied a

request to stay an injunction as to non-parties that were similarly situated to

plaintiffs).

At the end of the day a court "must undertake an 'equitable weighing process'

to select a fitting remedy for the legal violations it has identified, taking account of

'what is necessary, what is fair, and what is workable.'" North Carolina v.

Covington, 581 U.S. 486, 488 (2017) (first quoting NAACP v. Hampton Cnty.

Election Comm'n, 470 U.S. 166, 183 n.36 (1985), and then quoting New York v.

Cathedral Acad., 434 U.S. 125, 129 (1977)). Defendants urge the court—in the event

it rules in plaintiffs' favor—to limit the injunction to the plaintiffs and their

members. While the court does not agree with plaintiffs that a nationwide

injunction is appropriate, the injunction requested by defendants is too narrow a

remedial line to properly account for equitable principles of necessity, fairness, and

workability.

In this case, the 2025 Letter and its implementation measures directly target

entities that are currently non-parties to this action: schools, school districts, and

educational entities that receive federal funding. Defendants' enforcement of the

2025 Letter would necessarily be directed against educational institutions that

employ plaintiffs' members or that work with plaintiffs. If the court simply enjoined

the defendants from enforcing the 2025 Letter against the plaintiffs and their members, that would not necessarily prevent defendants from enforcing the Letter against institutions that employ or work with plaintiffs or their members. And if defendants can enforce the letter against such institutions, the precise harms that flow to the plaintiffs from the 2025 Letter's enforcement are likely to occur. Indeed, that was the basis for the court's standing and constitutional analyses above. Therefore, on the facts of this case and in order to afford complete relief as to the plaintiffs before this court, it is necessary to enjoin the defendants from enforcing the 2025 Letter and its implementation measures against one category of non-parties to the case: entities receiving federal funding that employ or contract with plaintiffs or plaintiffs' members.

For these reasons, the court is not persuaded that broader "nationwide" relief is necessary, in the sense of an injunction that enjoins defendants from enforcing the 2025 Letter in its entirety. Such an injunction would be broader than is necessary to provide relief to the plaintiffs. And, while plaintiffs contend that a nationwide injunction is necessary to avoid workability concerns, they have not articulated what these workability concerns are. Finally, while plaintiffs contend that they would be entitled to vacatur of the 2025 Letter for success on their APA claims, the First Circuit has held that a court should refrain from setting aside agency action under the APA when "the remedy provided by [success on another claim] is adequate under the circumstances." N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 62 (1st Cir. 2021).

V.    <u>Injunction Bond</u>

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." "A district court has 'substantial discretion to dictate the terms of an injunction bond.'" HCC Specialty Underwriters, Inc. v. Woodbury, 289 F. Supp. 3d 303, 330 (D.N.H. 2018) (quoting Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991)). A court may dispense with a bond where one is not requested by the non-movant. Tirrell, 748 F. Supp. 3d at 47. Here, however, defendants request a "nominal bond."

"In setting the amount of bond, courts typically take into account 'the potential incidental and consequential costs as well as . . . the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities.'" WEX Inc. v. HP Inc., No. 2:24-cv-00121-JAW, 2024 WL 3358651, at *35 (D. Me. July 9, 2024) (quoting 11A Mary Kay Kane, Federal Practice & Procedure § 2954 (3d ed.)). Courts have ordered bonds as low as one dollar when "the amount of potential damages" to the defendant is "extremely limited" if he turns out to have been wrongfully enjoined and the plaintiff's rights "are of such gravity that protection of those rights should not be contingent upon his ability to pay the bond." Sak v. City of Aurelia, 832 F. Supp. 2d 1026, 1048 (N.D. Iowa 2011); see also Bosley v. Wildwett.com, 310 F. Supp. 2d 914, 936 (N.D. Ohio 2004) ("Given the lack of evidence that Defendants will suffer damages should the Court issue a preliminary injunction in error, this Court sets a low bond of one

hundred dollars ($100).”). Such circumstances are present in this case: defendants stand to suffer no damages if the First Circuit or the Supreme Court concludes preliminary relief is not warranted, and plaintiffs’ rights are of profound import. Therefore, and in light of defendants’ decision to request a bond, the court orders plaintiffs to post a bond in the amount of fifty dollars ($50).

## CONCLUSION

Plaintiffs’ motion for a preliminary injunction (doc. no. 34) is granted as set forth herein:

1.  Defendants United States Department of Education; Linda M. McMahon, in her official capacity as Secretary of the Department of Education; Craig Trainor, in his official capacity as Acting Assistant Secretary for Civil Rights, Department of Education; and their agents, employees, representatives, successors, assigns, and any other person acting directly or indirectly in concert with them, are enjoined from enforcing and/or implementing the Dear Colleague Letter issued on February 14, 2025, including through the February 28, 2025 “Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act,” the End DEI Portal, and the April 3, 2025 certification requirement, against the plaintiffs, their members, and any entity that employs, contracts with, or works with one or more plaintiffs or one or more of plaintiffs’ members.

2.      Plaintiffs are ordered to post security in the amount of fifty dollars ($50).

3.      This injunction shall take effect immediately and shall remain in effect

pending further order of this court.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

April 24, 2025

cc:      Counsel of Record