# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION; NATIONAL EDUCATION ASSOCIATION-NEW HAMPSHIRE; CENTER FOR BLACK EDUCATOR DEVELOPMENT; DOVER SCHOOL DISTRICT; HANOVER AND DRESDEN SCHOOL DISTRICTS; OYSTER RIVER COOPERATIVE SCHOOL DISTRICT; and SOMERSWORTH SCHOOL DISTRICT,<br><br>                    Plaintiffs,<br><br>      v.<br><br><br>UNITED STATES DEPARTMENT OF EDUCATION,<br>400 Maryland Avenue, SW, Washington, DC 20202;<br><br>LINDA M. MCMAHON, in her official capacity as Secretary of the Department of Education,<br>400 Maryland Avenue, SW, Washington, DC 20202; and<br><br>CRAIG TRAINOR, in his official capacity as Acting Assistant Secretary for Civil Rights, Department of Education,<br>400 Maryland Avenue, SW, Washington, DC 20202,<br><br><br>                    Defendants. | Case No.: 25-cv-00091-LM<br><br><br><br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs, by and through their attorneys, bring this Complaint against Defendants and in support state the following:

1

## INTRODUCTION

1.      "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (citation omitted). Our schools cannot fulfill their role as the nation's "nurseries of democracy," *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021), without teaching students about the world, including the historical and lived experiences of people of different races, genders, and abilities. Diversity, equity, and inclusion initiatives are critical to that effort by both expanding equal educational opportunity and providing students with an education that prepares them to succeed in a diverse democratic society.

2.      On February 14, 2025, the Department of Education ("ED") issued a Dear Colleague Letter threatening schools and colleges across the country with the loss of federal funding in a matter of days if they continued to pursue vaguely defined "DEI programs" that "teach students that certain racial groups bear unique moral burdens that others do not" and/or "stigmatize students who belong to racial groups." ("DCL") (attached as Ex. A). The DCL radically resets ED's longstanding positions on civil rights laws that guarantee equality and inclusion and impermissibly infringes on the authority of states and school districts over public education as well as the First Amendment rights of educators and students.

3.      Plaintiff National Education Association ("NEA"), Plaintiff National Education Association-New Hampshire ("NEA-NH"), and their member educators have long engaged in education in accordance with requirements of equity and inclusion as set out in civil rights laws and guidance from ED. They have incorporated issues of race, diversity, equity, and inclusion in the content and approach to their teaching, in their broader educational practices, and in training and support for educators, all in accordance with sound pedagogical practice. The DCL

drastically disrupts Plaintiffs in their ability to provide education to students in accordance with professional requirements and best practices.

4.     Plaintiff Center for Black Educator Development ("CBED") engages in teacher training and recruitment with the aim of achieving educational equity and racial justice by rebuilding a national pipeline of Black teachers and preparing all teachers to teach Black students in an engaging, effective, and culturally responsive way. The DCL has impacted CBED's core activities and mission as well as CBED's partnerships with schools, training and professional development programs for educators and students, and curriculum materials by calling into question the legality of its programs through its vague and overly broad conceptions of impermissible DEI programs.

5.     Plaintiff Dover School District provides relevant and engaging learning experiences and curricula to each student, which could violate the DCL. The District celebrates the diversity of its student body, pursues equity, and creates inclusive learning environments. Per its sustainability plan for educational and racial equity, the District teaches its students to seek cultural understanding and prepares them to work effectively and respectfully with diverse teams. Dover School District received approximately $3.1 million in direct federal funding in the current fiscal year, which is now imperiled by the DCL.

6.     Plaintiff Somersworth School District seeks to provide an inclusive and comprehensive education, which ED might construe to violate the DCL. Diversity, equity, and inclusion are core values of the District. It focuses on closing gaps in opportunities and barriers to access—which may correlate with a student's race, ethnicity, gender, gender identity, disability, socioeconomic status, or geographic location. The Somersworth School District

received $2.1 million in direct federal funding in the current fiscal year, which the DCL jeopardizes.

7.    Plaintiff Oyster River Cooperative School District promotes a safe and nurturing community that honors the diversity of its students, families, and staff through a range of educational experiences and opportunities. The District's approach may be construed as violative of the DCL. The District's Coordinator of Diversity, Equity, Inclusion, & Justice provides professional development to promote culturally responsive sustaining curricular frameworks. The District incorporates inclusivity, equity, and justice into teaching, learning, practices, policies, and procedures. The District received over $720,000 in direct federal funding in the current fiscal year that it would lose if ED determined the District failed to abide by the DCL.

8.    Plaintiffs Hanover and Dresden School Districts strive to fully engage students—including their hearts, minds, and voices—so they become educated, caring, and responsible adults. Towards that end, the Districts embed diversity, equity, and inclusion throughout their work. The Districts are required to follow an Equity Policy, adopted in December 2022 after robust community-initiated efforts. The Districts may not be able to follow both the mandates of their Equity Policy and the DCL, putting at risk $350,000 in direct federal funding in the current fiscal year at stake.

9.    The School District Plaintiffs' instruction, programming, professional development, and other activities are subject to ED's enforcement authority and the requirements set forth in the DCL. Their work could be construed to involve "diversity," "equity," or "inclusion," include topics related to race, or otherwise fall within the broad prohibitions of the DCL.

10. The DCL reflects final agency action. It sets forth substantive obligations that it vows to "vigorously enforce," declares ED's intention to "take appropriate measures to assess compliance with the applicable statutes and regulations based on the understanding embodied in th[e] letter" invites complaints, and announces that ED will begin enforcement as of February 28, 2025. DCL at 3.

11. Yet throughout the DCL, ED wholly eschews the congressionally imposed procedures designed to ensure that agency actions are not arbitrary and capricious but reasoned and within their sound expertise. Sidestepping these requirements, the DCL announces sweeping conclusions about the existence of legal violations across states, local educational agencies, and educational institutions and issues new interpretations of law unsupported by statutory provisions, court decisions, or any articulated reasoning.

12. The DCL fails to acknowledge—let alone explain—its marked change from ED's prior guidance and interpretations of Title VI, as well as other federal civil rights and education laws. And it fails to account for reliance interests created by decades of law, regulations, and longstanding agency guidance and interpretations. Moreover, it exceeds ED's authority and is contrary to law, including the body of law it purports to interpret.

13. In addition to its many procedural failings, the DCL's substance is contrary to the constitutional rights of academic institutions and educators. In its parts and as a whole, the DCL mandates compliance while at the same time leaving schools and educators without clear notice of the law, opening them to arbitrary and discriminatory enforcement. And it further oversteps the federal government's role by reaching into curriculum, chilling the free speech and scholarship of academics and educators, and likewise impinging on the ability of students to hear perspectives the federal government finds objectionable.

5

14.     As the Supreme Court recently reaffirmed, "Congress . . . enacted the [Administrative Procedure Act ("APA")] 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). Agencies acting within their "specialized experience" can provide important guidance as to how the law will be applied, grounded in their thorough consideration and sound reasoning. *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)). However, the courts, not agencies, provide the final interpretation of law, and agencies cannot exceed the scope and substance of the federal statutes by which they are bound. *Id.* at 392. Substantive changes to the interpretation of statutes that effectively upend decades of law, regulations, and longstanding agency guidance to impose new legal obligations on Plaintiffs and indeed the entire education sector must, at minimum, be made through the process of notice and comment rulemaking that enables reasoned decision making. 5 U.S.C. § 553. As that required process has not been followed, education institutions and educators are left scrambling with only vague direction as to what might or might not be considered discrimination under the DCL and contending with a sword of Damocles threatening their federal funding.

15.     The DCL's fundamental contradiction of Title VI in prohibiting equity and inclusion programs, its violations of due process in failing to set clear standards and in opening educators to arbitrary and discriminatory enforcement, as well as its chill to First Amendment protected speech and expression could not stand no matter the process followed.

16.     ED is aggressively enforcing the DCL, despite its legal and constitutional infirmities. On March 14, 2025, ED announced that it has opened investigations into 45 universities following the DCL. On April 3, 2025, ED issued a Certification Requirement to state

and local education agencies (SEAs and LEAs, respectively), requiring them to certify that they are currently in compliance with "Title VI and *SFFA v. Harvard*" as interpreted in the DCL, including its prohibition on "DEI programs." U.S. Dep't of Educ., Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard (Apr. 3, 2025) https://perma.cc/A8VQ-JRZB ("Certification Requirement") (attached as Ex. B). ED further required that SEAs and LEAs acknowledge that compliance with the assurances and the certification "constitute a material condition for the continued receipt of federal financial assistance." *Id.* at 1. The Certification Requirement does not include a control number from the Office of Management and Budget ("OMB"). ED warned that noncompliance with the Certification Requirement could result in the loss of all future federal funding, clawing back of previously distributed funds, and threatened new forms of liability under contract law and the False Claims Act, 31 U.S.C. § 3729(a) ("FCA"). *Id*. SEAs were initially given just 10 days to complete this Certification Requirement on behalf of themselves and their LEAs. The deadline was extended to April 24, 2025.

## PARTIES

17.     Plaintiff National Education Association (NEA) is a nonprofit organization headquartered in Washington, D.C. NEA is the nation's oldest and largest professional association of educators and represents approximately three million members who work at every level of education—from pre-school to university graduate programs. NEA's members include individuals training to become educators, classroom teachers, education support professionals, higher education faculty and staff, and other current and former educators. NEA has affiliate organizations in every state and in more than 14,000 communities across the nation.

18.     NEA's mission is to advocate for education professionals and to ensure that public education prepares every student to succeed in a diverse and interdependent world.

19.     To further that mission, NEA and its members share core values, including that public education is the gateway to equal opportunity; is vital to building respect for the worth, dignity, and equality of every individual in our diverse society; and provides individuals with the skills to be involved, informed, and engaged in our representative democracy.

20.     As the nation has grown more diverse,[1] state and local curriculum, education programming, and educator preparation standards have been revised to require that educators both learn to, and do teach, in ways that are culturally competent and racially inclusive. Such curriculum and practices have been shown to be more effective methods of reaching and engaging students and preparing them to thrive in our multiracial democracy.

21.     Consistent with, and essential to, fulfilling NEA's mission, values, and objectives, NEA provides several core services to its affiliates and members. These services include:

(a) professional excellence grants that assist educators in expanding their skills and expertise, including in educating students of different races and backgrounds, including students with disabilities, students from rural communities, and students who are multi-lingual learners;

(b)  professional development training in such skills that NEA and its affiliates often offer with the support of school districts;

---

[1] New Hampshire, and Southern New Hampshire in particular, is rapidly growing more racially diverse, according to data from the 2020 Census. *See* Kenneth Johnson, *Modest Population Gains, but Growing Diversity in New Hampshire with Children in the Vanguard* (Carsey Sch. Pub. Pol'y, Regional Issue Brief No. 66, 2021), https://perma.cc/VBQ9-5M2E.

(c)  micro-credentials (certifications in a particular topic) in such skills for which NEA members provide training and by which NEA members can advance in their careers;

(d)  education reform efforts that often highlight the diverse assets of a school and its surrounding community;

(e)  reading programs that celebrate a nation of diverse authors and readers; and

(f)  trainings for members and staff on diversity, equity, inclusion, and racial and social justice.

22.    NEA also provides legal representation to its members who are targeted for teaching inclusively, provides Know Your Rights guidance and trainings to members on attacks on inclusive education, and assists both its members and affiliates in responding to efforts to censor curriculum and roll back progress in allowing schools and colleges to reach and engage all of their students to learn about the world as it is.

23.    NEA members teach, provide training, and engage in a broad range of educational programming subject to ED's enforcement authority and the requirements set forth in the DCL. Many members' work could be construed to involve "diversity," "equity," or "inclusion," include topics related to race, or otherwise fall within the broad terms of the DCL.

24.    For example, NEA and NEA-NH Member A teaches high school English in New Hampshire and often teaches literature that touches on topics related to race and gender. He is concerned that he could be accused of discrimination under the DCL's vague descriptions because of the ways issues related to diversity, systemic racism, and moral burdens come up in his classroom, subjecting him to potential risk of investigation, discipline, or adverse employment action.

25.     NEA and NEA-NH Member B teaches 8th Grade Social Studies in New Hampshire, including United States history from the Civil War to modern day. Member B is concerned that classroom discussions about matters of race and discrimination, important parts of teaching certain aspects of American history, could be construed to violate the DCL's prohibitions related to "systemic and structural racism" or "discriminatory policies and practices," DCL at 2, leaving her vulnerable to allegations of discrimination under the DCL.

26.     NEA and NEA-NH Member C is a middle school counselor in New Hampshire. An important part of her work is creating a school culture that fosters safe and positive identity development for middle schoolers. Member C is concerned that she might be accused of violating the DCL's vague prohibitions on toxic indoctrination and discrimination.

27.     NEA Member D teaches Indigenous Studies in higher education, at a school receiving federal funding, and their curriculum and readings reflect a range of experiences of indigenous people and explore the identities that those experiences create. Member D does not know whether they will be able to continue to teach this subject or whether it could be considered unlawful pursuant to the DCL. Despite their understanding that such instruction is vital and effective, Member D must grapple with the decision of whether to teach according to professional training and standards and risk enforcement consequences for themselves and their institution.

28.     NEA Member E is a professor at a university in the Southeast that receives federal funding. Member E provides teacher training to pre-service special education teachers, and he incorporates into his teaching practice instructional methods that are designed to ensure that pre-service teachers are able to effectively teach students of all abilities and all backgrounds so that they can access and engage in learning. Such methods, in fact, are part of the national standards

for special education teachers, which mandate, among other things, that individuals learn how to provide culturally responsive curriculum to diverse students. Member E fears that because of the DCL, these practices will be targeted, and understands that in response to the DCL, his institution is already undertaking efforts to comply.

29.    Similarly, NEA Member F works as an instructor and fellow at a community college in the Midwest that receives federal funding. She is afraid to allow students to select their own topics for writing assignments out of fear these could be construed as impermissibly related diversity, equity, and inclusion under the DCL, and fears that her scholarship focused on removing barriers to access for education will be viewed as impermissible. Member F's work developing training for faculty, staff, and administrators has also been dramatically impacted. Member F fears she will be required to further limit her academic activities by her college due to the DCL. This fear is particularly acute because the majority of students at Member F's school are economically disadvantaged, so the fear of losing resources is a very big concern.

30.    NEA Member G is a tenured professor of middle and secondary education at a public university in Georgia. Her coursework and research include issues of systemic and structural racism, along with equity and inclusion. She worries that her scholarship and classroom instruction could be perceived to teach that people of some races or gender/sexuality carry a moral burden that others do not in violation of the DCL. Member G's fear is informed by the fact that she has already had federal grants terminated because they related to racial diversity. Member G's work developing programming for faculty, students, and the community as a co-director of the Center for Equity and Justice in Teaching Education has also been undermined as a result of the DCL. Member G is further injured because her work for the Center is a part of her academic responsibilities on which she is evaluated.

31.     NEA Member H is a Professor of Psychology at Pensacola State College, which receives federal funds. Her research focuses on transgenerational trauma and lynchings committed in Escambia and Santa Rosa Counties, Florida. Member H was scheduled to present an academic paper on March 4, 2025, regarding her family's history in the South; the paper includes references to racism, white supremacy, and lynching. After the DCL, college administrators cancelled the presentation, citing "issues" with the presentation and explaining that the paper was "close" to the line—a warning that Member H understood to refer the DCL's prohibitions on scholarship related to diversity, equity, and inclusion. Member H fears that the DCL will continue to restrict her ability to conduct and share her academic research.

32.     NEA Member I is a student at a large university in the Midwest. She studies elementary education and will soon be entering her sixth and final year of higher education, during which she will be student teaching. Member I is concerned about the DCL's impact on her as both a student and a soon-to-be teacher. As a student, the content of her existing courses has already shifted to remove any focus on cultural responsiveness, and her university will be removing a course on diversity, equity, and inclusion in education altogether. And she fears she will be unable to speak freely about issues relating to diversity, equity, and inclusion as an education student or an educator as long as the DCL and accompanying guidance remain in place.

33.     Plaintiff National Education Association-New Hampshire (NEA-NH) is a non-profit organization and affiliate of NEA. NEA-NH is a legally separate entity from NEA that is incorporated as a domestic non-profit under New Hampshire law and headquartered in Concord, New Hampshire. It was founded in 1854—then as New Hampshire State Teachers Association. NEA-NH is comprised of more than 17,000 member educators in New Hampshire representing

12

the majority of all public school employees in the state. Member A, Member B, and Member C are also members of NEA-NH.

34.    NEA-NH's members are public school educators in all stages of their careers, including classroom teachers and other certified professionals, education support personnel, instructors and staff at public higher education institutions, students preparing for a teaching career, and those retired from the profession.

35.    NEA-NH is one of the "founding ten" state education associations that formed the NEA in 1857.

36.    NEA-NH's mission is to strengthen and support public education and serve their members' professional, political, economic, and advocacy needs.

37.    Plaintiff Center for Black Educator Development (CBED) is a non-profit organization headquartered in Philadelphia, Pennsylvania. CBED was founded in 2019 with the mission of rebuilding a national pipeline of Black teachers to correct for historical discrimination and help achieve educational equity and racial justice.

38.    In support of this mission, CBED engages in three main categories of core activities: the "Teaching Pathways" program, the "Professional Learning" program, and policy and advocacy work.

39.    CBED's "Teaching Pathways" program aims to recruit and prepare teachers. CBED partners with school districts to conduct Teaching Academies, year-round high school Career & Technical Education (CTE) courses grounded in Black pedagogy—instructional practices that center the historic frameworks, philosophy, and strategies that cultivate positive racial identities and social consciousness while deepening academic knowledge and skills. The Teaching Academies include CBED's "Grow Your Own" curriculum aimed to help communities

"grow their own" culturally-responsive teachers. CBED also offers a Freedom Schools Literacy Academy (FSLA), a summer program that offers high school and college students paid apprenticeships and instruction on Black culture, history, and pedagogy. CBED also created Future Teachers of Excellence Fellowships that provide financial, academic, and professional support to students enrolled in higher education with an interest in teaching to help build the pipeline of teachers working to advance educational equity and racial justice.

40.    CBED's Professional Learning program offers a variety of professional learning resources, including workshops and consultation services. CBED's workshops, which are approved as continuing education requirements for educators in Pennsylvania, cover topics including cultural identity, implicit bias, cultural proficiency, ableism, microaggression, and equity. CBED also hosts a Black Men in Education Convening, open to all educators, that specifically addresses the experiences and needs of Black educators. CBED also provides consultation services to other non-profits and school districts around DEI, teacher recruitment, hiring and retention, affinity spaces, and more.

41.    Through its policy and advocacy work, CBED successfully advocated for Pennsylvania's adoption of Culturally Responsive-Sustaining Education competencies. CBED also developed a Teachers of Color Retention Toolkit and contributed to toolkits for recruitment and mentoring.

42.    CBED's core services and mission are existentially threatened by ED's actions, as its programming invokes concepts that relate to "diversity," "equity," and "inclusion," and its critical partnerships with educators, schools, and districts are now threatened by ED's vague and overly broad conception of discrimination, as educational institutions will be deterred from

working with CBED. Indeed, one school has already expressed reservations about launching a planned Teaching Academy after issuance of the DCL.

43.    Dover School District serves approximately 3,500 students in Dover, New Hampshire. The District aspires to produce well-rounded learners who have the critical thinking, collaboration, communication, character, and life skills necessary to prepare them for the challenges of the future.

44.    Dover School District uses varied instructional practices to meet the needs of all learners and establishes specific achievement goals, including resources to reduce opportunity gaps. It follows a learning framework that begins with teaching students to recall and reproduce facts, to process skills and concepts more deeply and ask questions, to think strategically using evidence, and finally, to engage in extended thinking and to transfer knowledge from one context to solve problems in another. The District aims for all students to reach the highest levels of learning.

45.    Dover's district-wide equity plan includes five goals: (i) increase the equity literacy of teachers, administrators, and staff; (2) improve school culture in all schools to be inclusive, safe, and welcoming; (3) ensure equitable achievement of all students; (4) expand family and community engagement; and (5) recruit, retain, and promote educators who are representative of the growing diversity in the schools and communities.

46.    The District introduces adaptive sports opportunities so students learn how to use wheelchairs and engage in inclusive play together. The Special Olympics New Hampshire has recognized Dover High School with a Certificate of Inclusion for four consecutive years.

47.    Even though the District does not engage in discrimination, the vaguely worded DCL restricts the District's instruction and has a chilling effect on teachers as they encourage

students to move beyond rote memorization and into the higher levels of thinking, including application of knowledge in novel situations. Teachers in Dover School District do not know what instructional techniques or topics are permissible after the DCL.

48.    Dover School District fears that it would need to water down or alter its courses to follow the DCL, which is a disservice to students and is inconsistent with the goals of the District. It cannot teach students how to engage in civil discourse around topics that ED might consider to improperly address race, diversity, equity, or inclusion.

49.    The District's confusion about how to comply with the DCL is compounded because it conflicts with state law and local requirements. The Dover School Board approves the District's curriculum and considers whether it is accessible, including whether the content is relevant to the diverse abilities and needs of the students, and accessible to a diverse range of students.

50.    The District recently spent $1.4 million to update its elementary and middle school curriculum to reflect the diversity of its student body. The District used the Elementary and Secondary School Emergency Relief (ESSER III) Fund, allotted through the Coronavirus Aid Relief and Economic Security (CARES) Act, and relied on ED's guidance that the funds may be used to support the implementation of curriculum and instructional practices that were culturally responsive and that incorporated trauma-informed pedagogy.

51.    Dover School District received approximately $3.1 million in direct federal funding grants, including Titles I–IV and Individuals with Disabilities in Education Act (IDEA) financial support, for the current fiscal year. It uses the federal funds to provide critical instructional support to its students with reading, writing, and math and professional development to its staff.

52.     Dover School District uses Title I grants, which support students and families in high-poverty communities and low-income families, to provide valuable reading and writing interventions. The District stocked a van to drive through neighborhoods and bring books for students, hosted summer programming for eligible elementary and middle school students, and hosted family engagement events that demonstrated activities families can do at home to support their children's learning. Dover School District also conducted professional development on the academic, behavioral, mental, and socio-emotional wellbeing of students, including training on innovative literacy strategies. Finally, the District used Title I funds to increase staffing so it was able to provide extra assistance with reading, writing, and math to students.

53.     Dover School District uses Title III funds to ensure the proficiency of English Language (EL) learners. It purchased instructional materials, provided professional learning for teachers, and supported language-building activities for EL students.

54.     The District uses Title IV funds to execute its plan for educational and racial equity, develop programming and opportunities for social emotional learning, and support drug and alcohol involved students.

55.     Dover School District uses IDEA funds to provide instruction and services to students with disabilities. It extended the school year for students who would fall behind over the summer without continuity of services, hired occupational therapists to provide therapy necessary for students with disabilities to be included in the general education setting, and hired three special education teachers and three special education administrators.

56.     The District cannot afford to lose $3.1 million in federal funding. It also cannot afford the cost of replacing the curriculum it recently purchased, in reliance on ED's previous guidance.

57.    Somersworth School District is committed to providing an inclusive and complete education to its approximately 1,300 students. Located in Somersworth, New Hampshire, the District endeavors to eliminate gaps in opportunities and barriers to access, recognizing these gaps may correlate with a student's race, ethnicity, gender, gender identity, disability, socioeconomic status, or geographic location.

58.    The District provides inclusive educational opportunities, including services for English for Speakers of Other Languages (ESOL) services and appropriate services, accommodations, and modifications (per state and federal law) for students with disabilities and learning differences.

59.    The District does not engage in discrimination but fears that ED would consider work it does to provide an inclusive learning environment to violate the DCL. It fears that classroom discussions on the evolution of racism or bigotry, as required by New Hampshire law, could be construed by ED as instruction that "preference[s] certain racial groups" or "teaches students that certain racial groups bear unique moral burdens that others do not." The District endeavors to engage immigrant students and families to make sure they feel welcome in the District.

60.    The District directly received federal grants totaling $2.1 million for the current fiscal year. This sum includes IDEA grants, Title I grants, and Titles II–IV financial support. It also receives federal funding indirectly through the New Hampshire Department of Education. Somersworth cannot afford to lose its federal grant support. It lacks a large property tax base and is unable to replace this revenue.

61.    The Oyster River Cooperative School District has over 2,000 students from Lee, Madbury, and Durham, New Hampshire. The District's mission is working together to engage

every learner. It seeks to instill a lifelong passion for learning and to engage all students to develop skills and knowledge.

62.     The District created a Coordinator of Diversity, Equity, Inclusion, & Justice (DEIJ) leadership position during the 2022-23 school year. The DEIJ Coordinator trains faculty and staff to promote culturally sustaining curricular frameworks; shapes compassionate, equitable practices, policies, and procedures that center concepts of inclusivity, equity, and justice in learning; and advances opportunities for student access to programs, stakeholder engagement, community groups. The DEIJ Coordinator fosters a culture of belonging, dignity, and inclusion in Oyster River's schools and community.

63.     The District has invited guest speakers and community organizations to engage in conversations with students about race, diversity, public policy, and social history that demonstrate the struggles of specific demographic groups and individuals.

64.     Even though the District does not engage in discrimination, the DCL restricts its ability to meet its obligation to fully deliver curriculum and instruction to students, to uphold its mission to engage every learner, and to prepare students to live and work in a multicultural and global society.

65.     The District is not sure whether ED would consider its range of programs to violate the DCL. The District uses social and emotional curriculum and programs; provides ESOL instruction; offers instruction and academic support for students with disabilities and students of low socio-economic status; and implements culturally responsive sustaining curriculum frameworks. Its Advanced Placement courses, range of textbooks, and high school English and social studies courses focus on diverse literature and historical topics that relate to race, diversity, equity, and/or inclusion.

66.    The District does not know if it can continue leadership opportunities that, while open to all students, recruit students from different backgrounds. The District does not know if any effort to provide additional support for certain demographic student groups, such as low socio-economic status or ESOL, will be deemed "smuggling racial stereotypes into everyday programming."

67.    The District received over $720,000 for the current fiscal year in direct federal funding support and additional federal funds indirectly through the New Hampshire Department of Education. Oyster River Cooperative School District cannot afford to lose federal funding, which it uses for staffing, programs, and resources to meet student educational needs.

68.    Hanover and Dresden Districts serve students in Hanover, New Hampshire and Norwich, Vermont. The Districts provide students with rigorous, engaging, and equitable instruction and curriculum. They seek to ensure that school programs are accessible to all students and utilize purposeful and intentional social emotional learning.

69.    The Districts are governed by an Equity Policy, which recognizes a common interest that all children—including children of every race, ethnicity, economic status, or identity—have access to learning experiences and support. The Equity Policy directs Hanover and Dresden School Districts to incorporate equity into all policies, programs, operations, practices, and resource allocations. To meet this mandate, the Districts include diverse perspectives in academic curriculum and extracurricular activities, counteract biased practices that perpetuate opportunity gaps, implement culturally responsive instructional practices, and adopt other equitable policies. They also provide professional development to overcome achievement gaps and ensure that the Districts' predominantly white teaching staff is prepared to serve students of all backgrounds.

70.     Students participate in March Intensive, an enrichment week with full day courses or immersive travel experiences to explore the history and culture of the South, focusing on civil rights.

71.     The middle school proudly displays a land acknowledgment that it was built on Abenaki and Pennacook native land, the result of a student led initiative.

72.     Students form and actively participate in groups centered around diverse identities.

73.     The Districts fear that their Equity Policy, instruction, programming, and professional development could be construed as a violation of the DCL, even though they do not engage in discrimination. Hanover and Dresden Districts consider free and reduced lunch status when distributing funding for curricular activities like March Intensive, which ED could interpret as adoption of a "proxy for race."

74.     The Districts received over $350,000 in direct federal funding, which includes Titles I–IV financial support, for the current fiscal year. They used this money to positively impact students by hiring special education staff, offering math and literacy tutoring, and implementing Kindergarten readiness programs.

75.     The Districts' ability to provide rigorous and equitable instruction to students with special needs would be compromised without federal funding. Changes to their curriculum, professional development, and extracurricular offerings would be costly.

76.     Defendant U.S. Department of Education is a federal agency headquartered in Washington, DC, at 400 Maryland Avenue, SW, Washington, DC 20202.

77.     Defendant Linda M. McMahon is the Secretary for Education. She is sued in her official capacity.

78.    Defendant Craig Trainor is the Acting Assistant Secretary for Civil Rights at the Department of Education. He is sued in his official capacity.

## JURISDICTION AND VENUE

79.    This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1346 (civil actions against the United States), and 5 U.S.C. § 702 (final agency action).

80.    Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Plaintiff resides in this district and each Defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

81.    This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–02 and Rule 57 and 65 of the Federal Rules of Civil Procedure.

82.    This Court is authorized to vacate and set aside the DCL under 5 U.S.C. § 706(2).

83.    Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

**I.    The DCL imposes vague and viewpoint-discriminatory prohibitions on schools that upend and conflict with longstanding law, guidance, and professional practice.**

84.    The Acting Assistant Secretary of Education issued a Dear Colleague Letter on February 14, 2025. Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ., to Colleagues (Feb. 14, 2025). The DCL purports to address "Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the United States Constitution, and other relevant authorities." DCL at 1. It applies to "schools," encompassing "preschool, elementary, secondary, and postsecondary educational institutions that receive federal financial assistance from the Department." *Id.* at n.1.

85.    Although styled as a Dear Colleague Letter, the DCL does not operate as other Dear Colleague Letters. Guidance and interpretation issued within the scope of ED's proper

authority identify and explain the law as written by Congress and interpreted in court decisions, assess relevant data and other factual information, and provide additional guidance regarding how ED will apply the law to factual circumstances in the course of its investigations and enforcement actions. *See, e.g.*, Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues (Aug. 14, 2023), https://perma.cc/69WH-NECT; U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug.14, 2023), https://perma.cc/V7Z6-XMCM; U.S. Dep't of Educ., Off. of the Undersec'y, Strategies for Increasing Diversity and Opportunity in Higher Education, https:// perma.cc/52W4-XJFR.

86.    ED's DCL instead opens with sweeping conclusions that schools are engaged in discrimination and then, abruptly and without acknowledging a change, announces new rules identifying categories of unlawful activity, invites complaints, and issues a deadline of a matter of days before ED will take "appropriate measures." DCL at 3. Contrary to civil rights and federal education laws, regulations, guidance, and other interpretations, and without even acknowledging the change, the DCL indicates ED's position that any equity or inclusion programming is unlawful.

87.    The DCL starts with conclusory and unsupported generalizations, asserting: that "pervasive and repugnant race-based preferences and other forms of racial discrimination have emanated throughout every facet of academia"; that "colleges, universities, and K-12 schools have routinely used race as a factor in admissions, financial aid, hiring, training, and other institutional programming"; that "many American schools and universities . . . encourage segregation by race at graduation ceremonies and in dormitories and other facilities"; that schools have "toxically indoctrinated students with the false premise that the United States is

built upon 'systemic and structural racism'" and have "advanced discriminatory policies and practices"; and that schools have used "'diversity, equity, and inclusion' ('DEI')," as a means of "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." DCL at 1–2.

88.   None of these assertions is supported by reference to ED investigations and findings, court cases, data sets, scholarly research, or the agency's own explained reasoning. The DCL provides no guidance that would help a school to understand how ED would apply existing legal precedent to reach these conclusions based on the facts of a particular case. Nor does ED provide any definitions of key terms of the practices it deems discriminatory, including "diversity," "equity," and "inclusion."

89.   The DCL follows these assertions by announcing entirely new rules. For the first time in ED's history, the DCL announces: that "[r]elying on non-racial information as a proxy for race . . . violates the law . . . whether the proxies are used . . . on an individual basis or a systematic one"; that it would be "unlawful for an educational institution [to undertake a change in policy] to increase racial diversity"; and that "DEI programs . . . deny students the ability to participate fully in the life of a school." DCL at 3. ED provides no specific sources for its pronouncement that these actions are, on their face, unlawful.

90.   To the extent ED supplies any reason for the positions in the DCL, it states that "[a]lthough *SFFA* [*Students for Fair Admissions v. Harvard*] addressed admissions decisions, the Supreme Court's holding applies more broadly." DCL at 2.

91.   While the Supreme Court in *SFFA* ruled that the benefits of diversity did not provide a compelling interest justifying the consideration of race in college admissions, 600 U.S. 181, 230 (2023), it did not conclude, in a particular case or as a general matter, that it violates the

law to " [r]el[y] on non-racial information as a proxy for race . . . on an individual basis or a systematic one," to use race neutral efforts to increase diversity, or to implement DEI programs. DCL at 3. ED acknowledges that the Supreme Court's holding was narrower than the proscriptions announced in its DCL, yet it treats the case as a sufficient basis for its conclusions without explanation.

92.    Further, to the extent the Supreme Court has spoken on these issues, it has distinguished them. In *SFFA*, for example, the Court writes that the interests furthered by diversity, including "promoting the robust exchange of ideas," "broadening and refining understanding," and "producing new knowledge stemming from diverse outlooks," are "commendable goals," 600 U.S. at 214 (citation omitted), and Justice Kavanaugh, in his concurrence, expressly states that "governments and universities still 'can, of course, act to undo the effects of past discrimination in many permissible ways.'" *Id.* at 317 (quoting *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 526 (1989) (Scalia, J., concurring)).

93.    The DCL states that a "[s]chool may not use students' personal essays, writing samples, participation in extracurriculars, or other cues as a means of determining or predicting a student's race and favoring or disfavoring such students." DCL at 2 (citing *SFFA*, 600 U.S. at 230 ("[U]niversities may not simply establish through application essays or other means the regime we hold unlawful today.")). Although the DCL here cites *SFFA*, it omits additional guidance that the Supreme Court itself supplied to schools in navigating this area in line with its holding.

94.    As stated by the Supreme Court: "nothing in [its] opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise . . . . A benefit to a student who

overcame racial discrimination, for example, must be tied to *that student's* courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to *that student's* unique ability to contribute to the university." *SFFA*, 600 U.S. at 230–31.

95.     By omitting this additional guidance and failing to provide any reasoned explanation, it is unclear if ED intends to ignore the Supreme Court's guidance in its enforcement actions and treat as impermissible "considering an applicant's discussion of how race has affected his or her life." *Id*. at 230. To the extent the DCL does so, ED clearly acts beyond its authority. At a minimum, ED omits available guidance that would help schools to administer their programs in a reasoned fashion, leaving them to question unnecessarily whether they can consider applicants' self-expressed experiences at all.

96.     Next, the DCL states that "[r]elying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systematic one." DCL at 3. It is unclear what exactly ED seeks to prohibit through these terms. ED accuses schools of using information "as a proxy for race" but it provides no guidance on how it would determine that information was used as a proxy for race. Further, it is unclear what ED has in mind when it references "grant[ing] preferences . . . on a systematic [basis]." *Id.*

97.     ED provides one example, stating that it would be "unlawful . . . to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity." *Id.* But this example only compounds the vagueness of the DCL's directive. It is not clear from ED's guidance how eliminating standardized testing would constitute reliance on a proxy for race, nor is it self-evident how this would amount to an impermissible racial preference. There is no

reference to any law, case, or set of facts that could further illuminate ED's thinking. Nor does ED clarify how or why it would treat an intent "to increase racial diversity" as unlawful. *Id.* Schools and educators must guess, at their peril, what these provisions of the DCL actually forbid.

98.     Finally, the DCL states that "[o]ther programs discriminate in less direct, but equally insidious, ways." *Id.* The DCL discusses this form of discrimination as distinct from "programs [that] may appear neutral on their face, [but] a closer look reveals that they are, in fact, motivated by racial considerations." *Id.* at 2 & n.8 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). The DCL does not explain how it arrived at this separate standard.

99.     Further, these "ways" of discriminating are not clearly enumerated. In citing DEI programs as an example, however, ED invites the inference that the teaching of "DEI" ideas is one "less direct . . . way[ ]" of discriminating. *Id.* at 3. In particular, the DCL states without support that "DEI programs frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not." *Id.*

100.     ED does not explain what would be considered a "DEI program," how such programs "preference" certain racial groups, or how the mere discussion of certain ideas would violate the law. ED does conclude that "such programs" — whichever programs these are — "stigmatize students" and "deny [them] the ability to participate fully in the life of a school." *Id*. Again, these are broad characterizations of certain types of harm, but ED provides no actual guidance of how it would apply the law to actual or hypothetical facts to conclude that education programs violate Title VI.

101.    The DCL identifies specifically that "DEI programs . . . teach students that certain racial groups bear unique moral burdens that others do not." *Id*. It is doubtful that ED seeks to ban the verbatim use of this phrase in teaching, and such a prohibition would create separate problems. Because the DCL prohibits the teaching of an idea or concept, it inherently lacks the clear boundaries that ensure fair implementation. To enforce this prohibition in practice, ED must depend on subjective evaluations and assumptions.

102.    Here, the DCL is not only vague; it also encroaches on teaching and academic freedom. With respect to K-12 education provided by states and their subdivisions, Congress has expressly prohibited ED from involvement in curricular decisions. For example, the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act ("ESSA"), 20 U.S.C. §§ 6301–7981, is the primary federal statute governing K-12 education funding. The statute establishes formula and competitive grants to states, local education agencies, schools, non-profits, and institutes of higher education "to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational opportunity gaps." *Id.* § 6301. ESSA explicitly prohibits the Federal Government from interfering with states' curriculums, instructional content, and related activities across all of its titles involving federal grants. *See, e.g.*, *id.* § 7906a; *id.* § 7907(b) ("Notwithstanding any other provision of Federal law, no funds provided to the Department [of Education] under this chapter may be used by the Department, whether through a grant, contract, or cooperative agreement, to endorse, approve, develop, require, or sanction any curriculum . . . designed to be used in an elementary school or secondary school."); *id.* § 7907(c)(1) ("Nothing in this section shall be construed to—(1) authorize an officer or employee of the Federal Government, whether

through a grant, contract, or cooperative agreement to mandate, direct, review, or control a State, local educational agency, or school's instructional content, curriculum, and related activities.").

103.    Likewise, the Higher Education Opportunity Act ("HEOA"), which is designed to provide financial assistance to post-secondary students and enhance the programming of colleges and universities, prohibits ED from "mandat[ing], direct[ing], or control[ing] an institution of higher education's specific instructional content, curriculum, or program of instruction." 20 U.S.C. § 1132-2.

104.    Further, the General Education Provisions Act ("GEPA"), 20 U.S.C. §§ 1221–1234i, governs the administration of federal education programs. GEPA prohibits the federal government from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system." *Id.* § 1232a.

105.    These prohibitions on federal intrusion into curriculum, instruction, and materials are longstanding. The Department of Education Organization Act ("DEOA"), 20 U.S.C. §§ 3401–3510, which established ED and its various offices in 1979, similarly prohibits ED from exercising "direction, supervision, or control" over a range of activities, including "over the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." *Id.* § 3403(b).

106.    In higher education, the DCL's prohibitions on "indoctrination" and teaching certain disfavored ideas stand to interfere with core First Amendment rights of academics in the classroom and in broader research and writing.

107.    In declaring these practices and programs broadly unlawful, ED has not only encroached upon the courts' authority to say what the law is and exceeded the scope and substance of the statutes by which it is bound; it has also issued rules while ignoring its own prior guidance and interpretation and providing no explanation whatsoever for its dramatic reversal in position. The DCL makes no mention of ED's own prior publications on these topics, some of which remain posted on ED's website. *See, e.g.*, Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues (Aug. 14, 2023), https://perma.cc/69WH-NECT; U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug. 14, 2023) ("SFFA Q&A"), https://perma.cc/V7Z6-XMCM; U.S. Dep't of Educ., Off. of the Undersec'y, Strategies for Increasing Diversity and Opportunity in Higher Education (Sept. 28, 2023) ("Strategies for Increasing Diversity and Opportunities Report"), https://perma.cc/52W4-XJFR.

108.    Nor does the DCL even acknowledge the agency's change in position. *See FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency must "display awareness that it is changing position" (emphasis omitted)).

109.    To take but one example, in August 2023, ED issued a Q&A document regarding *SFFA* that advises that "institutions of higher education may continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity." SFFA Q&A at 3. The DCL contradicts this prior interpretation foundationally, and instead indicates that "diversity, equity, and inclusion" practices are discriminatory, DCL at 2,

30

that such practices "deny students the ability to participate fully in the life of a school," and that "it would be unlawful … for an educational institution" to take an action "to increase racial diversity." *Id.* at 3.

110.     Similarly, ED's Strategies for Increasing Diversity and Opportunities Report is described as a "resource for educational institutions considering new policies or programs to advance or maintain student diversity after the Supreme Court's decision in *SFFA*" and presents "examples of actions that can help advance equitable opportunity in ways that do not consider an individual student's race in and of itself in admissions." Strategies for Increasing Diversity and Opportunities Report at 6. The Report, still available on ED's website, describes programs and practices that ED has previously identified as related to promoting diversity. However, the DCL does not address the prior Report or these practices specifically, and its general conclusion that "DEI programs" are unlawful. DCL at 3, contradicts the Report. In so doing, the DCL induces confusion and broadly chills educators including Plaintiffs, their members, and their staff in their day-to-day work.

111.     The DCL also fails to explain the dramatic shift in the factual premises underlying those competing ED publications. Citing statistics and studies about college completion rates and sense of belonging within institutions, ED's prior guidance advises that, "[t]o support students' sense of belonging and the college completion, institutions should consider activities such as . . . ensuring campuses provide a welcoming and supportive environment for students from all backgrounds through affinity groups; diversity, equity, and inclusion (DEI) programming; and shared, accessible spaces." Strategies for Increasing Diversity and Opportunities Report at 38 & nn.158–60, 44–46 & nn.185–96. Without citation to any factual support, the DCL instead insists that DEI programs "stigmatize students who belong to particular racial groups based on crude

racial stereotypes" and "deny students the ability to participate fully in the life of a school." DCL at 3.

112.    By neglecting to address its departure from settled law, regulations, and the agency's prior guidance and interpretations, the DCL fails to acknowledge the reliance interests of Plaintiffs, states, local education agencies, schools, higher education institutions, and other stakeholders in education. The DCL broadly addresses all facets of schools' programs, from pre-school to postsecondary education, including "admissions, financial aid, hiring, training, and other institutional programming," *id.* at 1 & n.1, and extending to "third-party contractors, clearinghouses, or aggregators," *id.* at 3. Schools have invested financially and otherwise in ensuring that their programming conforms with federal law while serving their own missions and the needs of their students. Now, in the middle of the academic year and fiscal cycle, the DCL advises schools and the entire education community indicated by the DCL that they must abruptly change course to adhere to new rules that are broad, retroactive, and open-ended in their reach. The impact is felt immediately by schools and educators and radiates out through the entire education community.

113.    None of the School District Plaintiffs had the opportunity to knowingly accept or reject the federal funds based on the new conditions. They cannot continue to deliver the quality of instruction, programming, and professional development that their school communities deserve without federal funds. Educators and school districts, including Plaintiffs and their members, have invested in practicing their profession in compliance with federal law, including in their own training and professional development, in designing their courses and curriculum, and otherwise. Indeed, laws, regulations, and other guidance and interpretation address the provision of equal educational opportunity and inclusion in many ways, including for students on

the basis of race, ethnicity, national origin, sex, and for students with disabilities, English learners, and students experiencing homelessness. Compliance with these civil rights obligations is deeply woven into the practice of teaching and education. The DCL introduces new and uncertain requirements in educators' work without affording any opportunity to prepare and plan to incorporate these new requirements—a particularly thorny problem, as the DCL's requirements appear to conflict with many other professional requirements, best practices, and other federal laws. This places educators and the organizations that serve them in an immediate bind and interferes with the education that students receive.

114.    Organizations like Plaintiffs NEA, NEA-NH, and CBED are also impacted by the uncertainty and the change in policies. The DCL orders schools to "cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race," *id.* at 3, and makes discriminatory educator practices that are common to teaching and learning. In so doing, the DCL squarely places in contention the training and support that NEA and NEA-NH provide to members and in turn to schools, as well as the training, programming, and consultation that CBED provides to students and teachers through their schools and districts.

115.    Moreover, ED elected to set forth substantive obligations and a vow to vigorously enforce them without proceeding through the notice and comment process set out by Congress in the APA. 5 U.S.C. § 553. Indeed, by inviting comments in a footnote to the DCL, *see* DCL at 1 n.3, ED appears to be aware that notice-and-comment rulemaking was required, but attempts to avoid its obligations. Section 553 demands that notice and comment be solicited before "not less than 30 days before [the rule's] effective date." 5 U.S.C. § 553(d).

II.    **The DCL invites arbitrary and discriminatory enforcement and compels immediate compliance.**

116.    Although the DCL's requirements are not clear, ED's intent to enforce them is. The DCL states that ED "intended to take appropriate measures to assess compliance with the applicable statues and regulations based on the understanding embodied in this letter beginning no later than 14 days from today's date," i.e., by February 28, 2025. DCL at 3.

117.    Further, "[a]ll educational institutions are advised to: (1) ensure that their policies and actions comply with existing civil rights law; (2) cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends; and (3) cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." *Id*.

118.    These statements are phrased as directives to educational institutions. The DCL communicates to schools that enforcement action is coming swiftly, within 14 days. Yet here, as throughout the DCL, ED has already concluded that schools are in violation and schools are directed to "cease all efforts" to violate the law as ED conceives of it.

119.    The DCL also exhorts "[a]nyone" who "believes" that a covered entity has engaged in activities covered by the DCL to file a complaint with ED and provides a link to its online complaint form. *Id*. at 4.

120.    The open-ended and subjective nature of the DCL's prohibitions allow for arbitrary and discriminatory enforcement. Any teaching or other education programs that ED views as impermissible "DEI" can be targeted. The DCL's summary conclusion that schools are engaged in discrimination indicates that the administration will make determinations about a program's legality without meaningful investigation and process.

121.    On March 14, 2025, just one month after it issued the DCL, ED announced that it

initiated investigations against 45 universities for alleged violations of Title VI. The press release

indicated ED was also investigating six universities for offering impermissible race-based

scholarships and one university who allegedly segregated students on the basis of race.

122.    Other actions by the administration substantiate this threat of enforcement. For

example, on February 10, 2025, the Department of Government Efficiency ("DOGE") reportedly

announced termination of $881 million worth of ED grants and contracts, including 29 training

grants for diversity, equity, and inclusion, worth $101 million.[2] On February 13, 2025, ED

announced that it cancelled over $350 million in contracts and grants to Regional Education

Laboratories and Equity Assistance Centers because of purported "ideologically driven spending

not in the interests of students and taxpayers." Press Release, U.S. Dep't of Educ., U.S.

Department of Education Cancels Additional $350 Million in Woke Spending (Feb. 13, 2025),

https://perma.cc/VT57-LXEX. ED explained it targeted grants and contracts that advised schools

to "undertake 'equity audits' and equity conversations" and those that "supported divisive

training in DEI, Critical Race Theory, and gender identity for state and local education agencies

as well as school boards." *Id.* On February 17, 2025, ED slashed over $600 million in diverse

teaching grants to institutions and nonprofits for teacher preparation programs. Press Release,

U.S. Dep't of Educ., U.S. Department of Education Cuts Over $600 Million in Divisive Teacher

Training Grants (Feb. 17, 2025), https://perma.cc/K2N4-UUN7. According to the Department,

such programs were targeted because they trained teachers and education agencies on "divisive

ideologies," including "inappropriate and unnecessary topics such as Critical Race Theory;

---

[2] Hannah Parry, *DOGE Announces it's Slashing $881M from Education Department Contracts*, Newsweek (Feb. 11, 2025), https://perma.cc/642U-T5GB.

Diversity, Equity, and Inclusion (DEI); social justice activism; 'anti-racism'; and instruction on white privilege and white supremacy." *Id.*

### III.    ED's actions implementing and purporting to explain the DCL continue to target ideologies and practices with which it disagrees and sow more confusion.

123.    ED has halted investigation of Title VI complaints on a categorical basis and allowed only select investigations to continue or be opened.[3] Yet, following the issuance of the DCL, ED announced a new "End DEI" complaint portal for "parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in" schools. Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 26, 2025) ("Portal Press Release"), https://perma.cc/8737-NAA9. The "End DEI" complaint form invites only specific complaints and does not provide an avenue for filing other civil rights complaints within ED's jurisdiction. U.S. Dep't of Educ., End DEI Portal, https://perma.cc/GYS3-J2GR. Instead, ED solicits complaints focused on the communication of ideas ED disfavors and tendentiously describes as "divisive ideologies and indoctrination." *Id.*

124.    The "End DEI" portal is described as focused on "divisive ideologies and indoctrination," U.S. Dep't of Educ., End DEI Portal, and asks complainants to identify specific schools or school districts and detail "concerning practices," and indicates that ED "will use submissions as a guide to identify potential areas for investigation," Portal Press Release.

125.    ED does not provide its own explanation of the portal's purpose, but cedes this space to a private individual, identified as a co-founder of Moms for Liberty, who makes unsupported claims about schools "pushing critical theory, rogue sex education and divisive

---

[3] Jennifer Smith Richards & Jodi S. Cohen, *Education Department "Lifting the Pause" on Some Civil Rights Probes, but Not for Race or Gender Cases*, ProPublica (Feb. 20, 2025), https://perma.cc/BK9Z-77AV; Jennifer Smith Richards & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025), https://perma.cc/4GSZ-6NT7.

ideologies" and encourages parents to use the portal "to share the receipts of the betrayal that has happened in our public schools" through "pushing critical theory, rogue sex education and divisive ideologies." Portal Press Release.

126.    ED's platforming of Moms for Liberty in its press release announcing the "End DEI" portal lays bare the DCL's potential breadth and chilling effect. On February 15, 2025, Moms for Liberty characterized the DCL informing the departments of education of all 50 states that "they have 14 days to eliminate all Diversity, Equity, and Inclusion (DEI) programs in their public schools," and that "NO MORE Tax Payer Dollars will be spent on DEI!"[4]

127.    Moms for Liberty also attended school board meetings and proclaimed that the DCL "means the Office of Equity Affairs needs to be dismantled along with any DEI programs," and threatened that "February 28 is the deadline to say goodbye to DEI. It will be in the best interest of this school district to comply. If compliance is not met, Moms for Liberty is prepared to escalate this issue, potentially leading to the loss of federal funding for the school district."[5] Given the apparent close relationship of Moms for Liberty to ED, these threats weigh heavily. In the past, Moms for Liberty in New Hampshire has even offered money for people to "catch" a public school teacher violating similar bans on teaching.[6]

128.    On March 1, 2025, ED announced the release of a Frequently Asked Questions Document, "Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act," which is "intended to anticipate and answer questions that may be raised in response to [the DCL]." U.S. Dep't of Educ. Office for Civil Rights, Frequently Asked

---

[4] Moms for Liberty, DEAR COLLEAGUE, Facebook (Feb. 15, 2025),
https://www.facebook.com/story.php?story_fbid=935218675478809&id=100069720560290.
[5] Brianna Kraemer, *DEI tug-of-war in Wake County Schools stirs tensions among board, parents*, The Carolina Journal (Feb. 20, 2025), https://perma.cc/KQY2-D743.
[6] Sarah Gibson, *Offer of Cash Prize Against N.H. Teachers Draws Rebuke*, New Hampshire Public Radio (Nov. 18, 2021), https://perma.cc/BB4Y-6C6P; Moms for Liberty Hillsborough Co, NH, X (Nov. 12, 2021), https://x.com/Moms4LibertyNH/status/1459166253084467205?s=20.

Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Feb. 28, 2025) ("FAQ"), https://perma.cc/D63A-7MD9 (attached as Ex. C). ED states that this document is intended to "provide helpful information" about how the Supreme Court's *SFFA* decision "applies to racial classifications, racial preferences, and racial stereotypes," as well as "how OCR will interpret the ruling in its enforcement of Title VI of the Civil Rights Act of 1964 and its implementing regulations." FAQ at 1.

129.    Nothing in the FAQ changes the force and effect of the DCL. In fact, the FAQ confirms ED's position as final. ED states that this document is intended to "provide helpful information" about how the Supreme Court's *SFFA* decision "applies to racial classifications, racial preferences, and racial stereotypes," as well as "how OCR will interpret the ruling in its enforcement of Title VI of the Civil Rights Act of 1964 and its implementing regulations." FAQ at 1. Further, ED did not even announce its FAQ until after the DCL's deadline for compliance,[7] and the FAQs themselves state that they do not "bind the Department of Education in the exercise of its discretionary enforcement authority." FAQ at 1 n.3.

130.    The FAQ only adds to educators' sense of uncertainty and chill. The FAQ purports to clarify ambiguity in the DCL. However, the FAQ is itself contradictory in how it attempts to do this, and provides further indication of the lack of objective, definite guidelines for the conduct and expression that the DCL forbids.

131.    For example, in FAQ 3, ED attempts to explain the *SFFA* decision. Yet the FAQ introduces additional misstatements of the law. In the FAQ, ED states that "[s]trict scrutiny has

---

[7] The FAQ is dated February 28, 2025. However, the press release announcing the document to the public was not made until March 1, 2025. Press Release, U.S. Dep't of Educ., U.S. Department of Education Releases Frequently Asked Questions on Dear Colleague Letter About Racial Preferencing (Mar. 1, 2025), https://perma.cc/6JK6-TWRN.

famously been described as 'strict in theory, fatal in fact.'" FAQ at 3. The Supreme Court has written to refute this contention.

132.    In *Adarand Constructors, Inc. v. Peña*, the Supreme Court wrote to "dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.'" 515 U.S. 200, 237 (1995) (citation omitted). The Court explained further that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Id.*

133.    Further, the FAQ states that "the *SFFA* Court recognized only one interest as sufficiently compelling in the educational context." FAQ at 3. This ignores *SFFA*'s clear statement that it was not speaking beyond the case before it to reach other articulated compelling interests. 600 U.S. at 213 n.4 (declining to reach the question of whether U.S. military academies had distinct compelling interests that would justify the consideration of race in admissions).

134.    In FAQ 9, ED suggests that it is not directing schools to violate the First Amendment and acknowledges federal laws that prohibit ED from exercising control over school curricula. But this does nothing to upset the text of the DCL itself, which indicates that ED is concerned with "indoctrination" and "teaching." DCL at 2, 3. In fact ED reaffirms in the FAQ that it intends to evaluate classroom discussion for violations of Title VI, noting only that it would treat "themes in a class discussion" differently if they occur in a university or at an elementary school. FAQ at 6.

135.    Moreover, the characterization of programming that ED would review turns on subjective judgments and incorporates the same types of vague terms and viewpoint discriminatory prohibitions that have been found constitutionally suspect in other laws. For example, what does it mean to conduct "trainings that are designed to emphasize and focus on

racial stereotypes?" FAQ at 7. Courts analyzing similar prohibitions have found this vague

language would prohibit a teacher from describing or identifying discriminatory beliefs in an

orientation or course, or assigning a reading or work in which an author describes or identifies

discriminatory beliefs, like how current stereotypes about race may affect the opportunities of

historically marginalized groups. *See, e.g.*, *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL

2722254 (D.N.H. May 28, 2024) (appeal filed); *Black Emergency Response Team v. Drummond*,

737 F. Supp. 3d 1136, 1149 (W.D. Okla. 2024).

136.    These are just some examples of the ways in which the FAQ only serves to

compound the problems with the DCL.

137.    On April 3, 2025, ED issued a press release regarding letters ED sent to State

Commissioners overseeing SEAs.[8] According to the press release, the letters require SEAs to

certify that they are not engaging in undefined "DEI" and that they are complying with ED's

newly announced understanding of Title VI and *SFFA*.[9] The press release notes that the

certifications "are being sent out pursuant to the Department of Education's authority and

responsibility to ensure that recipients of federal funding are complying with United States civil

rights law," further citing the DCL and FAQ.[10] The press release indicates that SEAs have 10

days—until Sunday, April 13, 2025—to certify their compliance and collect certifications from

all LEAs.[11] That deadline was later extended to April 24, 2025.[12]

138.    ED did not issue a 60-day notice of its intent to issue the Certification

Requirement, depriving the public of the opportunity to comment on such changes. It also did

---

[8] Press Release, U.S. Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and Students v. Harvard as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://perma.cc/6UKX-7E66.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] ECF 45-3.

not print any OMB control number on the Certification Requirement, as required by the

Paperwork Reduction Act.

139.    The Certification Requirement provides the following "[r]equested [c]ertification"

that SEAs and LEAs must sign:

> On behalf of _____ [SEA/LEA],
> I acknowledge that I have received and reviewed this Reminder of Legal
> Obligations Undertaken in Exchange for Receiving Federal Financial Assistance
> and Request for Certification under Title VI and *SFFA v. Harvard*. I further
> acknowledge that compliance with the below and the assurances referred to, as well
> as this certification, constitute a material condition for the continued receipt of
> federal financial assistance, and therefore certify our compliance with the below
> legal obligations.

Certification Requirement at 1.

140.    SEAs and LEAs are required to certify compliance with ED's new requirements for

the receipt of federal funding, as first announced in the DCL, and for which ED provides no

justification. While the Certification Requirement notes several sources of obligations for federal

funding recipients, i.e., Title VI, *id.* (citing 42 U.S.C. § 2000d), federal contract and grant

regulations, *id.* at 2 (citing 2 CFR § 200.300(a)), and ESSA, *id.* (citing 20 U.S.C. § 6301 et seq.),

as well as the requirement that federal funding recipients file assurances of compliance with federal

nondiscrimination law, *id.* (citing 20 U.S.C. § 7844), SEAs and LEAs already have provided such

assurances. The Certification Requirement thus seeks to bind SEAs and LEAs to ED's new

requirements introduced in the DCL and in the language of the Certification Requirement itself.

The Certification Requirement concludes that, "[g]iven the text of Title VI and the assurances you

have already given, any violation of Title VI—including the use of Diversity, Equity, & Inclusion

('DEI') programs to advantage one's race over another—is impermissible. The use of certain DEI

practices can violate federal law." *Id.* at 3. Critically, as with the DCL, the Certification

Requirement does not define "Diversity, Equity, & Inclusion ('DEI') programs."

141.    The Certification Requirement threatens that "[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences" including (1) "eliminating federal funding for any SEA, LEA, or educational institution that engages in such conduct," (2) "the potential initiation of litigation for breach of contract by the Department of Justice in connection with civil rights guarantees contained in federal contracts and grant awards seeking to recover previously received funds paid to them under these contracts and grants," and (3) liability under the FCA, 31 U.S.C. § 3729(a), for which "violators face penalties including treble damages and civil penalties of thousands of dollars per violation." Certification Requirement at 3–4. The reach of the Certification Requirement is broad. It indicates that "individuals using [DEI] practices" may face "serious consequences," and that the enumerated consequences are not exhaustive. *Id.* at 3. Further, it obligates SEAs to sign on behalf of their agency as a whole, which by its terms includes the entirety of their programs, including those in higher education.[13] The email accompanying the Request for Certification also requires SEAs to report the signature status of each of their LEAs, any compliance issues within LEAs, and the SEA's proposed enforcement plans.[14]

142.    The Certification Requirement both implements the DCL, and also independently reflects separate final agency action. It sets forth substantive obligations that ED vows to enforce and threatens liability based on "compliance with the [information therein] and the assurances referred to, as well as th[e] certification," including new forms of liability under contract law and the FCA.

---

[13] *See, e.g.*, 20 U.S.C. § 6861 (providing grants to entities, including higher education institutions, to provide professional development to improve instruction for English language learners, including in consortia with SEAs or LEAs); *id.* § 7294 (providing grants to entities, including higher education institutions, to assist SEAs, LEAs, and other entities in training personnel in the identification and education of gifted and talented students).
[14] Letter from Daniel Morton-Bentley, Counsel & Deputy Comm'r, N.Y. State Educ. Dep't, to U.S. Dep't of Educ., Off. of C.R. at 2 (Apr. 4, 2025), ECF 41-9.

143.    SEAs have moved swiftly to obtain compliance. For example, on the evening of April 3, the New Hampshire Department of Education (NHED)'s Bureau of Federal Compliance emailed all New Hampshire LEAs requiring them to submit the Certification Requirement and additional information to NHED by Thursday, April 10, 2025 at 5:00 pm ET.[15] NHED extended this deadline to April 17, 2025 following the extension of ED's deadline to April 24, 2025.[16] The email notes that if no form is received by the deadline, NHED "is required to report to the United States Department of Education that no certification was received," and that "[a]ll issues of noncompliance and a proposed enforcement plan will be submitted to [ED]."[17]

144.    NHED includes ED's Certification Requirement as well as a "Mandatory Supplement Questionnaire" (the "Supplement Questionnaire").[18] This additional questionnaire asks as follows:

> Upon investigation, have there been instances of noncompliance identified within your LEA? . . . If the answer to the question above is yes, please describe each issue of noncompliance found within your LEA. For each area of noncompliance identified above, detail your remediation plans including intended date of remediation completion.[19]

145.    No additional reason or purpose is provided for requiring LEAs to submit this information. The Supplement Questionnaire provides no additional definitions of "investigations," "instances of noncompliance," or "remediation," or guidance on how to assess compliance.

---

[15] N.H. Dep't of Educ., Certification Requirement Directions (Apr. 3, 2025), ECF 41-5.
[16] N.H. Dep't of Educ., Updated Deadline for Certification Requirement (Apr. 8, 2025), ECF 47-1.
[17] *Id.* NHED has also incorporated the DCL requirements into its annual general assurances. See Memorandum from Lindsey Labonville, Adm'r, Bureau of Fed. Compliance, N.H. Dep't of Educ., on General Assurances FY 2026 to Senior Education Officials at 1 (Apr. 4, 2025), ECF 41-10.
[18] Supplement Questionnaire, ECF 41-11.
[19] *Id.*

**IV.    The DCL causes substantial, irreparable harm to Plaintiffs.**

146.    The DCL causes substantial harm to educators and school districts, including Plaintiffs and their members. The vague prohibitions in the DCL related to diversity, equity, inclusion, and race will chill teacher practices that are core to effective teacher pedagogy, state standards, and other teaching and learning requirements. Educators and school districts will be forced to guess what practices may run afoul of the DCL and will self-censor and dramatically change course, or continue core tenants of their profession at the risk of reports through the so-called "End-DEI" portal, and under the threat of investigation and discipline.

147.    Under the rules set out by the DCL, educators and school districts, including Plaintiffs and their members, face significant uncertainty about what they can teach, how they can teach, how they can interact with their students, and about what educational programs they can operate and how. This uncertainty has an immediate impact on their ability to do their jobs in accordance with professional standards and to provide students with quality education.

148.    Consistent with sound pedagogical practices, most states across the country have requirements or standards for teaching and learning that provide that teachers should instruct on concepts and practices the DCL prohibits. Discussions regarding race are necessary to comply with state and local standards and requirements across a variety of subjects, and particularly those governing history and social studies.

149.    For example, an adequate public education, as defined by New Hampshire law, requires schools to provide the types of instruction and pedagogical strategies that the DCL prohibits. "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education [is required] to enable [students] to participate in the democratic process and to make informed choices as responsible citizens." RSA 193-E:2, IV. The K-12 Social

Studies New Hampshire Curriculum Framework sets standards for teaching social studies to develop students' knowledge and skills. According to the guide, "[a]n effective study of social studies social studies must focus on conceptual frameworks and themes rather than solely an examination of facts." *Id.* The themes for U.S. History include "slavery; racism; 'Jim Crow'; Darwinism; eugenics." *Id.* at 11. Seventh and eighth graders must learn how "suffrage expanded to various groups of citizens," including African Americans and women. *Id.* at 62. High schoolers must analyze the impact of various labor systems, including "slavery, the medieval guilds, or wage labor." *Id.* at 100. New Hampshire's Curriculum Framework further requires a "grounding in . . . literature to enable [students] to appreciate our cultural heritage and develop lifelong interests and involvement in these areas." *See* RSA § 193-E:2, V. Educators must teach about the evolution of "intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination," as well as "how to prevent the evolution of these practices." RSA 189:11, I-c(j).

150.    Moreover, many states and local school districts have requirements or standards that mandate teaching concepts and engaging in practices related to valuing and analyzing diverse perspectives, fostering critical thinking, and ensuring that education is inclusive and equitable. In New Hampshire, for example, students must learn to recognize the ongoing struggle to realize America's founding principles; consider interactions and interdependence through multiple perspectives; and examine engagement across differences of culture, race, and heritage. N.H. Code Admin. R. Ann. Ed. 306.23(f)(3)(f).

151.    Principles related to diversity, equity, and inclusion and topics related to race are also included in many educator training and professional standards. For example, The State of New Hampshire's Guiding Principles: The Code of Ethics for New Hampshire Educators direct

educators to communicate with colleagues and students in a culturally sensitive manner.
According to the Guiding Principles, educators have a responsibility to "commit[ ] to equality,
equity, and inclusion of colleagues, staff, students, parents or guardians and other members of
the school community; [and] respects diversity amongst colleagues, staff, students, parents or
guardians, and other members of the school community."

152.    Because of the DCL and against this backdrop, educators and school districts,
including Plaintiffs and their members, are uncertain whether they can, for example:

(a) assign or provide access to a variety of readings, including where authors express
a particular view, theory, or experience concerning discrimination, racism, or
other prejudices, where the reading could be considered to address topics of
"diversity," "equity," or "inclusion";

(b) discuss in their instruction topics that address historical and contemporary events
such as the existence and legacy of slavery, the existence of Jim Crow laws, or
Supreme Court arguments regarding affirmative action;

(c) assign materials or instruct on subjects reflecting a diversity of views and beliefs
such as differing political systems and theories, or addressing different cultures
and languages;

(d) answer questions from students about current events that may relate to race,
"diversity," "equity," or "inclusion" or respond when students share their own
experiences that may relate to these subjects; or

(e) continue to teach according to professional training and standards.

153.    For example, Member A is a high school English teacher who teaches books like
*Heart of Darkness* by Joseph Conrad, *To Kill a Mockingbird* by Harper Lee, and *Beloved* by

46

Toni Morrison. To make these books relevant and interesting to students and to promote critical thinking, Member A encourages students to connect these works' themes of race, colonialism, discrimination, and slavery to contemporary society. Under the DCL's vague terms, Member A is concerned that these teaching practices could result in him being accused of "indoctrinating" students in a way that the DCL suggests constitutes illegal discrimination, which could result in investigation, discipline, or adverse employment outcomes.

154.    Member B is an 8th Grade Social Studies teacher who covers United States history from the Civil War to the modern era, including state-required instruction on genocide and antisemitism and lessons on Juneteenth, the Reconstruction era, the Civil Rights Act of 1866, the Fourteenth and Fifteenth Amendments, the Black Codes, the KKK, the Jim Crow Era, the Compromise of 1877, the Tulsa race massacres, and other topics that necessarily touch on concepts of race, racism, and slavery. She does not know how she can teach or facilitate student research and discussion of these topics without creating a risk of being accused of violating the DCL's vague conception of illegal discrimination. She feels that she is being held hostage to students and parents' vague conceptions of discrimination and DEI under the DCL, which creates a risk to her career through its reporting mechanisms.

155.    Member G's higher education courses and research include issues of systemic and structural racism (for example, the need for teacher preparation programs to be more responsive to the assets and experiences of pre-service teachers of color,) along with equity and inclusion (for example, the importance of including LGBTQIA+ literature and experiences in ELA curricula). She worries that a student or anyone else could perceive her scholarship and classroom instruction to teach that people of some races or gender/sexuality carry a moral burden that others do not in violation of the DCL. She is also worried about whether she can assign

47

students readings that center on the experiences of marginalized peoples in the U.S., or whether this would be considered impermissible programing related to diversity, equity, and inclusion.

156.    Member E fears that the DCL conflicts with the national standards for special education professionals that he uses in designing and implementing his courses to prepare pre-service special education teachers. For example, these standards require that beginning special education professionals understand "how language, culture, and family background influence" the learning of their students, and require them to build inclusive and culturally-responsive learning environments. Member E worries that these standards conflict with the DCL and has and will undermine his preparation of pre-service special education teachers.

157.    The DCL limits Dover School District's instruction. The District does not know whether or how to discuss topics involving racism, like the Jim Crow era or Indigenous history, that arise naturally during classroom instruction, particularly in social studies and English language arts courses. Instead of celebrating the intellectual curiosity of students who ask questions connecting instructional topics to current events, Dover teachers are chilled because they do not know if the DCL prohibits them from answering questions. They are unsure whether they can assign tasks that involve higher level learning if they could implicate themes of race, diversity, equity, and inclusion. For example, the District wonders if it may direct students to compare and contrast the current political climate with the Civil War or to analyze the impact of political conditions on Shakespeare's writing. While a Holocaust survivor made a compelling presentation about her lived experience last year, Dover School District does not know if it could host the event again because ED might construe it to "teach students that some racial groups bear unique moral burdens that others do not." The DCL's vague terms chill the Dover School District's instruction.

158.    Further, Dover School District recently spent $1.4 million to replace its elementary and middle school curriculum to reflect the diversity of its students, in accordance with ED's guidance on ESSER III funds, and may not be able to utilize these materials due to the ED's unexplained reversal in the DCL. Replacing the curriculum was a long-term investment. The District expected to use the instructional materials for years to come and cannot afford to purchase another curriculum so soon.

159.    Somersworth School District worries that classroom discussions on the evolution of racism or bigotry, in the context of instruction required by state law, could be construed by ED to violate the DCL.

160.    Oyster River's high school English and social studies courses incorporate diverse perspectives in literature and cover historical topics that ED may consider to be DEI-related subjects, in contravention of the DCL. Teachers cannot fully explore concepts and historical facts in World History, American History, and literature courses due to the DCL.

161.    Hanover and Dresden School Districts' instruction arguably violates the terms of the DCL. Its history and social studies courses highlight the perspectives of populations that have traditionally been overlooked, including diverse voices on the American colonization, the Civil War, and the Civil Rights movement. The Districts also provide full day courses or immersive travel experiences to explore the culture and history of the South and civil rights.

162.    In accordance with New Hampshire law and other state and local requirements, all of the School District Plaintiffs teach topics and perspectives that could abut the DCL's restrictions. These topics include slavery, racism, Jim Crow, Darwinism, eugenics, slavery, genocide, mass violence, and the Holocaust. The law does not envision a cursory review of these topics; students must utilize conceptual frameworks to consider how intolerance, bigotry,

antisemitism, hatred and discrimination have evolved, can result in genocide, and can be prevented.

163.    In addition to the content of instruction and programming, the DCL's vague prohibitions on "diversity," "equity," and "inclusion," implicate the ways in which educators teach across subject matters. These principles are central to sound pedagogy because they encourage students to question, analyze, and think critically about the world around them. The vagueness in the DCL's prohibitions thus means that educators must not only consider whether a particular book or discussion is permissible, but every aspect of their professional practice.

164.    For example, many educators and school districts, including Plaintiffs and their members:

   (a) employ culturally responsive practices as part of strong pedagogy, and as encouraged or required by state and local educational policies. Culturally responsive pedagogy is teaching "to and through [students'] personal and cultural strengths, their intellectual capabilities, and their prior accomplishments."[20] As part of culturally responsive teaching, educators should "help[ ] students learn more about their own and others' cultures, as part of their personal development and preparation for community membership, civic engagement, and social transformation."[21]

   (b) provide instruction for multilingual learners through high-quality instructional materials that are culturally relevant to students, consistent with best practices. High-quality instructional materials for multilingual learners provide students

---

[20] Geneva Gay, Culturally Responsive Teaching 26, 213 (Teachers College Press, 2nd ed. 2000).
[21] Geneva Gay, *The what, why, and how of culturally responsive teaching: international mandates, challenges, and opportunities*, 7 Multicultural Education Review, 123–39 (2015), https://doi.org/10.1080/2005615X.2015.1072079.

with the opportunities to study their own culture—and other cultures—to learn

while developing understanding of sociopolitical contexts, inequities, and global

challenges; to make personal connections to the material based on their own

cultural experience, for example, by free-writing on a given topic of discussion;

and incorporate student voice and partnership, including students' cultural,

linguistic and other intersectional identities into classroom learning.[22]

165.    Educators and school districts, including Plaintiffs and their members and staff,
frequently employ practices that recognize and value the diverse experiences and learning styles
that their students bring to their classrooms and school community. For example, effective
pedagogy includes differentiated instruction where teachers can present different material or
ways of accessing the material based on, among other things, student interest and background
knowledge. In the context of teaching students with disabilities, educators must consider both the
strengths of a learner, and what individual support, if any, they need to participate in the most
inclusive learning environment possible. Because of the broad scope and vagueness of the DCL,
Plaintiffs and their members and staff cannot know which of their education practices may be
construed as unlawful by ED. Instead, Plaintiffs and their members and staff must go about their
professional duties under the pervasive threat of ED enforcement actions.

166.    As an example, Member B allows her 8th Grade students to choose "passion
projects" to research a topic of interest, create a project outcome, and present their findings to the
classmates. These assignments are highly engaging to students. Students often choose projects
related to topics that could be implicated by the DCL's prohibitions, including race, gender, and

---

[22] Education First, *Toward Inclusivity: Advancing Social and Emotional Learning for Multilingual Learners* (2024),
https://perma.cc/M5CQ-W5U4.

LGBTQ history. Member B fears that allowing such passion projects to go forward could subject her to complaints of toxic indoctrination.

167.    In higher education, too, Member G is concerned about whether she can continue with her methods of assessment, such as requiring students to prepare a critical literacy unit, which would involve analyzing power and representation in texts and society, or whether these will be perceived as discriminatory under the DCL.

168.    In Member F's higher education English composition course, she is afraid to continue to allow students to choose their own topics for an argumentative paper because students often choose topics related to immigration issues, women's rights, and other similar topics. She fears these could be construed as impermissibly related diversity, equity, and inclusion under the DCL. In considering avoiding this assignment or others like it, Member F grapples with the consequence that students will no longer have the opportunity to learn about these topics, hear their classmates' viewpoints, and learn to respectfully debate with peers.

169.    Dover School District does not know if its culturally responsible instructional techniques and trauma-informed pedagogy are prohibited by the DCL. Its curriculum is designed to be accessible and relevant to students with diverse abilities and needs. It uses varied instructional strategies to target opportunity gaps and meet the needs of diverse learners. It does not know if it can invite guest speakers to discuss topics mentioned in the DCL. Teachers are unsure if they can include Black or Indigenous history books in their classroom and whether they can read these books aloud to students. Dover School District worries that, due to the DCL, it will no longer be able to produce academic learners with the skills they need to excel in a diverse society.

170.    Somersworth School District is not certain whether its inclusive educational opportunities violate the DCL. It provides robust ESOL services for immigrant communities as well as services, accommodations, and modifications of students with disabilities. Civil discourse on historical and contemporary matters, including topics involving race, ethnicity, and gender, are deliberately incorporated into instruction. As required by law, the District teaches about topics that abut the DCL's restrictions, including the evolution of racism and bigotry. Its students learn to analyze history through multiple perspectives and to recognize differences across philosophy, culture, race, and heritage. Somersworth School District fears that it cannot provide the inclusive education that its students deserve due to the DCL.

171.    Oyster River School District offers instruction that could be prohibited by the DCL, including its social and emotional curriculum and programs, instruction for ESOL students, and implementation of culturally responsive sustaining frameworks. Its additional academic support to certain demographic student groups, including low socio-economic status or ESOL students could conflict with the DCL.

172.    Diversity, equity, and inclusion are embedded into the curriculum and educational practices of Hanover and Dresden School Districts, putting them at risk after the DCL. The Districts use social emotional learning to ensure programs are accessible to all students. Academic curriculum incorporates diverse perspectives and 20% to 30% of new library books are authored by people of color. The Districts utilize culturally responsive instructional practices and are unsure if they can continue due to the DCL.

173.    These practices and concepts extend beyond the classroom. Schools are places where students learn about themselves and others. Accordingly, educators and other school personnel, like school counselors, engage in critical discussions with students regarding racial

and other forms of identity. These practices necessarily happen both inside and outside of the classroom, and both formally and informally in interactions among students and educators or other school personnel.

174.    Because of the DCL, educators and school districts, including Plaintiffs and their members and staff, do not know, for example, whether they can:

> (a) support student groups that focus on interests that could be considered to relate to "diversity," "equity," or "inclusion";
>
> (b) offer special events and programs that celebrate different cultures, languages, or religions or that seek to bring students from differing backgrounds together;
>
> (c) provide education on social and emotional learning to foster a culture of kindness and respect within schools as students develop their identities; or
>
> (d) take steps to review and address barriers to educational access due to language access, economic need, or housing insecurity.

175.    For example, Member C is a middle school counselor. An important part of her work is creating a school culture that fosters safe and positive identity development for middle schoolers. To accomplish this, she teaches an advisory curriculum on social and emotional learning that helps students develop healthy social skills, interpersonal skills, and emotional skills, which sometimes requires discussion of topics like hurtful language or stereotypes, including around race and racial slurs. She also teaches lessons on identity, gender, inclusivity, developing empathy, understanding bullying, and diversity, with the goal of teaching self-awareness, challenging stereotypes, imagining the feelings of others, the impact of bullying, and an appreciation for individual differences. Member C is concerned that because these lessons

touch on topics implicated by the DCL, she might be accused of violating the DCL's vague prohibitions on toxic indoctrination and discrimination.

176.    Dover School District's commitment to principles of diversity, equity, and inclusion may be impermissible due to the DCL. The District follows an equity plan and trains staff to better understand equity. Its professional development prepares staff to work with students from marginalized groups. The District hosts events to celebrate diversity with the learning community and prioritizes inclusion of students with disabilities, including adaptive sports activities. Dover students initiated and lead support groups, including Project D.R.E.A.M and the Gender, Sexuality Alliance at Dover High School, as well as a social justice group at the elementary school. The District conducts targeted suicide prevention activities, including a focus on marginalized populations. Dover School District fears these programs will violate the DCL.

177.    Somersworth School District's goal, to increase equitable opportunities for its students, may be foreclosed by the DCL. The District hosts engagement events for ESOL families and targets outreach to immigrant communities.

178.    Oyster River Cooperative School District develops and promotes diversity, equity, inclusion, and justice—concepts targeted by the DCL. The DEIJ Coordinator provides professional development on culturally responsive sustaining curricular frameworks; develops compassionate, equitable practices, policies, and procedures; and connects students with community partners. The District celebrates diversity through honoring Black History Month, Hispanic History Month, Pride Month, and the unique experiences of stakeholders. Students formed community groups to discuss their lived experiences, including PRIDE Student Spaces, Multicultural Student Spaces, the High School DEI Student Club, and the Community and Belonging Group. It recruits students for leadership opportunities. When students use derogatory

racial epithets, the District highlights the history of the term, including oppression and the use of dehumanizing language to humiliate a group. The District's approach could be construed to conflict with the DCL.

179.    The Hanover and Dresden School Districts follow the directives of the Equity Policy. All policies, principles, programs, operations, practices, and resource allocations in the Districts incorporate principles of equity. The Districts conduct an equity survey to monitor students' experiences with discrimination. The high school's advisory programs bring students together to discuss social and interpersonal issues, including identities and inequalities. Students formed identity-based clubs, including the Slavic Club, the Jewish Culture Club, Italian Club, BIPOC affinity space, Women in STEM, and Neurodiversity Club.

180.    Institutions are already adjusting their behavior in ways that have and will continue to immediately and irreparably harm the teaching of Plaintiffs NEA and NEA-NH's members. For example, Member E understands that in response to the DCL their institution is reviewing all courses that refer in any way to diversity, equity, or inclusion and may modify or eliminate such courses. Member E is aware that a colleague was instructed to eliminate the words "diversity, equity, and inclusion" from their course to avoid unwanted scrutiny.

181.    Member F assists in developing training for faculty, staff, and administrators to help them develop best teaching and pedagogical practices. State standards for technical colleges include requirements related to diversity, equity, and inclusion. But after the DCL was issued, Member F and her colleagues have had to "gut" much of their trainings on best teaching practices in this curriculum. Member F was instructed to determine materials to remove, including by looking for certain words such as diversity, equity, inclusion, culturally responsive,

or economically disadvantaged. Member F fears that she will continue to be pressed to make more changes to training under the DCL.

182.    Member G's work as a co-director of the Center for Equity and Justice in Teaching Education has likewise been adversely impacted by her employer university's efforts to comply with the DCL. The Center provides resources such as teaching tools and research and invites guest speakers. Following the issuance of the DCL, the Center's website was removed, and Member G was told that the website and mission statement needed to be reworked. Member G was also told to change the content on an upcoming event. As a result, Member G feels that her speech related to diversity or inclusion is being censored and that she has lost the opportunity to fully participate in contributing to the college community through the Center.

183.    Member H's presentation at a faculty research colloquia was cancelled after the content of her paper, addressing lynching, was reviewed. A college administrator told Member H that she was "coming close to [the legal line]," which she understood to include reference to the DCL. Member H's paper makes "references to racism and the need to overcome a history of white supremacy," and because it "address[es] familial secrets in regard to a lynching, [Member H] cannot control how anyone will feel when confronted with the ghosts in their family heritage." Member H understood that while her administration was supportive, "they had a legal mandate which requires adherence." Because of the DCL, Member H cannot share her academic research and knowledge with her college community. Although some have asked to read the paper, Member H is "disheartened that a much needed discussion will go unheard in [HER] voice." She continues to fear that her research will be restricted.

184.    Educators and school districts, including Plaintiffs and their members and staff, also face immediate and irreparable harm because they have no choice but to self-censor

practices critical to teaching, learning, and supporting their students, or to risk the arbitrary and discriminatory enforcement the DCL invites. ED has made plain its intent to enforce the prohibitions in the DCL and is actively inviting parents and even third parties with no connection to a school community to file complaints on the so-called "End-DEI" portal. An ED investigation or enforcement action premised on so-called "receipts of betrayal," or the vague prohibitions in the DCL aimed at eradicating speech and practices with which Defendants disagree, would impose onerous costs and harms on Plaintiffs, their members, staff, and other educators. The Certification Requirement heightens and amplifies the immediacy of enforcement and the severity of the consequences at stake.

185.    Indeed, educators, including Plaintiffs and their members, subject to similar discriminatory censorship laws that ban topics related to race, gender, and other ideas at the state level have experienced fear, chill, and other harm because of the parent and student complaints and inquiries by relevant authorities that these vague prohibitions invite.[23]

186.    For example, in New Hampshire, a high school World History teacher worried that discussions around topics like affirmative action, the Voting Rights Act, and the Equal Rights Amendment would spur a complaint about his teaching under the state censorship law, and that he would be subject to investigation and charges. Because he felt like he could not teach honestly under the state censorship law, he made a decision to leave his school at the end of the year.[24] A former United States History teacher in New Hampshire who encouraged students to debate and learn about topics like affirmative action, reparations, and the criminal justice system was targeted by a political group in New Hampshire who published his name for signing an

---

[23] Mica Pollock et al., *The Limitation Effect: Experiences of State Policy-Driven Education Restriction in Florida's Public Schools* (2024), https://perma.cc/F9B6-T3WM.
[24] ECF No. 85-111, at 156, *Loc. 8027 v. Edelblut*, No. 21 Civ. 1077 (PB) (D.N.H. Aug. 14, 2023).

online petition pledging to teach "honest history." Because of this, he was subject to online harassment, threats, and obscenities, and ultimately left the teaching profession.[25]

187.    School Districts face additional dilemmas in attempting to conform to the vague prohibitions in the DCL. For example, without further guidance, Plaintiffs do not know how broadly ED will conclude that information was improperly used as a proxy for race. For example, Plaintiffs Hanover, and Dresden School Districts do not know whether ED would interpret their consideration of free and reduced lunch status when distributing funding for curricular activities as adoption of a "proxy for race" since many of the students who benefit from this assistance are white.

188.    The DCL impacts the professional development school districts may provide, as it is unclear whether it requires cessation of trainings intended to create inclusive learning environments so all students succeed. Dover School District trains staff on equity and methods to support marginalized communities, including LGBTQ+ and Indigenous students. Oyster River School District's DEIJ Coordinator conducts training on culturally sustaining curriculum and programs. Hanover and Dresden Districts train staff on culturally responsive instruction and offer professional development to overcome achievement gaps.

189.    In addition, School District Plaintiffs similarly face immediate and irreparable harm from the DCL and the Certification Requirement, which threaten to withhold their federal funding and trigger additional liability, including under contract law and the FCA. The conditions to federal funds imposed by the DCL and Certification Requirement amount to coercion for School District Plaintiffs, imposing new conditions on the receipt of federal funds in

---

[25] *Id.*

the middle of funding cycles. School District Plaintiffs had no opportunity to knowingly accept or reject the funds based on these new conditions when the funds were accepted.

190.    As the School District Plaintiffs explain, the loss of federal funding would be a devastating blow to almost any SEA, LEA, or educational institution. For example, the average class size in Dover elementary schools would likely double. The District would be able to offer any services that are not legally mandated and students may not go on field trips. Hanover and Dresden Districts would not be able to maintain the rigorous, equitable instruction it currently offers.

191.    According to the OMB, the Federal Government spent roughly $1.1 trillion (approximately 4 percent of the GDP) on aid to State, local, tribal, and territorial governments in 2023.[26] Of the total proposed federal grant spending for fiscal year 2025, over $84 billion is allocated to education, training, and social services.[27] Of the five largest discretionary programs in 2025, Education for the Disadvantaged (Title I) is estimated to be the third largest with $20 billion in spending, and Special Education is estimated to be the fifth largest with $14 billion.[28] Of the five largest mandatory spending programs in 2025, Child Nutrition programs (including the School Breakfast Program and the National School Lunch Program) are the second largest with $32 billion in spending.[29] States, local education agencies, and schools rely on this federal education funding for the health and welfare of their students, including for educating students with disabilities, serving students from low-income families, and providing for school counselors, nurses, and mental health professionals.

---

[26] Off. of Mgmt. and Budget, *Analytical Perspectives Budget of the U.S. Government: Fiscal Year 2025* 75 (2024).
[27] *Id.* at 75–76.
[28] *Id.*
[29] *Id.* at 75.

192.    To avoid cuts to this funding and additional liability that the Certification Requirement imposes, many educational institutions will take steps to suppress any expression or curtail any practices that could be construed to violate the DCL in ways that injure educators and school districts, including Plaintiffs and their members. Because the DCL's terms are wholly vague, enforcement of its prohibitions can only occur in an arbitrary and discriminatory manner and without notice and ability to steer clear of a violation.

193.    Educators, including Plaintiffs NEA and NEA-NH's members, face consequences of enforcement. Most states provide for processes in which teachers are subject to discipline, including suspension and termination of employment or of their teaching license or certification. As just a few examples:

   (a) In New Hampshire, a licensed educator may face discipline, reprimand, suspension, nonrenewal, or revocation of their teaching credentials for violating the Code of Conduct. N.H. Code Admin. R. ED. 511.02(a)(2). The Code of Conduct prohibits a wide range of behaviors including discrimination. *Id*. at 510.01–03. Complaints against educators can be initiated by *anyone* including parents, students, superintendents and principals, and law enforcement. Investigations, either formal or informal, must be initiated any time possible misconduct comes to the attention to the New Hampshire Department of Education, including through means such as news articles or social media postings. *Id.* at 511.01(a). Furthermore, the Code of Conduct requires educators to report suspected violations of the Code, and failure to do so is itself a violation of the Code. *Id.* at 510.05(a) & (f).

(b) Educators in New Hampshire may also face consequences through the New Hampshire Human Rights Commission that takes complaints under the Law Against Discrimination, which prohibits discrimination including on the basis of sex, gender identity, race, creed, color, marital status, familial status, physical or mental disability, or national origin. RSA ch. 354-A. The HRC has general jurisdiction to "eliminate and prevent" discrimination in employment, places of public accommodation, and K-12 public schools.[30] *Id.*

(c) In Tennessee, the State Board of Education can "revoke, suspend, formally reprimand, or refuse to issue or renew an educators license" for, among other things, "negligence in the commission of duties as an educator" and "other good cause" defined as "conduct that calls into question the fitness of an educator to hold a license . . .". Tenn. State Bd. of Educ. R. 0520-02-03.09. Such conduct includes violations of the Tennessee Teacher Code of Ethics, which requires educators to "[a]bide by all applicable federal and state laws." T.C.A. § 49-5-1003(b).

(d) In Oklahoma, a teaching certificate can be revoked for "[a] willful violation of a rule or regulation of . . . the United States Department of Education" or "[a] willful violation of any federal [ ] law." Okla. Admin. Code § 2101:1-5-6(b).

(e) Texas teaching standards require that "educator[s] shall comply with . . . federal laws." 19 Tex. Admin. Code § 247.2, and the State Board for Educator

---

[30] *See also* New Hampshire Commission for Human Rights, https://www.humanrights.nh.gov/#:~:text=Welcome%20to%20the%20New%20Hampshire,status%2C%20disability%20or%20national%20origin.

Certification may discipline an educator if they have "conducted school or education activities in violation of law." 19 Tex. Admin. Code § 249.15.

(f) In Idaho, a teaching license can be revoked for violations of the professional standard of ethics, Idaho Code § 33-1208, which states that "an educator abides by all federal . . . laws." Idaho Admin. Code R. 08.02.02.076.

194.    Educators, including Plaintiffs NEA and NEA-NH's members, have a clear reason to fear that the DCL will be enforced to reach their own professional practices through state mechanisms. For example, the New Hampshire Department of Education issued a technical advisory on February 4, 2025, alerting schools that the "U.S. Department of Education takes action to eliminate D.E.I." and requiring school districts to carefully review various executive orders, including executive orders related to ending government and private sector practices related to diversity, equity, and inclusion, and to gender ideology (the "NH February Advisory") and referencing a similar "Dear Colleague" letter."[31]

195.    The DCL also harms NEA as an organization. NEA must divert resources and expand and modify its core activities of representation, training, and grantmaking to address the harm its members experience under the DCL. In addition, the DCL diminishes the value of NEA's trainings and other supports to educators, including many centered on strengthening educator practices related to diversity, equity, and inclusion, as sound pedagogy requires. Because the DCL broadly prohibits programs that could be construed to involve issues of race, diversity, equity, or inclusion, NEA's offerings focused on, or including such issues, will be less sought after than they previously were, resulting in those offerings having less impact on educational practice and less value to NEA members, both of which harm NEA's organizational

---

[31] N.H. Dep't of Educ., Technical Advisory (Feb. 4, 2025), https://perma.cc/6K8T-QAY2.

interests. NEA will also need to review its training and professional development offerings to attempt to ascertain what, if any, offerings should be modified in light of the DCL.

196.    NEA will need to expand the support it provides to members targeted for inclusive education practices that arguably run afoul of the vague contours of the DCL, particularly as enforced through a public tipline fueled by appeals to avowed opponents of inclusive education approaches. The primary vehicle by which NEA supports the legal needs of its members is through its Unified Legal Services Program, under which NEA funds the legal representation of NEA members and affiliates in covered matters, including approved employment related matters and matters that NEA and the relevant state affiliate agree are significant for NEA members. Such matters include advice and counsel to educators facing restrictions on how and what they teach, members facing discipline or termination, work to protect the rights of educators to engage in protected advocacy to advance educational opportunities and equity, and work representing members and affiliates in other education and employment-related matters.

197.    NEA has had to defend its members facing threats under state censorship initiatives similar to those posed by the DCL, for example (1) winning back the job of a high school contemporary issues teacher who was terminated for playing a spoken word poem addressing white privilege to his high school juniors and seniors; (2) defeating an effort to strip a teacher of her teaching credentials for declining to remove a Black Lives Matter flag from the school; (3) defending the right of a teacher to assign a powerful essay by an award winning African American author to her AP English class as an example of how to write a persuasive essay; (4) challenging the termination of a middle school teacher for reading an age appropriate book "*My Shadow is Purple*" that her students picked for a class read aloud; and (5) challenging

the termination of a music teacher for raising concerns about her school's decision to prevent the school choir from singing, "Rainbow Land."

198.    That work will necessarily expand further due to the national application and mass appeals to enforce the DCL to ideological opponents of inclusive education.

199.    NEA also devotes substantial resources and staff to improving educator professional excellence, including work to support educators teaching professional skills to other educators such as those related to racial and cultural competence, and other topics implicated in the DCL. This work comprises many different types of professional training, including improving the skills of educators in engaging, teaching, and supporting students of different races, national origins, sexual orientations and/or gender identities. Examples of these trainings include 15-hour blended learning courses on "Culture, Ability, Resilience & Effort (CARE)," "Bullying Prevention," "Diversity, Equity, and Cultural Competence," "Disability, Rights, and Inclusion," "LGBTQ+ Blended Learning Series," "Trauma-Informed Pedagogy," "Mental Health Awareness" and "Social Emotional Learning." NEA also offers courses that enable educators to earn micro-credentials in subjects including "Teacher Leadership: Diversity and Equity and Cultural Competence Pathway," "Bully Free Schools," "Diversity, Equity, and Culture Competence," "Native Education," "Restorative Practices," "Supporting LGBTQ+ Students," and "Trauma-Informed Pedagogy."

200.    Thousands of NEA members take these trainings and earn micro-credentials, which, in many instances, are accepted by employers as required professional development work and, in some instances, qualify members for additional compensation.

201.    Since the issuance of the DCL, NEA's members have voiced concerns that school districts or state certification agencies will no longer accept these courses because they focus on

cultural competence and inclusive education approaches. NEA will be harmed as a result, as vague concerns about what the DCL permits prevent members and school districts from seeking out and utilizing NEA's offerings.

202.    NEA's professional excellence work includes annual grants to fund a variety of educational improvement efforts. This past year, NEA awarded almost $4 million in grants for professional excellence work, including work to expand and elevate the skills of educators in engaging, teaching, and supporting students of all races, national origins, sexual orientations, and gender identities. Examples of topics funded include: grants that improved the professional practice of educators by supporting induction and mentoring resources for new educators as they enter the profession, teacher certification test preparation supports for new educators, and after-school mentoring and meal programs for rural students. The work to implement NEA's professional excellence grants is often done in coordination with, and with the support of, school districts, colleges, and universities, who view the professional development work as valuable.

203.    NEA also provides a "Read Across America Grant" for state affiliates to enhance state affiliate coordinated Read Across America events and activities grounded in celebrating key ingredients in building a nation of diverse readers—books, reading, and the freedom to learn. This small grant program encourages proposals that use funds as a way to get books from diverse perspectives into the hands of students, and proposals that further that objective are strongly encouraged. Due to the DCL, NEA will need to respond to concerns that Read Across America selected books are inappropriate or at odds with the dictates of the DCL and its vague condemnation of celebrations of diversity.

204.    The DCL will substantially frustrate the purpose, execution of, and member and school interest in these grants. For example, it is unclear how the grant programs will continue to

work in light of the DCL's prohibition of state and school district practices related to diversity, equity, and inclusion, which are at the core of NEA's grant work.

205.    NEA-NH is also harmed as an organization. The DCL has forced NEA-NH to divert its organizational resources to identify and counteract the DCL's impermissibly vague restrictions, and it has frustrated NEA-NH's mission of advocating for public school employees and for the kind of robust public education that will prepare the children of New Hampshire as citizens and members of society.

206.    NEA-NH advises members regarding job security, adverse employment actions, and what would rise to the level of termination of employment or discipline, including with respect to classroom instruction and conduct. NEA-NH also advises members regarding issues related to its members' ability to teach, including under collective bargaining agreements with local school districts, and the parameters of the New Hampshire's Educator Code of Conduct. NEA-NH is unable to properly advise its members on these issues because of the DCL's impermissibly vague terms and prohibitions.

207.    NEA-NH also provides its members with the benefit of extensive professional development programming, which will be affected by the DCL's vague terms and prohibitions. For example, the DCL's vague terms and prohibitions and federal and state efforts to implement it will make it impossible for NEA-NH to provide meaningful professional development about what conduct may or may not result in threats of investigation or adverse enforcement under the DCL.

208.    NEA-NH engages members in an annual professional development and leadership program which typically spans a week during the summer. During this programming members are trained on a variety of topics, including the New Hampshire Educator's Code of Conduct,

what conduct in the classroom and with respect to students may give rise to employment discipline or adverse action from the Department of Education against a credential holder. Members have already expressed confusion and concern regarding how to approach classroom instruction in order to protect themselves. Given the vague nature of the DCL, it is likely that this training, and others, would need to be revised to address the additional potential bases of discipline that could arise related to the DCL, and its impacts.

209.    NEA-NH also represents members in matters before the New Hampshire State Board of Education—both in licensure actions contesting alleged violations of the New Hampshire Educator Code of Conduct, and in actions representing educators appealing the non-renewal of their teaching contracts. Based on NEA-NH's experience with the enforcement of state censorship efforts by the New Hampshire Department of Education, NEA-NH will likely face questions from educators about how the enforcement of the DCL may impact their credentials.

210.    CBED is also harmed as an organization. The DCL will substantially impair and interfere with CBED's ability to engage in its core activities, which further its mission to rebuild the Black teacher pipeline and support educational equity and racial justice. Because of the DCL's vague prohibitions and ED's threats of enforcement, it will be difficult if not impossible for CBED to continue critical partnerships and contractual relationships with educational institutions, including its "Teaching Pathways" programming, "Professional Learning" programming, and its policy and advocacy work, due to schools' fears of complaints, enforcement, and federal funding termination, which will significantly hamper CBED's core activities in frustration of its mission. One school district planning to start a Teaching Academy

has already indicated that it is not sure whether it can proceed with the Academy following the issuance of the DCL.

211.    Concepts related to DEI, such as implicit bias, cultural identity, cultural proficiency, and equity are central to CBED's core programming and mission. CBED may have to invest significant time and resources into modifying, expanding, or eliminating its offerings to educational institutions. More fundamentally, these concepts in CBED's programs and training are essential to the issues that CBED works to address, including rebuilding the Black teacher pipeline and training all educators in how to teach Black students in an engaging, effective, and culturally responsive way. Teachers often do not receive training or instruction on best practices, and school districts require support to meet Black and non-Black teachers' needs in these areas, and generally address the national shortage of qualified teachers. For example, with respect to rebuilding the teacher pipeline, the DCL will inhibit the educational content and practices of Black educators, including those who seek to apply the lessons learned from CBED's programs. The DCL will also dissuade future educators, and particularly Black students and students of color, from pursuing a career in education, frustrating CBED's efforts to address the broader issue of teacher shortages, ultimately undermining the successful education of students of all races. As a small organization that cannot adapt its programming and funding sources quickly, CBED's core programming, mission, and indeed existence is existentially threatened by the Department's actions.

## CLAIMS FOR RELIEF

### First Cause of Action
### Fifth Amendment – Due Process, Void for Vagueness

212.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

213.    The Fifth Amendment prohibits vagueness as "an essential of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotations and citation omitted). The prohibition on vagueness guarantees that ordinary people have fair notice of the conduct proscribed, and guards against arbitrary and discriminatory enforcement. *Id.*

214.    A regulation is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule). And where First Amendment rights are at stake, "[t]he general test of vagueness applies with particular force." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976). A regulation is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

215.    The DCL is impermissibly vague and violates the Fifth Amendment due process rights of Plaintiffs. All of its prohibitions are unclear and undefined, broad in scope, and turn on subjective judgement. To take an example, although the DCL asserts that "DEI programs" unlawfully "discriminate," it fails to define what constitutes a "DEI program," explain how such programs "preference" certain racial groups, or provide criteria for determining the circumstances under which educational programs that in any way address race might violate federal antidiscrimination law. As illustrated by the difficulties facing the Plaintiffs described above, the DCL fails to provide adequate notice about what speech and programming regarding

race, diversity, equity, or inclusion is prohibited under federal law. The ambiguity permeating the DCL's discussion of DEI programs also invites arbitrary and selective enforcement against educational programs that advocate views on race inconsistent with those espoused by ED.

216.    Plaintiffs are subject to compliance with federal law in their teaching and professional practices. They fear that their educational practices could be construed as impermissibly addressing issues of race, diversity, equity, or inclusion under the DCL. Because the DCL is vague, they cannot effectively alter their practices to conform with the law and are left open to arbitrary and discriminatory enforcement.

217.    School District Plaintiffs' programs and operations, including instruction, programming, and professional development, are subject to ED's enforcement authority and the requirements set forth in the DCL and Certification Requirement and Plaintiffs fear they could be construed to impermissibly involve "diversity," "equity," or "inclusion," or otherwise violate the terms of the DCL. Because the DCL is vague, they cannot effectively alter their practices to conform with the law and are left open to arbitrary and discriminatory enforcement.

218.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Second Cause of Action**
**First Amendment – Free Speech and Free Association**

219.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

220.    Plaintiffs and their members engage in constitutionally protected expression on issues pertaining to race, diversity, equity, and inclusion, including in their curricular and extracurricular interactions with students. Plaintiffs and their members reasonably fear that their speech is subject to the DCL's prohibition on "DEI programs" in federally funded educational institutions.

221.    While elementary and secondary school teachers' First Amendment rights are limited, after school hours and outside their official duties, their speech to students, even on school grounds, can be protected. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528–30 (2022). Government efforts to penalize or suppress private speech because of its content or viewpoint, including by threatening to withhold federal funding from institutions that host disfavored speech or associate with disfavored speakers, are presumptively unconstitutional. *See Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963) (holding that a government entity's "threat of invoking legal sanctions and other means of coercion" against a third party "to achieve the suppression" of disfavored speech violates the First Amendment); *accord NRA v. Vullo*, 602 U.S. 175, 190–91 (2024).

222.    In the university context, government-sponsored censorship of disfavored ideas also interferes with fundamental principles of academic freedom. *See, e.g.*, *Keyishian*, 385 U.S. at 603; *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *cf. Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 237 (2000) (Stevens, J., concurring) ("Our understanding of academic freedom has included not merely liberty from restraints on thought, expression, and association in the academy, but also the idea that universities and schools should have the freedom to make decisions about how and what to teach.").

223.    The DCL unconstitutionally penalizes the protected speech of Plaintiffs NEA and NEA-NH's members by threatening to withhold federal funding from any educational institution that provides a "DEI program." The threats contained in the DCL are reinforced by ED's "End DEI" portal, which solicits members of the public to provide "receipts of betrayal" identifying educational institutions that promote "divisive ideologies and indoctrination." Portal Press Release.

224.    Because Plaintiffs and their members are subject to compliance with federal law in their teaching and professional practices, the DCL also exposes them to professional and legal penalties by declaring that their protected expression violates federal law.

225.    The loss of federal funding will be devastating to the School District Plaintiffs, who will no longer be able to maintain the quality of the education they provide. For example, they would need to terminate staff, discontinue programming and interventions for students, and scale back field trips. The loss of funding would have similar effects on almost any educational institution or entity, including the institutions and entities that employ Plaintiffs NEA and NEA-NH's members. An ED investigation premised on the vague prohibitions in the DCL, in conjunction with the so-called "receipts of betrayal," would impose onerous legal, administrative, and reputational costs on the targeted institution.

226.    To avoid these costs, it is foreseeable that educational institutions and entities will take steps to suppress any expression that could be construed as a "DEI program." Because the DCL does not offer any guidance as to what constitutes a DEI program, any curricular or even extracurricular speech at an educational institution that conceivably runs afoul of ED's positions on race, diversity, equity, or inclusion is at risk of being censored or penalized.

227.    Plaintiffs NEA and NEA-NH's members reasonably fear that their educational institutions and entities will investigate, discipline, or take other adverse action against them if they continue to discuss with students issues pertaining to race, diversity, equity, or inclusion. Plaintiffs NEA and NEA-NH's members also fear adverse action if they continue to assign readings, invite guest speakers, or engage in discussion and debate with students on anything that might be construed to fall within these prohibited categories.

228.    School District Plaintiffs reasonably fear that ED will investigate or take other adverse action against them if they continue to provide instruction, student programming, or professional development, or otherwise operate their programs, in ways that are or could be construed to be related to race, diversity, equity, or inclusion, including under the Certification Requirement.

229.    The DCL unconstitutionally penalizes protected speech on the basis of its content and viewpoint.

230.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Third Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(B) – Contrary to Constitutional Right**

231.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

232.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

233.    The DCL constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The "End DEI" portal, FAQ, and Certification Requirement likewise reflect and incorporate this final agency action. The Certification Requirement also independently constitutes final agency action.

234.    The DCL violates the Fifth Amendment right to due process and the First Amendment right to freedom of speech and association, as set forth above. Additionally, the DCL, including through its implementation in the Certification Requirement, violates the

Spending Clause, as set forth below. Because the DCL is contrary to constitutional rights, it violates the APA. 5 U.S.C. § 706(2)(B).

235.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Fourth Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(C) – In Excess of Statutory Jurisdiction, Authority, or Limitations, or Short of Statutory Right**

236.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

237.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . ." 5 U.S.C. § 706(2)(C).

238.    The DCL constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Spear*, 520 U.S. at 178. The "End DEI" portal, FAQ, and Certification Requirement likewise reflect and incorporate this final agency action. The Certification Requirement also independently constitutes final agency action.

239.    The DCL is in excess of ED's statutory authority and limitations, and short of statutory right. Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013).

240.    The DCL exceeds ED's authority under the DEOA, which prohibits ED from exercising "direction, supervision, or control" over a range of activities, including "over the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, over any accrediting agency or association, or over the selection or

content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b). Through the DCL, ED exceeds its authority by intruding on curricular, instructional, and other matters related to this prohibition.

241.    The DCL is therefore "in excess of statutory authority, jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

242.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Fifth Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Not in Accordance with Law**

243.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

244.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

245.    The DCL constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Spear*, 520 U.S. at 178. The "End DEI" portal, FAQ, and Certification Requirement likewise reflect and incorporate this final agency action. The Certification Requirement also independently constitutes final agency action.

246.    The DCL violates the DEOA, which prohibits ED from exercising "direction, supervision, or control" over a range of activities, including "over the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b). Through the DCL's terms and prohibitions, ED is exercising direction,

supervision, and control over curriculum, programs of instruction, instructional materials, and other activities reserved to state and local government.

247. The DCL is not in accordance with the GEPA, which prohibits the federal government from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system." 20 U.S.C. § 1232a. Through the DCL's terms and prohibitions, ED is exercising direction, supervision, and control over curriculum, programs of instruction, instructional materials, and other activities reserved to state and local government.

248. The DCL is contrary to ESSA, which explicitly prohibits the federal government from interfering with states' curriculums, instructional content, and related activities across all of its titles involving federal grants. *See, e.g.*, 20 U.S.C. § 7906(a) ("No officer or employee of the Federal Government shall, through grants, contracts, or other cooperative agreements, mandate, direct, or control a State, local educational agency, or school's specific instructional content, academic standards and assessments, curricula, or program of instruction developed and implemented to meet the requirements of this chapter."); *id.* § 7907(b); *id.* § 7907(c)(1) ("Nothing in this section shall be construed to—(1) authorize an officer or employee of the Federal Government, whether through a grant, contract, or cooperative agreement to mandate, direct, review, or control a State, local educational agency, or school's instructional content, curriculum, and related activities."). Through the DCL's terms and prohibitions, ED is mandating, directing, reviewing, and controlling curriculum, programs of instruction, instructional content, and other activities reserved to state and local government.

249.     The DCL is also contrary to the HEOA, which prohibits ED from "mandat[ing], direct[ing], or control[ing] an institution of higher education's specific instructional content, curriculum, or program of instruction." 20 U.S.C. § 1132-2. Through the DCL's terms and prohibitions, ED is mandating, directing, and controlling curriculum, instructional content, instructional materials, and other activities of higher education institutions.

250.     The DCL is therefore "not in accordance with law," within the meaning of 5 U.S.C. § 706(2)(A).

251.     As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Sixth Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(D) – Failure to Observe Procedure Required by Law**

252.     Plaintiffs incorporate the above paragraphs as if fully set forth herein.

253.     The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "without observance of procedure required by law. . . ." 5 U.S.C. § 706(2)(D).

254.     The DCL constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Spear*, 520 U.S. at 178. The "End DEI" portal, FAQ, and Certification Requirement likewise reflect and incorporate this final agency action. The Certification Requirement also independently constitutes final agency action.

255.     The DCL is a legislative rule that "effects 'a substantive regulatory change' to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (quoting *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34–40 (D.C. Cir.

78

2005)). The DCL imposes new legal obligations on Plaintiffs and appears on its face to be

binding. "It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208

F.3d 1015, 1023 (D.C. Cir. 2000).

256.    Because the DCL is a legislative rule, ED was required to "publish notice of [the]

proposed rule in the Federal Register and to solicit and consider public comments upon its

proposal." *Elec. Priv. Info. Car.*, 653 F.3d at 5; *see* 5 U.S.C § 553 (requiring agencies to publish

notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to

participate in the rule making through submission of written data, views, or arguments. . . .").

257.    The opportunity for public comment under 5 U.S.C. § 553(c) must be meaningful,

which means the agency must allow comment on the relevant issues. An agency may only issue

a rule after "consideration of the relevant matter presented" in public comments. 5

U.S.C. § 553(c).

258.    ED did not provide Plaintiffs, states, local education agencies, schools, or other

stakeholders with notice of or an opportunity to comment on the DCL. As a result, the DCL

adopts legislative rules without observance of procedure required by law.

259.    The DCL is therefore agency action that is "without observance of procedure

required by law . . . ." 5 U.S.C. § 706(2)(D).

260.    ED's issuance of the April 3, 2025 Certification Requirement is "without

observance of procedure required by law" for additional reasons. 5 U.S.C. § 706(2)(D). Under

the Paperwork Reduction Act of 1980, 44 U.S.C. §§ 3501 et seq., when a federal agency seeks to

collect information from the public, such as through government forms, it is obligated to

"provide 60-day notice in the Federal Register, and otherwise consult with members of the

public and affected agencies concerning each proposed collection of information[.]" 44 U.S.C. 3506(c)(2)(A).

261.    The Certification Requirement issued on April 3, 2025 was introduced with no notice. It was not announced with the required 60 days' notice in the Federal Register. Members of the public, including Plaintiffs, were not consulted concerning the collection.

262.    The Paperwork Reduction Act required ED to obtain and publish an OMB control number on the collection of information form. 44 U.S.C. § 3507(a)(2), (3). ED OCR has previously asserted, "no persons are required to respond to a collection of information unless such collection displays a valid OMB control number."[32] Because the Certificate Requirement does not include an OMB control number, it is unlawful.

263.    The Certification Requirement increases the burden as well as the cost to SEAs, LEAs, and individuals, and does not maximize the usefulness of the information collected.

264.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Seventh Cause of Action**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Arbitrary, Capricious, and Abuse of Discretion**

265.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

266.    The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).

267.    The DCL constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that schools are acting unlawfully, and proscribes new substantive obligations "from which legal

---

[32] *See* United States Department of Education, Office of Civil Rights, Assurance of Compliance, Civil Rights Certificate (Boy Scouts of America Equal Access Act of 2001), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/boy-scouts-assurance-form.pdf.

consequences will flow." *Spear*, 520 U.S. at 178. The "End DEI" portal, FAQ, and Certification

Requirement likewise reflect and incorporate this final agency action. The Certification

Requirement also independently constitutes final agency action.

268.    The APA's bar on arbitrary and capricious agency actions "requires agencies to

engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of

California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

269.    The DCL is arbitrary and capricious because ED issued the DCL without a

reasoned explanation, relied on factors that Congress did not intend it to consider, fails to

consider important aspects of the problem, and disregards material facts and longstanding

reliance interests.

270.    The DCL is arbitrary and capricious because ED has failed to reasonably justify

its departure from decades of settled law with respect to Title VI of the Civil Rights Act of 1964,

42 U.S.C. §§ 2000d, et seq., its implementing regulations, and longstanding guidance, all of

which are intended to further equity and inclusion in education. Plaintiffs have longstanding

reliance interests based on these laws, regulations, and their interpretation by courts.

271.    The DCL is arbitrary and capricious because ED promulgated it without

"display[ing] awareness that it is changing position." *Fox*, 556 U.S. at 515 (emphasis omitted).

Indeed, the DCL wholly ignores the existence of prior agency guidance, including guidance

discussing the implementation of *SFFA*, the very case it invokes. As a result, ED has not

provided an explanation of its change in policy or what, if any, alternatives were considered to

address ED's concerns. "An agency may not . . . depart from a prior policy *sub silentio*." *Id.*; *see*

*also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("an '[u]nexplained

inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and

capricious change from agency practice'"). The DCL's failure to acknowledge or explain its change in position from prior ED guidance also violates Defendants' obligation to provide a "more detailed justification than what would suffice for a new policy created on a blank slate" where, as here, the DCL rests on factual premises that contradict those underlying its prior position, and the agency's prior position engendered serious reliance interests. *Fox*, 556 U.S. at 515.

272.    The DCL is arbitrary and capricious because its broad and vague terms and new prohibitions standing alone and taken together arbitrarily require Plaintiffs to guess at whether common education practices essential to nearly every aspect of teaching, learning, and operating schools would run afoul of the DCL, and fails to acknowledge that its terms and prohibitions create unworkable situations for Plaintiffs.

273.    The DCL is arbitrary and capricious because it fails to consider important aspects of the problem, including the DCL's interference with Title VI, of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq., its implementing regulations, and longstanding guidance on the provision of equitable and inclusive education and closely related values of diversity, including the requirement that schools with a history of racial discrimination make proactive efforts to overcome the effects of prior discrimination, 34 C.F.R. § 100.3(b)(6)(i), the prohibition on schools from using "criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin," *id.* § 100.3(b)(2), and longstanding Title VI and other ED guidance, including regarding language access and disability access.

274.    The DCL is arbitrary and capricious because it fails to consider important aspects of the problem, including its interference with the administration of ESSA, *see, e.g.*, 20 U.S.C. § 7906a, *id.* § 7909; GEPA, *see* 20 U.S.C. § 1232a, DEOA, 20 U.S.C. § 3403, and HEOA, 20 U.S.C. § 1132-2, insofar as the DCL intrudes on and otherwise directs, supervises, or controls curriculum, programs of instruction, and instructional materials.

275.    The DCL is arbitrary and capricious because it overstates and misstates case law interpreting Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq. and the Equal Protection Clause, including *SFFA v. Harvard*, 600 U.S. 181 (2023).

276.    The DCL is arbitrary and capricious because it is pretextual. While the DCL purports to address discrimination, its adoption of terms and prohibitions bear no reasonable relationship to that purpose and demonstrates instead that ED is seeking to eliminate ideologies, practices, and programming with which it disagrees.

277.    The DCL is arbitrary and capricious because it fails to consider the enormous costs the DCL will impose, including significant costs to Plaintiffs, states, local education institutions, schools, and institutes of higher education. The DCL also fails to consider the federalism implications that intrusions into state and local education curriculum, programming, training, instructional materials, and other activities will have on these governmental entities, which will cause substantial harm and confusion to them, Plaintiffs, and students.

278.    The DCL is therefore "arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).

279.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Eighth Cause of Action**
**U.S. Const. art. I, § 8, cl. 1 (Spending Clause)**

280.    Plaintiffs incorporate the above paragraphs as if fully incorporated therein.

281.    The Spending Clause of the Constitution does not permit Defendants to "exert power akin to undue influence" over Plaintiffs by attaching conditions to federal funds that are "so coercive as to pass the point at which pressure turns into compulsion."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578–88 (2012) (op. of Roberts, C.J.) (citations omitted).

282.    Defendants' threat under the DCL, including through the implementation of the DCL in the Certification Requirement, to terminate, refuse to grant or continue assistance, or eliminate federal funding for any SEA, LEA, or educational institution that engages in vaguely defined diversity, equity, and inclusion programs—as well as the threat to individuals and entities to impose substantial liability including for breach of contract and pursuant to the FCA, 31 U.S.C. § 3729(a)—is unconstitutionally coercive and violates the Spending Clause.

283.    The Spending Clause also requires that any conditions attached to the receipt of federal funds must be unambiguous and clearly stated in advance, so that SEAs, LEAs, and educational institutions considering acceptance of those funds can do so knowingly and voluntarily. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

284.    The DCL, including through its implementation by the Certification Requirement is unconstitutionally vague and ambiguous, and attaches new-after-the-fact conditions to School District Plaintiffs' receipt of federal funds, in violation of the Spending Clause.

285.    The Spending Clause further requires that conditions placed on federal funds be reasonably related to the purposes of the federal programs at issue. *Id.*

286.    The DCL, including through its implementation by the Certification Requirement, unconstitutionally imposes conditions on the receipt of federal funds that have no nexus to the purposes of those federal programs.

287.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**Prayer for Relief**

Plaintiffs respectfully request that this Court:

A.  Declare that the DCL violates the First and Fifth Amendments to the United States Constitution;

B.  Declare that the DCL and Certification Requirement are arbitrary, capricious, an abuse of discretion, not in accordance with law, contrary to constitutional right, in excess of statutory jurisdiction, and without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2);

C.  Declare that the DCL and the Certification Requirement violate the Spending Clause of the United States Constitution;

D.  Hold unlawful, vacate, and set aside the DCL, the "End DEI" portal, the FAQ, and the Certification Requirement;

E.  Preliminarily and permanently restrain or enjoin Defendants and their agents, employees, representatives, successors, and any other person acting directly or indirectly in concert with them, from enforcing and/or implementing the DCL;

F.  Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

G.  Grant all such other and further relief as the Court may deem just and proper.

Dated: May 12, 2025

Respectfully submitted,

Sarah Hinger*
Amanda Meyer*
Alexis Alvarez*
Leah Watson*
Ethan Herenstein*
Victoria Ochoa*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org

Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org

Alice O'Brien*ᵀ
Jason Walta*ᵀ
Phil Hostak*ᵀ
NEA Office of General Counsel
National Education Association
1201 16ᵗʰ Street NW
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
SangYeob Kim (N.H. Bar No. 266657)
American Civil Liberties Union of New Hampshire
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org

Rachel E. Davidson*
American Civil Liberties Union Foundation of Massachusetts, Inc.
One Center Plaza, Suite 801
Boston, MA 02018
(617) 482-3170
rdavidson@aclum.org

Callan E. Sullivanᵀ (N.H. Bar No. 20799)
Lauren Snow Chadwickᵀ (N.H. Bar No. 20288)
National Education Association-New Hampshire
9 South Spring Street
Concord, NH 03301
(603) 224-7751
csullivan@nhnea.org

*admitted pro hac vice*
ᵀ appearing only on behalf of NEA, NEA-NH, and Center for Black Educator Development