**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

NATIONAL EDUCATION ASSOCIATION; *et al.*,

                           *Plaintiffs*,

        v.

UNITED STATES DEPARTMENT OF EDUCATION; *et al.*,

                     *Defendants.*

Case No. 1:25-cv-00091-LM

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

   I.   The Dear Colleague Letter ........................................................................................ 2

   II.   Additional Relevant ED Actions .............................................................................. 5

   III. Impact on Plaintiffs and the Students They Serve ...................................................11

LEGAL STANDARD ........................................................................................................ 21

ARGUMENT ..................................................................................................................... 21

   I.   The DCL Violates the Fifth Amendment Prohibition on Vagueness (First Cause of
       Action). ................................................................................................................... 21

      A.   The DCL is Devoid of Objective Guidelines. .................................................. 22

      B.   Schools and Educators are Left Without Notice, Chilled in Their Ability to Educate
          Students, and Open to Arbitrary and Discriminatory Enforcement. ........................... 27

   II.   The DCL Violates the First Amendment (Second Cause of Action). ............................... 29

      A.   The DCL Censors Constitutionally Protected Academic Speech. ............................... 29

      B.   The DCL Unconstitutionally Coerces Third Parties. ...................................................... 31

   III. ED's Actions Violate the APA ....................................................................................... 33

      A.   The DCL and Certification Constitute Final Agency Action. ..................................... 33

      B.   The DCL is Contrary to Constitutional Right (Third Cause of Action). ..................... 35

      C.   The DCL Exceeds ED's Statutory Authority (Fourth Cause of Action). .................... 35

      D.   The DCL is Contrary to Law (Fifth Cause of Action). ................................................ 36

      E.   The DCL is Arbitrary and Capricious (Seventh Cause of Action). ............................. 37

          1.   ED failed to acknowledge, let alone explain, its dramatic departure from settled law
              and its own guidance, despite Plaintiffs' reliance. ...................................................... 37

          2.   The DCL's application of *SFFA* is overreaching and arbitrary. ................................. 40

          3.   ED failed to consider important aspects of the problem. ............................................. 42

          4.   ED failed to acknowledge or consider the costs of the DCL. ..................................... 44

      F.   ED Failed to Observe Required Procedure (Sixth Cause of Action). .......................... 45

   IV. The DCL and Certification Violate the Spending Clause (Eighth Cause of Action). ....... 47

      A.   The DCL and Certification Attach Ambiguous and Retroactive Conditions to the
          Districts' Receipt of Federal Funds. ............................................................................ 47

B.  The DCL and Certification Are Coercive. ................................................................. 50

C.  The DCL and Certification Violate the Spending Clause's Relatedness Requirement. 52

V.  ED's Actions Should Be Vacated or Permanently Enjoined. ............................................ 52

CONCLUSION ................................................................................................................................ 55

## INTRODUCTION

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (citation omitted). Indeed, "[t]he Nation's future depends upon leaders trained through wide exposure to [a] robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritative selection." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (internal quotation marks omitted).

The Department of Education ("ED") contradicts these foundational principles through its recent actions intended to "End DEI." Through its February 14 Dear Colleague Letter ("DCL"), Certification, and other implementation measures, ED announces that any educational program associated with diversity, equity, and inclusion, or "DEI," is illegal. Schools and educators who do not "cease" these prohibited practices face "serious consequences" including the loss of all federal funding, claw back of previously issued funding, and individual liability.

The DCL impermissibly prohibits academic speech on the basis of the viewpoint espoused. Its chill is further amplified by the vagueness of its prohibitions on undefined "DEI programs" and the severity of the consequences. Further, ED radically resets longstanding positions on civil rights laws that guarantee equity and inclusion and impermissibly infringes on the authority of states and schools and coerces them to adopt its policies. It eschews guardrails designed to ensure that agency actions are well reasoned and supported, not arbitrary and capricious.

Schools, educators, and the entire education community—including Plaintiff school districts (the "Districts"), the National Education Association ("NEA"), NEA-New Hampshire ("NEA-NH"), and the Center for Black Educator Development ("CBED")—are irreparably injured. Educators are chilled in their college classrooms, are afraid to engage students in

1

discussion of diverse perspectives, fear advancing their own scholarship, and have had their contributions to the academic community gutted. K-12 schools and educators are left scrambling to assess whether a wide range of core programs and practices incorporating values of diversity, equity, and inclusion will now be held illegal. And they are left with the impossible task of applying state requirements for teaching history or critical thinking skills, for example, and the contradictory prohibitions of the DCL. The risk of misjudgment includes the loss of all federal funding for Districts, and for educators, the loss of their teaching license. Plaintiffs NEA, NEA-NH, and CBED's work providing training and support to teachers—including those designed to advance best practices incorporating values of diversity, equity, and inclusion—also stands in jeopardy.

ED violates essential constitutional protections and flaunts rules governing agency decision making. The Court should vacate ED's actions or, in the alternative, issue a permanent injunction.

STATEMENT OF FACTS

## I.    The Dear Colleague Letter

On February 14, 2025, ED issued a Dear Colleague Letter regarding "legal requirements under Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the United States Constitution, and other relevant authorities." Letter from U.S. Dep't of Educ. to Colleagues 1 (Feb. 14, 2025), https://perma.cc/7YT7-65SV (attached as Ex. 1).[1] The DCL is addressed to "preschool, elementary, secondary, and postsecondary educational institutions" as well as "other entities that receive federal financial assistance," DCL at 1 & n.1, and extends to "third-party contractors, clearinghouses, or aggregators," *id.* at 3.

The DCL begins with ED's conclusions that "pervasive and repugnant race-based preferences and other forms of racial discrimination have emanated throughout every facet of

---

[1] All references in this memorandum to "Ex. _" are to the exhibits accompanying the Declaration of Sarah Hinger in Support of Plaintiffs' Motion for Summary Judgment (attached hereto as Ex. A).

academia"; that schools have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism'" and have "advanced discriminatory policies and practices"; and that schools have used "'diversity, equity, and inclusion' ('DEI')" as a means of "smuggling racial stereotypes and explicit race-consciousness into everyday training, programming, and discipline." *Id.* at 1–2.

The DCL asserts that "[r]elying on non-racial information as a proxy for race . . . violates the law . . . whether the proxies are used . . . on an individual basis or a systematic one" and that it would be "unlawful . . . to eliminate standardized testing  . . . to increase racial diversity." *Id.* at 3. Further, the DCL states that "DEI programs" "discriminate in less direct, but equally insidious, ways" by "frequently preferenc[ing] certain racial groups and teach[ing] students that certain racial groups bear unique moral burdens that others do not." *Id.* It asserts "[s]uch programs stigmatize students who belong to particular racial groups based on crude racial stereotypes" and "deny students the ability to participate fully in the life of a school." *Id.*

The DCL states that "[a]lthough *SFFA* [*Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)] addressed admissions decisions, the Supreme Court's holding applies more broadly." DCL at 2. However, the DCL omits Supreme Court guidance relevant to understanding its full meaning. *Cf. SFFA*, 600 U.S. at 230–31. It also does not address ED's longstanding regulations,[2] prior civil rights guidance, including guidance on *SFFA*,[3]

---

[2] *See, e.g.*, 34 C.F.R. § 100.3(b)(2) (prohibiting program participants from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin"); *id.* § 100.3(b)(6)(i) (a recipient who has previously discriminated "must take affirmative action to overcome the effects of prior discrimination").

[3] *See* Letter from U.S. Dep't of Educ. & U.S. Dep't of Just. to Colleagues (Aug. 14, 2023), https://perma.cc/69WH-NECT (attached as Ex. 2); U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug. 14, 2023) ("SFFA Q&A"), https://perma.cc/V7Z6-XMCM (attached as Ex. 3); U.S. Dep't of Educ., Off. of the Undersec'y, *Strategies for Increasing Diversity and Opportunity in Higher Education* (Sept. 28, 2023) ("*Strategies Report*"), https://perma.cc/52W4-XJFR (attached as Ex. 4); Letter from Richard W. Riley, Sec'y of the Dep't of Educ., to

ED's own resolution agreements,[4] federal civil rights statutes,[5] or ED's practice guidance reflecting its systematic review of education research.[6]

The DCL asserts that ED will "vigorously enforce" the obligations set forth and "take appropriate measures to assess compliance with the applicable statutes and regulations based on the understanding embodied in [the DCL] . . . no later than 14 days" from its issuance. DCL at 3. Schools are warned to "cease all efforts to circumvent prohibitions on the use of race by relying on proxies or other indirect means to accomplish such ends" and "cease all reliance on third-party contractors, clearinghouses, or aggregators that are being used by institutions in an effort to circumvent prohibited uses of race." *Id.* Schools that "fail to comply . . . face potential loss of

---

Colleagues (Jan. 19, 2001), https://perma.cc/4FUF-K9XM (attached as Ex. 5) (encouraging address of racial disparities in school resources); Letter from Catherine E. Lhamon, Assistant Sec'y for C.R., Off. of C.R., to Colleagues (Oct. 1, 2014), https://perma.cc/3WM7-DZ3A (attached as Ex. 6) (encouraging school districts to "conduct a comprehensive resource equity assessment"); Letter from Glenna Wright-Gallo, Assistant Sec'y, Off. of Special Educ. and Rehab. Servs., & Adam Scott, Principal Deputy Assistant Sec'y, Off. of Elementary and Secondary Educ., to Colleagues 4 (Jan. 16, 2025), https://perma.cc/K6YN-SSVL (attached as Ex. 7) (addressing "inclusive educational practices" for students with disabilities, requiring data analysis of disparities, and recommending practices to address students' "social, emotional, and mental health needs"); Off. of Special Educ. and Rehab. Servs., U.S. Dep't of Educ., *Building and Sustaining Inclusive Educational Practices* (Jan. 2025), https://perma.cc/AVG6-4E3S (attached as Ex. 8).

[4] Resolution Agreement, East Side Union High School District, Case No. 09-14-1242, at 2, 7–8 (Dec. 13, 2017), https://perma.cc/ZB6P-4P9U (attached as Ex. 9) (requiring a "School-Based Supports Plan that will examine and describe . . . a process for building interpersonal, social and emotional competencies for at-risk youth" and data collection and evaluation); Resolution Agreement, Victor Valley Union High School District, Case No. 09-14-5003, at 3 (Aug. 16, 2022), https://perma.cc/3J39-846B (attached as Ex. 10) (requiring data collection and evaluation); *id.* at 12 (the district will provide information to students and families regarding "resources that are available to students to assist them in developing social and emotional competencies"); Resolution Agreement, Grants/Cibola County Schools, Case No. 08-19-1269 (Sept. 17, 2020), https://perma.cc/L27G-SZND (attached as Ex. 11) (requiring revision of gifted and talented eligibility criteria to remedy racial disparities).

[5] The Individuals with Disabilities Education Act of 1975, 20 U.S.C. § 1412(a) ("IDEA"), requires the provision of an individualized education program that meets the needs of a child with a disability, and was signed into law to ensure inclusion in response to findings that "one million [students with disabilities] are excluded entirely from the public school system and will not go through the educational process with their peers." Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142, 89 Stat. 773, 774 (1975); *see also* 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act of 1974); 42 U.S.C. § 12101 et seq. (Americans with Disabilities Act of 1990). Title VI itself explicitly prohibits schools from "exclud[ing] from participation" any student on the basis of race, color, or national origin, thereby requiring inclusion. 42 U.S.C.§ 2000d. Similarly, Title IX prohibits schools from "exclud[ing] from participation" any student on the basis of sex, thereby requiring inclusion. 20 U.S.C. § 1681.

[6] *See, e.g.*, What Works Clearing House, *Practice Guide: Teacher-Delivered Behavioral Interventions in Grades K-5*, Institute of Educational Sciences, https://perma.cc/KGQ4-H6RE (last visited June 5, 2025) (attached as Ex. 12) (cataloging the guide under the topics "Children and Youth with Disabilities" and "Social Emotional Learning and Behavior"); *see also* What Works Clearing House, Inst. of Educ. Scis., *Teacher-Delivered Behavioral Interventions in Grades K-5: Practice Guide Summary* (2025), https://perma.cc/ZUG7-YTRF (attached as Ex. 13).

federal funding." *Id.* at 4. The DCL further supplies a link where "[a]nyone who believes that a covered entity has unlawfully discriminated" may file a complaint. *Id.*

## II.    Additional Relevant ED Actions

**End DEI Portal.** Following the issuance of the DCL, ED announced a new "End DEI" portal for "parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in" schools.[7] The "End DEI" portal solicits complaints regarding "divisive ideologies and indoctrination,"[8] to be used "as a guide to identify potential areas for investigation."[9] Its purpose is explained by a private individual, identified as a co-founder of Moms for Liberty, who encourages parents "to share the receipts of the betrayal that has happened in [ ] public schools" through "pushing critical theory, rogue sex education and divisive ideologies."[10] The portal is described as an outlet to report the teaching of "divisive ideologies and indoctrination," which it classifies as an "illegal discriminatory practice[ ]."[11]

Moms for Liberty also posted the DCL stating "NO MORE Tax Payer Dollars will be spent on DEI!"[12] and has threatened local school boards that "[i]t will be in the best interest of this school district to comply" with the DCL, and that "Moms for Liberty is prepared to escalate this issue."[13]

---

[7] Press Release, U.S. Dep't of Educ., U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025) ("Portal Press Release"), https://perma.cc/8737-NAA9 (attached as Ex. 14).
[8] U.S. Dep't of Educ., End DEI Portal, https://perma.cc/GYS3-J2GR (attached as Ex. 15).
[9] Portal Press Release.
[10] *Id.*
[11] End DEI Portal.
[12] Moms for Liberty, DEAR COLLEAGUE, Facebook (Feb. 15, 2025), https://www.facebook.com/story.php?story_fbid=935218675478809&id=100069720560290 (last accessed June 10, 2025) (attached as Ex. 16). Plaintiffs offer these postings for the fact of their existence and availability to the public. *See, e.g.*, *Starbrands Cap., LLC v. Original MW Inc.*, No. CV 14-12270-ADB, 2015 WL 13691435, at *4 (D. Mass. Aug. 14, 2015), *report and recommendation adopted*, No. 14-CV-12270-ADB, 2015 WL 5305215 (D. Mass. Sept. 11, 2015); *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n. 15 (3d Cir. 2006).
[13] Moms for Liberty, *DEI Tug of War in Wake County Schools Stirs Tensions Among Board, Parents* (reposted from the Carolina Journal) (Feb. 20, 2025), https://perma.cc/3B8D-W5WN (attached as Ex. 17).

In the past, Moms for Liberty has offered money for people to "catch" a public school teacher violating similar New Hampshire bans on teaching.[14]

**Frequently Asked Questions.** On March 1, 2025, ED announced the release of a document titled "Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act," "intended to anticipate and answer questions that may be raised in response to [the DCL]."[15] U.S. Dep't of Educ., Off. for C.R., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Feb. 28, 2025) ("Mar. 1 FAQ"), https://perma.cc/D63A-7MD9 (attached as Ex. 19). The FAQ states that "many schools have advanced discriminatory policies and practices under the banner of 'DEI' initiatives," and that others "have sought to veil racially discriminatory policies with terms like 'social-emotional learning' or 'culturally responsive' teaching." FAQ at 6. The FAQ insists that ED has authority to curb "themes in a class discussion," including in higher education when they involve "more extreme practices" such as requiring students to "take certain positions on racially charged issues," or "mandating courses . . . designed to emphasize and focus on racial stereotypes." *Id.* at 7. In investigating allegations of "covert discrimination," the FAQ states that ED will consider a school's history and stated policy of "further[ing] DEI objectives, 'equity,' a racially-oriented vision of social justice, or similar goals." *Id.* at 9. The FAQ states that it does not "bind [ED] in the exercise of its discretionary enforcement authority," *id.* at 1 n.3, and that assessment "depends on the facts and circumstances of each case," *id.* at 6.

---

[14] Moms for Liberty Hillsboro Co, NH, X (Nov. 12, 2021), https://perma.cc/L9YE-7HZJ (attached as Ex. 18).

[15] Without announcement to the public and without any acknowledgement within the document, ED subsequently amended the FAQ, omitting or altering portions. U.S. Dep't of Educ., Off. for C.R., Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Apr. 2025), https://perma.cc/43EZ-ME6A (attached as Ex. 20) ("FAQ"). In briefing, the Government indicates that the change was made on April 9, 2025. ECF 52-1 at 8.

**Certification.** On April 3, 2025, ED emailed a letter to State Commissioners requiring State Education Agencies ("SEA"s) to certify they are not engaging in undefined "DEI."[16] The accompanying press release cites the DCL and FAQ and contains a statement from Acting Assistant Secretary Trainor that "too many schools flout or outright violate" federal antidiscrimination law, "including by using DEI programs to discriminate."[17] SEAs had 10 days to certify and collect certifications from all Local Education Agencies ("LEA"s).[18] ED subsequently extended the deadline 10 days, to April 24.[19]

The Certification requires SEAs and LEAs to certify compliance with ED's newly announced understanding of *SFFA*, and separately, that compliance with ED's interpretations constitutes a material condition for the receipt of federal funds. Certification at 1. It also requires certification that entities understand that "the use of Diversity, Equity, & Inclusion ('DEI') programs to advantage one[ ] [person's] race over another" is contrary to Title VI. *Id.* at 3. It further states that "[t]he use of certain DEI practices can violate federal law" and that "[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences" including (1) "eliminating federal funding for any SEA, LEA, or educational institution that engages in such conduct," (2) "the potential initiation of litigation for breach of contract by the Department of Justice in connection with civil rights guarantees contained in federal contracts and grant awards seeking to recover previously received funds paid to them under these contracts and grants," and (3) liability under the False Claims Act ("FCA"), 31 U.S.C. §

---

[16] Decl. of David W. Samburg, ECF 45-1; April 3, 2025 OCR Email, ECF 45-2; U.S. Dep't of Educ., Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard* (Apr. 3, 2025), https://perma.cc/A8VQ-JRZB ("Certification") (attached as Ex. 21).

[17] Press Release, U.S. Dep't of Educ., ED Requires K-12 School Districts to Certify Compliance with Title VI and *Students v. Harvard* as a Condition of Receiving Federal Financial Assistance (Apr. 3, 2025), https://perma.cc/6UKX-7E66 ("Apr. 3 Certification Press Release") (attached as Ex. 22).

[18] *Id.*

[19] April 7, 2025 OCR Email, ECF 45-3.

3729(a), for which "violators face penalties including treble damages and civil penalties of thousands of dollars per violation." *Id.* at 3–4. The Certification indicates that "individuals using [DEI] practices" may face "serious consequences," and that the enumerated consequences are not exhaustive. *Id.* at 3. Further, it obligates SEAs to sign on behalf of their agency as a whole, including their higher education programs.[20] *Id.* at 1. The email accompanying the Certification also requires SEAs to report the signature status of each of their LEAs, any compliance issues within LEAs, and the SEA's proposed enforcement plans.[21]

While the Certification references several sources of obligations for federal funding recipients, *i.e.*, Title VI, *id.* (citing 42 U.S.C. § 2000d), federal contract and grant regulations, *id.* at 2 (citing 2 CFR § 200.300(a)), and ESSA, *id.* (citing 20 U.S.C. § 6301 et seq.),[22] as well as the requirement that federal funding recipients file assurances of compliance with federal nondiscrimination law, *id.* (citing 20 U.S.C. § 7844), as the Certification acknowledges, SEAs and

---

[20] An SEA's assurance requirements under the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act ("ESSA") apply to each of its relevant programs under ESSA, *see* 20 U.S.C. § 7844; *infra* n.22, which include programs that involve institutes of higher education, or otherwise relate to higher education, *see, e.g.*, *id.* § 6861 (providing grants to entities, including higher education institutions, to provide professional development to improve instruction for English language learners, including in consortia with SEAs or LEAs); *id.* § 7294 (providing grants to entities, including higher education institutions, to assist SEAs, LEAs, and other entities in training personnel in the identification and education of gifted and talented students).

[21] Letter from Daniel Morton-Bentley, Counsel & Deputy Comm'r, N.Y. State Educ. Dep't, to U.S. Dep't of Educ., Off. of C.R. 2 (Apr. 4, 2025) (attached as Ex. 23).

The New Hampshire Department of Education ("NHED") notified all New Hampshire LEAs requiring them to submit the Certification and stating that, if no form is received, NHED "is required to report to [ED] that no certification was received," and that "[a]ll issues of noncompliance and a proposed enforcement plan will be submitted to [ED]." N.H. Dep't of Educ., Certification Requirement Directions (Apr. 3, 2025) ("NHED Certification Requirement Directions") (attached as Ex. 24). NHED's notification includes a "Mandatory Supplement Questionnaire" (the "Supplement Questionnaire"), requiring LEAs to answer whether, "[u]pon investigation, [there have] been instances of noncompliance identified within your LEA" and if so to "describe each issue of noncompliance" and "detail [the LEA's] remediation plans including [the] intended date of remediation completion." Supplement Questionnaire (attached as Ex. 25). No reason is provided for requiring LEAs to submit this information, and no definitions of "investigations," "instances of noncompliance," or "remediation," or guidance on how to assess compliance is provided. *Id.* After ED extended its deadline, New Hampshire extended the deadline for LEAs to respond to April 17, 2025. Email from NH Dept of Education to LEAs, ECF 47-1.

[22] Further, ED suggests that ESSA prohibits education institutions from undertaking "DEI programs" but ignores the totality of assurances required under ESSA. ESSA and state plans adopted under ESSA require SEAs to implement practices relating to "diversity," "equity," or "inclusion." *See, e.g.*, 20 U.S.C. § 6311(b) (requiring inclusion of English language learners); *id.* § 6311(c) (requiring meaningful differentiation for students, including subgroups).

LEAs already have provided general assurances under these laws. *Id.* at 2–3.[23] According to ED, these assurances that have already been signed are "an efficient and effective tool for achieving compliance with [these] laws"; recipients need only sign such assurances once every three years; and the assurances apply to all future funding during that time period.[24] The Certification did not include an Office of Management Budget (OMB) control number, as required.[25] Previous certifications that ED has issued have followed these procedures.[26]

**Investigations and Enforcement Approach.** On March 14, 2025, ED announced it had opened investigations into 45 universities pursuant to the DCL as part of an effort to "reorient civil rights enforcement."[27] ED has also announced the "immediate cancellation of approximately $400 million in federal grants and contracts" to Columbia University related to its "ongoing investigation under Title VI," warning that this "serves as a notice to every school and university that receives federal dollars."[28] ED, with other agencies, sent a subsequent letter indicating sweeping "precondition[s]" to negotiation and receipt of federal funds, including placing an academic department under receivership.[29] The Federal Government also abruptly froze $2.2 billion in federal funding to Harvard University after it refused to comply with demands from ED

---

[23] *See also* 20 U.S.C. § 7844(a) (requiring under ESSA "a single set of assurances" that "each such program will be administered in accordance with all applicable statutes, regulations, program plans, and applications").

[24] *See* U.S. Dep't of Educ., Off. for C.R., OMB No. 1870-0503, Supporting Statement for Paperwork Reduction Act Submission 2 (2024), https://omb.report/icr/202404-1870-001/doc/141488800.pdf (attached as Ex. 26).

[25] 44 U.S.C. § 3507(a)(2), (3).

[26] *See* U.S. Dep't of Educ., Supporting Statement for Paperwork Reduction Act Submission 2, 5-6; *see also* U.S. Dep't of Educ., Revised Assurances Template (2017), https://www.ed.gov/sites/ed/files/2020/10/reviseded18100576.pdf (attached as Ex. 27).

[27] Press Release, U.S. Dep't of Educ., Office for Civil Rights Initiates Title VI Investigations into Institutions of Higher Education (Mar. 14, 2025) ("Mar. 14 Investigations Press Release"), https://perma.cc/9GJ9-LBYK (attached as Ex. 28).

[28] Press Release, U.S. Dep't of Educ., DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million (Mar. 7, 2025) ("Columbia Press Release"), https://perma.cc/96Y4-CNC2 (attached as Ex. 29).

[29] Letter from Josh Gruenbaum, Comm'r of the Fed. Acquisition Serv., Gen. Servs. Admin., et al., to Dr. Katrina Armstrong, Interim President, Columbia Univ. (Mar. 13, 2025) ("Letter to Columbia"), https://perma.cc/RNC4-E3GY (attached as Ex. 30).

and others in a proposed "agreement in principle" to "maintain Harvard's financial relationship with the federal government," including to "immediately shutter all [DEI] programs, under whatever name, and stop all DEI-based policies . . . under whatever name[.]"[30]

ED has also moved to revoke millions of dollars in grant funding based on bare assertions of "ideologically driven spending," including "divisive training in DEI, Critical Race Theory, and gender identity,"[31] or "divisive ideologies," including "inappropriate and unnecessary topics such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; 'anti-racism'; and instruction on white privilege and white supremacy."[32]

In congressional testimony, the Secretary of Education has asserted that Columbia University needed to "vet" professors based on ideology,[33] been unable to explain how a school would discern it is running an unlawful DEI program,[34] and indicated she was unable to answer whether teaching the book "Through My Eyes" by Ruby Bridges would constitute illegal DEI without having read the book.[35]

---

[30] Letter from Josh Gruenbaum, Comm'r of the Fed. Acquisition Serv., Gen. Servs. Admin., et al., to Alan M. Garber, President of Harvard Univ., & Penny Pritzker, Lead Member of Harvard Corp. 2–3 (Apr. 3, 2025), https://perma.cc/Q22V-MY7K (attached as Ex. 31).

[31] Press Release, U.S. Dep't of Educ., U.S. Department of Education Cancels Additional $350 Million in Woke Spending (Feb. 13, 2025), https://perma.cc/VT57-LXEX (attached as Ex. 32) (announcing cancellation of grants to Regional Educational Laboratories and Equity Assistance Centers).

[32] Press Release, U.S. Dep't of Educ., U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants (Feb. 17, 2025), https://perma.cc/K2N4-UUN7 (attached as Ex. 33).

[33] *A Review of the President's Fiscal Year 2026 Budget Request for the Department of Education Before the Subcomm. on Lab., Health and Hum. Servs., Educ., and Related Agencies of the S. Comm. on Appropriations*, 119th Cong., at 33:56 (Jun. 3, 2025), https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2026-budget-request-for-the-department-of-education (stating the school needed to "vet the students who are coming in better to see what kind of backgrounds that they have. Even professors who come on campuses, are they teaching ideology or [unclear] subjects.").

[34] *Hearing on the Nomination of Linda McMahon to be Education Secretary Before the S. Comm. on Health, Educ., Lab. and Pensions*, 119th Cong., 2025 WL 502955 (Feb. 13, 2025) (Q: "How does the school know whether it's running a DEI program or not?" A: "Um, DEI I think has been – um, it's a program that's tough. It was put in place ostensibly for more diversity for equity and inclusion. And I think what we're seeing is that it's having an opposite effect"); *see also id.* (Q: "if you're running an African American history class, could you perhaps be in violation of [Executive Order prohibitions on DEI]" A: "I'm not quite certain and I'd like to look into it further.").

[35] *Hearing Examining the Policies and Priorities of the Department of Education Before the S. Comm. on Health, Educ., Lab. and Pensions*, 119th Cong., at 1:38:42 (Jun. 4, 2025), https://edworkforce.house.gov/calendar/eventsingle.aspx?EventID=412504; *see also id.* at 1:38:28 (Q: "Would you

### III. Impact on Plaintiffs and the Students They Serve

School districts and educators at every level, including NEA and NEA-NH members, are concerned that teaching core texts and topics will be considered discrimination."[36] For example, educators fear that:

- Texts that are staples of high school English courses like *Heart of Darkness* by Joseph Conrad, "The White Man's Burden" by Rudyard Kipling, *Beloved* by Toni Morrison, and *To Kill a Mockingbird* by Harper Lee, will subject them to accusations of discrimination because they address themes of racism, colonialism, and/or imperialism.[37]

- Lessons integral to teaching social studies "directly tied to concepts of race, racism, and slavery," including "Juneteenth, the Civil Rights Act of 1866, and the Fourteenth and Fifteenth Amendments, leading up to the Black Codes, the founding of the KKK, the Jim Crow Era, and the Compromise of 1877" are impossible to discuss "without creating a risk of being accused of presenting a narrative of the United States as racist."[38]

- Texts and topics that are related to gender roles because of the Letter's reference to "toxic[] indoctrinat[ion]" and DEI programs may now be considered discrimination.[39]

---

say that it would be an illegal DEI for a lesson plan on the Tulsa race massacre [to be taught]?" A: "I'd have to get back to you on that."); *id.* at 1:36:57 (stating that "African studies or Middle East studies or Chinese studies" would not be "part of DEI" if they were taught "giving the facts on both sides.").

[36] *See, e.g.*, Mem. A Decl. ¶ 6 (attached as Ex. 34); Mem. B Decl. ¶ 6 (attached as Ex. 35); Mem. C Decl. ¶ 6 (attached as Ex. 36); Mem. D Decl. ¶¶ 10–12 (attached as Ex. 37); Mem. G Decl. ¶ 9 (attached as Ex. 38); Boston Decl. ¶¶ 13-15, 26-27, 29 (attached as Ex. 39); *id.* ¶ 32 (the district, relying on ED guidance, recently used federal funds to purchase curriculum "to reflect the diversity of its student body."); Shea Decl. ¶ 10 (attached as Ex. 40). NEA and NEA-NH are membership associations with the purpose and mission of advocating for members' interests including those asserted here. NEA Decl. ¶¶ 4–11, 24–37 (attached as Ex. 41); NEA-NH Decl. ¶¶ 5–6, 8–17 (attached as Ex. 42).

[37] Mem. A Decl. ¶¶ 11–18; *see also id.* ¶¶ 25–27; Boston Decl. ¶¶ 27 (expressing concern that the district's teaching of Indigenous history or the context of the Civil War, or hosting a Holocaust survivor as a guest speaker could each be perceived as "teach[ing] students that certain racial groups bear unique moral burdens that others do not."); *id.* ¶ 29; Shaps Decl. ¶ 14 (attached as Ex. 43) (concern that "the use/implementation of culturally respons[ive] sustaining curriculum frameworks, Advanced Placement courses, a range of textbooks, and high school English and social studies courses that focus on diverse literature and historical topics [ ] may be deemed DEI-related").

[38] Mem. B Decl. ¶ 15; *see also* Shea Decl. ¶¶ 10, 14–16.

[39] Mem. A Decl. ¶¶ 19–20 (worried about texts that explore the concept of gender such as works by Austen, Atwood, Shakespeare, Shelley, Salinger, and Vonnegut and discussions the texts prompt); *see also* Mem. B Decl. ¶¶ 18–19; Boston Decl. ¶ 27.b ("teachers have asked me whether they may answer a student's question about human sexuality in a health class or whether they may teach a book in an upper-level English class that references sexuality.").

Other examples at all levels of education abound.[40] Professors in higher education are worried that topics core to their scholarship are no longer permissible or too risky to pursue.[41]

Schools and educators fear employing basic, sound pedagogical practices.[42] For example, they are worried that they cannot, without risk of sanction:

- Ask students to draw on current events, popular culture, or their own experiences and use these frameworks to inform their analysis of core texts and topics without risking impermissible discussions related to race and gender;[43]

- Allow students to explore topics related to race, diversity, or discrimination by choosing their own essay topics or projects;[44]

- Have conversations with students regarding race, diversity, equity, and inclusion, including by helping students understand and navigate hurtful language;[45]

---

[40] *See, e.g.*, Mem. B Decl. ¶ 14 (eighth grade social studies teacher in New Hampshire fearing accusations of discrimination under DCL because "it is not possible to teach about the Holocaust or other examples of antisemitism without reference to concepts like white privilege or racial oppression" ); Mem. G Decl. ¶ 9 (Professor at Georgia State University focusing on social justice teacher education fears teaching about equity and inclusion relating to English Language Arts curricula could be perceived as teaching that "people of some races or gender/ sexuality carry a moral burden that others do not" in violation of the DCL); *id.* ¶ 12 (worried that assigning readings that center on the experiences of marginalized people in the U.S. and that take a social justice approach, such as Linda Christensen's *Reading, Writing and Rising Up* (2017) could be perceived as discriminatory); Mem. D Decl. ¶ 10 (worried that lessons focused on Indigenous narratives and identity, which include topics of colonialism and settlerism central to her teaching and scholarship could be perceived as teaching that "certain racial groups bear unique moral burdens"); Mem. E Decl. ¶ 13 (attached as Ex. 44) (explaining concern that assigning students to reflect on the documentary *Crip Camp*, which allows students "to see the fight for social justice for people with disabilities," will be alleged to violate the DCL); NEA-NH Decl. ¶¶ 9–12; Mem. I Decl. ¶ 7 (attached as Ex. 45) (sixth-year higher-education student explaining that her education is being impacted because her children's literature classes have "removed focus on cultural responsiveness" in response to DCL).

[41] *See, e.g.*, Mem. G Decl. ¶¶ 11–13, 18; Mem. D Decl. ¶¶ 10–11, 13–15; Mem. H Decl. ¶¶ 8, 13–15,18 (attached as Ex. 46) (describing fears that she will be unable to continue her research that focuses on transgenerational trauma and lynchings); Mem. F Decl. ¶¶ 17–18 (attached as Ex. 47) (explaining that she is worried her scholarship on anti-DEI legislation and its negative impact on student success for her Leadership in Community College Ed. D. program will be viewed as impermissible and explaining that looking at equity gaps and where those gaps may be bridged is central to her discipline and academic inquiries); NEA Decl. ¶ 27.

[42] *See generally* NEA Decl. ¶¶ 29–30; NEA-NH Decl. ¶¶ 13–14.

[43] *See* Mem. A Decl. ¶¶ 12, 16–18; Mem D. Decl. ¶ 12; Boston Decl. ¶ 27.c; Mem. G Decl. ¶ 11 (questioning whether to continue asking aspiring teachers to develop a critical literacy unit plan because "critical literacy involves analyzing power and representation in texts and society"; Mem. D Decl. ¶ 12 (questioning whether she can give credit to student assignments that address their own experiences and viewpoints related to race, diversity, equity, and inclusion).

[44] *See* Mem. A Decl. ¶ 21; Mem. D Decl. ¶ 12; Mem. F Decl. ¶¶ 6–8.

[45] *See* Mem. B Decl. ¶¶ 20–21; Mem. C Decl. ¶¶ 9–10; Shaps Decl. ¶ 17 (concern that the DCL might prohibit the use of restorative justice conferences to respond to students' use of racial epithets, because "a core of the restorative practice is to highlight the historical oppression and use of dehumanizing language to humiliate or degrade a group of individuals defined by color or race.").

- Engage in practices and lessons reflecting social and emotional learning and culturally responsive teaching, which the FAQ deems efforts that "veil discriminatory policies."[46]

The uncertainty under the DCL strikes at the heart of educators' professional responsibilities,[47] implicating instruction and practices necessary to comply with state and local teaching and learning requirements[48] and to prepare students for success in the next steps in their education.[49] These practices are also critical to ensure students engage with learning,[50] build trust with their teachers and community,[51] and gain critical thinking skills to formulate their own

---

[46] *See* Mem. C Decl. ¶ 9 (explaining instruction on social and emotional learning that includes lessons on "hurtful language, identity, gender, inclusivity, developing empathy, understanding bullying, and diversity" with the goal of providing "students with the social and emotional competencies they need to feel successful as learners and citizens of their communities"); *see also* Mem. A Decl. ¶ 23; Mem. B Decl. ¶ 23; Mem. E Decl. ¶ 9; Mem. I Decl. ¶ 7; Shaps Decl. ¶ 14 (concern that social and emotional curriculum and programs, English instruction for speakers of other languages, academic support for students with disabilities, and support for bilingual and multicultural learning could fall under the FAQ's allegation that "schools have sought to veil discriminatory policies with terms like 'social-emotional learning' or 'culturally responsive' teaching.").

[47] This also includes NEA member responsibilities outside the classroom, including participation in developing curriculum and professional development standards and a range of extracurricular activities that support student learning. NEA Decl. ¶¶ 32–34; NEA-NH Decl. ¶ 15.

[48] In New Hampshire, for example, educators must teach about "intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred and discrimination," as well as "how to prevent the evolution of these practices." N.H. Rev. Stat. Ann. § 189:11, I-c(j) (2023); *see also* Mem. B Decl. ¶ 14; Mem. A Decl. ¶ 12 (explaining "state certification standards require [him] to teach students how to talk about experiences (both their own and others), understand different cultures, and experiences other than their own, and critically examine the information they receive in the media every day"); Boston Decl. ¶ 28; Badams Decl. ¶ 20 (attached as Ex. 48); Shaps Decl. ¶¶ 20–23; Shea Decl. ¶¶ 13–16.

Tennessee provides K-12 social studies content standards, defined as "the essential knowledge to be learned … within each course." Tenn. State Bd. of Educ., *Tennessee Social Studies Standards* 6 (2017), https://www.tn.gov/content/dam/tn/education/standards/ss/Social_Studies_Standards.pdf (attached as Ex. 49). Examples include "how slavery became a national issue during the mid-19th century, including the significance of: [the] *Dred Scott v. Sandford* decision," *id.* at 59, the "economic and social impact of Jim Crow laws on African Americans," *id.* at 122, and "the state-sponsored mass murder of the Jews in Nazi-controlled lands," *id.* at 240.

Oklahoma asks educators to prepare students "to become informed, contributing, and participating citizens in this democratic republic," Okla. State Dep't of Educ., *Oklahoma Academic Standards for Social Studies, Pre-K–12* at 3 (2019), https://perma.cc/H95Y-FAZN (attached as Ex. 50), and to engage them with curricula "inclusive of the identities that reflect the richness and diversity of the human experience," Okla. State Dep't of Educ., *2021 Oklahoma Academic Standards for English Language Arts* 5 (2021), https://perma.cc/D7GD-DFT6 (attached as Ex. 51).

Pennsylvania recommends a "multicultural education program" to "promote cultural understanding and appreciation and to further good will among all persons, without regard to race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability." 43 P.S. § 958; *see also generally* NEA Decl. ¶¶ 12, 28–34.

[49] *See, e.g.*, Mem. A Decl. ¶¶ 9–10, 27 (explaining certain practices and texts that are central to preparing students for success on the English Advanced Placement exam); Mem. E Decl. ¶ 11 (explaining the conflict between the Letter and accreditation standards for special education teachers); Mem. I Decl. ¶¶ 7–10 (student discussing impact Letter has had on her education and her preparedness to serve as a future K-12 educator).

[50] *See, e.g.*, Mem. A Decl. ¶ 12; Mem. F Decl. ¶ 6; Mem. I Decl. ¶¶ 7–9.

[51] *See, e.g.*, Mem. B Decl. ¶ 10; Mem. C Decl. ¶¶ 7, 9; Mem. D Decl. ¶ 14; Mem. I Decl. ¶¶ 7–9; Shea Decl. ¶ 12.

13

arguments and reach their own conclusions.[52] Under the DCL, educators grapple with an impossible choice: continue practices core to teaching and risk adverse consequences to their reputations and livelihoods,[53] or substantially change practices, requiring significant disruption and time and sacrificing the quality of their teaching and professional obligations.[54] At bottom, either choice will have a profound impact on students,[55] including censoring their expression.[56]

Educators in numerous states face consequences including revocation of a teaching license and civil enforcement.[57] For example, in New Hampshire, educators face discipline up to revocation of their teaching credentials for violating the Code of Conduct, N.H. Code Admin. R. ED. 511.02(a)(2), which prohibits behaviors including discrimination. *Id.* at 510.01–03. Any

---

[52] *See, e.g.*, Mem. A Decl. ¶¶ 19, 24; Mem. B Decl. ¶¶ 9, 21; Mem. C Decl. ¶ 7; Mem. F Decl. ¶ 9; NEA Decl. ¶ 30; Boston Decl. ¶ 27.

[53] *See, e.g.*, NEA Decl. ¶¶ 11, 35–37; NEA-NH Decl. ¶¶ 16–17; Mem. A Decl. ¶¶ 8, 25–26; Mem. B Decl. ¶¶ 7, 25; Mem. C Decl. ¶ 6; Mem. D Dec. ¶¶ 15, 18; Mem. G Decl. ¶ 18; Mem. I Decl. ¶ 10; Mem. H Decl. ¶ 14; CBED Decl. ¶¶ 41–45.

[54] *See, e.g.*, Mem. A Decl. ¶ 27; Mem. B Decl. ¶ 26; Mem. D Decl. ¶¶ 9–11, 13–15; Mem. F Decl. ¶¶ 13–14; *cf.* Mem. G Decl. ¶¶ 16–18.

[55] *See, e.g.*, Mem. A Decl. ¶ 19 (explaining how critical thinking is essential to "promote[ ] the democratic principles enshrined in our Constitution"); *id.* ¶ 27 (explaining that his "[s]tudents preparing for the AP English Exam would be most affected" if he revised his curriculum in response to the Letter because "it would be difficult to modify the curriculum quickly enough to cover all the necessary components that the AP Exam tests"); Mem. B Decl. ¶¶ 26–27 (explaining English language learner students and students with disabilities would "suffer the most"); NEA Decl. ¶ 31 ("The Letter leaves in doubt whether and how teachers will be able to continue key practices and programs that serve students with disabilities and multi-lingual learners"); Mem. D Decl. ¶ 14 (explaining that her students can no longer learn about aspects of "diversity, equity, and inclusion or hear their classmates' viewpoints, to understand the sheer breadth of possible arguments" and to "debate this subject with their peers"); *id.* ¶ 9; Mem. H Decl. ¶ 19 (explaining those interested in her research will "no longer have the chance to learn about topics related to diversity, equity and inclusion, hear their classmates' viewpoints, or understand the breadth of possible arguments related to these topics); Mem. E Decl. ¶¶ 9, 11–12; Mem. F Decl. ¶ 9; Mem. I Decl. ¶¶ 7–10.

[56] *See, e.g.*, Mem. G Decl. ¶ 10 (Professor whose teaching focuses on social justice in teacher education is worried that students will feel prohibited from discussing their own or others' experiences with ableism, racism, sexism, and other forms of discrimination); Mem. F Decl. ¶ 16 (explaining harm to students at two-year colleges, many of whom are economically disadvantaged); Mem. I Decl. ¶ 10 (student explaining that, under ED's letter and accompanying guidance, she fears she will be unable to speak freely about diversity, equity, and inclusion).

[57]*See, e.g.*, Tenn. State Bd. of Educ. R. 0520-02-03.09 (board may "revoke. . . an educator's license" for "negligence in the commission of duties as an educator" and "other good cause" defined as "conduct that calls into question the fitness of an educator to hold a license . . ." including violation of the Teacher Code of Ethics); T.C.A. § 49-5-1003(b) (requiring educators to "[a]bide by all applicable federal and state laws"); Okla. Admin. Code § 2101:1-5-6(b) (permitting revocation of teaching certificate for " willful violation of a rule or regulation of . . . the United States Department of Education."); . 19 Tex. Admin. Code § 247.2 ( "educator[s] shall comply with . . . federal laws"); 19 Tex. Admin. Code § 249.15 (addressing discipline where educators have "conducted school or education activities in violation of law"); . Idaho Code § 33-1208 (a teaching license may be revoked for violations of the professional standard of ethics); Idaho Admin. Code R. 08.02.02.076 ("an educator abides by all federal . . . laws").

member of the public can file a complaint, and investigations, either formal or informal, must be initiated any time possible misconduct comes to the attention of the state Department of Education, through any means.[58] *Id.* at 511.01(a).

Plaintiffs in higher education have already experienced censorship of speech and expression related to race, diversity, equity, and inclusion. For example:

- On the day that ED's threats of funding termination became effective, a professor at Georgia State University who serves as the co-director for Center for Equity and Justice in Teacher Education was told to rework the name and website for the Center, which has been unavailable to students since ED issued the Letter.[59] She was also instructed to change the programming for an upcoming event related to the Black freedom struggle.[60]

- That same day, the administration at Pensacola State College canceled a professor's presentation to the college community of work referencing the need to overcome the history of white supremacy and addressing lynching.[61]

- At a college in the Midwest, a teaching fellow was instructed to review training on pedagogical best practices for words such as "diversity," "equity," "inclusion," "culturally responsive," or "economically disadvantaged," and has had to gut much of this training.[62]

- The provost of a university in the Southeast instructed faculty to remove terms such as "'disability, 'inclusion,' and 'culturally responsive'" from course descriptions.[63]

---

[58] Furthermore, the Code of Conduct requires educators to report suspected violations of the Code, and failure to do so is itself a violation of the Code. *Id.* at 510.05(a) & (f). Educators may also face consequences through the New Hampshire Human Rights Commission that takes complaints under the Law Against Discrimination, which prohibits discrimination including on the basis of race. N.H. Rev. Stat. Ann. §354-A. The HRC has general jurisdiction to "eliminate and prevent" discrimination in employment, places of public accommodation, and K-12 public schools. *See also* New Hampshire Commission for Human Rights, https://www.humanrights.nh.gov/ (attached as Ex. 52); *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *19 (D.N.H. May 28, 2024) ("The Law Against Discrimination, in turn, authorizes aggrieved parties to sue not only employers but also individual employees who aid and abet in an employer's 'unlawful discriminatory practice.'") (appeal filed July 26, 2024).

[59] Mem. G Decl. ¶¶ 16–18.

[60] *Id.* ¶ 18.

[61] Mem. H Decl. ¶¶ 12–14.

[62] Mem. F Decl. ¶¶ 3, 10–14.

[63] Mem. E Decl. ¶ 10; *see also* Mem. I Decl. ¶ 7 (student explaining that her courses "removed the focus on cultural responsiveness" following issuance of the Letter).

Additional colleges and universities, as well as K-12 schools, have removed and modified programs in an effort avoid the threatened loss of federal funding, signaling to their faculty and staff that they should censor teaching and education practices associated with diversity, equity, and inclusion. *See, e.g.*, John Back, *President Pinto shares message regarding future of DEI at UC* 2, UC News (Feb. 21, 2025), https://perma.cc/D8HM-ZSDB (attached as Ex. 53) (publishing letter from university president announcing that "the federal government has effectively outlawed DEI Programs and practices," requiring the university to evaluate jobs, programs, initiatives and projects, and remove references to DEI principles).; Letter from Amy Parsons, President, Colo. State Univ., to Colo. State Univ. Community (Feb. 18, 2025), https://perma.cc/3GGQ-68K5 (attached as Ex. 54). (writing that because "the new administration's

These actions taken pursuant to the DCL have grave consequences for Plaintiffs, including in the evaluation and advancement of their employment and in their success in their disciplines.[64]

Plaintiffs Dover, Somersworth, Oyster River Cooperative, Hanover and Dresden School Districts (the "Districts") receive millions of dollars of federal funding—including funding under Titles I–IV of ESSA, the Individuals with Disabilities in Education Act ("IDEA"), and other programs—which they rely on to provide a range of services to their students, including students that need targeted support,[65] and the loss of that federal funding would create substantial hardships

interpretation of law marks a change" and "[g]iven the university's reliance on federal funding, it is necessary to take additional steps to follow the federal administration's new interpretations"); Univ. of Neb. Sys., "*A message from President Gold on OCR's 'Dear Colleague' letter*" (Feb. 21, 2025), https://perma.cc/ET78-B7ZV (attached as Ex. 55) (writing that the DCL "outlines federal requirements to restrict [DEI] initiatives at institutions receiving federal financial support" and "outlines consequences for direct and *non-direct* noncompliance – most notably the entire university system becoming ineligible for all federal funding" and, in response, University initiated an "immediate" and "comprehensive review of potentially relevant activities," recognizing the "significant questions and uncertainties" remaining for the university community) (emphasis added); Danielle James, *Muskegon Community College suspends DEI programs amid Trump mandates*, M Live (Mar. 7, 2025), https://perma.cc/6CV3-NTRU (attached as Ex. 56) (explaining the college "suspended Diversity, Equity, and Inclusion (DEI) programming," including a partnership with a local organization to conduct trainings, "as a direct result of" the DCL and that "'the uncertain legal landscape regarding enforcement, and implementation by [ED] of that interpretation,' led the college to conclude that continuing to offer DEI programming 'could place absolutely necessary federal financial assistance at risk.'"); Virginia Beach City Public Schools, School Board Regular Meeting Minutes 9-12 (Apr. 8, 2025), https://perma.cc/A9GF-C5HF (attached as Ex. 57) (adopting "Resolution to Comply with Legal Obligations in Exchange for Receiving Federal Financial Assistance"); City Schools of Decatur, Regular Monthly Meeting Minutes 4–5 (Apr. 15, 2025) https://app1.eboardsolutions.com/api/PrintMinutes/ViewPrintMinutes?fid=Minutes_4052_124736_27May20250124 16.pdf&fname=Regular%20Monthly%20Meeting%20-%2004-15-2025%20-%20Meeting%20Minutes (attached as Ex. 58) (rescinding policies on school board governance and on equity and amending policy on gender equity in sports); City Schools of Decatur, Special Called Meeting Minutes 2 (Apr. 29, 2025) https://app1.eboardsolutions.com/api/PrintMinutes/ViewPrintMinutes?fid=Minutes_4052_125489_27May20250121 20.pdf&fname=Special%20Called%20Meeting%20-%2004-29-2025%20-%20Meeting%20Minutes (attached as Ex. 59) (reinstating policies "amended and rescinded in response to federal directives").

[64] *See, e.g.*, Mem. G Decl. ¶ 18 (explaining that in addition to the time and resources she will need to spend making these changes, she has lost the opportunity to fully participate in the Center and its services for her college, which is part of her academic responsibilities for which she is evaluated); Mem. H Decl. ¶ 15 (explaining inability to share her research); Mem. D Decl. ¶¶ 9–11, 15; Mem. E Decl. ¶ 14.

[65] Boston Decl. ¶ 10 (discussing Dover district's receipt of $3.1 million in federal funds for fiscal year 2024-25 used, for example, to provide instruction in reading, writing, and math to students with disabilities, students from high poverty-communities, and English Language learners, connect with families, to execute its plans for educational and racial equity, to develop opportunities for social and emotional learning, and to invest in staff training and increase staffing); Shea Decl. ¶ 6 (discussing Somersworth district's receipt of $2.1 million in federal funds under the IDEA, Titles I-IV of ESSA, and school safety grants); Badams Decl. ¶ 7 (discussing the Hanover and Dresden districts' receipt of federal funds used to provide for special education, math and literacy tutoring, and Kindergarten readiness); Shaps Decl. ¶ 5 (discussing Oyster River Cooperative district's receipt and use of federal funds, including under ESSA, IDEA, and School Nutrition Funds).

for the Districts, their staff, and their students.[66] Collectively, SEAs and LEAs stand to lose billions of dollars in federal funding.[67] The threat of the loss of federal funds through the DCL and Certification has a coercive impact on Districts, including because the conditions they impose are new and retroactive, effective immediately, in the middle of relevant funding cycles.[68] The DCL's prohibitions conflict fundamentally with the Districts' missions, values, and approach to education.[69] The Districts' instruction, programming, professional development and other activities risk being construed to involve impermissible "diversity," "equity," or "inclusion," include topics related to race, or otherwise fall within the broad prohibitions of the DCL.[70] This includes instructional techniques and topics that are integral to student learning,[71] and necessary to abide by state, local, or other requirements;[72] programming and events where students can share

---

[66] Boston Decl. ¶ 35 ("The loss of federal funds . . . would be roughly equivalent to losing the entire staffing budget for one of our elementary schools. Taxes are capped in Dover so we would not be able to bridge the gap in revenue."); *id.* ¶¶ 35–36 (discussing the harms to educational programming if federal funding were cut); Badams Decl. ¶¶ 7, 22; Shaps Decl. ¶ 5; Shea Decl. ¶ 6; *see also* Boston Decl. ¶ 30 (expressing fear the district will "lose teachers because of the confusion and fear caused by the [DCL]").

[67] *See Fiscal Year 2023-FY 2025 President's Budget State Tables for the U.S. Department of Education*, U.S. Dep't of Educ., https://perma.cc/GL8U-LCUY (attached as Ex. 60) (linking to tables that include ED funds to SEAs and LEAs using statutory formulas but that do not reflect all ED funds that a State receives); U.S. Dep't of Educ., *Funds for State Formula-Allocated and Selected Student Aid Program, by Program* (2025), https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ed.gov%2Fsites%2Fed%2Ffiles%2F2024-10%2F25stbyprogram.xlsx&wdOrigin=BROWSELINK (attached as Ex. 61) (listing grand totals of applicable ED funding to SEAs and LEAs for fiscal years 2023, 2024, and 2025 at approximately $170 billion to $183 billion per year).

[68] Boston Decl. ¶ 34; Badams Decl. ¶ 22; Shaps Decl. ¶ 25; Shea Decl. ¶ 18.

[69] Boston Decl. ¶ 8 ("[Dover School District] celebrates the individual differences students bring to the educational environment"); *id.* ¶¶ 7, 9, 37; Badams Decl. ¶ 11 ("diversity, equity, and inclusion are fundamental values that are embedded into the fabric of our curriculum, educational practices, and extra-curricular offerings"); *id.* ¶¶ 12–14; Shaps Decl. ¶ 8 ("Oyster River Cooperative School District promotes a safe and nurturing community where the uniqueness of each member is valued and appreciated."); *id.* ¶¶ 10–13; Shea Decl. ¶ 9 ("Diversity, equity, and inclusion are independent, but connected, ideas that are core values in the Somersworth School District. These values are not a standalone program or limited to a practice or policy; rather they are who we are as a community"); *id.* ¶ 10.

[70] Boston Decl. ¶¶ 16, 18–32.

[71] Boston Decl. ¶ 27; Badams Decl. ¶ 15; Shaps Decl. ¶¶ 8, 11–13; Shea Decl. ¶ 13.

[72] Boston Decl. ¶ 28 (citing state law, N.H. Rev. Stat. Ann. § 189:11, I(j), requiring schools to address how "intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices."); Badams Decl. ¶¶ 11–14, 19–20; Shaps Decl. ¶¶ 20–23; Shea Decl. ¶¶ 13–16.

their aspects of their own culture with the school community[73] and where students come together
across differences;[74] and support for student-formed groups around shared interests.[75]

Districts fear they cannot continue to operate in compliance with relevant state and local
requirements, or use instructional techniques and curriculum core to student learning and sound
pedagogical practices without violating the DCL; and changing course in an attempt to comply
would be enormously costly.[76] Districts fear efforts to respond to discrimination[77] and to ensure
that all students are included may be considered impermissible under the DCL; for example:

- After losing three students in one class to suicide, the Dover School District
  prioritizes suicide prevention, including "activities specifically targeted toward
  marginalized populations at higher risk to experience suicide."[78]

- The Hanover and Dresden School Districts "measure educational outcomes as well
  as the experiences of students, parents, and teachers across social identity
  categories," and this data informs programing.[79] However, the Districts fear this
  work "could be construed as "advocating in a way that 'preference[s] certain racial
  groups' against the terms of the [DCL]" where, for example, certain groups like

---

[73] Boston Decl. ¶ 22 (the district hosts a celebration of learning and diversity event where "[s]tudents, families and community organizations [a]re invited to share aspects of their culture or language"); Shaps Decl. ¶ 9 ("Community & Belonging Group" provides "a space where students, staff, faculty, parents, administrators, and community members can come together to foster a culture of belonging, dignity, and inclusion"); *id.* ¶ 15 (celebrations of Black History Month, Hispanic History Month, and Pride Month); *id.* ¶ 18 (inviting guest speakers "to engage students in conversations about race, diversity, public policy, and social history"); Shea Decl. ¶ 12 (allowing district space "to host an autumn festival for a local immigrant community. Everyone is welcome; no one is excluded.").

[74] Boston Decl. ¶¶ 23–24 (providing adaptive sports programs that bring together people of all abilities); Badams Decl. ¶ 15 (high school advisory program "convenes students who would not otherwise socialize together to grapple with questions related to current social and interpersonal issues, including those related to identities and inequalities").

[75] Boston Decl. ¶¶ 25, 31.c; Badams Decl. ¶ 16; Shaps Decl. ¶ 15.

[76] Boston Decl. ¶¶ 27, 34 (explaining that the District recently spent $1.4 million to update its curriculum to reflect the diversity of its student body and if ED "considers this curriculum to be DEI" the District will "lose the value of its investment" and "does not have money in its budget to re-purchase an entire curriculum"); Badams Decl. ¶ 19 ("Simply put, it is unclear whether we can continue to operate our schools under [our] Equity Policy altogether or without significant and costly changes to our curriculum, professional development, and extracurricular offerings"); *id.* ¶ 20 (questioning how to continue instruction in accordance with New Hampshire state law because of DCL); Shaps Decl. ¶¶ 14, 19–23; Shea Decl. ¶¶ 13–16.

[77] Boston Decl. ¶ 31.b (concern that student group created in response to an incident where students "sang a KKK-themed jingle threatening to 'kill all the Blacks'" and formed "to hold conversations with other students and administrators about [Black students'] experiences and the importance of considering various viewpoints" may be considered impermissible DEI); Shaps Decl. ¶ 17 (concern that the DCL may prohibit the use of restorative justice conferences to respond to students' use of racial epithets, because "a core of the restorative practice is to highlight the historical oppression and use of dehumanizing language to humiliate or degrade a group of individuals defined by color or race.").

[78] Boston Decl. ¶ 31.a.

[79] Badams Decl. ¶ 18.

low-income White students or cisgender males stand to benefit from targeted programs to support their educational outcomes and emotional wellbeing."[80]

- The Somersworth School District engages in specific outreach to [students from immigrant communities] to ensure that their needs are met and they are aware of the opportunities the District has to offer," including special language programming and events.[81]

Plaintiffs NEA, NEA-NH, and CBED also experience organizational harms. For example, since the DCL was issued, NEA has fielded member concerns about pursuing and completing NEA's teacher training and professional development programs related to strengthening skills in engaging, teaching, and supporting students of different races, national origins, sexual orientations, and gender identities.[82] NEA does not know whether states and school districts will cease supporting such training, thereby limiting the scope and reach of NEA's core professional development work.[83] Similarly, the DCL directly affects the purpose, execution of, and member interest in grant programs focused on diversity, equity, and inclusion.[84] NEA will have to divert resources to assess, modify, and address concerns related to these substantial investments.[85] Similarly, NEA-NH must grapple with the impact of the DCL on the content of its annual professional training.[86]

NEA has also had to expend substantial resources to address the legal needs of its members through its Unified Legal Services (ULS) Program, a core service, as a result of censorship

---

[80] Badams Decl. ¶ 18; *see also id.* ¶ 19; Shea Decl. ¶ 10.
[81] Shea Decl. ¶ 12; *see also* Shaps Decl. ¶ 16 (advertising student leadership opportunities that are open to all students and recruit students from specific backgrounds); *see also id.* ¶ 19 (concern that providing "additional academic support for certain demographic student groups (e.g. low socio-economic status, English Speakers of Other Languages) will be deemed as 'smuggling racial stereotypes into everyday programming.'").
[82] NEA Decl. ¶¶ 12–13.
[83] NEA Decl. ¶¶ 13, 25, 28.
[84] NEA Decl. ¶¶ 14–16. *See also id.* ¶ 17 (discussing NEA partnerships with community schools).
[85] NEA Decl. ¶ 16.
[86] NEA-NH Decl. ¶ 20.

initiatives since 2020.[87] Because the DCL expands prohibitions on teaching certain concepts to a nationwide scope, abruptly changes federal interpretation of civil rights laws, and adds the risk of a loss of federal funding, NEA expects that it will need to expend substantial resources to advise and defend its members in an uncertain national legal landscape.[88]

CBED provides training and programs to students, educators, and schools on topics including implicit bias, cultural identity, cultural proficiency, and equity.[89] Due to the DCL's vagueness, CBED faces the need to invest significant time and resources into modifying, expanding, or eliminating its offerings to educational institutions.[90] If CBED continues its work in accordance with its mission, it would be difficult if not impossible to continue or seek out new partnerships and contractual relationships with educational institutions due to schools' fears of ED's threatened consequences.[91] One school district has already expressed uncertainty regarding proceeding with starting a CBED Teaching Academy following the issuance of the DCL.[92]

Fundamentally, the concepts prohibited by the DCL are essential to CBED's programming and the issues that it works to address, including rebuilding the Black teacher pipeline, training all educators in how to teach Black students in an engaging, effective, and culturally responsive way, supporting school districts to meet Black and non-Black teachers' needs in these areas, and generally addressing the national shortage of qualified teachers.[93] The DCL will inhibit these efforts, including by dissuading future educators, and particularly Black students and students of color, from pursuing a career in education.[94] As a small organization that cannot adapt its

---

[87] NEA Decl. ¶¶ 18–22. NEA-NH is similarly injured in its ability to advise and support its members. NEA-NH Decl. ¶¶ 10, 18–19, 21.
[88] NEA Decl. ¶ 23.
[89] CBED Decl. ¶¶ 4–33 (attached as Ex. 62).
[90] *Id.* ¶¶ 34–45.
[91] *Id.* ¶ 19.
[92] *Id.* ¶ 43.
[93] *Id.* ¶¶ 4, 9–11.
[94] *Id.* ¶ 45.

programming and funding sources quickly, CBED's core programming, mission, and indeed existence are thus existentially threatened by ED's actions.[95]

Plaintiffs filed this action on March 5, 2025. ECF 1. The Court, finding Plaintiffs demonstrated a likelihood of success on the merits, ordered preliminary injunctive relief on April 24, 2025. ECF 74. Plaintiffs filed their Second Amended Complaint on May 12, 2025. ECF 79.

## LEGAL STANDARD

A movant is entitled to summary judgment where they "show[] that that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When parties cross-move for summary judgment, this Court "view[s] each motion separately, drawing all inferences in favor of the nonmoving party." *Giguere v. Port Res. Inc.*, 927 F.3d 43, 47 (1st Cir. 2019) (quotation omitted).

## ARGUMENT

### I.    The DCL Violates the Fifth Amendment Prohibition on Vagueness (First Cause of Action).

The Fifth Amendment prohibits vagueness as "an essential of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (internal quotation marks and citation omitted). A rule is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

A higher degree of clarity is required where a rule "abuts upon sensitive areas of basic First Amendment freedoms," engendering self-censorship, *Grayned v. City of Rockford*, 408 U.S. 104,

---

[95] *Id.* ¶¶ 44–45.

109 (1972) (internal quotation marks and citation omitted), or where it imposes severe

consequences such as penalties "that strip persons of their professional licenses and livelihoods."

*Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *7, *8 (D.N.H. May 28, 2024)

(quoting *Sessions*, 584 U.S. at 184 (Gorsuch, J., concurring in part)) (appeal filed July 26, 2024);

*see also Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 95–96 (1st Cir. 2004). Even where a more

stringent test does not apply, "[v]ague laws in any area suffer a constitutional infirmity." *Ashton*

*v. Kentucky*, 384 U.S. 195, 200 (1966) (collecting cases).

## A.  The DCL is Devoid of Objective Guidelines.

The DCL is replete with vagueness, covering pre-K through college, DCL at 1 n.1, "every

facet" of education, *id.* at 1, including classroom instruction, and extending to third parties, *id.* at

3, without distinction. ED's prohibition on "DEI programs" is broad—indeed it seeks to "End

DEI,"[96]—and will be "vigorously enforce[d]." DCL at 3; *see also* Certification at 1. But the DCL

contains only generalized, "subjective judgments without statutory definitions, narrowing context,

or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008).

Because the DCL targets concepts or values of diversity, equity, and inclusion, it inherently

lacks clear boundaries necessary for fair implementation and adequate notice. *See, e.g.*, *Smith v.*

*Goguen*, 415 U.S. 566, 578 (1974) (statute with operating term "treats contemptuously," turns on

subjective preference, and "simply has no core"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614

(1971) (statute with operating term "annoying" found vague "in the sense that no standard of

conduct is specified at all"). The DCL does not define "DEI program," DCL at 3, or discrimination

"under the banner of 'diversity, equity, and inclusion' ('DEI'),"[97] *id.* at 2, and the Secretary of

---

[96] End DEI Portal.
[97] Likewise, the End DEI Portal, the FAQ, and the Certification do not define these terms, but refer back to the DCL, FAQ at 1; Certification Press Release, or mirror its language referencing DEI. End DEI Portal; Certification.

Education has herself struggled to explain what ED prohibits.[98] There are a wide range of viewpoints not only about whether pursuit of the values of diversity, equity, and inclusion is a good thing, but also about what constitutes a DEI program at all.[99] Turning to the dictionary, *see Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011), "Diversity, Equity, and Inclusion," is defined, to start, as "a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment . . ."[100] Deciding what constitutes an impermissible "DEI program" thus requires subjective assessment of a set of values.

The DCL's additional discussion indeed turns on subjective values characterizations. The DCL concludes that schools have "toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism,'" DCL at 2, and prohibits "DEI programs" that "teach students that certain racial groups bear unique moral burdens that others do not" and "stigmatize students who belong to particular racial groups based on crude racial stereotypes." *id.* at 3. Similarly, the FAQ discusses "themes in a class discussion," that "shame," "accuse," "ascribe . . . less value" or "assign . . . intrinsic guilt." FAQ at 6–7. These characterizations directly contradict the common dictionary definition of DEI. Moreover, they suffer from the same constitutional failings found in other laws restricting teaching of "concepts" rather than objectively measurable conduct. The DCL "is built around unrestrained appeals to abstract principles with contestable moral and political content." *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024). As such, a wide range of speech and activity are

---

[98] *See supra* at 10–11 & nn. 33–35.

[99] The FAQ further indicates that ED takes an expansive view of what it will consider a prohibited "DEI program," stating that ED's evaluation will "not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' equity,' or inclusion,'" and referring to practices such as "social-emotional learning" and "culturally responsive teaching" that "veil discriminatory policies." FAQ at 6.

[100] *Diversity, Equity, and Inclusion*, Merriam-Webster, https://perma.cc/Y879-7HB2; *see also Diversity*, Merriam-Webster, https://perma.cc/XZ8W-KAVJ; *Equity*, Merriam-Webster, https://perma.cc/9PJW-JHE9; *Inclusion*, Merriam-Webster, https://perma.cc/CHW8-FGP5.

swept in, and enforcement necessarily and impermissibly turns on subjective evaluation. *Grayned*, 408 U.S. at 108–09 ("A vague law impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis."); *see also, e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 353–54 (1983) (requirement to provide "credible and reliable" identification); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921) (prohibition on "unjust and unreasonable" rates). By eschewing definiteness and referring to unlawful programs "under the banner of 'diversity, equity, and inclusion,' ('DEI')," DCL at 2, the DCL allows ED to make up the rules as it goes.

Courts considering state laws prohibiting teaching similar concepts have also found these to be vague in whole. *Loc. 8027*, 2024 WL 2722254, at *12 ("All told, the banned concepts speak only obliquely about the speech that they target . . . . This lack of clarity sows confusion and leaves significant gaps that can only be filled in by those charged with enforcing the Amendments . . . ."); *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807 ("[T]he practical meaning of the Act must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it."); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543–44 (N.D. Cal. 2020) (prohibition on trainings that "inculcate," "promote," "teach[] or imply[]" certain concepts unconstitutionally vague) (internal quotation marks and citation omitted). As have courts considering both this and other government prohibitions on "DEI." *See NAACP v. U.S. Dep't of Educ.*, No. 25-CV-1120, 2025 WL 1196212, at *6 (D.D.C. Apr. 24, 2025) (finding, inter alia, that the challenged documents fail to "delineate between a lawful DEI practice and an unlawful one"); *Perkins Coie LLP v. U.S. Dep't of Just.*, No. CV 25-716, 2025 WL 1276857 at *45 (D.D.C. May 2, 2025) (finding "unpersuasive" the government's defense which "avoid[ed] trying to define the terms 'diversity, equity and inclusion' altogether" and instead relied on reference "to 'categories prohibited by civil rights laws'").

The DCL's remaining terms characterizing DEI programs as unlawful similarly fail to provide objective standards. First, distinct from facially discriminatory policies and discrimination established through circumstantial evidence, DCL at 2 & n.8 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)), the DCL states that "[o]ther programs discriminate in less direct, but equally insidious, ways," but provides no further articulation of a standard and only cites "DEI programs" as its example,[101] *id.* at 3.

The DCL states that "DEI programs frequently preference certain racial groups and teach students that certain racial groups bear unique moral burdens that others do not," and that they "stigmatize students . . . based on crude racial stereotypes." *Id.* Similarly, the FAQ states that "pressuring" students to "take certain positions" and "mandating courses . . . that are designed to emphasize and focus on racial stereotypes" are forms of "school-on-student harassment." FAQ at 7. Neither explains how ED has or would reach the conclusion that programs either create a "preference," "stigmatize," "stereotype," or "teach," "emphasize," or "focus on" impermissible ideas. DCL at 3; FAQ at 6–7. Moreover, these prohibitions do not turn on intent. Courts analyzing similar vague prohibitions have found they would prohibit a teacher from describing or identifying discriminatory beliefs in a course or assigning a reading in which an author does the same. *See, e.g.*, *Loc. 8027*, 2024 WL 2722254 at *13 (prohibition on "teach[ing]" a doctrine could "ostensibly extend to a professor who merely 'informs his class' about the banned doctrine without in any way

---

[101] The FAQ introduces additional vagueness. For example, the March 1 FAQ stated that "schools with programs focused on interests in particular cultures, heritages, and areas of the world would not in and of themselves violate Title VI." Mar. 1 FAQ at 6. "However," it continued, "schools must consider whether any school programming discourages members of all races from attending, either by excluding or discouraging students of a particular race or races, or by creating hostile environments." *Id.* How would ED evaluate whether a program "discourages" attendance, included separately from the creation of a hostile environment? ED subsequently revised the FAQ to state: "However, schools may not sponsor programming that creates a hostile environment based on race for students who do participate." FAQ at 6. ED still does not explain how or why a "Black History Month, International Holocaust Remembrance Day, or similar event[ ]" would create a hostile environment, or even provide the applicable legal standard. *Id.*

advocating for that doctrine") (quoting *Keyishian*, 385 U.S. at 600)); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1148–49 (W.D. Okla. 2024); *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1181 (N.D. Fla. 2022), *aff'd*, 94 F.4th 1272 (11th Cir. 2024).

Other requirements are likewise vague. The DCL states that "[r]elying on non-racial information as a proxy for race, and making decisions based on that information, violates the law. That is true whether the proxies are used to grant preferences on an individual basis or a systematic one." DCL at 3. ED accuses schools of using information "as a proxy for race" but provides no explanation of how it believes this occurs. *Id.* Further, it is wholly unclear what ED means by "grant[ing] preferences . . . on a systematic [basis]." *Id.* ED's one given example only compounds the directive's vagueness, stating that it would be "unlawful . . . to eliminate standardized testing to achieve a desired racial balance or to increase racial diversity." *Id.* How would eliminating standardized testing constitute reliance on a proxy for race? How would this amount to an impermissible racial preference? How or why would ED treat an intent "to increase racial diversity" as unlawful? *Id.* The DCL points to no further source of definition or guidance.

Even where referencing the Supreme Court's guidance, ED introduces confusion. The DCL instructs against using students' self-expression, including through essays and writing samples, "as a means of determining or predicting a student's race and favoring or disfavoring such students." DCL at 2 (citing *SFFA*, 600 U.S. at 230). While citing *SFFA*, the DCL adopts an overreaching interpretation of the Court's holding and omits the Supreme Court's particular guidance regarding what schools *can* do consistent with its holding. The Supreme Court pointedly advised that "nothing in [its *SFFA*] opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise." 600 U.S. at 230. Omitting this guidance suggests the

DCL's prohibitions encompass considerations of students' self-expression, and at a minimum, leaves schools and educators in doubt.[102]

**B. Schools and Educators are Left Without Notice, Chilled in Their Ability to Educate Students, and Open to Arbitrary and Discriminatory Enforcement.**

The DCL leaves educators and schools uncertain of what and how they can teach. They do not know, for example, whether they can engage students in critical thinking about like *To Kill a Mockingbird* that address themes or race and discrimination, or teach the history of the Jim Crow era without being accused of "indoctrination" or impermissibly teaching that "certain racial groups bear unique moral burdens."[103] Discussions regarding race are often necessary to comply with state and local standards and subject matter requirements, as well as standards related to valuing diverse perspectives, fostering critical thinking, and inclusivity.[104] The DCL's chill extends to reach programs and practices intended to help students to build social and emotional skills such as developing empathy, understanding bullying, and appreciating individual difference.[105]

In higher education as well, educators face a chill and uncertainty. For example, they question whether they can continue to allow students to choose their own paper topics, they have been denied the ability to present their own research to faculty and the broader community, and their training programs that reference diversity, equity, or inclusion have been gutted.[106] Districts

---

[102] Likewise, the March 1 FAQ stated that *SFFA* Court recognized "only one interest as sufficiently compelling in the educational context," Mar. 1 FAQ at 3, omitting the Court's statement that it was not speaking beyond the case before it, *SFFA*, 600 U.S. at 213 n.4 (declining to reach the question of whether U.S. military academies had distinct compelling interests justifying the consideration of race in admissions). And further, that "[s]trict scrutiny has famously been described as 'strict in theory, fatal in fact,'" Mar. 1 FAQ at 3, inviting the reader to adopt this understanding as accurate, despite the Supreme Court writing directly to "dispel [this] notion." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 237 (1995) (citation omitted). This language was omitted from the revised FAQ.
[103] *Supra* at 11–12 & nn. 36–41.
[104] *Supra* at 11–14 & nn. 37–40, 42–46, 48–56.
[105] *Supra* at 13–14 & nn. 46–52; 17–19 & nn. 70–81.
[106] *Supra* at 12 and nn. 40–41; 15–16 & nn. 59–64.

fear their efforts to ensure all students are included and to address discrimination could be argued to violate the DCL.[107] The DCL's chill extends to NEA, NEA-NH, and CBED as well.[108]

The DCL invites arbitrary and discriminatory enforcement. Its unsupported conclusion that schools are discriminating and that enforcement will follow swiftly, DCL at 1, 3, suggests consequences will precede meaningful process, an understanding confirmed by other ED actions intended to "serve[ ] as notice."[109] ED has only ratcheted up the threat through the Certification, announcing a swift deadline to certify schools have no prohibited "DEI programs," while also binding them to serious new consequences, including threats to claw back funds and penalties beyond enforcement of Title VI applicable to both schools and individuals. Certification at 3.

The propensity for arbitrary enforcement is amplified by the specially created "End DEI" portal, inviting complaints from the public and focused on ideas ED tendentiously describes as "divisive ideologies and indoctrination."[110] Further description of the portal's purpose is offered by a private individual identified as a co-founder of Moms for Liberty, who encourages parents "to share the receipts of the betrayal that has happened in our public schools" through "pushing critical theory, rogue sex education and divisive ideologies."[111] The same group has previously offered monetary rewards to anyone who would "catch" a teacher violating a similar state law.[112] ED plans to use portal submissions "as a guide to identify potential areas for investigation."[113]

Plaintiffs are left with a Hobson's choice. If they fail to adhere to the DCL's vague prohibitions, educators risk their employment, their professional licenses, and further individual

---

[107] *Supra* at 16–19 & nn. 65–66, 69–81.
[108] *Supra* at 19–21 & nn. 82–95.
[109] Columbia Press Release.
[110] End DEI Portal; *see also* Portal Press Release.
[111] Portal Press Release.
[112] *Supra* at 6 & n. 14.
[113] Portal Press Release.

liabilities,[114] Districts risk losing millions of dollars in federal funds and efforts to claw back funds,[115] and organizations are hindered in their ability to operate activities core to their mission or at all.[116] Educators risk their reputations and public ostracization based on one person's view of impermissible "DEI." Nor can Plaintiffs guarantee they are in compliance with the DCL's standardless prohibitions even if they try, and attempting to do so chills their speech and academic engagement and jeopardizes their ability to educate students in keeping with their missions, and in accordance with the best practices of their profession, and state and other requirements.

## II.    The DCL Violates the First Amendment (Second Cause of Action).

### A.  The DCL Censors Constitutionally Protected Academic Speech.

"[T]he First Amendment does not tolerate laws that cast a pall of orthodoxy over the classroom" and protects classroom instruction, scholarly research, and discussions about scholarship and matters of public concern within higher education from government intrusion.[117] *Keyishian*, 385 U.S. at 603; *see also, e.g.*, *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Kilborn v. Amiridis*, 131 F.4th 550, 558 (7th Cir. 2025) (collecting cases); *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021).

"Under the First Amendment, it is presumptively unconstitutional for '[t]he government [to] regulate speech based on its substantive content or the message it conveys.'" ECF 74 at 60 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)); *see also Matal v. Tam*, 582 U.S. 218, 223 (2017). Viewpoint discrimination is an "egregious form of content discrimination," occurring "[w]hen the government targets not [just] subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829; *see also McGuire v. Reilly*,

---

[114] *Supra* at 14–15 & nn. 57–58.
[115] *Supra* at 16–17 & nn. 65–68.
[116] *Supra* at 19–21 & nn. 82–95.
[117] Similarly, K-12 students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528–30 (2022).

386 F.3d 45, 62 (1st Cir. 2004) ("The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another."); *Speech First v. Cartwright*, 32 F.4th 1110, 1128, 1127 n.6 (11th Cir. 2022) (citation omitted) ("[T]he dangers of viewpoint discrimination are heightened in the university setting.")). Disagreement with speech does not remove its First Amendment protection or authorize the government to stifle public debate. *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 191; *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949). Thus, the government may not limit the provision of funds for private expression to suppress disfavored viewpoints, especially if doing so "result[s] in the imposition of a disproportionate burden calculated to drive 'certain ideas or viewpoints from the marketplace.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)); *see also Rosenberger*, 515 U.S. 819.

This Court already concluded that the DCL "targets speech based on viewpoint." ECF 74 at 61, explaining that, for example, "[a] professor runs afoul of the [DCL] if she expresses the view in her teaching that structural racism exists in America, but does not do so if she denies structural racism's existence." *Id.* (citing *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1277 (N.D. Fla. 2022)); *see also* DCL at 2 (stating DEI programs "toxically indoctrinate[] students with the false premise that the United States is built upon 'systemic and structural racism'"). The DCL and related documents are replete with examples of ED's prohibitions of viewpoints deemed associated with DEI, while permitting the disparagement of the same. Instruction that, in ED's characterization, "certain racial groups bear unique moral burdens that others do not," DCL at 4, or that encourages students to "take *certain* positions on racially charged issues," FAQ at 7 (emphasis added); courses that "focus on racial stereotypes," *id.*; themes in

classroom discussion that ED could interpret to "shame students of a particular race or ethnicity, accuse them of being oppressors in a racial hierarchy, ascribe them less value as contributors to class discussions because of their race, or deliberately assign them intrinsic guilt because of their presumed ancestors" are prohibited, *id.* at 6–7. Schools and educators must steer clear of anything ED could interpret to further undefined "DEI objectives, 'equity,' a racially-oriented vision of social justice, or similar goals."[118] *Id.* at 9. The End DEI portal by its name seeks to "End DEI" and targets specific types of theory, sex education, and ideologies that ED disfavors.[119] Likewise, the Certification targets "illegal DEI." Certification at 3.

### B. The DCL Unconstitutionally Coerces Third Parties.

This Court already recognized that "the 'threat of invoking legal sanctions and other means of coercion' in order to 'achieve the suppression' of speech that the government disfavors violates the First Amendment." ECF 74 at 62 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). Just last year, the Supreme Court affirmed that "a government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024). The use of third-party coercion raises particular concern because it "allows government officials to expand their regulatory jurisdiction to suppress the speech of [individuals]"—here, educators and students—"they have no direct control over." *Id.* at 197–98 (internal quotation marks and citation omitted). Such overreach is particularly problematic because it encroaches on academic freedom.

---

[118] Secretary McMahon's congressional testimony likewise reflects ED's focus on "ideology" taught in classrooms, *see supra* at 10 & n. 33, as well as the need to review the content of books and lessons on African American history or historical events related to race discrimination and civil rights in order to determine whether they constitute prohibited DEI, *see supra* at 10–11 & nn. 34–35.
[119] End DEI Portal.

The government crosses the line from persuasion to impermissible coercion when its conduct "could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191. The Court must look first to whether the entity seeking to limit speech had enforcement authority. *Id.* "[T]he greater and more direct the government official's authority, the less likely a person will feel free to disregard the directive from the official." *Id.* at 191–92. Other, non-exhaustive factors include the formality of the communication, whether the words used "can be reasonably understood as a threat," whether third parties were required to take a particular action, and the reaction from the third parties. *Id.* at 190–94. Here, the factors establish that the DCL is coercive.

ED has expansive enforcement authority over schools, including the power to withhold crucial funding, and to "initiate investigations and refer cases for prosecution."[120] *Id.* at 192. In the DCL, an official communication on agency stationery, ED summarily concludes that schools have engaged in discrimination and that enforcement will follow swiftly. DCL at 2, 3–4; *see Vullo*, 602 U.S. at 193–94. ED's recent enforcement actions "serve[ ] as a notice"[121] to schools that adherence will be treated as a "precondition[ ]."[122] The Certification further communicates the "serious consequences" ED can invoke against schools and individuals. Certification at 3.

The DCL orders schools not to take particular actions. ED issued the DCL to "explain[ ] . . . legal requirements." DCL at 2. Schools are not "free to disregard" the directives of the DCL, *Vullo*, 602 U.S. at 192, and the letter is not an attempt to persuade their interpretation, *id.* at 188. The DCL tells schools what they "may not" do, DCL at 2, what is "unlawful," and what must "cease." *id.* at 3. ED vows to "vigorously enforce" its interpretation of law within 14 days, DCL

---

[120] Schools are well aware of this authority and its consequences. *See supra* at 16–17 & nn. 65–68.
[121] Columbia Press Release.
[122] Letter to Columbia at 2; *see also supra* at 9–10 & nn. 28–32.

at 3, threatening "potential loss of federal funding." DCL at 4. One month after declaring "DEI"

unlawful, ED cited the DCL in announcing it had "opened investigations into 45 universities."[123]

The Certification leaves no doubt, requiring schools to attest that they are abiding by ED's

prohibitions on DEI as a material condition of funding. Certification at 1. ED's actions are targeted

at DEI. *Vullo*, 602 U.S. at 194. This is further emphasized by the End DEI portal, created to solicit

complaints on "divisive ideologies" "as a guide to identify potential areas for investigations."[124]

As intended, given the nature of the threatened sanctions, schools have altered, restricted,

or eliminated educators' teaching and scholarship to comply with the DCL. Plaintiffs' speech and

expression related to race, diversity, equity, and inclusion is censored.[125] Furthermore, educators

fear that instruction and scholarship could be viewed to violate the DCL.[126]

### III.    ED's Actions Violate the APA.

### A.  The DCL and Certification Constitute Final Agency Action.

The DCL and Certification constitute "final agency action."[127] 5 U.S.C. § 704. To

determine whether an action is final, and thus reviewable under the APA, courts apply a two-step

"pragmatic" test. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016)

(citation omitted); *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). First, the action must "mark the

consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178 (internal

quotation marks and citation omitted). Second, "the action must be one by which rights or

obligations have been determined, or from which legal consequences will flow." *Id.* (internal

quotation marks and citation omitted); *see also Berkshire Env't Action Team, Inc. v. Tenn. Gas*

---

[123] Mar. 14 Investigations Press Release.
[124] Portal Press Release.
[125] *See supra* at 15–16 & nn. 59–64.
[126] *See supra* at 11–14, nn. 36–56.
[127] The "End DEI" portal and FAQ likewise reflect and incorporate final agency action.

*Pipeline Co.*, 851 F.3d 105, 111 (1st Cir. 2017). An agency's characterization of its own action is not dispositive. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). Instead, an "agency pronouncement will be considered binding as a practical matter if it . . . appears on its face to be binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002). The "most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (collecting cases).

As the Court has previously held, the DCL satisfies both of these requirements. *See* ECF 74 at 40–43 (explaining DCL is "attributable to" ED and satisfies the "actual legal effect component of the finality inquiry" because "the plaintiffs face substantial threat of consequences for failing to comply with the [DCL]"); *see also* ECF 34-1 at 31–32; ECF 41 at 12–13.

The Certification also constitutes final agency action.[128] Like the DCL, there is no doubt that the Certification is "attributable to" ED. ECF 74 at 40 n.8. It is on ED's letterhead, and "speaks in [ED's] voice, setting forth the 'interpretation' and 'guidance' of the agency," *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020), including that the use of DEI programs is "unlawful" under Title VI, Certification at 3. The Certification also is "unequivocal." *Appalachian Power Co.*, 208 F.3d at 1022. It "gives rise to 'direct and appreciable legal consequences,'" *Hawkes*, 578 U.S. at 598 (quoting *Bennett* 520 U.S. at 178); *see also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000), imposing severe and immediate consequences for failure to comply. Certification at 3. The Certification is thus final agency action.

---

[128] The Certification constitutes both implementation of the DCL insofar as ED sought compliance with the DCL through the Certification, *see* ECF 74 at 30–31 (explaining the Certification "underscores the threat posed to schools by failure to comply with the [DCL's] uncertain requirements); *id.* at 81 (enjoining "enforcing and/or implementing" the DCL, including through the Certification), and final agency action, *see Am. Federation of Teachers v. Dep't of Educ.*, No. SAG-25-628, 2025 WL 1191844, at *8 (D. Md. Apr. 24, 2025) (acknowledging that the Certification could constitute both implementation of the DCL and "independent final agency action imposing harms apart from the [DCL]").

**B. The DCL is Contrary to Constitutional Right (Third Cause of Action).**

When final agency action is contrary to constitutional rights, the APA requires it to be "set aside." *Bos. All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224, 243 (D. Mass. 2021) (citing 5 U.S.C. § 706(2)(B)). For the reasons explained *supra*, the DCL violates the First and Fifth Amendments and, in turn, the APA. *See also* ECF 74 at 67–68.

**C. The DCL Exceeds ED's Statutory Authority (Fourth Cause of Action).**

The DCL violates the APA because it is in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Courts look to "the scope of the agency's [statutory] authority and discretion" to determine whether the agency's statutory authority encompasses the action taken. *N.H. Hosp. Ass'n v. Burwell*, Civ. No. 15-cv-460-LM, 2017 WL 822094, at *12 (D.N.H. Mar. 2, 2017) (brackets omitted) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). The "question . . . is always whether the agency has gone beyond what Congress has permitted it to do," *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013), a consideration requiring courts to "exercise their independent judgment," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Here, the DCL exceeds ED's authority as clearly limited by ED's enabling statute.

In the Department of Education Organization Act ("DEOA"), 20 U.S.C. §§ 3401–3510, establishing ED, Congress's explicit intent was to "not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems." 20 U.S.C. § 3403(a). Congress further made clear that ED has no authority to exercise "direction, supervision, or control" over "the curriculum, program of instruction, administration, or personnel of any education institution, school, or school system, . .

. or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b).

Yet ED's intent to control these activities, including the curricular choices of schools and educators, is plain. *See, e.g.*, DCL at 3–4 (prohibiting teaching "systemic and structural racism," "race-consciousness," and "teach[ing] students that certain racial groups bear unique moral burdens that others do not"); FAQ at 8 (prohibiting "mandating courses . . . designed to emphasize and focus on racial stereotypes" or requiring students to "take certain positions on racially charged issues"); Portal Press Release (targeting the "pushing" of "critical theory, rogue sex education, and divisive ideologies."). As such, ED has impermissibly "exercise[d] its authority in a manner that is inconsistent with the administrative structure Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (internal quotation and citation omitted). "Because DEOA 'clearly and unambiguously' precludes the Department from exercising this manner of control over the content of what schools teach their students," the Court should grant Plaintiffs summary judgment on this claim. ECF 74 at 70–71 (citing *Jindal v. U.S. Dep't of Educ.*, No. 14–534–SDD–RLB, 2015 WL 5474290, at *7 (M.D. La. Sept. 16, 2015)); *see also Am. Fed'n of Tchrs.*, 2025 WL 1191844, at *17.

**D. The DCL is Contrary to Law (Fifth Cause of Action).**

The Court must "hold unlawful and set aside" agency action "not in accordance with law." 5 U.S.C. § 706(2)(A). The DCL impermissibly intrudes on matters that Congress explicitly prohibits ED from directing, controlling, or supervising and thus is contrary to law.

Under the General Education Provisions Act ("GEPA"), governing the administration of federal education programs, 20 U.S.C. §§ 1221–1234i, ED is prohibited from "exercis[ing] any direction, supervision, or control over the curriculum, program of instruction, administration, or

personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks, or other printed or published instructional materials by any educational institution or school system," *id.* § 1232a. Similar prohibitions are incorporated in the DEOA, *see supra* Section III.C; ESSA, 20 U.S.C. §§ 6301–7981; 20 U.S.C. § 7906a(a) ("No officer or employee of the Federal Government shall, through grants, contracts, or other cooperative agreements, mandate, direct, or control a State, local educational agency, or school's specific instructional content, academic standards and assessments, curricula, or program of instruction developed and implemented to meet the requirements of this chapter."), and the Higher Education Opportunity Act, 20 U.S.C. § 1132-2 ("HEOA").

ED violates these provisions, including because it seeks to direct, supervise, or control the curricular and instructional choices of schools and educators.[129]

### E. The DCL is Arbitrary and Capricious (Seventh Cause of Action).

#### 1. ED failed to acknowledge, let alone explain, its dramatic departure from settled law and its own guidance, despite Plaintiffs' reliance.

The DCL marks an unexplained departure from decades of settled law with respect to Title VI, 42 U.S.C. §§ 2000d, et seq., regulations, and longstanding guidance, all of which further equity and inclusion in education.[130] Indeed, ED intends to "reorient civil rights enforcement."[131]

An agency must "display awareness that it is changing its position," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account,'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 226 (2016) (citation omitted). This is especially true, where, as here, ED's regulations and guidance on furthering equity and inclusion have been consistent throughout

---

[129] *See supra* Section II.B; ECF 74 at 71.
[130] *See supra* at 3–4 & nn. 2–6.
[131] Mar. 14 Investigations Press Release.

the decades.[132] *See Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1439 (D.C. Cir. 1983) (agency's "elimination" of a policy that governed "for almost 50 years" required the court "to scrutinize more closely the [agency's] proffered explanations for its actions"). Yet the DCL wholly ignores regulations that have been in place for nearly 60 years and prior agency guidance—including, most recently, guidance discussing the implementation of *SFFA*, 600 U.S. 181, the very case it invokes.[133] ED's 2023 Q&A document regarding *SFFA* advised that "institutions of higher education may continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity."[134] The DCL contradicts this, indicating that "diversity, equity, and inclusion" practices are discriminatory, DCL at 2, that "DEI programs . . . deny students the ability to participate fully in the life of a school," and that "it would be unlawful . . . for an educational institution" to take action "to increase racial diversity," *id.* at 3.

Similarly, ED's previously published Strategies for Increasing Diversity and Opportunities Report is described as a "resource for educational institutions considering new policies or programs to advance or maintain student diversity after . . . *SFFA*" and presents "examples of actions that can help advance equitable opportunity in ways that do not consider an individual student's race in and of itself."[135] The Report, available on ED's site at the time the DCL was issued, describes programs and practices ED identified as promoting diversity. The DCL's generalized conclusion that "DEI programs" are unlawful, DCL at 3, sweeps away ED's prior guidance in whole.

---

[132] *See, supra* at 3–4 & nn. 2–3.
[133] *See, e.g.*, Letter from U.S. Dep't of Educ. & U.S. Dep't of Justice to Colleagues (Aug. 14, 2023); SFFA Q&A; *Strategies Report*.
[134] SFFA Q&A at 3.
[135] *Strategies Report* at 6.

It is not surprising then that inconsistencies exist in each of the DCL's pronouncements. For one glaring example, take ED's statements regarding the use of standardized tests: ED's Strategies for Increasing Diversity and Opportunities Report states that "[i]nstitutions can consider test-optional or test-free policies as a practice to diversify their applicant pool,"[136] while the DCL declares it would be "unlawful for an educational institution to eliminate standardized testing . . . to increase diversity,"[137] DCL at 3. Such an "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars*, 579 U.S. at 222 (cleaned up).

The DCL is also silent as to why ED disregards the factual premises underlying prior publications  These premises are supported by academic scholarship demonstrating that affinity groups, accessible spaces, and DEI programming can "influence enrollment and retention rates by shaping [underrepresented students'] sense of belonging on campus,"[138] and that efforts of fostering and increasing diversity via financial support and academic advising can improve disparate college completion rates among students of color.[139] The DCL disregards the benefits that DEI programming has on underserved students and instead proffers another, factually unsupported conclusion: that these programs "discriminate" and "deny students the ability to participate fully in the life of a school." DCL at 3.

---

[136] *Strategies Report* at 26.

[137] ED's Strategies for Increasing Diversity and Opportunities Report (at 8, 20) also encouraged institutions to promote diversity by conducting targeted recruitment programs and consider[ing] "experiences of hardship or discrimination, including but not limited to racial discrimination" in admissions, and its prior SFFA Q&A guidance (at 3) advises that "institutions of higher education may continue to articulate missions and goals tied to student body diversity and may use all legally permissible methods to achieve that diversity."  In contrast, the DCL (at 2–3) deems these practices "unlawful" if used to "increase racial diversity." Similarly, the DCL and FAQ label social emotional learning as veiled discriminatory policies, FAQ at 5, despite the fact that ED has previously recommended social emotional learning as a best practice supported by evidence. *See supra* at 3–4 & nn. 3–4.

[138] *Strategies Report* at 44.

[139] *Id.* at 38.

Plaintiffs and their members have built up legitimate reliance on longstanding federal laws and regulations, and ED's own prior guidance.[140] The DCL advises the entire education community that they must abruptly change course to adhere to new, vague, rules. In failing to grapple with or even recognize the DCL's inconsistencies with prior existing sources, ED abdicated its responsibility to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020); *see also California v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025).

### 2. The DCL's application of *SFFA* is overreaching and arbitrary.

To the extent that ED offers any rationale for its marked departures, it relies on *SFFA*. But the DCL misconstrues and misapplies the decision in violation of the APA. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) (agency action must be logical and rational). While the Court in *SFFA* held that the benefits of diversity did not provide a compelling interest justifying the consideration of race in college admissions, its holding was limited to such admission decisions. 600 U.S. at 213 n.4 (declining to reach the question of whether U.S. military academies had distinct compelling interests that would justify the consideration of race in admissions). Yet the DCL announces that the "Supreme Court's holding applies more broadly," to conclude that it violates the law as a general matter to "[r]el[y] on non-racial information as a proxy for race . . . on an individual basis or a systematic one," to use race neutral efforts to increase diversity, or to implement "DEI programs." DCL at 2–3; *cf. Friends of Back Bay v. U.S. Army Corps. Of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012) ("A material

---

[140] *See supra* at 13–14 & nn. 47–54 (educator reliance); 16–19 & nn. 65–66, 76–81 (school district reliance); 19–20 & nn. 82–87 (NEA and NEA-NH reliance);20 –21 nn. 89–95 (CBED reliance).

misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision.").

As this Court previously concluded, the Supreme Court "did not hold that the Constitution commands color-blindness." ECF 74 at 73; *see also Am. Fed'n of Tchrs.*, 2025 WL 1191844, at *20 (noting that DCL "fundamental[ly] misunderstand[s] *SFFA*, which "does not proscribe any particular classroom speech, or relate at all to curricular choices"). Rather, in *SFFA*, the Supreme Court writes that the interests furthered by diversity, including "promoting the robust exchange of ideas," "broadening and refining understanding," and "producing new knowledge stemming from diverse outlooks," are "commendable goals." 600 U.S. at 214 (citation omitted). Moreover, Justice Kavanaugh, concurring, expressly states that "governments and universities still 'can, of course, act to undo the effects of past discrimination in many permissible ways.'"[141] *Id.* at 317 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 526 (1989)); *see also id.* (citing *Croson*, 488 U.S. at 509 (plurality opinion of O'Connor, J.) ("[T]he city has at its disposal a whole array of race-neutral devices to increase the accessibility of city contracting opportunities to small entrepreneurs of all races[.]")). Justice Kavanaugh cites back to SFFA's own briefing, which highlights examples of permissible means of achieving diversity, including, for example, eliminating requirements for SAT scores. *SFFA*, 600 U.S. at 317 (citing Pet'r's Br. at 80–86). The DCL fails to acknowledge, let alone explain, that the very opinion on which its reasoning rests contradicts its pronouncement that these practices are broadly discriminatory.[142]

---

[141] The same is true of the Supreme Court's address of elementary and secondary education, also unmentioned in the DCL. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 788 (2007) (Kennedy, J., concurring in judgment) ("School boards may pursue the goal of bringing together students of diverse backgrounds and races through [ ] means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race.").

[142] The DCL also prohibits schools from "us[ing] students' personal essays" and other application materials "as a means of determining or predicting a student's race and favoring or disfavoring such students," DCL at 2 (citing *SFFA*,

### 3. ED failed to consider important aspects of the problem.

The Court must "set aside" the DCL because ED "entirely failed to consider . . . important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

First, the DCL fails to consider how its broad, vague prohibitions on DEI would undermine the effective provision of education, and various state, local, and professional obligations. *See ACA Int'l v. FCC*, 885 F.3d 687, 699 (2018) ("Administrative action is 'arbitrary and capricious [if] it fails to articulate a comprehensible standard' for assessing the applicability of a statutory category.") (quoting *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 754 (D.C. Cir. 2015)). For example, most states have requirements or standards for teaching and learning providing that educators should instruct on concepts and practices the DCL prohibits.[143] Similarly, principles related to diversity, equity, and inclusion and topics related to race are included in many educator training and professional standards.[144] For example, many educators, including Plaintiffs and Plaintiff members, employ culturally responsive practices and approaches to helping students develop healthy social, emotional, and behavioral skills as part of strong pedagogy, and as encouraged or required by state and local educational policies.[145] The DCL's vague terms sweep in these practices and the FAQ explicitly labels them discriminatory. FAQ at 5. "[W]hen an agency ignores factual matters," as ED clearly has, courts "ha[ve] not hesitated" to vacate agency decisions. *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016).

Second, ED fails to consider the DCL's interference with the administration of Title VI, its implementing regulations, and other civil rights and education laws. The DCL makes it impossible

---

600 U.S. at 230), while omitting portions of the Supreme Court's opinion regarding what remains permissible in considering applicant's discussion of their personal experiences. *See supra* Section I.A.

[143] *See supra* at 13 & n. 48; 17 & n. 72.

[144] *See supra* at 12–13 & n. 42–47, 49.

[145] *See supra* at 12–13 & n. 42, 45–47.

for Plaintiffs to implement programs that foster diversity, equity, and inclusion, which Title VI and its implementing regulations permit and often require. *See, e.g.*, 34 C.F.R. § 100.3(b)(2) (prohibiting program participants from "utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin"); *id.* § 100.3(b)(6)(i) (where a recipient has previously discriminated against persons on the ground of race, the recipient "must take affirmative action to overcome the effects of prior discrimination"). For example, the DCL determines it is "unlawful for an educational institution to eliminate standardized testing . . . to increase racial diversity." DCL at 3. Yet educational institutions may "undo the effects of past discrimination in many permissible ways," *SFFA*, 600 U.S. at 371 (Kavanaugh, J. concurring) (internal quotation marks omitted), including by decrease their reliance on or eliminating standardized testing, *id.* (citing Pet'r's Br. at 80–86). Put another way, schools may eliminate a test that unfairly denies students educational opportunities. The DCL also interferes with Plaintiffs' ability to ensure that students are included and fully participate in school. For example, ED has addressed social and emotional learning in its surveys of evidence-based education practices, its recommendations for serving students with disabilities, and its resolution agreements remedying discrimination.[146] Indeed, Title VI itself explicitly prohibits schools from "exclud[ing] from participation" any student on the basis of race, color, or national origin, thereby requiring the inclusion that ED now purports to prohibit. 42 U.S.C.§ 2000d.

ED also ignores that practices and programs related to diversity, equity, and inclusion are permitted or indeed required by the very statutes that are the source of the federal funding at issue.

---

[146] *See supra* at 3–4 & nn. 3–4, 6.

For example, ESSA requires, as a condition for receiving federal funds, that SEAs and LEAs implement a number of practices relating to diversity, equity, or inclusion. *See, e.g.*, 20 U.S.C. § 6311(b) (requiring inclusion of English Language Learners); *id.* § 6311(c) (requiring meaningful differentiation for students, including subgroups). Similarly, other federal civil rights statutes were established to end exclusion of students (and others) with disabilities in schools, and to ensure inclusion and equity.[147] The IDEA, for example, requires, as a condition for receiving federal funds, the provision of a free appropriate public education and an individualized education program that meets the needs of a child with a disability in the least restrictive environment, i.e. in an environment that fosters inclusion. *See* 20 U.S.C. § 1412(a).

Third, ED fails to consider the DCL's interference with federal statutes expressly prohibiting ED from involvement in curricular and instructional decisions.[148] "[W]hen an agency ignores a mandatory factor it defies a statutory limitation on its authority," and "[s]uch an act is necessarily arbitrary and capricious." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 587 (7th Cir. 2011) (cleaned up); *see also Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

Fourth, ED failed to consider the federalism implications of its intrusions into activities to state and local governments. In exceeding its statutory authority, ED overreaches into areas of state and local control, and moreover, does so in an effort to conscript schools and educators to carry the federal government's anti-DEI priorities and viewpoint.

### 4. ED failed to acknowledge or consider the costs of the DCL.

"[T]he costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act." *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732–33 (D.C. Cir. 2016)

---

[147] *See supra* at 4 & n. 5.
[148] *See supra* Section III.C–D.

(Kavanaugh, B., dissenting); *see also Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017). The DCL entirely failed to acknowledge, much less quantify, its cost, including harms to practices core to the basic provision of education.

The DCL will impose financial and other costs on Plaintiffs, educational institutions, and others in the education community, all of whom have invested substantial financial and other resources in ensuring that they best serve all students.[149] Absent relief through this case, they are forced to abruptly reevaluate their practices. For example, to comply with the DCL, the Districts fear that they will need to spend substantial money that they do not have to overhaul or revise their instructional and other programs.[150] ED's refusal to acknowledge much less quantify or explain these costs is arbitrary and capricious. *See Perdue*, 873 F.3d at 932 (agencies must "adequately analyze . . . the consequences" of their actions).

### F. ED Failed to Observe Required Procedure (Sixth Cause of Action).

The Court must "set aside" the DCL as agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

First, the DCL should be set aside for ED's failure to observe notice and comment rulemaking. A "rule" within the meaning of the APA is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). In general, before an agency adopts a rule, it must first "publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). ED has not done so here.

---

[149] *See supra* at 13–14 & nn. 47–54 (educator reliance); 16–19 & nn. 65–66, 76–81 (school district reliance); 19–20 & nn. 82–87 (NEA and NEA-NH reliance);20 –21 nn. 89–95 (CBED reliance).
[150] *See supra* at 16–17 & nn. 65–66, 68.

As the Supreme Court has explained, an agency must employ notice-and-comment procedures before issuing a rule that has the "force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979); *see also N.H. Hosp. Ass'n*, 887 F.3d at 70. As this Court has recognized, the DCL is a legislative rule that carries the force and the effect of law. ECF 74 at 72– 74. "It imposes substantial obligations, directing schools to 'cease all efforts to circumvent prohibitions on the use of race,' or else face 'potential loss of federal funding.'" *Id.* at 72 (citing DCL at 4–5. The fact that the DCL imposes new obligations, as ED acknowledges and as discussed *supra*, belies the legislative nature of the DCL. When a rule attempts "'to supplement [existing law], not simply to construe it,'" that rule is substantive, not interpretive. *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992) (citation omitted).

The promise to "vigorously enforce" the DCL, the investigations into 45 universities, the End DEI portal, and the Certification all make this plain. ED's characterization of the DCL as less than a substantive rule, DCL at 1 n.3, does not change this analysis. *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1056 (D.C. Cir. 1987) ("[W]e are not compelled to defer to agency characterizations of rules [as being exempt from notice and comment].").

Second, the Certification should be set aside for failure to observe the procedures required by the Paperwork Reduction Act ("PRA"). *Orr v. Trump*, No. 1:25-cv-10313-JEK, 2025 WL 1145271, at *19 (D. Mass. Apr. 18, 2025) (preliminarily enjoining passport gender marker changes in part based on agency's failure to follow PRA's notice requirements). Under the PRA, when an agency seeks to collect information from the public, such as with government forms, it must provide "60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information." 44 U.S.C. § 3506(c)(2)(A). Such forms also must include an OMB control number. 44 U.S.C. § 3507(a)(2),

(3). Previous certifications from ED have followed these procedures.[151] Defendants entirely failed to follow required procedures when issuing the Certification, in violation of the PRA and the APA.

## IV.    The DCL and Certification Violate the Spending Clause (Eighth Cause of Action).

The Constitution vests Congress with spending power, U.S. Const. art. I, § 8, cl. 1, through which it may "set the terms on which it disburses federal money to the States." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Such power "is of course not unlimited" and any conditions Congress sets on the receipt of federal funds (1) must be unambiguous and cannot be retroactively imposed, (2) must not be coercive, and (3) must have a nexus between the funds at issue and the federal program's purpose. *South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 & n.13 (1981)). The same limitations apply to agency implementation. *See Lau v. Nichols*, 414 U.S. 563, 569 (1974) (evaluating Spending Clause challenge to Title VI implementing regulation). The DCL and Certification violate the Spending Clause's limitations.[152]

### A. The DCL and Certification Attach Ambiguous and Retroactive Conditions to the Districts' Receipt of Federal Funds.

"[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Penhurst*, 451 U.S. at 17. This is because exercises of the spending power operate "much in the nature of a contract," and the "legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* Thus, the federal government's spending power "does not include surprising participating States with post acceptance or 'retroactive' conditions.'" *Id.* at 25. Here, the DCL and Certification run afoul of the Spending Clause's clear notice requirement by retroactively imposing

---

[151] *See supra* at 9 & n. 26.
[152] The Certification is both implementation of the DCL and independent final agency action. *See supra* at 34 & n. 128.

ambiguous conditions on the receipt of federal funds in at least four ways. Because these were not "unambiguous condition[s] that the states and local jurisdictions voluntarily and knowingly accepted at the time Congress appropriated these funds, [they] cannot be imposed now." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017); *see also Nat'l Fed. of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519 (2012).

First, the DCL and Certification impose new and retroactive requirements intended to apply within days to all recipients of federal funds. SEAs and LEAs have already provided assurances of compliance with Title VI and other federal laws.[153] The Certification adds to these, requiring SEAs and LEAs to separately certify compliance with the DCL and ED's new interpretation of *SFFA*, as well as to agree that compliance constitutes a material condition for the continued receipt of federal funds. Certification at 1. The Certification leverages these retroactive conditions to conscript Districts into compliance in a matter of days.[154] Because these conditions were issued after Districts accepted federal funds to which they apply, Districts "were unaware of and therefore could not have assented to [them] when receiving federal funding." *City & Cnty. of San Francisco v. Trump*, No. 25-cv-1350, 2025 WL 1282637, at *29 (N.D. Cal. May 3, 2025).

Second, the DCL, its implementation, and the Certification include vague prohibitions on a variety of undefined DEI programs and so-called "indoctrination,"[155] significantly altering and making uncertain the conditions to which the Districts initially agreed when they accepted federal funds. As discussed above, these undefined prohibitions require Districts to hypothesize whether common pedagogical practices and programs central to the provision of education may run afoul of them, and how recipients can avoid the penalties the DCL and Certification threaten. These are

---

[153] *See supra* at 8–9 & n. 23.
[154] *See supra* at 7 & nn. 17–18.
[155] *See supra* Section I.A.

not abstract concerns for Districts: their schools rely on programming and practices implicated by the DCL every day.[156] Defendants cannot dodge the Spending Clause's clear notice requirement by deferring determinations regarding what the DCL does and does not prohibit to its post-hoc interpretations. *See City & Cnty. of San Francisco v. Sessions*, 372 F. Supp. 3d 928, 950–51 (N.D. Cal. 2019).

Third, the DCL and the Certification arguably conflict with a variety of legal and professional requirements regarding DEI or teaching about race, gender, or other concepts.[157] Districts did not knowingly agree to abandon or undercut compliance with these requirements when they accepted federal funds. *Cf. City & Cnty. of San Francisco*, 372 F. Supp. 3d at 949–51. To the extent the conflict is ambiguous, ED erodes the clear notice requirement of the Spending Clause by placing the impossible responsibility on Districts to reconcile the DCL with other conflicting federal and state laws. For example, Districts are required by state law to address how "intolerance, bigotry, antisemitism, and national, ethnic, racial, or religious hatred have evolved in the past, and can evolve, into genocide and mass violence, such as the Holocaust, and how to prevent the evolution of such practices," and Districts fear that this requirement will run afoul of the DCL's prohibitions.[158] As this example underscores, the DCL's ambiguity makes it impossible for recipients to decide whether to "accept [the] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist.*, 548 U.S. at 296; *see also New York v. U.S. HHS*, 414 F. Supp. 3d 475, 568 (S.D.N.Y. 2019) (finding violation of Spending Clause where agency rule imposed "uncertain ground rules for compliance," including by imposing standards that conflicted with relevant laws).

---

[156] *See supra* at 16–19 & nn. 65–81.

[157] *See supra* at 13 & n. 48; 17 & n. 72.

[158] *See supra* at 17 & n. 72 (citing N.H. Rev. Stat. Ann. § 189:11, I(j)).

Fourth, the Certification retroactively and significantly alters and expands the penalties for noncompliance. Specifically, the Certification introduces the threats of claw backs of previously distributed funding and liability under the FCA,[159] and expands the scope of Title VI liability, making its "serious consequences" applicable not only to entities like school districts but also to "individual[s] . . . using such practices." Certification at 3.

Because of the retroactivity and the vagueness of the meaning, scope, and threatened penalties of the DCL and Certification, Districts cannot possibly "exercise their choice [to receive federal funds] knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (internal quotation marks and citation omitted); *see also Cnty. of Santa Clara*, 250 F. Supp. 3d at 532 (finding Spending Clause violation where executive order's "vague language [did] not make clear what conduct it proscribes or give jurisdictions a reasonable opportunity to avoid its penalties"); *City & Cnty. of San Francisco*, 2025 WL 1282637, at *29 (finding Spending Clause violation where localities were unaware of and therefore could not assent to conditions when choosing to receive federal funding); *cf. Tennessee v. Becerra*, 131 F.4th 350, 363 (6th Cir. 2025) (explaining that "HHS's decision to discontinue" the relevant grant "based on the state's refusal to adhere to the" applicable conditions "would violate the Spending Clause if it imposed new requirements *after* Tennessee's acceptance of the grant").

**B. The DCL and Certification Are Coercive.**

Any effort to "coerce[] a State [or local government] to adopt a federal regulatory system as its own" is "contrary to our system of federalism." *NFIB*, 567 U.S. at 577–78. Although Congress may provide incentives, the "financial inducement offered must not be so coercive as to pass the point at which pressure turns into compulsion," *Dole*, 483 U.S. at 211 (internal quotation

---

[159] In some circumstances, FCA violations can lead to criminal liability.  *See* 18 U.S.C. § 287.

marks and citation omitted). ED has crossed the line here. The DCL and Certification indicate ED will withhold, deny, suspend, or terminate billions of dollars in federal funds—including millions in funds to Districts[160]—if ED believes there is a failure to comply with the DCL. The DCL applies to all sources of federal funding that SEAs and LEAs, including Districts, receive. The amount of federal funding at risk, and the importance of that funding to Districts[161] leave Districts with no meaningful choice but to attempt to acquiesce to ED's prohibitions. The "financial 'inducement' [ED] has chosen . . . is a gun to the head." *NFIB*, 567 U.S. at 581, 588 (explaining that a state that opted out of the Medicaid expansion stood "to lose not merely a 'relatively small percentage' of its existing Medicaid funding but all of it" (citing *Dole*, 483 U.S. at 211)); *see also City & Cnty. of San Francisco*, 2025 WL 1282637, at *31 (finding coercion where the relevant orders "target all applicable funds, not just one grant program"); *New York*, 414 F. Supp. 3d at 570 (finding coercion where HHS threatened "not a small percentage of the States' federal health care funding, but literally *all* of it").

In addition, the DCL and Certification accomplish "a shift in kind, not merely degree" regarding Title VI and related statutes. *NFIB*, 567 U.S. at 583. Through the DCL and Certification, ED has dramatically "altered and expanded the boundaries," *id.*, of Title VI and other "applicable statutes and regulations," DCL at 3, ignoring limits on its authority to target academic speech and curriculum in order to "End DEI."[162] The DCL and Certification thus impermissibly coerce Districts to adopt ED's new prohibitions as their own. *See NFIB*, 567 U.S. at 519 (explaining the Medicaid expansion constituted a "shift in kind, not merely degree" where the "original program was designed to cover medical services for four particular categories of the needy" and was

---

[160] *See supra* at 16 & n. 65.
[161] *See supra* at 16–17 & nn. 65–68.
[162] End DEI Portal.

"transformed into a program to meet the health care needs of the entire nonelderly population with [a certain income]"); *see also New York*, 414 F. Supp. 3d at 571 (Spending Clause violation where agency action changed the "'who,' 'what,' 'when,' 'where,' 'why,' and 'how' with respect" to regulated subject area); *cf. Mayhew v. Burwell*, 772 F.3d 80, 89 (1st Cir. 2014) (distinguishing *NFIB* because challenged requirement did not "expand" the relevant program "at all").

### C. The DCL and Certification Violate the Spending Clause's Relatedness Requirement.

The DCL and Certification further violate the Spending Clause's requirement that any conditions imposed on spending must be reasonably related to the purpose of the federal program. *See Dole*, 483 U.S. at 207–08. The DCL and Certification condition federal funds on elimination of programs related to diversity, equity, and inclusion, despite the fact that these practices are permitted or indeed required by the very statutes that are the source of the federal funding at issue.[163] *See supra* Section III.E.3. By threatening Districts' receipt and continued use of congressionally-appropriated funds in ways that are directly contrary to the funding streams at issue, the DCL and Certification violate the Spending Clause's relatedness requirement. *See, e.g.*, *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 960–61 (N.D. Cal. 2018); *Cnty. of Santa Clara*, 250 F. Supp. 3d at 532–33.

### V.    ED's Actions Should Be Vacated or Permanently Enjoined.

As set forth above, ED's actions violate the Constitution and the APA, and each constitutes an independent basis for relief. Together, they demonstrate overwhelmingly that Plaintiffs are entitled to relief. Fashioning a remedy involves undertaking an "equitable weighing process to select a fitting remedy for the legal violations [a court] has identified, taking account of what is

---

[163] *See supra* at 4 & n. 5 (discussing requirements under ESSA, IDEA, Section 504, ADA, and Title VI related to diversity, equity, and inclusion); *cf. supra* at 3–4 & nn. 2–4 (discussing implementing regulations, guidance, and resolution agreements).

necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (internal quotation marks and citations omitted). These "background equitable principals" must also be considered in light of the express legal remedy created by the APA. *Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring); *see also* T. Elliot Gaiser et al., *The Truth of Erasure: Universal Remedies for Universal Agency Actions*, U. Chi. L. Rev. Online, Aug. 28, 2024, https://perma.cc/KG72-USGF (distinguishing between vacatur and general equitable remedies).

Vacatur supplies the appropriate relief here.[164] The APA instructs that "[t]he reviewing court shall . . . hold unlawful and set aside agency action" that violates the Act. 5 U.S.C. § 706(2). This is "more than a mere non-enforcement remedy" applicable only to Plaintiffs, and the Court has the power to act "directly against the challenged agency action," to set aside or "strike down" the action. *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Statement of Kavanaugh, J.) (citation omitted); *Corner Post*, 603 U.S. at 829 (2024) (Kavanaugh, J., concurring) ("When Congress enacted the APA in 1946, the phrase 'set aside' meant 'cancel, annul, or revoke.'" (citation omitted)); *O.A. v. Trump*, 404 F. Supp. 3d 109, 152 (D.D.C. 2019) ("The APA mandates that the Court 'shall' 'set aside' the challenged 'agency action.' That is, under the plain language of the APA, the Court must 'annul or vacate' the agency's action." (quoting 5 U.S.C. § 706; *see Set Aside*, *Black's Law Dictionary* (10th ed. 2014)).

Thus, vacatur is the ordinary remedy ordered on finding an APA violation. *See, e.g.*, *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring); Tr. of Oral Arg. at 36, 38, *United States v. Texas*, 599 U.S. 670 (2023) (No. 22-58) (Roberts, C.J.) (vacatur is "what the D.C. Circuit and other courts of appeals have been doing all the time as a staple of their decision output," and a remedy upheld

---

[164] The DCL as well as the "End DEI" portal, FAQ, and Certification which reflect and incorporate final agency action, should be vacated. The Certification also independently constitutes final agency action which should be vacated.

"over and over and over again."); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Am. Fed'n of Tchrs.*, 2025 WL 1191844, at *24.

In particular, vacatur is needed to address violations of the APA's procedural requirements.[165] As then-Judge Ketanji Brown Jackson explained "the true gravamen of an APA claim is . . . that the agency has breached the plaintiff's (and the public's) entitlement to non-arbitrary decision making and/or their right to participate in the rulemaking process when the agency undertook to promulgate the rule." *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 72 (D.D.C. 2019), *rev'd on other grounds sub nom.*, *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020). To fully remedy these failures, "it is not enough for a court to prevent the application of the facially invalid rule to a particular plaintiff," *id.*, which "side-step[s]" APA process and "ultimately[ ] deprives successful plaintiffs of the full measure of the remedy to which they are entitled," *id.* at 66. Instead, courts must vacate the agency action, "so as to give interested parties (the plaintiff, the agency, and the public) a meaningful opportunity to try again." *Id.* at 72.

Similarly, vacatur is necessary to provide full and adequate relief for Defendants' substantive violations of the APA. Vacatur "remed[ies] the adverse downstream effects of the rule on the unregulated plaintiff." *Corner Post*, 603 U.S. at 826 (Kavanaugh, J., concurring). For example, CBED is injured in its ability to solicit new contracts to expand its programs with schools directly covered by the DCL.[166] In addition, considerations of fairness and workability also support vacatur. "It would be wholly impractical—and a huge waste of resources—to expect and require every potentially affected party to bring pre-enforcement . . . challenges against every agency order

---

[165] For this reason, among others, *see infra*, permanently enjoining ED's actions solely as to Plaintiffs, those who employ them, and those who contract with them, does not provide a remedy that is "adequate under the circumstances," where the public has not been provided an opportunity to participate in the rulemaking process. *Cf. New Hampshire Lottery Commission v. Rosen*, 98 6 F.3d 38, 62 (1st Cir. 2021).

[166] *See supra* at 20 & nn. 90–92.

that might possibly affect them in the future." *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2061 (2019) (Kavanaugh, J., concurring). Students, individual educators, schools, and education contractors are already substantially chilled by ED's threat of enforcement and withholding of federal funds.[167] This chill, in addition to the cost of litigation, makes it onerous and unlikely that each would be able to individually assert their rights.

*In the alternative*, nationwide injunctive relief is necessary to ensure Plaintiffs full relief, and "to protect similarly situated nonparties." *Florida v. HHS*, 19 F.4th 1271, 1282 (11th Cir. 2021). Fairness and workability are further concerns where NEA's approximately three million members are "dispersed throughout the United States." *Florida*, 19 F.4th at 1282; *see also Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023); *Mass. v. NIH*, No. 25-CV-10338, No. 25-CV-10340, No. 25-CV-10346, 2025 WL 702163, at *33. It is not clear how ED would apply a narrow remedy without requiring Plaintiffs to identify which schools they have relationships with, or which educators are members in particular schools, or requiring states to craft separate mechanisms for enforcement oversight to distinguish between covered and non-covered schools and entities. *Cf. Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) (universal injunction necessary to ensure against unwitting enforcement against plaintiffs).

## CONCLUSION

For the foregoing reasons, the Court should vacate ED's actions, or in the alternative, issue a nationwide permanent injunction.

[Signature follows]

---

[167] *See supra* at 11–21 & nn. 36–95.

Dated: June 10, 2025


Respectfully Submitted,

Sarah Hinger*                                    */s/ Gilles R. Bissonnette*
Amanda Meyer*                                   Gilles R. Bissonnette (N.H. Bar No. 265393)
Alexis Alvarez*                                 Henry R. Klementowicz (N.H. Bar No.
Leah Watson*                                    21177)
Ethan Herenstein*                               SangYeob Kim (N.H. Bar No. 266657)
Victoria Ochoa*                                 American Civil Liberties Union of New
Sophia Lin Lakin*                               Hampshire
American Civil Liberties Union Foundation       18 Low Avenue
125 Broad Street, 18th Floor                    Concord, NH 03301
New York, NY 10004                              (603) 224-5591
(212) 519-7882                                  gilles@aclu-nh.org
shinger@aclu.org


                                                Rachel E. Davidson*
Megan C. Keenan*                                American Civil Liberties Union Foundation
American Civil Liberties Union Foundation       of Massachusetts, Inc.
915 15th Street NW                              One Center Plaza, Suite 801
Washington, DC 20001                            Boston, MA 02018
(740) 632-0671                                  (617) 482-3170
mkeenan@aclu.org                                rdavidson@aclum.org

Alice O'Brien*ᵀ                                 Callan E. Sullivanᵀ (N.H. Bar No. 20799)
Jason Walta*ᵀ                                   Lauren Snow Chadwickᵀ (N.H. Bar No.
Phil Hostak*ᵀ                                   20288)
NEA Office of General Counsel                   National Education Association-New
National Education Association                  Hampshire
1201 16th Street NW                             9 South Spring Street
Washington, DC 20036                            Concord, NH 03301
(202) 822-7035                                  (603) 224-7751
aobrien@nea.org                                 csullivan@nhnea.org


                                                *admitted pro hac vice
                                                ᵀappearing only on behalf of NEA, NEA-NH,
                                                and Center for Black Educator Development