IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

NATIONAL EDUCATION
ASSOCIATION, *et al.*,

      *Plaintiffs*,

      v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

      *Defendants*.

Case No. 1:25-cv-00091-LM

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION

BACKGROUND

I.    ED's authority to effectuate equal education opportunities.................................................. 2

II.   ED's initial guidance following the *SFFA* decision in 2023. ........................................... 3

III.  ED's further guidance in the DCL issued in February 2025. ........................................... 4

ARGUMENT

I.    Plaintiffs cannot establish standing as a matter of law. .................................................. 8

  A.  Organizational Plaintiffs cannot establish organizational or associational standing. ......... 9

    1.  Organizational Plaintiffs cannot establish organizational standing. ............................ 10

    2.  Organizational Plaintiffs cannot establish associational standing. .............................. 14

  B.  The School District Plaintiffs cannot establish standing. .................................................. 19

II.   Plaintiffs lack a cause of action under the APA because they do not challenge any final agency action. ................................................................................................................... 22

III.  Plaintiffs' APA claims fail as a matter of law. .................................................................. 25

  A.  The DCL does not violate the APA's notice and comment requirement. ........................ 25

  B.  The DCL is within ED's statutory authority and consistent with applicable law.............. 26

  C.  The DCL is not arbitrary and capricious............................................................................ 28

IV.  Plaintiffs' constitutional claims fail as a matter of law...................................................... 31

  A.  Fifth Amendment. .............................................................................................................. 32

    1.  The DCL affords more notice than ED is required to provide before exercising its enforcement discretion.................................................................................................. 32

    2.  The DCL is not vague because it clearly reiterates well-established prohibitions on discriminatory conduct................................................................................................. 33

  B.  First Amendment. .............................................................................................................. 35

    1.  The DCL does not censor protected speech or intrude on academic freedom.............. 36

    2.  ED's longstanding conditioning of federal funding on non-discrimination is not coercive. ........................................................................................................................ 38

  C.  Spending Clause.................................................................................................................. 41

    1.  Plaintiffs' Spending Clause challenge is not ripe for judicial review........................... 43

    2.  The DCL reiterates that compliance with Title VI is a condition of federal funding... 45

    3.  The guidance is neither coercive nor unrelated to the federal interest in enforcing Title VI's nondiscrimination mandate................................................................................... 47

V.   The scope of relief, if any, should be limited to vacatur and tailored to the parties before the Court............................................................................................................................. 49

CONCLUSION

# INTRODUCTION

This case concerns a Dear Colleague Letter issued by the Department of Education ("ED") on February 14, 2025 to explain ED's understanding of the preexisting requirements of the Equal Protection Clause of the Constitution and Title VI of the Civil Rights Act following the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"). U.S. Dep't of Educ., Off. C.R, Dear Colleague Letter ("2025 DCL") (Feb. 14, 2025), https://perma.cc/J5PJ-DTKG, ECF 32-1. As it states explicitly, the 2025 DCL does not have the force or effect of law and does not bind the public or create new legal standards. *See* 2025 DCL at 1 n.3.

Nonetheless, Plaintiffs, three nonprofit associations purporting to represent educators of all levels of instruction in New Hampshire and across the United States, as well as five New Hampshire school districts, have filed suit challenging the 2025 DCL, a related "Frequently Asked Questions" document, and a new online portal through which the public can report suspected civil rights abuses, arguing that they violate the Spending Clause as well as the First and Fifth Amendments to the U.S. Constitution, and the Administrative Procedure Act ("APA"). Plaintiffs now seek summary judgment, asking the Court to vacate ED's actions or, in the alternative, to issue a permanent injunction prohibiting the implementation or enforcement of the 2025 DCL, FAQ, reporting portal, and Certification. The Court should deny Plaintiffs' motion, and grant Defendants' Cross-Motion for Summary Judgment, because Plaintiffs' claims fail as a matter of law, and there is no genuine dispute of material fact warranting relief against ED's implementation of longstanding civil rights enforcement under Title VI.

As a preliminary matter, the nonprofit Plaintiffs cannot prevail on any of their claims because they lack standing under either an organizational or associational theory. They  have not

shown that ED's guidance directly impairs their core organizational functions, and the alleged injuries to their members rest on self-censorship and speculative predictions of future harm. But self-imposed decisions to "overcorrect," as Plaintiffs themselves describe them, are not reasonable responses to nonbinding guidance and cannot support Article III standing. The school district Plaintiffs also rest on speculative "fears" of future enforcement and unreasonable misinterpretations of the challenged guidance. They allege no actual or imminent loss of federal funding, investigation, or enforcement action traceable to ED, thus they also do not have standing.

Plaintiffs' APA claims fail because the DCL, FAQ, reporting portal, and Certification are not final agency actions as they have no binding legal effect. For this same reason the DCL was not required to go through notice-and-comment rulemaking. The DCL is not arbitrary and capricious as it reflects a reasonable interpretation of *SFFA* and is rationally grounded in the longstanding principle that policies that classify on the basis of race are not lawful unless justified by a compelling interest. Plaintiffs' constitutional claims also fail because the DCL is not unconstitutionally vague and does not implicate speech protected by the First Amendment—it plainly and clearly addresses Title VI's prohibition on the unprotected conduct of racial discrimination, which is unlawful even when advanced by speaking. Nor does the DCL violate the Spending Clause, as the funding conditions it discusses stem from Title VI, not the letter itself, and they are reasonably related to the federal interest in preventing discrimination in federally funded education programs. Regardless, Plaintiffs' Spending Clause challenge is not ripe because no Title VI enforcement action has been taken against them.

## BACKGROUND

### I.    ED's authority to effectuate equal education opportunities.

The opportunity to receive an education, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ. of Topeka*, 347

U.S. 483, 493 (1954). In the landmark *Brown* decision, the Supreme Court held that "[t]o separate [students] from others of similar age and qualifications solely because of their race" not only "affect[s students'] hearts and minds in a way unlikely ever to be undone," but also violates the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 493–94. Soon thereafter, Congress reinforced *Brown's* guarantee of equal educational opportunities by enacting Title VI of the Civil Rights Act of 1964, which prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. §§ 2000d, *et seq.* Congress also authorized ED to issue regulations and guidance designed to ensure equal access to education. 20 U.S.C. § 3402(1); *see also Nondiscrimination in Federally-Assisted Programs at the Department of Health Education, and Welfare—Effectuation of Title VI of the Civil Rights Act of 1964*, 29 Fed. Reg. 16298–305 (Dec. 4, 1964). And the Supreme Court has reiterated time and again since *Brown* that its reasoning applies to *all* distinctions based on race. *See Regents of Univ. of California v. Bakke*, 438 U.S. 265, 307 ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids."); *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) ("We have held that *all* racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'" (emphasis added))

## II.    ED's initial guidance following the *SFFA* decision in 2023.

In 2023, the Supreme Court decided *SFFA*, a challenge to two schools' consideration of applicants' race as a plus factor in their higher-education admissions processes for the purposes of obtaining a diverse student body. 600 U.S. 181. The Court held that the schools' use of race violated the Equal Protection Clause of the Fourteenth Amendment. *Id*. The decision noted that the Court has to date recognized only two compelling interests the government may have in

considering a person's race for purposes of satisfying strict scrutiny; the first is an interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the second is in "avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id*. at 207. In handing down its ruling, the Court announced that "[t]he time for making distinctions based on race had passed" and that "[e]liminating racial discrimination means eliminating all of it." *Id*. at 204, 206. The Court noted that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Id.* at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003)).

Following the decision in *SFFA*, the Departments of Education and Justice co-authored a Dear Colleague Letter and a Frequently Asked Questions document that were sent to schools receiving federal funding in an effort to provide compliance guidance on how to "pursue *lawful* steps to promote diversity and full inclusion," but also "noting [ED's] continued commitment to *vigorous enforcement* of Titles IV and VI of the Civil Rights Act of 1964 from early childhood through postsecondary education." Letter from U.S. Dep't of Educ. & U.S. Dep't of Just. to Colleagues, at 1, 3 (Aug. 14, 2023) ("2023 DCL"), https://perma.cc/69WH-NECT (emphasis added), ECF 34-5; *see also* U.S. Dep't of Educ., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina* (Aug. 14, 2023) ("2023 FAQ"), https://perma.cc/V7Z6-XMCM, ECF 34-6.

### III.    ED's further guidance in the DCL issued in February 2025.

On February 14, 2025, ED issued the Dear Colleague Letter challenged in this case. It explains that Title VI, as interpreted by the agency in light of *SFFA*, forbids discriminatory practices in which "an educational institution treats a person of one race differently than it treats

another person because of that person's race." 2025 DCL at 2. The letter explains that the strict scrutiny analysis of Equal Protection, as well as the analysis of a school's compliance with Title VI, will turn on a central question: does the school "treat[] a person of one race differently than it treats another person because of that person's race?" *Id*. However, the letter is explicit that its "guidance does not have the force and effect of law and does not bind the public or create new legal standards." *Id*. at 1 n.3.

On February 27, 2025, ED launched a public portal, https://enddei.ed.gov/, for parents, students, teachers, and the broader community to submit reports of discrimination based on race or sex in publicly-funded K-12 schools, which ED could subsequently investigate to determine whether those schools were engaging in discriminatory behavior. *See* U.S. Dep't of Educ., Press Release, U.S. Department of Education Launches "End DEI" Portal (Feb. 27, 2025), https://perma.cc/QT6V-68L7, ECF 34-8.

On March 1, 2025, ED released a Frequently Asked Questions document "to anticipate and answer questions that may be raised in response to the [DCL]." Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act at 1 (Feb. 28, 2025), https://perma.cc/WK7Z-JBC2, ECF 34-10. On April 9, 2025, ED issued a revised version of the FAQ. Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act (Apr. 9, 2025) ("2025 FAQ"), https://perma.cc/43EZ-ME6A. This document reiterates that ED's interpretations "do not have the force and effect of law and do not bind the public or impose new legal requirements." *Id*. at 1 n.3. It also reaffirms ED's commitment to "enforce[] federal civil rights law consistent with the First Amendment" and states that "[n]othing in Title VI or its implementing regulations, authorizes a school to restrict any rights otherwise protected by the First Amendment, nor does the [2025 DCL] indicate as much." *Id*. at 6.

5

To be sure, the DCL and FAQ articulate ED's concerns regarding diversity, equity, and inclusion ("DEI") *programs*—not concepts—and their susceptibility to treating individuals differently on the basis of race. But as the FAQ emphasizes, "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" *Id*. Rather, all school programs—DEI or otherwise—must not "intentionally treat students differently based on race, engage in racial stereotyping, or create hostile environments for students of particular races." *Id*.

On April 3, 2025, ED's Office for Civil Rights ("OCR") emailed a certification letter to every State Education Agency ("SEA").  *See* U.S. Dep't. Ed., *Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard*, https://perma.cc/AL43-BUMH (April 3, 2025) ("Certification"), Pls.' Ex. 21.  The email directed:

> Within ten (10) days, please sign and return the attached certification along with the certifications of your Local Education Agencies (LEAs).  Furthermore, within these ten (10) days, please report the signature status for each of your LEAs, any compliance issues found within your LEAs, and your proposed enforcement plans for those LEAs.

Email from OCR to State Departments of Education, (April 3, 2025) ("April 3 Email"), ECF No. 45-2. The recipients were asked to certify their compliance with legal obligations undertaken in exchange for receiving federal financial assistance under Title VI and *SFFA*, as explained in the Certification.  *See* Certification at 2–4.  On April 7, 2025, OCR sent a follow-up email to the SEAs notifying the recipients that ED had granted all States and LEAs a 10-day extension to provide the Certification requested in the April 3 Email. Email from OCR to State Departments of Education, (April 7, 2025) ("April 7 Email"), ECF No. 45-3.

**IV.    This Litigation**

On March 5, 2025, Plaintiffs National Education Association ("NEA") and National Education Association-New Hampshire ("NEA-NH") filed a complaint for declaratory and injunctive relief against the United States Department of Education as well as Education Secretary Linda McMahon and Acting Assistant Secretary for Civil Rights Craig Trainor in their official capacities. *See* Compl., ECF No. 1. NEA and NEA-NH are nonprofit organizations purporting to represent educators at all levels of instruction in New Hampshire and the United States. *Id*. at 4-7.

On March 21, 2025, Plaintiffs amended their complaint adding a new Plaintiff, the Center for Black Educator Development ("CBED"). *See* Am. Compl., ECF No. 32. CBED is also a nonprofit organization that operates "programs [that] are designed to rectify past inequities by enhancing diversity within the teaching workforce, with the ultimate goal of providing all students with a more inclusive and representative educational experience." Pls.' Ex. X, ECF No. 34-26. The first amended complaint alleged violations of the First Amendment, Fifth Amendment, and various provisions of the APA. Am. Compl. at 50–59. The same day, Plaintiffs filed a motion for a preliminary injunction, seeking to enjoin ED from implementing or enforcing the DCL, FAQ, or reporting portal. *See* Prelim. Inj. Mot., ECF No. 34-1; Pls.' Proposed Order, ECF No. 34-58.

On April 24, 2025, the Court granted Plaintiffs' motion for a preliminary injunction, finding that they had standing and were likely to succeed on their APA and constitutional claims. *See* Order, ECF No. 74.

On May 20, 2025, Plaintiffs filed a Second Amended Complaint, adding five school district plaintiffs and asserting an additional claim under the Spending Clause. *See* 2d Am. Compl., ECF No. 79 at 3–4, 84. On June 10, 2025, Plaintiffs filed the instant motion for summary judgment. *See* Pls.' Mot. for Summ. J., ECF No. 81.

**LEGAL STANDARD**

Summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" *Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship*, S.E., 615 F.3d 45, 51 (1st Cir. 2010) (quoting *Adria Int'l Group, Inc. v. Ferré Dev. Inc.*, 241 F.3d 103, 107 (1st Cir. 2001)). However, "each motion should not be considered in a vacuum. Rather, a district court ordinarily should consider the motions 'at the same time, applying the same standards to each motion.'" *March v. Frey*, 458 F. Supp. 3d 16, 30 (D. Me. 2020) (quoting *Wells Real Estate*, 615 F.3d at 51); *see also Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (explaining that the summary judgment standard is "not altered by the presence of cross-motions for summary judgment" because the court considers distinctly each motion and draws inferences against each movant in turn).

## ARGUMENT

### I.    Plaintiffs cannot establish standing as a matter of law.

The standing inquiry "comprises a mix of constitutional and prudential criteria." *Osediacz v. City of Cranston*, 414 F.3d 136, 139 (1st Cir. 2005). The constitutional criteria required to establish an Article III "case[]" or "controvers[y]" include

> [f]irst, . . . an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent," not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not

before the court.  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up).

"The Supreme Court has overlaid these constitutional dictates with several prudential limitations," including limitations on third-party standing, pleading of generalized grievances, and parties who fall outside a law's zone of interest.  *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 46 (1st Cir. 2011) (abrogated on other grounds by *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)).

## A.    Organizational Plaintiffs cannot establish organizational or associational standing.

Plaintiffs NEA, NEA-NH, and CBED ("Organizational Plaintiffs") allege standing on the basis of organizational and associational standing theories. But as the Supreme Court has explained, if the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *See Lujan*, 504 U.S. at 561-62 (1992) (emphasis in original).  Here, Organizational Plaintiffs are not the "object of the action . . . at issue" and experience solely attenuated effects of the government's regulation of someone else, and therefore "much more is needed" to demonstrate Article III standing.  *Id*.  They fall woefully short.

Organizational Plaintiffs rely on two theories of injury, one alleging harms to their own organizational interests and another alleging harms to their associational interests, that is to their members.  *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) ("An association or organization can establish an injury-in-fact through either of two theories, appropriately called 'associational standing' and 'organizational standing.'"); *Citizens to End Animal Suffering & Exploitation, Inc. v. New England Aquarium*, 836 F. Supp. 45, 50 (D. Mass. 1993) (distinguishing an organization's "standing to sue representatively, on behalf of

its members," with "injuries the organization has itself suffered"). Neither theory has merit.

### 1. Organizational Plaintiffs cannot establish organizational standing.

First, Organizational Plaintiffs fail to demonstrate organizational standing because they have not demonstrated they are suffering or will imminently suffer any concrete, imminent, and direct harm due to the challenged actions. "In determining whether [an organization] has standing [in its own right, courts] conduct the same inquiry as in the case of an individual: Has the plaintiff '"alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction'?" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)). At the preliminary injunction stage, the Court found that the Organizational Plaintiffs were similarly situated to the plaintiffs in *Havens* and thus had standing. *See* Prelim. Inj. Op. at 23. The Court should revisit this finding at the summary judgment stage because it is in tension with the Supreme Court's intent that *Havens* be narrowly construed, and in any event, the Organizational Plaintiffs' alleged injuries do not involve interference with core business activities, thus they are not akin to the *Havens* plaintiffs' injuries.

In *Havens*, the plaintiff was a housing counseling service named HOME that sued the defendant under the Fair Housing Act alleging that the defendant provided its employees false information about apartment availability. 455 U.S. at 368. As the Supreme Court has emphasized, HOME was only able to establish Article III standing because "when [defendant] gave [its] employees false information about apartment availability," it "perceptibly impaired [the service's] ability to provide counseling and referral services for low- and moderate-income homeseekers." *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 395 (2024) (quoting *Havens*, 455 U.S. at 379). The Court has explained that "*Havens* was an unusual case," *id.* at 396, likening it to "a retailer who sues a manufacturer for selling defective goods to the

retailer," *id*. at 395.

The Supreme Court "has been careful not to extend the *Havens* holding beyond its context," including most recently in *Alliance for Hippocratic Medicine*. 602 U.S. at 396. There, the Court held that medical advocacy organizations lacked standing to challenge a decision of the FDA to relax regulatory requirements for the prescription of a certain drug. *Id.* The Court rejected the organizations' theory that the FDA's regulatory decision "impaired their ability to provide services and achieve their organizational missions," including by "mak[ing] it more difficult for them to inform the public about safety risks." *Id*. at 394, 395 (quotation marks omitted). The Court held that the "argument does not work to demonstrate standing" because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's actions." *Id*. at 394. *See also Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013) ("In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending"). The Court also dismissed the organization's reliance on *Havens*, explaining that the FDA's "actions relaxing regulation of [the drug] have not imposed any similar impediment to the medical associations' advocacy businesses." *Alliance for Hippocratic Medicine*. 602 U.S. at 395.

Thus, it is not enough for standing purposes for "an organization [to] divert[] its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. Moreover, "[a]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Article III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Instead, Organizational Plaintiffs must show that

Defendants' "actions directly affected and interfered with [their] core business activities." *All. For Hippocratic Med.*, 602 U.S. at 395.

Here, Organizational Plaintiffs fail to demonstrate any injury in fact sufficient for organizational standing because they do not show that the documents at issue "directly affect[] and interfere[] with [their] core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395. At the preliminary injunction stage, this Court found that *Havens* was apposite because there the plaintiff "'not only was an issue-advocacy organization, but also operated a housing counseling service[,]'" and here, the Organizational Plaintiffs "core activities include the provision of trainings, professional education courses, and grant[making.]" Prelim. Inj. Op. at 23 (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). But the fact that an organization engages in activities besides issue-advocacy is not sufficient to show an injury. Indeed, the plaintiffs in *Alliance* alleged that in addition to issue advocacy, they were engaged in "public education" about mifepristone, and the FDA's actions impeded this activity. [Cite]. However, the Court concluded that the mere fact that a government action "ma[de] it more difficult for [plaintiffs] to inform the public" was not enough to show an injury, particularly where there was no claim of an informational injury and federal law did not require the agency to provide such information. *All. for Hippocratic Med.*, 602 U.S. at 395.

Like the medical associations in *Alliance* that attempted to claim an injury to their ability to educate the public about mifepristone, the Organizational Plaintiffs' here attempt to claim an injury to their ability to educate the public about DEI. *See id.*; Pls.' Mem. Supp. Summ. J., at 11–13. However, like the medical associations, the Organizational Plaintiffs cannot show standing because they neither allege an informational injury nor show that the ED was required by federal law to facilitate the provision of such information.

This Court also found standing by analogizing NEA's provision of legal counseling services to HOME's provision of housing counseling services. *See* Prelim. Inj. Op. at 25. But the fact that both activities involve "counseling" is where the comparison ends. The issue in *Havens* was that HOME could no longer effectively engage in counseling because it was provided false information. Here, NEA does not allege that the Government denied it accurate information and thus interfered with its ability to effectively counsel its clients; instead, NEA argues that it is harmed because it speculates that more people will make use of its counseling services. Accordingly, NEA says it will "have to divert resources to assess, modify, and address concerns" regarding "member[s'] interest in [DEI] grant programs," Pls.' Mem. Supp. Summ. J., at 19. This argument fails, however, both because such diversion of resources does not demonstrate direct interference with NEA's core business activities, *All. for Hippocratic Med.*, 602 U.S. at 395, and because it is entirely speculative, *Clapper* 568 U.S. at 410 (2013). NEA's anticipation that it will have to "expend substantial resources to advise and defend its members in an uncertain national landscape," based on resources it has already been expending "as a result of censorship initiatives since 2020," Pls.' Mem. Supp. Summ. J., at 19–20, likewise fails to demonstrate a cognizable organizational injury, *All. for Hippocratic Med.*, 602 U.S. at 395, or that any such injury is fairly traceable to the DCL, *Perez-Kudzma v. United States*, 940 F.3d 142, 146 (1st Cir. 2019).

CBED similarly fails to show that it is suffering any organizational injury, and the Court's finding that the challenged actions "threaten to put it out of business entirely," Prelim. Inj. Op. at 24, fails to specify any concrete reasons for concluding as much. The only evidence CBED has proffered is a sworn statement that "[o]ne school district . . . has already indicated that it is not sure whether it can proceed [with their contractual relationship] following the

[DCL]." CBED Decl. ¶ 43 . Such equivocating language from one school district with which CBED does business is not enough to establish concrete harm. CBED's theory of injury relies entirely on anticipated downstream effects of the DCL—it does not show that the DCL's effects are imminent or the equivalent of selling "defective goods to the retailer" that Plaintiffs contract with, *All. for Hippocratic Med.*, 602 U.S. at 395. NEA also admits that it "does not know whether school districts will cease supporting such training." Pls.' Mem. Supp. Summ. J., at 19. These claims are hardly sufficient to demonstrate an "ongoing" injury or one that "is certainly impending." *Clapper*, 568 U.S. at 414.

### 2.    Organizational Plaintiffs cannot establish associational standing.

Organizational Plaintiffs also fail to establish associational standing. In order to establish associational standing, Organizational Plaintiffs "must show that at least one of its members has standing in her own right." *Equal Means Equal v. Ferriero*, 3 F.4th 24, 29 (1st Cir. 2021). At the summary judgment stage, each Organizational Plaintiff "must present affirmative evidence of specific facts demonstrating a genuine issue as to each element on which he will bear the ultimate burden at trial"—here, that at least one of its members' is suffering or will imminently suffer an injury in fact that is both caused by ED and likely to be redressed by this Court. *Chu v. Legion of Christ, Inc.*, 2 F. Supp. 3d 160, 169 (D.R.I. 2014) (citing *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 1996)).

Organizational Plaintiffs claim that their members—teachers and school districts—are chilled in their speech and expressive activities by the DCL. "In certain facial First Amendment challenges to a statute, [a court] may relax [] prudential limitations [on standing], but the constitutional requirements apply with equal force in every case." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 46 (1st Cir. 2011) (cleaned up). Therefore, the standing inquiry for First Amendment claims is no less rigorous with respect to injury, causation, and redressability. *Cf.*

*Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021) (there is no "unqualified right to pre-enforcement review" even for "constitutional claims.").

The fears that Organizational Plaintiffs' members describe fall into three categories; (1) those that depend upon an expectation that ED will take actions not actually described in the DCL; (2) those that result from actions schools have taken based on their own misunderstandings of the DCL and other documents; and (3) those about actions that third parties might take.

Beginning with the first category, teachers' fears fail to establish Organizational Plaintiffs' members' standing because they rely on members' decisions to self-censor their own speech or expressive activities based on a misunderstanding of the DCL—specifically an incorrect expectation that ED will take actions against *them*. These fears are purely subjective, and therefore unreasonable, primarily because ED has no authority to take disciplinary action against individual teachers—ED's investigations would be into the federal funding recipient, *i.e.*, the schools. 42 U.S.C. 2000d-1.

The Court stated that this reasoning overlooks the language in the Certification that: "[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences." Prelim. Inj. Op., at 36. The Court further stated that whether ED has the authority to take enforcement actions under 42 U.S.C. § 2000d-1 against individuals is "beside the point," because ultimately the individuals' belief in that authority was sufficient to grant the Organizational Plaintiffs associational standing. *Id.* But ED's actual authority under Title VI is critical to understanding whether members' alleged fears can be fairly traceable to it. ED's language discussing consequences for "individuals" was accompanied by a list of three enforcement powers the government has, the first two explicitly

15

only concern institutions and the third concerns False Claims Act liability. *See* ECF No. 44-4 at 3-4. Liability under the False Claims Act is not the fear that the Organizational Plaintiffs' members have cited. Thus, teachers' actions resulting from fear of authority that does not exist could not have been the "predictable and direct result" of the DCL's regulation of the school districts. Prelim Inj. Op. at 37. Their unreasonable fears are not *fairly* traceable to ED's actual actions, which said nothing about individual liability for engaging in discriminatory DEI programs.

Regarding the actions by schools—the second category of fears Organizational Plaintiffs discuss—some NEA members have observed that their own institutions have taken actions to change the contents and views that faculty express in trainings, presentations, or other school activities. *See* Pls.' Mem. Supp. Summ. J., at 15. However, to the extent Plaintiffs fear that their members' institutions will take actions *not* required by Title VI or ED, based on an incorrect understanding of the DCL, Plaintiffs' complaints about potential infringements on academic freedom are traceable to their members' institutions' own unreasonable actions, not ED. *See Lujan*, 504 U.S. at 560 ("the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" (quoting *Simon*, 426 U.S. at 41-42)).

These fears are also unreasonable because the DCL does not prohibit teachers from teaching certain books, the history of race, racism, and slavery, gender, or any other topic. *See* 2025 DCL at 3 (advising schools to ensure their policies comply with civil rights laws, their programs do not use racial proxies, and that their contractors also comply—*not* addressing teachers or directing curricula change). ED has long made clear that, pursuant to its statutory authority, it does not "exercis[e] control over the content of school curricula," 2023 FAQ at 6,

but that the agency retains authority to ensure that school curricula are not discriminatory, *see, e.g.*, U.S. Dep't Educ., Dear Colleague Letter: Title VI Access to AP Courses, https://perma.cc/TL57-2AHP, at 2 (May 2008) ("To promote educational excellence for all students and to ensure nondiscrimination in secondary school curricula, the Department will vigorously enforce the nondiscrimination requirements of Title VI.").

At the preliminary injunction stage, the Court found that this lack of curricular control was counteracted by the portal, such that the existence of the portal and corresponding press releases caused self-censoring. Prelim. Inj. Op., at 37. However, that conclusion conflates political messaging with legal obligation. The portal does not—and cannot—modify the scope of Title VI or impose new legal duties on teachers. It is  a passive conduit for the public to submit information.

The Court did not address the third category of fears—those about actions that third parties may take. Some members assert that they face harm because of potential future actions by outside third parties like community members who submit complaints through ED's portal, or State entities that impose disciplinary consequences. However, like the teacher members, these fears "rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414.  Moreover, the Supreme Court has emphasized that a "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Id*. at 409 (cleaned up).  The Court's prior acceptance of a long chain of possible events—from ED review to state discipline—conflicts with *Clapper*, which rejected such attenuated theories of injury.

Also in the third category, Organizational Plaintiffs' members' expressed fears about potential harms to their "reputations and livelihoods," Pls.' Mem. Supp. Summ. J., at 14. This

relies upon a theory that if ED later found in the course of an investigation that one of their members discriminated on the basis of race, the New Hampshire Human Rights Commission or some other State's education board may take disciplinary action against the member.  *See id.* at 15 n.58.  That chain of events speculates that:  ED will investigate a member's school, the member's conduct will be a part of that investigation, ED will report on that conduct as discrimination (despite the fact that ED's focus is on the funding recipients themselves, not teachers), someone will learn of these findings, someone will report those findings to a State Board, and a State Board will discipline the member.  This causal chain runs counter the rule that a theory of Article III injury "cannot be overly attenuated."  *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quoting *Katz v. Pershing*, LLC, 672 F.3d 64, 71 (1st Cir. 2012)).  And this attenuation, combined with the reliance upon third parties, makes it far from clear that these harms are "certainly impending." *Clapper*, 568 U.S. at 414.

The Court previously invoked *Department of Commerce v. New York*, 588 U.S. 752 (2019), to justify its standing finding. But that analogy fails. In *Department of Commerce*, the Supreme Court credited a standing theory based on the *historically documented* reluctance of noncitizens to respond to census questions—an empirically supported pattern—and a *direct, foreseeable consequence* of including the citizenship question: reduced census responses and undercounts, which would cause loss of federal funding and congressional seats. 588 U.S. at 767–68. In contrast, Organizational Plaintiffs here rely on unsubstantiated predictions about how various third parties—including ED, the public, and state licensing boards—*might* act in response to ED's interpretive guidance. The fear that an individual teacher could suffer reputational or professional harm through such a chain of events is not a "predictable effect of Government

action," *id.* at 768, but a speculative reaction to a nonbinding letter that does not apply to individuals and does not prescribe curricular content or teacher conduct.

Even if traceable, none of the three categories of fears meet the injury-in-fact requirement because in the First Amendment context, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (quoting *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947)). Organizational Plaintiffs have not provided evidence of actual or threatened specific future harm to their members beyond subjective fears.

### B.    The School District Plaintiffs cannot establish standing.

Plaintiffs Dover, Somersworth, Oyster River Cooperative, Hanover and Dresden School Districts (for the purposes of Section I.B., collectively "School District Plaintiffs") also fail to establish standing because their alleged harms are neither imminent nor actual, and they are not fairly traceable to Defendants' actions. First, School District Plaintiffs fail to allege any actual or imminent loss of federal funding. Moreover, while School District Plaintiffs repeatedly state that they face the "threat of the loss of federal funds through the DCL and Certification," they have not alleged any actual or imminent investigation, or accusation of noncompliance that could jeopardize their federal funds. *See* Pls.' Mem. Supp. Summ. J., at 16–18. School District Plaintiffs' "fear" that they may lose this funding if they fall out of compliance. *See id.* The First Circuit has repeatedly held, however, that "a plaintiff's conjectural fear that a government actor 'might in the future take some other and additional action detrimental to' [a plaintiff] does not suffice to create standing. *Reddy v. Foster*, 845 F.3d 493, 503 (1st Cir. 2017). (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013)). Indeed, School Districts Plaintiffs' "[s]peculation of that sort amounts to 'a subjective chill"—

which, in the Article III standing context, is 'not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).

Even under the "potentially more lenient 'substantial risk' standard," fear alone is therefore not a cognizable injury. *Savage v. United States SBA*, 552 F. Supp. 3d, 241, 248 (D.R.I. 2021) (quoting *Blum v.* Holder, 744 F.3d 790, 799 (1st Cir. 2014)). School District Plaintiffs' *fear* of losing federal funding, Pls.' Mem. Supp. Summ. J., at 11–18, without any allegation of actual loss of funding or pending enforcement action against them that could lead to loss of funding, without more, is mere speculation insufficient to establish an Article III injury-in-fact. *See also id.* ("a plaintiff claiming standing must show that the likelihood of future enforcement is 'substantial.'"). Any enforcement depends on Plaintiffs' own compliance with longstanding civil rights obligations under Title VI—not on speculative or arbitrary action by ED.

Second, School District Plaintiffs, like the Organizational Plaintiffs' members, cannot establish traceability because any purported harms are based on their own unreasonable reactions. For example, School District Plaintiffs express that their educators "are worried that they cannot, without risk of sanction:" ask students about popular culture, topics related to race, or students' personal experiences. Pls.' Mem. Supp. Summ. J., at 12–13. The School District Plaintiffs' fears, and any resulting overcorrections, are also unreasonable because the DCL does not *prohibit* teachers from teaching certain books, the history of race, racism, and slavery, gender, or any other topic. *See* 2025 DCL at 3 (advising schools to ensure their policies comply with civil rights laws, their programs do not use racial proxies, and that their contractors also comply—*not* addressing teachers or directing curricula change). In fact, ED's

2023 DCL informed schools that they *can* take into account students' *personal* experience with hardship, including racial discrimination. *See* 2023 DCL at 2. Thus, any purported harms stemming from School District Plaintiffs' asserted "fears" neither reasonable nor traceable to any action by ED, but instead result from their own overcorrection. Their interpretation misconstrues the 2023 guidance and 2025 DCL, which do not regulate curriculum content, but reiterate Title VI's prohibition on race-based decision-making. *See* 2023 FAQ at 3; 2025 DCL at 2.

School District Plaintiffs' "fear [that] they cannot continue to operate in compliance with relevant state and local requirements," Pls.' Mem. Supp. Summ. J., at 18, is also too attenuated to establish traceability. Like the Organizational Plaintiffs' theory of injury (id. at 15 n.58), they speculate that: ED will investigate a School District, ED will report on that conduct as discrimination, someone will learn of and report those findings to a State Board, and a State Board will discipline the School District. This "overly attenuated" causal chain runs counter to the requirements of Article III. *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quoting *Katz v. Pershing*, LLC, 672 F.3d 64, 71 (1st Cir. 2012)). Organizational Plaintiffs' attenuated argument that the New Hampshire Human Rights Commission or another State education board may take disciplinary action against a member makes it far from clear that these harms are "certainly impending." *Clapper*, 568 U.S. at 414. Further, any potential conflict between state and local requirements and longstanding obligations under Title VI is resolved by the Supremacy Clause. *See infra* Section IV.C.2.

In sum, School District Plaintiffs' asserted injuries rest on speculative fears of future enforcement and unreasonable interpretations of the challenged guidance. They identify no

actual or imminent loss of funding, no pending investigation, and no direct conflict between Title VI and state or local law. Because their alleged harms are neither concrete nor traceable to ED's actions, the School District Plaintiffs have failed to establish Article III standing.

## II.    Plaintiffs lack a cause of action under the APA because they do not challenge any final agency action.

The APA directs courts to review "[a]gency action made reviewable by statute and final agency action." 5 U.S.C. § 704.  Unless agency action is made reviewable by statute, a plaintiff who fails to challenge "final agency action" thus lacks a cause of action under the APA. *See R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002).

Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (cleaned up).  The DCL "does not have the force and effect of law and does not bind the public or create new legal standards." 2025 DCL at 1, n. 3. Because the DCL lacks the force and effect of law, bind the public, or create new legal standards, it cannot plausibly have finally determined anyone's rights or obligations or had direct legal consequences.

Indeed, the DCL fits comfortably within the APA's definition of an "interpretative rule." 5 U.S.C. §§ 553(b)(4)(A), (d)(2).  An interpretive rule is "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)).  Such rules do not have the force and effect of law, which distinguishes them from "legislative rules" that are subject to more rigorous procedures.  *Id*.  The purpose of interpretive rules is to provide notice to regulated entities of how an agency intends to exercise its enforcement discretion.  "[I]nterpretative rules or statements of policy generally do

22

not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which [they are] addressed.'" *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (quoting Judge Harry T. Edwards et al., *Federal Standards of Review* 157 (2d ed. 2013)).

At the preliminary injunction stage, the Court treated interpretive guidance as final action because it promises future enforcement. A promise to enforce existing law does not render an interpretive rule "final," however. To the contrary, any legal consequences from an interpretive statement ultimately flow from the statute the statement interprets. *See Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (finding that a letter from Department of Labor interpreting the Fair Labor Standards Act "created no new legal obligations beyond those the [statute] already imposed"). Here, any hypothetical legal consequences flow from Title VI and the Equal Protection Clause, not the DCL. ED's commitment to enforcing Title VI obligations in light of *SFFA* does not alter the nonbinding nature of its interpretive guidance.

The Court's prior conclusion that the DCL "prohibits" certain curricular content attributes more authority to the guidance than it has, *see* Order, at 70. The DCL does not "prohibit" certain discriminatory content; Title VI does. It restates ED's interpretation of existing legal obligations. *See* 2025 DCL at 1 ('This letter explains and reiterates *existing legal requirements* under Title VI of the Civil Rights Act of 1964," (emphasis added)). Indeed, ED has long made clear that it does *not* "exercis[e] control over the content of school curricula." 2023 FAQ at 6. Moreover, the DCL expressly states that it does not have the force and effect of law, it was not published in the CFR, and it did not rely on ED's rulemaking authority. *See Guedes v. BATFE*, 920 F.3d 1, 19 (D.C. Cir. 2019) (describing each of these as factors in

evaluating whether a document is an interpretive rule).

The FAQ, which anticipates questions recipients may have regarding the DCL, is also not "final agency action" within the meaning of the APA for the same reasons the DCL is not. Like the DCL, the FAQ states "[t]he contents of this Q&A document do not have the force and effect of law and do not bind the public or impose new legal requirements." 2025 FAQ at 1 n.3. And it too seeks only to "provide clarity about *existing law* for the benefit of the public." *Id.* (emphasis added). Finally, it was neither published in the CFR nor did it rely upon ED's rulemaking authority. *See Guedes*, 920 F.3d at 19.

The portal also does not constitute reviewable, final agency actions because it does not "mark[] the consummation of the Agency's decisionmaking process." *Bennett*, 520 U.S. at 127 (cleaned up). The portal allows the public to submit reports of race-based discrimination—this is not the "consummation" of the decisionmkaing process, but rather initiates the *potential* for investigation. *See* U.S. Dep't of Educ., Complaint Portal, https://perma.cc/M9QD-7DUX. Moreover, even if the portal does incentivize compliance, "voluntary compliance… has no legally binding effect." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003) (citing *FTC v. Std. Oil Co.*, 449 U.S. 232, 243 (1980). "Merely investigatory" actions do not constitute final agency action, even if "practical consequences"—like the prospect of enforcement actions—flow. *Id.*

Finally, the Certification is also not final action because it does not create any binding consequences independent from those that are already imposed by Title VI and the ED's enforcement regulations. Title VI and the regulations prohibit discrimination "on the ground of race color or national origin." 8 C.F.R. § 100.3. The Certification reiterates the longstanding requirements that, "[e]very application for Federal financial assistance . . . shall, as a condition

to its approval and the extension of any Federal financial assistance, contain assurances that the program will be conducted . . . with all requirements imposed by . . . this part." 8 C.F.R. § 100.3(a)(1); *see also* Certification at 2 (quoting *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629–30 (1983) (Marshall, J. dissenting)); *cf. Grove City Coll. v. Bell*, 465 U.S. 555, 574 (1984) ("Since Grove City operates an 'education program or activity receiving Federal financial assistance,' the Department may properly demand that the College execute an Assurance of Compliance with Title IX."). Accordingly, *Reliable Automatic Sprinkler Co.* forecloses any claim that the Certification is final agency action because it seeks voluntary compliance with existing statutory and regulatory requirements and warns of consequences for refusing to comply. *See* 324 F.3d at 731.

Because the DCL is at most an interpretive rule that does not have the force and effect of law—and because neither the DCL, FAQ, portal, nor Certification determine rights or obligations or have legal consequences—Plaintiffs do not challenge "final agency actions" within the meaning of the APA and therefore lack a valid cause of action under the statute as a matter of law. *R.I. Dep't of Env't Mgmt.*, 304 F.3d at 40.

## III.    Plaintiffs' APA claims fail as a matter of law.

Plaintiffs' APA arguments also fail as a matter of law, as ED is vested with statutory authority to enforce the civil rights laws, and the DCL and other challenged documents are consistent with longstanding understandings of Title VI and the Equal Protection Clause.

### A.    The DCL does not violate the APA's notice and comment requirement.

Plaintiffs' argument that the DCL is procedurally invalid because it did not go through notice-and-comment rulemaking applies the wrong procedural requirement. While legislative rules must go through notice and comment, the APA explicitly exempts interpretive rules like the DCL from such procedures. 5 U.S.C. § 553(b)(4)(A) ("Except when notice or hearing is

required by statute, this subsection does not apply. . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."); *see also Perez*, 575 U.S. at 105 ("the text of the APA makes plain: 'Interpretive rules do not require notice and comment.'" (quoting *Shalala*, 514 U.S. at 99).  "The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'"  *Perez*, 575 U.S. at 97 (quoting *Shalala*, 514 U.S. at 99).  As was just discussed, the DCL is an interpretive rule; therefore, it is exempt from notice and comment.  *Id*.

The Court's prior conclusion that the DCL is a legislative rule rests on the premise that ED created "new" obligations or threatened "serious consequences." *See* Order, at 73. But reiterating that violations of Title VI may trigger enforcement is not new law—it is the existing statutory framework. The 2025 DCL does not prescribe new standards or require schools to adopt particular policies—it clarifies what existing law already prohibits.

### B.    The DCL is within ED's statutory authority and consistent with applicable law.

Plaintiffs' arguments that the DCL and FAQ are outside ED's statutory authority and contrary to law are without merit. Plaintiffs contend that the documents violate the Department of Education Organization Act's  ("DEOA") provision that ED shall not exercise "direction, supervision, or control" over, *inter alia*, "the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b).  But Plaintiffs do not identify any portion of the documents that actually

conflicts with the DEOA.

Plaintiffs cite, as an example of purported inconsistency with the DEOA, the DCL's comment that DEI programs may unlawfully stigmatize and stereotype when they "teach[] students that certain racial groups bear unique moral burdens that others do not." Pls.' Mem. Supp. Summ. J., ECF No. 81-1 at 36 (quoting 2025 DCL at 3). The DCL does not control education; ED is not exercising "any role either in the day-to-day operation of the city schools, or in the *setting* of policy on a city or statewide basis." *Grimes v. Cavazos*, 786 F. Supp. 1184, 1187 (S.D.N.Y. 1992) (emphasis added). The DCL does not set policy, nor prescribe curricula or control school administration; it merely informs schools of their existing obligations under the Equal Protection Clause and Title VI: that they must not discriminate among students when implementing their curricula and must avoid stereotyping and stigmatizing based on race. Plaintiffs' conflation of the control of school administration and the reminder of legal obligations would leave little room for ED to enforce the civil rights laws. *See id.* The Court's prior finding that the DCL exceeds ED's authority under the DEOA misconstrues both the statute and the DCL. Section 3403(b) prohibits federal control over curricula, not the enforcement of nondiscrimination laws. Courts have consistently recognized that ED may investigate whether school programs violate Title VI—even when those programs relate to instruction. See *Castaneda v. Pickard*, 648 F.2d 989, 1008–09 (5th Cir. 1981) (ED may review bilingual programs for compliance with Title VI). ED's enforcement role does not transform interpretive guidance into curriculum control.

Moreover, the DEOA should not be read in a manner that would frustrate Title VI's nondiscrimination requirements. *See 289 Kilvert, LLC v. SBC Tower Holdings LLC*, 133 F,4th 1, 3 (1st Cir. 2025) ("Simply put, we do not interpret a statute's text 'in a vacuum'; we read

the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016))); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 500 (2018) (applying the interpretive "canon against reading conflicts into statutes").

For the same reasons, Plaintiffs fail to show that the DCL and FAQ violate the prohibitions on ED's interference in curricular, administrative, and personnel decisions set forth in the General Education Provisions Act ("GEPA"), Elementary and Secondary Education Act ("ESEA"), or Higher Education Opportunity Act ("HEOA"). *Contra* Pls.' Mem. Supp. Summ. J., at 36–37; *see also* 20 U.S.C. § 3403(b); *id*. at §§ 1221-1234i; *id*. at §§ 6301-7981; *id*. at § 1132-2. In its preliminary injunction opinion, the Court overlooked that these provisions apply to *control of* curriculum, not to enforcement of civil rights statutes that prohibit discrimination *within* curriculum.

### C.    The DCL is not arbitrary and capricious.

Plaintiffs contend that the DCL is arbitrary and capricious on the basis that it (1) fails to explain its departure from ED's prior guidance; (2) unreasonably interprets *SFFA*; and (3) fails to consider important aspects of the problem it addresses. Pls.' Mem. Supp. Summ. J., at 37–47. Review under the arbitrary and capricious standard is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and examines whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 52 (1983). Because the DCL's guidance is both reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), it satisfies the deferential "arbitrary and capricious" standard as a matter of law.

As observed by ED in the DCL, under the standard articulated in *SFFA*, many Diversity, Equity, and Inclusion programs may violate the Equal Protection Clause— and thus also Title VI—by introducing "explicit race-consciousness into everyday training, programming, and

28

discipline." 2025 DCL at 2. As a result, DEI programs "frequently preference certain racial groups" in ways that make them more susceptible to discriminating based on race. *Id*. In making this observation, ED simply applied the longstanding principle that policies that distinguish on the basis of race are not lawful unless justified by a fact-supported compelling interest.

The Court did not reach Plaintiffs' arbitrary-and-capricious claim at the preliminary injunction stage, *see* ECF No. 74 Order, at 67, n.10, but even if it had, the record refutes the suggestion that the DCL reflects unreasoned decisionmaking. The DCL expressly connects its legal interpretation to the principles reaffirmed in *SFFA*, and explains how race-based practices may violate Title VI. That is all the APA requires.

On the issue of ED's prior guidance, the 2023 guidance—like the 2025 guidance at issue in this case—was at best an interpretative rule that does not have the force and effect of law. ED therefore is not required to provide any explanation for its "departure" from that guidance. But to the extent there might be any such requirement, the DCL simply explains that it would be unlawful for schools to use practices that appear race neutral as a covert means of selecting or rejecting students because of their race, 2025 DCL at 2–3—exactly what the Supreme Court held would not satisfy strict scrutiny in *SFFA*, 600 U.S. at 230-31 ("[A] student must be treated based on his or her experiences as an individual—not on the basis of race.").

**Consistent with SFFA.** Plaintiffs' argument that the DCL's discussion of personal essays conflicts with *SFFA*, *see* Pls.' Mem. Supp. Summ. J., at 40–41, is wrong because the DCL is consistent with both the Supreme Court decision and ED's earlier discussions of the topic. When making admissions decisions, schools may consider an applicant's individual circumstances. ED's 2023 DCL informed schools that they may consider a student's personal

essay about how that student has overcome hardship, including racial discrimination. *See* 2023 DCL at 2. But, as the 2023 guidance also makes clear, a student must be "'treated based on his or her experiences as an individual' and 'not on the basis of race.'" 2023 FAQ at 3 (quoting *SFFA*, 600 U.S. at 231). This is precisely what the 2025 DCL says. *See* 2025 DCL at 2 ("race-based decision-making . . . remains impermissible."). And as ED further emphasized in the FAQ, 2025 FAQ at 8, the 2025 DCL does not prohibit taking personal experiences (including race-related experiences) into account; it simply informs schools that, as *SFFA* held, schools may not use personal essays as a means to identify applicant's race and then make an admissions decision on account of that race-based information. *Compare* 2025 DCL at 2–3 ("[A] school may not use students' personal essays, writing samples, participation in extracurriculars, or other cues as a means of determining or predicting a student's race and favoring or disfavoring such students."), *with SFFA* 600 U.S. at 230–31 ("A benefit to a student who overcame racial discrimination, for example, must be tied to *that student's* courage and determination. Or a benefit to a student whose heritage or culture motivated him or her to assume a leadership role or attain a particular goal must be tied to *that student's* unique ability to contribute to the university. In other words, the student must be treated based on his or her experiences as an individual—not on the basis of race." (emphasis in original)).

   ***Important aspects of the problem.*** Plaintiffs' argument on Defendants' alleged failure to consider important aspects of the problem also fails as a matter of law because no such requirement applies to interpretative rules. Regardless, the issues Plaintiffs identify do not add up to an APA violation.

   As Plaintiffs correctly state, ED is not responsible for school curricula, Pls.' Mem. Supp. Summ. J., at 44, and the 2025 DCL does not prescribe requirements for school curricula, *see*

*supra* Section III.B.  So, ED need not have considered whether any given teacher would need to change his or her lesson plan or any costs plaintiffs would incur in doing so.  Pls.' Mem. Supp. Summ. J., at 42–45. That is a matter for individual schools, who, notably, are not plaintiffs here.  Nor did ED need to consider state standards, *id.*. at 44, because, if their state requirements and *SFFA* conflict, those standards would violate the Fourteenth Amendment's guarantee of Equal Protection.  Similarly, Plaintiffs' argument on the lawfulness of removing standardized testing misses the mark, *see id*. at 43 (asserting that the DCL "determines it is 'unlawful for an educational institution to eliminate standardized testing . . . to increase racial diversity'" (quoting 2025 DCL at 3)).  The DCL prefaces the discussion on standardized testing by stating "[r]elying on non-racial information as a proxy for race, and making decisions based on that [testing] information, violates the law," 2025 DCL at 3 which is a correct statement of the law.

Because ED explained the basis for its guidance, anchored its reasoning in *SFFA's* binding precedent, and reasonably interpreted its enforcement responsibilities under Title VI, the DCL is not arbitrary and capricious.

## IV.    Plaintiffs' constitutional claims fail as a matter of law.

Plaintiffs constitutional claims similarly fail as a matter of law. Plaintiffs' Fifth Amendment vagueness claim is misplaced, as the framework for such claims is meant to apply to binding actions with the force of law. In any event, the DCL is clear about the conduct that is prohibited: discrimination that treats a person differently on the basis of race.  Plaintiffs' First Amendment claims also fail because to the extent the documents at issue address speech or expressive activity, they simply reiterate the well-established principle that speech that amounts to racial harassment and creates a hostile environment is unlawful under Title VI; harassment—including race-based harassment—is conduct that the First Amendment does not

31

protect. Finally, Plaintiffs' Spending Clause claim cannot succeed because it is not ripe for adjudication and fails as a matter of law. The challenged guidance sets forth clear, prospective conditions that are directly tied to the federal interest in preventing discrimination in federally funded education programs, and it does not impose any coercive or unconstitutional threat to existing funding.

### A.    Fifth Amendment.

The Court should revisit its finding that ED's actions likely violate the void for vagueness doctrine because (1) it failed to consider that ED provided more notice and clarity than it was required to, and (2) it misidentified the conduct that the DCL claimed was proscribed by Title VI.

### 1.    The DCL affords more notice than ED is required to provide before exercising its enforcement discretion.

First, the DCL affords more notice than ED is required to provide before exercising enforcement discretion. Title VI authorizes ED to take enforcement actions when it believes a recipient of federal funding may be violating individuals' civil rights. Under 42 U.S.C. § 2000d-1, "[e]ach Federal department and agency which is empowered to extend Federal financial assistance," including ED, is "authorized and directed" to effectuate Title VI by securing compliance through "the termination of or refusal to grant or to continue assistance." In concluding that the DCL imposes ambiguous, coercive mandates, the Court ignores this statutory framework which expressly conditions funding on compliance with nondiscrimination obligations and instructs ED to act where discrimination is suspected.

ED is not required to issue any notice of how it intends to use its enforcement discretion before it does so. Throughout Title VI, Congress instructs when agencies are required to give recipients notice or opportunity for a hearing. *See, e.g.*, *id.* (allowing termination of funding

only "after opportunity for [a] hearing"); *id.* § 2000d-5 (requiring ED to provide recipients notice of deferred action on any application for funds). ED's own regulations also specify when notice is to be provided to recipients, and none of these notice requirements precedes the opening of an investigation. 34 C.F.R. §§ 100.7, 100.8, 100.10.

Thus, because ED could enforce Title VI without issuing the DCL, Plaintiff's vagueness claim counterintuitively suggests that the DCL provides *less* notice than no guidance at all. They point to no precedent supporting such a conclusion. The Court's previous decision risks discouraging agencies from issuing interpretive guidance—undermining transparency and contradicting longstanding precedent encouraging clarification of enforcement policy.

### 2.    The DCL is not vague because it clearly reiterates well-established prohibitions on discriminatory conduct

The DCL also is not unconstitutionally vague because it clearly describes ED's understanding of Title VI's prohibition on race discrimination. As explained in the DCL, ED understands Title VI to forbid discriminatory practices in which "an educational institution treats a person of one race differently than it treats another person because of that person's race." 2025 DCL at 2.

At the preliminary injunction stage, the Court correctly identified that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). However, the Court then faulted ED for not defining terms like "diversity," "equity," and "inclusion," such that regulated parties could know what is expected of them. *See* Prelim Inj. Op. at 47. But this discussion was misplaced because ED never defined DEI as the "incriminating fact," for a Title VI violation. Williams, 553

U.S. at 306.  Indeed, ED explained that "whether an initiative constitutes unlawful discrimination does not turn solely on whether it is labeled 'DEI' or uses terminology such as 'diversity,' 'equity,' or 'inclusion.'" 2025 FAQ at 6. Instead, ED defined the "incriminating fact" as "treat[ing] a person of one race differently than [a school] treats another person because of that person's race." 2025 DCL at 2.  Thus, ED was crystal clear about what the conduct is that regulated parties need to steer clear from. The remainder of the Court's discussion raising hypotheticals about what would violate the standard does little to prove that the DCL is vague; all it does is establish that "it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved." Williams, 553 U.S. at 306.  Much more is needed to show unconstitutional vagueness.

Plaintiffs attempt to supplement their vagueness allegations by arguing that the reporting portal will result in arbitrary enforcement because it invites "students, parents, teachers, and the broader community to report illegal discriminatory practices at institutions of learning" and those "community submissions [will be used] to identify potential areas for investigation." *See* U.S. Dep't of Educ., Complaint Portal, https://perma.cc/M9QD-7DUX; *see* Pls.' Mem. Supp. Summ. J., at 28.  But ED has long solicited online reporting as a mechanism to enforce civil rights.  34 C.F.R. § 100.7(c) ("The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part."); *see also* U.S. Dep't of Educ., File a Complaint, https://perma.cc/JMA6-UJVS.  A report of discrimination is not the same as ED *finding* discrimination, and "assessment of school policies and programs depends on the facts and circumstances of each case."  2025 FAQ at 6. Online complaint forms are the method ED has always used, and the new portal does not increase any likelihood of arbitrary enforcement.

The Court's view that the complaint portal contributes to vagueness fails to account for the regulatory context. *See* Prelim. Inj. Op. at 53-54. Soliciting public complaints does not lower the bar for enforcement—it provides information to ED to inform any decisions to initiate the investigation and enforcement process subject to statutory safeguards, factfinding, and legal standards. It does not shift the locus of decision-making from the agency to the public.

Because the DCL clearly describes a type of conduct that Title VI prohibits—differential treatment based on race—it is not vague and does not increase the risk of arbitrary enforcement, and the complaint portal does not change ED's longstanding commitment to independently investigating and assessing the facts reported in each case.

### B.    First Amendment.

Plaintiffs argue that the DCL "suppress[s] disfavored viewpoints" because of its mentions of the harms that result from discriminatory programs. Pls.' Mem. Supp. Summ. J., at 30; *see, e.g.* 2025 DCL at 4 (giving "certain racial groups... unique moral burdens"). But this mischaracterizes what the DCL actually does. The DCL is not focused on what schools may *say* about DEI—they remain entitled to take a positive view, negative view, or any other view on DEI. Instead, the DCL focuses on what DEI programs often *do*—treat people differently on the basis of race in a manner that constitutes discriminatory harassment or the creation of a hostile environment, which "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954); *see* 2025 FAQ at 6 (the First Amendment does not "relieve [schools] of their duty to respond to racial harassment that creates a hostile environment").

The Court's conclusion that Plaintiffs are likely to succeed on their First Amendment claim failed to grapple with this crucial distinction. The DCL regulates conduct, not expression.

Any incidental effect on speech arises only when that speech constitutes unlawful racial discrimination.

Alternatively, Plaintiffs argue that rather than directly suppress particular viewpoints, the letter unlawfully coerces third parties—the schools that receive federal funding—into doing so. *See* Pls.' Mem. Supp. Summ. J., at 31–33. This argument also fails, because such claims limited to situations in which a government official makes a specific threat of enforcement to a third party completely unrelated to the conduct at issue. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024).

### 1.     The DCL does not censor protected speech or intrude on academic freedom.

The DCL does not "suppress" any *protected* speech expressing any particular viewpoint. *Contra* Pls.' Mem. Supp. Summ. J., at 30. The DCL describes a scope of conduct has been long prohibited by Title VI. It is well settled that denying a student an educational opportunity on the basis of race violates the law. *See SFFA*, 600 U.S. 181. It is no defense that creating a racially hostile environment or engaging in racial harassment may involve speaking. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI obligations."); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) (rejecting First Amendment argument that firing teacher for his harassing use of racial epithet violated his free speech).

When speech is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit, such "speech acts" may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 248 (4th Cir. 1997) ("[T]he

First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts"); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 262 (S.D.N.Y. Feb. 5, 2025), *reconsideration denied*, No. 24 CIV. 2669 (JPC), 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025) ("when a hostile environment claim is based on both protected speech and unprotected conduct, a court must still consider the entire record in determining whether the harassment was discriminatory in nature.").

At the preliminary injunction stage, the Court failed to grapple with this well-established distinction between protected viewpoint expression and unprotected discriminatory conduct. Title VI does not authorize ED to penalize viewpoints—only discriminatory acts. While Plaintiffs focus heavily on academic freedom, they overlook that racial discrimination is not part of academic freedom, and "free speech does not grant teachers a license to say or write in class whatever they may feel like." *Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir. 1971) (per curiam). Indeed, as recipients of federal funds overseen by ED,

> colleges and universities are legally required to maintain a hostile-free learning environment and must strive to create policies which serve that purpose. While a professor's rights to academic freedom and freedom of expression are paramount in the academic setting, they are not absolute to the point of compromising a student's right to learn in a hostile-free environment. To hold otherwise under these circumstances would send a message that the First Amendment may be used as a shield by teachers who choose to use their unique and superior position to [] harass students secure in the knowledge that *whatever* they say or do will be protected.

*Bonnell v. Lorenzo*, 241 F.3d 800, 823–24 (6th Cir. 2001).

At the same time, however, as ED's FAQ document makes clear, schools' implementation of policies to protect against race-based hostile environment harassment must respect First Amendment rights. 2025 FAQ at 6 ("[ED] OCR enforces federal civil rights law consistent with the First Amendment of the U.S. Constitution. Nothing in Title VI or its implementing regulations authorizes a school to restrict any rights otherwise protected by the

37

First Amendment, nor does the [DCL] indicate as much.").

To the extent Plaintiffs or their members fear that educational institutions may restrict certain viewpoints in response to the Department's guidance, those concerns reflect discretionary decisions by independent institutions—not government-imposed orthodoxy. *See* Pls.' Mem. Supp. Summ. J., at 30–31. The DCL does not mandate classroom content; it explains how certain practices may, in context, raise Title VI concerns if they result in race-based stereotyping or exclusion. *See* 2025 DCL 2, 4; 2025 FAQ at 6–7. The First Amendment does not prevent ED from reminding schools that federally funded programs may not discriminate. *See supra* Section III.B. To the extent any chilling effects have resulted, they stem not from the DCL but from institutions' own unreasonable interpretations and decisions to self-censor; this does not convert ED's advisory guidance into unconstitutional viewpoint discrimination.

The Court credited Plaintiff's theory that the DCL pressures institutions into censoring particular views. But that view improperly attributes independent decisions by regulated entities to the government. Such an indirect chain of causation is not sufficient to transform lawful guidance into viewpoint discrimination. Because discriminatory conduct effectuated by words is neither protected speech nor an aspect of academic freedom, Plaintiffs' viewpoint censorship arguments fail as a matter of law.

### 2. ED's longstanding conditioning of federal funding on non-discrimination is not coercive.

Plaintiffs' argument that the DCL violates the First Amendment by "order[ing] school not to take particular actions," namely, to refrain from discriminating on the basis of race, also fails as a matter of law. Pls.' Mem. Supp. Summ. J., at 32. The government is allowed to condition school funding on nondiscrimination; indeed, this is the method by which Congress

intended to stop discrimination under Title VI. *Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 290 (1st Cir. 1998) ("Title VI's only express remedy is a cutoff of federal funding to the affected program."). And the government is also allowed to express its own viewpoint; "it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Plaintiffs contend, however, that when government does both at the same time—uses its powers under Title VI and expresses its viewpoint—it somehow coercively impedes upon *their* expression of their viewpoints. This argument is unavailing.

"A government official can share her views freely and criticize particular beliefs, and she can do so forcefully." *Vullo*, 602 U.S. at 188. Thus, the expression of ED's views that concepts like structural racism are "toxic[]," 2025 DCL at 1, does not violate the free-speech rights of citizens who hold an opposite view. *Contra* Pls.' Mem. Supp. Summ. J., at 30. And the DCL does not threaten enforcement action against educational institutions that take such a view; it separately commits to "vigorously enforce the law on equal terms" under the principles of *SFFA*. 2025 DCL at 3. This is the same longstanding commitment to Title VI and Equal Protection that ED has always held. *See* 2023 DCL at 3 ("We close by noting our continued commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964…We will continue to use all enforcement tools at our disposal."). The same is true of the online complaint portal when it expresses ED's viewpoint that DEI is "divisive ideolog[y]." *See* Pls.' Mem. Supp. Summ. J., at 33. Regardless of ED's views on DEI programs generally, the portal only solicits reports of "illegal discriminatory practices at institutions of learning." *See* U.S. Dep't of Educ., https://perma.cc/M9QD-7DUX. The Court previously concluded that this combination of ED's messaging and certification process would leave a reasonable school

administrator fearful of retaining DEI programming for fear of funding loss. *See* Order, at 65–66. But the agency's reiteration of its enforcement authority—paired with a mechanism for reporting potential Title VI violations—does not amount to coercion, any more than does a hotline for reporting fraud to the Department of Justice.

*Vullo*, which sets forth a third-party coercion framework that Plaintiffs argue should apply here, *see* Pls.' Mem. Supp. Summ. J., at 31–32, is inapposite. *See Vullo*, 602 U.S. 175. Unlike the DCL, *Vullo* concerned a government official's attempt to cudgel an insurance provider into no longer insuring the National Rifle Association ("NRA") because the official disagreed with the NRA's viewpoints. *Id*. If the insurer did not comply and discontinue its coverage of the NRA, the government threatened to crack down on the insurer for "technical infractions . . . unrelated to any NRA business." *Id*. at 192. With respect to enforcement, the DCL, in contrast, merely explains ED's understanding of what Title VI requires of federal funding recipients. And as the FAQ emphasizes, ED's evaluation of whether a recipient is discriminating on the basis of race in its programs or activities "depends on the facts and circumstances of each case," 2025 FAQ at 6. Whatever ED's views of DEI programs generally, ED has made clear that its enforcement of Title VI will be based on whether schools are discriminating based on race, and not on any other factor. *Id.* This is easily distinguishable from *Vullo*, where the government official was not just executing the official's enforcement responsibilities, but threatening use of enforcement powers to coerce a specific regulated entity to disassociate from a particular organization with which the official disagreed. This Court held that ED's guidance resembled *Vullo* in its allegedly targeted focus on DEI-related language and outcomes, *see* Prelim. Inj. Op. at 65-67, but in *Vullo* the official targeted a private entity and threatened non-enforcement-based financial retaliation. ED, by contrast, is carrying

out its statutory mandate to interpret and enforce Title VI.

Moreover, concurring in *Vullo*, Justice Ketanji Brown Jackson worried that "the effect of [the government's] alleged coercion of regulated entities on the NRA's speech [was] significantly more attenuated" than in earlier applications of the third- party coercion doctrine, signaling that *Vullo* represents the outer boundary of what it means for an enforcement agency to "establish[] 'a system of prior administrative restraints.'"  *Vullo*, 602 U.S. at 202 (Jackson, J., concurring) (quoting *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963)).  Unlike in *Vullo*, ED's challenged actions here do not establish any similar system of restraint or coercion. ED's FAQ expressly disclaims any intent to penalize schools based on their views, instead it focuses only on conduct that constitutes racial discrimination. That limitation to race-based differential treatment—the actual scope of Title VI—precludes a finding of unconstitutional pressure or compulsion.

No court has held that Title VI's enforcement mechanism coercively violates free speech. Because the DCL only implicates enforcement insofar as it explains ED's understanding of Title VI's requirements, it does not violate the First Amendment.[1]

### C.    Spending Clause.

Like Plaintiffs' First and Fifth Amendment claims, their Spending Clause claim fails as a matter of law. As a threshold matter, challenges under the Spending Clause require a specific

---

[1] Plaintiffs also purport to bring claims under the APA for alleged constitutional violations under the First and Fifth Amendments.  For the reasons explained in Section II, plaintiffs fail to state a cognizable APA claim, as they do not challenge a final agency action. Moreover, when a plaintiff "appears to distinguish its first claim, seeking review under the APA, from its second claim, stating a constitutional violation. . . . [the plaintiff] is not seeking a second basis for review under the APA." *Hy-On-A-Hill Trout Farm, Inc. v. Glickman*, No. CIV. 00-443-JD, 2001 WL 873049, at *2 n.1 (D.N.H. July 31, 2001).  And as explained in this Section, the DCL and other challenged documents are consistent with the First and Fifth Amendments.

ripeness showing that Plaintiffs fail to meet because they do not plausibly allege an immediate or concrete risk of withdrawal of funds due to noncompliance. Plaintiffs assert that the DCL and related Certification impose ambiguous conditions that districts "were unaware of," coerce recipients by threatening funding loss, and impose requirements unrelated to the specific funding streams at issue. Pls.' Mem. Supp. Summ. J., at 47–52. But inherent to the spending power vested in Congress, U.S. Const. art. I § 8, cl. 1, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory *and administrative* directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 488 U.S. 448, 474 (1980)) (emphasis added). Further, "objectives not thought to be within Article I's enumerated legislative fields, may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *Id.* (cleaned up); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("Congress has broad power to set the terms on which it disburses federal money to the States.").

Although limited, this authority permits conditions on the receipt of federal funds that are (1) "in pursuit of the general welfare;" (2) unambiguous such that recipients can make informed choices; and (3) related to the federal interest in the funded program. *Id.* (internal citations omitted). Each element is satisfied here. The government is allowed to condition school funding on nondiscrimination; indeed, this is the method by which Congress intended to stop discrimination under Title VI. *Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 290 (1st Cir. 1998) ("Title VI's only express remedy is a cutoff of federal funding to the affected program."). Moreover, the DCL is both unambiguous and consistent with longstanding guidance and enforcement practice from ED. *See* 2023 DCL at 3 ("We close by noting our continued

commitment to vigorous enforcement of Titles IV and VI of the Civil Rights Act of 1964…We will continue to use all enforcement tools at our disposal.").

### 1.    Plaintiffs' Spending Clause challenge is not ripe for judicial review.

An Article III "case or controversy" as to Plaintiffs' Spending Clause claim does not presently exist. Plaintiffs' allegations reduce to the theory that the mere existence of agency guidance to schools somehow already interferes with their state and local sovereignty. *See* Pls.' Mem. Supp. Summ. J., at 50. But Plaintiffs' speculation about the possibility of some future harm stemming from the application of this guidance is insufficient to establish a Spending Clause case or controversy over which the Court may preside.[2] *See City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1086–87 (9th Cir. 2022) (finding plaintiffs' facial constitutional challenge to federal statute, 8 U.S.C. § 1373, as unripe because any future injury was then purely conjectural).

Ripeness requires both fitness and hardship. *CTC Communs. Corp. v. Verizon New Eng. Inc.*, 2006 WL 8458287 at *5 (D. Mass. 2006). Fitness is "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st. Cir. 1995). Plaintiffs' Spending Clause challenge is not fit for review because any alleged funding consequence is entirely speculative and contingent on future events—namely, the creation of an arguably racially discriminatory program, the initiation of an investigation into any such program, an express finding of noncompliance with Title VI, and the provision of procedural safeguards including notice and an opportunity to be heard. *See* 42 U.S.C. § 2000d-1 (requiring "an express finding on the record, after opportunity for hearing, of a failure to comply" before funding termination, and limiting such termination "to the

---

[2] First Amendment claims may be subject to relaxed ripeness requirements, but Spending Clause claims must still satisfy traditional standards of ripeness to be justiciable. *See Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007) ("when free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements.").

particular program, or part thereof, in which such noncompliance has been so found"). Until such a finding occurs, Plaintiffs' concerns about losing funding are hypothetical and not grounded in any concrete agency action. *See* 2d Am. Compl. at 3–4.

The hardship prong "encompasses the question of whether the plaintiff is suffering any present injury from a future contemplated event. Importantly, the hardship analysis focuses on 'direct and immediate' harm and is unconcerned with wholly contingent harm." *CTC Communs. Corp.* 2006 WL 8458287 at \*5 (cleaned up) (*citing Reg'l Rail Reorganiz. Act Cases*, 419 U.S. 102, 143 n.29, (1974)) (*quoting McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63, 73 (1st Cir. 2003)). Plaintiffs identify no current injury stemming from the DCL or Certification, only an abstract fear that the documents might be interpreted in ways that conflict with state policy or could lead to future enforcement. But such fears do not amount to direct or immediate hardship. Any potential harm is wholly contingent on future agency decisions that may never occur.

This is distinguishable from *New York v. HHS*, 414 F. Supp. 475 (S.D.N.Y. 2019) where the threatened loss of federal funding was ripe. In that case, "[t]he Rule assigns significant new substantive meaning to the Conscience Provisions. On taking effect, it would require major and immediate changes in the policies and actions of the State Plaintiffs and their subrecipients, including with respect to hiring, staffing, transfer, and other employment decisions." *Id.* at 564. Unlike the regulation in *New York v. HHS*, which imposed new, binding obligations with immediate compliance demands, the DCL and Certification merely reiterate longstanding Title VI requirements that have governed recipients of federal education funds since 1964, and thus do not trigger the type of immediate, concrete hardship necessary to establish ripeness. Accordingly, Plaintiffs' Spending Clause claim is not ripe for adjudication.

### 2.    The DCL reiterates that compliance with Title VI is a condition of federal funding.

Even if the Court finds the Spending Clause claim ripe for review, the condition of racial nondiscrimination is unambiguous and aligns with ED's longstanding enforcement of Congress's desired policy.

"The Supreme Court often characterizes Spending Clause legislation as 'much in the nature of a contract.'" *Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1149–50 (N.D.D. 2021) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).[3] However, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). There is no genuine dispute as to any material fact that Congress's policy is to prohibit racial discrimination in federally funded educational programs and activities—a mandate codified in Title VI of the Civil Rights Act of 1964 and reinforced through consistent agency enforcement. *See* 20 U.S.C. § 3402(1); *see generally Nondiscrimination in Federally-Assisted Programs at the Department of Health Education, and Welfare—Effectuation of Title VI of the Civil Rights Act of 1964*, 29 Fed. Reg. 16298–305 (Dec. 4, 1964).

Defendants agree with Plaintiffs that "the federal government's spending power 'does not include surprising participating States with post acceptance or 'retroactive' conditions." Pls.' Mem. Supp. Summ. J., at 47 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)). However, the condition at issue here has been clear since 1964: entities that accept federal

---

[3] The Supreme Court has raised "serious questions" as to whether third parties[—like NEA, NEA-NH, or CBED—]may sue to enforce Spending Clause legislation…" *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 683 (2003) (Breyer, J., concurring). "In contract law, a third party to the contract may only sue for breach if he is the intended beneficiary of the contract." *Id.* (cleaned up).

education funds must not discriminate on the basis of race. The exact contours of what Title VI's mandate requires of schools may have evolved over time. Any such change or "surprise," however, is the result of intervening Supreme Court precedent—not agency overreach. The Supreme Court's decision in *SFFA* clarified how this longstanding requirement applies in the educational context, and ED's role—as reflected in the 2023 and 2025 DCLs—is to interpret and enforce both the statutory mandate and the Court's interpretation. Far from imposing new obligations, the DCLs reaffirm ED's consistent enforcement of Title VI and restate the core principle that federal funds cannot be used to support racial discrimination. Plaintiffs therefore cannot plausibly claim they lacked notice that federal funding is conditioned on compliance with longstanding nondiscrimination requirements. *See* Pls.' Mem. Supp. Summ. J., at 50.

Moreover, the DCL's articulation of this condition is not ambiguous. As the guidance makes plain, the central inquiry is straightforward: does an action "treat[] a person of one race differently than it treats another person because of that person's race?" 2025 DCL at 2. Each purported vagueness concern Plaintiffs raise is readily resolved by applying this clear standard, which simply reiterates Title VI's core prohibition. Because the statutory bar on racial discrimination has been in place for over six decades, and the DCL underscores that requirement without adding new obligations, Plaintiffs' Spending Clause claim fails as a matter of law—it challenges an unambiguous, longstanding, and constitutionally permissible condition on the receipt of federal funds.

To the extent Plaintiffs argue that the DCL or Certification conflict with state laws or educational mandates, that concern does not support a Spending Clause violation. *See* Pls.' Mem. Supp. Summ. J., at 49. Title VI is a federal civil rights statute enacted pursuant to Congress's Spending Clause authority, and under the Supremacy Clause, it preempts any conflicting state law.

*See U.S. Const. art. VI, cl. 2*. The DCL does not prohibit teachers from teaching certain books, the history of race, racism, and slavery, gender, or any other topic, but instead reiterates Title VI's longstanding prohibition on treating students differently because of race. *See* 2025 DCL at 2, 3 (advising schools to ensure their policies comply with civil rights laws, their programs do not use racial proxies, and that their contractors also comply—*not* addressing teachers or directing curricula change). Any perceived tension between this mandate and state requirements is not evidence of ambiguity or coercion but simply reflects the requirement that federal funds be used in compliance with federal law. Plaintiffs' reliance on *New York v. U.S. HHS*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019), is misplaced. *See* Pls.' Mem. Supp. Summ. J., at 49. There, the court found a violation because the agency's rule conflicted with other *federal* statutes and imposed "uncertain ground rules." *Id.* at 568. By contrast, the guidance at issue here enforces Title VI's express statutory mandate, and any purported conflict arises from state—not federal—law.

Because the statutory bar on racial discrimination has been in place for over six decades, and the DCL reinforces that requirement without adding new obligations, Plaintiffs' Spending Clause claim fails as a matter of law—it challenges an unambiguous, longstanding, and constitutionally permissible condition on the receipt of federal funds.

### 3. The guidance is neither coercive nor unrelated to the federal interest in enforcing Title VI's nondiscrimination mandate.

Plaintiffs' coercion argument misconstrues the nature and legal effect of the Department's guidance. The DCL and Certification do not impose new substantive conditions on federal funds, nor do they threaten immediate loss of funding. Rather, they restate longstanding obligations under Title VI, which has prohibited racial discrimination in federally funded education programs since 1964.

Plaintiffs' attempt to analogize *NFIB v. Sebelius* is unpersuasive. *See* Pls.' Mem. Supp. Summ. J., at 50–52. Unlike the Medicaid expansion at issue in *NFIB v. Sebelius*, 567 U.S. 519 (2012), the DCL does not fundamentally alter the nature of a longstanding federal program or impose new conditions on existing funds. In *NFIB*, the Court found coercion because Congress sought to transform Medicaid from a program serving "four particular categories of the needy" into a broad entitlement for all low-income adults, conditioning *all* Medicaid funds on states' agreement to the entirely new program. *Id.* at 519, 588. The Court described this as a "shift in kind, not merely degree," *id.* at 583, and concluded that threatening states with the loss of all Medicaid funds for failing to adopt the expansion left them with no other choice but to comply, *id.* at 588.

Here, by contrast, ED's guidance simply reaffirms that entities receiving federal education funds must not engage in race-based discrimination, a condition that has been part of Title VI since its enactment in 1964. *See* 42 U.S.C. § 2000d. This is not a new condition, nor does it impose fundamentally different obligations from those that have long applied. And unlike *NFIB*, where the funding threat was automatic and categorical, Title VI includes procedural safeguards: funding may only be withheld after notice, an investigation, and an opportunity to cure. *See* 42 U.S.C. § 2000d-1. That statutory process forecloses any argument that ED wields "a gun to the head." *Id.*

Nor is there a relatedness problem: the condition of nondiscrimination is directly tied to the purpose of the underlying federal education funding programs. As the First Circuit has recognized, "Title VI's only express remedy is a cutoff of federal funding to the affected program." *Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 290 (1st Cir. 1998). The DCL and Certification reinforce this enforcement mechanism by ensuring that recipients comply with the foundational requirement that federal funds not be used to support racially discriminatory practices. Plaintiffs' disagreement with how ED has interpreted or emphasized that requirement

does not transform a reaffirmation of settled law into an unconstitutional expansion of agency authority.

**V.    The scope of relief, if any, should be limited to vacatur and tailored to the parties before the Court.**

Even if the Court concludes that any part of the challenged agency action is unlawful, vacatur—not a forward-looking, universal injunction—is the only permissible remedy, and should be narrowly tailored to the parties. It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). However, Plaintiffs seek sweeping nationwide relief, including complete vacatur of ED's guidance and a nationwide injunction—but neither remedy is appropriate here.

First, under the APA, "[t]he reviewing court shall… set aside agency action" that is unlawful, 5 U.S.C. § 706(2), and courts have long held that this remedy is limited to annulling the challenged action itself, not enjoining future conduct or issuing sweeping injunctive relief. *See Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (The APA does not provide district courts "jurisdiction to order specific relief," including the award or performance of a contract.). "Thus, 'under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.'" *Id.* (quoting *City of L.A. v. Shalala*, 192 F.3d 1045, 1011 (D.C. Cir. 1999)). Accordingly, any relief should be limited to remedying improper agency action and must leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and consider other future agency actions consistent with law. *See Utah ex rel. Cox v. Env't Prot. Agency*, No. 23-1157, 2025 WL 1354371, at *4 (D.C. Cir. May 2, 2025); *Util. Solid Waste*

*Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018) ("Remand has the benefit of allowing agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect and incomplete.") (internal citation omitted).

Moreover, while vacatur is the only remedy authorized by the APA, it does not automatically extend to nonparties. "Section 706 does not tell courts to apply the remedy of setting aside agency action. It does not deal with remedial orders at all. When it says 'set aside,' it directs the court not to decide in accordance with the agency action." *Gorss Motels, Inc. v. FCC*, 20 F.4ᵗʰ 87, 104 (2nd Cir. 2021) (Menashi, J., dissenting) (quoting John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. On Reg. Bull. 37, 42 (2020)). A narrow remedy limited to the parties before the Court aligns with the APA's structure, respects Article III limitations, and prevents sweeping judicial interference in administrative governance. Vacatur, if warranted, should therefore apply only to the parties in this case.

Second, universal or nationwide relief is also inappropriate. "Universal injunctions likely exceed the equitable authority that Congress has given to federal courts." *Trump v. CASA, Inc.*, 606 U.S. ___ (2025). As the Supreme recently made clear, "'complete relief' is not synonymous with 'universal relief.' It is a narrower concept, long embraced in the equitable tradition, that allows courts to administer complete relief *between the parties*." *Id.* (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928) (emphasis added)). The APA does not expand this authority to allow courts to issue relief that binds the rights of nonparties nationwide. "'To be sure, party-specific injunctions sometimes 'advantag[e] nonparties,' but they do so only incidentally. *Id.* (quoting *Trump v. Hawaii*, 585 U. S 667, 717 (Thomas, J., concurring)) (cleaned up); *see also*

*Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Gil v. Whitford*, 585 U.S. 48, 73 (2018) (any remedy must "be tailored to redress that plaintiff's particular injury."); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (any "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

Nor does this case present any circumstances that would justify departing from these foundational limits. Plaintiffs have not demonstrated that narrower, party-specific relief would be insufficient to address *their* alleged harms. Rather, Plaintiffs' contention that nationwide relief is necessary to "protect similarly situated nonparties" has been explicitly rejected by the Supreme Court. Trump v. CASA, Inc., No. 24A884, 2025 WL 1773631, at *11 (U.S. June 27, 2025) (although the law at issue had nationwide impact, "[e]xtending the injunction to cover all other similarly situated individuals would not render [the plaintiff's] relief any more complete"). Moreover, if the Court determines that only some of the Plaintiffs here have standing, it must limit relief so as to only apply to "each plaintiff with standing to sue." *Id*. at *15.

Accordingly, the Court should reject Plaintiffs' request for sweeping nationwide relief and limit any remedy to the parties properly before the Court.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion for summary judgment and grant summary judgment in favor of ED. Plaintiffs lack standing, have not identified any final agency action subject to review under the APA, and cannot prevail on any of their statutory or constitutional claims. Because there are no genuine disputes of material fact and ED is entitled to judgment as a matter of law, the Court should enter judgment for ED on all counts.

Date: July 17, 2025,                    Respectfully submitted,

                                        CHAD R. MIZELLE

Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director
Civil Division, Federal Programs Branch

/s/ *Eitan R. Sirkovich*
EITAN R. SIRKOVICH
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 353-5525
E-mail: eitan.r.sirkovich@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on July 17, 2025, I electronically filed the within Certification with the Clerk of the United States District Court for the District of New Hampshire using the CM/ECF System, thereby serving it on all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule 5.1(d).

<u><em>/s/ Eitan R. Sirkovich</em></u><br>Trial Attorney