## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

NATIONAL EDUCATION ASSOCIATION; *et al.*,

          *Plaintiffs*,

      v.

UNITED STATES DEPARTMENT OF EDUCATION; *et al.*,

          *Defendants.*

Case No. 1:25-cv-00091-LM

**COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

   I. Plaintiffs Have Each Established Standing. ........................................................ 2

   II. ED Does Not Squarely Address and Cannot Excuse its Vague Prohibitions. ...................... 7

   III. The DCL and Certification Violate the First Amendment. ................................. 8

      A. The DCL Limits Constitutionally Protected Speech in Classrooms. ...................... 9

      B. The DCL and Its Implementation Are Viewpoint Discriminatory. ........................ 10

      C. The DCL and Certification's Coercion Runs Afoul of the First Amendment. ........11

   IV. The DCL and Certification Violate the Administrative Procedure Act. ........................... 12

      A. The DCL and Certification Are Final Agency Action. ............................................ 12

      B. The Government Fails to Refute that ED Violated APA Procedural
Requirements. .................................................................................................. 16

      C.  ED Cannot Refute That It Acted in Excess of Authority and Contrary to Law. ... 16

      D. The DCL is Arbitrary and Capricious. .................................................................. 17

   V. The DCL and Certification Violate the Spending Clause. .................................................. 18

   VI. ED's Actions Should Be Vacated or Permanently Enjoined. ............................................ 22

CONCLUSION .................................................................................................................... 25

## INTRODUCTION

At issue in this case are the Department of Education's ("ED's") efforts to chill and prohibit any and all education programs and practices—from pre-K to graduate school and including curriculum and classroom conversations—aligned with values of diversity, equity, and inclusion. Through its February 14th Dear Colleague Letter ("DCL") and implementation, ED announced its intent to "End DEI," declaring that discrimination permeates through every facet of education "under the banner of 'diversity, equity, and inclusion' ('DEI')." The entire education community— including Plaintiff school districts (the "Districts"), the National Education Association ("NEA"), NEA-New Hampshire ("NEA-NH"), and the Center for Black Educator Development ("CBED")—are, in ED's own words, directed to "cease" illegal DEI programs under penalty of ED's "vigorous[ ] enforce[ment]" to come within days, and face "serious consequences," including the loss of all federal funding and the claw back of prior funding from Districts, private party lawsuits seeking treble damages, and the loss of teaching licenses for educators.

Plaintiffs have already felt the consequences of ED's actions. They are stymied in their scholarship and contributions to the academic community, chilled in their ability to engage students' own perspectives and employ effective education practices, and undermined in pursuit of their core activities as organizations committed to pursuing equitable and inclusive education. *See* Pls.' Mot. for SJ, Mem. of Law, ECF 81-1 at 14–24. ED does not oppose these material facts[1] and makes little effort to address them.

Despite its accusations of ongoing discrimination and threats of swift consequences, ED

---

[1] As such, Plaintiffs' statement of material facts should be deemed admitted. L.R. 56.1(b). As to its own opposition and cross motion, ED has not clearly identified a statement of facts, and to the extent its discussion of the content of the DCL, the Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act ("FAQ"), End DEI Portal, and Certification includes ED's interpretation of the documents, as well as their purpose and effect, ECF 85-1 at 6–8, Plaintiffs contest these and address them as relevant to the legal arguments.

provided no administrative record in this case, effectively conceding it considered nothing in issuing the DCL. *See* Joint Stip. Regarding Briefing Sched., ECF 80. Instead, ED continues to rely on the argument that the DCL is non-binding and that ED's actions announce nothing new. These arguments were insufficient and unpersuasive at the preliminary injunction stage of this litigation, *see* ECF 74, and they are unavailing now. The Court should deny the Government's Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

## ARGUMENT

### I. Plaintiffs Have Each Established Standing.

First, Districts have standing as the "object[s] of the action . . . at issue," ECF 85-1 at 11 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)), as the "colleagues" to whom the DCL is addressed and who are required to sign ED's Certification.[2] For these directly-regulated Districts, "there is . . . little question that the action . . . has caused [them] injury, and that a judgment preventing . . . the action will redress it." *Lujan*, 504 U.S. at 561–62; *see also Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943 (D.C. Cir. 2012) ("If the appellants are right that FDA's actions outlaw [their business practices], there is no doubt that the appellants . . . have suffered the requisite 'injury in fact.'"). The Government incorrectly argues that only an actual or imminent investigation or accusation of noncompliance would confer standing. Defs.' Mot. for SJ, Mem. of Law, ECF 85-1 at 21–22. This is wrong, particularly where, as here, ED has required districts to immediately comply through the Certification, ECF 81-1 at 31, at risk of severe consequences, including loss of all federal funds, *id.* at 31–32, *see also infra*

---

[2] The Government overlooks that NEA, NEA-NH, their members, and CBED are similarly "the object of the action." The DCL and FAQ impose liability on schools working with "third-party contractors," DCL, ECF 81-3 at 4, and ED threatens any "individual or entity" with liability including under contract law and the False Claims Act, 31 U.S.C. § 3729(a) ("FCA"), Certification, ECF 81-23 at 4–5. Further, it is the individual public servants and educators who must implement ED's directives.

at 18–22, and where attempting compliance would itself impose significant injury, ECF 81-1 at 20–21. Where a government action "require[s] or forbid[s] some action by the plaintiff . . . standing is usually easy to establish." *FDA. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). The Certification and DCL, particularly in light of ED's enforcement efforts,[3] predictably have injured Districts[4] in a way that far surpasses a "conjectural fear," or "speculation." ECF 85-1 at 21–22.

Second, as the Court held, NEA, NEA-NH, and CBED have organizational standing. Order Granting Pls.' Mot. for Prelim. Inj., ECF 74 at 20–31. The Government wildly misrepresents the organizational Plaintiffs' injuries. Plaintiffs have not relied on "injury to their ability to educate the public about DEI," ECF 85-1 at 14, but rather have proven immediate, perceptible impairment of existing core business activities, "far more than the ideological or moral objections" held insufficient in *Alliance for Hippocratic Medicine*.[5] ECF 74 at 23. As the Court noted, *id.* at 23–24, the DCL interferes with Plaintiffs' core programs, including member trainings, work with districts, legal representation of members, and in the case of CBED, its ability to remain in business at all.[6] The uncertainty the DCL creates will predictably turn districts and educators away from Plaintiffs' offerings, directly frustrating Plaintiffs' missions and forcing them to change their activities, thereby incurring costs, all of which is more than sufficient to establish standing.[7] *See Am. Ass'n*

---

[3] *See* ECF 81-1 at 12–13.

[4] *See, e.g.*, Boston Decl., ECF 81-41 ¶¶ 27–29, 31–32 (impact on district's instruction, educators, superintendent, and school environment); Shea Decl., ECF 81-42 ¶¶ 12, 16, 20 (impact on district's superintendent, curriculum, and programming); Shaps Decl., ECF 81-45 ¶¶ 10, 14–23 (impact on district's initiatives, programming, employees, learning environment, disciplinary practices, curriculum, and academic support services); Badams Decl., ECF 81-50 ¶¶ 12–20 (impact on district's policies, curriculum, extracurriculars, and student groups).

[5] *See, e.g.*, NEA Decl., ECF 81-43 ¶¶ 12–23 (impairment of NEA's trainings, grant programs, and legal representation); NEA-NH Decl., ECF 81-44 ¶¶ 18–21 (impairment of NEA-NH's training and advising); CBED Decl., ECF 81-64 ¶¶ 14–30, 37–45 (impairment of CBED's Teaching Academies and professional development programs); *see also generally* ECF 41-1 at 17–20.

[6] *See* Pls.' Mot. for Prelim. Inj., Mem. of Law, ECF 34-1 at 16; ECF 81-64 ¶¶ 41–44; ECF 81-43 ¶¶ 13, 25; Pls.' Emergency Mot. for TRO, Mem. of Law, ECF 41-1 at 18–19.

[7] *See* ECF 81-43 ¶¶ 4–17; ECF 81-44 ¶¶ 6, 18–21; ECF 81-64 ¶¶ 4–30; ECF 41-1 at 17–19. The similarity to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), is also closer than the Government suggests. ECF 85-1 at 15. Just as the provision of false information interfered with HOME's counseling services, ED has provided NEA and NEA-NH with information purporting to establish rules for Title VI compliance that is vague and otherwise flawed in numerous

3

*of Univ. Professors v. Rubio*, No. 25-CV-10685-WGYT, 2025 WL 1235084, at *18 (D. Mass. Apr. 29, 2025) (standing established based on deterrence of organization's noncitizen members from participating in core activities and impairment of mission of fostering study); *League of Women Voters of N.H. v. Kramer*, No. 24-CV-73-SM-TSM, 2025 WL 919897, at *9–10 (D.N.H. Mar. 26, 2025) (standing established based on interference with organization's core function of counseling and combatting voter suppression); *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 49 (D. Mass. 2024) (standing established where nonprofit providing programming and resources to immigrant communities diverted resources to respond to needs of immigrants relocated by defendants); *United States v. Texas*, No. 24-CV-50149, 2025 WL 1836640, at *4 (5th Cir. July 3, 2025) (finding standing for legal services organization challenging state law due to diversion of resources necessary to train staff, develop materials, provide legal counsel, and create a new operation). *Contrast All. for Hippocratic Med.*, 602 U.S. at 395 (finding injury to public education insufficient). As to CBED, the Government significantly understates the evidence, ECF 85-1 at 15–16, ignoring the undisputed testimony that its programs, trainings, and resources for students and educators, as well as each of their contracts and partnerships, are implicated by the DCL, posing an existential threat.[8]

Third, as the Court held, ECF 74 at 31–37, NEA and NEA-NH have associational standing through their members. *See* ECF 41-1 at 12–16. Despite the Government's assertion to the contrary, these members' standing does not rely on "an incorrect expectation that ED will take actions against *them*." ECF 85-1 at 17. As an initial matter, as the Court correctly noted, ECF 74 at 36, the Certification does threaten "the individual" with serious consequences, Reminder of

---

ways, thus interfering with Plaintiffs' ability to accurately and effectively counsel members on their obligations and liabilities. ECF 81-1 at 22–23.
[8] ECF 81-64 ¶¶ 34–45.

Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and SFFA v. Harvard, ECF 81-23 at 4, which are not limited to the enumerated consequences. ECF 85-1 at 17–18; ECF 81-23 at 4 ("serious consequences, including:"). Even if they were, members have reasonably taken ED at its word that they could be subjected to these consequences as individuals, regardless of ED's actual authority. ECF 74 at 36–37. The members' undisputed testimony confirms educators are reasonably self-censoring themselves from sound pedagogical practices because of ED's confusing and consequential pronouncements,[9] establishing standing. ECF 74 at 33–35; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014). This self-censorship is an attempt to protect members not only from ED, but from the reality that the DCL will be invoked by schools who employ them,[10] by their state licensure/certification authorities,[11] and by the public, including groups like Moms for Liberty,[12] to target members. The reputational and career harms[13] that would result all flow from ED's vague pronouncements here.

As the Court found, ECF 74 at 25–31, these injuries are imminent and traceable to, as well

---

[9] *See generally* ECF 34-1 at 13–14 & nn.35–38. The Government unpersuasively continues to argue that the DCL, FAQ, End DEI Portal, and Certification Requirement do not reach into curricula, ECF 85-1 at 18–19, an argument this Court has already rejected, ECF 74 at 70.

[10] As this Court found, the DCL's vague prohibitions and promise of swift enforcement make it "virtually inevitable that schools will act to limit the possibility that the Department will target them for enforcement by, for example, eliminating teaching positions that involve race or censoring teachers who teach about race." ECF 74 at 32–33 (summarizing evidence).

[11] *See* ECF 34-1 at 11 & n.24; 13 & n.33.

[12] *See* ECF 34-1 at 27–28 (describing Moms for Liberty's involvement in End DEI Portal and prior enforcement efforts in New Hampshire).

[13] *See, e.g.*, Mem. A Decl., ECF 81-36 ¶ 8 ("If [an End DEI Portal] complaint were lodged, even if meritless, my reputation would be harmed"); Mem. A Supp. Decl., ECF 82-1 ¶ 5 (reiterating fears); Mem. B Decl., ECF 81-37 ¶ 7 ("[T]he FAQ . . . invites distrust in the ethics and professionalism of schools and educators."); Mem. D Decl., ECF 81-39 ¶ 15 ("[I]f I [continue my scholarship], I will lose opportunities for advancement."); Mem. G Decl., ECF 81-40 ¶ 18 (explaining "my expertise as a social justice scholar is being undermined" and that she has lost the opportunity to fully participate in academic responsibilities on which she is evaluated); Mem. I Decl., ECF 81-47 ¶ 10 ("[T]he [DCL] language feels accusatory and vicious."); Mem. H Decl., ECF 81-48 ¶ 14 (academic presentation on her research canceled because of the DCL); ECF 81-43 ¶ 36 ("anonymous complaints against members can touch off lengthy investigations during which members are placed on administrative leave with the consequent reputational injury"); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021); *Meese v. Keene*, 481 U.S. 465, 473 (1987).

as redressable by, ED. It is undeniable that the Certification, before being enjoined, was "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Further, there is no question the DCL and Certification apply directly to schools with no third-party step required before these are effective. *Cf. id*, 568 U.S. at 412–13 (respondents "assum[ed]" and could "only speculate" that they would be targeted by third parties). Plaintiffs' fears that schools will respond as they have here, ECF 34-1 at 13–14, 22 & n.57, and previously, ECF 81-43 ¶ 22, are far from speculative. Indeed, these harms are "already occurring." *New York v. Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 227 (S.D.N.Y. 2020); *see* ECF 34-1 at 10–14, 50 & n.102.

Plaintiffs' responses to the DCL are "the predictable effect of Government action," *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019),[14] not "unfettered choices" within the scope of "broad and legitimate discretion," *Lujan*, 504 U.S. at 562 (citation omitted); *see also* ECF 41-1 at 20–21. These responses, including any arguable overcorrections, are caused by ED's vague terms and steep penalties. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (cleaned up); ECF 34-1 at 21–22; *cf. Dep't of Com.*, 588 U.S. at 768 (traceability satisfied where "third parties will likely react in predictable ways . . . even if they do so unlawfully and despite the requirement that the Government [act in a contrary manner]"). Likewise, Plaintiffs' fears that ED will follow through with its solicitation of "receipts of . . . betrayal," Press Release, U.S. Department of Education Launches 'End DEI' Portal, ECF 81-16, is reasonable and not "imaginary or wholly speculative." *Babbitt v. United Farm Workers*

---

[14] The Government attempts to distinguish *Department of Commerce*. ECF 85-1 at 20–21. In that case, the documentation of historical reluctance was particularly relevant because this trend ran counter to the legal obligation to answer the census. *Dep't of Com.*, 588 U.S. at 768. But the Government places undue stress on this fact. The pertinent question is whether the effects are predictable. It is certainly predictable that schools will seek to comply with ED's directives, as several already have. *See* ECF 81-1 at 18–19. Further, contemporary evidence coupled with historical experience also demonstrates that the private parties with which ED aligns will invoke the DCL provisions to target teachers and schools. *See* ECF 81-1 at 8–9.

*Nat'l Union*, 442 U.S. 289, 302 (1979). The Government's response that harms from third parties "rest on speculation about the decisions of independent actors," ECF 85-1 at 19 (citation omitted), fails to account for the record evidence.[15] *See* ECF 34-1 at 7–8, 27–28.

**II. ED Does Not Squarely Address and Cannot Excuse its Vague Prohibitions.**

The Government does not directly defend the DCL's vague terms, instead arguing the DCL was unnecessary and announces nothing new. ECF 85-1 at 34–36. But the DCL is something new. ECF 74 at 73. It expands the obligations of schools and educators, and it is more confusing, not less, than if it had not been issued. As this Court recognized, the DCL fails to acknowledge and contradicts prior guidance. ECF 74 at 42–43; *see also id.* at 4–6; ECF 81-1 at 6–7; *Am. Fed'n of Tchrs. v. Dep't of Educ.* ("*AFT*"), No. CV SAG-25-628, 2025 WL 1191844, at *13 (D. Md. Apr. 24, 2025) (finding that the DCL expands Title VI's reach to new categories of conduct). It articulates liabilities untethered to legal standards, and rests on conclusory statements providing no explanation of *how* programs discriminate. *See* ECF 81-1 at 28–29; ECF 74 at 52–53.

The Government attempts to avoid the lack of definitions and the remaining vague terms by merely citing the FAQ statement that a determination of discrimination "does not turn solely on whether it is labeled 'DEI'" ECF 85-1 at 36 (quoting FAQ, ECF 81-22 at 7). The Court has already rejected this argument, and this assertion gives schools and educators even less of a standard to grasp at. ECF 74 at 54; *see also NAACP v. U.S. Dep't of Educ.*, No. 1:25-cv-01120, 2025 WL 1196212, at *6 (D.D.C. Apr. 24, 2025) (challenged documents provide "no clear 'boundaries of the forbidden areas' to guide schools' compliance") (citation omitted).

---

[15] That evidence shows, among other things, that ED is only soliciting select civil rights complaints via its End DEI portal—namely, those concerning DEI efforts. *See* ECF 34-1 at 27–28. The skewed portal solicitation and the heated rhetoric that has accompanied it only heightens the coercive effect of ED's DCL and Certification.

As the Court found, the portal further demonstrates ED's broad intent to "End DEI," leaving officials "free to 'pursue their personal predilections'" in enforcement. ECF 74 at 53 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). It highlights the stigmatizing consequences of the DCL, exhorting members of the public to "share receipts" and aligning with a group that previously offered payments to "catch" a teacher violating similar state prohibitions,[16] *id.* at 56 (citation omitted), and threatened a school district, citing the DCL.[17] In response to this evidence of the potential for arbitrary and discriminatory enforcement, the Government argues that "[o]nline complaint forms are the method ED has always used." ECF 85-1 at 36. But the portal is a new and stand-alone method of soliciting complaints, focused solely on "End[ing] DEI," which is impossible to square with the indifference the government now expresses as to DEI. ECF 85-1 at 37. And ED has announced its intent to rely on these complaints in its decision-making "as a guide to identify potential areas for investigation."[18] *Contrast* ECF 85-1 at 37 ("[The End DEI portal] does not shift the locus of decision-making from the agency to the public."). Nothing in the Government's argument disposes with the fundamental vagueness concerns the Court already identified.[19] ECF 74 at 59; *see also* ECF 81-1 at 30–32.

### III. The DCL and Certification Violate the First Amendment.

The Government's argument that the DCL "is not focused on what schools may *say*" is plainly wrong; far from leaving schools free to "to take a positive view, negative view, or any other view on DEI," ECF 85-1 at 7, the DCL concludes that schools have "toxically indoctrinated

---

[16] *See also* Moms for Liberty Hillsboro Co, NH, X, ECF 81-20.

[17] Moms for Liberty, *DEI Tug of War in Wake County Schools Stirs Tensions Among Board, Parents*, ECF 81-19.

[18] ECF 81-16.

[19] Plaintiffs' constitutional injuries also constitute APA violations under Section 706(2)(B). ECF 81-1 at 38; ECF 79 at 74–75; ECF 74 at 67–68. The Government's reliance on *Hy-On-A-Hill Trout Farm, Inc. v. Glickman*, No. CIV. 00-443-JD, 2001 WL 873049 at *2 (D.N.H. July 31, 2001) is misplaced because the plaintiffs in that case did not plead their constitutional claims as violations of the APA.

students" if they teach disfavored views. Dear Colleague Letter, ECF 81-3 at 3–4. The FAQ warns that requiring students to take classes that "focus on" disfavored views or taking "certain positions" in instruction are forms of school-on-student harassment. FAQ, ECF 81-22 at 8. The End DEI portal likewise targets disfavored teaching. End DEI Portal, ECF 81-17. The DCL and Certification condition federal funding on suppression of disfavored speech.

### A. The DCL Limits Constitutionally Protected Speech in Classrooms.

This Court already recognized that the classroom discussions of Plaintiffs NEA and NEA-NH's higher education members are protected by the First Amendment. ECF 74 at 60–61. The Government now attempts to reframe the DCL's focus on suppression of speech in classroom instruction as mere regurgitation of the standard for discriminatory conduct. This argument must fail; it is supported by neither facts nor law. As this Court noted, the DCL does not "specif[y] how DEI programs are being deployed in a discriminatory or harassing fashion, . . . define what a DEI program is[,] . . . or clearly articulate what conduct would run afoul of Title VI." ECF 74 at 65–66. None of the cases cited by the Government address Plaintiffs' First Amendment challenge to the DCL's suppression of constitutionally protected classroom speech.[20]

Further, the DCL is an unconstitutional prophylactic ban on disfavored speech. As the court recognized in *AFT*, "[p]rior restraints on speech are presumptively unconstitutional, and highly disfavored. Here, the government cannot justify its preemptive prohibition on speech by arguing, without justification, that it is possible the speech could be a part of unlawful harassment." 2025

---

[20] The Government's remaining citations span a spectrum of doctrine and likewise do not support its argument. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 308–09 (D. Mass. 2024) (denying motion to dismiss plaintiffs' claims that they had experienced "repeated, fear-inducing conduct that amounted to more than 'off-color banter,'" and concluding that whether to credit the school's First Amendment defense was "a decision best reserved for a later day"); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184–85 (6th Cir. 1995) (concluding "Discriminatory Harassment Policy" violated the First Amendment and separately, that coach did not have a First Amendment right in his non-academic speech as an employee under *Pickering v. Board of Education*, 391 U.S. 563, 574 (1968)).

WL 1191844, at *21 (internal citation omitted).

The Government's argument that it can proscribe classroom speech without "much, if any concern about the First Amendment" is as appalling as it is wrong.[21] ECF 85-1 at 38. The Government cites *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 262 (S.D.N.Y. Feb. 5, 2025), but even in *Gartenberg,* the court recognized:

> A statute that burdens protected speech must comport with the First Amendment regardless of whether it does so directly, such as by prohibiting certain speech outright, or indirectly…. [R]equiring schools to censor or punish political speech to avoid liability for a hostile environment would burden not only their students' freedom of expression, but the academic freedom of the institution itself to create an educational environment centered around the free exchange of ideas.

*Id.* at 260–61. Fundamentally, "the First Amendment protects the free-speech rights of professors when they are teaching."[22] *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021); *see also* ECF 81-1 at 32.

### B. The DCL and Its Implementation Are Viewpoint Discriminatory.

This Court already determined that the DCL "targets speech based on viewpoint," and the Government's assertions to the contrary are unpersuasive. ECF 74 at 61. The Government did not—indeed cannot—deny that the DCL prohibits teaching that the United States was built on structural racism but permit teaching the opposite, ECF 81-3 at 3; that only "certain positions on racially charged issues" are prohibited in instruction but not others, ECF 81-22 at 8; or that "critical theory, rogue sex education, and divisive ideologies" are not allowed while other theories are, ECF 81-16 at 2. As this Court noted, "[t]hat is textbook viewpoint discrimination." ECF 74 at 61. The

---

[21] The Government's reliance on *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 248 (4th Cir. 1997) is misplaced, as the court addressed a separate First Amendment doctrine of "speech acts" in the criminal context. *See also AFT*, 2025 WL 1191844 at *21 n.11.

[22] Plaintiffs assert that the First Amendment protects their ability to teach free from censorship, not to engage in racial discrimination, therefore *Mailloux v. Kiley*, 448 F. 2d 1242, 1243 (1st Cir. 1971), and *Bonnell v. Lorenzo*, 241 F.3d 800, 823–24 (6th Cir. 2001), are inapplicable.

Government's assertion that any viewpoint censorship "reflect[s] discretionary decisions by independent institutions," ECF 85-1 at 40, fails to account for the fact that these restrictions are declared under threats to federal funding and other serious consequences.

### C. The DCL and Certification's Coercion Runs Afoul of the First Amendment.

As this Court held, ED attempts to "coerce third parties 'to punish or suppress disfavored speech on [their] behalf,'" in violation of the First Amendment, and the Government has offered no new arguments that warrant reconsideration. ECF 74 at 64, 67 (quoting *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024)). The Government cannot seriously contend that the DCL only explains what "Title VI requires," ECF 85-1 at 42, and "does not threaten enforcement action against educational institutions" who express opposite views, *id.* at 41. Unlike a hotline for reporting fraud, ECF 85-1 at 42, the DCL directs schools to "cease" practices, such as disfavored teaching, under threat of "potential loss of federal funding." ECF 81-3 at 4–5. ED doubled down in the Certification, which adds new forms of liability through third parties under contract and law and the FCA to the "serious consequences" schools and individuals face. ECF 81-23 at 4–5. ED's claim that it will review "the facts and circumstances of each case," ECF 85-1 at 42 (quoting ECF 81-21 at 6) does not counter the coercive directives of the DCL to censor speech that could be considered DEI and may underscore ED's intent to enforce its vague directives without any objective standard. *See supra* at 7–8. As in *Vullo*, ED seeks to suppress the speech of educators and students that it could not control directly. 602 U.S. at 197–98.

ED unsuccessfully attempts to distinguish *Vullo* by arguing that it is fulfilling its "statutory mandate to interpret and enforce Title VI." ECF 85-1 at 43. However, just as in *Vullo*, ED cannot "threaten enforcement actions . . . to punish or suppress" disfavored speech. 602 U.S. at 187.

**IV. The DCL and Certification Violate the Administrative Procedure Act.**

**A. The DCL and Certification Are Final Agency Action.**

The Parties agree on the operative test for final agency action: The action must (1) "mark the consummation of the agency's decisionmaking process"; and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1977) (citations omitted). *See* ECF 85-1 at 24 (citing *Bennett*, 520 U.S. at 177–78); ECF 81-1 at 36 (same). As the Court previously held, and as explained in Plaintiffs' opening brief, the DCL meets these requirements. *See* ECF 74 at 40–43; ECF 81-1 at 36–37. Moreover, the Certification is both an implementation of the DCL, *see* ECF 74 at 30–31, 81; ECF 81-1 at 37 & n.128, and independently constitutes final agency action, *see* ECF 81-1 at 34.

The Government's attempt to recast the DCL as an "interpretive rule" is a red herring. ECF 85-1 at 24. Similar to the test for final agency action, in "distinguishing legislative rules from interpretive rules," the "most important factor" courts assess "concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (collecting cases); *see also Ctr. For Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 23 (D.C. Cir. 2004) ("When considering whether [actions] constitute final agency actions, the D.C. Circuit has [ ] emphasized that—much like the determination of whether agency action constitutes a rule or a policy—the question hinges on whether the agency's statement was binding."). Because the DCL and Certification impose entirely new legal obligations and consequences, as the Court already found and discussed further herein, they are legislative rules subject to notice and comment. The cases the Government cites are not to the contrary. *Compare Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 107 (2015) (making clear that there was no dispute that the action at issue constituted an

12

interpretive rule); *Guedes v. BATFE*, 920 F.3d 1, 19 (D.C. Cir. 2019) (explaining that in contrast to a legislative rule, an interpretive rule "simply communicates the agency's interpretation of what a statute has always meant"). Indeed, the "government cannot now, in litigation, reconceive [the challenged actions] as [ ] interpretive rule[s]." *Guedes*, 920 F.3d at 20.

The Government's attempts to fault the Court's conclusion that the DCL constitutes final agency action fall flat. ECF 85-1 at 25–26. The Court did not "treat[]" the DCL as "final action because it promises future enforcement." *Id.* at 25. Instead, the Court rightly focused on the "'actual legal effect,'" concluding the DCL creates legal consequences not only because it made clear that ED's "enforcement efforts will begin within weeks" but also because of (1) the legal conclusions it asserted; (2) the instruction to "cease all efforts" that violate the DCL's prohibitions or "face potential loss of federal funding"; (3) the investigations opened based on the DCL; and (4) ED's attempt to enforce the DCL through the Certification. ECF 74 at 40–42 (internal quotation marks omitted). The Government simply has no answer to the Court's holding that "[b]ecause the plaintiffs face substantial threat of consequences for failing to comply with the [DCL], the actual legal effect component of the finality inquiry is satisfied." *Id.* at 42. Nor does the sole case it cites for the proposition that "any legal consequences from an interpretive statement ultimately flow from the statute the statement interprets" provide any basis for the Court to revisit its decision. ECF 85-1 at 25 (citing *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016)). The court in *Rhea Lana* found that the challenged letter "created no new obligations beyond those the [statute] already imposed" but rather restated its "longstanding view" of the law, citing a robust record of agency publications. 824 F.3d at 1028. Here, the Court has rightly concluded the exact opposite. *See* ECF 74 at 73; *see also id.* at 42–43.

13

Nor does the Court's conclusion that the DCL "prohibits" certain content and actions "attribute[ ] more authority to the guidance than it has." ECF 85-1 at 25 (citing ECF 74 at 70). This is precisely what the DCL does. *See* ECF 74 at 41–42, 70. The Government offers nothing new to refute the Court's finding but instead reasserts that the DCL merely encompasses ED's interpretation of existing legal obligations. ECF 85-1 at 25. As the Court previously noted this argument is "puzzling" and wrong, including because ED's previous guidance takes the exact opposite position. ECF 74 at 43.[23] Moreover, the Government is once again incorrect that a court's determination of whether an action is final hinges on an agency's boilerplate disclaimers, ECF 85-1 at 25–26. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (dismissing agency's disclaimer of the challenged action as "boilerplate" because it gave regulated states "marching orders"); ECF 81-1 at 37. Courts routinely look past an agency's characterization of its own action under *Bennett*'s two-part test for finality. *See, e.g.*, *Texas v. Equal Opportunity Comm'n*, 933 F.3d 433, 437, 443–44 (5th Cir. 2019) (final agency action where "guidance" broadly condemned a practice as unlawful); *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) (explaining "that the issuance of . . . guidance may constitute final agency action has been settled in [the D.C. Circuit] for many years" and does not turn on "agency label[s]").

The Government is likewise wrong that the Certification is not final agency action because it does not create binding consequences independent from those already imposed by Title VI and other statutes. *See* ECF 85-1 at 26–27. The Certification acknowledges SEAs and LEAs already

---

[23] In addition, the Government's argument that the DCL does no more than reiterate the agency's interpretation of Title VI is belied by ED's actions to set up a portal to End DEI, to investigate 45 universities pursuant to the DCL, and to institute the Certification setting an imminent timeline for compliance and explicitly threatening not only funding loss under Title VI but also of wholly new forms of liability for violating the DCL through breach of contract claims and the FCA. ECF 81-23 at 2, 4–5. This makes abundantly clear that ED intends to imminently initiate a variety of enforcement actions against schools that violate the DCL's prohibitions and invites third parties to enforce its terms as well. *Cf. Nat'l Mining Ass'n*, 758 F.3d at 253 (explaining that the regulated entities may "ignore" the relevant guidance "without suffering any legal penalties or disabilities" and that the entities "may be able to obtain permits even if they do not meet the recommendations in the [relevant guidance]").

have provided general assurances under Title VI and other referenced laws, ECF 81-23 at 2–4, which ED has previously acknowledged are sufficient.[24] ED had no reason to issue the Certification but to impose additional binding consequences for failure to comply with the DCL's new requirements. Indeed, far from "reiterat[ing] the longstanding requirements" imposed by Title VI, ECF 85-1 at 26–27,[25] the Certification requires SEAs and LEAs to certify compliance with ED's newly announced understanding of *SFFA*, that compliance with ED's interpretations constitutes a material condition for the receipt of federal funds, and that entities understand that "the use of Diversity, Equity, & Inclusion ('DEI') programs to advantage one[ ] [person's] race over another" is contrary to Title VI. ECF 81-23 at 2, 4. It further states that "[t]he continued use of illegal DEI practices may subject the individual or entity using such practices to serious consequences" including liability under contract law and the FCA, that "individuals using [DEI] practices" may face "serious consequences," and that the enumerated consequences are not exhaustive. *Id.* at 4–5. It also obligates SEAs to sign on behalf of their agency as a whole, *id.* at 2, and ED required SEAs to report the signature status of each of their LEAs, any compliance issues within LEAs, and the SEA's proposed enforcement plans, *see* Certification Press Release, ECF 81-24 at 3; N.H. Dep't of Educ., Certification Requirement Directions, ECF 81-26 at 2. In short, the Certification is not an effort to achieve "voluntary compliance with existing statutory and regulatory requirements," *compare* ECF 85-1 at 27 (citing *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Com'n*, 324 F.3d 726, 731 (D.C. Cir. 2003)), but instead imposes new legal obligations and consequences for failure to comply, thus constituting final agency action.

---

[24] *See* U.S. Dep't of Educ., Supporting Statement for Paperwork Reduction Act Submission, ECF 81-28 at 2.

[25] The Government appears to erroneously cite to requirements under 8 C.F.R. § 100.3 rather than requirements under 34 C.F.R. § 100.3. *See* ECF 26-27.

**B. The Government Fails to Refute that ED Violated APA Procedural Requirements.**

For the same reasons that the DCL and Certification are final agency action, ED's new if ill-defined prohibition on DEI programs, announced first through the DCL and further enforced through the Certification, is a legislative rule requiring notice and comment rulemaking. *See* ECF 81-1 at 48–50. The Government offers no new arguments to refute the Court's holding to the contrary. ECF 74 at 72–74. In addition, the Government fails to address, let alone refute, Plaintiffs' separate claim that the Certification violates the Paperwork Reduction Act and therefore should be set aside. ECF 81-1 at 49–50. The Court should thus consider any arguments to the contrary waived. *See Iverson v. City of Boston*, 452 F.3d 94, 103 (1st Cir. 2006).

**C. ED Cannot Refute That It Acted in Excess of Authority and Contrary to Law.**

As the Court previously found, ECF 74 at 69–71, *see also* ECF 81-1 at 38–40, ED seeks to prohibit schools from teaching concepts and offering courses and programs aligned with DEI. The Government again ignores the text of the DCL and implementing documents in arguing ED did not act in excess of its authority under the Department of Education Organization Act ("DEOA") or contrary to law under DEOA, the General Education Provision Act ("GEPA"), the Elementary and Secondary Education Act ("ESSA"), and the Higher Education Opportunity Act ("HEOA"), but "merely informs schools of their existing obligations." ECF 85-1 at 29–30.

The cases ED cites do not mention DEOA and are inapposite. ECF 85-1 at 29. In *Grimes By & Through Grimes v. Cavazos*, 786 F. Supp. 1184 (S.D.N.Y. 1992), plaintiffs alleged their school curriculum violated Title VI. *Id.* at 1185. Federal defendants were merely alleged to enforce Title VI, and "plaintiffs offer[ed] no explanation of how actions taken (or even inaction) by [ED] caused the injury." *Id.* at 1187. And ED was not a defendant in *Castaneda v. Pickard*, 648 F.2d 989, 992 (5th Cir. 1981). The passage referenced by the Government concerned the requirements of the Equal Educational Opportunities Act ("EEOA") governing language access. Further, the

court's discussion was consistent with DEOA. The court explained that "choosing between sound but competing theories [of language acquisition] is properly left to the educators and public officials charged with responsibility for directing the educational policy of a school system," and that Congress, under the EEOA, did not intend the courts to choose an educational program, but to "ascertain that a school system is pursuing a program informed by [expertise in the field]." *Id.* at 1009. The court's reasoning in *Castaneda* further demonstrates the ability to read civil rights laws like Title VI consistent with DEOA. *Contrast* ECF 85-1 at 29–30.

### D. The DCL is Arbitrary and Capricious.

The Government is wrong that the DCL is "both reasonable and reasonably explained." ECF 85-1 at 30. First, the Government's only defenses to ED's failure to acknowledge, let alone explain, its departure from settled law and its own guidance are premised on its flawed arguments that the DCL is an interpretive rule and "simply" applies "longstanding" principles and guidance. ECF 85-1 at 31. These arguments fail for the same reasons explained above. Moreover, the Government, like ED, fails entirely to address Plaintiffs' well-documented reliance interests on longstanding federal laws and regulations, and ED's own prior guidance. *See* ECF 81-1 at 40–43.

Second, the Government fails to address the myriad ways that the DCL misconstrues and misapplies *SFFA*, including that it ignores the limits of the Court's holding, announces its holding "applies more broadly" to support its vague conclusions, and contradicts the Court's statements that the interests furthered by diversity are "commendable goals." *Compare* ECF 81-1 at 43–44 (quoting *SFFA*, 600 U.S. at 214) with ECF 85-1 at 31–32. Instead, ED premises its defense to this claim solely on the DCL's partial discussion of personal essays. But, as Plaintiffs have explained, the DCL adopts an overreaching interpretation of the Supreme Court's holding and omits the Court's particular guidance regarding what schools *can* do consistent with its holding, which

suggests the DCL's prohibitions encompass considerations of students' self-expression, and at a minimum, leaves schools and educators in doubt. ECF 81-1 at 29–30 & n.142.

Third, the Government's arguments regarding ED's failure to consider important aspects of the problem again rest on flawed premises—*e.g.*, the DCL (1) is an interpretive rule, ECF 85-1 at 32; *compare supra* at 12–14; and (2) does not interfere with federal statutes expressly prohibiting ED from involvement in curricular and instructional decisions, ECF 85-1 at 33; *compare supra* at 16–17—or otherwise ignore, and therefore waive, Plaintiffs' arguments entirely—*e.g.*, ED fails to consider (1) the DCL's interference with educator training and standards and the administration of Title VI, its implementing regulations, and other civil rights and education laws, *see* ECF 81-1 at 45–46; (2) that practices and programs related to diversity, equity, and inclusion are permitted or indeed required by the statutes that are the source of the funding at issue, *id.* at 46–47 (discussing ESSA and the Individuals with Disabilities and Education Act); and (3) federalism implications, *id.* at 47. The Government's attempts to defend ED's consideration of important aspects of the problem are insufficient: for example, Plaintiffs have submitted unrefuted evidence that they plan and execute lessons, programming, and training and must adhere to state standards that raise palpable conflicts with the DCL, *see id.* at 14–24; *compare* ECF 85-1 at 33. Each of these flaws in ED's reasoning constitute an independent basis for rendering the DCL arbitrary and capricious.

Finally, the Government fails to address, and therefore waives, Plaintiffs' argument that ED failed to acknowledge let alone consider the costs of the DCL. ECF 81-1 at 47–48.

**V. The DCL and Certification Violate the Spending Clause.**

Plaintiffs' Spending Clause claim is ripe for review. Ripeness requires a court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *New Hampshire Lottery*

*Comm'n v. Rosen*, 986 F.3d 38, 52–53 (1st Cir. 2021) (same). "'To establish ripeness in a pre-enforcement context, a party must have concrete plans to engage immediately (or near so) in an arguably proscribed activity' and 'a showing that the challenged [action], fairly read, thwarts implementation of the plan adds the element of hardship.'" *Crosspoint Church v. Makin*, 719 F. Supp. 3d 99, 113 (D. Maine) (quoting *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999)).[26] "In the pre-enforcement context . . . the doctrines of standing and ripeness tend to overlap . . . ." *New Hampshire Lottery Comm'n*, 986 F.3d at 52.

The Government's argument that Plaintiffs' Spending Clause challenge is not fit for judicial review because any "alleged funding consequence" is speculative and contingent on future events, ECF 85-1 at 45, ignores both the explicit purpose and intended effect of the DCL and Certification: to compel Plaintiffs' *compliance* with the Government's unlawfully and unreasonably expanded interpretation of Title VI. *See, e.g.*, ECF 81-23 at 2 (requiring acknowledgment and certification with legal obligations imposed therein and in the DCL); ECF 81-24 at 3 (requesting SEAs certify and collect certifications from LEAs); ECF 81-3 at 4 (making plain ED's intent to "assess compliance" within 14 days "based on the understandings embodied in" the DCL). Contrary to the Government's contention, Plaintiffs need not wait for an investigation or enforcement action to initiate funding termination for their claim to ripen. *See, e.g.*, *Crosspoint Church*, 719 F. Supp. 3d at 114 (rejecting argument that claim was based on "a pyramid of hypotheticals" including that plaintiff be "charged and punished" because plaintiff was

---

[26] To the extent that the Government suggests there are heightened ripeness standards in the context of Spending Clause claims, ECF 85-1 at 43–44, this is wrong. *See, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 263 (6th Cir. 2009); *New York v. United States Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 563–64 (S.D.N.Y. 2019); *City & Cnty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001, 1010 (N.D. Cal. 2019); *W. Virginia v. United States Dep't of Treasury*, No. 7:21-CV-00465-LSC, 2021 WL 2952863, at *7 (N.D. Ala. July 14, 2021); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President,* No. CV 25-917 (RJL), 2025 WL 1502329, at *10 (D.D.C. May 27, 2025). Nor does Plaintiffs' Spending Clause claim turn on so-called "relaxed ripeness requirements," ECF 85-1 at 45 & n.2, but instead satisfies relevant fitness and hardship inquiries, *see infra* at 19–21.

forced "to either violate the statute or compromise its religious beliefs"); *City of New York v. U.S. Dep't of Commerce*, 739 F. Supp. 761, 766 (E.D.N.Y. 1990).[27] The DCL and Certification standing alone seek to compel changes in Plaintiffs' behavior or expose them to the risk of fund termination on the day they take effect—with extremely disruptive consequences for Plaintiffs and students regardless of any further factual development. *See Lujan*, 497 U.S. at 891 ("[A]gency action is 'ripe' for review at once" when "as a practical matter [it] requires the plaintiff to adjust his conduct immediately."). In any event, it is clear from Plaintiffs' unrefuted evidence that Plaintiffs not only have "plans to engage in" but already are engaged in activity that is at minimum "arguably proscribed," by the DCL and Certification. *Crosspoint Church*, 719 F. Supp. 3d at 113; *see* ECF 81-1 at 18–19. Moreover, as the Court previously found, the DCL and Certification demonstrate that ED "intends to initiate a variety of enforcement actions against schools that allegedly violate" the DCL's prohibitions. ECF 74 at 42.

Similarly, the Government's argument regarding hardship fails. Plaintiffs have set forth unrefuted evidence that because of the DCL and Certification, Plaintiffs will have no choice but to either acquiesce to the DCL's demands to eliminate DEI programming, or risk losing millions in funds that the DCL and Certification plainly state ED intends to withhold. *See* ECF 81-1 at 19–22. This immediate harm constitutes the very threat that the limitations on the spending power proscribe. *See Nat'l Fed'n of Indep. Business v. Sebelius* ("*NFIB*"), 567 U.S. 519, 580 (2012) (explaining that "[b]y 'financial inducement' the Court meant the *threat* of losing . . . funds" (emphasis added) (internal quotation marks omitted)). When Plaintiffs "ha[ve] no choice, the

---

[27] The sole case the Government cites for support is not to the contrary. In *Ernest & Young*, potential harm was remote: the challenged statute would cause injury only if a chain of *eight* "serendipitous" events came to pass, which were dependent on a variety of third-party actors. *Ernest & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 538 (1st. Cir. 1995). Here, in contrast, Plaintiffs' evidence shows that they are required to cease day-to-day programming immediately, or risk losing millions of funds because of ED's explicit threats of immediate enforcement.

Federal Government can achieve its objectives without accountability," *id.* at 578, as Plaintiffs' unrefuted evidence regarding the impact of the DCL and the Certification on their day-to-day programming establishes. Moreover, the Government's attempt to distinguish *New York v. HHS* because the regulation at issue in that case "imposed new, binding obligations with immediate compliance demands" rings hollow. ECF 85-1 at 44. As the Court previously found, the obligations imposed by the DCL are indeed new, ECF 74 at 73, and the DCL and Certification make plain they are binding and immediate, *see* ECF 81-3 at 3–4; ECF 81-23 at 2; *see also* ECF 74 at 41–42.

With respect to the merits of Plaintiffs' Spending Clause claim, the Government's principal argument is similarly that the DCL (and the Certification) do not impose any "new obligations" but merely "reaffirm[ ] that entities receiving federal education funds must not engage in race-based discrimination" and therefore are not retroactive or unduly coercive, and do not raise any concerns with respect to the Spending Clause's relatedness requirement. ECF 85-1 at 48–50. This Court has already held the opposite, ECF 74 at 73, and the Government has introduced nothing in the record to change that conclusion. The Certification similarly imposes new obligations consistent with the DCL and heightened liability for any noncompliance.[28] *See* ECF 81-23 at 2, 4–5. Accordingly, the DCL and the Certification impose new conditions on existing funds that fundamentally alter the nature of Title VI obligations and are unrelated to the statutes ED purports to or otherwise must implement. *See* ECF 81-1 at 50–55.

In addition, the Government is wrong that the conditions imposed by the DCL and Certification are unambiguous. As the Court determined, the DCL's prohibitions fail to make clear what constitutes a DEI program or the circumstances under which such program may violate Title VI. ECF 74 at 46–55. Further, the Government's argument that Title VI preempts any conflicting

---

[28] Indeed, the Government repeatedly cites *Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 290 (1st Cir. 1998), which made plain "Title VI's only express remedy is a cutoff of federal funding to the affected program."

state law misses the point. ECF 85-1 at 48–49. Plaintiffs' fear that state requirements will run afoul

of the DCL and Certification underscores the ambiguity of ED's prohibitions and the uncertainty

that Plaintiffs face. *See* ECF 81-1 at 52–53.[29]

The Government's additional attempt to soften the coercive effect of the DCL and

Certification also fails. ECF 85-1 at 50. As an initial matter, it is unclear what the Government

means that the "funding threat" at issue in *NFIB* was "automatic and categorical." ECF 85-1 at 50.

Nothing in the Supreme Court's analysis in *NFIB* turned on the mechanics of how Congress may

have withheld funds. Indeed, the operative provision for funding termination cited in *NFIB*

provided for reasonable notice and the opportunity for a hearing before any sanction, *see NFIB*,

569 U.S. at 581 (citing 42 U.S.C. § 1396c), similar to the "procedural safeguards" that the

Government highlights under Title VI, ECF 85-1 at 50. In any event, the relevant inquiry under

*NFIB* is whether "the financial inducement" to adopt the federal government's policies as one's

own is "so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 569 U.S.

at 580 (internal quotation marks omitted). Because the DCL and Certification target all of

Plaintiffs' education funding, and more, for failing to adhere to ED's new and dramatically

expanded view of Title VI, these actions are unconstitutionally coercive. *See* ECF 81-1 at 53–55.

### VI. ED's Actions Should Be Vacated or Permanently Enjoined.

The DCL, the Certification, and ED's additional implementing actions (i.e. the FAQ and

the End DEI Portal) violate the Constitution and the APA and entitle Plaintiffs to vacatur of those

actions or, in the alternative, a permanent injunction. *See* ECF 81-1 at 56–58. The Government

argues that vacatur should be limited to Plaintiffs, citing a single dissenting opinion. ECF 85-1 at

---

[29] In any event, the Government's attempt to distinguish *New York v. HHS* "because the agency's rule conflicted with other *federal* statutes" falls flat. ECF 85-1 at 49 (citing *New York*, 414 F. Supp. 3d at 568). The Court has already determined that—as in *New York*—the DCL conflicts with federal law. ECF 74 at 71.

52 (quoting *Gorss Motels, Inc. v. FCC*, 20 F.4th 87, 104 (2nd Cir. 2021) (Menashi, J., dissenting)). As a D.C. district court recently explained in rejecting a similar argument, "that contention is both at odds with settled precedent and difficult to square with the statutory text of the APA, which offers no such limitation." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. CV 25-306 (RDM), 2025 WL 1825431, at *50 (D.D.C. July 2, 2025)*.

The APA's instruction that a court "shall . . . hold unlawful and set aside agency action," 5 U.S.C. § 706(2), is "more than a mere non-enforcement remedy" applicable only to Plaintiffs, and the Court has the power to act "directly against the challenged agency action," to set aside or "strike down" the action in full. *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Statement of Kavanaugh, J.) (citation omitted); *see also* ECF 81-1 at 56–57. As Justice Blackman once wrote, when an APA challenge involves a "rule of broad applicability," the resulting remedy "is that the rule is invalidated, not simply that the court forbids its application to a particular individual." *Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting); *see also id.* at 890 n.2 (majority opinion) (noting that when an "across the board" measure violates the APA, the entire program "would thereby be affected" by the remedy).

Confusingly, the Government asserts that any relief should leave ED "to engage in further consideration of the topic at hand and consider other future agency actions consistent with law." ECF 85-1 at 51. The relief Plaintiffs seek regards the DCL, the Certification, and implementation, and consists of declaratory relief and vacatur or, in the alternative, an injunction against enforcement. *See* ECF 81-1 at 58; ECF 79 at 85. It is unclear what "further consideration" or "future agency action" the Government contemplates.[30] Declaratory relief, alongside vacatur,

---

[30] The Government cites cases involving remand, but remand is inappropriate here where ED did not first make a decision on a record before it and thus, there is nothing to remand. This is not a direct appeal from the agency, *contrast Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 436 (D.C. Cir. 2018) (direct appeal from EPA); *Utah ex rel. Cox v. Env't Prot. Agency*, No. 23-1157, 2025 WL 1354371, at *1 (D.C. Cir. May 2, 2025) (same); *id.* at

would prevent ED from implementing a vacated policy or reimplementing a substantively identical policy. *See Ass'n of Am. Universities v. Nat'l Sci. Found.,* No. 1:25-CV-11231-IT, 2025 WL 1725857, at *24 (D. Mass. June 20, 2025) (citing *Union de Empleados de Muelles de Puerto Rico, Inc. v. Int'l Longshoremen's Ass'n*, 884 F.3d 48, 58 (1st Cir. 2018)).

The Government is further wrong that *Trump v. CASA, Inc.*, 606 U.S.—, 2025 WL 1773631 (June 27, 2025) affects the proper scope of relief. ECF 85-1 at 52–53. The Supreme Court in *CASA* made plain that it did not reach "the question whether the [APA] authorizes federal courts to vacate federal agency action." 2025 WL 1773631, at *8 n.10; *see also id.* at *19 (Kavanaugh, J. concurring) ("In cases under the [APA], plaintiffs may ask a court to preliminarily 'set aside' a new agency rule." (citing *West Virginia v. EPA*, 577 U.S. 1126 (2016) and *Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring))); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (distinguishing between an injunction and vacatur, which is "a less drastic remedy"). *CASA* only concerned the *equitable* authority of district courts under the Judiciary Act of 1789 to issue "universal injunctions" *preliminarily*. *See* 2025 WL 1773631, at *4; *id.* at *19 (Kavanaugh, J., concurring) ("underscor[ing] that [*CASA*] focuses on only one discrete aspect of the preliminary litigation . . . namely, what *district courts* may do . . . that might be called the 'interim before the interim.'"). It did not affect the Court's *statutory* authority and obligation under the APA, as numerous courts

---

*4 & n.4 (noting skepticism with appropriateness of remand under the APA); nor was there an application or other matter initially presented to ED for consideration, *contrast Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 401 (D.C. Cir. 2005) (hospital sought review of denial of its claim under specific statutory scheme); *id.* at 437 (remanding only those provisions "unchallenged on their merits"). Even if remand were an appropriate consideration, the severity of the constitutional and statutory violations, and the balance of equities would make remand inappropriate. *See Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (in direct appeal from agency decision, holding that the ability to remand "depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations."); *Ass'n of Am. Universities*, 2025 WL 1725857, at *20 (where "the Policy is directly contrary to the relevant regulations and is not authorized by the relevant statutes," "remand is insufficient").

have recognized. *See Refugee & Immigrant Center*, 2025 WL 1825431, at *51 (explaining the court was bound by precedent and the statutory command of the APA, including post-*CASA*, to vacate the challenged guidance); *Doctors for Am. v. Office of Personnel Mgmt.*, —F. Supp. 3d—, 2025 WL 1836009, at *22 (D.D.C. July 3, 2025); *Haitian Evangelical Clergy Assoc. v. Trump*, —F. Supp. 3d—, 2025 WL 1808743, at *6–7 (E.D.N.Y. July 1, 2025); *Walker v. Kennedy*, —F. Supp. 3d—, 2025 WL 1871070, at *7 (E.D.N.Y. July 8, 2025).

Nor does *CASA* alter the appropriateness of Plaintiffs' alternative request for a permanent injunction to afford full and complete relief. ECF 85-1 at 52–53. The Court in *CASA* made clear that an injunction may be granted as necessary to provide "complete relief," regardless of whether it may have the "*practical effect* of benefiting nonparties." 2025 WL 1773631, at *11–12 (remanding to consider plaintiff states' arguments that a "universal injunction was necessary to provide the States *themselves* with complete relief"); *see also id.* at *19 n.1 (Kavanaugh, J. concurring) (same).

The injunctive relief requested in the alternative is necessary. Complete relief requires a permanent injunction that applies nationwide to reach the scope of Plaintiffs' presence and work and adequately address their injuries. *See* ECF 81-1 at 57–58. Tellingly, the Government has no answer for how ED would apply a narrower injunction to resolve the concerns that Plaintiffs raise. *See* ECF 81-1 at 55; *cf. CASA*, 2025 WL 1773631, at *12 (remanding for consideration of plaintiff states' arguments that their injuries "cannot be remedied without a blanket ban on the enforcement of the [e]xecutive [o]rder" because a "'patchwork injunction' would prove unworkable").

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

Dated: July 25, 2025

Respectfully submitted,

Sarah Hinger*
Amanda Meyer*
Alexis Alvarez*
Leah Watson*
Ethan Herenstein*
Victoria Ochoa*
Sophia Lin Lakin*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7882
shinger@aclu.org

Megan C. Keenan*
American Civil Liberties Union
Foundation
915 15th Street NW
Washington, DC 20001
(740) 632-0671
mkeenan@aclu.org

Alice O'Brien*ᵀ
Jason Walta*ᵀ
Phil Hostak*ᵀ
NEA Office of General Counsel
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
aobrien@nea.org

*/s/ Henry R. Klementowicz*
Henry R. Klementowicz (N.H. Bar No. 21177)
Gilles R. Bissonnette (N.H. Bar No. 265393)
SangYeob Kim (N.H. Bar No. 266657)
American Civil Liberties Union of New Hampshire
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org

Rachel E. Davidson*
American Civil Liberties Union
Foundation
of Massachusetts, Inc.
One Center Plaza, Suite 801
Boston, MA 02018
(617) 482-3170
rdavidson@aclum.org

Callan E. Sullivanᵀ (N.H. Bar No. 20799)
Lauren Snow Chadwickᵀ (N.H. Bar No. 20288)
National Education Association-New Hampshire
9 South Spring Street
Concord, NH 03301
(603) 224-7751
csullivan@nhnea.org

*admitted pro hac vice*
ᵀ*appearing only on behalf of NEA, NEA-NH, and Center for Black Educator Development*

26