**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION; *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00091-LM |
| UNITED STATES DEPARTMENT OF EDUCATION; *et al.*, | |
| *Defendants*. | |

**DECLARATION OF CHRISTINE BOSTON**

I, Christine Boston, pursuant to 28 U.S.C. § 1746, depose and say as follows:

1. My name is Christine Boston. The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify to the following matters under oath.

2. I am the Assistant Superintendent of Dover School District (School Administrative Unit 11). I have held this role since 2018. On July 1, 2025, I will become the Superintendent of Dover School District.

3. I make this declaration to describe the effects that the Dear Colleague Letter issued by the Department of Education (the "Department") on February 14, 2025 (the "Letter"), and the Department's subsequent directives in execution of the Letter, are having, and will continue to have on Dover School District.

1

### Background on the Dover School District

4.   The City of Dover was settled in 1623. It is the seventh oldest city in the United States and the fastest growing city in New Hampshire.

5.   Dover School District serves approximately 3,500 students. It has three elementary schools, one middle school, one high school, and a career technical center.

6.   Dover School District is governed by the Dover School Board.

7.   The goal of the Dover School District's educational system is to ensure that each student, regardless of background, has access to relevant and engaging learning experiences and curricula that they will need to thrive today and into the future.

8.   Dover School District's learning philosophy is that education can be the most powerful mechanism of social change. The District celebrates the individual differences students bring to an educational environment. For Dover School District, educational excellence results from producing work that others can use and helps learners develop a sense of self through engaging with the larger community.

9.   The District strives to produce learners who have critical thinking, collaboration, communication, character, and life skills. Dover School District endeavors for our students to become well-rounded individuals who are prepared for the challenges of the future. Our students learn to seek cultural understanding to enable them to work effectively and respectfully with diverse teams.

10. Dover School District receives approximately $3.1 million for this current fiscal year (2024-25) in direct federal funding grant support, which includes Titles I–IV and Individuals with Disabilities in Education Act (IDEA) financial support, which are recurring based on qualifications.

a.  The largest source of federal funding for Dover School District is Title I, which
    supports students in high-poverty communities and low-income families. We use
    these funds to provide valuable reading and writing intervention to students and
    families at the District's elementary and middle schools. For example, we stocked
    a van with books that runs to high-poverty neighborhoods to give students books
    to read and host story time. During the summer, we hosted programming for
    eligible elementary and middle school students. We hosted enhanced family
    engagement events to make sure the forms for free and reduced lunch programs
    were accessible to parents who do not speak English or have limited literacy
    skills. We held monthly family engagement nights with math games or invited
    authors to speak in an effort to reach families who typically do not engage with
    the school and to demonstrate enrichment activities they can do at home to
    support their children's learning. In addition, we used this funding to provide
    professional development. We trained staff to support the academic, behavioral,
    mental, and socio-emotional wellbeing of students and emphasized the
    importance of positive behavior interventions and solutions. We sent Title I staff
    to the Granite State Literacy Summit to learn innovative literacy tools and
    strategies to enhance reading and writing instruction. Our Title I interventionists
    were trained to promote literacy development with their students. Finally, we
    increased our staffing to provide services to students who need extra assistance
    with reading, writing, and math.

b.  The Title III funds were used to serve our English Language (EL) learners. Dover
    School District has EL teachers and paraprofessionals in all of its schools,

supporting approximately 160 EL students. We used these funds to enrich and develop English language proficiency and help students meet state standards. We purchased instructional materials, provided professional learning for teachers, and supported language-building activities, such as field trips for EL students, and a summer program.

c. The District used Title IV funds to create a district-wide sustainability plan for educational and racial equity, develop programming and to expand social-emotional learning opportunities, and to expand supports from a licensed drug and alcohol counselor to serve students. Our annual needs assessment indicated that we needed to focus on students' wellbeing. We introduced intense interventions to ensure our students are able to cope with anxiety and will pilot the Coping Cat, an evidence-based program that addresses mild to moderate anxiety in school age children in the fall.

d. Dover School District used IDEA funds to improve instructional practices for the inclusion of students with disabilities. We extended the school year through the summer for students who, without continuity of services, would fall behind over the summer and be unable to access their education in the fall. We hired occupational therapists to provide additional speech and occupational therapy so students with disabilities could be included in the general education setting. We hired three special education teachers and three special education administrators so we could fully serve our students with disabilities.

11. I am aware of the February 14, 2025 Dear Colleague Letter and the February 28, 2025 "Frequently Asked Questions" document published by the United States Department of Education,

as well as the President's Executive Orders on diversity, equity, and inclusion in K-12 schools and higher educational institutions. I am also aware of the United States Department of Education's March 14, 2025 announcement that it has opened investigations into 45 universities following the February 14, 2025 Dear Colleague Letter.

12. Furthermore, I am aware that, on April 3, 2025, the United States Department of Education sent a letter to all state departments of education stating that these state departments need to—within 10 days (by Sunday, April 13, 2025)—certify compliance with the February 14, 2025 Dear Colleague Letter as a condition for receiving federal funds. As a result, on the evening of April 3, 2025, I received from the New Hampshire Department of Education a certification document stating that my district must complete the certification by no later than Thursday, April 10, 2025 at 5:00 p.m. After the United States Department of Education extended the deadline for state departments of education to Thursday, April 24, 2025, the New Hampshire Department of Education set a new **Thursday, April 17, 2025 (5:00 p.m.)** deadline for my District to send a certification. I am aware of the parties' April 9, 2025 agreement with respect to the certification ramifications.

<u>**Instruction at Dover School District**</u>

13. Dover School District uses competency-based education, a system that ensures all students reach mastery of the content and skills at their own pace. Students have both voice and choice in creating their own pathways for learning. Competency-based learning prioritizes practical and authentic application and assessment.

14. Instruction follows a Depth of Knowledge framework that considers how deeply students must know, understand, and be aware of what they are learning in order to attain and explain answers, outcomes, results and solutions. It teaches students to transfer knowledge to other

academic and real-world settings. At level one, students initially learn to recall and reproduce facts, including tasks to copy, compute, define, or recognize facts. Level two focuses on developing students' skills and concepts and includes tasks like comparing, organizing, summarizing, predicting, and estimating. At level three, students engage in strategic thinking, which requires them to use evidence to make and justify their choices, such as solving non-routine problems, designing and conducting experiments, or analyzing characteristics of a genre. Level four requires the most complex cognitive effort, extended thinking. Students synthesize information from multiple sources or transfer knowledge from one domain to solve problems in another.

15. We strive for all students to reach the highest levels of thinking through instruction, in a way that is developmentally appropriate, because that is where students develop the skills necessary to thrive in the world and higher education.

16. Dover School District's best practices include the use of a variety of instructional strategies to meet the needs of diverse learners and the establishment of specific achievement goals, including resources to reduce achievement gaps.

### Principles of Diversity, Equity, and Inclusion at Dover School District

17. Dover School District does not promote discrimination of any kind. Discrimination conflicts with our values and approach to learning, and is prohibited by federal and state law.

18. The District celebrates the diversity of our student body, pursues equity, and creates inclusive learning environments. This commitment is required by the City of Dover school board and the State of New Hampshire.

19. Dover School District submits proposed curriculum to the school board for approval. One of the criteria considered by the school board is whether the curriculum is accessible, including

whether it "contains appropriate content that is relevant to the diverse abilities and needs of the students" and whether it is "accessible to diverse students. Materials are available to support all learning needs." (attached as Ex. A).

20. The District designed a plan to embrace educational equity as ensuring just outcomes for each student, raising marginalized voices, and challenging the imbalance of power and privilege. The equity plan outlined five goals:

    a.  Increase the equity literacy of teachers, administrators, and staff of the Dover School District.

    b.  Improve the school culture in all schools to be inclusive, safe, and welcoming for all students, staff, and families.

    c.  Ensure equitable achievement of all students through effective communication, instruction, and assessment practices.

    d.  Expand family and community engagement in Dover Schools, especially families that have not been historically engaged.

    e.  Recruit, retain, and promote a diverse mix of educators who are representative of the growing diversity in our schools and communities.

21. Dover School District provides trainings to help staff understand equity. For example, the District focused its opening day activities on equity and inclusion in 2023, including trainings by NH Outright, on support for LGBTQ+ students, Indigenous NH, and others.

22. On April 10, 2025, Dover School District hosted its annual celebration of learning and diversity event for the entire K-12 community. Students, families, and community organizations were invited to share aspects of their culture or language through books, poetry, art, clothing or traditional dress, dance, music, games, or food.

23. For four consecutive years, Dover High School has been recognized by the Special Olympics New Hampshire with a Certificate of Inclusion as part of their Unified Champion Schools program. The recognition affirmed Dover High School's commitment to students with and without intellectual disabilities.

24. The Frances G. Hopkins School at Horne Street collaborated with Northeast Passage to introduce adaptive sports opportunities. Students learned to use wheelchairs and engaged in inclusive play together. They learned about the Special Olympics and other opportunities for people of all abilities to play together.

25. Students at the middle and high schools in Dover School District have created groups to support each other. For example, Dover High School has a Gender, Sexuality Alliance, and the elementary school has a social justice group. All student groups are initiated by students, supervised by an adult, and open for any student to join.

### Impact of Dear Colleague Letter on Dover School District

26. Dover School District discusses race, diversity, equity, and inclusion in ways that are appropriate for students' age and understanding. The Dear Colleague Letter's vague position that all diversity, equity, and inclusion programs engage in "smuggling racial stereotypes" into everyday programming makes me question whether the Department of Education and others could view the District's efforts to create relevant and engaging learning environments with well-rounded teachers and staff as violative of the Letter. The Dear Colleague Letter does not meaningfully define what the Department of Education means by DEI nor does the Letter offer specific guidance as to precisely what is (or is not) legal in the eyes of the current federal administration.

27. The Dear Colleague Letter limits instruction at every level. It has a chilling effect on teachers as they push students beyond rote memorization towards application of knowledge to

novel situations. I worry that I cannot provide guidance to Dover School District staff about what the Department of Education might consider to violate the Dear Colleague Letter. They are concerned because they don't know what instructional techniques or topics they can continue to use.

    a. At the lowest level of learning, recall and reproduction, teachers must consider whether the facts introduced could be considered within the bounds of the Dear Colleague Letter. Topics of "systemic and structural racism" naturally arise within the scope of classroom discussion in various courses, including many of the District's social studies and English language arts courses. Because some instruction requires discussion of these topics, like the Civil Rights Movement, I cannot tell what the Department of Education would construe as impermissible.

    b. As students learn skills and concepts in level two, they often ask questions as they are processing information. Teachers have asked me whether they should respond or are required to ignore questions from students related to information taught in class. Grappling with information and developing curiosities is exactly what we want students to do at this stage, but teachers are chilled in their classroom interactions because they do not know if answering questions could be considered to violate the Dear Colleague Letter. Specifically, teachers have asked me whether they may answer a student's question about human sexuality in a health class or whether they may teach a book in an upper-level English class that references sexuality. Indigenous history is very important in the Dover community and taught in the District. Because we must teach the mistreatment of Indigenous people to be accurate, I am worried that the Department of Education could

perceive this classroom discussion and instruction as "teach[ing] students that certain racial groups bear unique moral burdens that others do not."

c.  At the higher levels, strategic and extended thinking, the teacher coaches students as they think critically to interpret and contextualize the instructional material. Students make real-time applications of the concepts they learn in class. For example, students in a history course may be tasked with comparing and contrasting the current political climate with the developments that immediately preceded the Civil War or considering the impact of political conditions on Shakespeare's writing. By encouraging students to analyze the similarities to the present, I fear that a teacher could be accused of training students on "explicit race-consciousness." This level of critical thinking is exactly what we strive to reach with every student but teachers don't know if instruction involving race, diversity, equity, and education at the highest levels of learning is permissible after the Dear Colleague Letter. Outside of the tasks assigned by teachers, students engaged in higher level learning may ask questions about current events that lead to class discussion that could be considered appropriate after the Dear Colleague Letter.

d.  In order to follow the Dear Colleague Letter, teachers and administrators will likely need to water down the content of their courses and reduce students to the lowest levels of thinking, which does a disservice to students and is inconsistent with the goals of the Dover School District.

e.  We are tasked with creating engaged global citizens, but the Dear Colleague Letter would not allow us to teach students how to engage in civil discourse

around topics that the Department of Education could interpret as impermissibly addressing race, diversity, equity, or inclusion. In school, students learn to consider various viewpoints and make conclusions based on evidence. This isn't just an academic skill; it is a life skill. Because of the Dear Colleague Letter, students may lose the ability to analyze material, increase their cognitive effort, and apply skills to novel situations. If so, learning environments will no longer be dynamic spaces for the student engagement that leads to academic success and real-world preparation.

f.   The Dear Colleague Letter limits instruction on topics that fit squarely within our curriculum so teachers don't know if they can continue to teach this information. For example, teachers must discuss racism to contextualize the Civil War. Would the Department of Education consider this instruction as "teach[ing] students that certain racial groups bear unique moral burdens that others do not?" Instead of focusing on a developmentally appropriate way to present information, teachers now must question whether they can discuss the topic at all and attempt to predict if their instruction could be considered prohibited. I have never seen classroom instruction restricted in this way.

g.   Last year, Dover High School invited a Holocaust survivor to speak to students about her experience. The students learned so much from her lived experience; the event was much more impactful than simply reading about the Holocaust. I'm not sure if this event would run afoul of the Dear Colleague Letter by "teaching that certain racial groups bear unique moral burdens that others do not."

11

28. The Dear Colleague Letter is difficult to apply because it conflicts with my state's requirements for instruction and the responsibilities of educators.

a. New Hampshire law requires that we provide an "Adequate Public Education," which includes: "Knowledge of civics and government, economics, geography, history, and Holocaust and genocide education to enable them to participate in the democratic process and to make informed choices as responsible citizens." *See* RSA 193-E:2, IV. It also includes "Grounding in … literature to enable them to appreciate our cultural heritage and develop lifelong interests and involvement in these areas." *See* RSA § 193-E:2, V. Celebration of cultural history is central to Dover School District's approach, but I fear the Department of Education would determine it violates the Dear Colleague Letter.

b. Chapter Ed 300 of New Hampshire's Education Rules details the "Minimum Standards for Public School Approval." United States and New Hampshire history, government and civics, economics, personal finance, and world history are courses required for graduation. N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f) Students are required to learn through multiple perspectives; consider interactions and interdependence through multiple perspectives; and to examine engagement across differences of culture, race, and heritage. N.H. Code Admin. R. Ann. Ed 306.23(f)(3)(f). I worry that the Department of Education could perceive the courses and approach to instruction mandated by New Hampshire as a contravention to the Dear Colleague Letter.

c. The State of New Hampshire's Guiding Principles: The Code of Ethics for New Hampshire Educators articulate consideration of diversity, equity, and inclusion

principles as part of educators' "responsibility to practice within the educational profession according to the highest ethical standards...." (attached as exhibit B). Principle I outlines educators' responsibility and commitment to the education profession and colleagues, advising that the educator "communicates with colleagues in a clear, respectful, and culturally sensitive manner." Exhibit B. Principle II outlines educators' responsibility and commitment to the student, noting that the educator "communicates with students in a clear, respectful, and culturally sensitive manner." Exhibit B. Principle III describes educators' responsibility and commitment to the school community. Exhibit B. To fulfill this principle, the educator "commits to equality, equity, and inclusion of colleagues, staff, students, parents or guardians and other members of the school community; [and] respects diversity amongst colleagues, staff, students, parents or guardians, and other members of the school community." Exhibit B. New Hampshire describes consideration of cultural sensitivity, diversity, equity, and inclusion as educators' responsibility, but I fear that the Department of Education would view this approach as illegal DEI.

29. The Dear Colleague has created fear and confusion amongst teachers who do not know what or how they may teach. I regularly receive questions from teachers wondering what is allowable and how they may avoid being reported to the DEI tip line. Teachers have asked if they can still include books about Black or Indigenous history in their classroom library and if so, whether they can read these books aloud to students. I do not know what the Department of Education will consider to be DEI. I am also aware that some teachers have chosen to self-censor altogether instead of asking questions.

30. I fear that the Dover School District will lose teachers because of the confusion and fear caused by the Dear Colleague Letter. The District is already facing teacher shortages in general and special education as well as substitute teachers.

31. Beyond instruction, the Dear Colleague Letter limits Dover School District's ability to continue to create environments that are safe and affirming for students. Our commitment to equity is not abstract, it developed from our students' painful experiences and expressed interests.

    a.   Over the course of three years, the Dover School District lost three students from one class to suicide. It was, and is, excruciating. As a result, we prioritize suicide prevention, including activities specifically targeted towards marginalized populations at higher risk to experience suicide. We never want to lose another student to suicide and fear that the Department of Education could consider the work we do to ensure the livelihood of students as DEI.

    b.   In 2018, students at Dover High School sang a KKK-themed jingle threatening to "kill all the Blacks" during a lesson on post-Civil War reconstruction era lesson in a U.S. History course. The District addressed the matter with those directly involved. The shocking nature of this incident also began a broader discussion within Dover School District. A group of Black students joined together to create Project D.R.E.A.M. to pursue equity at school, holding conversations with other students and administrators about their experiences and the importance of considering various viewpoints. Ensuring that all students are welcome at Dover School District requires programs and partnerships that the Department of Education may consider DEI.

c. Dover School District may no longer be able to continue Project D.R.E.A.M., the student groups that support LGBTQIA students, and student groups committed to social justice or equity if the Department of Education considers these activities to be DEI.

32. Dover School District recently spent $1.4 million from the Elementary and Secondary School Emergency Relief (ESSER III) Fund, allotted through the Coronavirus Aid Relief and Economic Security (CARES) Act, to update its elementary and middle school curriculum to reflect the diversity of its student body. The District considered various options to spend the ESSER III funds, including after school programs, but decided that updating curriculum would be the best investment because students could use the materials for years to come. Further, the Department of Education's guidance explicitly stated that the funds may be used to support the implementation of curriculum and instructional practices that were culturally responsive and that incorporated trauma-informed pedagogy. (attached as exhibit C, at 41). Therefore, the curriculum materials the District purchased included diversity. These materials provided elementary students with background knowledge that would provide a basis of understanding for instruction in middle and high school. If the Department of Education considers this curriculum to be DEI, Dover School District will lose the value of this investment. The District does not have money in its budget to re-purchase an entire curriculum.

### Impact of the Loss of Federal Funding on Dover School District

33. On February 4, 2025, the N.H. Department of Education sent a Technical Advisory highlighting the U.S. Department of Education's actions to eliminate DEI. Both the United States and N.H. Department of Education are requiring the District to imminently certify that the District is in compliance with the Letter or risk losing vital federal funds that the District depends on.

34. The conditions to federal funds imposed by the Dear Colleague Letter and Certification Requirement also amount to coercion. This is because the financial conditions imposed in the Letter and the Requirement seem to be new and retroactive and imposed midstream in the middle of a funding cycle. Given this potential retroactivity of new requirements, my District, as a recipient, had no opportunity to knowingly accept or reject the funds based on these new conditions when funds were accepted.

35. Unless the letter is voided, Dover School District will be irreparably harmed. The loss of federal funds would be devastating and would be roughly equivalent to losing the entire staffing budget for one of our elementary schools. Taxes are capped in Dover so we would not be able to bridge the gap in revenue. Because we would still be required to fulfill our obligations to students with disabilities, we would need to reduce programming for general education students.

36. Without federal funding, I fear that the quality of education in Dover School District would suffer significantly. The average class size in our elementary schools would likely double, from 16 to 19 students per class to approximately 35 students per class. The District would no longer be able to provide any services that are not legally mandated, including the mental health services that our students need. Students may not be able to go on field trips anymore. Teacher attrition would likely increase. The loss of federal funds would be detrimental to our ability to maintain buildings and programs.

37. I am proud that Dover School District produces students who are not only academic learners but dynamic global citizens adept at the skills they need to live in a diverse society. The Dear Colleague Letter, through its vaguely worded prohibitions, threatens the essence of what keeps our learning environment a place where all students and staff are welcomed and succeed.

I declare under penalty of perjury that the foregoing is true and correct.

16

Executed this 15th day of April, 2025.

Christine Boston

# Exhibit A

# Dover School District

## Course-specific Curriculum Approval Criteria

| Criteria # 1 | **COMPETENCIES:** | a. Competencies for the course are aligned to the scope and sequence of the courses in the department. | ◯Yes ◯No |
| | | b. Competencies emphasize application and development of important skills. | ◯Yes ◯No |
| Criteria # 2 | **STANDARDS:** | a. The curriculum aligns with state and national standards. | ◯Yes ◯No |
| Criteria # 3 | **INSTRUCTIONAL PLANNING:** | a. Instructional objectives are stated clearly in terms of standards and learning targets. | ◯Yes ◯No |
| | | Course includes explicit measurable, transferable learning objectives captured in the UbD template. | ◯Yes ◯No |
| | | Curriculum reflects evidence-based practices. | |
| | | Focus is on mastery and application of skills and knowledge more than "getting through the curriculum." | |
| | | Students are asked to solve real world and authentic challenges when appropriate. | |
| Criteria # 4 | **EXPECTATION OF LEARNING:** | a. The curriculum reflects a learning progression which b. promotes student self-direction and a strength-based approach. | ◯Yes ◯No<br>◯Yes ◯No<br>◯Yes ◯No |
| Criteria # 5 | **ACCESSIBILITY:** | a. The curriculum contains appropriate content that is relevant to the diverse abilities and needs of the students. | ◯Yes ◯No |
| | | b. Curriculum materials allow teachers to offer students choice when learning. | ◯Yes ◯No |
| | | c. The curriculum is accessible to diverse students. Materials are available to support all learning needs. | ◯Yes ◯No |
| Criteria # 6 | **ASSESSMENT:** | a.The curriculum supports valid and varied formative and summative assessments. Assessments are created using Depth of Knowledge 3-4 to assess competency. | ◯Yes ◯No |
| | | Assessments focus on a variety of tasks that address multiple modalities. | ◯Yes ◯No |
| | | c. Students are required to apply their understanding, knowledge and skills for summative assessments. | ◯Yes ◯No |

*Revised 11/14/2022*

# Exhibit B

# New Hampshire Code of Ethics for Educational Professionals

**Guiding Principles:  The Code of Ethics for New Hampshire Educators**

**Statement of Purpose**

A New Hampshire educator is entrusted by the state and the public with a responsibility to teach New Hampshire's children the skills and model the values that will make each child a knowledgeable, capable, and engaged member of a democratic society.  The educator accepts the responsibility to practice within the educational profession according to the highest ethical standards and aspires to continuously and consistently make decisions which are, first and foremost, within the best interests of the student.

This "Code of Ethics for New Hampshire Educators" is created as a set of guiding principles which articulate the responsibilities common to all members of the education profession.  The Code of Ethics is designed to provide guidance to educators in the decision making process involving their interactions with students, the school community, colleagues, parents, and the public.  The principles set forth in the Code of Ethics for New Hampshire Educators should be interpreted with reference to the context of the classroom, the learning community, and the educational profession.

This Code of Ethics for Educators is created upon the recognition that teaching is a profession.  As such, there is an acknowledgement within the educational field that The Code of Ethics for New Hampshire Educators is applicable to all aspects of an educator's life.

The Code of Ethics for educators establishes guidance for all school personnel and is not intended to be a basis for civil liability nor is it designed to be a basis for employment action.  The Code of Ethics for New Hampshire Educators establishes guidance for educators.

Adopted by the State Board of Education June 13, 2018

<u>Definitions</u>

The term "student" as used in The Code of Ethics for New Hampshire Educators means an individual who is enrolled or participating in any class or program from preschool through grade-12 at any school or education institution.  "Student" includes individuals through nine months after graduation.

<u>Principle I—Responsibility and Commitment to the Education Profession and Colleagues</u>

The educator is committed to a high level of professional ethics at all times.  As such, the educator is expected to uphold and adhere to laws, regulations, policies, and procedures which are relevant to the educational profession regardless of personal viewpoints.  There is also a recognition that the decisions and actions that the educator makes, whether inside or outside of the school and classroom, may be reflective of ones' professional judgment.

In addition to holding oneself accountable to a high level of professional ethics, the educator encourages colleagues to meet the same high standards and to engage in discussions with appropriate colleagues on ethical matters.

In fulfillment of this principle, the educator:

- Values honesty and established commitments;
- Respects intellectual property and ownership rights when using or sharing materials such as lesson plans, research and assessment, curricula, syllabi, or gradebooks;
- Recognizes the possible impact and ramifications upon a colleague's professional reputation when speaking about a colleague in public and private communications;
- Communicates with colleagues in a clear, respectful, and culturally sensitive manner;
- Considers the ramifications of accepting or offering any gratuity, gift or favor which would influence or appear to influence ones' professional decisions; and
- Considers the ramifications of using institutional or professional privileges for personal or partisan advantage

<u>Principle II—Responsibility and Commitment to the Student</u>

An educator holds a position which is imbued with public trust.  As such, one of the educator's obligations is to ensure that each student is treated with dignity and respect.  An educator also establishes and maintains appropriate verbal, physical, emotional and social boundaries with every student.

In fulfillment of this principle, the educator:

- Interacts with students within appropriate settings;
- Communicates with students in a clear, respectful, and culturally sensitive manner;

- Considers the potential implications and possible perception of accepting a gift from a student and considers the potential implications and possible perception of giving a gift to a student;
- Considers the ramifications and possible perceptions of entering into an adult relationship of any kind with a former student, including but not limited to, any potential harm to the former student, public perception, and the possible impact on the professional educator's career;
- Recognizes and respects confidential information acquired in the course of employment regarding individual student safety, education, health, and personal information of students and their families.

Principle III—Responsibility and Commitment to the School Community

The educator models effective relationships and communicates responsibly among members of the school community, while maintaining appropriate professional boundaries. The educator acts in the best interests of all students by advocating for equitable educational opportunities and endeavoring to present facts with fidelity to the content and without distortion, bias or personal prejudice.

In fulfillment of this principle, the educator:

- Communicates with parents and guardians in a respectful manner which represents students' best interests;
- Has an awareness and respect of the confidential nature of material received and communicated from a variety of audiences.
- Commits to equality, equity, and inclusion of colleagues, staff, students, parents or guardians and other members of the school community;
- Respects diversity amongst colleagues, staff, students, parents or guardians, and other members of the school community;
- Considers and recognizes the potential ramifications of having a personal relationship with colleagues, staff, students, parents, or guardians and other members of the school community in consideration of the role and the perception of the educator within the classroom and the community; and
- Recognizes that the professional educator often serves multiple roles within the school, as such must consider that the varied relationships have the potential to impair ones' objectivity.

Principle IV - Responsible and ethical use of technology as it relates to students, schools, and other educational professionals

Adopted by the State Board of Education June 13, 2018

The educator considers the impact of consuming, creating, distributing and communicating information through the use of any and all types of technology.

In fulfillment of this principle, the professional educator:

- Utilizes social media responsibly, transparently and primarily for the purpose of teaching and learning;
- Considers the ramifications and  public perception of using social media;
- Exercises prudence to establish and maintain appropriate professional boundaries of time and place in all electronic communications with students.

Adopted by the State Board of Education June 13, 2018

## Commissioner's Task Force on Educator Ethics

**Membership**

Adam Marcoux (NH AFT)

Barrett Christina (NHSBA)

Carl Ladd (NHSAA)

Dean Cascadden (NHSAA), 2017

Diana Fenton (NHDOE)

Dianna Terrell (PSB), 2016

Doug Ley (NH AFT)

Frank Hoell (CTE), 2017

Gail Adams-Davis (NHASP)

Helen Honorow (NHSBE), 2016

Irv Richardson (NEA NH)

KimberlyYarlott (PSB)

Laura Waiselewski (CTE), 2016

Lorrain Tacconi-Moore (NHSAA)

Michael Perez (NHASP)

Nancy Morse (NEA NH)

Nicole Heimarck (NHDOE)

Phil Littlefield (NHSAA)

Suzanne Canali (CTE)

Virginia Clifford (NHDOE,) 2016

Adopted by the State Board of Education June 13, 2018

# New Hampshire Code of Conduct for Educational Professionals

Readopt with amendment Ed 501.01, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.01  <u>Purpose</u>.  The rules of this part implement the statutory responsibilities of the New Hampshire board of education to:

(a)  Develop and administer credential standards for educational personnel;

(b)  Develop continuing professional education requirements and prerequisites for the renewal or reinstatement of credential holders;

(c)  Develop and administer a code of conduct for all credential holders and to inform members of the public of the code of conduct applicable to credential holders;

(d)  Specify unprofessional conduct which justifies disciplinary sanctions against credential holders; and

(e)  Provide oversight of adjudicatory proceedings required for discipline of credential holders while providing such with fair hearing practices and rights of appeal.

Readopt with amendment Ed 501.02, effective 3-27-14 (Doc #10558), to read as follows:

Ed 501.02  <u>Definitions</u>.  Except where the context makes another meaning manifest, the following words shall have the meanings indicated when used in this chapter:

(a)  "Administrator" means the administrator of the bureau of credentialing;

(b)  "Authorization" means a document issued by the department giving permission for a person to serve in the role of a licensed educator prior to completing the licensure endorsement requirements for that role, or for a temporary period of time established by the document;

(c)  "Board" means the state board of education created by RSA 21-N:10;

(d)  "Bureau" means the bureau of credentialing, division of program support, department of education;

(e)  "Certificate" means the document issued when a credential holder meets full licensure requirements;

(f)  "Commissioner" means the commissioner, department of education;

(g)  "Credential" means any authorization or license issued by the bureau including, but not limited to, beginning educator license (BEL), experienced educator license (EEL), in process of licensure authorization (IPLA), intern authorization (IA), emergency authorization, statement of eligibility (SOE), paraeducator I & II, school nurse, and master teacher license (MTL);

(h)  "Credential holder" means any individual who holds a credential, as defined in Ed 501.02(g);

(i)  "Denial" means the refusal to grant credential to an applicant;

(j)  "Department" means the New Hampshire department of education;

(k)  "Director" means the director, division of program support;

(l)  "Division" means the division of program support;

(m)  "Educator" means any professional employee of any school district whose position requires certification by the state board pursuant to RSA 189:39.  Administrators, specialists, and teachers are included within the definition of this term;

(n)  "Emergency authorization" means the authorization issued by the bureau to a school district or school administrative unit to employ a non-credentialed educator to fill a vacancy as specified in Ed 504.04;

(o)  "Endorsement" means the specific subject area for which the credential is issued;

(p)  "Intern authorization" means the authorization granted to applicants pursuant to Ed 505.04, and Ed 505.05 to perform educational services while the plans are being implemented;

(q)  "License" means the document issued when a credential holder meets full licensure requirements;

(r)  "Licensure" means the official recognition by the board that an individual has met minimum requirements and is approved to practice in their endorsement area(s);

(s)  "Mentor" means a person who:

    (1)  Is appointed to provide assistance to an applicant for certification pursuant to Ed 505.04 or Ed 505.05; and

    (2)  Meets at least one of the following qualifications:

        a. Is a credential holder with 3 years of experience as an educator in the area of endorsement; or

        b.  Has experience equivalent to the experience requirement under a. above such as, but not limited to, involvement in a collegiate teacher preparation program;

(t)  "Professional conduct" means a set of established professional norms and behaviors as defined in Ed 510.01 through Ed 510.04 which extend beyond the workplace;

(u)  "Reprimand" means is a note to file of a credential holder for his or her conduct, which does not rise to the level of a suspension or revocation of a credential, which can be used in the event of a subsequent investigation;

(v)  "Revocation" means the department has permanently rescinded a credential from credential holder;

(w)  "Statement of eligibility" means a verification issued by the department of education that indicates that an individual has successfully met the entry requirements of an intern authorization for:

(1)  Pathway 4 certification as specified in Ed 505.04; or

(2)  Pathway 5 certification as specified in Ed 505.05;

(x)  "Suspension" means the department has rescinded a credential from credential holder for a specified period of time; and

(y)  "Student" means an individual who is enrolled or participating in any class or program from preschool through grade-12, or any "adult student" as specified in Ed 1102.01(f)(1), at any school or education institution except as otherwise noted in these rules.

Readopt with amendment Ed 502.01, effective 3-27-14 (Doc. #10558), to read as follows:

PART Ed 502  PUBLIC INFORMATION

Ed 502.01  <u>Confidentiality of Credential Holder Certification Records</u>.

(a)  Pursuant to RSA 91-A:5, V, the following limited credential status information shall be available to the general public, upon written or verbal request:

(1)  The name of the credential holder;

(2)  The individual's current credential status, including type of credential, expiration date of credential, and all endorsements;

(3)  The individual's suspension, if applicable, including effective dates of each suspension period, reason for the suspension, and revocation, if applicable; and

(4)  The school, if known or stated, where the credential holder is currently employed.

(b)  The provisions of this section shall not require the release of information related to:

(1)  Informal or formal investigations; or

(2)  Board or hearing officer records from adjudicatory proceedings involving the credential holder when such adjudicatory proceeding is not open to the public in accordance with Ed 200.

(c)  The complete record of a credential holder shall be released by the division upon written request to the following:

(1)  A party in an adjudicatory proceeding when:

a.  The credential holder is a party to the proceeding; and

b.  The credential holder's credential record is relevant to the proceeding;

(2)  A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

(3)  A certifying agency of another jurisdiction for:

    a.  Purposes of credentialing the credential holder in the other jurisdiction; or

    b.  An investigation of the credential holder by the other jurisdiction, when:

        1.  The credential holder was the subject of a formal investigation under Ed 511; or

        2.  Disciplinary action was taken against the credential holder by the board under Ed 511;

(4)  Board investigators or prosecutors; or

(5)  Persons to whom the credential holder has given a release.

(d)  The bureau shall report:

(1)  Any suspension or revocation to the credential holder's current superintendent of school in N.H. and The National Association of State Directors of Teacher Education and Certification (NASDTEC) educator identification clearing house; and

(2)  Any reprimand to the credential holder's current superintendent of school in N.H.;

(e)  The department shall maintain a list of all credential holders whose credential~~s has~~ **have** been revoked or who are under suspension, and such list shall be published on the department's website.

Readopt with amendment Ed 504.04, effective 1-17-14 (Doc. #10506), to read as follows:

Ed 504.04  <u>Emergency Authorization</u>.

(a)  The superintendent of schools shall request emergency authorization from the bureau, and the emergency authorization shall be granted provided that the requirements of paragraphs (b) through (e) are met. The applicant for the teaching position shall provide the information and documentation required in (c) and (e) below.

(b)  The bureau shall issue an emergency authorization applied for under (a) above if an emergency situation exists as determined by the local school district and the applicant for the teaching position has:

(1)  Paid the applicable application fee, provided in Ed 508.06(c); and

(2)  Filed with the bureau the information and documentation required in (c) and (e).

(c)  An applicant for a teaching position for whom a superintendent is requesting emergency authorization shall provide the following information or documents, unless it is specified below that the information is optional, on or with the form titled "Application for Emergency Authorization":

(1)  Social security number, unless the applicant chooses to have the department supply an alternative number, subject to the provisions of (d) and (e) below;

(2)  Date of birth;

(3)  Name;

(4)  Address;

(5)  Sex, which may be specified at the option of the applicant;

(6)  Telephone number;

(7)  Date of application;

(8)  Educational information, including the following:

    a.  Degree, if any;

    b.  Major;

    c.  State;

    d.  College or university;

    e.  Date degree granted; and

    f.  Transcript for each degree listed;

(9)  Educational employment record for the last 7 years including:

    a.  Dates;

    b.  State;

    c.  School district;

    d.  Position;

    e.  Assignment/subject;

    f.  Grade level;

    g.  Credential held;

    h.  Number of years of any public school experience;

    i.  Number of years of any non-public school experience; and

    j.  Copy of each teaching credential held in New Hampshire , other state, or both;

(10)  Whether the applicant ever held a New Hampshire credential and, if so, the year it expired and the name under which it was issued;

(11)  Whether the applicant has ever been convicted of a felony and, if so, an explanation;

(12)  Whether the applicant has ever had a teaching credential revoked or suspended and, if so, an explanation;

(13)  Whether the applicant has ever surrendered a teaching credential in any other state, and, if so, an explanation;

(14)  Whether the applicant has ever been subject of a finding of professional misconduct in New Hampshire, another state, or territory of the United States, or foreign country and, if so, an explanation; and

(15)  Identification of ethnic origin, which may be specified at the option of the applicant, including one of the following categories:

    a.  American Indian;

    b.  Asian/Pacific;

    c.  African-American/Non-Hispanic;

    d.  White/Non-Hispanic;

    e.  Hispanic;

    f.  Multi-ethnic; and

    g.  Other/do not wish to specify.

(d)  If an applicant provides a social security number under (c)(1) above, the social security number shall be used by the bureau for the purposes of generating data on teacher salaries or such other purposes as authorized by law including but not limited to RSA 161-B:11,VI-a.

(e)  If an applicant chooses to have the department supply an alternative number, the department shall use the teacher number generated by the electronic educator information system and it shall be used as specified in (b).

(f)  An emergency authorization shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Readopt with amendment and renumber Ed 504.041, effective 1-17-14 (Doc. #10506), as Ed 504.05, and renumber the remaining sections in Part Ed 504 so that, for example, Ed 504.05 becomes Ed 504.06, to read as follows:

Ed 504.05  In Process of Licensure Authorization (IPLA).

(a)  The applicant who is in process of licensure authorization (IPLA) shall sign the application acknowledging that all information contained on the application is true, accurate and complete to the best of the applicant's knowledge.

(b)  If a superintendent files an IPLA with the bureau, the bureau shall approve such filing, if the bureau finds that the applicant who is the subject of the IPLA:

(1)  Is in the process of certification;

(2)  Has submitted a completed application for certification; and

(3)  Has paid any applicable fees.

(c)  An approved IPLA shall be issued to the superintendent of schools for up to one school year and shall not be renewable.

Adopt Ed 510.01 – 510.04, cited and to read as follows:

PART Ed 510 CODE OF CONDUCT

Ed 510.01  <u>Principle 1—Responsibility to the Education Profession and Educational Professionals</u>.

(a)  In fulfilling responsibilities to the education profession and educational professionals, a credential holder shall exemplify honesty and integrity in the course of professional practice.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Discrimination against a fellow professional as specified in RSA 354-A:1;

(2)  Failure to self-report within 5 business days if he or she has been arrested for any violation of offenses enumerated in RSA 189:13-a, V;

(3)  Falsifying, fraudulently altering, or deliberately misrepresenting professional qualifications, including, but not limited to, degrees, academic awards, and related employment history when applying for a credential;

(4)  Unlawful possession of a drug;

(5)  Possessing, using, or being under the influence of alcohol or drugs not prescribed for the use of the credential holder when on school premises or at a school sponsored activity where students are present or may reasonably be expected to be present;

(6)  Failure to notify the state at the time of application for credential of past criminal convictions, or of revocations or suspensions of a credential or license by New Hampshire or any other jurisdiction; and

(7)  Falsifying or deliberately misrepresenting information submitted to the department in the course of an official inquiry, investigation, or both.

Ed 510.02  <u>Principle 2—Responsibility to Students</u>.

(a)  In fulfilling responsibilities to students a credential holder shall maintain a professional relationship with all students, both inside and outside the educational setting, and make reasonable efforts to protect students from conditions which are harmful to their health and safety.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Discrimination against a student as specified in RSA 354-A:1;

(2) Failure to provide appropriate supervision of students, pursuant to local school district policy adopted as specified in Ed 306.04, at school or school-sponsored activities or the failure to ensure the safety and well-being of students;

(3) Furnishing alcohol or illegal or unauthorized drugs to any students, or allowing or encouraging a student to consume alcohol or illegal or unauthorized drugs;

(4) Committing any of the following acts to any minor, or any student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), including, but not limited to:

  a. Abuse, including, but not limited to physical and emotional abuse;

  b. Cruelty or any act of endangerment;

  c. Any sexual act with or from any student; and

  d. Harassment as defined by state or federal law or regulations;

(5) Soliciting or encouraging participation in a romantic or sexual relationship, whether written, verbal, or physical, with a student the credential holder knows or should know is a student or prior student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1); and

(6) Soliciting a student, or a former student up to 10 months after the student's graduation, departure, or departure in cases as specified in Ed 1102.01(f)(1), to engage in any illegal activity.

Ed 510.03    Principle 3—Responsibility to the School Community.

(a) In fulfilling the responsibilities to the school community a credential holder shall communicate responsibly among members of the school community, while maintaining appropriate professional boundaries.

(b) Unprofessional conduct shall include, but not be limited to:

(1) Discrimination against a parent or guardian of a student or other member of the community who is on the school property as specified in RSA 354-A:1;

(2) Accepting or soliciting gratuities, gifts, or favors for personal use or gain where there might be an actual or appearance of a conflict of interest. Gifts of a small amount shall not be deemed a conflict of interest;

(3) Misuse of funds intended for use by the school, to include funds which are collected from parents and students; and

(4) Intentionally altering or misrepresenting student assessments, assessment results, or official school records.

Ed 510.04    Principle 4—Responsible and Ethical Use of Technology

(a)  In fulfilling the responsibilities and ethical use of technology a credential holder shall consider the impact of consuming, creating, distributing, and communicating information through the use of any and all types of technology.

(b)  Unprofessional conduct shall include, but not be limited to:

(1)  Engaging in any activities as specified in Ed 510.02(b)(4)-(7) via electronic media with a student or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1); and

(2)  Engaging in inappropriate communication with a student, or former student up to 10 months after the student's graduation, departure, or departure as specified in Ed 1102.01(f)(1) via electronic media.

(c)  For the purposes of this section, inappropriate communication shall be determined by considering:

(1)  The intent, timing, subject matter, and amount of communication; and

(2)  Whether:

a.  The communication made was covert in nature;

b.  The communication could reasonably be interpreted as solicitous, sexually explicit, or romantic in nature; and

c.  The communication involved discussion(s) of the physical or sexual attractiveness or the sexual activities or fantasies of either the credential holder or the student.

Readopt with amendment and renumber Ed 510.01, effective 2-23-12 (Doc #10089), as Ed 510.05 to read as follows:

Ed 510.05  Duty to Report.

(a)  Any credential holder shall report any suspected violation of the code of conduct following the school, school district, or SAU reporting procedures.

(b)  Each principal shall report to the superintendent of the school district or SAU where the principal is employed, the chief executive officer of a chartered public school or public academy, or the headmaster of a nonpublic school, if the principal has been notified of, or is personally aware that a credential holder has violated any of the rules of professional conduct as enumerated in Ed 510, which occurred on or off duty.

(c)  The superintendent, chief executive officer of a chartered public school or public academy, or headmaster of a nonpublic school, shall report any of the following to the office of credentialing:.

(1)  When a superintendent has knowledge that an credential holder, as defined in Ed 501.02(m), has been arrested and charged with an offense enumerated in RSA 189:13-a, V; and

(2)  When a superintendent has knowledge that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04.

(d)  If a credential holder suspects that a superintendent has violated the code of conduct, as specified in Ed 510.01 through Ed 510.04, or if a credential holder has made a report and believes the local reporting procedures have not been followed, the reporting credential holder shall notify the department directly.

(e)  Credential holders who have reason to suspect that a student has been, or is being, abused or neglected, shall report the same to:

(1)  His or her immediate supervisor, superintendent, or both; and

(2)  The department of health and human services, pursuant to RSA 169-C:29.

(f)  If the department has reason to suspect that any violation of the code of conduct enumerated in Ed 510.01 through Ed 510.04 was known by a credential holder and not reported, the department shall undertake an  investigation, as enumerated in Ed 511.01, against that credential holder as required by Ed 510.05(a), (b), or (c).

(g)  The office of credentialing shall open a case, as enumerated in Ed 511.01, in response to a report made pursuant to Ed 510.05(a), (b), (c), or (d) above.

Adopt Ed 511.01, cited and to read as follows:

PART Ed 511 INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS

Ed 511.01    Complaints, Cases and Investigations.

(a)  A case shall be opened when a complaint of possible misconduct against a credential holder has come to the attention of the department either through direct reporting or other means.

(b)  After an initial review, if the department determines that a possible violation of the code of conduct, as specified in Ed 510.01 through 510.04, has occurred, an investigation shall be opened.

(c)  Investigations into allegations of unprofessional conduct, as specified in Ed 510.01 to Ed 510.04, shall not constitute a disciplinary hearing and shall not constitute an finding of misconduct against a credential holder.

(d)  Credential holders shall be notified in writing, via certified mail, that an investigation has been opened and the nature of the investigation and the status of the credential holder's credential pending the investigation.

(e) The credential holder's current superintendent shall be notified in writing by the department that an investigation has been opened, unless the notification compromises, or has the appearance of compromising, the investigation.

(f) Investigations shall be handled by the department.

(g) The department shall make every attempt to interview all people, including the credential holder, who might have information which might be relevant to the investigation.

(h) Investigations, including those based upon allegations in a complaint, shall be conducted on an ex parte basis.

(i) The department shall make every attempt to obtain any and all documentation which might be relevant to the investigation.

(j) Once the investigation is complete, the following procedures shall apply:

> (1) The department shall create a report which documents the results of the investigation;

> (2) If the investigation finds a credential holder in violation of a rule of the code of conduct as specified in Ed 510.01 through Ed 510.04, the department shall propose a form of discipline as follows:

>> a. Suspension;

>> b. Revocation; or

>> c. Reprimand; and

> (3) The department shall determine the sanctions to be imposed after considering the presence of aggravating or mitigating circumstances as specified in Ed 511.01(j)(4)-(5);

> (4) The following shall be considered aggravating circumstances:

>> a. The seriousness of the offense;

>> b. The credential holder's prior disciplinary record;

>> c. The credential holder's lack of willingness to cooperate with the department during an investigation;

>> d. Potential harm to public health and safety; and

>> e. The purpose of the rule violated;

> (5) The following shall be considered mitigating circumstances:

>> a. Absence of a prior disciplinary record;

      b.  The credential holder's willingness to cooperate with the department during an investigation;

      c.  The credential holder's acknowledgment of his or her wrongdoing; and

      e.  The purpose of the rule or statute violated;

  (6)  The credential holder shall be notified in writing of any proposed discipline;

  (7)  If no disciplinary sanction is proposed, the department shall notify the credential holder in writing that the investigation is closed.

(k)  Investigatory reports and all information gathered during the course of an investigation shall be confidential, with the following exceptions:

  (1) The report shall be made available to the parties in any adjudicatory proceedings resulting therefrom; and

  (2)  If further disciplinary proceedings are to be conducted as a result of the investigation, the department shall provide information gathered in the disciplinary investigation to the following:

      a.  A law enforcement agency when the agency is conducting a criminal investigation of the credential holder;

      b.  A certifying agency of another jurisdiction for:

         1.  Purposes of certification of the credential holder in the other jurisdiction; or

         2. An investigation of the credential holder by the other jurisdiction when:

            (i)  The credential holder was the subject of a formal investigation under Ed 510.1; or

            (ii)  Disciplinary action was taken against the credential holder by the board pursuant to Ed 510.1;

      c.  Other states' licensing board investigators or prosecutors; and

      d.  Expert witnesses or assistants retained by a prosecutor or investigator in the same related disciplinary matters.

Readopt with amendment and renumber Ed 510.03, effective 2-23-12 (Doc #10089), as Ed 511.02 to read as follows:

Ed 511.02 <u>Reprimand, Suspension, or Revocation</u>.

(a)  If the department determines that a credential holder has violated the code of conduct as specified in Ed 510.01 through Ed 510.04, and the credential holder agrees to the proposed disciplinary finding, the credential holder shall agree to a reprimand, suspension, or revocation.

(b)  All reprimands, suspensions, or revocations shall be documented in writing, and shall set out the terms of the discipline.  The credential holder shall receive a copy of the discipline in writing and a copy shall be placed in the credential holder's electronic credentialing file at the department once it is signed by all required parties, to include the credential holder.

(c)  Any credential holder whose credential is revoked or who voluntarily agrees to a revocation shall be prohibited from applying or reapplying for any other credential issued by the New Hampshire state board of education.

Readopt with amendment and renumber Ed 510.02, effective 2-23-12 (Doc #10089), as Ed 511.03 to read as follows:

Ed 511.03  <u>Disciplinary Hearings</u>.

(a)  If a credential holder does not agree with the proposed disciplinary finding as a result of an investigation as specified in Ed 511.01, a credential holder may request an adjudicatory hearing which shall commence pursuant to Ed 200 after the following:

(1)  Completion of an informal or formal investigation; and

(2)  Filing of a written report and recommendation pursuant to Ed 511.01(h).

(b)  The provisions of Ed 200 shall apply to all disciplinary hearings and ***such hearings*** shall commence not more than 15 days after the disciplinary finding.

Readopt with amendment and renumber Ed 510.04, effective 2-23-12 (Doc #10089), as Ed 511.04 to read as follows:

Ed 511.0~~4~~  <u>Status of a Credential Pending Completion of Disciplinary Proceeding</u>.

(a)  When the department receives information indicating that a credential holder has been arrested for one of the offenses enumerated in RSA 189:13-a, V, the credential holder's credential and any and all endorsements shall be immediately suspended pursuant to RSA 541-A:30, III.

(b)  The department shall notify the credential holder and the employing school district that the credential holder's credential has been suspended pending an investigation by the department.

(c)  In accordance with RSA 541-A:30*,* III, unless waived, an adjudicatory hearing shall commence within 10 working days after the suspension of the credential. Such hearings shall be governed by the process set forth in Ed 200.

Readopt with amendment and renumber Ed 511.03, effective 2-23-12 (Doc #10089), as Ed 511.05 to read as follows:

Ed 511.05 <u>Grounds for Reinstatement After Suspension</u>.

(a)  A credential which has been suspended shall be reinstated for one of the following reasons:

(1)  The period of the suspension has passed and any and all terms and conditions regarding possible reinstatement have been satisfied; and

(2)  A credential holder whose credential has been suspended demonstrates by clear and convincing evidence that he or she has corrected the deficiencies or conduct which led to the original suspension.

(b)  Upon reinstatement, the department may issue a credential which is limited in time, level, or scope or subject to other terms as the department deems necessary to include a reinstatement fee. If the credential is so limited, then the credential holder may appeal that decision using the process specified in Ed 200.

Change the Part heading and renumber Part Ed 511 as Part Ed 512 to read as follows:

PART Ed 512  DENIAL OF CERTIFICATION

Readopt with amendment and renumber Ed 508.07, effective 6-15-13 (Doc. #10362) as Ed 512.01, and renumber the existing Ed 512 and Ed 513 as Ed 513 and Ed 514, so that Ed 512.01 reads as follows:

Ed 512.01  <u>Denial of Credential</u>.

(a)  A credential application shall be denied by the board based on the following grounds:

(1)  Failure to meet the conditions for issuance of the license, endorsement, renewal, or reinstatement;

(2) The applicant has been charged pending disposition for, or convicted of any violation or attempted violation of any of the crimes enumerated in RSA 189:13-a, or has been convicted of any felony in any other state, territory, or country;

(4) The applicant is under investigation for, under suspension for, or has been revoked for a violation of the principles of professional conduct enumerated in Ed 510.01 through Ed 510.04; or

(5) The applicant is under investigation, under suspension, or has been revoked in any other state, jurisdiction, territory, or country.

(b)  An applicant aggrieved by the decision of the bureau to deny an application may file a petition for reconsideration along with supporting documentation to the director within 20 days after receipt of the denial decision.  If the petition for reconsideration is denied, the applicant may appeal the director's decision pursuant to RSA 21-N:11, III, and Ed 200.

**APPENDIX I**

| RULE | STATUTE |
|---|---|
| Ed 501 | RSA 186:8, II; RSA 189:39 |
| Ed 502 | RSA 186:11, X(a) |
| Ed 510 | RSA 186:11, X(a) |
| Ed 511 | RSA 186:11, X(a); RSA 189:14-a, (b) and (c) |
| Ed 512 | RSA 186:11, X(a) |

# Exhibit C

**Frequently Asked Questions**

**Elementary and Secondary School Emergency Relief Programs
Governor's Emergency Education Relief Programs**



**U.S. Department of Education
Washington, D.C. 20202**

**December 7, 2022 Update\***

\*Update of May 2021 ESSER and GEER Use of Funds FAQs

# Table of Contents

Table of Contents ........................................................................................................................4

Introduction ............................................................................................................................. 10

Overview of ESSER and GEER Funds ................................................................................... 10

A-1. What funds are covered in these FAQs? ........................................................................ 11

*ESSER Formula Funds to LEAs* ............................................................................................. 12

A-2. How does an SEA allocate ESSER formula funds to LEAs? ........................................ 12

A-3. How may an LEA use ESSER funds? ............................................................................ 12

A-4. Does ARP ESSER include any new provisions for LEAs that ESSER I and ESSER II do not? ... 15

A-4.a. Are LEAs required to periodically review their ARP ESSER safe return to in-person instruction and continuity of services plans? (*New December 7, 2022*) .................... 17

A-4.b. In meeting the ARP ESSER requirement to use at least 20 percent of its ARP ESSER allocation to address the academic impact of lost instructional time and address the disproportionate impact of COVID-19 on underserved populations, may an LEA include the costs associated with implementing an evidence-based strategy that advances this purpose? (*New December 7, 2022*)................ 17

A-5. Is there a deadline by which an SEA must award ESSER funds to LEAs? ................................... 17

A-6. May an SEA or a State legislature limit an LEA's use of ESSER formula funds? ....................... 17

A-7. May an SEA or a State legislature limit how long an LEA has to access or spend its ESSER formula funds? ............................................................................................................... 18

*ESSER Funds Reserved at the SEA Level* .............................................................................. 18

A-8. May an SEA reserve any ESSER I and II funds for the SEA's use? ............................................ 18

A-9. May an SEA reserve any ARP ESSER funds for the SEA's use?................................................ 18

A-10. What does it mean for a program to be evidence-based? ............................................. 19

A-11. Must an SEA engage in meaningful consultation before determining how to use the ARP ESSER funds it reserves?.................................................................................................................... 19

A-12. How may an SEA use its ESSER SEA Reserve funds? ............................................................. 20

*GEER* ...................................................................................................................................... 20

A-13. Which entities may receive emergency grants from a Governor through the GEER Fund? ........ 20

A-14. Is a Governor required to award GEER funds to each category of eligible entities (i.e., LEAs, IHEs, and education-related entities)? ...................................................................................... 20

A-15. How may an LEA use GEER funds?............................................................................................ 21

*Other Provisions* .................................................................................................................... 21

A-16. Do the requirements in the Uniform Guidance apply to ESSER and GEER Funds? .................. 21

A-17. May ESSER and GEER funds be used in combination with ("braided with") other funding? .... 22

A-18. Is there a "supplement not supplant" requirement for ESSER and GEER funds?....................... 22

A-19. Do CARES Act funds need to be obligated prior to obligating CRRSA Act and ARP Act funds? ............................................................................................................................................. 23

A-20. Do the Buy American Act provisions apply to ESSER and GEER?.............................................23

A-21. May ESSER and GEER funds be used to improve cybersecurity? ...............................................23

A-22. May an SEA or LEA use ESSER and GEER funds to develop or implement an innovative approach to providing instruction to accelerate learning and mitigate the effects of lost instructional time for those students most impacted by the COVID-19 pandemic?....................................................24

A-23. Which disposition rules must States and LEAs follow for equipment and supplies purchased with ESSER and GEER funds? (*New December 7, 2022*).............................................................................24

A-24. May an LEA or another subrecipient award subgrants with ESSER and GEER funds? (*New December 7, 2022*)........................................................................................................................................25

B. Reopening Schools Safely and Promoting the Health and Safety of Students, Staff, and the School Community ...............................................................................................................................................26

B-1. What resources are available to support the safe reopening and sustained operations of schools? 26

B-2. Is COVID-19 testing for students and LEA staff an allowable use of ESSER and GEER funds? . 26

B-3. May ESSER and GEER funds be used to provide COVID-19 vaccinations to LEA teachers, staff, and eligible students?.................................................................................................................................27

B-4. May ESSER and GEER funds be used for personal protective equipment (PPE), cleaning and sanitizing materials, and related supplies necessary to maintain school operations during and after the COVID-19 pandemic? .................................................................................................................................27

B-5. How might an LEA use ESSER and GEER funds to engage stakeholders to build confidence in an LEA's plan for safe return to in-person instruction and continuity of services? ...................................27

B-6. May ESSER and GEER funds be used for construction? (*Updated December 7, 2022*) ...............28

B-6.a. May a State determine the process for granting prior approval to an LEA to use ESSER or GEER funds for capital expenditures? (*New December 7, 2022*).........................................................30

B-6.b. What information does the Department need in order to consider a State's prior approval request for a State's capital expenditures? (*New December 7, 2022*) ..................................................................31

B-6.c. Is a grantee/subgrantee required to complete an environmental impact assessment under 34 CFR § 75.601 and the National Environmental Policy Act (NEPA) for a construction, renovation, or real property project supported by ESSER or GEER funds? (*New December 7, 2022*)...............................32

B-6.d. What are grantee and subgrantee responsibilities under the requirements in section 106 of the National Historic Preservation Act? (*New December 7, 2022*) ..............................................................32

B-6.e. What are the Federal reporting requirements associated with using ESSER and GEER funds to purchase land, construct a building, or make improvements to a building? (*New December 7, 2022*) ..33

B-7. May ESSER and GEER funds be used for renovation, including for such projects as making improvements to a school facility to improve indoor air quality (such as heating, ventilation, and air conditioning (HVAC) systems), and projects that would promote social distancing and safe in-person instruction? (*Updated December 7, 2022*) ................................................................................................33

B-8. May an LEA use ESSER and GEER funds to purchase trailers or modular units?........................34

B-9. May an LEA use ESSER and GEER funds to renovate, remodel, or construct athletic facilities, such as swimming pools, playing fields, or sports stadiums? (*New December 7, 2022*)......................35

B-10. May ESSER and GEER funds be used to mitigate flood, tornado, and other natural disaster-related damage, including damage to buildings/infrastructure, technology, and equipment, to ensure that schools can open and safely remain open? (*New December 7, 2022*) ..............................................35

B-11. May ESSER and GEER funds be used to support costs for utilities or gasoline? (*New December 7, 2022*) ........................................................................................................................ 36

B-12. May ESSER and GEER funds be used to pay student fees for activities such as art, music, and theater classes? (*New December 7, 2022*) ................................................................................ 36

B-13. May ESSER and GEER funds be used to provide students with safe, healthy, and supportive learning environments? (*New December 7, 2022*) ............................................................... 36

B-14. May ESSER and GEER funds be used for the cost of purchasing and installing video systems for security purposes? (*New December 7, 2022*) ..................................................................... 37

C. Advancing Educational Equity in COVID-19 Response ....................................................... 39

*Overall Equity Considerations* ................................................................................................ 39

C-1. What should each State and LEA consider in order to ensure that ESSER and GEER funds are equitably allocated among schools? ...................................................................................... 39

C-2. How may an LEA use ESSER and GEER funds to support students who have lost instructional time due to the COVID-19 pandemic? ..................................................................................... 40

C-3. How may an LEA use ESSER and GEER funds to support students' social, emotional, mental health, and academic needs, including by hiring support personnel such as nurses, counselors, and social workers? ...................................................................................................................... 40

*Focusing on Student Groups Most Impacted by the Pandemic* .............................................. 41

C-4. How may an LEA use ESSER and GEER funds to support English learners (also referred to as multilingual learners)? .............................................................................................................. 41

C-4.a. In addition to the approaches described in FAQ C-4, how may ESSER and GEER funds support multilingual learners? (*New December 7, 2022*) ................................................................. 42

C-4.b. In addition to the approaches described in FAQ C-4 and C-4.a., how may ESSER and GEER funds support family engagement for multilingual learners? (*New December 7, 2022*) ....... 43

C-4.c. How may ESSER and GEER funds support assessments for multilingual learners? (*New December 7, 2022*) ................................................................................................................... 43

C-5. How may an LEA use ESSER and GEER funds to support the needs of children with disabilities under the IDEA? ........................................................................................................................ 44

C-6. How may an LEA use ESSER and GEER funds to support students with disabilities who are not IDEA-eligible but who receive services in accordance with a Section 504 plan? .................. 48

C-7. How may ESSER and GEER funds be used to support students experiencing homelessness? ...... 48

C-8. How may an LEA use ESSER and GEER funds to serve children and youth in foster care? ........ 49

C-9. How may an LEA use ESSER and GEER funds to support migratory students? ......................... 50

C-10. How may ESSER and GEER funds support students who are in correctional facilities, including those who are served under the Title I, Part D programs for students who are neglected, delinquent, or at risk? ......................................................................................................................................... 50

*Interventions and Strategies for Consideration* ..................................................................... 51

C-11. How may an LEA use ESSER and GEER funds to address chronic absenteeism? (*Updated December 7, 2022*) ................................................................................................................... 51

C-11.a. How may ESSER and GEER funds be used to support early warning indicator systems? (*New December 7, 2022*) ................................................................................................................... 52

C-12. How may an SEA or LEA use ESSER and GEER funds to improve its data systems and its transparency when reporting to the public? ........................................................................................ 52

C-13. How may an LEA use ESSER and GEER funds to support full-service community schools? .... 53

C-14. How may ESSER and GEER funds be used to support mental health services for students and educators facing COVID-19 pandemic-related trauma? (*Updated December 7, 2022*) ....................... 54

C-15. How may an LEA use ESSER and GEER funds to support evidence-based literacy programs? . 56

C-16. May an LEA use ESSER and GEER funds to provide meals for students? (*Updated December 7, 2022*) .................................................................................................................................................. 57

C-16.a. May ESSER and GEER funds be used to cover the costs of waiving the outstanding school meals balance of a student from low-income backgrounds? (*New December 7, 2022*) ...................... 57

C-17. How may an LEA use ESSER and GEER funds to specifically support high school seniors? .... 57

C-18. May an LEA use ESSER and GEER funds to support students who graduated high school in the class of 2020 (and students who will graduate in 2021) who have not yet successfully transitioned to college or careers? ................................................................................................................................. 58

C-19. May an LEA use ESSER and GEER funds to support distance learning, including the purchase of educational technology for student use? ............................................................................................ 58

C-20. May an LEA use ESSER and GEER funds for a pre-kindergarten or other early childhood education program? ................................................................................................................................. 58

C-21. May ESSER and GEER funds be used to serve adults, including English learners, who are eligible to be served under the Adult Education and Family Literacy Act? ............................................ 59

C-22. May ESSER and GEER funds be used for career and technical education? ................................ 59

C-23. May ESSER and GEER funds be used to re-engage students who have not been able to participate in in-person and/or remote instruction during the COVID-19 pandemic? ........................... 60

C-23.a. May ESSER and GEER funds be used to provide incentive payments directly to parents and students to encourage students to attend school? (*New December 7, 2022*) ........................................ 60

C-24. May ESSER and GEER funds be used to implement community violence intervention strategies? .................................................................................................................................................................. 60

*Summer Learning and Enrichment* .......................................................................................................... 61

C-25. What kinds of summer programs may ESSER and GEER funds support? ................................... 61

C-26. May ESSER and GEER funds be used for summer job or service-learning programs for high school students? .................................................................................................................................... 61

C-27. Do Federal procurement requirements permit noncompetitive procurements, if necessary, to enable an SEA or LEA to use ARP ESSER funds to operate a summer enrichment program in 2021? 61

D. Using ESSER and GEER Funds to Support Educators and Other School Staff .................................... 63

D-1. May ESSER and GEER funds be used to stabilize and support the educator workforce? (*Updated December 7, 2022*) .................................................................................................................................. 63

D-1.a. How may ESSER and GEER funds be leveraged with funding and initiatives of other Federal agencies to promote education workforce stability? (*New December 7, 2022*) ..................................... 64

D-2. May an LEA use ESSER and GEER funds to hire additional health support staff? ..................... 64

D-3. Must an entity that receives ESSER or GEER funds under the CARES Act or CRRSA Act continue to pay employees and contractors, to the greatest extent practicable, during the period of any disruptions or closures related to COVID-19? ....................................................................................... 65

D-4. May an LEA use ESSER and GEER funds to pay overtime to its salaried custodians and other staff in order to prepare for a safe reopening of schools and sustain safe school operations?................65

D-5. May an LEA use ESSER and GEER funds to provide childcare services or instructional supervision to the children of teachers and other staff in order to enable them to return to their teaching or other school responsibilities?.................................................................................................65

D-6. May an LEA use ESSER and GEER funds to provide "premium pay" or other additional compensation for teachers, principals, and other school personnel, including school nutrition staff and custodians?................................................................................................................................65

D-7. May an LEA that has experienced significant, unbudgeted increases in unemployment costs use ESSER and GEER funds to pay for those costs?...................................................................................65

E. Additional Fiscal Considerations....................................................................................................67

*Timelines for Obligating Funds* ..........................................................................................................67

E-1. What is the timeline for a Governor, SEA, or LEA to obligate funds under ESSER I and GEER I? (*Updated December 7, 2022*)......................................................................................................................67

E-2. What is the timeline for a Governor, SEA, or LEA to obligate funds under ESSER II and GEER II? (*Updated December 7, 2022*) ................................................................................................................67

E-3. What is the timeline for an SEA or LEA to obligate funds under ARP ESSER? ..........................67

E-3.a. May an SEA establish a shorter period of availability for awards made from the ESSER State Reserve than the full period of availability under the applicable ESSER program? (*New December 7, 2022*) ..........................................................................................................................................................68

E-3.b. When must ESSER I, ESSER II, ARP ESSER, GEER I, and GEER II funds be liquidated? (*New December 7, 2022*)....................................................................................................................................68

E-3.c. What happens to ESSER and GEER funds that are unobligated at the end of the Tydings Amendment deadline? (*New December 7, 2022*) ..................................................................................68

E-3.d. How long may ESSER or GEER-funded activities continue after the liquidation period? (*New December 7, 2022*)....................................................................................................................................68

*Administrative Funds and Indirect Costs* ..............................................................................................69

E-4. May a Governor or SEA reserve ESSER or GEER funds for administrative costs? .....................69

E-5. May an LEA use ESSER or GEER funds to defray the costs of administering the program?........70

E-6. May a Governor or SEA determine what constitutes a reasonable and necessary amount of funds necessary for an LEA to effectively administer the program?................................................................70

E-7. May an SEA or LEA consolidate ESSER and GEER administrative funds? .................................70

E-8. May an LEA charge indirect costs to its ESSER or GEER Fund subgrant?..................................71

E-9. How might ESSER or GEER funds affect an SEA's or LEA's indirect cost recoveries? .............71

*Revenue Loss*.........................................................................................................................................71

E-10. May an SEA or LEA use ESSER and GEER funds to supplement or restore its "rainy day" fund rather than use the funds for specific purposes? ..................................................................................71

E-11. May ESSER and GEER funds be used to make up State revenue losses?...................................71

E-11.a. May ESSER and GEER funds be used to support local matching requirements under other Federal programs? (*New December 7, 2022*)......................................................................................72

*Fiscal Considerations for Other Programs* ...........................................................................................72

E-12. How does the use of ESSER and GEER funds to make up for State and/or local revenue losses impact IDEA's LEA Maintenance of Effort (MOE) requirement?.........................................................72

E-13. How does the use of ESSER and GEER funds to make up for State revenue losses impact the IDEA's Maintenance of State Financial Support (MFS) requirement? ....................................................73

E-14. How does the use of ESSER and GEER funds to make up for State and/or local revenue losses impact the LEA MOE requirement in section 8521 of the ESEA?...........................................................73

Appendix A -- Allocations..............................................................................................................................75

Appendix B -- Related FAQs........................................................................................................................83

  Section 1: Vaccinations and Testing....................................................................................................83

  Section 2: COVID-19 Testing Incentives Fact Sheet .........................................................................85

  Section 3: Student Transportation.......................................................................................................87

  Section 4: Promoting Public Safety ....................................................................................................89

  Section 5: Use of Funds to Prevent, Prepare for, or Respond to COVID-19..........................................95

**C-2. How may an LEA use ESSER and GEER funds to support students who have lost instructional time due to the COVID-19 pandemic?**

SEAs and LEAs must reserve a portion of their ARP ESSER funds to address the academic impact of lost instructional time. Specifically, section 2001(f)(1) of the ARP Act requires an SEA to reserve not less than 5 percent of the State's grant to carry out, directly or through subgrants or contracts, activities to address the academic impact of lost instructional time by supporting the implementation of evidence-based interventions. Similarly, section 2001(e)(1) of the ARP Act requires each LEA to reserve not less than 20 percent of its ARP ESSER allocation to address the academic impact of lost instructional time. Please note that these reserves are only minimum requirements; spending a larger share of funds for this purpose is allowable and may be necessary to address the needs of students.

The interventions implemented through these reservations must be evidence-based (see FAQ A-10) and may include such activities as summer learning or summer enrichment, extended day, comprehensive after-school programs, tutoring, extended school year programs, and innovative approaches to providing instruction to accelerate learning. Further, SEAs and LEAs must ensure that the interventions implemented respond to students' social, emotional, mental health, and academic needs and address the disproportionate impact of the COVID-19 pandemic on students from low-income families, students of color, children with disabilities, English learners, migratory students, students experiencing homelessness, and children and youth in foster care.

ESSER and GEER funds may also be used to provide a variety of activities and supports to help improve the achievement of students to address the impact of lost instructional time due to the COVID-19 pandemic. For example, funds may be used for costs associated with evidence-based approaches to accelerating learning, high-dose tutoring, leveraging technology to provide embedded assessment and differentiated instruction, diagnostic and curriculum-embedded assessments, and extending the school day or year to provide additional time for student learning, enrichment, and support. These costs may include supplementing the salaries of educators and other qualified personnel to perform additional services. ESSER and GEER funds may also be used to support the costs associated with hiring additional teachers and teacher aides to provide intensive support to students. ESSER and GEER funds may further be used to provide professional development to educators on research-based strategies for meeting students' academic, social, emotional, mental health, and college, career, and future readiness needs, including strategies to accelerate learning without remediation or tracking.

For more information on using ESSER and GEER funds to address the academic impact of lost instructional time for students with disabilities eligible under IDEA, see FAQ C-5.

Effective strategies to address lost instructional time are further described in Volume 2 of the Department's COVID-19 Handbook, which is available at:
https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

**C-3. How may an LEA use ESSER and GEER funds to support students' social, emotional, mental health, and academic needs, including by hiring support personnel such as nurses, counselors, and social workers?**

An LEA may use ESSER and GEER funds, including the 20 percent of ARP ESSER funds set aside to address the academic impact of lost instructional time, to support students' social, emotional, mental health, and academic needs, including by implementing school-wide strategies that enhance supports and interventions for students as well as targeted assistance for students who need such supports. For example, an LEA might hire additional personnel to prioritize student well-being and health by increasing

student access to teachers, nurses, counselors, social workers, and other support personnel (including teachers' aides and paraprofessionals). An LEA might also address the needs of students arising from the COVID-19 pandemic by using ESSER and GEER funds to implement or expand arts programs, such as music programs, including purchasing instruments; expand sports programming so more students can participate; or initiate clubs, such as a robotic or STEM club.

LEAs should also work to ensure that schools are implementing instructional practices that are culturally responsive and that incorporate trauma-informed pedagogy in response to the COVID-19 pandemic. For example, LEAs with high concentrations of English learners may hire additional bilingual staff to address the social, emotional, mental health, and academic needs of English learners. ESSER and GEER funds may be used to support implementation of curriculum, including related professional development.

As noted in FAQs A-4 and A-9, in implementing evidence-based strategies to address the academic impact of lost instructional time through the ARP ESSER required reservation of funds, SEAs and LEAs must respond to students' social, emotional, mental health, and academic needs and address the disproportionate impact of the COVID-19 pandemic on students from low-income families, students of color, English learners, children with disabilities, migratory students, students experiencing homelessness, and children and youth in foster care.

Effective strategies to support student social, emotional, mental health, and academic development are further described in Volume 2 of the Department's COVID-19 Handbook available at: https://www2.ed.gov/documents/coronavirus/reopening-2.pdf.

### *Focusing on Student Groups Most Impacted by the Pandemic*

Please note that the following FAQs provide examples of allowable uses of ESSER and GEER funds for specific groups of students. To the extent that these groups are also served by other Federal education programs, uses of funds under those programs, which are governed by specific programmatic requirements, may be more restrictive. The examples provided below with respect to one student group may also be implemented with respect to other student groups if the LEA determines it is necessary and reasonable to do so.

### C-4. How may an LEA use ESSER and GEER funds to support English learners (also referred to as multilingual learners)?

In order to address the needs of English learners, an LEA may use ESSER and GEER funds to address the impact of lost instructional time and services, support culturally responsive instruction, and support family engagement activities.

To address the impact of lost instructional time, an LEA may use ESSER and GEER funds for a variety of activities, including:
- Extended-day and/or extended-year activities designed to recover lost instructional time as a result of the pandemic, including costs associated with transportation services to support English learners' access to these services.
- Providing language accommodations for English learners to increase their access to content, and/or their participation in programs and services.
- Activities that respond to the social and emotional learning needs of English learners, including professional development for teachers to support English learners—e.g., how to provide a welcoming, nurturing, and supportive learning environment whatever the learning mode; and strategies that increase student collaboration and enhance classroom community.