IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-00091-LM |

**REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION

ARGUMENT

I.      Plaintiffs cannot establish standing as a matter of law. ...................................... 2

        A. Organizational Plaintiffs ...................................................................... 2

        B. School District Plaintiffs...................................................................... 5

II.     Plaintiffs lack a cause of action under the APA because they do not challenge any final

        agency action. ....................................................................................... 7

III.    Plaintiffs' APA claims fail as a matter of law. .............................................. 10

        A. The DCL does not violate the APA's notice and comment requirement. ................... 11

        B. The DCL is within ED's statutory authority and consistent with applicable law........ 11

        C. The DCL is not arbitrary and capricious.................................................. 13

IV.     Plaintiffs' constitutional claims fail as a matter of law.................................... 15

        A. Fifth Amendment. ........................................................................ 16

        B. First Amendment. ........................................................................ 17

        C. Spending Clause.......................................................................... 21

V.      Any relief should be limited to vacatur and tailored to present parties with standing...... 23

CONCLUSION

## INTRODUCTION

Multiple courts have now held that the same challenged actions here did not constitute final agency action or violate the constitution or Administrative Procedure Act ("APA"). *See Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.,* No. 25-CV-1120, 2025 WL 1196212 (D.D.C. Apr. 24, 2025) (hereinafter *NAACP*); *Bd. of Educ. for Silver Consol. Sch. v. McMahon*, No. 25-CV-586-WJ-GBW, 2025 WL 2017177 (D.N.M. July 18, 2025). This Court should do the same.

The question in this case is whether the Department of Education ("ED") may, without judicial interference, (a) focus its civil rights enforcement discretion afforded to it by Title VI on school programs that it believes are likely to discriminate based on race and (b) communicate its intention to do so publicly. The answer to (a) must be yes, as no party disputes that Title VI delegates enforcement authority to ED. The exercise of such authority inherently requires ED to decide when or when not to investigate a school. It follows logically that the answer to (b) is also yes, as ED must be able to communicate its enforcement priorities to regulated entities. It would make little sense to hold, as Plaintiffs essentially ask this Court to do, that ED may investigate DEI programs for discrimination but only if it does not provide notice of its intention to do so.

Ultimately, what Plaintiffs take issue with is the tone of the DCL, which condemns DEI categorically while simultaneously conveying that only DEI programs that treat students differently on the basis of race will violate Title VI. Plaintiffs latch onto the categorical discussion of DEI, which expresses the Government's view as a policy matter, separate from its view of what is required as a legal matter, in order to suggest that ED has instituted an outright ban on DEI programming. But ED has done no such thing. The DCL and accompanying FAQ are clear that a finding of discrimination will not turn on the fact that a program labels itself DEI.

Despite the fact that not one of the Plaintiffs can point to an investigation or enforcement action that ED has initiated against it, they maintain that they have suffered a cognizable injury because their speculative fears about how third-parties might react to the DCL and related documents has chilled their speech. The DCL does not tell Plaintiffs what they can say, however, thus any chilling effect stems from admitted overreactions and self-censorship, not the DCL. The DCL only prohibits discrimination, and the First Amendment does not protect unlawful discrimination. Accordingly, Plaintiffs' self-inflicted harms are insufficient to establish standing. Furthermore, the lack of an investigation or enforcement action, and relatedly any administrative record of those actions, demonstrate that no final agency action has happened yet, and review under the APA is unavailable. Notwithstanding these threshold issues, the agency's actions withstand review on the merits because ED must be able to use its enforcement discretion to combat discrimination and provide regulated entities with notice of how it intends to do so.

For these reasons and those discussed below, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

## ARGUMENT

### I. Plaintiffs cannot establish standing as a matter of law.

#### A. Organizational Plaintiffs

Plaintiffs NEA, NEA-NH, and CBED ("Organizational Plaintiffs") allege standing on the basis of organizational and associational standing theories, neither of which work.

The parties agree that *Havens Realty v. Coleman* and *FDA v. Alliance for Hippocratic Medicine* provide the appropriate framework for analyzing a claim of organizational standing. 455 U.S. 363 (1982); 602 U.S. 367 (2024). Plaintiffs argue that the present case is more like *Havens*, while Defendants argue it is more like *Alliance*. The Supreme Court's description of *Havens* as "an unusual case," and caution against "extend[ing] the *Havens* holding beyond its

context," tilts the scales in Defendants' favor. *Alliance*, 602 U.S. at 396.

*Havens* has been likened to "a retailer who sues a manufacturer for selling defective goods to the retailer," *id*. at 395, thus "mak[ing] it more difficult for [the retailer] to inform the public about safety risks." *Id*. at 394, 395. The housing counseling organization in that case was provided with false information about the availability of housing. Here, the Government is not accused of harming Plaintiffs by providing false information. NEA originally argued that it is harmed as a legal counselor because "NEA expects that it will need to expend substantial resources to advise and defend its members" due to an increased demand for legal services. Pls.' MSJ Br. at 20, ECF No. 81-1. Recognizing that such a diversion of resources argument is insufficient, however, Plaintiffs changed their theory to allege that "vague and otherwise flawed" guidance from ED has impaired their interest in "accurately and effectively counsel[ing] members on their obligations and liabilities." Pls.' Opp'n at 3 n.7, ECF No. 90. This new theory fares no better than their original.

While Plaintiffs may not like the current regulatory and legal landscape in which they must advise their clients, much as a housing counselor might not like the state of the housing market, it does not impair the provision of legal counseling services when the Government states what it truthfully believes the law requires, much as it would not impair the provision of housing counseling services for a realtor to truthfully report that housing is unavailable in a certain neighborhood. While it may make it more challenging to counsel clients when the housing market is bad or the legal landscape is unfavorable in the counselor's view, such challenges are the normal "cost of doing business," so to speak, and are the reason that people seek out counseling in the first place. Even if ED's guidance were vague, which it is not, it is the duty of a legal counselor to wrestle with the gray areas of the law and to provide clients

with their best advice based on the information at hand. *Cf.* MODEL CODE OF PRO. CONDUCT r. 2.1 (AM. BAR ASS'N 2025) ("In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation."). At bottom, the new theory of harm relies on an assertion that having to do one's job is an injury. While many disgruntled workers might sympathize, it is hardly a cognizable injury for Article III purposes.

Plaintiffs push back on Defendants' characterization of their core activities as educating the public on DEI. *See* Pls.' Opp'n. at 3. Fair enough. Even if there is a distinction to be drawn between educating their members and educating the public at large, however, it is not clear why this makes a difference to the broader point Defendants make, which is that issue-advocacy is Plaintiffs' primary interest in bringing this case and *Alliance* demonstrates that such an interest, even when coupled with another interest, such as an educational one, is insufficient to confer standing. 602 U.S. at 394 (spending resources to "engag[e] in public advocacy and public education" is not enough to confer standing without "something more").

CBED argues that its ability to "remain in business at all" is threatened, Pls.' Opp'n at 3, but it has provided insufficient evidence to prove that. Instead, it "predict[s]" that "districts and educators [will be] turned away from Plaintiffs' offerings[.]" *Id.*. This prediction is grounded in a single statement from a single school district it contracts with saying that it *might* not renew its contract. Pls.' Ex. 62 at ¶ 43, ECF No. 81-64. This is scant evidence of an existential threat to CBED's business.

Without showing direct organizational harm, the Organizational Plaintiffs can only show standing if one of their members would have standing in their own right to sue. *See Equal*

4

*Means Equal v. Ferriero*, 3 F.4th 24, 29 (1st Cir. 2021). This is not the case either. The Certification does not apply to individual teachers, as evidenced by the three authorities upon which it relies. *See* Certification at 3-4, ECF No 41-4. The first two do not discuss individuals, and the third, the False Claims Act, only applies to individuals who falsely certify compliance, which is not the type of harm which Plaintiffs claim their members fear. *See id.* Thus, any fear by Plaintiffs' members about a looming government enforcement action against them as an individual is unreasonable and not fairly traceable to ED. Plaintiffs concede that their members' fear does not stem directly "from ED, but from the reality that the DCL will be invoked by the schools who employ them, by their state licensure/certification authorities, and by the public. . .." Pls.' Opp'n at 5. The list of entities Plaintiffs' members actually fear shows that their theory of causation depends on third-parties who are not present to this suit. *But see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" (quoting *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976)).

Organizational Plaintiffs fail to prove either organizational or associational standing because their core activities have not been interfered with and their members' self-censorship is unreasonable and stems from fear of third parties not present here.

### B.    School District Plaintiffs

While the School District Plaintiffs may have been the recipients of the DCL, *see* Pls.' Opp'n. at 2, it is not enough to be the "'object'" of the challenged action, *see id.* (quoting *Lujan* 504 U.S. at 561–62, without that action creating a concrete injury. Thus, while their recipient status might be sufficient to demonstrate the DCL was particularized to the Districts, "[c]oncreteness is quite different from particularization and requires an injury to be 'de facto,'

that is, to actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 331 (2016). Thus, Plaintiffs "could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id*. at 341.

But not one District can point to an investigation or enforcement action that ED has initiated against it that might result in an actual, concrete injury, such as a termination of their funding. Plaintiffs' response is that an actual investigation or enforcement action is not needed because "ED has required districts to immediately comply" with Title VI. Pls.' Opp'n at 2. But the obligation to "immediately comply" did not come from the DCL or other challenged actions, it came from Title VI, which Plaintiffs do not challenge as unlawful. Thus, even if immediate compliance is an injury, it is not traceable to the DCL but to Title VI.

The School District Plaintiffs fail to allege any actual or imminent loss of federal funding. Moreover, while School District Plaintiffs repeatedly state that they face the "threat of the loss of federal funds through the DCL and Certification," they have not alleged any actual or imminent investigation, or accusation of noncompliance that could jeopardize their federal funds. Pls.' Mem. Supp. Summ. J., at 16–18. School District Plaintiffs' "fear" that they may lose this funding if they fall out of compliance. *See id.* The First Circuit has repeatedly held, however, that "a plaintiff's conjectural fear that a government actor 'might in the future take some other and additional action detrimental to' [a plaintiff] does not suffice to create standing." *Reddy v. Foster*, 845 F.3d 493, 503 (1st Cir. 2017) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013)). Indeed, School District Plaintiffs' "[s]peculation of that sort amounts to 'a subjective chill'—which, in the Article III standing context, is 'not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)).

Even under the "potentially more lenient 'substantial risk' standard," fear alone is not a cognizable injury. *Savage v. United States SBA*, 552 F. Supp. 3d, 241, 248 (D.R.I. 2021) (quoting *Blum v.* Holder, 744 F.3d 790, 799 (1st Cir. 2014)). School District Plaintiffs' fear of losing federal funding, Pls.' Mem. Supp. Summ. J., at 11–18, without any allegation of actual loss of funding or pending enforcement action against them that could lead to loss of funding, without more, is nothing more than speculation.

While the Districts may have been the object of the DCL, they have not suffered a concrete injury to satisfy Article III's standing requirement.

## II.    Plaintiffs lack a cause of action under the APA because they do not challenge any final agency action.

Plaintiffs insist that the challenged actions are final because they "impose entirely new legal obligations and consequences." Pls.' Opp'n at 12. But the legal obligations that existed the day before the DCL was issued are the same as the ones that existed after the day it was issued, and indeed, are the same even now that the DCL has been preliminarily enjoined. Surely nothing could be more telling of the lack of "actual legal effect," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014), than the fact that ED may still investigate schools operating DEI programming that is discriminatory under Title VI and bring enforcement actions against those schools. Relatedly, the "answer" Plaintiffs seek, *see* Pls.' Opp'n at 13, to the Court's prior holding that "[b]ecause the plaintiffs face substantial threat of consequences for failing to comply with the [DCL], the actual legal effect component of the finality inquiry is satisfied," Order at 42, ECF No. 74, is that while it is true that this substantial threat of consequences exists, it was incorrect to hold that these consequences are a product of the DCL and not Title VI itself.

Any legal consequences from an interpretive statement ultimately flow from the statute

the statement interprets. *See Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (finding that a letter from Department of Labor interpreting the Fair Labor Standards Act "created no new legal obligations beyond those the [statute] already imposed"). Plaintiffs attempt to distinguish *Rhea Lana* because there all the agency did was "restate[] its 'longstanding view' of the law[.]" Pls.' Opp'n at 13 (quoting *Rhea Lana* 824 F.3d at 1028). But the DCL did precisely the same thing—it was written to "clarify and reaffirm the nondiscrimination obligations of schools" and "explain[] and reiterate[] existing legal requirements under Title VI of the Civil Rights Act of 1964, the Equal Protection Clause of the United States Constitution, and other relevant authorities." DCL at 1.

The nondiscrimination obligations under Title VI, which *Students for Fair Admissions v. President and Fellows of Harvard College* (*SFFA*) clarified applied even to racial classifications that are intended to "help" minority groups, are longstanding and deeply rooted. 600 U.S. 181 (2023). The Supreme Court has reiterated time and again that the Equal Protection Clause and Title VI apply to all distinctions based on race. *See Regents of Univ. of California v. Bakke*, 438 U.S. 265, 307 ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids."); *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) ("We have held that all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'"). The DCL is the natural understanding of this longstanding Title VI jurisprudence as it applies to DEI programs.[1] *See NAACP*, ECF 30 at 8 ("the Letter itself does not impose any new obligations;

---

[1] ED's 2023 guidance is not inconsistent with the 2025 guidance, *contra* Pls.' Opp'n. at 14. The earlier guidance states that a student must be "'treated based on his or her experiences as an individual' and 'not on the basis of race.'" 2023 FAQ at 3 (quoting *SFFA*, 600 U.S. at 231). This is fundamentally the same test espoused by the 2025 DCL: "If an educational institution treats a

rather it merely reminds readers of the preexisting obligation to ensure their policies comply with Title VI."); *Silver Consol. Sch.*, 2025 WL 2017177 at *12 (not reaching the DCL but holding that "to the extent Plaintiff challenges the FAQs the Court does not find these are a final agency action subject to the APA. Neither is the 'End DEI' portal.").

The Court's prior conclusion that the DCL "prohibits" certain curricular content attributes more authority to the guidance than it has, *see* Order at 70. The DCL does not "prohibit" certain discriminatory content; Title VI does. The DCL only restates ED's interpretation of existing legal obligations. *See* DCL at 1 ('This letter explains and reiterates *existing legal requirements* under Title VI of the Civil Rights Act of 1964," (emphasis added)). Indeed, ED has long made clear that it does *not* "exercis[e] control over the content of school curricula." FAQ at 6. Moreover, the DCL expressly states that it does not have the force and effect of law, it was not published in the CFR, and it did not rely on ED's rulemaking authority. *See Guedes v. BATFE*, 920 F.3d 1, 19 (D.C. Cir. 2019) (describing each of these as factors in evaluating whether a document is an interpretive rule); *NAACP*, 2025 WL 1196212, at *3-4 (applying them to the challenged documents here to conclude they are not final).

The Certification is also not final action because it does not create any binding consequences independent from those that are already imposed by Title VI and the ED's enforcement regulations. Title VI and the regulations prohibit discrimination "on the ground of race color or national origin." 34 C.F.R. § 100.3. The Certification reiterates the longstanding requirements that, "[e]very application for Federal financial assistance . . . shall, as a condition to its approval and the extension of any Federal financial assistance, contain

---

person of one race differently than it treats another person because of that person's race, the educational institution violates the law." 2025 DCL at 2.

assurances that the program will be conducted . . . with all requirements imposed by . . . this part." *Id*. at § 100.3(a)(1).

Plaintiffs counter that "ED had no reason to issue the Certification but to impose additional binding consequences for failure to comply with the DCL's new requirements." Pls.' Opp'n at 15. But a different reason is conspicuously found the formal title of the Certification document: "Reminder of Legal Obligations Undertaken in Exchange for Receiving Federal Financial Assistance and Request for Certification under Title VI and *SFFA v. Harvard*." *See* Certification at 1. The Certification served the purpose of reminding funding recipients of preexisting obligations, which ED feared were not being met due to schools' engagement in DEI programming that treats students differently on the basis of race. *See id.* Furthermore, the obligations discussed in the Certification were directly and explicitly tied to Title VI and *SFFA*, not the DCL (which is not even referenced by the Certification). *Id*. Thus, the Certification seeks voluntary compliance with existing statutory and regulatory requirements and warns of consequences for refusing to comply, which is perfectly permissible. *See Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Com'n*, 324 F.3d 726, 731 (D.C. Cir. 2003),

Because the DCL is at most an interpretive rule that does not have the force and effect of law—and because the Certification does not determine rights or obligations or have legal consequences—Plaintiffs do not challenge "final agency actions" within the meaning of the APA and therefore lack a valid cause of action under the statute as a matter of law. *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 40 (1st Cir. 2002).

### III.    Plaintiffs' APA claims fail as a matter of law.

Plaintiffs' APA arguments also fail as a matter of law, as ED is vested with statutory authority to enforce the civil rights laws, and the DCL and other challenged documents are consistent with longstanding understandings of Title VI and the Equal Protection Clause.

**A.    The DCL does not violate the APA's notice and comment requirement.**

Plaintiffs' argument that the DCL is procedurally invalid because it did not go through notice-and-comment rulemaking applies the wrong procedural requirement. While legislative rules must go through notice-and-comment, the APA explicitly exempts interpretive rules like the DCL from such procedures. 5 U.S.C. § 553(b)(4)(A) ("Except when notice or hearing is required by statute, this subsection does not apply. . . to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."); *see also Perez v.Mortg. Bankers Ass'n*, 575 U.S. 92, 104 (2015)) ("the text of the APA makes plain: 'Interpretive rules do not require notice and comment.'"(quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995))). "The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Perez*, 575 U.S. at 97 (quoting *Shalala*, 514 U.S. at 99). As was just discussed, the DCL is an interpretive rule; therefore, it is exempt from notice and comment. *Id*.

The Court's prior conclusion that the DCL is a legislative rule rests on the premise that ED created "new" obligations or threatened "serious consequences." *See* Order at 73. But reiterating that violations of Title VI may trigger enforcement is not new law—it is the existing statutory framework. The DCL does not prescribe new standards or require schools to adopt particular policies—it clarifies what existing law already prohibits.

**B.    ED acted within its statutory authority and consistent with applicable law.**

Plaintiffs' arguments that the DCL and FAQ are outside ED's statutory authority and contrary to law are without merit. Plaintiffs contend that the documents violate the Department of Education Organization Act's ("DEOA") provision that ED shall not exercise "direction,

supervision, or control" over, *inter alia*, "the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system." 20 U.S.C. § 3403(b). Plaintiffs fail to identify any actual conflicts with the DEOA.

Plaintiffs cite, as an example of purported inconsistency with the DEOA, the DCL's comment that DEI programs may unlawfully stigmatize and stereotype when they "teach[] students that certain racial groups bear unique moral burdens that others do not." Pls.' Mem. Supp. Summ. J., ECF No. 81-1 at 36 (quoting DCL at 3). The DCL does not control curriculum, however, ED is not exercising "any role either in the day-to-day operation of the city schools, or in the *setting* of policy on a city or statewide basis." *Grimes v. Cavazos*, 786 F. Supp. 1184, 1187 (S.D.N.Y. 1992) (emphasis added). The DCL informs schools of their existing obligations under the Equal Protection Clause and Title VI: that they must not discriminate among students when implementing their curricula and must avoid stereotyping and stigmatizing based on race. Plaintiffs' conflation of the control of school administration and the reminder of legal obligations would leave little room for ED to enforce the civil rights laws. *See id*. The Court's prior finding that the DCL exceeds ED's authority under the DEOA misconstrues both the statute and the DCL. Section 3403(b) prohibits federal control over curricula, not the enforcement of nondiscrimination laws. Courts have consistently recognized that ED may investigate whether school programs violate Title VI—even when those programs relate to instruction. *See Castaneda v. Pickard*, 648 F.2d 989, 1008–09 (5th Cir. 1981) (ED may review bilingual programs for compliance with Title VI). ED's enforcement role does not transform interpretive guidance into curriculum control.

Moreover, the DEOA should not be read in a manner that would frustrate Title VI's nondiscrimination requirements. *See 289 Kilvert, LLC v. SBC Tower Holdings LLC*, 133 F,4th 1, 3 (1st Cir. 2025) ("Simply put, we do not interpret a statute's text 'in a vacuum'; we read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016))); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 500 (2018) (applying the interpretive "canon against reading conflicts into statutes").

For the same reasons, Plaintiffs fail to show that the DCL and FAQ violate the prohibitions on ED's interference in curricular, administrative, and personnel decisions set forth in the General Education Provisions Act ("GEPA"), Elementary and Secondary Education Act ("ESEA"), or Higher Education Opportunity Act ("HEOA"). *Contra* Pls.' Mem. Supp. Summ. J., at 36–37; *see also* 20 U.S.C. § 3403(b); *id*. at §§ 1221-1234i; *id*. at §§ 6301-7981; *id*. at § 1132-2. In its preliminary injunction opinion, the Court overlooked that these provisions apply to *control of* curriculum, not to enforcement of civil rights statutes that prohibit discrimination *within* curriculum.[2]

## C.    The DCL is not arbitrary and capricious.

Review under the arbitrary and capricious standard is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019), and examines whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

---

[2] Plaintiffs throw in as an afterthought a claim that the Certification also violates the Paperwork Reduction Act because it lacks an Office of Management and Budget Control Number. *See* Pls.' Opp'n at 16. While the "Paperwork Reduction Act provides a defense to administrative or judicial enforcement actions, [it] does not create a private right of action for alleged violations of the statute." *Smith v. United States*, No. 08-10288, 2008 WL 5069783, at *1 (5th Cir. Dec. 2, 2008); *see also Association of American Physicians & Surgeons, Inc. v. U.S. Department of Health and Human Services*, 224 F.2d 1115 (S.D. Tex. 2002); *Tozzi v. EPA*, 148 F. Supp. 2d 35 (D.D.C. 2001). As has been thoroughly discussed, there is no enforcement action at hand. In any event, since the Certification requests the same information that ED already collects, it would be covered by the same control number.

*Co.*, 463 U.S. 29, 52 (1983). Because the DCL's guidance is both reasonable and reasonably explained, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417 (2021), it satisfies the deferential "arbitrary and capricious" standard as a matter of law. Plaintiffs contend nonetheless that the DCL is arbitrary and capricious because it unreasonably interprets *SFFA* and fails to consider important aspects of the problem it addresses. Pls.' Opp'n at 17-18.

As observed in the DCL, under the standard articulated in *SFFA*, many DEI programs may violate the Equal Protection Clause—and thus also Title VI—by introducing "explicit race-consciousness into everyday training, programming, and discipline." DCL at 2. As a result, DEI programs "frequently preference certain racial groups" in ways that make them more susceptible to discriminating based on race. *Id*. In making this observation, ED simply applied the longstanding principle that policies that distinguish on the basis of race are not lawful unless justified by a fact-supported compelling interest.

Plaintiffs are wrong that "the DCL misconstrues and misapplies *SFFA*." Pls.' Opp'n at 17. They highlight dicta from the opinion stating that the interests furthered by diversity are "commendable goals," but fail to recognize that the thrust of the Court's opinion was that any attempt to achieve these goals must be done in a race-neutral way that does not treat one student differently than another because their race. *See SFFA*, 600 U.S. at 218 ("race may never be used as a 'negative' and [] it may not operate as a stereotype"). The DCL says nothing different. And while the DCL criticized DEI *programs* operating under the "banner of [DEI]," it did not diverge from the Supreme Court's description of diversity as a worthy goal, and indeed, it decried "segregation by race at graduation ceremonies and in dormitories and other facilities" as "a shameful echo of a darker period in this country's history." DCL at 1-2.

Plaintiff's other critique, that ED did not consider state and federal laws that may

require the incorporation of components of a DEI program, *see* Pls.' Opp'n at 18, fails because ED did not proscribe DEI programs, as Plaintiffs allege, but only reiterated Title VI's requirement that such programs must not discriminate on the basis of race. The statutes that Plaintiffs reference do not mandate treating one person differently than another person because of that person's race. If they did, they would flatly be unconstitutional under the Equal Protection Clause, therefore ED did not need to consider any conflicts they might pose.

Because ED explained the basis for its guidance, anchored its reasoning in *SFFA's* binding precedent, and reasonably interpreted its enforcement responsibilities under Title VI, the DCL is not arbitrary and capricious.

## IV.    Plaintiffs' constitutional claims fail as a matter of law.

Plaintiffs' constitutional claims similarly fail as a matter of law. Plaintiffs' Fifth Amendment vagueness claim is misplaced, as the framework for such claims is meant to apply to binding actions with the force of law. In any event, the DCL is clear about the conduct that is prohibited: discrimination that treats a person differently on the basis of race. Plaintiffs' First Amendment claims also fail because to the extent the documents at issue address speech or expressive activity, they simply reiterate the well-established principle that speech that amounts to racial harassment and creates a hostile environment is unlawful under Title VI; harassment—including race-based harassment—is conduct that the First Amendment does not protect. Finally, Plaintiffs' Spending Clause claim cannot succeed because it is not ripe for adjudication. The challenged guidance sets forth clear, prospective conditions that are directly tied to the federal interest in preventing discrimination in federally funded education programs, and it does not impose any ambiguous or coercive threat to existing funding.

A.    **Fifth Amendment.**

The challenged documents are not unconstitutionally vague. Plaintiffs demand to know "*how* programs discriminate," Pls.' Opp'n at 7, but refuse to acknowledge ED has already answered that; whether a program is named "DEI" or something else, it discriminates by "treat[ing] a person of one race differently than it treats another person because of that person's race." DCL at 2. Perhaps this does not provide the surgical level of clarity that Plaintiffs would like it to, but that is not what the void for vagueness doctrine requires; instead, it recognizes that words are inherently blunt instruments. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) ("perfect clarity and precise guidance have never been required.").

Plaintiffs have no answer to Defendants' discussion of *United States v. Williams*, which held that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." 553 U.S. 285, 306 (2008). The challenged documents are clear that treating students differently because of their race is sufficient to establish a Title VI violation. Thus, there is no "indeterminacy" about what the fact is that must be established. Perhaps there may be indeterminacy about whether a particular DEI program treats one student differently than another on the basis of race, but that is no reason to find ED's guidance vague as a facial matter. By issuing the DCL and FAQ, ED let schools know that they should be on the lookout for differential treatment on the basis of race in their DEI programming, as well as other areas such as social-emotional learning and culturally responsive teaching, because those are the problem areas ED intends to exercise its discretion to prioritize. The agency should not be faulted for providing schools with advance notice of its enforcement priorities.

Stretching the void for vagueness doctrine to an extreme, Plaintiffs suggest that not only can a non-binding agency guidance be challenged on vagueness grounds, but so can a complaint

portal that acts as a passive conduit soliciting information from the public. The "vague" End DEI Portal, which regulates nobody, nonetheless violates the Fifth Amendment, Plaintiffs allege, because it "leave[s] officials 'free to "pursue their personal predilections"' in enforcement. Pls.' Opp'n at 8 (quoting ECF 74 at 53 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). But officials are not free to pursue their own predilections; they are bound by Title VI's requirements.

Plaintiffs argue further that while an online complaint portal is the form of Title VI enforcement ED has always used, the End DEI Portal is different because it is "a new and stand-alone method of soliciting complaints, focused solely on 'End[ing] DEI[.]'" *Id*. But Plaintiffs do not explain why it is that ED cannot make multiple or overlapping solicitations for civil rights complaints. Under their logic, ED could not launch an "End Segregated Housing" portal or "End Microaggressions" portal because it would be a new and stand-alone tool that singles out one particular activity and might sweep in reports of perfectly lawful behavior. This cannot be so. And until ED actually *does something* with a report it receives, Plaintiffs' fears ring hollow. If a complaint does not plausibly allege a civil rights violation, ED will not act on it.

Because ED clearly described the factual prerequisite needed to find a Title VI violation, and it is within ED's discretion to prioritize certain areas of civil rights enforcement and solicit related complaints, ED's actions are not vague and do not invite arbitrary enforcement.

### B.    First Amendment.

The DCL is not focused on what schools may *say* about DEI—they remain entitled to take a positive view, negative view, or any other view on DEI. Instead, the DCL focuses on what DEI programs often *do*—treat people differently on the basis of race in a manner that constitutes discriminatory harassment or the creation of a hostile environment. *See* FAQ at 6 (the First Amendment does not "relieve [schools] of their duty to respond to racial harassment that creates a hostile environment"). Plaintiffs' counter that they are in fact limited in what

they can say, *see* Pls.' Opp'n at 8-9, because the FAQ states that a school cannot force a student "to take certain positions on racially charged issues." FAQ at 7. But Plaintiffs forget that School Districts like the ones present in this litigation are also government actors who cannot "prescribe what shall be orthodox." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). ED's assertion that these schools cannot engage in First Amendment coercion of students cannot itself be impugned as violating the First Amendment.

The Government has made the benign observation that it has the authority to regulate discriminatory conduct such as harassment and the creation of racially hostile environments "without much concern about the First Amendment." Defs.' MSJ Br. at 38. Creating the ultimate strawman, however, Plaintiffs twist these words to suggest that Defendants took the position that "classroom speech" is unprotected by the First Amendment, and they call that position "appalling" no less. Pls.' Opp'n at 10. Of course, Defendants never made such a claim. Accordingly, Defendants stand by the argument that when speech is an integral part of a transaction involving conduct the government otherwise is empowered to prohibit, such "speech acts" may be proscribed without much, if any, concern about the First Amendment, since it is merely incidental that such "conduct" takes the form of speech. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 248 (4th Cir. 1997); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 262 (S.D.N.Y. Feb. 5, 2025), *reconsideration denied*, No. 24 CIV. 2669, 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025).

Plaintiffs' attempts to diminish *Rice* and *Gartenberg* are unpersuasive. They argue that *Rice* is inapposite because it is "in the criminal context," Pls.' Opp'n at 10 n.21, but this ignores that *Rice* explicitly discusses civil enforcement; the court wrote, "the First Amendment poses no bar to the imposition of civil (or criminal) liability for speech acts." 128 F.3d at 248.

Plaintiffs also argue that *Gartenberg's* recognition that speech protected by the First Amendment may be intertwined with unlawful discriminatory conduct, and that "abusive speech, no less than abusive conduct, can readily slam shut the doors to the workplace or seal the schoolhouse gates," 765 F. Supp. 3d at 263, is overshadowed by its statement that a school cannot be required to "censor or punish political speech to avoid [Title VI] liability." *Id.* at 261.  But this ignores *Gartenberg's* ultimate conclusion, which is that "just as federal anti-discrimination law must provide some breathing space for contentious political expression if First Amendment rights are to survive, the Constitution must tolerate the regulation of at least some offensive speech if the Civil Rights Act is to achieve its promise of unlocking the benefits of employment and education for all Americans." *Id.* at 263.

Plaintiffs argue that the Government "cannot []deny that the DCL prohibits teaching that the United States was built on structural racism but permit[s] teaching the opposite[.]" Pls.' Opp'n at 10. It can and it does. The letter states ED's view that "[e]ducational institutions have toxically indoctrinated students with the false premise that the United States is built upon 'systemic and structural racism' *and* advanced discriminatory policies and practices." DCL at 2 (emphasis added). The "and" in the sentence demarcates between ED's views about indoctrination and its separate point that schools have advanced discrimination. ED never stated that sharing one's belief about systemic racism's existence is *itself* illegal discrimination. ED's expression of its viewpoint is not discrimination against the opposite viewpoint. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024) ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully.").

Plaintiffs also argue that rather than directly suppress particular viewpoints, the letter unlawfully coerces third parties—the schools that receive federal funding—into doing so. *See*

Pls.' Opp'n at 11. This argument also fails, because such claims are limited to situations in which a government official makes a specific threat of enforcement to a third party completely unrelated to the conduct at issue. *See id.* at 175. ED's longstanding conditioning of federal funding on non-discrimination is not coercive; indeed, this is the method by which Congress intended to stop discrimination under Title VI. *Schultz v. Young Men's Christian Ass'n of U.S.*, 139 F.3d 286, 290 (1st Cir. 1998) ("Title VI's only express remedy is a cutoff of federal funding to the affected program.").

*Vullo*, which sets forth a third-party coercion framework that Plaintiffs argue should apply here, *see* Pls.' Mem. Supp. Summ. J., at 31–32, is inapposite. *See Vullo*, 602 U.S. 175. Unlike the DCL, *Vullo* concerned a government official's attempt to cudgel an insurance provider into no longer insuring the National Rifle Association ("NRA") because the official disagreed with the NRA's viewpoints. *Id*. If the insurer did not comply and discontinue its coverage of the NRA, the government threatened to crack down on the insurer for "technical infractions . . . unrelated to any NRA business." *Id*. at 192. With respect to enforcement, the DCL, in contrast, explains ED's understanding of what Title VI requires of federal funding recipients. And as the FAQ emphasizes, ED's evaluation of whether a recipient is discriminating on the basis of race in its programs or activities "depends on the facts and circumstances of each case," FAQ at 6.

Whatever ED's views of DEI programs generally, ED has made clear that its enforcement of Title VI will be based on whether schools are discriminating based on race, and not on any other factor. *Id.* This is easily distinguishable from *Vullo*, where the government official was not just executing the official's enforcement responsibilities, but threatening use of enforcement powers to coerce a specific regulated entity to disassociate from a particular

organization with which the official disagreed. This Court held that ED's guidance resembled *Vullo* in its allegedly targeted focus on DEI-related language and outcomes, *see* Prelim. Inj. Op. at 65-67, but in *Vullo* the official targeted a private entity and threatened non-enforcement-based financial retaliation. ED, by contrast, is carrying out its statutory mandate to interpret and enforce Title VI.

No court has held that Title VI's enforcement mechanism is coercive. Because the DCL only implicates enforcement insofar as it explains ED's understanding of Title VI's requirements, it too is not coercive.[3] This Court should follow the District of New Mexico's lead in holding that "the DCL [is] not unduly coercive. The discontinuation of grant money does not infringe on free speech because Defendants' actions do not prohibit or compel private speech." *Silver Consol. Sch*, 2025 WL 2017177, at *9 (citing *Vullo*).

## C.    Spending Clause.

Plaintiffs still fail to demonstrate that an Article III "case or controversy" as to their Spending Clause claim presently exists. They fail both the fitness and the hardship prongs of the ripeness test. *See CTC Communs. Corp. v. Verizon New Eng. Inc.*, 2006 WL 8458287 at *5 (D. Mass. 2006). Nothing has yet happened *to* Plaintiffs. They do not allege they have been the subject of a civil rights complaint, an investigation, or that ED otherwise imminently intends to exercise its enforcement power against them.

---

[3] Plaintiffs also purport to bring claims under the APA for alleged constitutional violations under the First and Fifth Amendments. For the reasons explained in Section II, plaintiffs fail to state a cognizable APA claim, as they do not challenge a final agency action. Moreover, when a plaintiff "appears to distinguish its first claim, seeking review under the APA, from its second claim, stating a constitutional violation. . . . [the plaintiff] is not seeking a second basis for review under the APA." *Hy-On-A-Hill Trout Farm, Inc. v. Glickman*, No. CIV. 00-443-JD, 2001 WL 873049, at *2 n.1 (D.N.H. July 31, 2001). And as explained in this Section, the DCL and other challenged documents are consistent with the First and Fifth Amendments.

Plaintiffs apply the wrong ripeness standard to the Spending Clause context, instead applying First Amendment cases which have a laxer standard (and hence why Defendants have not challenged the ripeness of their First Amendment claims). *See Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007) ("when free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements."). The Government is not suggesting there is a "heightened ripeness standard in the context of Spending Clause claims," Pls.' Opp'n at 19 n.26, only that there is *not* a diminished standard, as Plaintiffs suggest by their heavy reliance upon First Amendment cases. *See* Pls.' Opp'n at 19 (citing *Crosspoint Church v. Makin*, 719 F Supp. 3d 99, 113 (D. Me. 2024) and *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999)). Thus, it is not enough for plaintiffs to intend to engage in a course of protected conduct arguably proscribed. *Whitehouse*, 199 F.3d at 33. In constitutional contexts outside the First Amendment, "[r]ipeness requires a 'genuine threat of imminent prosecution.'" *UACC Midwest, Inc. v. City of Santa Cruz*, No. C 84-07546 SI, 2007 WL 174416, at *4 (N.D. Cal. Jan. 22, 2007) (quoting *San Diego County Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1126 (9th Cir.1996)). Such a threat does not exist here.

Furthermore, Plaintiffs do not satisfy the hardship prong, which "encompasses the question of whether the plaintiff is suffering any present injury from a future contemplated event. Importantly, the hardship analysis focuses on 'direct and immediate' harm and is unconcerned with wholly contingent harm." *CTC Communs. Corp.* 2006 WL 8458287 at *5 (cleaned up) (*citing Reg'l Rail Reorganiz. Act Cases*, 419 U.S. 102, 143 n.29, (1974)) (*quoting McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63, 73 (1st Cir. 2003)). Given the long series events that Defendants have reiterated many times now about what would need to happen for Plaintiffs' funding to be withheld, and that the first of these steps (an investigation) is not alleged to have happened or be forthcoming, there is no present hardship, only "'wholly contingent harm.'" *Id*.

Even if the Spending Clause claim is ripe, it would fail on the merits. That is because there are no surprise retroactive conditions, *see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981); there is only the longstanding, unambiguous requirement that funding recipients comply with Title VI, which is violated when "an educational institution treats a person of one race differently than it treats another person because of that person's race." DCL at 2. And it would be a tragic mistake to hold that the enforcement mechanism put in place by Title VI of the Civil Rights Act of 1964 is coercive.

## V.    Any relief should be limited to vacatur and tailored to present parties with standing.

"[U]niversal relief, whether by way of injunction or vacatur, strains our separation of powers." *United States v. Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring). Thus, "a district court should 'think twice—and perhaps twice again—before granting' such sweeping relief." *Id.* at 702 (quoting *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 202) (Sutton, C. J., concurring)).

Plaintiffs seek to minimize the Supreme Court's clear statement in *Trump v. CASA* that all universal injunctions—not just preliminary ones—"likely exceed the equitable authority that Congress has granted to federal courts." 145 S. Ct. 2540, 2548. Furthermore, they argue that *CASA* "did not affect the Court's *statutory* authority and obligation under the APA" because that question was not before the Court. Pls.' Opp'n at 24. But the remedy of vacatur, which is not mentioned in the text of the APA at all, is an implied *equitable* power,[4] not a statutory authority conferred by the APA itself. *See Texas*, 599 U.S. at 702 (Gorsuch, J., concurring) (supposing "the APA . . . authorize[s] . . . a more expansive *equitable power to vacate agency action* (in § 706)") (emphasis added)). Remedies "ordinarily 'operate with respect to specific parties,'" rather than "'on legal

---

[4] This is to the extent the remedy of vacatur even properly exists, which the Department of Justice contests is contrary to the text of the APA.

rules in the abstract,'" but reading § 706 to authorize universal vacatur would do the opposite. *California v. Texas*, 593 U.S. 659, 671 (2021) (citation omitted).

Any form of equitable relief the Court may decide to enter "must be limited to the inadequacy that produced [the] injury in fact." *Gill* v. *Whitford*, 585 U. S. 48, 50 (2018) (internal citation omitted). It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702. Plaintiffs argue that a nationwide, universal injunction is necessary to afford complete relief; however, "'[c]omplete relief' is not synonymous with 'universal relief.' It is a narrower concept: The equitable tradition has long embraced the rule that courts generally may administer complete relief *between the parties*." *CASA*, 145 S. Ct. at 2557 (cleaned up).

Vacating the challenged documents with respect to the Plaintiffs would remedy any hypothetical injury they have suffered, and Plaintiffs have made no showing to the contrary. Plaintiffs argue that because they have a "nationwide . . . presence" they should receive nationwide relief that extends to nonparties. Pls.' Opp'n at 25. But there is no reason to believe that a party-specific remedy would not address all of Plaintiffs' members across the country. By asking for relief for nonparties, however, Plaintiffs are asking this Court to step outside the confines of Article III jurisdiction, which would "exaggerate[] the role of the Judiciary in our constitutional order, allowing individual judges to act more like a legislature by decreeing the rights and duties of people nationwide." *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring). "As with universal injunctions, [universal] vacatur can stymie the orderly review of important questions, lead to forum shopping, render meaningless rules about joinder and class actions, and facilitate efforts to evade the APA's normal rulemaking processes. Vacatur can also sweep up nonparties who may not wish to receive

24

the benefit of the court's decision." *Id.* For all these reasons, this Court must carefully tailor its relief to only resolve the injuries of "each plaintiff with standing to sue" in this case. *CASA*, 145 S. Ct. at 2563.

If the Court concludes that any part of the challenged agency action is unlawful, vacatur (limited to the parties) and remand to the agency is the only appropriate relief. Should the Court determine that the challenged documents constitute a legislative rule that should have been issued through notice and comment rulemaking or that they are not thoroughly enough explained, then remand to the agency to engage in the proper process and offer a more thorough explanation of its reasoning is the proper remedy. *See Biden v. Texas*, 597 U.S. 785, 807–08 (2022) ("upon finding that the grounds for agency action are inadequate, a court may remand for the agency to do one of two things. First, the agency can offer a fuller explanation of the agency's reasoning at the time of the agency action. If it chooses this route, the agency may elaborate on its initial reasons for taking the action, but may not provide new ones. Alternatively, the agency can deal with the problem afresh by taking *new* agency action. An agency taking this route is not limited to its prior reasons." (cleaned up)). The Court should not enter relief that would limit the agency's delegated authority from Congress to engage in future consideration of the issue at hand.

Accordingly, the Court should reject Plaintiffs' request for sweeping nationwide relief and limit any remedy to only present parties with standing.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion for summary judgment and grant summary judgment in favor of Defendants.

Date: August 1, 2025,                                    Respectfully submitted,

                                                         CHAD R. MIZELLE

Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DIANE KELLEHER
Director
Civil Division, Federal Programs Branch

/s/ *Eitan R. Sirkovich*
EITAN R. SIRKOVICH
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 353-5525
E-mail: eitan.r.sirkovich@usdoj.gov

*Counsel for Defendants*

## CERTIFICATION OF SERVICE

I hereby certify that on August 1, 2025, I electronically filed the within Certification with the Clerk of the United States District Court for the District of New Hampshire using the CM/ECF System, thereby serving it on all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rule 5.1(d).

*/s/ Eitan R. Sirkovich*
Trial Attorney
